## PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. SECTION 2254

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2009 MAR 10 PM 4: 12

LORETTA G. WHYTE
CLERK

| | |
|---|---|
| **Prisoner's Name:** | **Jessie Hoffman** |
| **Prison Number:** | **# 400473** |
| **Place of Confinement:** | **Louisiana State Penitentiary, Angola, Louisiana** |

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF LOUISIANA

**JESSIE HOFFMAN**
          **Petitioner**

**NO. 09-3041**

**SECT. B MAG. 1**

**v.**                                                    SECT.  MAG.

**BURL CAIN, Warden,**
          **Louisiana State Penitentiary,**
          **Angola, Louisiana,**
                    **Respondent**

---

### PETITION FOR WRIT OF HABEAS CORPUS

### THIS IS A CAPITAL CASE

_____ Fee _____
_____ Process_____
__X__ Dktd_____
_____ CtRmDep_____
_____ Doc. No._____

## TABLE OF CONTENTS

**PART ONE**
**I. PROCEDURAL HISTORY**..................................................................**2**
    **A. Trial** ..............................................................................**2**
    **B. Direct Appeal Proceedings**...........................................**2**
    **C. State Post-Conviction Proceedings**.............................**3**
**II. FACTUAL BACKGROUND TO CLAIMS**.....................................**5**
**III. HABEAS PROCEDURAL CONSIDERATIONS**.........................**7**
    **A. All Of Petitioner's Claims Are Exhausted** .................... **7**
    **B. None of Petitioner's Claims Are Procedurally Barred**...................**8**
        1. Claims Raised on Appeal.........................................**8**
        2. Claims Raised In State Post-Conviction.................**8**
**IV. LIMITATIONS ON THE COURT'S POWER TO GRANT RELIEF UNDER §**
**2254(d)**..................................................................................**10**
    **A. Application of 2254(d) to Petitioner's Claims**..........................**12**
        1. Claims Not Previously Decided On The Merits................................**12**
        **2. Claims Partially Adjudicated On The Merits**.................................**13**
        **3. Summarily Adjudicated Claims**.................................................**13**
        4. Claims Reviewed Under § 2254(d)(1)-(2)...............................**16**
**V. PETITIONER HAS A RIGHT TO AN EVIDENTIARY HEARING IN FEDERAL**
    **COURT TO FACTUALLY DEVELOP HIS CLAIMS**...........................**22**
    **A.    AEDPA's Limitations On The Availability Of Evidentiary Hearing Do Not**
        **Apply In This Case**.....................................................**22**
    **B. An evidentiary hearing is mandated in this case**.....................**24**
        1. State Court's Failure To Make Factual Findings.............................**25**
        **2. Failure Of State Court To Hold Evidentiary Hearing**.......................**27**
        3. Inadequacy, Incompleteness Or Unavailability Of Relevant Parts Of Trial
        Record........................................................................**29**
        4. Unsupported State Fact-Findings.............................................**29**
**PART TWO**
**ARGUMENT**
**I.    PETITIONER'S CONSTITUTIONAL RIGHTS TO THE EFFECTIVE**
    **ASSISTANCE OF COUNSEL, A RELIABLE SENTENCING HEARING, AND**
    **DUE PROCESS OF LAW WERE VIOLATED BY TRIAL COUNSEL'S FAILURE**
    **TO INVESTIGATE AND PRESENT MATERIAL, RELEVANT, AND**
    **COMPELLING MITIGATING EVIDENCE OF MR. HOFFMAN'S MAJOR**
    **MENTAL ILLNESS, CHAOTIC UPBRINGING AND CHILDHOOD PHYSICAL,**
    **EMOTIONAL AND SEXUAL ABUSE, AND A NEW SENTENCING HEARING**
    **MUST THEREFORE BE ORDERED.**........................................ **30**
    **A.    Ineffective Assistance of Counsel** .................................... **31**
    **B.    Trial Counsel's Performance at the Sentencing Trial Fell Below an Objective**
        **Standard of Reasonably Effective Representation**............................. **36**
        1. Counsel's Duty to Conduct Reasonable Investigation..................... **36**
        2. Trial Counsel's Failure to Investigate........................................ **38**

C.  **Thorough and Competent Post-Conviction Investigation of Jessie Hoffman's Background Produced Readily Available Evidence of Mr. Hoffman's Major Mental Illnesses and Chaotic Upbringing in a Family Plagued by an Intergenerational History of Profound Mental Illness, Severe Substance Abuse, and Relentless Violence.** ............................................................. 47
    1. Jessie Hoffman Was Born into a Family and Environment Already Crippled by a Devastating Intergenerational History of Substance Use and Abuse, Mental Illness, Sexual Inappropriateness, Criminality, Instability of Home, Paternity Confusion and Lack of Nurturing and Appropriate Parenting Skills ...................................................................................................................... 48
    2. Jessie Hoffman's Life History ............................................................ 56
    3. A Competent and Reliable Mental Health Evaluation Properly Incorporating a Comprehensive Psychosocial History Firmly Established that Jessie Hoffman Suffers From Post Traumatic Stress Disorder, Psychosis, and Has Significant Neurocognitive Deficits. ....................................................................... 71

D.  **The State District Court's Denial of Mr. Hoffman's Claim of Ineffective Assistance of Counsel On the Grounds That Counsel's Representation Was Competent and Reasonable Was Contrary To and an Unreasonable Application of Clearly Established Federal Law, and an Unreasonable Determination of the Facts in Light of the Evidence Presented.** ...................... 79
    1. The District Court and Louisiana Supreme Court Orders Denying Relief ..... 80
    2. The State Court's Decision Was Contrary to Clearly Established Federal Law in that It Denied Relief Despite the Fact That Mr. Hoffman Established Facts Materially Indistinguishable from *Wiggins*. ................................................. 82
    3. The State Court's Decision Rests On an Unreasonable Application of Clearly Established Federal Law in That It Is Premised On Wholly Inaccurate Fact-Findings and An Objectively Unreasonable Application of *Strickland*.......... 92
    4. The State Court's Decision Rests On an Unreasonable Determination of the Facts in Light of the Evidence Presented in State Post-Conviction Proceedings. ...................................................................................... 101

E.  **There is a Reasonable Probability that, but for Trial Counsel's Deficient Performance, the Result of the Sentencing Hearing Would Have Been Different.** ................................................................................................. 101

F.  **Summary of Case** ...................................................................................... 105
    1. The Trial ........................................................................................ 106
    2. Defense case for an accidental shooting ........................................... 107
    3. The key to specific intent: the location of the shooting ...................... 108

II.  **PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, *NAPUE V. ILLINOIS, BRADY V. MARYLAND* AND TO A FAIR CAPITAL SENTENCING HEARING UNDER THE EIGHTH AMENDMENT WERE VIOLATED WHEN THE STATE FAILED TO DISCLOSE A FORENSIC REPORT THAT SUPPORTED THE DEFENSE CASE AGAINST SPECIFIC INTENT AND FAILED TO CORRECT THE MISLEADING TESTIMONY OF THEIR OWN WITNESS REGARDING THAT EVIDENCE.** ................................................................................................. 113

A.   The coroner's investigator's report that the State failed to disclose in violation of *Brady* and *Napue* ................................................................................................ 114
B.   The coroner's investigator's report was not disclosed despite defense requests ......................................................................................................................... 115
C.   The misleading testimony of the Medical Examiner, Dr. MacKenzie which the State failed to correct in violation of *Napue* .................................................. 116
D.   *NAPUE V. ILLINOIS* VIOLATION .................................................................. 118
     1. There Was False Testimony .............................................................................. 118
     2. The Prosecutor Knew The Testimony Was False .......................................... 119
     3. The evidence was material ................................................................................ 120
E.   *BRADY V. MARYLAND* VIOLATION .............................................................. 122
F.   Applicability of §2254(d); Petitioner is entitled to *de novo* review of these claims ...................................................................................................................... 124

III.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT CRITICAL EVIDENCE THAT REFUTED THE STATE'S CASE FOR FIRST–DEGREE MURDER AND SUPPORTED THEIR OWN THEORY THAT MS. ELLIOT WAS SHOT AT THE BOAT LAUNCH DURING A STRUGGLE ........ 125
A.   Defense Counsel's duty to investigate ............................................................... 128
B.   Defense counsel's failure to investigate ............................................................ 130
C.   The evidence the jury never heard ..................................................................... 133
     1. The expert forensic evidence the jury never heard ....................................... 133
     2. The documentary evidence and lay witness testimony the jury never heard ......................................................................................................................... 149
     3. Defense counsel was ineffective for presenting an inflammatory and highly prejudicial defense in which they blamed the victim and demonized their client ............................................................................................................... 153
     4. Defense counsel's failure to present a credible unified theory ..................... 159
     5. Conclusion ...................................................................................................... 160
D.   The guilt phase errors also prejudiced Petitioner at the penalty phase ......... 161
E.   *Strickland* and *Brady/Napue* errors are to be considered collectively or cumulatively and the ultimate question is whether the trial was rendered unfair by the cumulation of error .................................................................... 167
F.   Applicability of §2254(d); Petitioner is entitled to *de novo* review of these claims ...................................................................................................................... 168
     1. Ruling of the Louisiana Supreme Court on Appeal ...................................... 169
     2. The court did not assess prejudice cumulatively ........................................... 172
     3. The court's rulings were also an unreasonable application of *Strickland* and unreasonably determined the facts ............................................................... 172
G.   The need for an evidentiary hearing ................................................................. 176

IV.  THE PROSECUTORS' REPEATED MISSTATEMENTS OF THE LAW DURING VOIR DIRE AND CLOSING ARGUMENT OF THE PENALTY PHASE, ALL GEARED TOWARD URGING THE JURY TO IGNORE MITIGATING EVIDENCE, SO INFECTED THE SENTENCING TRIAL WITH UNFAIRNESS AS TO BE A DENIAL OF DUE PROCESS AND RESULTED IN AN UNRELIABLE DEATH SENTENCE, IN VIOLATION OF MR. HOFFMAN'S

RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.................................................................... 177

    A.    The Prosecutors Placed the Burden on Defense to Prove Mitigation and Urged Jurors to Disregard Their Constitutional Duty to Consider Mitigation........ 178

    B.    The Prosecutors Urged Jurors to Abandon Consideration of Mitigation Altogether and Sentence Mr. Hoffman to Death Based Solely on a Conviction for First Degree Murder ......................................................................... 181

    C.    The Misconduct So Infected the Sentencing Trial as To Violate Due Process and Render the Sentencing Proceeding Unreliable.......................................... 182

    D.    Because the State Court Reached Its Decision Based On State Law, Never Addressing the Federal Constitutional Issues Raised, Mr. Hoffman Is Entitled to *De Novo* Review of This Claim. ........................................................ 184

    E.    The State Court's Denial of Relief Was Based On An Unreasonable Determination of the Facts In Light of the Evidence Presented and Constituted An Unreasonable Application of *Darden, Caldwell, Eddings,* and *Lockett.* .... 185

V.    THE STATE VIOLATED ITS DISCOVERY OBLIGATIONS UNDER *BRADY V. MARYLAND*, 373 U.S. 83 (1963), DEPRIVING PETITIONER OF HIS RIGHTS TO COUNSEL, DUE PROCESS OF LAW, AND A RELIABLE SENTENCING PROCEEDING AS SECURED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION ......................... 187

    A.    The State Failed To Reveal Exculpatory/Mitigating Evidence to The Defense Relevant to The Penalty Phase of this Capital Case ........................................ 187

    B.    *Brady* Evidence That the State Should Have Disclosed ................................... 187

    C.    Review of the Law on *Brady* ............................................................................ 188

    D.    Mr. Hoffman Is Entitled to Habeas Relief on This Claim ............................... 189

VI.    PETITIONER'S RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN THE TRIAL COURT UPHELD THE STATE'S RACED-BASED PEREMPTORY STRIKES AGAINST THE ONLY TWO QUALIFIED PROSPECTIVE AFRICAN-AMERICAN JURORS IN THE VENIRE ..................................................................................... 190

    A.    The many factors relevant to a showing of purposeful discrimination .......... 191

    B.    The State's Purported Race Neutral Reasons for Striking Mr. Galatas and Ms. Malter are implausible, belied by the record, and were a pretext for race discrimination .................................................................................................... 194

        1. Michael Galatas ............................................................................................ 194

        2. Elaine Malter ................................................................................................ 208

    C.    The race-based peremptory strikes of the only two qualified African-American jurors on Petitioners' voir dire forms part of a long established practice by the St. Tammany District Attorney's Office of striking qualified prospective black jurors in murder cases of black defendants.................................................... 213

    D.    Other evidence that the State's peremptory strikes of Mr. Galatas and Ms. Malter were motivated by race ......................................................................... 217

        1. The State's whole case was designed to appeal specifically to white people from St. Tammany parish ............................................................................. 217

2. The State's exercise of discretion in choosing the venue of St. Tammany Parish had a racially discriminatory impact on the composition of the jury, just as its use of peremptory strikes did............................................................ 221

E.   Conclusion.................................................................................................... 222
F.   Relief for these constitutional violations is not barred by § 2254 ..................... 222
   1. The state district court's decision ................................................................ 223
   2. The Louisiana Supreme Court's decision was an unreasonable application of clearly established U.S. Supreme Court law and an unreasonable application of the facts........................................................................................................ 224
   3. Problems specific to the court's ruling on Ms. Malter................................... 230
G.   An evidentiary hearing is required............................................................... 232

VII.  INTENTIONAL RACIAL DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS VIOLATES THE EQUAL PROTECTION CLAUSE, REQUIRING REVERSAL OF PETITIONER'S CONVICTION AND DEATH SENTENCE. ........................................................................................... 233
A.   Procedural Posture........................................................................................ 233
B.   Equal Protection and the Racially Discriminatory Process of Selecting Grand Jury Forepersons in St. Tammany Parish. ..................................................... 234
   1. Discrimination against a Distinct Class. .................................................... 236
   2. A Pattern of Under-representation. .............................................................. 236
   3. Opportunity to Discriminate. ..................................................................... 242
C.   Discrimination in the Selection of Grand Jury Forepersons Is a Structural Defect that Requires the Reversal of Hoffman's Conviction and Death Sentence........................................................................................................ 243
D.   Petitioner Requests an Evidentiary Hearing to Prove This Claim.................. 243
E.   AEDPA Does Not Prevent Granting Habeas Relief......................................... 243

VIII. PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, TO DUE PROCESS TO A FAIR TRIAL BY AN IMPARTIAL JURY, TO EFFECTIVE COUNSEL AND TO A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WERE VIOLATED WHEN THE TRIAL COURT PREVENTED PETITIONER FROM QUESTIONING PROSPECTIVE JURORS ABOUT THE ISSUE OF RACIAL BIAS, AND BY HIS DEFENSE COUNSEL'S FAILURES ON VOIR DIRE............................................. 244
A.   Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to Due Process to a fair trial by an impartial jury and to a reliable sentencing hearing were violated when the trial court prevented Petitioner from questioning prospective jurors about the issues of racial bias........................ 244
B.   Petitioner's rights under the Sixth and Fourteenth Amendments to the effective assistance of trial counsel were violated when his counsel failed to voir-dire prospective jurors about racial prejudices in circumstances where the risk of racism was obvious and significant, and despite their considered view that it was necessary in this case ................................................................ 245
C.   Applicability of § 2254(d) .............................................................................. 250
D.   The direct appeal decision on the claim of ineffective assistance of trial counsel is also unreasonable.......................................................................... 250
E.   Requirement for an Evidentiary Hearing...................................................... 253

IX.     PETITIONER WAS DEPRIVED OF HIS FUNDAMENTAL RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT, TO DUE PROCESS AND A FAIR HEARING BY AN IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND TO A RELIABLE SENTENCING UNDER THE EIGHTH AMENDMENT WHEN THE JURY'S DECISION TO CONVICT AND SENTENCE HIM TO DEATH WAS TAINTED BY RACIAL BIAS, AND AT LEAST ONE MEMBER OF THE JURY, THE ULTIMATE DECISION-MAKER OF HIS CAPITAL CHARGE, HELD RACE-BASED ANIMUS AGAINST HIM.................................................................... 253

          1. The evidence of racial bias against Petitioner.............................................. 255

     B.    The Multiple Constitutional Guarantees That Should Have Protected Petitioner From Racist Jurors: Rights To An Impartial Jury, To Freedom From Discrimination In Exercise Of Fundamental Rights, And To A Reliable Capital Sentencing Hearing ........................................................................ 262

     C.    The presence of a biased juror is a structural defect and requires automatic reversal of Petitioner's conviction and death sentence ................................... 265

     D.    Petitioner was prejudiced by Juror Lower's racism.................................... 266

     E.    The applicability of § 2254(d)...................................................................... 268

     F.    An evidentiary hearing is required................................................................ 269

X.      PETITIONER'S RIGHTS TO A FAIR TRIAL AND TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN THE STATE'S DECISION AS TO VENUE FOR THE TRIAL WAS TAINTED BY RACISM.................................................................................................................... 269

     A.    The State's purported race-neutral reasons ................................................. 271

     B.    The State's asserted race-neutral reasons were pre-textual............................ 272

     C.    The other evidence of discriminatory intent................................................ 274

     D.    Applicability of § 2254(d) ............................................................................ 277

     E.    An evidentiary hearing is required................................................................ 278

XI.    PETITIONER'S RIGHTS TO DUE PROCESS, TO A FAIR TRIAL BY AN IMPARTIAL JURY, TO CONFRONTATION, TO BE PRESENT AT ALL STAGES OF HIS CAPITAL TRIAL, TO APPELLATE REVIEW, AND TO A FULL TRANSCRIPT OF TRIAL PROCEEDINGS WERE VIOLATED IN NUMEROUS WAYS DURING THE JURY CRIME SCENE VISIT ..................... 279

     A.    Petitioner's rights to Confrontation of all evidence presented against him, to be present, to Due process and to a fair trial were violated. ........................... 282

     B.    Petitioner's rights to a fair trial by an impartial jury, and to confrontation were violated when the jury was compromised by extraneous influences during the crime scene visit ........................................................................ 284

     C.    Petitioner's rights to a fair trial by an impartial jury were violated when the jury engaged in premature deliberations........................................................ 286

     D.    Petitioner's constitutional rights to due process, to appeal, to the effective assistance of counsel and to judicial review based on a complete record of the proceedings were violated when the critical parts of the court proceedings at the crime scene were not recorded.................................................................... 287

E.     Petitioner's Due Process rights to a fair trial were violated when the trial court woefully failed to conduct a critical part of the trial proceedings according to minimum standards of due process or fairness. .............................................. 289

F.     Applicability of § 2254(d) ........................................................ 290

G.     An evidentiary hearing is required ............................................ 291

XII.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL JURY AND A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WHEN THE JURY ENGAGED IN NUMEROUS ACTS OF MISCONDUCT AND THE JURY'S DELIBERATIONS WERE PREJUDICED BY EXTRANEOUS AND IRRELEVANT FACTORS. ................. 292

A.     Petitioner Was Denied His Right To A Fair And Impartial Jury During The Guilt/Innocence And Penalty Phases Of His Trial When The Jury Engaged In Premature Deliberations During Both Phases ................................ 293

B.     Petitioner Was Denied His Right To A Fair Trial And Reliable Sentencing By An Impartial Jury Free From Arbitrary Extraneous Factors When The Jury Discussed During Deliberations the Possibility that, if They Voted For Life, Petitioner Could Be Paroled ....................................................... 298

C.     Petitioner Was Denied His Right To A Fair And Impartial Jury During The Penalty Phase Of His Trial When The Jury Improperly Speculated That Petitioner Was Involved With Drugs And Was A Member Of A Gang. ....... 301

D.     Applicability of § 2254(d) ........................................................ 303

E.     An Evidentiary Hearing is Required ............................................ 304

XIII.  PETITIONER'S CONVICTION AND DEATH SENTENCE SHOULD BE VACATED BECAUSE HE WAS DENIED HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO DUE PROCESS, TO A FAIR TRIAL BY A FAIR AND IMPARTIAL JURY, AND TO A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WHEN THE TRIAL COURT DENIED HIS MOTION FOR CHANGE OF VENUE ................. 305

A.     The Louisiana Supreme Court's ruling on direct appeal ................................ 309

        1. The state court's decision was "contrary to" clearly established federal law 309

        2. The state court's decision was an "unreasonable application of" clearly established federal law and involved an unreasonable determination of the facts ................................................................................ 311

XIV.   PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT AND THE LOUISIANA CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE EVOLVING STANDARDS OF DECENCY PROHIBIT THE EXECUTION OF SEVERELY MENTALLY ILL OFFENDERS ....................................................... 313

A.     Insanity, Criminal Responsibility, and the Volitional Incapacity. ................ 314

B.     Jessie Hoffman: A Severely Mentally Ill, "Non-Willing" Offender. .............. 315

C.     General Principles In Determining Whether a Punishment Is Cruel and Unusual ....................................................................................... 316

D.     The Application of Atkins to Severely Mentally Ill Non-Willing Offenders. . 318

        1. Objective Evidence of the Non-Acceptance of Executing the Volitionally Incapacitated Offender. ....................................................... 318

    2. Imposition of the Death Penalty for Conduct the Defendant was Unable to Control is Grossly Disproportionate to His Personal Moral Culpability and Lacks Penological Justification ..................................................................... 323

    3. The Capital Prosecution of the Volitionally Incapacitated Carries the Same Risks of Unjustified Executions ..................................................................... 324

**E.**     Conclusion ................................................................................................... 324

**F.**     Petitioner is entitled to *de novo* review of this claim ........................... 325

**XV.**   **THE TRIAL COURT'S IMPROPER RESPONSE TO THE JURY'S QUESTION REGARDING WHETHER MR. HOFFMAN HAD A JUVENILE RECORD OF PRIOR CRIMES THAT HAD NOT BEEN DISCLOSED, AS WELL AS DEFENSE COUNSEL'S FAILURE TO REQUEST A CURATIVE INSTRUCTION, VIOLATED PETITIONER'S RIGHT TO A RELIABLE SENTENCING PROCEEDING, TO CONFRONT THE EVIDENCE AGAINST HIM, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND TO DUE PROCESS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.** ........................................................................... 325

**A.**     **The Court's Failure to Respond Honestly and Directly to the Jury's Question Deprived Mr. Hoffman of Due Process and His Right to Confrontation ....... 327**

**B.**     **The Court's Instruction in Response to the Jury's Question Was Misleading and Erroneous and Caused the Jury to Disregard Substantial Uncontroverted Mitigation ........................................................................................... 328**

**C.**     **The Court's Response to the Jury's Question Was Misleading and Erroneous and Transformed a Statutory Mitigating Circumstance, Youth, Into an Aggravating Circumstance, a Prior Criminal Record .................................... 332**

**D.**     **The Louisiana Supreme Court's Decision Denying Relief Was Contrary To *Penry*, and Mr. Hoffman Is Entitled to Habeas Relief ...................................... 333**

**E.**     **The Louisiana Supreme Court's Decision Constitutes an Unreasonable Application of *Penry* and *Gardner* ...................................................................... 334**

**F.**     **Ineffective Assistance of Counsel. ......................................................................... 335**

**XVI.**  **PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE A JUROR THAT WAS SUBSTANTIALLY IMPAIRED IN HER ABILITY TO CONSIDER A LIFE SENTENCE, AND WHO EXPRESSLY STATED SHE WOULD NOT CONSIDER THE MITIGATING CIRCUMSTANCES THAT PETITIONER PRESENTED, SHOULD HAVE BEEN EXCLUDED FOR CAUSE AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE A CAUSE CHALLENGE TO EXCLUDE HER** .......................................................................... 336

**A.**     **Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated when the court allowed a juror to sit on his capital jury despite being unable to consider statutory mitigating factors .................................................. 336**

**B.**     **Petitioner's rights under the Sixth and Fourteenth Amendments to the effective assistance of counsel were violated when his lawyer failed to move the trial court to strike a juror who expressly stated she would not consider the statutory mitigating evidence he presented in determining whether he should live or die ......................................................................................................... 340**

**C.**     **The State Court's decision is contrary to clearly established law. ................... 341**

XVII. THE USE OF A "SHORT FORM" GRAND JURY INDICTMENT VIOLATED MR. HOFFMAN'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 3, 14, 15, 16, 17, 20 AND 22 OF THE LOUISIANA CONSTITUTION.................................................................................. 343
    A.    Introduction .................................................................................. 343
    B.    Statutory Aggravators Constitute Elements of a Capital Offense and Therefore Must Be Indicted by the Grand Jury. ............................. 344
    C.    Mr. Hoffman Is Entitled to Habeas Relief. ....................................... 348

XVIII. WHEN VIEWED AS A WHOLE, THE PROCEDURAL AND SUBSTANTIVE ERRORS HEREIN ARGUED CANNOT BE HARMLESS SINCE THE COMBINATION OF ERROR DEPRIVED HIM OF THE FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.................................................................. 348

XIX. PETITIONER ASSERTS HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO A FAIR CLEMENCY PROCESS WHICH COMPLIES WITH A MINIMUM LEVEL OF DUE PROCESS, AND HIS RIGHT NOT TO BE EXECUTED UNTIL SUCH CLEMENCY PROCESS IS AVAILABLE TO HIM.................................................................................................. 352

XX. LOUISIANA'S LETHAL INJECTION PROTOCOL VIOLATES PETITIONER'S EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS.................................................................................... 354
    A.    A Method Of Execution That Creates A Substantial Risk of Severe Pain Violates The Federal And State Constitutions. ................................. 355
    B.    Louisiana's Lethal Injection Procedure Creates A Substantial Risk Of Serious Harm.................................................................................... 356
            1. Louisiana's Lethal Injection Protocol Lacks the Procedural Safeguards Relied Upon by the United States Supreme Court in finding Kentucky's Protocol Constitutional ............................................................................. 356
    C.    Conclusion.................................................................................. 360
    D.    Petitioner is entitled to de novo review of his claim ........................... 360

PRAYER FOR RELIEF .................................................................................. 361
CERTIFICATE OF SERVICE ........................................................................ 362

x

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, JESSIE HOFFMAN, through undersigned counsel, files this *Petition for Writ of Habeas Corpus* pursuant to 28 U.S.C. § 2254 challenging his conviction and death sentence. He is in custody pursuant to the judgment of a state court. 28 U.S.C. § 2254(a).

Petitioner shows below that his conviction and his sentence of death were obtained in violation of his federal constitutional rights, that his claims for relief are exhausted in state court, that his claims are not procedurally barred, that the denial of relief in state court may be redressed in habeas, and that his petition is timely. 28 U.S.C. §§ 2244(d), 2254(a)-(b).

Petitioner requests discovery, an evidentiary hearing, and relief from his unconstitutional conviction and sentence of death. Petitioner requests a new trial that comports with Due Process, and the new reliable sentencing hearing that a new trial would entail.

### Statement of Incorporation

All facts pled herein go to all claims, and all claims, facts, legal arguments, and authority of law previously pled in this action, whether to this Court or any other, are hereby incorporated by reference.[1] For all the reasons pled, Petitioner requires a new trial in the interests of justice, and a new sentencing hearing under the Eighth Amendment.

---

[1] For example, all claims concerning the evidence at the guilt phase of trial impact the Eighth Amendment right to a reliable capital sentencing as well, by virtue of the possibility that one juror might have been persuaded by residual doubt, to vote for a life sentence. Residual doubt is that measure of doubt between "beyond a reasonable doubt" and "beyond any doubt." Similarly, the facts developed support the contention that Petitioner's jury was deprived of the information it required to render a fair verdict. Petitioner was deprived of facts and expert assistance he needed to present his case to the jury. The constitutional source of the rights that were violated matters, but the results are the same whether it is the prosecution's failure to correct false or misleading testimony or failure to disclose favorable material (Claims II, IV, V) or trial counsel's failure to provide effective, assistance of counsel (Claims I, II); and the prejudice of the violations should be concluded to determine whether, considered as a whole, Petitioner's trial and sentencing were fair.

# PART ONE

## I. PROCEDURAL HISTORY

### A. Trial

On January 8, 1997, Petitioner Jessie Hoffman was indicted for the November 27, 1996

first-degree murder of Mary Elliot. R. 98.[2] Petitioner was arraigned and pled not guilty on

January 23, 1997 in the 22nd Judicial District Court in the Parish of St Tammany. R. 23. Voir

dire began on June 5, 1998, the honorable Judge Fendlason, presiding. The guilt phase

commenced on June 21, 1998. On June 25, 1998, the jury found Petitioner guilty of first degree

murder, under La. R. S. 14:30(A)(1). R. 4318. Two days later, on June 27, 1998, the jury

unanimously determined that Petitioner be sentenced to death after having found the following

aggravating circumstances under La. C.Cr.P. art. 905.4: that the offense was committed while the

offender was engaged in the perpetration or attempted perpetration of aggravated rape,

aggravated kidnapping and armed robbery, and that the offense was committed in an especially

heinous, atrocious or cruel manner and the victim was subjected to torture, physical abuse, or

pitiless infliction of unnecessary pain and suffering. La. C.Cr.Pr. art. 905.4 (1) and (7). R. 1276.

The trial court formally imposed the jury's sentence of death on September 11, 1998, following

the district court's denial of Mr. Hoffman's motions for a new trial and for post-verdict judgment

of acquittal.

### B. Direct Appeal Proceedings

Petitioner raised eighteen assignments of error on appeal: Appellant's Brief on Appeal,

7/16/99 ("Appeal Brief"); Appellant's Reply Brief, 2/22/00 ("Appeal Reply Brief"); Appellant's

Supplemental Brief, 3/10/00 ("Supplemental Appeal Brief"). The Louisiana Supreme Court

---

[2] "R. ___ " refers to the record of trial, lodged on appeal at the Louisiana Supreme Court.

affirmed Petitioner's conviction and sentence on April 11, 2000, denying all claims on the merits. *State v. Hoffman,* 98-3118 (La. 4/11/00), 768 So.2d 542. Appellant's Petition for Rehearing and Supporting Brief, 4/25/00 ("Rehearing Petition") was denied on May 12, 2000. (La. 5/12/00) (as amended by (La. 6/02/00)). On October 16, 2000, the United States Supreme Court denied his Petition for Certiorari. *Hoffman v. Louisiana,* 531 U.S. 946 (2000).

### C. State Post-Conviction Proceedings

Petitioner began his litigation in state post-conviction by filing an initial *pro-se* Petition for Post-Conviction Relief, 7/20/01 ("Initial Petition"). By order of the state district court, Petitioner was granted leave to supplement his application for post-conviction relief and he did so, alleging twenty-two claims for relief in his Supplemental Petition for Post-Conviction Relief and Motion for Evidentiary hearing, 12/10/2003 ("Supplemental Petition").[3] The State responded. District Attorney's Answer and Procedural Objections to Petition for Post Conviction Relief, 4/30/04. Petitioner replied. Reply Brief to the District Attorney's Answer and Procedural Objections to Petition for Post Conviction Relief, 5/20/04). At the time the Supplemental Petition was filed, several items of physical evidence were unavailable for Petitioner's review. The evidence was finally made available to Petitioner in early 2007. The court granted Petitioner's requests for testing of the evidence on January 8 and 16, 2007, following which Petitioner filed three further claims in an Amendment to Supplemental Petition for Post-Conviction Relief and Motion for Evidentiary Hearing, 4/17/07 ("Amended

---

[3] Petitioner subsequently filed a revised version of the Supplemental Petition on 10/20/06, to correct errors in exhibit citations and other minor errors; the trial court allowed the substitution of this revised petition on 10/20/06 granting Petitioner's Motion To Strike Petitioner's Supplemental Petition For Post-Conviction Relief Filed December 12, 2003 And Substitute It With Petitioner's Amended And Restated Supplemental Petition For Post-Conviction Relief Filed October 20, 2006. State Court Order, 10/20/06.

Supplemental Petition"). The State responded to these additional claims on the merits. Response to Amendment to Supplemental Petition for Post-Conviction Relief, 5/2/07.

The trial court granted an evidentiary hearing on ineffective assistance of counsel at the penalty phase (Claim IV Supplemental Petition), but denied a hearing on all other claims. State Court Order 12/2/04; State Court Order, 5/2/05. The majority of testimony for the evidentiary hearing on Claim IV was taken by deposition, out of the presence of the judge, and then admitted into evidence at the hearing. *See* Transcript of Hearing, 1/8/07. Petitioner and the State both filed post-hearing memoranda of law. Petitioner's Post Hearing Memorandum, 3/16/07; State's Post Hearing Memorandum, 4/12/07. On May 1, 2007 the trial court denied Petitioner's application for post-conviction relief. State Court Order, 5/1/07. In so doing, the trial court referenced only claims raised in his Supplemental Petition, but did not refer to any claims raised in either the Initial Petition or the Amended Supplemental Petition. *Id.*

Petitioner timely applied for a writ of discretionary review to the Louisiana Supreme Court from the district court's denial of post-conviction relief. Application for Supervisory Writ of Review 10/1//07 ("LASC Writ"); Supplemental Writ Application Following This Court's Denial in Part of the "Motion to Supplement Writ Application with Appendix Pursuant to Rule X.6," 12/6/08. ("LASC Supplemental Writ").[4] The State filed no opposition. The Louisiana Supreme Court denied the writ application on December 12, 2008. *State v. Hoffman*, 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791 ("writ denied"). Petitioner notes that review by the

---

[4] When the LASC Writ was filed the Louisiana Supreme Court refused to accept for filing many of the exhibits in the Appendix attached to Petitioner's Writ, despite the Court's rules which require that they be exhibited. Louisiana Supreme Court Rule X.6. Petitioner filed a Motion to Supplement Writ Application with Appendix Pursuant to Rule X.6, 10/1/07 asking the Court to accept those exhibits for filing. The court granted the Order in part, but denied Petitioner's request to file as exhibits his prior state post-conviction pleadings, which included his Initial Petition, Supplemental Petition, and Amended Supplemental Petition, and Post-Hearing Memorandum. Petitioner therefore filed his LASC Supplemental Writ to present further details of all the constitutional claims denied by the district court, which the court would have otherwise had presented before it if it had accepted the relevant pleadings as its rules required it should.

Louisiana Supreme Court of the denial of post-conviction relief is entirely discretionary, and is very rarely granted.[5] The court's writ denial is therefore not a decision of the issues raised before it, but is "merely a decision not to exercise the extraordinary powers of supervisory jurisdiction." *State v. Fontenot*, 550 So. 2d 179 (La. 1989); *Harold Alex, Jr., et al. v. Rayne Concrete Service, Et Al.*, 2005-1457 (La. 1/26/07); 951 So. 2d 138. *And see Maggio v. Williams*, 464 U.S. 46, 62 (U.S. 1983)(a denial of certiorari "is not a decision on the merits of the issues raised in the respective petitions.").

## II. FACTUAL BACKGROUND TO CLAIMS

Jessie Dean Hoffman, an African American male, was less than three months past his 18th birthday when he, at gunpoint, got into the car of a 28 year old white woman, kidnapped her, robbed her, forced her to drive to a remote area in St. Tammany Parish, raped her, and killed her. It was a crime that shocked the St. Tammany community. There is no question that Ms. Elliot's kidnapping, rape, and murder were crimes of unspeakable horror—Jessie has never contested that.

What he has consistently said, from the time of his arrest in 1996, through his capital trial in 1998, to this day, is that he did not intend to kill Ms. Elliot and that he should not be sentenced to death, but instead should spend the rest of his life at the Louisiana State Penitentiary.

The trial to determine Mr. Hoffman's culpability, both criminal and moral, occurred in an atmosphere of overt racism, in what is known as a white flight community, with prosecutors bent on capitalizing on that racism to get a sentence of death. The prosecutors had help, in the form of the men entrusted with defending Mr. Hoffman. To this day, Mr. Hoffman's lead trial

---

[5] *See* La.C.Cr.P. art. 930.6: "The petitioner may invoke the supervisory jurisdiction of the court of appeal if the trial court dismisses the application or otherwise denies relief on an application for post conviction relief. No appeal lies from a judgment dismissing an application or otherwise denying relief."

attorney does not understand why his theory of the defense, that if Ms. Elliot "would have just managed to show a little effort" she would not have been raped and murdered, incensed the public, adding fuel to what was already a fire raging out of control. It boggled his mind that at some point during the commission of the crimes, Ms. Elliot didn't find her way out of her car and flee. And of course jurors attributed defense counsel's sentiments to Mr. Hoffman. He didn't have a chance at trial.

Had defense counsel focused on more fruitful areas of inquiry, they would have discovered that Jessie's was a case full of legitimate defenses, both to first degree murder and a sentence of death. Had defense counsel followed obvious leads, they would have discovered physical evidence and expert testimony supporting their client's version of events—that he never meant to kill Ms. Elliot. Had defense counsel left their office, spoken in depth with Mr. Hoffman's family members, sought records documenting the lives of Mr. Hoffman and close family members, they would have uncovered a capital defense attorney's treasure trove of mitigation; the circumstances of Jessie Hoffman's life were excruciatingly painful, and documented whichever way one looked—from school records, to hospital records, to police records, to newspaper articles, to the vivid, nightmarish stories of the horror Jessie endured as a child. He suffered physical, emotional, and sexual abuse at the hands of his mother, growing surrounded by daily violence.

Instead, Petitioner was indicted by a grand jury with a history of discriminating against African American forepersons. The indictment was sought and obtained in St. Tammany Parish, and Petitioner's case was tried there despite the rampant and hostile media attention his case had attracted. Mr. Hoffman went to trial before an all-white jury, prosecuted by a team that withheld exculpatory evidence and then capitalized on suppressing the evidence by presenting misleading

6

testimony and arguments.  Mr. Hoffman was easily convicted and sentenced to death.  He didn't have a chance at trial.

Nor have his claims in post-conviction proceedings received, for the most part, any more than cursory review by the state courts.  With the exception of a hearing on Mr. Hoffman's claim of ineffective assistance of counsel, and a perfunctory denial of the claim, all claims raised in post-conviction were summarily denied on the merits.  Mr. Hoffman's attempt to seek review in the Louisiana Supreme

Mr. Hoffman turns, as he must, to the federal courts now, where he seeks impartial justice.  He asks no more than that a fair tribunal hear his claims of substantial violations of his constitutional rights, consider them fully, and rule on them in accordance with the laws of this country.

### III. HABEAS PROCEDURAL CONSIDERATIONS

#### A. All Of Petitioner's Claims Are Exhausted

All of Petitioner's claims are exhausted, having been fairly presented to the state courts on direct appeal and/or in state post-conviction proceedings. §2254(b)(1)(A).  *Vasquez v. Hillery,* 474 U.S. 254, 257 (1986) ("Once the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied") (citations omitted).  *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997) ("To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claim to the state courts.").

Habeas Claims III, IV, VI, VIII, XIII, XV, XVI, XVII, XVI were fairly presented on direct appeal to the Louisiana Supreme Court.  Appeal Brief; Appeal Reply Brief; Supplemental Appeal Brief.  Habeas Claims I, II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, XVI, XVIII, XIX, XX, XXI were presented to the state district court in post-conviction proceedings in his Initial Petition, Supplemental Petition, and Amended Supplemental Petition and were then

7

fairly presented in his LASC Writ and LASC Supplemental Writ to the Louisiana Supreme Court.[6]

### B. None Of Petitioner's Claims Are Procedurally Barred

In federal habeas proceedings brought by a state prisoner, "procedural bar" is a doctrine of comity and federalism that *sometimes* prevents a federal habeas court from addressing the merits of a claim when the state courts have denied that claim on state law procedural "waiver" grounds. *See generally* R. Hertz & J. Liebman, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE, ch. 26 (4th ed.). For default to arise, the state court must have clearly and unambiguously relied on the procedural violation as its reason for rejecting the claim. *Harris v. Reed,* 489 U.S. 255, 263 (1989); *Nobles v. Johnson,* 127 F.3d 409, 420 (5th Cir. 1997) (federal habeas claim is defaulted "if a state court *clearly and expressly* bases its dismissal of a prisoner's claim on a state procedural rule. . .."). Here, none of Petitioner's claims are procedurally barred.

### 1. Claims Raised On Appeal

Petitioner's habeas claims  III, IV, VI, VIII, XIII, XV, XVI, XVII, XVI, were denied *on the merits* by the Louisiana Supreme Court on appeal. *State v. Hoffman,* 98-3118 (La. 4/11/00), 768 So.2d 542. These claims are clearly not procedurally defaulted.

### 2. Claims Raised In State Post-Conviction

Petitioner's habeas claims I, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XVI, XVIII, and XIX, were denied *on the merits* by the state district court during post-conviction proceedings:

> After considering the record of this matter, the law and arguments of counsel, the Court finds that the claims set forth in Paragraphs I, II, II [sic], VI, V, VII, VIII,

---

[6] In capital cases the Louisiana Supreme Court has exclusive appellate jurisdiction. Both applications for discretionary review and appeals as of right are not cognizable in the intermediate appellate courts, and must be made directly to the Louisiana Supreme Court. La. C.Cr.P. art. 912.1(A).

> X, XI, XII, XIII, XIV, XV, XVI, XX, XXI and XXII *are without merit* and the
> Court hereby denies relief as to those claims.

State Court Order, 5/1/08, at 1 (emphasis added). All these claims were subsequently raised to

the Louisiana Supreme Court in Petitioner's application for discretionary review of the district

court's denial of post-conviction relief. LASC Writ; LASC Supplemental Writ. The state

supreme court denied writs. *State v. Hoffman,* 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791

("Writ denied"). Because the writ was an application for discretionary review[7] the court's writ

denial is "merely a decision not to exercise the extraordinary powers of supervisory jurisdiction,"

*State v. Fontenot,* 550 So. 2d 179 (La. 1989), and is not a decision *of the issues raised before it* at

all; it therefore cannot be construed as a decision to default any claim. Under *Ylst v.*

*Nunnemaker,* 501 U.S. 797 (1991), the court should "read through" the Louisiana Supreme

Court's decision denying his writ to the "last reasoned state-court opinion" to determine the basis

for the state court ruling. *Ylst,* 501 U.S., 803-06 ("procedural" or "merits" nature of the state

court's disposition of a claim is determined by the "last reasoned state-court opinion" on that

claim) (*citing Ellis v. Lynaugh,* 873 F.2d 830, 838 (5th Cir. 1989)); *Salazar v. Dretke,* 419 F.3d

384, 396 (5th Cir. Tex. 2005) (same). The "last reasoned state-court opinion" was the state

district court's decision which, as noted above, ruled on the merits of the claims.

Habeas claims XIV, XX, XXI were properly raised in state post-conviction proceedings

but were "dismissed without prejudice as premature," by the state district court. State Court

Order, 5/1/08. These claims were not "clearly and unambiguously" procedurally defaulted

---

[7] See: La.C.Cr.P. art. 930.6: "The petitioner may invoke the supervisory jurisdiction of the court of appeal if the trial court dismisses the application or otherwise denies relief on an application for post conviction relief. No appeal lies from a judgment dismissing an application or otherwise denying relief."

either.[8]  Again, the Louisiana Supreme Court's writ denial, not being a decision of the issues at all, is not a procedural default either.  Again, under *Ilst*, it is the state district court's decision that determines the issue.

Claims II, III were also properly raised in state post-conviction proceedings, but were not mentioned at all by the state district court when it denied his application for post-conviction relief.  Thus neither the state district *nor* the Louisiana Supreme Court (by denying his writ application), made any decision as to these claims at all; there is certainly no "clear and unambiguous" default of those claims.

## IV. LIMITATIONS ON THE COURT'S POWER TO GRANT RELIEF UNDER § 2254(d)[9]

This federal habeas petition is governed by the federal habeas statute, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  For issues as to which there is a state court decision on the merits, review is governed by 28 U.S.C. § 2254(d).  In such cases, Petitioner is entitled to relief for violations of his constitutional rights where the state court decision is "contrary to" or "an unreasonable application of" clearly established federal law as stated by the United State Supreme Court, or involves an "unreasonable determination of the facts" 28 U.S.C. § 2254(d)(1)-(2).  In making that determination, the state court's factual findings are "presumed to be correct" unless the Petitioner rebuts them by "clear and convincing evidence." § 2254(e)(1).  While § 2254(d)-(e) to some extent limits the power of federal courts to grant relief, review is still robust; § 2254 "does not imply abandonment or abdication of [federal]

---

[8] Petitioner notes too, that procedural default is *always* discretionary for the state court on post-conviction review. La. C.Cr.P. art. 930.4.  *See Carlin v. State*, 706 So.2d 968 (1998) ("the legislature directed the discretionary procedural bars of La.C.Cr.P. art. 930.4(B)-(E) to district court judges, who in appropriate cases may but need not invoke them to deny relief or dismiss an application") (internal citations omitted).

[9] § 2254(d) does not create a "standard of review," but rather operates as a "limitation on relief." *Williams v. Taylor*, 507 U.S. 362, 412 (2000) (characterizing the provisions as a "constraint on the power of a federal habeas court to grant … the writ" in those cases in which the federal court has found constitutional error).

judicial review," *Miller-El v. Cockrell,* 537 U.S. 322, 340 (2003),[10] but "require[s] meaningful federal court review of the evidentiary record considered by the state courts." *Beck v. Bowersox,* 257 F.3d 900, 901 (8th Cir. 2001).

By their own terms, the requirements of § 2254(d)(1)-(2) apply only to claims "adjudicated on the merits" in the state court. "It follows that, when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA and explained in *Williams* do not apply. In such an instance, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA." *Appel v. Horn,* 250 F.3d 203, 210 (3d Cir. 2001) (applying *de novo* review to constructive denial of counsel claim not adjudicated on the merits in state court); *Miller v. Johnson,* 200 F.3d 274, 281 & n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000) ("[r]eview is *de novo* when there has been no clear adjudication on the merits"); *Jones v. Jones,* 163 F.3d 285, 299-300 (5th Cir. 1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court); *see also Fisher v. Texas,* 169 F.3d 295, 300 (5th Cir. 1999) (AEDPA did not apply because state court's procedural dismissal not an "adjudication on the merits," and therefore reviewing claims *de novo*); *Lockhart v. Johnson,* 104 F.3d 54, 57-58 (5th Cir. 1997), *cert. denied,* 521 U.S. 1125 (1997) (addressing petitioner's conflict of interest claim not presented to the state courts and with regard to which the state waived exhaustion, the court

---

[10] *See also Panetti v. Quarterman,* 127 S Ct. 2842 (2007) (granting habeas relief under AEDPA); *Miller-El v. Dretke,* 545 U.S. 231 (2005) (granting habeas relief under AEDPA on *Batson* claim); *Rompilla v Beard,* 535 U.S. 374 (2005) (finding state court decision contrary to and an unreasonable application of clearly established law under AEDPA and granting habeas relief on claim of ineffective assistance of counsel); *Wiggins v. Smith* 539 U.S. 510 (2003) (same); *Williams v. Taylor,* 529 U.S. 362 (2000) (same); *Tassin v. Cain* 517 F.3d 770 (5th Cir. 2008) (finding state court decision contrary to clearly established law and granting habeas relief on *Brady/Giglio* claim).

stated "[c]onsequently, the AEDPA provision altering our standard of review when petitioner's claim has been adjudicated on the merits has no application to this claims).

### A. Application Of 2254(d) To Petitioner's Claims

#### 1. Claims Not Previously Decided On The Merits

Several of the claims Petitioner properly raised before the state courts were never addressed by the state courts in any ruling. The state district court's order denying post-conviction relief made no mention of Petitioner's claims raised in either his Initial Petition, or his Amended Supplemental Petition. State Court Order, 5/1/08. As noted above, the Louisiana Supreme Court's denial of his writ application is not a decision on Petitioner's claims either, but rather a decision declining to consider them at all. *State v. Hoffman*, 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791. Thus, several of Petitioner's claims, including his guilt phase *Strickland* and *Brady/Napue* violations, were not ruled upon at all. Federal habeas review of those issues is the same *de novo*, plenary review that was required before AEDPA. *Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998) (applying pre-AEDPA de novo standard of review to claims of ineffective assistance of counsel that were properly raised, but not adjudicated on merits in state court); *Holloway v. Horn*, 355 F.3d 707, 718 (3rd Cir. 2004) (applying *de novo* review where claim raised on direct appeal but state court decision did not mention claim); *Fortini v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001) ("AEDPA imposes a requirement of deference to state court decisions, but we can hardly defer to the state court on an issue that the state court did not address") (declining to apply AEDPA to a federal claim that was never addressed by the state courts); *Duckett v. Mullin*, 306 F.3d 982, 990-991 (10th Cir. 2002), *cert. denied*, 538 U.S. 1004 (2003) (same); *McKenzie v. Smith*, 326 F.3d 721, 726-727 (6th Cir. 2003), *cert denied*, 540 U.S. 1158 (2004) (same); *see also Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *Lockhart v.*

*Johnson* 104 F.3d 54, 57-58 (5th Cir. 1997), *cert. denied*, 521 U.S. 1125 (1997).  If the court finds such claims were in fact "adjudicated", they should be treated as summarily adjudicated claims.  See further below.

### 2. Claims Partially Adjudicated On The Merits

In addition, several of Petitioner's claims were only partially ruled upon.  Thus, for example, although the district court addressed the merits of Petitioner's claim of ineffective assistance of counsel at the penalty phase, the court only ruled upon the deficient performance prong of the claim.  Thus, while 2254(d) may apply to the federal court's review of that prong, its adjudication of the prejudice prong should be *de novo*.  *See Rompilla v. Beard,* 545 U.S. 374, 390 (2003) (noting that "because the state courts found the representation adequate, they never reached the issue of prejudice . . . we examine this element of the *Strickland* claim *de novo*"); *Wiggins v. Smith,* 539 U.S. 510 (2003) (reviewing prejudice prong of *Strickland* claim *de novo); see also Tassin v. Cain,* 517 F.3d 770 (5th Cir. 2008) (assessing materiality prong of *Brady* claim *de novo,* where state court did not reach materiality).

### 3. Summarily Adjudicated Claims

With the exception of Supplemental Petition Claim IV (*Strickland* penalty phase claim), the state district court's ruling on the merits of Petitioner's post-conviction claims was entirely summary:

> After considering the record of this matter, the law and arguments of counsel, the Court finds that the claims set forth in Paragraphs I, II, II [sic], VI, V, VII, VIII, X, XI, XII, XIII, XIV, XV, XVI, XX, XXI and XXII are without merit and the Court hereby denies relief as to those claims.

State Court Order, 5/1/08, at 1.  The United States Supreme Court has not "address[ed] directly the analysis to be used when federal courts are presented with a state court decision that is unaccompanied by any *ratio decidendi.*" *Delgado v. Lewis,* 223 F.3d 976, 982 (9th Cir. 2000).

However, language of at least six justices in *Williams v. Taylor,* 529 U.S. 362 (2000), indicates that both clauses of § 2254(d)(1) require federal court review and evaluation of the state court's *reasoning* process.  *See Williams,* 529 U.S. at 394, 395, 397-98 (opinion of Stevens, J.); *id.,* at 414-16 (opinion of O'Connor, J.).   Equally significant, the majority rejected Chief Justice Rehnquist's approach in his concurring and dissenting opinion, which would uphold state decisions as long as the state court's *result* was neither "contrary to" nor an "unreasonable application" of applicable Supreme Court precedent.

On more than one occasion the Fifth Circuit has also expressed concern that the requirements of § 2254(d) cannot be applied properly to unreasoned state court decisions.  In *Nobles v. Johnson,* 127 F. 3d 409, 416 (5th Cir. 1997) the court expressed:

> reservation about applying the more stringent AEDPA standards to this claim because we are not convinced that the state habeas court sufficiently addressed Nobles' *Giglio* claim" where "the state habeas court did not address the "materiality" prong of *Giglio* but simply ruled, without evidentiary hearing, that "applicant's allegations do not suggest ... the presentation of false evidence by the state.

*Id.* The court ultimately declined to reach the issue because it found the misleading evidence was not "material" even under *de novo* review).  In *Neal v. Puckett,* 286 F.3d 230 (5th Cir. 2002), the court noted that there was "some basis" in the majority opinion in *Williams* for the view that § 2254(d)'s "unreasonable application" standard refers to the quality of the state court's analysis." However, "[i]n the absence of clear guidance from the Supreme Court," and given the contrary interpretation of other circuits, the court felt obliged to apply a *results* based approach, focusing on "the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal,* 286 F.3d, at 245-46.

Petitioner recognizes that under Fifth Circuit precedent summarily denied claims are subject to § 2254(d).   However, the matter has not been resolved by the Supreme Court and

Petitioner asserts that the Fifth Circuit is incorrect.[11]  Based on the implications of the *Williams* language indicating that § 2254(d)(1) cannot be applied to unreasoned state decisions, this court should review *de novo,* under pre-AEDPA law, those federal constitutional claims raised by Petitioner which this Court concludes were not addressed or discussed by the state court with at least *some* reference to the governing federal law.  As set forth more fully below, this includes the majority of the claims which the state district court denied summarily on the merits.

Even if this court finds that the state court's summary denial of claims do constitute an "adjudication on the merits" that are susceptible to § 2254(d)(1) analysis focusing on the *result* of the court's decision, the court should conduct an *independent review of the record* to determine whether the state court's ruling was objectively unreasonable.

> When a state court does not furnish a basis for its reasoning, we have no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context.. [S]tate court judgments can[not] be insulated from habeas review in federal courts simply by failing to provide any reasoned explanation for the disposition....Federal habeas review is not *de novo* when the state court does not supply reasoning... but an independent review of the record is required to determined whether the state court clearly erred in its application of controlling federal law.

*Delgado v. Lewis,* 223 F.3d 976, 981-82 (9th Cir. 2000). *See also Bell v. Jarvis,* 236 F.3d 149, 163 (4th Cir. 2000) (en banc) (state court's "fail[ure] to articulate the rationale behind its ruling" imposes obligation on federal habeas corpus court to "independently review the record and the

---

[11]*See Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir. 2000), *cert. denied,* 532 U.S. 924 (2001) (evaluating legal claim under pre-AEDPA "independent judgment" standard rather than § 2254(d), because "we cannot say that the Delaware Supreme Court took into account controlling Supreme Court decisions" in considering applicants argument); *Romine v. Head,* 253 F.3d 1349, 1365 (11th Cir. 2001) (because state court opinion's truncated analysis of issue prevented federal court from determining "what, if any, rule of federal law" the state court applied, and gave rise to "grave doubt that the [state court] applied federal law at all," court of appeals deemed §2254(d)(1) inapplicable and reviewed claims *de novo*).

applicable law" to assess §2254(d)); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 121 S Ct. 1415 (2001); *Walker v. Gibson*, 228 F.3d 1217, 1240 (10th Cir. 2000), *cert. denied*, 121 S Ct 2560 (2001).

Moreover, the quality of reasoning expressed by the court is clearly a factor that must be taken into account in determining its reasonableness. See further below.

### 4. Claims Reviewed Under § 2254(d)(1)-(2)

Claims that were denied on the merits by a state court, but which the federal court finds are meritorious, are to be subject to analysis under § 2254(d)(1)-(2) before relief can be granted; it may only be granted where the state court decision is "contrary to" or "an unreasonable application of" clearly established federal law, or involves an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2). The two prongs of § 2254(d)(1) are distinct and relief may be granted under either. *See Williams v. Taylor*, 529 U.S 362, 412-13 (2000) (explaining § 2254); *see also Gardner v. Johnson*, 247 F.3d 551, 559 (5th Cir. 2001) ("[E]ach of these two prongs is to be accorded independent meaning, so habeas relief can be granted if the prisoner prevails on either prong").

### a. The "Contrary To" Prong Of § 2254(d)(1)

A state court decision is contrary to clearly established federal law if:

(1) "the state "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."

*Coble v. Quarterman*, 496 F.3d 430, 435 (5th Cir. 2007) (quoting *Williams*, 529 U.S. at 406); *accord Tassin v. Cain*, 482 F. Supp. 764, 769-72 (E.D. La. 2007), *aff'd* 517 F.3d 770, 776 (5th Cir. 2008). With respect to the first "contrary to" meaning, a state court's use of the wrong legal standard, even if made in conjunction with a correct legal standard, satisfies the "contrary to"

clause of § 2254(d)(1) unless it is manifestly clear that the wrong standard had no possible effect on the case. *See Williams*, 529 U.S. at 414-415 (opinion of O'Connor, J.) (because the lower court's mistake of law in relying on *Lockhart v. Fretwell*, 506 U.S. 364 (1993), may have tainted or distorted its analysis of prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984), the lower court's decision was "contrary to law"). With respect to the second meaning, factual contexts of cases may be "materially indistinguishable because their legal implications are the same, even if the facts themselves are significantly different. *Ramdass v. Angelone*, 530 U.S. 156, 180 (2000) (O'Connor, J., concurring in plurality opinion) (issue as to whether determination that petitioner was ineligible for parole had been made *prior* to trial, as in *Simmons v. North Carolina*, not significant to establishing materially indistinguishable facts when result "was foreordained").

### b. The "Unreasonable Application" Prong Of § 2254(d)(1)

A state court decision is an unreasonable application of clearly established federal law if:

> the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." The inquiry into unreasonableness is objective.

*Coble v. Quarterman*, 496 F.3d at 435 (5th Cir. 2007) (*quoting Williams*, 529 U.S., 407-408). Although the Fifth Circuit has not attempted to elaborate "unreasonable application" beyond the Supreme Court's recognition that it is an objective test, rather than a subjective one, it has spoken approvingly of the Ninth Circuit's "insightful observation[s]" on this question. *See Gardner*, 247 F.3d 551, 559-560 (5th Cir.) (citing with approval *Van Tran v. Lindsey*, 212 F.3d 1143 (9th Cir.), *cert. denied*, 531 U.S. 944 (2000)). In *Gardner*, the court stated that the "unreasonable application" standard "is identical to our [Circuit's] definition of clear error – next to *de novo*, our least deferential standard of review." *Id.* (citing *Adams v. Unione Mediterranea*

*Di Sicurta*, 220 F.3d 659, 670 (5th Cir.), *cert. denied*, 531 U.S. 1192 (2001)).  The *Gardner* court

went on to quote *Van Tran* at length:

> we must reverse a state court's decision as involving an "unreasonable application" of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a "firm conviction" that one answer, the one rejected by the [state] court, was correct and the other, the application of the federal law that the court adopted, was erroneous.

*Gardner*, 247 F.3d at 559-560 (*citing Van Tran*, 212 F.3d at 1153-54) (citation omitted in

original).

   A petitioner has gone a long way toward demonstrating that the state court's decision is

an objectively unreasonable application of federal law when a significant underlying factual

issue has been determined against the clear and convincing weight of the evidence presented in

state court.  *See infra*, 28 U.S.C. § 2254(e)(1) (state court finding of fact can be rebutted by clear

and convincing evidence).  By definition, a decision resting on the determination of a fact not

supported by the evidence that is central to the decision is objectively unreasonable.  *Ward v.

Sternes*, 334 F.3d 696, 704 (7th Cir. 2003) (factual determination that waiver of right to testify

was knowing and intelligent was "so inadequately supported by the record as to be arbitrary and

unreasonable" under § 2254(d)(1)).

   In addition, the quality of the reasoning given by the court is an important consideration

in determining the reasonableness of a state court's decision.  *Williams*, 529 U.S. at 391-98

(examining reasoning of the state court); *Neal*, 286 F.3d, 246 ("A thorough and well-reasoned

state court opinion may be more likely to be correct and to withstand judicial review"); *Hennon

v. Cooper* 109 F.3d 330, 335 (7th Cir. 1997), *cert denied*, 522 U.S. 819 (1997) ("the better the job

the state court does in explaining the grounds for its rulings, the more likely those rulings are to

withstand further judicial review.")  *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir. 1996) (en

banc), *rev'd on other grounds,* 521 U.S. 320 (1997) ("The reasonableness of a court's application of federal law must be measured, at least in part, by determining whether a state court provided a responsible, thoughtful answer reached after a full opportunity to litigate"); *Wright v. Angelone,* 151 F.3d 151, 157 (4th Cir. 1998) ("detailed state court order is more likely to withstand federal judicial scrutiny"); *Hurtado v. Tucker,* 245 F.3d 7, 20 (1st Cir. 2001) ("the better reasoned the state decision, the less likely it is that it could represent an unreasonable application of clearly established Supreme Court law").

### c. An "Unreasonable Determination Of Facts" Under § 2254(d)(2) And (e)(1)

The determination that a state court decision is based on "an unreasonable determination of the facts in light of the evidence presented" and therefore does not bar federal review of the decision arises in several contexts.  An unreasonable determination of facts can be presumed where: 1) the state court failed to make a determination that should have been made, *Taylor v. Maddox*, 366 F.3d 992, 999, 1001 (9th Cir.), *cert. denied* 543 U.S. 1038 (2004) ("where state court should have made a finding of fact but neglected to do so … the state-court factual determination is perforce unreasonable"); *Guidry v. Dretke,* 397 F.3d 306, 327 (5th Cir. 2005) ("the state trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim, where the witnesses are apparently credible, brought into question whether, under subpart (d)(2), its 'decision… was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'"); *Weaver v. Thompson,* 197 F.3d 359, 363 (9th Cir. 1999) (record does not reflect existence of state court fact-findings on relevant issue); or 2) the state court made a factual determination, but the determination was procedurally unreasonable in that the state court didn't hold an evidentiary hearing, *Taylor v. Maddox*, 366 F.3d at 1001; *Killian v. Poole,* 282 F.3d 1204, 1208 (9th Cir. 2002), *cert. denied,*

537 U.S. 1179 (2003) (state courts could not have made proper determination of facts when courts refused Petitioner evidentiary hearing on matter); *Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003), *cert. denied* 543 U.S. 1048 (2004) (state court's factual findings deemed unreasonable because made without an evidentiary hearing).

A state court decision may also constitute an unreasonable determination of the facts (or an unreasonable application of law) where the court failed to consider relevant factors, or considered irrelevant ones in reaching its decision. *Williams v. Taylor*, 529 U.S. 362, 397-98 (finding state court's decision on prejudice under *Strickland* was an unreasonable application of the law because the court failed to take into account all of the mitigating evidence in reweighing it against the evidence in aggravation); *Jacobs v. Horn*, 395 F.3d 92 (3rd Cir. 2005) (state court did not consider trial counsel's failure to provide relevant information to experts; decision based on one factor, to exclusion of other relevant ones, is unreasonable application of *Strickland*); *Hanna v. Price*, 245 Fed. App. 538, 543 (6th Cir. 2007) (failure to consider fact that defendant was deprived of food and water, when considering 5th amendment claim that confession was involuntary, was unreasonable determination of facts); *Bui v. Haley*, 321 F.3d 1304, 1318 (11th Cir. 2003) (holding state court's finding of no purposeful discrimination by the State was unreasonable determination of the facts under § 2254(d)(2) and clearly erroneous under §2254(e)(1) where four of the seven factors the state court relied on were irrelevant) (reversing conviction under *Batson*).

Similarly, a state court's decision is also unreasonable when it is not fairly supported by the evidence, or the state court relied, at least in part, on erroneous factual findings. *Wiggins v. Smith*, 539 U.S. 510, 526-34 (2003) (state court's decision that counsel performed competently

was unreasonable under §2254(d) because the court "partially relied on an erroneous factual assumption").

The inquiry into whether an individual finding of fact is reasonable is governed by 28 U.S.C. § 2254(e)(1).   In general, fact-findings of state courts are presumed correct unless rebutted by clear and convincing evidence.  If a finding of fact is rebutted, and it is part and parcel of the state court's decision, in most cases a petitioner has shown that the decision is "based on an unreasonable determination of the facts." *Valdez v. Cockrell,* 274 F.3d 941, 951 n. 17 (5th Cir. 2001).

The presumption of correctness applicable to state court findings of fact is not always accorded the same weight, particularly in instances where those fact-findings are not predicated on a judge's determination of credibility given her or his opportunity to observe the witnesses testify.

> The requirement that special deference be given to a trial judge's credibility determinations is itself a recognition of the broader proposition that the presumption of correctness that attaches to factual findings is stronger in some cases than in others.  The same "clearly erroneous" standard applies to findings based on documentary evidence as to those based entirely on oral testimony, … but the presumption has lesser force in the former situation than in the latter.

*Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500 (1984) (citation omitted); *see also Easley v. Cromartie,* 532 U.S. 234, 243 (2001) (where key evidence "consisted primarily of documents and expert testimony," and credibility determinations therefore played minor role, fact-findings would be subjected to "an *extensive* review" for clear error (emphasis added)).  In Mr. Hoffman's case, most of the evidence in support of his claim that counsel was ineffective at sentencing was adduced via deposition and the transcripts were subsequently moved into evidence at a hearing before the court. *See* Transcript of Hearing, 1/8/07.  Because the court was

not in a position to directly assess credibility, the presumption of correctness that applies to state court findings of fact is entitled to less weight.

## V. PETITIONER HAS A RIGHT TO AN EVIDENTIARY HEARING IN FEDERAL COURT TO FACTUALLY DEVELOP HIS CLAIMS

An evidentiary hearing is required when a habeas petition alleges facts which, if proven, would entitle the petitioner to relief, and the respondent presents a material dispute about those facts. *Townsend v. Sain*, 372 U.S. 293, 312-19 (1963). "[H]earings are particularly important in capital cases ... where the 'irremediable' penalty demands fact finding at a 'heightened standard of reliability.'" *Parkus v. Delo*, 33 F.3d 933, 939 n.6 (8th Cir. 1994) (quoting *Ford v. Wainwright*, 477 U.S. 399 (1986)).[5] Petitioner alleges numerous meritorious claims, concerning facts which the State disputed in state court, and which therefore require factual development through a hearing.[12]

### A. AEDPA's Limitations On The Availability Of Evidentiary Hearing Do Not Apply In This Case

AEDPA limits circumstances in which a federal habeas court may conduct an evidentiary hearing, prohibiting hearings for petitioners who "failed to develop the factual basis" of their claims in state court. 28 U.S.C. § 2254(e)(2). However, AEDPA's limitations do not apply in this case. The United State Supreme Court has determined that AEDPA does not prohibit an evidentiary hearing in federal court provided that the petitioner is not at fault for the lack of factual development in state court. *Williams v. Taylor*, 529 U.S. 420, 426 (2000). *See also Guidry v. Dretke*, 397 F.3d 306, 323 (5th Cir. 2005) ("if a petitioner develops a factual basis for

---

[5] *Cf. Banks v. Dretke*, 540 U.S. 668, 675 (2004) ("through discovery and an evidentiary hearing ... in a federal habeas corpus proceeding, ... long-suppressed evidence came to light" and death sentence was vacated).

[12] Petitioner requested an evidentiary hearing whenever required to develop the facts in state post-conviction proceedings. Supplemental Petition, at 2.

a claim in state court (or sufficiently attempts to do so), subpart (e)(2) does not bar an evidentiary hearing in district court.").

Petitioner made extensive efforts to develop the factual basis of his claims in state court. He investigated the facts; he requested and obtained extensive records (using requests under the Louisiana Public Records Act, La. R.S. 44:1, *et seq*, signed releases and/or court orders where appropriate); he interviewed numerous witnesses, and consulted with several experts. He then filed detailed applications for post-conviction relief alleging his claims, and attached numerous records, declarations and expert reports in factual support of them. Supplemental Petition; Amended Supplemental Petition. In addition, both orally and in writing, he requested evidentiary hearings on numerous claims where there were material factual disputes which required a hearing to resolve. Supplemental Petition; Amended Supplemental Petition; Transcript of State Court Proceedings, 12/1/04. The state district court granted him a hearing on his *Strickland* penalty phase claim (Claim IV, Supplemental Petition). However, the court denied him a hearing on the other claims stating that the court could determine them based on the record, and briefs and arguments of counsel. These included petitioner's habeas claims V, VI, VII, VIII, IX, X, XI, XII. State Court Order 12/2/04. The district court did not give reasons for its failure to grant Petitioner a hearing on the claims raised in his Amended Supplemental Petition (habeas claims II, II); the court never addressed those claims at all.

Because the court found that his habeas claims XIV, XX, XXI were premature and therefore dismissed them without prejudice, he did not determine any need for an evidentiary hearing. State Court Order 12/2/04, as amended by State Court Order 5/2/05.

Petitioner also requested that the Louisiana Supreme Court order an evidentiary hearing on those claims. LASC Writ; LASC Supplemental Writ. The Louisiana Supreme Court denied

Petitioner's Writ without a written opinion, and without ordering a hearing on any claim. *State v. Hoffman,* 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791.

To the extent that any facts are "undeveloped" it is not due to any fault of Petitioner's; his requests for evidentiary hearings are not limited by section 2254(e)(2). *Williams,* 529 U.S., 426 (2000); *Mayes v. Gibson,* 210 F.3d. 1284, 1288 n. 2 (10th Cir.), *cert. denied,* 531 U.S. 1020 (2000) (§ 2254(e)(2) did not bar hearing because prisoner 'raised the need for an evidentiary hearing in both the Oklahoma Court of Criminal Appeals on direct appeal, and the State district court on collateral appeal... [and] thus acted diligently to develop the factual basis of his habeas claim"); *Walker v. Gibson,* 228 F.3d 1217, 1231 (10th Cir. 2000), *cert. denied,* 533 U.S. 933 (2001) (petitioner's "attempt to develop the factual basis of the . . .claims in state court" by "present[ing] affidavits to support these claims in post-conviction proceedings and seeking evidentiary hearings ... frees him from the limitations of 28 U.S.C § 2254(e)(2)"); *Morris v. Woodford,* 229 F.3d 775, 781 (9th Cir. 2000) (petitioner whose claims were denied by state courts without evidentiary hearing, could not be faulted for lack of factual record in state court); *Breedlove v. Moore,* 279 F.3d 952 (11th Cir. 2002); *cert. denied sub nom. Breedlove v. Crosby,* 537 U.S. 1204 (2003) (where petitioner unsuccessfully sought evidentiary hearing on *Brady* claim at every stage of state proceedings, 2254(e)(2) was no barrier to evidentiary hearing); *see also Hines v. Lensing,* 1998 WL 603397 at *1 (E.D.La. Sept 9, 1998) (evidentiary hearing would have been granted if Petitioner had supported allegations with affidavits, exhibits or other materials, and thereby made sufficient effort to develop the facts).

### B. An evidentiary hearing is mandated in this case

Where § 2254(e)(2) does not bar a hearing, the pre-AEDPA decision of *Townsend v. Sain,* 372 U.S. 296 (1963) still controls a habeas petitioner's entitlement to an evidentiary

hearing.[13]   Under *Townsend,* an evidentiary hearing is *mandatory* provided that he alleges facts, which if proven, would entitle him to relief, *and* if he proves one of six factors:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id.* at 313.   In relation to all of his claims Petitioner has alleged facts, which if proven, would entitled him to relief.   He is entitled to a mandatory evidentiary hearing under *Townsend* for several reasons.

### 1. State Court's Failure To Make Factual Findings

With the exception of Petitioner's claim of ineffective assistance of counsel at the penalty phase, the state district court made *no* factual findings on his claims when denying his application for post-conviction relief.   State Court Order, 5/1/08.   This failure falls squarely within *Townsend* factor one.   *Townsend,* 372 U.S. 293, 313, 314, 320 (hearing required because "merits of the factual dispute were not resolved in the State court hearing").   Thus, courts have invariably found that a mandatory hearing is required where state determination is conclusory and does not indicate the factual basis for the conclusion reached, or does not address or resolve all of the controlling factual issues raised.   *Guidry v. Dretke,* 397 F.3d 306, 324 (5th Cir. 2005) (remanding for evidentiary hearing where state court findings insufficient, because federal court could only speculate as to factual basis for the decision); *Brown v. Johnson,* 224 F.3d 461, 465 (5th Cir. 2000) ("Where no findings of fact have been made by the state courts with respect to a

---

[13] *Bacon v. Lee,* 225 F.3d 470, 489 (4th Cir. 2000) (quoting *Fisher v. Lee,* 215 F.3d 438, 454 (4th Cir. 2000)); *Baja v. Ducharme,* 187 F.3d 1075, 1078-79 (9th Cir. 1999) (citing cases).   *Baja* and the cases cited therein were cited with approval by the Supreme Court in *Michael Wayne Williams v. Taylor,* 120 S. Ct. 1479, 1488 (2000).

particular habeas claim, ... a federal habeas petitioner is entitled to some form of evidentiary hearing so long as his 'allegations, if proved, would establish the right to habeas relief'); *Goodwin v. Johnson,* 132 F.3d 162, 182-184 (5th Cir. 1998)(petitioner entitled to evidentiary hearing because 'neither the state district court nor the Court of Criminal Appeals made any [explicit or] implicit findings of fact); *Mason v. Balkcom,* 531 F.2d 717, 722 (5th Cir. 1976) (hearing required because state court made no specific factual findings on ineffective assistance claim); *Stouffer v. Reynolds,* 168 F.3d 1155, 1165, 1168 (10th Cir. 1999) (district court erred in denying evidentiary hearing on ineffective assistance of counsel claim; "without benefit of an evidentiary hearing, our judgment of counsel's performance as deficient remains unsettled given the Court's admonition in *Strickland* to avoid the seduction of hindsight review"); *Stockton v. Virginia,* 852 F.2d 740, 743-45 (4th Cir. 1988) *cert. denied,* 489 U.S. 1071 (1989) (given absence of state court fact-finding on critical question whether and how third party contacted juror during deliberations, state court finding of lack of prejudice not due deference and federal hearing required). To the extent they require further factual development or resolution of factual disputes, Petitioner is entitled on this basis to a hearing on his habeas claims II, III, V, VI, VII, VIII, IX, X, XI, XII, XIV, XIV, XX and XXI.

The same principle applies where the state court made only partial findings, and did not resolve *all* factual issues necessary to the resolution of the claim. *Blackmon v. Scott,* 22 F.3d 560, 566-67, n.27 (5th Cir. 1994) (because "[n]o state court findings were made with respect to [one] aspect of petitioner's claim... [r]emand is necessary for an evidentiary hearing"). Thus, for example, although the Louisiana Supreme Court denied Petitioner's *Batson* claims on appeal giving fairly detailed reasons, Petitioner presented further evidence in support of his claims in post-conviction (statistical evidence demonstrating discriminatory pattern of strikes in District

Attorney Walter Reed's office) which no state court has ever commented upon; the state court denied the claim on the merits without giving reasons, so there is no means of determining the court's findings as to the weight or relevance of that evidence. The same applies to Petitioner's habeas claims III, IV, XVI.

### 2. Failure Of State Court To Hold Evidentiary Hearing

Again, with the exception of Petitioner's claim of ineffective assistance of counsel at the penalty phase, the state court denied all of Petitioner's post-conviction claims without an evidentiary hearing. Because hearings are generally so critical to the reliable determination of facts in post-conviction and habeas proceedings, this failure strikes at the heart of *Townsend* and meets several of its factors, including factor (1) "the merits of the factual dispute were not resolved in the state hearing;" factor (3) "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;" factor (5) "the material facts were not adequately developed at the state-court hearing; and (6) "for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Id.* Federal courts frequently grant evidentiary hearings even when the state court held one. *Guidry v. Dretke*, 397 F.3d 306 (5th Cir. 2005) (evidentiary hearing required in federal court, despite state court hearing because there were still unresolved disputes of fact); *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (despite evidentiary hearing in state court "the [federal] district court lacked sufficient undisputed facts to make an informed decision and therefore abused its discretion in failing to conduct an evidentiary hearing"). Where there has been no hearing in state court at all, an evidentiary hearing is almost always required to ensure the proper development of the material facts. *Perillo v. Johnson*, 79 F.3d 441, 444-45 (5th Cir. 1996) (petitioner entitled to federal evidentiary hearing because state court proceedings did not include hearing on factual

questions that could be dispositive in resolving claim of conflict of interest); *Trotter v. Bunnell,* 1998 U.S. App. LEXIS 23766, at *3 (9th Cir. 1998) (given that petitioner "did not receive an evidentiary hearing in state court" on claim of incompetency to plead guilty, petition is entitled to federal hearing if proof of facts alleged by petitioner would entitle him to relief"); *Glock v. Singletary* 84 F.3d 385, 386 (11th Cir. 1996) (petitioner entitled to evidentiary hearing because claim of ineffective assistance is "not meritless on its face" and "has heretofore been resolved on the record, without an evidentiary hearing"); *Houston v. Lockhart,* 982 F.2d 1246, 1250-53 (8th Cir. 1993) (en banc) (district court erred in denying hearing to petitioner who had alleged sufficient grounds for release and whose allegations were "not admitted by the State, ... not palpably incredible, and ... never the subject of a hearing in state court"); *Tate v. Wood,* 963 F.2d 20, 24 (2nd Cir. 1992) (remanding for hearing on claims of prosecutorial suppression of evidence, because state courts did not hold hearing on claim).  On this basis, to the extent that the claims require further factual development or the resolution of factual disputes, petitioner is entitled to a hearing on his habeas claims II, III, V, VI, VII, VIII, IX, X, XI, XII, XIV, XX, XXI.

Courts are particularly cognizant of the need for an evidentiary hearing where the merit of claims depends on unresolved credibility determinations.  The state court denied Petitioner's requests for evidentiary hearings on several of his habeas claims which rely on declarations by witnesses, the credibility of which the state disputes; (e.g. claim XII (jury misconduct); claim XI, (improper conduct of jury crime scene visit); claim IX (racially discriminatory jury)).  These claims in particular, require a hearing.  *See, e.g., Guidry v. Dretke,* 397 F.3d 306 (5th Cir. 2005) (remanding for evidentiary hearing to determine unresolved credibility determinations critical to resolution of claims); *Zilich v. Reid,* 36 F.3d 317, 322-23 (3rd Cir 1994) (district court should have granted evidentiary hearing because factual issues, which were never resolved by state

court, turned upon credibility determinations that could only be made on basis of live testimony); *Stockton v. Virginia,* 852 F.2d 740, 743-45 (4th Cir. 1988) *cert. denied,* 489 U.S. 1071 (1989) (given absence of state court fact-finding on critical question whether and how third party contacted juror during deliberations, state court finding of lack of prejudice not due deference and federal hearing required).

### 3. Inadequacy, Incompleteness Or Unavailability Of Relevant Parts Of Trial Record

The trial court record is incomplete in parts critical to the determination of Claim XI (crime scene errors).  A hearing is required in this instance because the federal court does not have sufficient facts available to determine the merits of the claim.  *See Magouirk v. Phillips,* 144 F.3d 348, 362-63 (5th Cir. 1998) (remanding for supplementation of record, or for evidentiary hearing if relevant parts of trial transcripts unavailable because court was "at a loss to understand how a federal habeas court can conduct a meaningful sufficiency [of evidence] review without a transcript of trial"); *Thomas v. Lockhart,* 738 F.3d 304, 307 n.3 (8th Cir. 1984) (hearing required because of absence of record of plea proceedings); *Williams v. Estelle,* 681 F.2d 046, 948 (5th Cir. 1982) (same); *Rogers v. Maggio,* 714 F.2d 35, 39 (5th Cir. 1983) (absence of sentencing hearing transcript); *Harris v. Pulley,* 692 F.2d 1189, 119-1200 (9th Cir. 1982), *rev'd on other grounds,* 465 U.S. 37 (1984) (absence of articles, broadcasts and *voir dire* transcript regarding pretrial publicity).

### 4. Unsupported State Fact-Findings

Under *Townsend*'s second factor, an evidentiary hearing is also required where the state court's decision is not fairly supported by, or is unreasonable in light of, the record as a whole. *Townsend,* 372 U.S., 313. *See also Jackson v. Herring,* 42 F.3d 1350, 1366 (11th Cir.), *cert. denied,* 515 U.S. 1189 (1995) (district court properly held evidentiary hearing because "crucial

finding of the state ... court was not fairly supported by the record"); *Blackmon v. Scott,* 22 F.3d 560, 566 n.20 (5th Cir. 1994) (state court finding that record was "devoid" of evidence of an undisclosed deal to state witness, was not supported by the record which contained conflict evidence, and thus issue "must be resolved" by means of federal hearing); *Giles v. Schotten,* 1999 U.S. App. LEXIS 16902 (6th Cir. 1999) (federal court should have granted hearing on issue because record contained "ample evidence" contradicting state court's finding and "little evidence to fairly support the finding"). Petitioner's claims are strong and well-supported, and the state court's denial of them is unreasonable in light of the record as a whole. He is therefore entitled to a hearing of any of his claims on this basis, if it is necessary to resolve any outstanding disputed facts, or sufficiently develop the facts to prove his claims.

Lastly, Petitioner notes that the court clearly has discretion to grant an evidentiary hearing in any case in which a factual dispute exist, *even* where the mandatory grounds under *Townsend* are not met. *Townsend,* 372 U.S., 312 ("where an applicant for writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court ... has the power to receive evidence and try the acts anew"). *See also Guidry v. Dretke,* 397 F.3d 306, 322 (5th Cir. 2005) (citing *Townsend).* Petitioner urges this Court to exercise its discretion to do so, if it finds the record is not sufficient to warrant relief.

# PART TWO

## ARGUMENT

I. **PETITIONER'S CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL, A RELIABLE SENTENCING HEARING, AND DUE PROCESS OF LAW WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT MATERIAL, RELEVANT, AND COMPELLING MITIGATING EVIDENCE OF MR. HOFFMAN'S MAJOR MENTAL ILLNESS, CHAOTIC UPBRINGING AND CHILDHOOD PHYSICAL, EMOTIONAL AND SEXUAL ABUSE,**

**AND A NEW SENTENCING HEARING MUST THEREFORE BE ORDERED.**

At the state post-conviction evidentiary hearing, Petitioner demonstrated that trial counsel's performance with respect to investigating mitigation fell below an objective standard of reasonable representation. Petitioner presented substantial mitigating evidence of mental illness, childhood physical, sexual and emotional abuse, and other environmental and family history factors that crippled his development. Petitioner likewise demonstrated that all of the substantial mitigating evidence presented at the state post-conviction hearing was readily available to trial counsel had counsel pursued avenues of investigation that were standard in capital representation at the time of Petitioner's trial.

Following the evidentiary hearing, the state district court denied Mr. Hoffman's claim that counsel's representation was ineffective at the sentencing phase of his capital trial. Its rationale for denying the claim was both contrary to and an unreasonable application of clearly established federal law. The facts of Mr. Hoffman's case are materially indistinguishable from those in the *Wiggins* case, and the court's failure to grant relief is contrary to the *Wiggins* holding. Additionally, its refusal to consider testimony and documentary evidence in assessing counsel's performance is contrary to *Williams, Wiggins,* and *Rompilla.* Furthermore, the key factual determinations underlying the state court's erroneous finding that counsel's representation was effective is against the clear and convincing weight of the evidence, rendering its decision objectively unreasonable. Based on the record before it, this Court should vacate Mr. Hoffman's sentence of death and remand his case to the state court for a new sentencing hearing.

### A. Ineffective Assistance of Counsel

As a result of counsel's ineffective representation, the jury that sentenced Jessie Hoffman to death never heard any of the compelling mitigation readily revealed by basic investigation.

With Jessie Hoffman's life in their hands, the jury never heard about a level of trauma, abuse and neglect so extreme it included:

- being raised by a severely mentally ill mother who abused both drugs and alcohol and:

    o believed in punishing her children by burning their hands on an open flame or, as a lesser punishment, beating them until they were bruised and bleeding;[14]

    o sexually abused some, if not all, of her sons;[15]

    o left her small children in the apartment alone, locking them in, and locking as well all the cabinets containing food so they had nothing to eat;[16]

- a well-intentioned but elderly and infirm grandmother who let a second degree burn on a toddler's little hand linger untreated for so long it required ten (10) days of hospitalization to begin the healing process;[17]

- a largely absent father who, when present, hog-tied his children and locked them in a dark closet;[18]

The jury never heard that Jessie Hoffman was raised in a family plagued by a multi-generational history of mental illness, substance abuse, physical and sexual abuse, and neglect, and that Jessie himself suffered from psychosis, post traumatic stress disorder, and brain damage. The jury also never heard that in Jessie Hoffman's family, murder was the leading cause of death.[19]   Instead

---

[14] Testimony of Joann Norman, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 32-33; Testimony of Marvin Fields, Transcript of Evidentiary Hearing, LASC Writ, Ex. 6-1, at 99-100.

[15] Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/24/06, LASC Writ, Ex. 6-2.

[16] Testimony of Jo Ann Norman, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1.

[17] Photograph of Jessie Hoffman, LASC Writ, Ex. 6-1, Ex. 1; Jessie Hoffman Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 6.

[18] Testimony of Marvin Fields, LASC Writ, Ex. 6-1, at 111-12.

[19] Eight of Jessie Hoffman's uncles and first cousins were brutally murdered on the streets of New Orleans. By the time Mr. Hoffman was born, one maternal uncle, Adolph "June" Ferrand Jr., had already been shot, killed, and dumped on his grandmothers' doorstep. He was twenty-two years old. Declaration of JoAnn Norman, LASC Writ, Ex. 6-4, Ex. 101. When Jessie was two Mr. Hoffman's paternal uncle William Leroy Hoffman was shot to death in the Desire housing projects. Declaration of J.D. Hoffman, LASC Writ, Ex. 6-4, Ex. 68. When Jessie was four his maternal uncle Michael Ferrand was fatally stabbed multiple times in the back with a machete in a parking lot close to the Desire Housing Project. Declaration of JoAnn Norman, LASC Writ, Ex. 6-4, Ex. 101. Michael Ferrand Death Records, in-globo, LASC Writ, Ex. 6-4, Ex. 36. When Jessie was eleven his nineteen-year-old maternal cousin Rene Ferrand was killed by his cousin Adam Ferrand; the next day, 24-year-old cousin Adam committed suicide.

the jury heard "generic testimony by family members about how he was a good kid followed by statements by the family members and by the expert that they just didn't know what caused Jessie to engage in this kind of conduct." Deposition of M. Michele Fournet, LASC Writ, Ex. 6-8, at 87-88.

So incompetent was defense counsel's representation at the sentencing phase that the state argued that *the defense* had proven that no mitigation existed:

> Ms. Salzer presented the most confusing picture or portrait of the defendant. He came from a good background, he had no history of any problems, he tested well on the exams, no indication according to her testing that the defendant had any serious problem, nothing. Yet, she couldn't conclude why he committed this horrible crime. It must have been a fluke.

> Well wait a minute, let's back up a second. If there were a history of problems, and he had some disorders and there were other problems associated, she would be coming in here and using that as a justification to spare him. How can she now use the lack of problems in his life as a justification for you to spare him again? That doesn't make any sense. It contradicts itself.

> One of the witnesses testified, during the course of the sentencing hearing, that we are all responsible for our actions. Jessie had a good upbringing, with people who loved him. He had opportunity available to him. He has no excuse for what he did to Molly Elliot.

R. 4519-20. And so *the defense* proved to jurors at sentencing that *nothing* mitigated the rape and murder of Molly Elliot and that Mr. Hoffman should be sentenced to death.

---

Ferrand was killed by his cousin Adam Ferrand; the next day, 24-year-old cousin Adam committed suicide. Declaration of Cynthia Ellis, LASC Writ, Ex. 6-4, Ex. 15. Five months later, Jessie's seventeen-year-old cousin Demond Hoffman, who had lived with Jessie and his brother for several years, was shot and killed in his mother's driveway while cleaning his car. Declaration of Bridget Scott, LASC Writ, Ex. 6-4, Ex. 129. Seven months after that, when Jessie had just turned twelve, his twenty-one year old cousin Little June was shot and killed in an argument involving drugs. Declaration of Geneva Jackson Jones, LASC Writ, Ex. 6-4, Ex. 88. Nine days later, Jessie's nineteen-year-old cousin Raymond (Little June's kid brother) was shot and killed. Declaration of JoAnn Norman, LASC Writ, Ex. 6-4, Ex. 101. Five years later, when Jessie was seventeen, Jessie's 37-year-old uncle Paul was shot and killed in the Desire Housing Projects. *Id.;* Paul Ferrand Death Records, in-globo, LASC Writ, Ex. 6-4, Ex. 39. These are just the fatalities. Violent, traumatic injury from gun-shots and other weapons have been even more common. The killings and neighborhood violence has continued to affect Mr. Hoffman's family. In 1997 Jessie Hoffman's brother, Charles Field was shot to death. In 2003 his brother Marvin Fields was lucky to survive a gunshot to the head. Declaration of Marvin Fields, LASC Writ, Ex. 6-4, Ex. 57; Declaration of Gerald Hoffman LASC Writ, Ex. 6-4, Ex. 67.

33

Not only did counsel for Mr. Hoffman do the state's job at sentencing, it relied on inaccurate, incomplete, and unreliable information to make its case.  Defense completely mischaracterized Mr. Hoffman's background and upbringing, and failed entirely to present the jury with any evidence of his major mental illnesses and an intergenerational family history replete with profound mental illness, severe substance abuse, and horrific physical abuse, sexual abuse and violence.  A sentence of death based upon such incompetent representation and such an inaccurate picture of Mr. Hoffman and his life cannot stand.

The law under which a claim of ineffective assistance of counsel must be assessed is well known.  The familiar two-prong analysis of *Strickland v. Washington,* 466 U.S. 688 (1984) requires a showing that counsel's performance fell below an objective standard of reasonably effective representation. *Id.* at 687-88.  Secondly, it must be shown that prejudice resulted from the deficient performance.  To prove prejudice, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.* at 683.  This standard requires "less than a preponderance of the evidence." *U.S. v. Cross,* 308 F.3d 308, 315 (3rd Cir. 2002).

In two recent cases, the United States Supreme Court strongly affirmed the long-standing principle that an accused who faces the possibility of death has "a right—indeed, a constitutionally protected right—to provide the jury with the mitigating evidence" during the penalty phase of a capital trial. *Williams v. Taylor,* 529 U.S. 362, 393 (2000).  In *Williams*, the Court held that the lawyer's failure to investigate mitigating evidence amounted to ineffective assistance of counsel and required a new capital sentencing hearing:

> Among the evidence reviewed that had not been presented at trial were documents
> prepared in connection with Williams' commitment when he was 11 years old

that dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he was "borderline mentally retarded," had suffered repeated head injuries, and might have mental impairments organic in origin.

* * *

Counsel's failure to discover and present this and other significant mitigating evidence was "below the range expected of reasonable, professional competent assistance of counsel." Counsel's performance thus "did not measure up to the standard required under the holding of *Strickland v. Washington,* and [if it had,] there is a reasonable probability that the result of the sentencing phase would have been different."

529 U.S. 362 at 370-71 (citations omitted).

Even more strikingly similar to Petitioner's plight is that of Wiggins, the petitioner in

*Wiggins v. Smith,* 539 U.S. 510 (2003).   In that case, the state argued that Wiggins' attorney

*had* investigated, had called witnesses, had consulted with experts, and had presented a defense,

albeit a weak and unconvincing one.  The Court was not persuaded, and reversed Wiggins' death

sentence, remanding for a new, fair capital sentencing hearing with competent counsel.

Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)--standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra, at 688, 80 L Ed 2d 674, 104 S Ct 2052; Williams v. Taylor, supra, at 396, 146 L Ed 2d 389, 120 S Ct 1495.* The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.  Cf. *id.,* 11.8.6, p 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p 4-55 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Investigation is essential to fulfillment of these functions").

35

*Wiggins v. Smith,* 539 U.S. 510, 524-25 (emphasis in original).[20]   *See also Rompilla v. Beard,*

545 U.S. 374 (2005) (finding counsel ineffective for failing to obtain records in the state's

possession despite the fact that counsel had presented the testimony of several lay witnesses and

three mental health experts at trial).

### B. Trial Counsel's Performance at the Sentencing Trial Fell Below an Objective Standard of Reasonably Effective Representation.

#### 1. Counsel's Duty to Conduct Reasonable Investigation

Trial counsel failed to conduct a reasonable investigation into Mr. Hoffman's life history,

failed to obtain a competent and reliable mental health evaluation of Mr. Hoffman, and failed to

present the jury at sentencing with readily available, compelling mitigating evidence of Mr.

Hoffman's major mental illnesses and chaotic upbringing in a family plagued by an

intergenerational history of profound mental illness, severe substance abuse, and relentless

violence,[21] in direct contravention of the standards of practice in effect at the time of trial as

articulated by the American Bar Association.  These standards provide that counsel should:

> Collect information relevant to the sentencing phase of trial including, but not
> limited to: medical history, (mental and physical illness or injury, history of
> alcohol and drug use, birth trauma and developmental delays); educational history
> (achievement, performance and behavior); special educational needs (including
> cognitive limitations and learning disabilities); military history (type and length of

---

[20] At the state post-conviction hearing, the expert in capital defense testified:

> There was a finding by the United States Supreme Court that Mr. Wiggins had received ineffective
> assistance of counsel under a set of facts that were remarkably similar to the facts in this case in
> that the very type of evidence that counsel in the Wiggins case failed to uncover was strikingly
> like the evidence that counsel in this case failed to uncover, including even not just the extensive
> physical abuse that was present in the Hoffman case, but even down to the mother locking the
> food up and the child having a burn that appeared to have been inflicted as part of a pattern of
> physical abuse. ... And just as in this case, Counsel apparently made no effort to uncover all this
> very important historical information. ... So the Court found that both prongs in the Strickland
> case had been met in a case that in my view is remarkably similar to this one.

Ex. 6-8, Deposition of Michele Fournet, 51-52.
[21] In fact, according to Odalys Acosta, a social worker hired by Petitioner's post-conviction counsel, "[i]n Jessie's family murder is the leading cause of death." Deposition of Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, at 106.

service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution/education or training/clinical services); and religious and cultural influences....Seek necessary releases for securing confidential records relating to any of the relevant histories. ... Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained ....

Counsel should consider interviewing potential witnesses, including: eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself; witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death; members of the victim's family opposed to having the client killed. Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 1989, Guideline 11.4.1.

The United States Supreme Court has repeatedly stressed the importance of a thorough social history investigation, citing the ABA guidelines for capital defense work, "standards to which we long have referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith,* 539 U.S. 510, 524 (2003) (internal citations omitted). "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins* at 2537. In this case, trial counsel's knowledge of Mr. Hoffman's history was not only rudimentary; it was grossly inaccurate.

Counsel in capital cases must investigate the defendant's entire life to prepare for sentencing. "Because the scope of mitigation evidence which may be considered by the jury in sentencing is much broader than the range of relevant information which may be considered in

37

determining guilt or innocence, counsel is under a greater obligation to discover and evaluate potential evidence of mitigation." *United States ex rel. Emerson v. Gramley*, 883 F.Supp. 225, 243 (N.D. Ill. 1995), *aff'd*, 91 F.3d 898 (7th Cir. 1996).   When counsel fails to adequately investigate, counsel's performance is deficient because counsel cannot have a valid "strategy" not to pursue evidence that is unknown to counsel due to a failure to adequately investigate. *Wiggins, supra.*

### 2.   Trial Counsel's Failure to Investigate

At Petitioner's evidentiary hearing, the testimony clearly demonstrated what was already abundantly clear from Mr. Hoffman's trial: trial counsel's lack of familiarity with well-established guidelines for the investigation and preparation of a penalty phase defense as promulgated by the ABA and the United States Supreme Court.

Trial counsel's meager preparation for the penalty phase of this case fell woefully short of the prevailing professional norms in effect at the time.[22]   Rather than conduct the thorough multigenerational family history investigation that was required, trial counsel obtained Mr. Hoffman's school records and conducted *one group interview* of some members of Mr. Hoffman's family, as well as a separate interview of his grandmother.   Trial counsel failed to collect readily available and voluminous records pertaining to Jessie Hoffman as well as family

---

[22] "At the time this case was tried, it had been recognized for a long period of time that the kind of horizontal and vertical, I believe is how Ms. Acosta described it, family investigation needed to be done in capital cases and needed to be done on a multigenerational basis.  The American Bar Association standards in 2003, which of course was subsequent to this trial, contains some language referring specifically to the intergenerational investigation.  Again, I would emphasize that merely because that language doesn't appear in earlier guidelines doesn't mean that it wasn't implicit in the earlier guidelines.  I believe that language merely amplified the earlier guidelines.  But in addition to that, the type of intergenerational investigation that Ms. Acosta described in her deposition was recognized as necessary long before this trial. ... One could look to training material.  As part of my preparation, I reviewed some training material from 1996 in Louisiana for capital case certification. ... And this was not in New York or Oregon.  This was in Louisiana.  It was a lecture given by a Louisiana lawyer.  And part of that presentation was an emphasis on the necessity to do an intergenerational investigation and to go back at least three generations.  So this is not something that suddenly arose in 2003.  This is a notion that has been around in preparing for capital trials for well before Mr. Hoffman's case went to trial."  Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 61-63.

members and failed to identify and/or thoroughly interview potential mitigation witnesses because, as his testimony revealed, "until the actual trial, nothing concerning Jessie Hoffman's family or history or Jessie's history of mental illness was involved in our investigation because we did not think that there was any further information to be acquired there." Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 32-33.

Both the readily available records and witnesses were essential as mitigation evidence in and of themselves, but for two additional purposes: they would have enabled counsel to either corroborate or correct information self-reported by Mr. Hoffman and they would have provided any expert retained by the defense the necessary information to conduct a full and accurate evaluation of Mr. Hoffman. Testimony established that trial counsel's reliance on Mr. Hoffman's denial of the existence of mitigating evidence to conclude that none existed was a complete abdication of his duty to investigate and prepare for sentencing. It was tantamount to police ceasing to investigate a crime because their prime suspect tells them he did not commit it. It was entirely unacceptable and wholly unreasonable under prevailing professional standards at the time. Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 77.

Likewise, counsel's single group interview of family members who came to his office was unacceptable under the prevailing professional norms at the time. It was well-established at the time that eliciting the kind of sensitive information that constitutes mitigating evidence requires multiple interviews over time, preferably conducted by professionals trained in recognizing signs of abuse. *Id.* at 70-74.

Counsel's failure to obtain these records and interview these witnesses resulted in a wholly inadequate, inaccurate and incomplete social history that was relied on by the only expert who evaluated Mr. Hoffman and testified at his trial. This was not a case in which trial counsel

made an informed, strategic decision not to pursue certain avenues of investigation or present available mitigation. As trial counsel concluded, "I have heard that significant things have been discovered in the psychological profile of Jessie and his family. And that being discovered, I can only say that we missed it." Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 53.

### a. Trial Counsel's Failure to Collect Readily Available Records

Once Mr. Hoffman was indicted for capital murder, trial counsel did not bother to independently obtain readily available records related to either Mr. Hoffman or his family.[23] Trial counsel's file contained one set of records: Mr. Hoffman's school records. Testimony established that the file did not contain a single release for records, a single request for them, or a single request for a subpoena *duces tecum* for records other than the one issued for the school records. Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 101-102. This fell far short of the standards of practice in effect at the time of trial as enunciated in section 11.4.1 of the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases adopted by the American Bar Association in 1989. The guidelines on this point are a matter of common sense; as the expert in capital defense explained succinctly, "[y]ou've got to get the records because the records … they're not in denial." *Id.* at 79.

The readily available records that counsel failed to obtain in this case included those supporting his major mental illness, childhood physical abuse and neglect, family history of profound mental illness and chronic substance abuse, and a chaotic upbringing in an unstable family plagued by extreme abuse and violence. Had trial counsel bothered to obtain the records that were readily available, he would have learned of the existence of compelling, material, and relevant mitigation evidence concerning Mr. Hoffman's background and family history.

---

[23] In both their affidavits and their depositions, trial counsel asserted that there was no strategic or tactical reason for their failure to obtain records pertaining to Jessie Hoffman and his family.

Both the social worker and the expert in capital defense testified at the post-conviction hearing that the wealth of information that would have been available to a lawyer that did his job was precisely the kind of information lawyers must seek as part of a basic investigation of mitigation.   Ms. Acosta testified that declarations from family members, obtained by post-conviction counsel, recounting Mr. Hoffman's and his family's history were borne out by "medical records, court records, you know, vital statistics records, records that are valid in that they were done by professionals at the time they were either rendering treatment or an event that actually happened that resulted in a court case." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 33. Ms. Fournet agreed:

> And the volume – I have to join in Ms. Acosta's observation, that the volume of available documentary evidence was truly amazing and just a wonderful, really, treasure trove from the standpoint of preparing for a capital trial of information.... Well, there was information about mental health problems that permeated this family back for several generations.   There was information about police calls to the residence.   There was information about the criminal records, as Ms. Acosta pointed out, that these family members of people that surrounded Jessie, their profession was committing crimes. That's what he grew up with.  There was information about the numerous moves that this family made when Jessie was a boy.  That's just – those are just examples.  I mean, it was just an incredible amount of information that both corroborated what was learned from the lay witnesses and also furnished additional information like the head circumference issue I mentioned earlier that only an expert would recognize as very significant in terms of who this young man turned out to be in his adolescence. … Well, they're all suggestive – not all of them, but certainly the burn and possibly the other two as well are suggestive of physical abuse … but also a suggestion that these children were neglected …

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 111-112.

### b.  Trial Counsel's Failure to Interview Readily Available Witnesses

In addition, trial counsel failed to interview readily available witnesses with firsthand knowledge of Mr. Hoffman's life and background—witnesses who would have corroborated the records documenting his chaotic upbringing, childhood abuse and neglect, long family history of severe mental illness and substance abuse, and repeated exposure to violence in his family and in

41

the community.  When asked specifically about whether he had interviewed potential mitigation witnesses, trial counsel responded as follows:

> Some of them.  The ones — I don't remember who came to the meeting in our office.  I want to believe – I want to think the father came and the sisters.  I really don't remember who came to the office.  And I seem to think that I visited the grandmother in her home.  That's my memory.

Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 44-45.  Beyond this, trial counsel's contact with potential witnesses occurred during breaks in Petitioner's trial.

To be sure, Petitioner established at the evidentiary hearing that the contents of counsel's trial file reflected his memory that he did not interview family witnesses beyond a single group interview at his office.  Review of counsel's trial file revealed no notes of interviews with potential mitigation witnesses and no notes of attempts to contact witnesses.  Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 125-127.  In fact, the only indication in the file that counsel did anything with respect to investigating potential mitigation witnesses "was a handwritten list that appeared to be a list of siblings.  There apparently was an attempt to identify the identities of people in the immediate family.  But I didn't see that it was carried any further than that."  *Id.* at 125.  The father counsel claimed he interviewed in his office in fact only met briefly with counsel ten minutes before taking the stand to testify at the penalty phase.  *Id.* at 128.

The cursory, limited interviews left the witnesses trial counsel did call in the penalty phase of Mr. Hoffman's trial uninformed as to their role and ill-equipped to testify at a capital sentencing proceeding.  Mr. Hoffman's grandmother, Ms. Rosa, was a chief witness at sentencing, yet had no idea that her grandson had been found guilty of first degree murder.

> With respect to Ms. Rosa, when you put a witness on the stand to plead for the life of the person on trial and you tell her you know Jessie has been convicted of first-degree murder, and she says, oh, no, he's been convicted.  Common sense – I don't have to read

the lady's mind or speculate. Common sense would tell you that lady had no idea that she was testifying at the second phase of a trial or that she even knew there were two phases. And common sense would tell that nobody told her that. And I find that frankly appalling.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 130.

This fell far short of the requirements of prevailing professional norms. "The prevailing professional norms at the time would have dictated that you sit down early with your client, your experts, and any potential mitigation witnesses and explain to them the bifurcated procedure and their role in it." *Id.* at 129. And while "you may not use all of the witnesses that you interview for one reason or another, but they may lead you to other information. And so they're still important." *Id.* at 134.

### c.   The Inaccurate/Incomplete Life History that Resulted

Given trial counsel's complete failure to obtain records pertaining to Mr. Hoffman and his family and the wholly inadequate witness interviews that were undertaken, it stretches the bounds of credulity to say that any social history was developed at all. As trial counsel conceded, "I mean obviously … our investigation was insufficient if, in fact, they found all of these other things. I mean, because I relied on Elaine Salzer [the sole defense expert] and on my own talking with him. I'm not a psychiatrist, but I did not see any evidence of that. And in relying on Elaine, we did not investigate that. We didn't know – we didn't think that was – we didn't think we would find anything there." Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 54.

What the jury heard concerning Jessie Hoffman's life history can be summarized as follows:

> The penalty phase presentation in Jessie's case consisted of some sort of generic testimony by family members about how he was a good kid followed by statements by the family members and by the expert that they just didn't know what caused Jessie to engage in this kind of conduct.

43

Deposition of Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 87-88.  Dr. Elaine Salzer, the lone defense expert who testified in the penalty phase, specifically told the jury that there was no evidence of abuse and that Mr. Hoffman had a good relationship with both his parents and his siblings.

### d.  The Inaccurate, Uninformed, and Inconsistent Diagnoses that Resulted

Trial counsel's failure to obtain readily available records, failure to interview readily available witnesses, and failure to develop a comprehensive and reliable medical and social history left the expert he retained with little to no accurate information on which to base a diagnosis.  It is no wonder, then, that she found no major mental illness and no organic brain damage.  As the capital defense expert testified at the hearing, "your expert is only going to be as good as your lawyer most of the time."  Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 124.

Trial counsel's failure to provide his experts with readily available, material and relevant information concerning Jessie Hoffman's background and upbringing was, in itself, ineffective. *See Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) ("A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment"); *State v. Coney*, 845 So.2d 120 (Fla. 2003) (counsel ineffective in capital sentencing where counsel failed to provide the defense experts with available background information on the defendant); *Commonwealth v. Alvarez*, 740 N.E.2d 610 (Mass. 2000) (counsel ineffective in murder case for failing to review or provide the defendant's medical records to the defense expert).

The mental health profession and the courts have recognized that a reliable and thorough forensic mental health evaluation must include consideration of "collateral information" about

the defendant – i.e. information that comes from sources other than the defendant himself. *See, e.g., Kaplan & Sadock, Comprehensive Textbook of Psychiatry* at 488, 550 (4th ed.); *Bonnie and Slobogin, The Role of Mental Health Professionals in the Criminal Process,* 66 Va.L.Rev. 427 (1980); *American Psychiatric Association, Report of the Task Force on the Role of Psychiatry in the Sentencing Process, Issues in Forensic Psychiatry 202* (1984); *Pollack, Psychiatric Consultation for the Court, 1 Bull.Am.Psych.&L.* 267, 274 (1974); *H. Davidson, Forensic Psychiatry 38-39* (2d ed. 1965); *Mason v. State,* 489 So.2d 734, 737 (Fla. 1986). Collateral sources of information are critical to a reliable forensic mental health evaluation because the defendant's ability to relate his own history and problems is often impaired – mentally ill persons tend to be poor historians; they hide rather than reveal symptoms; they are often (irrationally) afraid of what will happen to them if they do reveal their history or symptoms; and they often lack insight into their problems. As a result, without collateral sources of information, the defendant's mental illness and its full extent and implications may remain hidden. Because the consideration of collateral information is critical to a reliable evaluation, capital defense counsel are ineffective if they fail to investigate and develop such information and fail to present it to the mental health expert who is doing the evaluation for capital sentencing. *See e.g. Glenn v. Tate,* 71 F.3d 1204, 1210 n.5 (6th Cir. 1995) ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant"); *Beavers v. Balkcom,* 636 F.2d 114, 116 (5th Cir. 1981) (courts "repeatedly stress the particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel" (*citing United States v. Fessel,* 531

F.2d 1275, 1279 (5th Cir. 1976); *United States v. Edwards*, 488 F.2d 1154, 1163 (5th Cir. 1974))).[24]

### e. The Confusing, Inconsistent, Incomplete Sentencing Trial that Resulted

Because trial counsel failed to conduct a reasonable penalty phase investigation, the defense the jury heard at sentencing was confusing, inconsistent, and incomplete. Rather than offer mitigation evidence in support of a life sentence, the defense ultimately offered evidence in support of the prosecution's argument that Mr. Hoffman should be sentenced to death.

> Well, there were – the penalty phase presentation in Jessie's case consisted of some sort of generic testimony by family members about how he was a good kid followed by statements by the family members and by the expert that they just didn't know what caused Jessie to engage in this kind of conduct. I don't really consider that a theory. What it really represents to me is a complete abdication. It's, in effect, an admission that the lawyers could not find any mitigation in his life, any explanation for what led to this terrible crime. And what is so tragic about it, of course, is that there was a lot of information out there. It just wasn't presented. So there was no real strategy that I could see, not anything I would describe as a strategy. It was just sort of a default position that was predicated on the absence of enough information to develop a real theory or theme for life.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8 at 87-88.

The virtual vacuum of accurate, individualized information concerning Jessie Hoffman and his life history had catastrophic consequences in this cross-racial murder tried before an all-white jury:

> The truth of the matter is that it is a lot harder for people to act in a sort of generically racist way in their decision-making. It's a lot easier for them to do that than it is for them to make a decision based on race when they know all the information about the person. In other words, as long as Jessie Hoffman fits that racial stereotype that was propagated by Mr. Reed and probably believed by a lot of people in St. Tammany Parish at that time that there were predators coming out of the inner City of New Orleans who were violent

---

[24] This explains in large part why all of the experts, both defense and state, misdiagnosed Mr. Hoffman. "They were not able to provide sufficient information to the expert to reach a fully informed expert opinion, and they also foreclose the possibility that might have otherwise occurred of the expert, for instance, asking for the neuro – type of neuropsychological exam that was done in this case, because the expert wasn't able to get that far in the examination to know that was necessary without all this psychosocial history." Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8 at 136-137.

and had no redeeming qualities and who were a threat to the people in St. Tammany Parish and existed sort of as that type of abstraction, as long as that's what the people on the jury believed, then Jessie Hoffman was going to die.

*Id.* at 97-98.

Finally, in light of trial counsel's inadequate investigation, his decision not to put on

evidence of Mr. Hoffman's family history cannot be characterized as "strategic." Trial counsel

himself conceded as much:

> Q: So let's assume that the prior testimony is that Jessie Hoffman grew up in the projects in New Orleans, that he was severely abused by his family members, that he was subjected to physical, mental and sexual abuse, that his family members, a lot of them had mental problems, particularly on his mother's side, that he grew up, as one witness said, 'in hell,' would you feel that in front of a St. Tammany Parish jury – not would you feel, but would you have used those things in front of a St. Tammany parish jury, or would you have tried to convince them that he was a nice guy that just got this ball rolling downhill?

> A: If I had known everything that you said, I would have put it in front of a jury, even though I might not have thought it would be effective, but I would have felt that I had to put it in front of a jury because that is some significant information about the person.

Deposition of William Alford pp. 63-64. As the expert in capital defense put it, "there is *no*

*conceivable legitimate strategy reason* for failing to" identify, locate and interview potential

mitigation witnesses. Deposition of M. Michele Fournet, LASC Writ, Ex. 6-8, at 135 (emphasis

added).

**C. Thorough and Competent Post-Conviction Investigation of Jessie Hoffman's Background Produced Readily Available Evidence of Mr. Hoffman's Major Mental Illnesses and Chaotic Upbringing in a Family Plagued by an Intergenerational History of Profound Mental Illness, Severe Substance Abuse, and Relentless Violence.**

Had a competent investigation been conducted, the life history presented to the jury

deciding whether Jessie Hoffman lived or died would have been remarkably different than what

was presented at trial.

> I mean the environment to which he came in on the day he was born was so toxic, so dysfunctional, so chaotic, so entrenched with patterns that had clearly never been broken that I would have expected much chaos and instability and inability to function internally within them.

Deposition of Odalys Acosta 11/09/06, LASC Writ, Ex. 6-4, at 385.    After reviewing the

numerous, readily available records and witness declarations and interviewing a number of

witnesses to independently corroborate the information she had been provided, Ms. Acosta

concluded:

> I believe after reviewing and working on Jessie's case that Jessie Dean Hoffman is an overwhelmed, damaged and traumatized human being who lacks the resiliency skills to effectively manage adult life, and this is due to the timing of the events in his life which are critical, the enormity and severity of these events especially as they manifested themselves through the generational patterns of his family, the dysfunction and the chaos, as the result of the direct abuse, abandonment and neglect that he suffered, as a direct result of living in the community that he lived in which was like a war zone, and lastly because there was no societal intervention that could have provided Jessie with perhaps some of these skills to be able to handle and coping with life as we all must.

*Id.* at 96.[25]

**1.   Jessie Hoffman Was Born into a Family and Environment Already Crippled by a Devastating Intergenerational History of Substance Use and Abuse, Mental Illness, Sexual Inappropriateness, Criminality, Instability of Home, Paternity Confusion and Lack of Nurturing and Appropriate Parenting Skills**

Understanding the family into which a child is born is not only relevant to developing a

comprehensive and reliable psychosocial history, it is essential.   As Odalys Acosta, a social

---

[25] During her testimony, Ms. Acosta stated that this case involved "the most documents I have ever had to work with, whether it be a capital case or in any of the other job employments that I've had. ... Seldom do I have so much criminal records to go through just in a family per se. Seldom is there so much medical intervention in a family. ... I was also very impressed with the willingness of the family members to give declarations.  A lot of what was in those declarations again is not very flattering and most people do not tell stories that are not flattering of themselves and/or their families.  So their willingness to provide this was also impressive."  Deposition of Odalys Acosta 11/09/06, LASC Writ, Ex. 6-4, at 235-236.  In addition, Ms. Acosta personally interviewed Elvera Ferrand Ruffin, Marvin Fields, Gerald Hoffman, Derrick Scott and Raushannah Smith.  Ex. 6-4, Deposition of Odalys Acosta, 11/09/06, 241-244.

worker with particular expertise and training in child development and the generation of social histories, explained,

> I start with the family because like I said that's the house. And that's sort of, you know, whatever your house is made of is the storm it can withstand. A good house can perhaps withstand the storm of a violent community. So I started with Jessie's family and these patterns that began to develop for me.

Deposition of Odalys Acosta, 11/09/06, LASC Writ, Ex. 6-4, at 251.[26]

In Jessie Hoffman's case, this multigenerational investigation revealed a family history replete with patterns that negatively impacted Mr. Hoffman from the time he was born. These patterns included a multigenerational history of severe substance abuse, profound mental illness, sexual inappropriateness and sexual abuse, criminality, instability of home, physical abuse, violence, paternity confusion, and a lack of nurturing and appropriate parenting skills.

### a. Substance Use and Abuse

In Jessie Hoffman's family, there was a multigenerational history of severe substance abuse on both the maternal and paternal sides. It included profound alcoholism, drug abuse and misuse of prescribed medications. This well-documented history greatly impacted Jessie Hoffman's development. As Odalys Acosta explained, and as any parent knows,

> Well, because if you are a child in this family and as a child you have the needs that all children have to be loved, cared for, and all that stuff and all you see around you are the adults intoxicated, abusing drugs, abusing medications, that is very significant. Because we are not born in a vacuum. We become. We learn. ... If we see people behaving in this manner then it only leaves us two choices: One is to follow it. Because that's what they did, that's what I do. The other is to collapse under it.

---

[26] At the time of her deposition, Ms. Acosta had over twenty (20) years experience as a social worker. Her entire career has been spent working with at-risk children and her experience includes identifying and treating child abuse; developing programs and treatment plans for at-risk children; counseling and treating at-risk children; and identifying and developing mitigation in capital cases. In each of these settings, developing and utilizing psychosocial histories was a component of her work. In 1995, Ms. Acosta was named Social Worker of the Year in South Florida by the National Association of Social Workers. In addition, Ms. Acosta has taught a number of university courses on the topic of identifying and treating at-risk children in the field of social work. Curriculum Vitae of Odalys Acosta, LASC Writ, Ex. 6-4, Ex. 1.

Deposition of Odalys Acosta 11/9/06, LASC Writ, Ex. 6-4, at 259-260.  The substance abuse in Jessie Hoffman's family was inescapable.  On the maternal side, six of eight children in Jessie's mother's generation, including his mother, were substance abusers.  *Id.* at 262-263.  His mother's substance abuse was so severe that she had four documented overdoses before Jessie reached the age of two.  *Id.* at 51-62; Elvera Ferrand Ruffin's Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 109.  In addition, medical records described Mr. Hoffman's maternal grandmother as a severe alcoholic.  Ex. 6-4, Deposition of Odalys Acosta 11/9/06, LASC Writ, Ex. 6-4, at 266; Agnes Enclarde Ferrand's Charity Hospital Records 4/30/80-5/5/80, LASC Writ, Ex. 6-4, Ex. 27.[27]  The paternal history included Mr. Hoffman's grandfather, his father and his father's siblings.  During her testimony, Ms. Acosta described in detail the records, declarations and witness interviews supporting both a maternal and paternal family history of substance abuse. Deposition of Odalys Acosta 11/9/06, LASC Writ, Ex. 6-4, at 262-297.  This included abuse of crack cocaine, powder cocaine, IV heroin, PCP, alcohol, marijuana and prescription medication. LASC Writ, Ex. 6-4, Exs. 16, 19, 30, 40, 41, 48, 54, 58, 77, 99, 102, 131.

### b.  Mental Illness

Both of Jessie Hoffman's primary caretakers, his mother and his paternal grandmother, were severely mentally ill.  His mother displayed "psychotic behavior," Elvera Ferrand Ruffin Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 109, and has been variously diagnosed with schizo-affective type schizophrenia, unspecified state, major depressive affective disorder, and PTSD. Elvera Ferrand Ruffin Charity Hospital Records, Chartes-Pontchartrain Records, and Social Security Administration Records, LASC Writ, Ex. 6-4, Exs. 109, 110, 120.  Her behavior

---

[27] These records described Ms. Ferrand as a 48 year old woman weighing 98 pounds who was brought to the hospital by ambulance for alcoholism.  After 5 days in detox at Charity Hospital, she was diagnosed with acute alcohol withdrawal.  These records also described a chaotic, unstable home environment.

has been described as "somewhat bizarre," "delusional," "hallucinating," and "psychotic bizarre." *Id.*   His grandmother, Rosa Lee Hoffman, was diagnosed with depression, schizoaffective disorder and psychosis.  Rosa Lee Hoffman Medical Records, LASC Writ, Ex. 6-4, Exs. 73, 75.  According to the National Mental Health Association:

> Parental mental illness can significantly impact family life.   There can be confusion in family roles, with children assuming many adult responsibilities. ... Children living with a parent with serious mental illness are also adversely affected by the poverty that often accompanies the illness.

www.nmha.org, fact sheet, "When a Parent Has a Mental Illness," *citing* American Academy of Child and Adolescent Psychiatry, *Children of Parents with Mental Illness*, No. 39, May 2000.

In Jessie Hoffman's family, mental illness was not restricted to his primary caretakers. There was a significant, multi-generational history of documented mental illness on both sides of his family.  This history was relevant to understanding both Jessie Hoffman's development as well as his mental health.  According to Odalys Acosta:

> There are certain patterns that you look at as a matter of course just because these are patterns that if they do exist are pretty significant.   I go back to the doctor analogy.   If you are a doctor and trying to find out what was wrong with the patient, you would ask them do you have a history of hypertension in your family, diabetes, all those questions.   Because when you ultimately diagnose them, these patterns matter.   There are certain patterns that just matter.   Physical illnesses is one of them.   Mental illness is another one of them.   You always look at family's mental illness history.

Deposition of Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, at 297-298.

Ms. Acosta noted a pervasive, multigenerational history of psychotic disorders, including schizophrenia spectrum disorders and explained that psychotic symptoms

> are those symptoms which if it was a chart they are the ones at the tipity top. They are the maximum.   They are the worst symptoms that a human can manifest when it comes to a mental illness.

51

Deposition of Odalys Acosta, 11/09/06, LASC Writ, Ex. 6-4, at 301-302.   Ms. Acosta testified

extensively regarding both the maternal and paternal history of mental illness in Jessie

Hoffman's family.   *Id.* at 305-322.

> As to the paternal history of mental illness, Ms. Acosta noted:

> [t]he thing about Jessie's paternal side, which was a surprise to me to be honest
> with you because I had met his mother's side of the family and had already read
> the declarations and sort of kind of knew what was there to potentially investigate,
> once I actually started to get into Jessie's father what I found was on Jessie's
> father's side of the family tree there is also significant psychoses, but in a very
> much more classical, clean sense.   These diagnoses are straight up psychotic
> diagnoses each and every time.   And that was again why you investigate, why you
> get all the information.   Because that was a pattern that revealed itself that I
> wasn't particularly expecting it, but yet it did.

*Id.* at 316.

> Ms. Acosta summed up the significance of this pattern of mental illness as follows:

> Again it's not just mental illness.   It's psychotic mental illness, which has very
> often an organic base.   As we go on with Jessie's life, you couldn't ask for a
> worse situation than to grow up in a chaotic environment where organic psychotic
> processes is a family tree phenomenon.   It's adding gasoline to the fire.

*Id.* at 322.

### c.   Sexual Abuse and Sexual Inappropriateness

> Sexual abuse is not something you necessarily look for.   You don't assume that in
> most families sexual abuse is going on.   So this was a pattern that revealed itself
> to me as I went into the research of just reading all these exhibits that have now
> been entered.   And I did not find it in the father's side of the family.   But what I
> found on the mother's side of the family was as impressive as I have ever found.
> … In my professional experience, I have never seen such a family tree when it
> comes to sexual inappropriateness and sexual abuse, and remember I worked in a
> treatment facility for juvenile sex offenders.

*Id.* at 324.   The sexual abuse on the maternal side of Mr. Hoffman's family was

multigenerational and had a devastating impact.   Ms. Acosta detailed the maternal history of

sexual abuse and the declarations, records and witness interviews that supported this history.   Id.

at 326-358.   She further detailed its impact as follows

> This, again, is all very in keeping, you know, it's almost if you had a checklist and you had to check off things, you could almost check off every single one of them, the early sexualization, the inappropriate sexual attitudes and behaviors, the promiscuity. You know, just the same way all five sisters got married young and pregnant young, you start seeing these boys being sexualized very early and in a disrespectful kind of a way.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 246-247.

The pervasive, multigenerational sexual inappropriateness and sexual abuse was documented and then confirmed when examined by an experienced social worker. This information was readily available to a trained professional. It should have been readily available to the jury that sentenced Mr. Hoffman to death.

### d. Criminality

In Jessie Hoffman's family, employment was an almost non-existent family pattern. There were no professions or job skills passed from generation to generation. Instead, the profession the children in this family learned from the adults that raised them was crime.

> When you do this, one of the questions as you are doing this is what did mom do, what did dad do, to see again the patterns that develop in families. When I did this in Jessie's family, what I found was a royally intensive criminality chart and a basically nonexistent job chart. There was no particular occupation or profession that the family members followed. ... When I started to do that, what I found was criminality instead. I found criminal convictions.

*Id.* at 359-361. There was extensive, multigenerational documentation of criminal convictions on both sides of Jessie Hoffman's family. Court records documented convictions that included drug offenses, armed robbery, theft, and domestic violence. Deposition of Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, Exs. 16, 19, 21, 24, 30, 31, 32, 35, 38, 41, 46, 48, 54, 59, 61, 62, 69, 70, 71, 81, 85, 86, 92, 93, 99, 102, 127, 128, 131, 148.

### e. Instability of Home

There was a generational history of instability in the home.

53

> You never knew either where you were actually living because mom would move or who lived in this home, who had rooms in this [home]. I mean there are occasions where they are sleeping on kitchen floors, people in and out. I think that also leads credence to the sexual abuse. When you have so many people coming in and out of your home, it's a little hard to manage them all and to make sure everything is going as it should.

Deposition of Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, at 379. HANO records documented the deplorable and unstable living conditions at the home of Agnes Ferrand, Jessie Hoffman's maternal grandmother. Agnes Ferrand's HANO records, LASC Writ, Ex. 6-4, Ex. 26. . School records detailed a number of the moves made by Jessie Hoffman's mother during his school years and his brother Marvin's testimony confirmed this. Twice, Jessie Hoffman's mother made moves that resulted in the family being homeless. Jessie Hoffman's School Records, LASC Writ, Ex. 6-4, Exs. 7 & 9; Testimony of Marvin Fields, Evidentiary Hearing Transcript, 10/23/06, LASC Writ, Ex. 6-1, at 94-96; Testimony of Marvin Fields, Evidentiary Hearing Transcript,10/24/06, LASC Writ, Ex. 6-2, at 3-5.

### f. Paternity Confusion

In Jessie Hoffman's family, fathers were largely absent. Often there was confusion about who the biological father was. Men were transient and offered little in the way of role models. Jessie's mother changed his name from Fields (the last name of a former boyfriend) to Hoffman (Jessie's biological father).

> So now Jessie's name is Jessie Dean Hoffman, but his father is still Jessie Dean Fields. That's just a paper example of the confusion these children lived under. Because it isn't just that paper example. As we go through Jessie's life history, we will see where mom is saying this is your father. That's not your father. Fathers come and go and change at the drop of a hat. It's also a pattern Miss Agnes had. Miss Agnes often, again in the declarations and according to my conversation with Elvera as well as in the declarations of her sisters, no one was ever quite sure who your dad was. And that's very confusing to children.

Deposition of Odalys Acosta, 11/09/06, LASC Writ, Ex. 6-4, at 382-383.

### g. Lack of Nurturing and Appropriate Parenting Skills

In general, there was a multigenerational inability to nurture and parent in Jessie Hoffman's family.

> What I'm talking about is what we all as a society agree upon is good parenting. You provide your children with a stable home. You provide your children with nourishment. You provide your children with adequate medical care. You provide your children with discipline that's appropriate.

*Id.* at 385.

The chaotic, unstable family history that preceded Jessie Hoffman placed huge obstacles in his path from the day he was born.

> Families are just the macro of the micro, the micro being the self. What makes us a human being is not just all the bad things that happen to us because bad things have happened to everyone. So you can't just look at the bad influences in somebody's life and say that's the totality of their life. That's ridiculous.

> What makes us functional human beings, and functional I'll define as succeeding, coming home, living, feeding yourself, not needing the support of society to maintain you, just functional, is our resiliency. You are resilient. You have other skills. You are taught. And resiliency is taught. It's the one thing we are not born with. We are not born resilient. We are born an infant in a cradle. Resiliency has to be taught.

> Well, the primary place we look for resiliency is in our family. This country is made of nothing but resilient stories from families coming from other countries and bettering themselves. This country is founded on the fact that each generation bettered itself, worked hard, went to school, got to go to college, all these things.

> So when you look at a family and you see pattern after pattern, generation after generation that did not better themselves, they may have moved from one place to another but that place was one housing project to another. There was no homeownership. There was no ownership of those things that we all strive for as Americans in this land. There was no becoming doctors, lawyers. There was none of that.

> So if the family structure, the macro, does not have any ability to overcome, the burden on the individual child to gain those skills is almost impossible. What it takes to be able to do that as a self, just an individual self, is phenomenal and usually great stories of heroes, not the average person.

*Id.* at 386-387.

### 2. Jessie Hoffman's Life History

The same holds true for children and the environment they are born into. "[W]e're not born into nothing. We come into a family that already exists and it's the ground in which we're then to grow into." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 6. The multigenerational history of substance abuse, mental illness, sexual abuse and sexual inappropriateness, criminality, instability of home, paternity confusion, and lack of nurturing and appropriate parenting skills left Jessie Hoffman's caretakers ill-equipped to provide even the basic necessities, much less an environment in which he could thrive and develop the skills necessary to succeed in life.

There are predictable, well-documented stages of child development. At each stage, there is specific learning that is critical to successful progression to the next stage.

> Developmental psychology is the study of how human beings advance and become more effective. You know, that's what we try to do as human beings. We become effective, successful, functional, all these words that are interchangeable. … All Erickson did, which is accepted, never questioned, this is, you know, just straight up psychology, is he just identified critical junctures. After studying, and these studies have been repeated bazillion times, they found that at certain stages human beings must reach certain plateaus, if you will, so that they can advance to the next. So that when you get to adulthood, again, you are a functional, competent human being.

*Id.* at 12-13. The impact of not learning at one stage negatively affects all of the stages that follow.

> You're going into the next stage ill prepared. So your chances of being able to successfully master that stage becomes a little bit more difficult. So it's almost like you're always running behind. You're never quite fully catching up to what you need to be at the task you have to have accomplished.

*Id.* at 15. Jessie Hoffman did not successfully progress from a single developmental stage.

### a. Jessie Hoffman's First Year: Stage One

During the first year of his young life, when Jessie should have been learning to trust that the world was a safe place, his life instead was filled with instability, chaos, and neglect. This instability began at birth, when his mother left the hospital without him. Instead, Jessie Hoffman left the hospital in the care of his paternal grandmother, Rosa Lee Hoffman.

> As long as it's a reliable caretaker, that's fine. Now, when Ms. Rose takes Jessie home, also living with Ms. Rose at the time is her son, William Leroy Hoffman, who, as we discussed yesterday going through those charts is a schizophrenic, he's very violent, he's in and out of hospitalizations, the hospital records, you know, note that he's out of control, he doesn't take his medicines regularly.

*Id.* at 21; *see also* William Leroy Hoffman's Southeast Louisiana Hospital Records, LASC Writ, Ex. 6-4, Ex. 82; William Leroy Hoffman's Charity Hospital Medical Records, LASC Writ, Ex. 6-4, Ex. 83.

At times, though, Jessie was also in the care of his mother. Because of the tension between his mother and father, there was a lot of unpredictable back and forth. Jessie's mother would drop him off at Ms. Rosa Lee's house at all hours of the night without warning and then show up unexpectedly to take him home. Often, this was prompted by her anger at Jessie's father. However, it was particularly disruptive at such a young age.

> So now again, here's a baby. He's going back and forth. Feeding schedules, you know, diaper changes, sleeping times, napping times. Anybody who's ever had an infant knows that they come with timing.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 23. This instability had a significant effect on Jessie's early growth and development as an infant: medical records indicate a failure to thrive in his first year. *Id.* at 35.

Jessie was hospitalized a number of times as an infant. When Jessie was seven months old he was brought to the hospital as a result of severe asthma. Against medical advice, his

mother took him from the hospital but he was returned within thirty minutes by his grandmother.

Jessie Hoffman Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 6.

> [H]ere's the pattern [of instability] being played out in a medical setting, so therefore documented in medical records.  Again, what's been said in the declarations is that [Jessie's mother], at will, would take Jessie whenever she wanted to prove a point, and here she's doing it once again to her child while he's in the hospital. But that constitutes medical neglect as well.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 41.

A few months later, Jessie's asthma again required hospitalization.  When his grandmother, Rosa Lee Hoffman, visited, according to the hospital records, "she's not even aware that he's been – has this problem." *Id.* at 42.  According to a doctor's notation, "their plan includes the house needs to be dusted." *Id.*  The following month, when Jessie is ten months old, he was brought back to the hospital with an eye problem. "Again, … dust, … it's affecting his eyes.  He's rubbing his eyes.  It's affecting him.  Again, … how is he being cared for?" *Id.* at 43; Jessie Hoffman Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 6.

One month later, when Jessie was eleven months old, he returned to Charity Hospital and was diagnosed with diaper dermatitis, or severe diaper rash.  Ex. 6-4, Ex. 6 Jessie Hoffman Jr. Charity Hospital Records.  As Ms. Acosta summarized, even something as manageable as a diaper rash required a hospital visit, asthma went unabated due to poor housekeeping, medical treatment was refused, and all of this was occurring with Jessie going back and forth between two households.

> Again, I have a young child that medical records support he has a diaper rash that needs to go to the hospital because of it.  He has out-of-control wheezing and asthma because of possibly, you know, poor housekeeping.  He has – his mother takes him from the hospital when he needs to be there.  He is going, you know, people who lived at that time and knew them are reporting that Jessie is going back and forth. … He is not being cared for in a stable environment.

58

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-4, at 44-45. The result, based upon predictors of child development, was that Jessie Hoffman was "clearly learning [in his first year] that the world is not a place that he can trust." *Id.* at 45.

### b. Jessie Hoffman's Second Year: Stage Two

During his second year, when Jessie should have been developing self-confidence, he instead learned doubt. His world was unsafe and continued to be unstable as he went back and forth between a mentally ill mother who self-medicated and a physically ill grandmother who seemed unable to take care of her own well-being much less that of a little toddler. *Id.* at 53.

Also, during this second year, there were four documented instances of overdoses by his mother. Ex. 6-4, Ex. 109 Elvera Ferrand Ruffin Charity Hospital Medical Records. At the same time, his grandmother Rosa repeatedly went to the hospital because "she's a diabetic, and she does not monitor her diabetes very well." Ex. 6-4, Deposition of Odalys Acosta, 11/10/06, 52; Ex. 6-4, Ex. 75 Rosalee Hoffman Charity Hospital Records. The resulting lack of adequate care and supervision had devastating consequences for Jessie.

> Now comes a very critical incident in Jessie's life which is the burning of his hand. It is reported that Jessie's hand – in the records when they go to the hospital, which bear with me a little bit here, that he burned his hand on an iron while he was with his grandmother, Rosa-Lee Hoffman. ... He is taken to the hospital, however, ten days later. ... If you do the math and you go back to when the hand was burned and when Jessie was taken to the hospital and then you look at Ms. Rosa's medical records, she, herself, went to the very same hospital for her own medical condition, the diabetes, the tack, the foot and all that stuff on the same day Jessie was to have burnt his hand. ... [I]n the declarations[s], several family members said that they believe Jessie burned his hand because Elvera did it. Marvin himself testified that that was frequently a method his mother would use for discipline, especially when you touched or did something bad. Look at the stage. It's the no stage. Children are touching everything. ...
>
> This is not a big leap of faith to say that this child's hand was probably burned by his mother, not medically treated, and ten days later then taken to the hospital with the story that it had happened at the grandmother's house with an iron. I find it very difficult to believe that Jessie would have burned his hand at his

grandmother's house, she would have taken herself to the same hospital and left Jessie behind.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 54-55. By the time Jessie was brought to the hospital for this "second to third degree burn," his hand was so infected, he was hospitalized for ten days. Jessie Hoffman Jr. Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 6. Whether this injury was the result of an intentional burn or it happened accidentally, "it would have had an impact on Jessie's life." "One, you're talking extreme physical abuse, the other medical neglect, or both." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 58.

During this same year, two of Ms. Rosa Lee Hoffman's family members were killed in a house fire and Ms. Hoffman entered "a prolonged period of major depression which is diagnosed over and over again." *Id.* at 60; News Articles Regarding Deaths of Matilda and Willie Mae Davis, LASC Writ, Ex. 6-4, Ex. 12; Rosa Lee Hoffman Charity Hospital Records, LASC Writ, Ex. 6-4, Ex. 75.

In February of 1980, Jessie's mother overdosed for the fourth time. The medical records note that "she has psychotic behavior and she is very hostile. … this is the first time that we start seeing psychotic symptoms being identified in her pattern of behavior." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 62; Elvera Ferrand Ruffin Charity Hospital Medical Records, LASC Writ, Ex. 6-4, Ex. 109.

Around this time,

Ms. Agnes who's Elvera's mom also has to be taken to the hospital, and this is where she's diagnosed with the chronic alcoholism. The reason that matters is that Elvera, herself, is moving in and out of places. One of the places she's moving into is her mother's home. As she's doing this, she very frequently takes the boys with her because at this time she has the three boys.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 63; Agnes Ferrand Charity Hospital Records, LASC Writ, Ex. 6-5, Ex. 27.

When Jessie was nineteen months old, just over a year and a half, his right toe somehow got caught in the spokes of a moving bicycle. It was so severe that it required partial amputation of his toe and hospitalization for ten days. Ex. 6-4, Deposition of Odalys Acosta, 11/10/06, 66-67; Ex. 6-4, Ex. 6 Jessie Hoffman Jr. Charity Hospital Records. A short time later, Jessie returned to Charity Hospital:

> it's because in an act of diapering, his mother puts powder on him and somehow it causes his penis to swell. He has a swollen penis for five days, and five days later his grandmother, again, takes him to the hospital. ... I mean, babies get powdered all the time and they don't develop a swollen penis. This becomes a really, big, big red flag to me. Because at this very age later on as I go through, you know, again I divided this into categories and I look at sexual abuse that might have been happening at that time. This is exactly the same time the family members are stating that they see Marvin and Charles rubbing up and down on their mother.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 69.

It was during this time that Jessie's paternal uncle, William Leroy Hoffman, the schizophrenic who lived with Ms. Rosa Lee Hoffman, was murdered. *Id.* at 70; Newspaper Articles on Death of William Leroy Hoffman, LASC Writ, Ex. 6-4, Ex. 79; William Leroy Hoffman Death Certificate, LASC Writ, Ex.6-4, Ex. 80.

Thus, as a toddler, the prevailing theme of Jessie Hoffman's second year was trauma.

> I think that at this critical junction in this young man's life, all he experienced was very inconsistent traumatical events happening to the people around him so much so that key experiences, this is the beginning of Jessie experiencing trauma. ... Trauma. It is traumatical for a child at this age to have had his hand burned, whatever the circumstance was. It is traumatical to have your toe amputated, whatever the circumstances were. And it is traumatical to have had a swollen penis, whatever the circumstances were because it required three hospital stays, not to mention all the other times he went due to his asthma and poor medical care.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 73-74. This repeated trauma undermined Jessie's self-confidence and resulted in his failure to progress successfully from this stage.

### c. Jessie Hoffman's Pre-School Years: Stage Three

During his pre-school years, when Jessie should have been learning to take responsibility and manage impulses, "this stage just added to the continuation of his being overwhelmed, traumatized and damaged." *Id.* at 78.

The instability of home continued during these years, and the tension between his mother and father escalated. Jessie's father had two children: "Jerry with Elvera [Jessie's mother] and Jessica with Ms. Jordan, so dad's being clearly unfaithful or not loyal to a relationship or committed to a relationship." *Id.* at 79. Gerald Hoffman Birth Certificate, LASC Writ, Ex. 6-4, Ex. 66; Jessie Hoffman Sr. Civil Court Records (Paternity Suit re Jessica Jordan), LASC Writ, Ex. 6-4, Ex. 71. "But because of this, it causes great tension between Elvera and Joanne [Jordan]. They actually have screaming matches with each other, and the police being called and all these things happening." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 79. Jessie and his little brother Jerry continue to go back and forth between their mentally ill mother and their physically infirm grandmother, Rosa Lee Hoffman. Because of family deaths and failing health, Ms. Rosa Lee spiraled into a severe depression that continued until her death. This major depression is well-documented in medical records and meant she was "probably not up to the task of rearing a child and then another infant." *Id.* at 80.

At the same time, there was continued unrest in Jessie's mother's home.

Also at this time I started to see a pattern which is in phone calls to the police regarding the home Jessie is living in. For example, in 1981 there were 13 calls to the police made from the home where Elvera lived. Two calls concerning cruelty to juveniles, two calls for disturbances, one call for domestic disturbance, one call for illegal use of a weapon, one for a battery and one for medical reasons.

*Id.* at 81.  New Orleans Police Department Address Searches, LASC Writ, Ex. 6-4, Ex. 139.  In addition, Jessie Hoffman, Sr. continued to have a volatile relationship with Jessie's mother and meted out severe and abusive punishment to her children.  According to Jessie's brother Marvin Fields, Jessie Hoffman, Sr. "would hog-tie them and lock them in closets sometimes all day." Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex.6-5, at 81-82; Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 111-112.

> Now I start to see incidences in the documentation where physical abuse is being reported.  And Jessie remembers being beat with sticks, pipes, pants, baseball bats and frequently with extension cords which later on again will also reveal itself. The beating left welts and scars and sometimes drew blood.  They were often administered while he was naked.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 83.  The physical abuse Elvera Ruffin inflicted on her children was so bad that the boys named the extension cords their mother used to beat them.  "Blacky was the black one and Shredder was one that had been shredded, and Marvin testified to this in court as well."  *Id.* at 91-92.  After the beatings, the boys compared welts.  They concluded that their mother was maddest at the child with the most welts. Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 100-102.

> As a child developmentalist, social worker, therapist, when children start to do this, you are very alarmed.  Because what this is the normalization of torture. ... A parent might take a belt and maybe punish their child for whatever behavior they did.  But to do it to such a degree that the children name them, we're talking on a scale from 1 to 10, an 11.  This is off the charts.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 92.

In addition to the physical abuse, "Elvera again reported as being very verbally abusive to the children, calling them names, cursing at them, telling them they're no good, that she hates

them..." *Id.* at 82-83.  Also, Elvera began padlocking the refrigerator and the cabinets where food was stored.  The children were left to fend for themselves with a limited supply of food and once it ran out, the children went hungry.  *Id.* at 84; Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 96-99.

> When asked to provide an example of her good parenting, Jessie's mother had this to say:

> She would put the boys on a bus, the boys being Jerry and JD at her bus stop close to her home and let them ride on the bus all the way to Ms. Rose's house, and this was her example of, you know, how great the boys were because they could do this.  At the time they were like five and two.  She would put minor children on a bus ... [b]ut on a bus with whoever got on and off that bus all the way to their grandmother's house trusting that grandmother who was a very ill person who often was going in and out of emergency rooms to hospitals because she injured her foot or toe or didn't control her diabetes would be there to pick them up.  This to me was fascinating, that this was her example – and by the way, it was her only example of her being a -- ... of good parenting, that the boys would do this. ... [I] is so age inappropriate and so not an example of good parenting.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 101-103.   Truly, Jessie Hoffman's mother had no concept of parenting.

> During this time, Jessie started school.

> There's a misconception because I've heard it said a couple times and I heard it said in court that Jessie was a good student where in fact he was not.  If you read the school records, he got at best average grades.  They were always average to poor.

*Id.* at 95; Jessie Hoffman Jr. School Records, LASC Writ, Ex. 6-4, Ex. 7.  As a result of starting school, as well as his grandmother's declining health, Jessie lived primarily with his mother during the week and was with his grandmother during the weekend.

> I also, and Marvin's testimony in court, he also said, because I believe that Ms. Rose testified in Jessie's trial, that she was with him until 11 and that's clearly not the case.  And Marvin himself recalls that's not the case and the records bear out that that's not the case, that Jessie was living with his mother at least during the week and with Rose on and off on the weekends.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 100-101.

During this same time period, when his grandmother's health was rapidly declining, his mother was physically and verbally abusive, his father was physically abusive, and households were chaotic, another member of Jessie's family died violently; his uncle was stabbed to death with a machete. Michael Ferrand Obituary, LASC Writ, Ex. 6-4, Ex. 36.

> When I started to look – as I look at Jessie's life and people are dying, as people do in all families, a very clear pattern presented itself. And what the pattern was that ten out of the thirteen deaths that occurred during Jessie's lifetime were murders. If you were to do this for any other family, you might come up with heart attacks, cancer, you know. ... In Jessie's family, murder is the leading cause of death.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 105-106. Violence was equally prevalent within Jessie's family and in the neighborhood they lived in.

> This is again, where Jessie because of the age, remember now, they're knowing about community and school, starts to – the community violence starts to come into play. Jessie remembers, you know, bullet casings on the ground, gunshot holes on the walls, windows smashed as he walks by apartments. He remembers hearing gunshots on a regular basis, he remembers gunfire at school. ... So the stories that Jessie is saying bears out when you look at the newspaper articles and the things happening at the time which I regularly do to see the climate that the client is living in.

> Then, again, four more calls are made to where Jessie lives, and this time one of them is for domestic reasons. So all this violence that's going on between Elvera and her boyfriend bears out because the police have to get involved.

*Id.* at 119-121; New Orleans Police Department Address Searches, LASC Writ, Ex. 6-4, Ex 139; Newspaper Articles Regarding Desire Housing Project, LASC Writ, Ex. 6-4, Ex. 141; Newspaper Articles, Jessie Hoffman's Schools and Neighborhoods, LASC Writ, Ex. 6-4, Ex. 143.

Despite a number of social institutions coming in contact with Jessie and his family, there was no intervention.

> Again, these are social institutions that are coming into particularly Jessie's life but as well as his brother's and nothing happens. They're going to school. They're missing days. This is not reported. This is not noted. Police are coming to the house. They see that there's children there. Nothing is done. Because some of the calls have to do with juvenile issues. Nothing happens, no social service agency comes in, nobody's called to try to help this family. Again, this is just incredible to me.

*Id.* at 119-120; Jessie Hoffman School Records, LASC Writ, Ex. 6-4, Ex. 7; New Orleans Police Department Address Searches, LASC Writ, Ex. 6-4, Ex. 139..

> Odaly Acosta summarized this stage in Jessie's life as follows:

> This violence, this poor care giving, he's being denied food, he's being beat with devices they're naming. His father is hog-tying him and his brothers, you know this onslaught, we're talking about a child under the age of six. I mean, we're talking about a first grader. You know, most first graders are running around saying their ABCs and Jessie as a six year old is having to navigate a world where there is constant fear, constant intimidation, both in the community, in his home, from the people that are supposed to love and care for you. Where does this child go? Humans are incredible creatures and we're built to survive. Jessie has to find a place where he can just survive. And we're talking primitive survival. We're not talking thriving. There's no thriving happening here. We're talking surviving, making it through the day. And all he can do is be quiet. I think Jessie is literally scared to death and just shuts up. That's it. He shuts down. … He doesn't express feelings. How would he? How would he know to? The only feelings he sees expressing are violent ones, out of control ones.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 128-129. This is the point at which Jessie began shutting down. Because this was his basic coping mechanism, he did not learn self control and the ability to manage his impulses. Once again, he failed to successfully complete this third stage of child development and his pattern of shutting down continued to emerge.

### d. Jessie's School Years: Stage Four

At a time when Jessie should have been acquiring skills to prepare him for life and the transition from home to the outside world, his home was still so unstable and the violence and abuse so prevalent that he lived in a constant state of fear.

> [B]y this stage in Jessie's life, this is so constant that I think he has now accepted it as normal behavior. … When you are in such a traumatic – living in such a toxic traumatic environment, you start to view it as normal. … And at this point they're reporting things like they were beat so bad they couldn't sit down. I think Marvin testified that the boys start counting the welts. … And the thing was, whoever got the most welts is who she was the maddest at, she being Elvera. Again, this is now children now normalizing and humans have to survive and that's how they began to survive as seeing this as normal behavior. … Now, at this – in 1988 Charles Fields goes to the Louisiana Training Institute in Scottsdale. Jessie believed it's because he was selling drugs out of the house and that was the last straw that the mother was willing to put up with. All this time their relationship had gotten increasingly violent. And he goes there at Elvera's request. The reason this is so significant is she has been telling these children, you know, I am – you know, I will – you know, a threat. I'll get you out of here. I brought you in, I'll take you out. She's made this continuous threat and here she follows through on it.

*Id.* at 155-157; Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 100-103.

> This period in Jessie's life was also plagued by violence and death.
>
> Now so far Jessie has experienced all these deaths. He's had the one cousin with the machete killed, he now has these two cousins where one kills one and then himself, he has these two cousins that are drowned. But also during this time the most significant of all these deaths, which are tragic, happens, and it is the death of his cousin Demond Patrick Hoffman who was seventeen and was murdered during an argument. … And I think Demond just showed Jessie attention and, you know, Jessie liked that. This was somebody who was showing him attention in a positive way, laughing with him.

*Id.* at 186-190; LASC Writ, Ex. 6-4, Exs. 18, 20, 22, 36, 39, 44, 45, 47, 50, 65, 79, 87, 150.

> Elvera throughout all this sort of remains the same. She is rather consistent in some things. She's consistently going in and out with men, she's consistently expressing violence, she's consistently using drugs both legal and illegal.

*Id.* at 192.

For a fourth time, Jessie failed to move successfully through a stage of child development.

> Well, Jessie reaches adolescence, because it's the end of this stage, again, not having met what – the positive stage of this, leaving – feeling inferior. Once again, ..., by this point, I think, the trauma is so severe that, like I've said several times, it's normalized. He's shut down, he doesn't participate, he doesn't say, he doesn't lash out. And what's interesting about that that in some ways what Charles, Marvin and Jerry were doing was helpful. Because in confronting their mother or being mad at her and letting it show or engaging in behavior outside of school or in the community, that sort of released this, helped them, helped them not have it tense up. They were certainly much more expressive. And in my conversations with him, that was very clear. I mean, talking with Jessie is hard work. Marvin and Jerry, you ask them a question and they give you an answer. I think that Jessie's apparent good behavior was actually at this point beginning to work against him in a very serious way.

Deposition of Odalys Acosta, 11/10/06, LASC Writ, Ex. 6-5, at 196.

### e.  Adolescence:  Stage Five

At a stage in his life where Jessie should have been developing a strong identity and making plans for the future, the chaos and instability left Jessie overwhelmed by the struggle for daily survival in a house controlled by a mentally ill and abusive mother in a community plagued by violence. In addition, the family continued to move frequently and ended up homeless on at least two occasions. For most children who remain in school, high school graduation is the culmination of their youth, a huge accomplishment that opens doors to the future.

> So on the day of Jessie's graduation, he is now graduating from ... high school, excuse me, barely; he does not have any future plans, college plans, vocational plans or anything like that at the moment identified; he has a girlfriend who is pregnant; and he is lost.

*Id.* at. 221.

To make matters worse, during this period which should be hopeful, during which Jessie

felt lost, he was the victim of two robberies; the second robbery was at gunpoint.

> And apparently what had happened is they had been at Elvera's and Jessie was
> to take [his girlfriend] Raushana home. He had now begun to stay more
> frequently at Raushana's home which was also a very violent situation as her
> stepfather, … Eldon Johnson, Ollie Smith is her mom. I'm sorry. Would abuse
> Ollie Smith, her mother, and on several occasions Jessie even intervened, got
> between them to prevent a physical violence to occur. So here again, Jessie is
> now experiencing another home where violence is the mainstay.

> But, anyway, back to the robbery, he was trying to take Raushana home and
> Elvera would not loan him the car so that he could do so. It was nighttime. As
> they are walking towards the bus stop to wait for the bus to be able to go home, I
> believe some young men came up to them and robbed them. The thing about this
> robbing being so significant is that in the process of robbing them, they made
> Jessie strip because they robbed him of his clothing. … And he was robbed and
> they left him, according to Raushana, practically naked in just his boxer shorts
> and socks. …

*Id.* at 222-225; New Orleans Police Department Report, LASC Writ, Ex. 6-4, Ex. 8.

This was a defining moment in Jessie's life and, in many ways, was the culmination of

everything he had to endure up to that point.

> So at this point in Jessie's life, he details that he sees no future. As a matter of
> fact one of the things he says is that even when he bathes or sees the scars on his
> body from some of the beatings he had as a child, you know, it just reminds him
> of how sad his life has been. So when Jessie thinks of his life, if he recalls his
> past, it's sad and lonely. And if he thinks of his future, he doesn't see one.

*Id.* at 225

In addition, the lifelong sexual inappropriateness that Jessie and his brothers were

exposed to and the sexual abuse at the hands of their mother began to have serious repercussions.

> Again, and, you know, once Marvin, you know, testified that he had in fact had
> sex with his mother and so had Jessie. This, again, is all very in keeping, you
> know, it's almost if you had a checklist and you had to check off things, you
> could almost check off every single one of them, the early sexualization, the
> inappropriate sexual attitudes and behaviors, the promiscuity. You know, just the
> same way all five sisters got married young and pregnant young, you start seeing

these boys being sexualized very early and in a disrespectful kind of a way. I mean, they're having sex with the same person in front of each other, you know, most people even if they have sex as teenagers certainly don't do it in public, certainly don't share it with anybody else. You know, it's – it's a clear disrespect for this, you know, human activity. But where does that come from? You have to ask yourself, where did they get these attitudes from? Where did they think that this was okay to do?

*Id.* at 246-247; Testimony of Marvin Fields, Transcript of Evidentiary Hearing, 10/23/06, LASC

Writ, Ex. 6-1, at 122-125,.

The extent of abuse and neglect documented in Jessie Hoffman's family had a profound

effect – even on a social worker with over twenty years of experience:

We're talking about events that occurred to children. If this does not at some level catch your attention, if not your heart, then, my goodness, what world do we live in? This is happening to children, and not just because people are saying it but because there's documentation, medical records, police records of these things happening to children that are the most innocent – you know, a society is what, judged by the way we treat our children and our elderly. … Yes, I'm animated. I'm animated because I am as a human being, and I'm animated because of course these things mattered. And thirdly, I have never in my 25 years of doing this, and I have worked in every place children and adolescents gather, schools, hospitals, treatment facilities, delinquency systems, dependency systems. I used to investigate child abuse. I have never in all my life as a professional person in a profession that I love dearly and take great pride in seen such a case. Frankly, I am overwhelmed personally by the amount of incidences, documentable incidences that Jessie Dean Hoffman, Jr., had to endure.

*Id.* at 134-135.

The impact it had on those who were forced to endure it was devastating. It left Jessie

Hoffman with no resiliency and no coping mechanisms.

Again, it is my professional opinion that Jessie Dean Hoffman in November of his 18th year was a completely overwhelmed, damaged and traumatized human being who lacked all resiliency skills to effectively manage adult life. I would add to that that I believe that by that time Jessie not only lacked the resiliency skills that are needed so that we can cope, but I believe at that time he was also beginning to perhaps manifest some of the psychotic symptoms that were the genetics of his family. Nature-nurture. I think what was happening was – I was asked to address the nurture part mostly. I think – clearly the nurturing was not there. You know, I was not asked to evaluate Jessie's mental health, you know, as a psychologist or

psychiatrist at the time.  But because of the genetics of his family, I think that these are two roads that have just collided.  Again, if all I know is of Jessie's, what happened to just him, if you were to throw out the family patterns, just what specifically occurred to Jessie alone is enough for me to reach this conclusion.  The fact that I have all this other supported evidence of the family patterns leaves me very comfortable in my conclusion, not to mention the community.  And lastly, the lack of intervention.

*Id.* at 250-251.

### 3. A Competent and Reliable Mental Health Evaluation Properly Incorporating a Comprehensive Psychosocial History Firmly Established that Jessie Hoffman Suffers From Post Traumatic Stress Disorder, Psychosis, and Has Significant Neurocognitive Deficits.

In addition to a comprehensive multigenerational psychosocial history, the complete story of Jessie Hoffman's life would have emphasized mental illness.  Most important, it would have emphasized that Jessie Hoffman suffers from psychosis and post traumatic stress disorder and has significant neurocognitive deficits.  Significantly, Jessie Hoffman's entire life history, as developed in post-conviction, supported these diagnoses.

At the outset, two very significant patterns emerged from Mr. Hoffman's psychosocial history alone:  psychosis and trauma.  Both patterns raised the possibility that Jessie Hoffman had a vulnerability to developing psychosis and/or post traumatic stress disorder.  In order to address these concerns, a competent and reliable mental health evaluation of Mr. Hoffman required expertise in both of these areas.  Post-conviction counsel retained the services of three experts:  1) Dr. Ruben Gur, a neuropsychologist with particular expertise in neuroimaging, neurocognitive deficits, schizophrenia and brain development, *see* Curriculum Vitae of Dr. Ruben Gur, LASC Writ, Ex. 6-3, Ex. 1; 2) Dr. Frederic Sautter, a psychologist with particular expertise in the areas of psychosis, post traumatic stress disorder and schizophrenia, *see* Curriculum Vitae of Dr. Frederic Sautter, LASC Writ, Ex. 6-6, Ex. 1; and 3) Dr. Edward Foulks,

a psychiatrist with particular expertise in the areas of psychosis and post traumatic stress disorder, *see* Deposition of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 15-21.

The psychosocial history identified a "large number of people in Mr. Hoffman's family who suffered severe mental illness including schizophrenia and schizophrenia spectrum disorders." Deposition of Dr. Ruben Gur, 11/7/06, LASC Writ, Ex. 6-3, at 62. According to Dr. Gur, "having a lot of people in the family with schizophrenia makes it a higher probability that you will have schizophrenia or one of the spectrum disorders of it." *Id.* at 65. Thus, Mr. Hoffman's family history created a genetic vulnerability to schizophrenia and related disorders for Mr. Hoffman. *Id.* at 62-68. *See also* Deposition of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 32-35. Even Dr. Kelly, the psychiatrist retained by the state, conceded as much. Deposition of Dr. Dennis Kelly, 12/20/06, LASC Writ, Ex. 6-12, at 150.

In addition, there was evidence that Mr. Hoffman suffered traumatic stressors in utero during the second trimester. These included inadequate nutrition, possible substance abuse, and a maternal seizure, which is "accompanied by lack of oxygen to the brain, including the brain of the fetus." Deposition of Dr. Ruben Gur, 11/7/06, LASC Writ, Ex. 6-3, at 70. According to Dr. Gur, there are several "large scale studies that documented the association between abnormal stressful events during the second trimester of pregnancy and the emergence of schizophrenia in the products of those pregnancies." *Id.* at 69. Again, even the state's expert conceded that this was an accepted theory. Deposition of Dr. Dennis Kelly, 12/20/06, LASC Writ, Ex. 6-12, at 150-151.

Finally, the lifelong history of relentless and chronic trauma described by Odalys Acosta, and documented in a plethora of records, further increased Mr. Hoffman's vulnerability to psychosis.

He was constantly under threat, under danger. He was exposed to violence, guns beatings of his, you know, fighting among his parents, he was exposed to abandonment, he was exposed to various sexual abuse scenes. Each one of those is a stressor, even if he did not have the vulnerability to schizophrenia. But in someone who has the vulnerability to schizophrenia, these stressors can be much more really devastating for development.

Deposition of Dr. Ruben Gur, 11/7/06, LASC Writ, Ex. 6-3, at 75-76.   Again, Dr. Kelly, the state's expert, conceded that "if someone is born with the vulnerability to psychosis every experience of trauma would in essence be a hit to an already vulnerable brain." Deposition of Dr. Dennis Kelly, 12/20/06, LASC Writ, Ex. 6-12, at 152.

All of the mental health experts retained by post conviction counsel reviewed the psychosocial history which documented Mr. Hoffman's genetic vulnerability to psychosis, the *in utero* exposure to traumatic stressors, and the lifelong history of relentless and chronic trauma detailed by Odalys Acosta. All three had specific expertise in the area of psychotic disorders and all three evaluated Mr. Hoffman after reviewing his psychosocial history. All three diagnosed Mr. Hoffman with psychosis and testified in detail regarding the basis for this diagnosis.

Comprehensive neuropsychological testing confirmed the diagnosis of psychosis. It revealed that "Jessie Hoffman suffers from neurocognitive deficits of the type associated with psychosis or other brain dysfunction." Deposition of Dr. Ruben Gur, 11/7/06, LASC Writ, Ex. 6-3, at 184. Volumetric analysis of an MRI confirmed brain damage. It showed that Mr. Hoffman's "parietal lobe ... on both the left and on the right is three standard deviations below average." *Id.* at 163. Significantly, Mr. Hoffman's left insula is three standard deviations below normal. *Id.* at 164. As Dr. Foulks explained:

And we know from Ruben Gur's findings here, astounding findings, that his brain didn't grow normally, something like seriously wrong with his brain. Three standard deviations of a smaller parietal lobe is not a trivial finding. This is a major – three standard deviations is seriously different than the norm. ... Oh,

73

God, and that parietal lobe is developing in childhood. That's when that's growing, so it wasn't growing right then.

Deposition of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 39.

Finally, Mr. Hoffman's brain was not fully developed as he was only two months past his eighteenth birthday at the time of the crime. The significance of this lack of development was recently recognized by the United States Supreme Court in a decision striking down the death penalty for offenders who had not yet achieved their eighteenth birthday. *See Roper v. Simmons*, 543 U.S. 551 (2005).

In addition, the lifelong history of relentless and chronic trauma in Jessie Hoffman's life created a vulnerability to developing Post Traumatic Stress Disorder. In fact, each instance of trauma met the first criteria for a diagnosis of Post Traumatic Stress Disorder. According to Dr. Sautter:

> Mr. Hoffman has been exposed to a large number of Criterion A stressful events, and I feel like I could spend several days just enumerating his trauma exposures, but it's not necessary.

Deposition of Dr. Frederic Sautter, 11/17/06, LASC Writ, Ex. 6-6, at 59. Dr. Foulks concurred:

> We have a whole series – we have a life-style of recurrent trauma, of various kinds, some of it very, very severe, other presumed because he probably didn't witness the murder of his cousin, but people were sure yelling and screaming and probably crying about it. He knew about it. This is traumatic. These are all very traumatic. And it set the stage here for childhood responses and developmental delays in children that we see with trauma.

Deposition of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 38-39. Both Dr. Frederic Sautter and Dr. Edward Foulks had specific expertise in the diagnosis and treatment of post traumatic stress disorder and both have conducted significant research in this area. Dr. Frederic Sautter administered the structured clinical interview for DSM-IV, the Clinician Administered PTSD Scale and the Structured Interview of Reported Symptoms. Deposition of Dr. Frederic

Sautter, 11/17/06, LASC Writ, Ex. 6-6, at 47-48.  Dr. Edward Foulks conducted a psychiatric

evaluation which included a clinical interview.  Deposition of Dr. Edward Foulks, 11/17/06,

LASC Writ, Ex. 6-7, at 28-29.  Both Dr. Sautter and Dr. Foulks reviewed the data used to

compile the psychosocial history testified to by social worker Odalys Acosta and incorporated

this information in their diagnoses.  The comprehensive testing and evaluation conducted by Dr.

Sautter and Dr. Foulks established that Jessie Hoffman met the diagnostic criteria for Post

Traumatic Stress Disorder.    Deposition of Dr. Frederic Sautter, 11/17/06, LASC Writ, Ex. 6-6,

at 57-75; Deposition of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 78-79.

 In addition, with proper expert testimony, the jury would have been presented with

information detailing the significance of these diagnoses to explaining and understanding the

crimes for which Mr. Hoffman had been convicted.  "The jury was already aware [that he had

kidnapped, robbed and raped a woman.  This expert testimony] would have introduced the

possibility that [Mr. Hoffman's] inability to control his violent behavior was caused by

childhood trauma, abuse [and mental illness].  This information could have been used in his

favor at the penalty phase.  Instead, the jury was left to conclude that [Mr. Hoffman's] violent

behavior was simply the result of his wicked and aggressive nature." *Simmons v. Luebbers*, 299

F.3d 929 (8th Cir. 2002) (granting relief from a death sentence).

> All of Mr. Hoffman's impairments impacted his behavior on the day of the crime.
>
> And so by my understanding, when Mr. Hoffman stepped into the car, there was another increase in anxiety.  That was additional stress, and there was a cascade, in my opinion, of psychological consequences which would be predicted by the data that we have about his PTSD and Dr. Gur's data, and that those consequences would be PTSD symptoms and psychotic symptoms which he's had all the time anyway.  There's no questioning about those symptoms.  I'm just suggesting that at that day they probably increased in severity.
>
> I know that he has a brain abnormality that has demonstrable, you know, effects on functioning, and I know that both from Dr. Gur's report and my own knowledge of the literature that psychotic symptoms increase as stress increases,

but, you know – and I know that PTSD increases in severity. I know my own experience of talking to individuals with PTSD and what happens to them when things get stressful. And so, you know, from my own experience, from what is known in science, behavioral science about these things, what's shown on an MRI, what's shown on neuropsychological test profiles, all of this kind of converges on to the conclusion that this individual, this trauma history with these symptoms, with this brain abnormality put in that car would not be able to function normally, you know compared to normal people, that there would be a dramatic impact on behavior and the ability to figure out what's going on. This is not subtle. This is big, big stuff, big time trauma, big time brain problem. But in that situation, given what happened, the situation, he would not be able to cope with it. He would not be able to control his own behavior. He would be influenced by those factors, significantly influenced.

Deposition of Frederic Sautter, 11/17/06, LASC Writ, Ex. 6-6, at 103-104. *See also*, Deposition

of Dr. Edward Foulks, 11/17/06, LASC Writ, Ex. 6-7, at 78-80.

According to Dr. Sautter, PTSD would "impede his ability to control his behavior and

think logically about what's going on." Deposition of Frederic Sautter, 11/17/06, LASC Writ,

Ex. 6-7, at 104. Dr. Sautter concluded:

My opinion is that the major thing that got exacerbated that day was his psychosis. I think his PTSD got exacerbated. But I think that his psychotic symptoms, that his documented brain abnormality, those are the things that had the most influence on his behavior that day, even though I'm sure PTSD had an impact.

*Id* at 106.

One of the things that I struggled with in terms of looking at what influenced him during the crime and to what extent is it PTSD and to what extent is it psychosis. I tend to emphasize the psychosis part. You know, there's also the PTSD part and depersonalization, an aspect of PTSD, which was included in my CAPS diagnosis, indicated in the presence of depersonalization. And that's certainly, you know, contributed to his inability to control his behavior on the day of the crime. I emphasize that psychotic part of his problem because he certainly described that to me very vividly but also because the evidence for the severity of the brain mechanism which describes his experience during the crime is so strong. And not only is the evidence strong, but the degree of abnormality measured being more than three standard deviations is so severe that I chose to emphasize that. It doesn't exclude other contributing factors such as depersonalization, and I would want to emphasize in strongest terms my certainty that this thought disorder which has been diagnosed on the basis of signs and symptoms, brain imaging and neuropsychological testing which is also consistent with extensive family and genetic history just would lead me just without reservation to conclude

that those symptoms affected him, especially at a time when he was under severe stress on the day of the crime, and that his PTSD also played an important role in his inability to function normally and control and regulate his behavior.

*Id.* at 164-166.[28]

The jury that had Jessie Hoffman's life in its hands should have learned that his entire life history, as compiled from records and interviews, was consistent with these diagnoses and they should have known the importance of this consistency.

Well, for one thing, it lends credence to all these pieces of information, because each and every piece of information is corroborated by another piece of information that's consistent with it. So it's a very credible and believable package. And the ultimate result in terms of a mitigation is what you want the ultimate result to be, which is a picture of a real live human being, not a stereotype, not an abstraction, a picture that shows that Jessie Hoffman consists of far more than the person who they heard about during the several hours that constituted his commission of his crime, that there is far more to him than that. That, yes, that was a terrible, brutal crime that Jessie committed, and we're not trying to excuse what he did. What he did was wrong. But we are here to explain who this young man is so that you will know that he is a human being who has had special challenges and obstacles all his life and his life is worth something. That's what you want to try to get across to a jury. And that's what I think this – all this information which meshes together very well and is very, very consistent, documentary information from lay witnesses and expert testimony, that's what you get when you add it all up. …Just to give you an example that you just gave, I have a hard time believing that anyone would think that Jessie Hoffman sat down and read the criteria for post-traumatic stress syndrome. So the fact that he demonstrated those criteria corroborates the claims by lay witnesses that there was, indeed, trauma occurring in that household. … And it creates not just a very compelling picture of an overwhelming amount of abuse, neglect, and violence, but it creates a very credible picture that that did indeed exist.

---

[28] Mr. Hoffman's mental illness, in addition to his youth, unfamiliarity with the criminal justice system, and failure to understand *Miranda* warnings, rendered his statements to police involuntary and their introduction at trial violated Mr. Hoffman's constitutional rights against self-incrimination, to a reliable sentencing proceeding, and to due process. They should have been suppressed at trial. Certainly there introduction was not harmless. The state capitalized on the statements again and again to argue that Mr. Hoffman specifically intended to kill Molly Elliot. *See* Appeal Brief, at 72. Because counsel unreasonably failed to investigate Mr. Hoffman's mental illness, it did not move to suppress his statements to police on the grounds that mental illness rendered them involuntary. In post-conviction, however, the state court denied the claim on its merits. Supplemental Petition, Claim XIV, at 185-93; State Court Order, 5/1/07, at 1. The state court's denial of the claim, without a hearing and without findings of fact renders the denial an unreasonable application of the clearly established law of *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This Court should grant Petitioner a new trial.

Deposition of Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 150-152.

The state offered three expert witnesses in an attempt to rebut Petitioner's claim of ineffective assistance of counsel at sentencing. Two had evaluated Jessie Hoffman prior to his trial for the limited purpose of a competency assessment. The third never evaluated Jessie Hoffman, never met Jessie Hoffman, and never even requested an opportunity to evaluate him. They did not have any of the detailed, corroborated medical and social history that was provided to all of the experts who were retained by Petitioner's counsel in post-conviction and performed competent and reliable mental health assessments incorporating *all* of the available, relevant information regarding Jessie Hoffman and his family.[29]

More important, *none* of the experts offered by the state had specific expertise in either psychosis or post traumatic stress disorder. As the district court aptly noted during the evidentiary hearing:

> I've had one case where I had a Daubert decision on my part. And I can tell you what it is. It was a medical malpractice case, where a neurosurgeon testified on one side, orthopedic on the other. The argument was, an orthopedic isn't the same as a neuro. And I agree. And I said get your own neurosurgeon if you want to counter that neurosurgeon's testimony, because I am not listening to a GP testify that a brain surgeon doesn't know what he's doing.

Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 151. The district court clearly recognized the importance of choosing the appropriate expert, but utterly failed to apply this understanding to its ruling in Mr. Hoffman's case.

---

[29] For example, it is clear from Dr. Kelly's testimony that he had not reviewed the testimony of the experts retained by post conviction counsel and relied solely on their reports. As a result, he testified that trauma in and of itself does not necessarily result in PTSD, never acknowledging that the very thorough testing showed not only trauma but also significant and persistent symptoms of PTSD, as required by the diagnosis.

The comprehensive mental health evaluation obtained by post conviction counsel firmly established that Jessie Hoffman suffers from psychosis and post traumatic stress disorder and that he has significant neurocognitive deficits. These diagnoses were essential to explaining and understanding Jessie Hoffman's behavior on the day of the crime. Additionally, these diagnoses were specifically relevant to three statutory mitigating factors: extreme mental oremotional disturbance; mental disease or defect that impaired ability to conform to the law and/or appreciate consequences, and youth. The jury that sentenced Jessie Hoffman to death should have learned of his severe mental illness.

### D. The State District Court's Denial of Mr. Hoffman's Claim of Ineffective Assistance of Counsel On the Grounds That Counsel's Representation Was Competent and Reasonable Was Contrary To and an Unreasonable Application of Clearly Established Federal Law, and an Unreasonable Determination of the Facts in Light of the Evidence Presented.

The state district court wrongly denied relief on Mr. Hoffman's meritorious claim of ineffective assistance of counsel at sentencing, and § 2254 does not prevent granting habeas relief. The state court decision was contrary to the United States Supreme Court's decision in *Wiggins*: the facts presented by Mr. Hoffman's case, established at the evidentiary hearing, are materially indistinguishable from those presented by *Wiggins*, yet the state district court reached the opposite conclusion. As a result, Mr. Hoffman is entitled to *de novo* review of his ineffective assistance of counsel claim. The state district court's decision involved an unreasonable application of the standards set out in *Strickland*, *Williams*, *Wiggins*, and *Rompilla* in that it unreasonably applied the legal standard governing the determination of counsel's effectiveness at sentencing when it found counsel's investigation reasonable and competent. Furthermore, the state court went on to conclude, contrary to the clear and convincing weight of the evidence, that counsel followed ABA standards, a finding so inadequately supported by the record as to render the ultimate decision objectively unreasonable.

### 1.   The District Court and Louisiana Supreme Court Orders Denying Relief

#### a.   The 22nd Judicial District Court Order

Following the taking of testimony and submission of documents and depositions, the district court issued an order denying relief.  The district court understood correctly that Mr. Hoffman alleged "ineffective assistance of counsel at the penalty phase of his trial in that his trial counsel failed to investigate and present evidence that would have mitigated his sentence of death."  Order, 5/1/07, at 1.  It went on, erroneously, to characterize the claim as a specific argument "that trial counsel should have done a psychosocial evaluation with a mitigation specialist and that those findings should have been presented at the penalty phase." *Ibid.*[30]

Having identified a very limited basis for Mr. Hoffman's assertion of ineffective assistance of counsel, the court found that both attorneys who represented Mr. Hoffman at trial were certified under state rules to represent capital defendants and that their testimony at the post-conviction depositions established that in preparation for the sentencing phase, "they interviewed the defendant concerning his social and family history and also interviewed his brother, Marvin Fields, and a former aunt by marriage, Jo Ann Normand [sic]." *Id.* at 2.  Again referring to the trial attorney depositions, the state court concluded that trial counsel "had no reason to suspect any mental deficiencies or psychotic condition on [Mr. Hoffman's] part" because two experts who examined competency and insanity prior to trial, as well as a defense psychologist, as well as the attorneys' interactions with the defendant "led to their reasonable belief that no such conditions were present from the time the crime was committed through the trial of the matter." *Id.* at 2-3.  The court found that the attorneys' opinions regarding the non-

---

[30] The issue is much broader.  Counsel failed to investigate Mr. Hoffman's case at all.  They did not get documents, speak with witnesses, and hire experts accordingly.  Counsel asked a few questions of a few people and handed school records to a psychologist who then performed psychological testing.

existence of "mental deficiencies or psychotic condition" "were substantiated and reinforced by the defendant himself when he specifically denied any negative family or social history during their questioning of him on those issues." *Ibid.*

Finally, with regard to the overall claim of ineffective assistance of counsel, the court erroneously concluded:

> Based on all the evidence presented in this matter and applying the relevant law, the Court finds that Mr. McNary and Mr. Alford followed the American Bar Association guidelines which were in effect at the time of the trial of this case. Their representation of the defendant was competent and reasonable. The defendant has failed to meet his burden of proof under *Strickland v. Washington*, 466 U.S. 668 (1984), and therefore, the relief sought in Paragraph IV of the Supplemental Petition for Post-Conviction Relief is denied.

*Id.* at 3. Having determined that that counsel provided competent representation, the court never reached the prejudice prong of ineffective assistance of counsel.

### b. The Louisiana Supreme Court Decision

The Louisiana Supreme Court declined to review the state district court's order in a two-word denial. *State v. Hoffman,* 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791 ("writ denied"). While the Court allowed Petitioner to file the depositions and transcripts pertaining to the ineffective assistance of counsel evidentiary hearing, it did not accept filing of the pleadings upon which the claim was based and the post-hearing memoranda addressing the evidence adduced at the hearing in relation to the claim even though Louisiana Supreme Court Rules provide for the filing of those documents.[31] As a result of its refusal to allow Petitioner to file a complete record of the proceedings in the state district court, the Louisiana Supreme Court's never fully considered the legal and factual arguments presented to the state district court.

---

[31] *See e.g., Hoffman v. Cain,* Louisiana Supreme Court Docket No. 2007-KP-1913, *Motion to Supplement Writ Application with Appendix Pursuant to Rule X.6,* 10/1/07 (requesting permission to file documents the clerk's office refused to accept pursuant to Supreme Court Rule X, § 6); *Hoffman v. Cain,* Louisiana Supreme Court Docket No. 2007-KP-1913, *Order,* 10/23/07 (granting request in part and denying in part).

### 2. The State Court's Decision Was Contrary to Clearly Established Federal Law in that It Denied Relief Despite the Fact That Mr. Hoffman Established Facts Materially Indistinguishable from *Wiggins.*

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court addressed a claim of ineffective assistance of counsel that, as in Mr. Hoffman's case, was premised at its core upon counsel's failure to investigate and present mitigating evidence. Prior to trial, counsel for Mr. Wiggins obtained a Presentence Investigation Report (PSI) and records from social services (SSR) detailing Mr. Wiggins' mother's alcoholism, his placement in foster care, and numerous instances of physical and sexual abuse. *Id.* at 518. At sentencing, counsel argued "Kevin Wiggins has had a difficult life. It has not been easy for him. But he's worked. He's tried to be a productive citizen, and he's reached the age of 27 with no convictions for prior crimes of violence and no convictions, period. . . . I think that's an important thing for you to consider." In addition, counsel was prepared to present "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other." *Id.* at 516. However, counsel did not obtain funding for a social worker to prepare a social history, even though funding was available to do so. Furthermore, counsel testified that the strategy at sentencing was to refocus "on 'retrying the factual case' and disputing Wiggins' direct responsibility for the murder." *Id.* at 517.

In the post-conviction proceedings, Wiggins presented evidence of his social history from an expert social worker who reviewed social services, medical, and school records and interviewed numerous family members, obtaining what the Supreme Court characterized as a "bleak life history." *Id.* at 516.

> According to [the social worker's] report, petitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior

82

included beating the children for breaking into the kitchen, which she often kept locked. She had sex with men while her children slept in the same bed and, on one occasion, forced petitioner's hand against a hot stove burner--an incident that led to petitioner's hospitalization.  At the age of six, the State placed Wiggins in foster care.

*Id.* at 516-17 (citations omitted).

Both the state trial and appellate courts rejected the claim of ineffective assistance of counsel, finding that trial counsel made a strategic decision to focus on Wiggins' lesser responsibility in the commission of the crime in conjunction with his lack of criminal history rather than evidence of Wiggins' background and history.  *Id.* at 518.  The Supreme Court rejected the state courts' conclusion that a strategic decision had been made to forego the presentation of mitigation.  Because strategic decision must be made based on thorough investigation, the Court instead focused on "whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*"  *Id.* at 523 (emphasis in the original) (citing *Strickland*, 466 U.S. at 691; *Williams v. Taylor*, 529 U.S. 362, 415 (2001)).

Prior to trial, counsel for Wiggins hired a psychologist to conduct testing.  The psychologist's report detailed that Wiggins "had an IQ of 79, had difficulty coping with demanding situations, and exhibited features of a personality disorder....These reports revealed nothing, however, of petitioner's life history."  *Wiggins*, 539 U.S. at 523.  In addition, counsel obtained the PSI and SSR.  The Supreme Court found that counsel's decision to stop investigating at that point was unreasonable in light of two factors.  First, it fell short of prevailing professional standards at that time:[32]

The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and

---

[32] Mr. Wiggins was tried in 1989, fully nine years prior to Mr. Hoffman's trial in 1998.

evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. *id.*, 11.8.6, p 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p 4-55 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Investigation is essential to fulfillment of these functions").

*Id.* at 524-25. Second, based upon what was contained in the information counsel *did* acquire, i.e. maternal alcoholism, emotional difficulties in foster care, long absences from school, and being left alone without food for days, the Supreme Court concluded that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." *Id.* at 525.[33] As a result, the Supreme Court concluded that the state court's finding that counsel was competent was an unreasonable application of federal law. "In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied *Strickland.*" *Id.* at 534.[34] It found that based on the record before it, counsel, in fact, had not performed competently. *Ibid.*

---

[33] The Court was also skeptical of counsel's assertion that their failure to investigate was a strategic decision; it found that the trial record seemed to reflect that the failure to investigate was due to "inattention." *Id.* at 526. It appeared that counsel had counted on having more time to investigate for sentencing, but realized they would not on the eve of the sentencing hearing. The Court concluded that counsel's justification for their failure to investigate "resemble[d] more a post-hoc rationalization" than a legitimate "strategic decision." *Ibid.*

[34] One factor the Supreme Court considered in finding the state appellate court's decision to be an unreasonable application of federal law was the court's reliance on an "erroneous factual assumption." *Id.* at 535. The court in Mr. Hoffman's case made numerous erroneous findings of fact which it relied on in finding counsel competent. *See infra.*

Because the state court had not reached the prejudice prong of *Strickland*, the Supreme Court was unconstrained in its analysis of it. The Court characterized the mitigation evidence as "powerful" because it presented "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Id.* at 534-35 (citing *Penry* v. *Lynaugh*, 492 U.S. 302 (1989); *Eddings* v. *Oklahoma*, 455 U.S. 104 (1982); *Lockett* v. *Ohio*, 438 U.S. 586 (1978)). The Court further found that reasonable counsel would have presented the mitigating evidence had it been discovered, particularly in light of the fact that there was no down-side to doing so (i.e. no aggravating factors in Wiggins' life history). *Id.* at 536. It concluded that the totality of the evidence adduced at both trial and in post-conviction demonstrated "that the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of Wiggins' moral culpability." *Id.* at 538.

In Mr. Hoffman's case, counsel failed to investigate Mr. Hoffman's life history beyond speaking with him, speaking with some unknown family members in his office, possibly speaking with Petitioner's ailing and delusional grandmother[35] at her home once, and obtaining an uninformed psychological evaluation. Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 21, 24, 44, 54.[36] Counsel further testified in the post-conviction deposition that his investigation was insufficient and it went no further than it did because they did not think further investigation would uncover any mitigation:

> obviously … our investigation was insufficient if, in fact, they found all of these other things. I mean, because I relied on Elaine Salzer [the psychologist] and on my own talking with him. I'm not a psychiatrist, but I did not see any evidence of

---

[35] Medical records reflect that following removal of a brain tumor, Jessie's grandmother displayed psychotic symptoms throughout the rest of her life. The tumor was diagnosed and removed early in Jessie's life. Deposition of Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, at 316-17.

[36] Co-counsel McNary later testified that Mr. Hoffman's was his first sentencing proceeding in a capital case, that he had never seen a sentencing phase of a capital trial, and that co-counsel Alford had taken responsibility for it. Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-10, at 14.

that.  And in relying on Elaine, we did not investigate that.  We didn't know – we
didn't think that was -- we didn't think we would find anything there.

*Id.* at 54.  Presumably the "we" to which counsel referred included the psychologist hired to test

Mr. Hoffman.  If so, then counsel failed to read Dr. Salzer's report with any care.

The psychologist's report reveals that, as in Mr. Wiggins' case, the information available

to counsel contained several leads that should have been followed in the most basic of mitigation

investigations.  Dr. Salzer *twice* mentioned in her report that the MCMI "offers the suggestion

that paranoid ideation may reach the level of psychotic delusions."  Psychological Evaluation,

Elaine Salzer, Ph.D., Supplemental Petition, Ex. 93, at 6-7, 9.  *Twice* she opined in her report that

*absent any additional data*, the paranoid ideation *might* be attributable to Mr. Hoffman's

incarceration.  *Ibid.*[37]  She noted as well, from her review of the only records provided to her,

school records, that at school age, Jessie's "primary caregiver changed from the grandmother to

the mother.  The mother then remained the consistent caretaker but instability in residence was

experienced."  *Id.* at 8.  "Instability in residence" was an understatement, given the large number

of moves over the course of Jessie's childhood reflected in school records.  Finally, Dr. Salzer's

report noted that testing indicated that Jessie engaged in drug or alcohol abuse, contrary to his

denial of any such problem.  Confused by this result, Salzer recommended that interviews be

conducted with "extended family members ... to clarify this issue."  *Ibid.*[38]  As in the reports

---

[37] The expert in standards for litigating capital cases noted that Dr. Salzer's testing indicated psychosis and
explained that this is precisely the type of information that warrants further exploration.  The experts provided with a
family and social history were not perplexed at all by Dr. Salzer's testing and in fact went on to diagnose psychosis.
Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 195-97.

[38] The capital trial expert characterized this recommendation as "a real red flag" that should have been followed up
on.  "When you get a specific request from an expert that you have retained, it's really important to pay attention to
that."  Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 122.  She noted as well that even if the
interviews had focused on substance abuse, they most likely would have begun to unlock the tremendous abuse and
neglect that Jessie suffered during childhood.  *Id.* at 123.

counsel obtained in Wiggins' case, counsel for Mr. Hoffman had specific leads and concerns the expert pointed to that should have been followed.

In addition, and worse than the fact scenario presented by *Wiggins,* both attorneys said in the course of post-conviction proceedings that the very little they knew about Jessie Hoffman's mother raised red flags. In his post-conviction affidavit, McNary recalled being aware of the fact that Mr. Hoffman's mother was "mentally unstable." Affidavit of Kevin McNary, Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-10, Pet. Ex. 1, at 1.[39] Alford remembered more precise concerns:

> The only time it was talked about was in my trying to find out why the mother, for example, she didn't come to our office, why she didn't -- I don't recall her ever calling me. I found that unusual that the mother didn't seem to be involved at all in the thing, and I was told, and maybe it was a warning flag that I ignored, but I was told that she was very nervous, but that's all I knew. I didn't look any further behind that.

Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 56.[40] Certainly trial counsel's acknowledgement that information he had constituted a warning flag that he ignored points unequivocally to the conclusion that information in counsel's possession should have prompted further investigation, as in Wiggins' case.[41]

The *Wiggins* Court exhibited skepticism when assessing trial counsel's assertion that mitigation did not fit its trial strategy and therefore was unnecessary. Trial counsel's assertion in

---

[39] McNary suspected his assumption that she was mentally ill came from a television interview with her, shortly after Mr. Hoffman was arrested. In the interview she went on at length about all the guns she kept, how much she loved guns, and that her son had never stolen one from her or used one. Both the content of what she said and her affect were strikingly inappropriate. See Transcript of Video Tape of Elvera Ferrand Ruffin, 11/30/1996, WWL-TV, Supplemental Petition, Ex. 81. According to the capital trial expert, "they might as well have sent [Jessie's mother] in front of the cameras with a big red flag to waive, because that's what it was. It was a big red flag." Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 105.

[40] Often "nervous" or a problem with "nerves" is used to mean some kind of mental illness, often psychosis, in the local African American community.

[41] Attorney Fournet testified that under prevailing professional norms governing the investigation of mitigation in capital cases, "this should have triggered an all-out effort to discover what was going on with the mental health of people in the family, not just the mother but others including Jessie himself." Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 106.

Mr. Hoffman's case that he did not further investigate mitigation because he thought it didn't exist is equally suspect. As in *Wiggins*, the record of sentencing suggests that the failure to pursue further investigation resulted from inattention rather than the non-existence of such evidence. Counsel testified that *only some* of the witnesses that testified at sentencing had been interviewed prior to trial. Others were interviewed in the hall outside the court at trial. *Id.* at 44. It was clear from Jessie's grandmother's testimony at trial that she didn't understand that he had been found guilty and that she was testifying at a sentencing proceeding. R. 4411.[42] It was also clear, during counsel's opening statement, that he had some follow-up to do with the psychologist prior to presenting her testimony. R. 4339 (psychologist does not understand why Jessie tested as drug and alcohol dependent and "the last time I spoke with her, she said she was trying to do some research on that"). Clearly the evidence that counsel *did* present was being discovered and cobbled together at the last minute, throwing doubt on counsel's ability and intent to conduct mitigation investigation complying with prevailing professional standards.

As in *Wiggins*, counsel's investigation did not comply with ABA guidelines governing investigation of capital cases. As the Court noted in *Wiggins*, ABA guidelines in effect beginning in 1989 called for investigation of "all reasonably available evidence," including information pertaining to medical history and family and social history. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1(C), at 93 (1989); *Id.,* 11.8.6, at 133. In Wiggins' case, obtaining psychological testing and an evaluation and

---

[42] The following transpired during defense counsel's questioning of the grandmother:
> Q: Do you understand that the jury has convicted, has found Jessie guilty of first degree murder?
> A: What? They have found him guilty?
> Q: Yes, the jury has found him guilty of first degree murder.
> A: They did?
> Q: Yes.
> A: Well they – I don't know much about court and stuff but I just can't understand. What kind of -- ... -- what kind of evidence –

R. 4411-12. The line of questioning was interrupted by a state objection.