documents pertaining to his life history was insufficient to meet ABA standards. Mr. Hoffman's lawyers' efforts toward mitigation investigation were equally weak—psychological testing and a report, a group interview of some family members who came to their office, and obtaining school records. In neither case did counsel conduct the critical family and social history evaluation required by ABA guidelines.

As in *Wiggins*, counsel's failure to investigate fell short of professional standards in place in Louisiana in 1998, at the time of trial. In order to represent capital defendants, counsel had to be certified by the state indigent defense board. The rules applicable to attorneys certified in Louisiana to represent capital defendants at trial mandated the retention of support services. Regardless of counsel's testimony that capital defense lawyers in his judicial district never retain a mitigation specialist to assist in preparing for trial, over a year prior to Mr. Hoffman's trial, he signed an application for certification as a capital trial lawyer attesting that he understood and would abide by the following standard for retaining support services in capital cases:

> Counsel appointed to represent a capital defendant should secure all proper and necessary support services, including, but not limited, to investigative, expert, mitigation, and any other services necessary to prepare and present a defense....Counsel should seek financial and technical assistance from all possible sources including the district indigent defender board and the Capital Program, Expert Witness/Testing Fund, and District Assistance Fund of the Louisiana Indigent Defender Board.

Louisiana Indigent Defender Board, Louisiana Standards on Indigent Defense, Standards Relating to the Provision of Counsel for Indigents Accused of Capital Crimes, Part X, Standard 7-10.1; Application for and Certification as Capital Trial Attorney, Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, Pet. Ex. 1 (certified January 3, 1997). Other attorneys representing capital defendants at the time abided by state standards and there were procedures in place to seek funding for mitigation specialists, which in general, capital attorneys actively sought. Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 124-25.

The facts pertaining to the unreasonableness of counsel's decision *not* to further investigate mitigation are materially indistinguishable from those in *Wiggins* and include the *additional* evidence that even in trial counsel's estimation, Mr. Hoffman's mother's mental instability was a red flag that probably should have been further investigated. They demonstrate, as they did in *Wiggins*, that counsel's decision to cease investigation was objectively unreasonable in light of what it discovered in its very minimal investigation. Likewise, the facts pertaining to professional standards in place in the region and at the time of trial are materially indistinguishable from those presented by *Wiggins*. ABA guidelines, local practice, *and* state rules called for a much more thorough investigation than that conducted in Mr. Hoffman's case.

As in *Wiggins*, the testimony at the post-conviction hearing established that nothing could have been more wrong than counsel's assumption, in spite of evidence to the contrary, that no further mitigation existed. As in *Wiggins*, in post-conviction a social worker testified to evidence discovered in records which unlocked the true picture of Jessie Hoffman's life. Counsel could have obtained Jessie's medical records, which revealed a chaotic upbringing, neglect, and red flags indicating abuse. Counsel could have located and interviewed Jessie's mother and readily obtained her medical records, which indicated psychosis, multiple suicide attempts, and alcohol and drug abuse. Counsel could have investigated the circumstances of Jessie's youth growing up in a series of projects that are known to be violent, revealed by Jessie's school records which indicated multiple moves as a child. Counsel could have interviewed family members and obtained police reports (public records) which revealed the level of violence Jessie witnessed and was subjected to growing up in the neighborhoods in which he lived. It took a full day for the social worker to testify to the information contained in a stack of over 140 exhibits culled from public records and record requests, as well as declarations of family members, that established

the deeply disturbing and moving factors that influenced Jessie's development.  Deposition of

Odalys Acosta, 11/9/06, LASC Writ, Ex. 6-4, and exhibits.

Ms. Acosta, a social worker experienced in the investigation of mitigation in capital

cases, concluded that she had never seen so much documentation readily available to collect in

any capital case.  *Id.* at 235-36.  In some cases, she testified, "you are lucky to get anything, a

school record, someone that you can talk to to tell you about this person's case."  *Id.* at 236.  Not

so in Jessie Hoffman's case—specifically in terms of the sheer volume of medical intervention,

family involvement in the criminal justice system, and the willingness of family members to talk

about their lives, even very unflattering aspects of them.  *Id.* at 235-36.  Ms. Fournet, who at the

time of deposition had practiced law as a criminal defense lawyer in Louisiana for some 28 years

and had represented many capital defendants at the trial, appeal, post-conviction, and clemency

stages of their appeals, also testified:

> I have to join join Ms. Acosta's observation, that the volume of available
> documentary evidence was truly amazing and just a wonderful, really, treasure
> trove from the standpoint of preparing for a capital trial of information.
>
> ***
>
> [T]here was information about mental health problems that permeated this family
> back for several generations.  There was information about police calls to the
> residence.  There was information about the criminal records, as Ms. Acosta
> pointed out, that these family members of people who surrounded Jessie, their
> profession was committing crimes.  That's what he grew up with.  There was
> information about the numerous moves the family made when Jessie was a boy.  I
> mean, it was just an incredible amount of information that both corroborated what
> was learned from the lay witnesses and also furnished additional information…

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 111-12.

Some of the details of horrors Mr. Hoffman suffered in his childhood are eerily similar to

those present in Mr. Wiggins' case.  From the alcoholic mother (Mr. Hoffman's was also

mentally ill, and made several suicide attempts), to the mother who left the children alone for

long periods of time, locking up the food in the apartment, to the burn likely suffered by having a hand held in flames as punishment (Mr. Hoffman also did not receive appropriate medical care, and so was hospitalized for 10 days as a result), to extreme physical abuse (in Mr. Hoffman's case sometimes so severe that his legs were bleeding so hard his mother did not allow him to attend school), both men had unspeakably difficult childhoods.   While Mr. Wiggins had diminished mental capacities, Mr. Hoffman was diagnosed with psychosis, PTSD, and visible brain damage.   The mitigation the jury never heard in Mr. Hoffman's case, so similar to Mr. Wiggins' mitigation, would have put before the jury "the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535.   As was Mr. Wiggins, Mr. Hoffman was prejudiced by counsel's incompetent representation.

It would be difficult to imagine two more factually materially indistinguishable cases, when it comes to a claim of ineffective assistance of counsel, than those of Mr. Wiggins and Mr. Hoffman.   The law is quite clear on this point: the state court's decision in Mr. Hoffman's case was contrary to the clearly established law of *Wiggins* and this Court should grant habeas relief. *Williams v. Taylor*, 529 U.S. 362, 406 (2000) (O'Connor, J., for majority); *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Ramdass v. Angelone*, 530 U.S. 156, 180 (2000) (O'Connor, J., concurring) (but for state law issue, the facts of petitioner's case would be materially indistinguishable from *Simmons v. North Carolina* and petitioner would be entitled to habeas relief).

### 3.   The State Court's Decision Rests On an Unreasonable Application of Clearly Established Federal Law in That It Is Premised On Wholly Inaccurate Fact-Findings and An Objectively Unreasonable Application of *Strickland*.

Ineffective assistance of counsel claims are "mixed questions of law and fact."   As such, relief may be granted where "the state court decision rests on an 'unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court.'"   *Martin v. Cain*, 246 F.3d

471, 475-76 (5th Cir.) (claim of ineffective assistance of counsel presents a mixed question of law and fact, which must be reviewed under 28 U.S.C. Sec. 2254 (d)(1)), *cert. denied*, 534 U.S. 885 (2001). This standard is satisfied where the state decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000). Here, the state district court "correctly identified" *Strickland* as the precedent governing ineffective assistance of counsel claims, but "unreasonably" applied *Strickland* in reaching the conclusion that trial counsel's representation was constitutionally adequate.

### a. The Underlying Erroneous Findings of Fact

*Strickland* cannot be reasonably applied to fact-findings that are not supported by clear and convincing evidence. The state court's decision in Mr. Hoffman's case rests on many facts not borne out by the record before the state court.

### i. Untrue: Mr. Alford and Mr. McNary interviewed family members Marvin Field and Jo Ann Normand.

The trial court found, in its Order, that "[t]he testimony of Mr. Alford and Mr. McNary shows that they interviewed the defendant concerning his social and family history and also interviewed his brother, Marvin Fields, and a former aunt by marriage, Jo Ann Normand." State Court Order, 5/1/07, at 2.[43] There is *no* evidence that counsel interviewed the family members the state court lists.[44]

---

[43] Regarding speaking with Mr. Hoffman about his social and family history, neither attorney specifically testified to doing so. Attorney Alford said he didn't sense any mental problems with Jessie, but also that "Jessie was very, very quiet, very -- everything was 'Yes, sir. No, sir.' Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 21. McNary described Jessie as "always very soft-spoken, reticent to talk....[H]e was never very forthcoming, difficult to communicate with." Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-10, at 23.

[44] Both family members testified to Jessie's mother's alcohol and drug abuse, her brutal beatings of the children, including burning Jessie's hand, and Marvin testified that his mother sexually abused him. Transcripts of Evidentiary Hearing, 10/23-24/06, LASC Writ, Exs. 6-1 and 6-2. Had trial counsel talked with them, he would have uncovered substantial mitigating evidence that could have been presented at trial.

Attorney McNary testified that Bill Alford put together the whole penalty phase and that he only dealt with DNA and scientific evidence. Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-10, at 10, 14, 15. Attorney Alford testified that he spoke only with the grandmother and with unnamed family members who came to his office. Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 42-44. Jo Ann Normand testified that she was never contacted by Mr. Hoffman's trial attorneys. Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 65. Marvin Fields testified that that he first saw Mr. Hoffman's trial lawyers in the hallway of the courthouse at trial. They told Marvin that someone might come talk with him, but no one ever did. Transcript of Evidentiary Hearing, 10/24/06, LASC Writ, Ex. 6-2, at 14-15.

The state court's completely erroneous finding of fact as to these witnesses critically undermines any conclusions it makes with respect to counsel's duty to investigate mitigation. Both family members testified to Jessie's mother's alcohol and drug abuse, her brutal beatings of the children, including burning Jessie's hand, and the inappropriately open sexual activities constantly occurring in the children's presence at their mother's and grandmother's homes. Marvin testified in addition that his mother sexually abused him. Transcripts of Evidentiary Hearing, 10/23-24/06, LASC Writ, Exs. 6-1 and 6-2. Had trial counsel talked with the family members the state court claimed they did, they would have uncovered this potent mitigating evidence. It is possible that the state court erroneously assumed that trial counsel *did* uncover this evidence prior to trial and therefore made a decision not to present it.

### ii. Untrue: a forensic psychiatrist and a psychologist both found that Mr. Hoffman had no mental defects or psychosis.[45]

A forensic psychiatrist and a psychologist were appointed by the state court prior to trial to assess Mr. Hoffman's competency to stand trial. They both submitted their findings to the

---

[45] State Court Opinion, 5/1/07, at 1.

court following evaluation. Based on a mental status exam, Dr. Pratt concluded that Mr. Hoffman was competent to proceed to trial based on the state criteria for competency, that he did not require psychiatric treatment, and regarding his sanity at the time of the crime, that he "*[did] not display* any signs or symptoms of mental illness now or in the past." Psychiatric Evaluation, Transcript of Evidentiary Hearing, 1/8/07, St. Ex. 1, at 4.

A psychologist also completed a competency evaluation and summarized his findings in a letter to the court. His conclusion was far removed from the state court's characterization. In fact, he found that "the current evaluation *failed to reveal* evidence of any psychopathology *that would compromise Mr. Hoffman's ability to meet*" the state competency criteria. Letter to Court from Rafael F. Salcedo, Ph.D., 5/31/97, Deposition of Rafael Salcedo, 12/14/06, LASC Writ, Ex. 6-11, St. Ex. 1, at 3.[46]

The purpose of the evaluations conducted was not to uncover in any thorough manner whether Mr. Hoffman had "mental defects or psychosis." All the court-appointed doctors found, based on a limited interview in jail with Mr. Hoffman, was that he was competent to stand trial. The state court's factual finding is against the weight of the clear and convincing evidence before the state court.

### iii. Untrue: defense psychologist Salzer concluded that Mr. Hoffman suffered from no psychosis or mental deficiencies.

The state court found that defense expert Salzer "performed extensive tests on the defendant and also concluded that he suffered from no psychosis or mental deficiencies." State Opinion, 5/1/07, at 1. As is set out at length, *supra*, Dr. Salzer's conclusions, which included reporting testing that revealed possible psychosis as well as drug and alcohol abuse, were all

---

[46] Dr. Salcedo explained at a post-conviction deposition that he did not rule out *all* psychopathology, just that which would affect competency. Deposition of Rafael Salcedo, 12/14/06, LASC Writ, Ex. 6-11, at 70.

premised upon the data available to her at that time. Psychological Evaluation, Elaine Salzer, Ph.D., Supplemental Petition, Ex. 93, at 6, 8, 9. In fact, in a post-conviction declaration, Dr. Salzer specifically attested to her experience with clients who are not initially forthcoming about abuse as children and the benefit of knowledge of a family history of abuse in exploring the issue thoroughly with clients. Declaration of Elaine Salzer, Ph.D., 12/9/03, Supplemental Petition, Ex. 35. Dr. Salzer expressed that even the knowledge that Mr. Hoffman's mother was mentally ill would have provided whole new insight into his behavior and been important to her testimony at the penalty phase. *Ibid.*

> ### iv. Untrue: the trial attorneys testified they had no reason to suspect mental deficiencies or psychosis throughout their representation of Mr. Hoffman.

According to the state court, "[t]he testimony of the trial attorneys shows that, throughout their representation of defendant, they had no reason to suspect any mental deficiencies or psychotic condition on his part." State Opinion, 5/1/07, at 2. To the contrary, *both* Mr. Alford and Mr. McCrary testified that Mr. Hoffman displayed troubling behavior as trial commenced and throughout the trial. Mr. McNary affirmed at deposition his observations, in an affidavit, regarding Mr. Hoffman's behavior during trial: "Jessie looked out of it. He rocked slightly back and forth, and hummed, very low, under his breath. He rarely commented on what was happening, or asked me a question." Affidavit of Kevin McNary, 12/9/03, LASC Writ, Ex. 6-10, Ex. 1, at 2; Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-10, at 23. Likewise, referring to his affidavit, Mr. Alford testified at deposition:

> I noticed during the penalty phase him just doing this slow humming underneath. And I remember looking at his hands, and he had bitten his fingernails to where, I think where one or two of them were bleeding.
> And I do recall holding his hand up. I grabbed his hand and held it up some kind of way for Elaine to look at it, Salzer, and I asked her what that indicated to her, and she said anxiety. And I do not -- it must have been after she testified that I really noticed the humming because if I would have noticed it, I

would have probably asked her about -- I would have probably said, you know, Mr. Hoffman's sitting over here humming to himself very quietly.  Would that mean anything to you because I found it unusual, and I didn't know what it meant.

Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-10, at 59-60.  *See also* Affidavit of William Alford, 12/9/03, LASC Writ, Ex. 6-9, Ex. 1.  Because, apparently, Dr. Salzer had left for the day, counsel never inquired any further—but their unrebutted testimony establishes, by more than clear and convincing evidence, that counsel for Mr. Hoffman had concerns about his mental health during the course of their representation of him.

> ### v.  Untrue: Mr. McNary and Mr. Alford followed the American Bar Association guidelines which were in effect at the time of the trial of this case.

Perhaps most erroneous of the state court's findings of fact, and most critical, is its entirely unsupported finding that defense counsel followed the 1989 ABA guidelines as they relate to investigation and presentation of mitigating evidence.  State Opinion, 5/1/07, at 3.  At the outset, it bears noting that the state court never accepted the basic premise that the ABA guidelines have relevance to assessing the reasonableness of counsel's representation.  At the outset of the hearings and depositions on ineffective assistance of counsel, it declared in no uncertain terms: "[t]he ABA has no legislative function and their guidelines or recommendations are, as far as this Court is concerned, are somewhat irrelevant."  Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 26.[47]

---

[47] The court dismissed the ABA guidelines in the context of ruling that testimony as to Mr. Hoffman's maternal grandmother's alcoholism and her penchant for engaging in sex with young children around to witness was irrelevant as potential mitigation and therefore inadmissible at the post-conviction hearing.  Transcript of Evidentiary Hearing, 10/23/06, LASC Writ, Ex. 6-1, at 19.  The court appeared to accept the prosecutor argument that whatever had occurred in Mr. Hoffman's family prior to his birth was irrelevant.  *Id.* at 20.  The state court did, subsequently, allow a proffer of the evidence it refused to consider.  *See* subsection vii, *infra,* regarding the state court's failure to consider clearly mitigating evidence in ruling on the claim of ineffective assistance of counsel.

Between 1996, when Mr. Hoffman was arrested, and 1998, when Mr. Hoffman went to trial, the ABA standards applicable to preparation and investigation for the penalty phase of a capital trial provided that counsel should:

> Collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury, history of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior); special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution/education or training/clinical services); and religious and cultural influences....Seek necessary releases for securing confidential records relating to any of the relevant histories. ... Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained ....

> Counsel should consider interviewing potential witnesses, including: eyewitnesses or other witnesses having purported knowledge of events surrounding the offense itself; witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death; members of the victim's family opposed to having the client killed. Counsel should attempt to conduct interviews of potential witnesses in the presence of a third person who will be available, if necessary, to testify as a defense witness at trial. Alternatively, counsel should have an investigator or mitigation specialist conduct the interviews.

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 1989, Guideline 11.4.1. The clear and convincing evidence adduced in post-conviction proceedings demonstrated that counsel failed to collect the following information:

- *medical history (mental and physical illness or injury, history of alcohol and drug use, birth trauma and developmental delays)*: counsel only attempted to gather medical history through their client, who generally is unlikely to have information pertaining to the early years of his life (birth trauma and developmental delays); counsel never obtained any medical records pertaining to Mr. Hoffman or his family (i.e. mother's records of birth);

- *family and social history (including physical, sexual or emotional abuse)*: again, counsel only asked Mr. Hoffman about his family and social history, and often

clients are terrible historians; the only one-on-one interviews counsel conducted with family members were in the hallway outside court once trial commenced and nothing suggests that counsel asked family and social history questions of these family members or attempted to meet with them individually to do so prior to trial; counsel's file contains no notes of any interviews with family members.

Counsel also failed to pursue the following avenues for collecting the above information:

- *interview witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death:* counsel never interviewed the client's own mother, let alone other witnesses with knowledge of his upbringing, in any depth or in a setting conducive to gathering mitigating evidence concerning the crime or a sentence of life;

- *Seek necessary releases for securing confidential records relating to any of the relevant histories:* no releases were sought—none; no records were sought, except Mr. Hoffman's school records (which revealed a history of moves through violent and poverty-ridden neighborhoods);

- *Obtain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained:* counsel failed to ever verify or corroborate Mr. Hoffman's version of his own life; they certainly never sought to expand upon it; their efforts to explain it were limited by the grossly inaccurate information they obtained.

Unquestionably, the clear and convincing evidence in the post-conviction record before the state court demonstrated that counsel abdicated their role as Mr. Hoffman's defenders, throwing their hands in the air when it came to sentencing and arguing, in essence, "who knows what happened." Advancing such a lame defense, if it can be called a defense, with so little investigation of Mr. Hoffman's life, clearly does not *begin* to comply with ABA standards in effect nine years before Mr. Hoffman's case was tried.

### b.  The Objectively Unreasonable Application of *Strickland*

As demonstrated at length *supra*, the post-conviction record overwhelmingly supports the conclusion that counsel for Mr. Hoffman unreasonably failed to investigate mitigation in his case, thereby failing to provide competent representation at sentencing. The facts of Mr.

Hoffman's counsel's failure to investigate are identical to those presented by *Wiggins*, and found by the United States Supreme Court to warrant relief under AEDPA's "unreasonable application" standard. *Wiggins,* 539 U.S. at 534.  Federal courts consistently find state court decisions to be unreasonable where state courts uphold capital trial counsel's failure to interview family members and seek documentary evidence as part of investigating mitigation. *Wiggins, supra*; *Walbey v. Quarterman*, ___ F.3d ___, 2009 U.S. App. LEXIS 942 at 18 (5th Cir. 2009) (where counsel failed to adequately investigate mitigation—failed to interview mother, hire mitigation specialist, and otherwise conduct investigation that would have uncovered evidence of a nightmarish childhood—and facts surrounding failure were almost identical to those in *Williams*, state court's denial of claim constituted an unreasonable application of state law); *Jells v. Mitchell*, 538 F.3d 478, 493, 497 (6th Cir. 2008) (counsel failed to obtain records and conducted insufficient interviews of only three family members, and failed to provide expert psychologist with client's history and records; state court's "refusal to recognize that these omissions by Jell's counsel fell outside the bounds of professionally competent assistance constituted an unreasonable application of federal law as determined by the Supreme Court in *Strickland*); *Outten v. Kearney*, 464 F.3d 401, 409-23 (3d Cir. 2003) (counsel's performance deficient for failure to obtain records and interview family members and others familiar with defendant's life history, and state court's refusal to grant relief constituted unreasonable application of federal law); *Marshall v. Cathel*, 428 F.3d 452, 464, 474  (3d Cir. 2005) (unreasonable application found where counsel failed to interview "family members, childhood friends, neighbors and business associates").

Furthermore, the state court made a plethora of factual findings completely unsupported by the record, most notably that counsel's representation was consistent with the 1989 ABA

standards and that counsel interviewed the two witnesses who testified at the post-conviction hearing. These erroneous fact-findings, critical to the assessment of counsel's competence, render the state court's application of *Strickland* objectively unreasonable. *Ward v. Sternes*, 334 F.3d 696, 704 (7th Cir. 2003) (factual determination that waiver of right to testify was knowing and intelligent was "so inadequately supported by the record as to be arbitrary and unreasonable" under § 2254(d)(1)). Because the state court unreasonably applied the competent representation prong of *Strickland*, AEDPA presents no obstacle to granting habeas corpus relief. This Court should remand Mr. Hoffman's case to the state court for a new sentencing trial.

### 4. The State Court's Decision Rests On an Unreasonable Determination of the Facts in Light of the Evidence Presented in State Post-Conviction Proceedings.

For all the reasons applicable to assessing whether the state court's decision is contrary to or an unreasonable application of federal law, the state court's decision is likewise based on "an unreasonable determination of the facts in light of the evidence presented" under § 2254(d)(2). Specifically, its determination that counsel acted in accordance with ABA guidelines is against the clear and convincing evidence presented in the course of litigating state post-conviction. *See* § 2254(e)(1).

### E. There is a Reasonable Probability that, but for Trial Counsel's Deficient Performance, the Result of the Sentencing Hearing Would Have Been Different.

Because the state court incorrectly determined that trial counsel's representation of Mr. Hoffman was competent and reasonable, it never reached the prejudice prong. This Court's review of prejudice is therefore *de novo*. *Rompilla v. Beard*, 545 U.S. 374, 390 (2003) ("because the state courts found the representation adequate, they never reached the issue of prejudice . . . we examine this element of the *Strickland* claim *de novo*"); *Wiggins v. Smith*, 539 U.S. 510 (2003) (reviewing prejudice prong of *Strickland* claim *de novo).*

101

Counsel's deficient performance left jurors with the erroneous impression that there was *no mitigation* in Jessie's case. Nothing could have been further from the truth. As in *Wiggins*, the mitigation counsel failed to discover and present was "powerful" because it presented "the kind of troubled history [the United States Supreme Court has] declared relevant to assessing a defendant's moral culpability." *Id.* at 534-35 (citing *Penry* v. *Lynaugh,* 492 U.S. 302 (1989); *Eddings* v. *Oklahoma,* 455 U.S. 104 (1982); *Lockett* v. *Ohio,* 438 U.S. 586 (1978)). Had counsel done their job, jurors would have heard about unspeakable hardship and abuse. They would have heard about an 18 year-old boy whose brain had not fully matured, whose brain was damaged, and who suffered from psychosis and post-traumatic stress disorder as well. All the diagnoses would have made sense in the context of a lengthy family history of such problems.

In post-conviction proceedings, the expert in capital defense testified that she did not think Jessie's case, the facts and circumstances of it, were indefensible in St. Tammany Parish, Louisiana *with the right mitigation.* Even in the face of daunting factors, Ms. Fournet saw a strong opening for the effective presentation of mitigation and a plea for a sentence of life rather than death:

> This is a jurisdiction, I'm sure, where most people take child rearing very seriously. They may, in fact, have moved out of New Orleans to get out of the very environment that Jessie couldn't get out of, you know....And Jessie, of necessity, grew up in an environment that many people in St. Tammany Parish correctly believe is not conducive to a well-formed child, you know. And so it would really resonate with jurors like that, it would resonate with all jurors because most jurors have children. But with jurors in a conservative area like this where there's a big emphasis on family values, I think it would especially resonate.
>
>                        * * *
>
> So it's nice to have the expert testimony. It kind of puts it in a framework that they can identify as professional and having a lot of scientific lingo and all of that, but they really need that expert because they know that children who are not raised in the kind of environment their children are raised in are going to have problems. That's the way – that's why they raised their children the way they do, to avoid that. And they know that a child that is beaten repeatedly with an

electrical cord while he's naked or beaten with baseball bats or doesn't have enough to eat or lives with a mentally ill brother, has people shot right outside of his window, that child is going to have very, very serious challenges in life and it's going to be very, very difficult for a child who's raised in that environment to conform to society's rules. They know that. They know that.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 146-148. As Ms. Fournet so succinctly summarized, people understand moral culpability. They know it and they feel it. And they especially know when a person never had a chance.

In light of the overwhelming mitigating evidence the jury never heard, there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Under similar circumstances, the Fifth Circuit has found, "[i]t is obvious to us that the level of abuse to which [the defendant] was exposed mandates the conclusion that, had this evidence been produced, it is quite likely that it would have affected the sentencing decision of at least one juror." *Lewis v. Dretke*, 355 F.3d 364, 368-69 (5th Cir. 2003) (per curiam). Mr. Hoffman is entitled to a new sentencing hearing at which he is represented by competent counsel.

## INTRODUCTION TO GUILT PHASE CLAIMS II AND III

*Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.*[48]

The only issue in dispute at the guilt phase was specific intent. Mr. Hoffman had confessed to acts which clearly constituted second degree murder: the kidnap, robbery, rape and homicide of Ms. Elliot. However, he adamantly denied that he intended to kill her. As he explained in his confession, and has consistently maintained since, he shot her accidentally during a struggle with a gun. Statement of Jessie Hoffman, 11/29/96, R. 724. Without specific

---

[48] *Brady v. Maryland*, 373 U.S. 83 (1963).

103

intent to kill, Petitioner could not be guilty of first-degree murder, nor eligible for the death penalty.[49] Nothing was more important to his defense than refuting the charge of specific intent to kill.

Despite this the State failed to disclose key information about the condition of the victim's body at the time it was found, information which supported Petitioner's account of the shooting in his confession and undermined the State's alternative and highly damaging theory of events upon which it relied to prove specific intent.  At trial, the State then knowingly presented misleading testimony from their forensic pathologist suggesting that the exculpatory information about the victim's body did not exist.

Matters were made worse by the failure of Petitioner's defense counsel to provide effective legal assistance. Defense counsel failed to consult forensic experts about the physical evidence and to investigate the relevant facts.  Consequently, they failed to discover and present to the jury powerful forensic and other evidence that supported Petitioner's defense.  Separately and cumulatively, these errors deprived the jury of critical evidence, which, had they been able consider, there is a reasonable probability the verdict would have been different.

---

[49] Petitioner was prosecuted for first degree murder under La. R.S. 14:30(A)(1), which at the time of his case, provided: "A. First degree murder is the killing of a human being: (1) where the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, or simple robbery." La. R.S. 14:30(A)(1) (1997).  La. R.S. 14:30(C) provides that the punishment for first degree murder shall be "death, or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, in accordance with the determination of the jury." Without proof of specific intent, the most Mr. Hoffman could be guilty of is second degree murder under 14:30.1(A)(2)(a): "A. Second degree murder is the killing of a human being: (2)(a) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, *even though he has no intent to kill or to inflict great bodily harm.*" *Id.* (emphasis added).  The punishment for second degree murder is mandatory "life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence." La. R.S. 14:30.1(B).

### F.  Summary of Case

At approximately 7:45 a.m. on the morning of November 28, 1996 a duck hunter found the dead body of Mary Elliot. R. 780. She was naked and had been shot once in the head. She was lying on an old wooden floating dock on the bank of the Middle Pearl River in Slidell, St. Tammany Parish. She lay on her side, head first towards the river, with part of her body in the water. R. 226, R. 265, R. 780. The tide was going out. R. 3675.

The floating dock was approximately 150 feet down-stream from a boat launch adjacent to the Hwy 90 bridge. R. 162. The only way to reach the dock by land was along an overgrown, debris strewn pathway that led from the parking lot at the top of the boat launch, to the dock. R. 226. R. 3677.

Investigation quickly led the police to Jessie Hoffman.[50] He was arrested at work, then taken to the New Orleans Police Department for interrogation. R. 233. After providing three exculpatory accounts of events on the evening of November 27th, Petitioner confessed, on videotape and audiotape, to the kidnap, robbery, rape and murder of Ms. Elliot, providing a detailed account of what occurred. R. 233; Statement Jessie Hoffman, 11/29/96. R. 238-241.

In his confession Mr. Hoffman reported that the shooting was accidental, and occurred during a struggle with the victim for a gun. He described the following: he and the victim had pulled over on a dirt road at the side of the Hwy 90 bridge that crossed the Middle Pearl River. After raping her inside the car, he had the victim get out of the car and they walked towards the water. Close to the river, he told Ms. Elliot to walk out into the water. He intended to leave her there

---

[50] It was discovered that Ms. Elliot had made a withdrawal of $200 from an ATM in New Orleans East at 6:18 p.m. that evening. Footage from security cameras at the ATM captured her withdrawing money in the presence of an African-American man, who wore a distinctive valet jacket. Police recognized the jacket as being the uniform worn by valets at the Sheraton where Mary Elliot parked her car. On making inquires at the Sheraton garage police learned that one of their valets, Jessie Hoffman, had taken an extended break from work at around the time that Mary Elliot was killed.

alive and drive off.  However, before he did so, she grabbed his wrist and they tussled over the gun.  During the struggle, the gun accidentally went off and Ms. Elliot was shot in the head.  She fell.  Mr. Hoffman turned around and ran to the car, and drove back to New Orleans.  Statement of Jessie Hoffman, 11/29/96, R. 725, 742, 748, 749.

### 1.  The Trial

#### a.  Matters not disputed

Most of the facts concerning the crime were not disputed at trial.  The State presented the strong direct evidence of Mr. Hoffman's own confession that he had kidnapped, robbed, raped and shot Mary Elliot.  State. Exs. 103, 107, 116; Trial Testimony Det. Harris, R. 4084-4126. Corroborating the confession, the State also presented:

- DNA evidence linking Petitioner to sperm found in the victim's car. State Ex. 112; Trial Testimony Anne Montgomery, R. 4032-53.

- Testimony from Petitioner's supervisors at work that he took a break around the time that the victim went missing, together with timecards, showing the same. State Ex. 14; Trial Testimony Alvaro Medina, R. 3586; Trial Testimony Giovanni Molina, R. 3604.

- ATM footage of the victim being held at gunpoint by an African American man wearing a valet jacket identical to the one Petitioner wore for work. State Exs. 11, 75, 76; Trial Testimony Sgt. Demma, R. 3783.

- ATM receipts showing the withdrawal of $200 from Mary Elliot's account at that time. State Ex. 77; Trial Testimony Sgt. Oswald, R. 3861.

Defense counsel expressly conceded that Jessie Hoffman committed second-degree murder.  R. 4282.

#### b.  The Dispute at Trial - Specific Intent

##### i.  The State's case

The only issue in dispute at trial was specific intent.  The State adopted the account of the crime given by Jessie Hoffman in his confession in all respects *except* those aspects inconsistent

with specific intent. In order to overcome this key discrepancy, which would be fatal to a first-degree murder conviction and death sentence, the State constructed and presented a theory that the crime was premeditated, carefully planned, and cold-bloodedly executed. This theory was two-fold. First, they argued that the physical evidence was more consistent with a cold-blooded execution style shooting.[51] Secondly they presented evidence of planning and premeditation, including, in particular, the location of the shooting.[52] This will be explained more fully below.

### 2. Defense case for an accidental shooting

At trial the defense conceded second-degree murder from the outset.[53] They strongly disputed specific intent and first-degree murder, based primarily on the confession, the "only piece of direct evidence in this case that came in regarding Jessie Hoffman's intent on the night in question." Defense Closing Argument, R. 4267-69, 4270, 4282. Second, they argued that the physical evidence presented by the State in fact supported the occurrence of a struggle.[54] Third,

---

[51] The State argued that the location of the bullet, the angle and path of the bullet, the cuts and bruises found on the victim's knees, and evidence that the gun was fired from over 18" from the victim, was most consistent with a cold-blooded killing in which the victim was made to kneel down and was then shot. In support of this they presented testimony of pathologist Dr. MacKenzie that the victim would more likely have been shot in the torso than in the head if there had been a struggle; that the gunshot wound penetrated the victim's head at a downwards angle consistent with the victim being shot on her knees from the front; and that cuts and bruises found on her knees were caused before or at the time of death, and were consistent with her kneeling when she was shot. R. 3652-59. Dr. MacKenzie also testified that the lack of gun shot residue around the wound indicated the gun was fired at least 18" from the victim, which the State argued was too far way for the victim and defendant to have been struggling for the gun. R. 3654. Finally, the State presented firearms testimony about the deliberate steps needed to fire a gun to undermine the defense case that the gun accidentally discharged. Testimony of Otto Stubbs, R. 3848-49; State's Closing Argument, R. 4253-54.

[52] The State presented evidence that the valets at the parking lot, including Mr. Hoffman, could have observed Ms. Elliot in the parking lot where she parked the car as a contract parker through her job in the days prior to the crime. Trial Testimony Alvaro Medina. R. 3583. They thus suggested that Mr. Hoffman had chosen the victim days before the crime, watched her inside the parking lot, and then took his break at that time because he saw her in the parking lot and was ready to attack. They pointed to the fact that Jessie Hoffman took a gun to work that day and wore gloves as evidence that he came to work with a plan and the intention to carry out the crimes against Ms. Elliot (to use the gun to shoot her, and to wear gloves to cover up fingerprints). State's Closing Argument, R. 4244, 4253.

[53] For example, defense counsel stated in closing: "I am up here confessing to second degree. Second degree has clearly been proven." R. 4282. *See also* R. 4259.

[54] The defense adopted the State's evidence from Dr. McKenzie concerning the distance from which the bullet was fired, but argued that it supported the defense case: that if the killing had been intentional, Mr. Hoffman would not have fired the fatal bullet from such a distance. Defense Closing Argument, R. 4270-71. They tried to refute Dr. MacKenzie's testimony that shots fired in a struggle were more likely to hit the torso than the head, by attempting to

they disputed the State's evidence of pre-meditation, and in particular the location of the shooting, asserted by the State.  They argued that the shooting occurred at the boat launch not the floating dock; if they could prove that, it would corroborate the confession, and make an accidental shooting much more plausible.  R. 4273.[55]

### 3. The key to specific intent: the location of the shooting

Location and specific intent were *integrally linked*, for both sides at trial.   In the confession, on which the defense case largely rested, Mr. Hoffman simply recounted pulling off the road by the bridge, and walking down to the river where a struggle for a gun ensued:

A:     ...I told her to get out the car and we walked down almost by the water."

. . .

A:     I had told her to get out.  So, we walked down this way I said 'now turn around'.

Q:     And that was by the water?

A:     It was by the water...."

. . .

Q:     Okay. Um, you made her get out the passenger side?

A:     Yes sir.

Q:     And you said the road curved to the...

A:     Left. (inaudible) curved right.

---

demonstrate through physical interactions with the State's witnesses during cross-examination, that other scenarios were possible.  Trial Testimony Fraser MacKenzie, R. 3661; Trial Testimony Otto Stubbs, R. 3851; Trial Testimony Det. Harris, R. 4106; Defense Closing Argument, R. 4271.

[55] The defense also countered the State's other evidence of planning. To dispel the State's argument that Petitioner had selected Ms. Elliot ahead of time, they elicited evidence from one of Mr. Hoffman's supervisors at the garage that the contract parkers do not usually come into contact with the valet service. Trial Testimony Giovanni Molina, R. 3612; Defense Closing Argument, R. 4262.  To explain why Mr. Hoffman wore gloves defense elicited testimony that it was common for garage workers to wear gloves in November because of the weather. Trial Testimony Alvaro Medina, R. 3612.  Defense Closing Argument, R. 4263.  Finally, in order to explain why Mr. Hoffman had a gun that day, they argued that Mr. Hoffman lived in the housing projects and carried a gun to defend himself.  R. 3597.

> Q:      Okay, okay. And then the water is out here and she walked? You told her
>          to walk to the edge of the water?
>
> A:      Yeah, she walked by the water."

Statement of Jessie Hoffman, 11/29/96, R. 742-47. There is no mention of a dock, nor of finding

and then walking down the winding overgrown path. As defense counsel argued in closing:

> What does he say happened? He says that they turned right after the bridge,
> which to me means down in that shell, one, not the little snaky lane there. He
> says that he took Ms. Elliot down there, that he intended to leave her there and
> run. That's what he said.

R. 4277. However, the victim's body was not found at the boat launch, but on an old wooden

dock approximately 150 feet down river from the boat launch. The only way to reach the dock

from land was from the boat launch along an overgrown, debris-strewn pathway through heavy

undergrowth. The State exploited this apparent discrepancy and adopted the dock as the location

of the shooting, critically transforming the picture of the crime. The State argued that after

raping Ms. Elliott Jessie Hoffman deliberately walked her down that pathway to the dock by the

river, and executed a premeditated plan to kill her and hide her body at that location. What other

reason could there have been to take the victim down that path, and how would he have found it

in the dark if he didn't know about it ahead of time? The location itself provided the State with a

strong inference of specific intent to kill.

     Throughout the trial the State took pains to emphasize and bolster their theory of a

deliberate "march of death" to the dock. In opening statement the prosecutor suggested:

> [H]e got her out of the car, and he forced her to walk to her death... And he
> marched her along filth and briars, trash that other people had dumped, broken
> glass, with the gun pointed at her to the river's edge."

R. 3540. It permeated their entire case.

Prior to trial the State sought an order from the court allowing the jurors to be taken to the scene of the crime, for the sole purpose of proving their case for specific intent. The State's Motion and Order to Allow Jury to View Crime Scene requests:

> an order from this Honorable Court allowing the jury to view the crime scene as the nature and location of the crime scene is relevant evidence in this case which bears directly on the issue of specific intent.

R. 1242. The motion was granted and the jury taken to the scene during the presentation of the State's case in chief. R. 3965.

Secondly, the State made vivid the image of the path in the jurors minds. They presented enlarged photographs of the view down the pathway during their case in chief and argued, "this shows you the amount of growth that they had to traverse and pass through as she took her last steps in life. It is not a pretty sight." State Exs. 40, 41; R. 4230.[56]

Third, the State elicited testimony describing the pathway from several witnesses, including police officers and a duck hunter who found the body. Trial Testimony Charles Dauzat, R. 3677-78; Trial Testimony Lt. Frey, R. 3691; Trial Testimony Sgt. Oswald, R. 3955-56.

Fourth, the prosecution presented evidence that blood of a type consistent with Ms. Elliot's was found on the dock a short distance from the body. Trial Testimony Bonnie DuBourg, R. 3923. In closing argument the State emphasized this evidence, arguing that it proved she died in that location:

> [W]hen she was shot here, near the dock... she was probably standing very close to the location where those blood stains were recovered. And as the gun was discharged into her head, a couple of splatters of blood landed on the dock, the

---

[56] In its decision on direct appeal, the Louisiana Supreme Court recognized the importance of these photos to the State's case, finding that the "photographs showing the location of the victim's body were especially relevant to refute the defense claim that the victim was shot during a struggle with the defendant." *State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, 565.

dock where she fell into the water.   That's why you know that the murder occurred here."

State's Closing Argument, R. 4231.  Fifth, the State presented evidence meant to counter any

suggestion that the body was carried from the launch to the dock by the tides.  They highlighted

photographs of the body depicting the water line, and elicited testimony from the St. Tammany

Parish Sheriff's Office crime scene technician, Lt. Frey, who attended the scene, as follows:

> Q: Lt. Frey, while you were at the scene taking photographs, did you notice anything in relation to the tide that day?
>
> A:  The water was falling.  In fact, I was making a comment in the next photograph.  I'll show you on the head aspect of it.  If you look at this picture, you look at the water, its starting, its basically down from her head.
>
> If you take a look at the mud that's by her, the mud by her head, and that was real damp and slippery while the mud by her feet was dry. … Ex 36… if you look at the top of her head, you can see the moisture, the wetness.  Her hair appears to have been wet.  You see how its stranded and wet.  But not all of her hair is wet, just kind of parts… Exh 27… again if you look at the hair, the hair by her neck is dry, but the top part of her head is wet.  It appears the water was up at her head, but it didn't go above it, past her head.

R. 3690.  Finally, in closing, the State again drew the jury's attention to their trip to the scene,

and emphasized its significance to their case for specific intent:

> …you recall going out to the scene and observing the scene as it appeared, there's another approximately 156 feet from the roadway of US 190 and the location where the vehicle of Ms. Molly Elliot is believe to have been parked.  From that location, there is a distance of approximately 169 feet from the location of the parking area along this torturous, difficult, treacherous route consisting of debris, cane, bushes, things that you have to push through to get through in order to make your way this horrible 169 feet to the location where Molly Elliot's body was located.

R. 4229.

> He has walked her from this location in the parking area where the car was parked, down that trail.  At any point along that trail… all he had to do was let her go, turn around, get back into the car and drive off… He walked her to the edge of this water.  Why?  To let her go?  Is that what he was going to do, let her go?

R. 4255-56.

In post-conviction interviews, the jury foreman confirmed the importance of the location of the shooting to the finding of specific intent.

> During the guilt phase the jury was taken to the crime scene. This was important for me because it let me see the layout of the path which Jessie Hoffman made the victim walk down to reach the floating dock where she was killed. This was critical to my conclusion that Mr. Hoffman intended to kill the victim and had planned it all along. The path was hidden and out of the way. You had to walk a way round the wooded area from where he would have parked the car to get to that path. I don't think that anybody could have found that path in the dark unless they knew about it already. If, as the defense argued, he didn't intend to kill her but just intended to drop her off somewhere, he would have left her in the area where the car was or let her out somewhere else. The only logical reason for driving out all the way to the Pearl River and for walking the victim down that path would be that he intended from the start to kill her and hide the body.
>
> For this reason I thought that Jessie Hoffman planned to rob and kill the woman ahead of time.

Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury Foreperson), Supplemental Petition Ex. 109. Defense counsel realized the significance of the State's emphasis on location and argued to the jury:

> They know they are in trouble with specific intent. That's why they have to have the story they tell about walking down the path. Is there any relation in Jessie's statement? Does he relate in that statement whatsoever that they took that route to get down to that little dock? No. Does he mention the little dock? No.

Defense Closing Argument, R. 4282. In turn it became crucial for the defense to defend their confession-based theory that the shooting occurred at the boat launch, and to explain why the body came to be found down river on the dock. They elicited testimony that there were tides in the area. R. 4274. They then theorized that the tides and currents could have washed her body downstream from the boat-launch to the dock. R. 4274-75. They argued that that the lack of injuries on her feet was inconsistent with her walking down the overgrown, debris riddled path to the dock. R. 4276. They speculated that the blood spots on the dock could have got there when

the body was removed from the scene. R. 4275. They also attempted to argue that the physical condition of the victim's body might be inconsistent with the body having lain on the dock for the entire period between the shooting and when the body was found. R. 4274. However, their efforts to do this were hampered by the lack of evidence concerning the condition of the body at the time it was found. The coroner testified concerning the condition of the body at the time of autopsy, *two days later*, and defense counsel's efforts to cross examine him to support their theory came across as confused at best. R. 3669-3670. In closing argument the State ridiculed the defense's paltry efforts. R. 4299. No one really knew what the body was like when it was found. Or so the defense thought.

II.   **PETITIONER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, *NAPUE V. ILLINOIS, BRADY V. MARYLAND* AND TO A FAIR CAPITAL SENTENCING HEARING UNDER THE EIGHTH AMENDMENT WERE VIOLATED WHEN THE STATE FAILED TO DISCLOSE A FORENSIC REPORT THAT SUPPORTED THE DEFENSE CASE AGAINST SPECIFIC INTENT AND FAILED TO CORRECT THE MISLEADING TESTIMONY OF THEIR OWN WITNESS REGARDING THAT EVIDENCE**

The State's suppression of exculpatory evidence in any case is egregious. When it is a capital case it is "beyond reprehension." *See Lindsey v. King*, 769 F.2d 1034, 1040 (5th Cir. 1985). The location of the shooting was integral to both parties' cases concerning specific intent. The State violated Petitioner's rights to Due Process under the Fourteenth Amendment by withholding a report by the coroner's investigator; the report provided scientific support for the defense's case that Mr. Hoffman killed Ms. Elliot on the boat launch, and directly undermined their own contradictory theory that she was intentionally led down the overgrown path by her killer, to her death. When the medical examiner was cross-examined by defense counsel at trial about that evidence, his testimony was misleading and created the impression that it did not exist. In further violation of Petitioner's Due Process rights, the prosecution failed to correct the

false impression created by that testimony and again failed to produce the contradictory report to the defense. There is a reasonable likelihood that but for the state's misconduct, the outcome would have been different. Mr. Hoffman is entitled to a new trial. *Napue v. Illionois,* 360 U.S. 264 (1959); *Brady v. Marylan,d* 373 U.S. 83 (1963).

### A. The coroner's investigator's report that the State failed to disclose in violation of *Brady* and *Napue*

On the morning that the victim's body was found, members of the St. Tammany Parish Coroner's office attended the scene. Joy Pfeffer, one of the coroner's investigators, arrived at the scene at 8:55 a.m., approximately fourteen hours after the shooting occurred.[57] A short time later, she examined the body. She made the following important findings at that time which she noted in her written report: "[l]ividity is not noted," "rigor mortis noted in the mandible. Rigor mortis is not fixed." Coroner Investigator Report, Joy Pfeffer, Amended Supplemental Petition Ex.1. Had this report been produced a forensic pathologist could have explained the significance of this finding.

> Lividity occurs after death when circulation ceases and as a result of gravity blood pools in the lower most areas of the body. It results in bluish coloration to the lower areas of the body. It is especially visible on light skinned people. I would expect to see signs of lividity on Ms. Elliot's body after a few hours and an observer should certainly have been able to see lividity after 12 hours. According to the observations of the coroner's investigator, there was no lividity apparent. Movement of a body before lividity is fixed can prevent lividity from forming. The lack of lividity over 12 hours after death suggests that the victim's body moved at some point between the shooting and when her body was found. The lack of lividity could be explained if the body had been in the river, where water movement could prevent the blood settling in one place and therefore preventing lividity from forming.

---

[57] Given the existing time-frame evidence (the period Mr. Hoffman was absent from work, the timing of the ATM withdrawal) Ms. Elliot was shot at approximately 6:45-7:00 p.m. Police Time Bar, R. 779. According to the uncontradicted evidence of the State's pathologist, Ms. Elliot died within 10-15 minutes of the shooting. Trial Testimony Dr. Frazier MacKenzie, R. 3661.

114

The processes causing rigor mortis also start soon after death. Rigor is apparent within a few hours. It occurs simultaneously all over the body, but smaller muscles, such as the mandible, show signs first because their mass is smaller. Low temperatures will accelerate rigor. If the body was moving around in water that could have prevented or lessened the extent of rigor forming, and could account for the relatively limited amount of rigor observed in the body at the time the coroner's investigator examined the body, over 12 hours after the victim died.

Affidavit of Gerald Liuzza M.D., 1/5/07, Amended Supplemental Petition, Ex. 3. The implications are clear: *the victim's body could not have lain where it was discovered from the time of the shooting until it was found* without significantly more livor and rigor mortis being apparent.

Given the lack of lividity and the limited amount of rigor mortis observed by the coroner's investigator after the body was discovered, it is unlikely that Ms. Elliot was found in the position in which she fell after being shot over 12 hours previously. If her body had been in water the constant movement of water could have prevented lividity and rigor mortis from forming. . . It is my opinion that Ms. Elliot may not have died where she was found, and that her body could have floated to the location after she was shot.

*Id.*

### B. The coroner's investigator's report was not disclosed despite defense requests

On January 16, 1997, defense counsel filed a *Request And Motion for Discovery Disclosure and Inspection* which included a request for discovery of all information about any tests and examinations of the victim's body. R. 107. The Motion specifically requested descriptions of and results of such tests and examinations, as well as names of all persons involved in the testing and examination, and all documents created by them. The defense also filed a Motion for Discovery of Information Necessary to A Fair Trial, highlighting the State's *Brady* obligations, and the State's duty to disclose evidence from all government agencies. R. 516, 518.

In response to the initial discovery request, the State filed 147 pages of discovery which included the autopsy report, but not the investigator's report. R. 133-290. The prosecution asserted that "All tests are identified in police reports. Results of testing will be provided." State's Answer to Defendant's Request and Motion for Discovery, Disclosure and Inspection. R. 282, 284. However, the prosecution never provided defense counsel with Joy Pfeffer's report. Petitioner obtained the report for the first time in post-conviction in response to the district court's Order for Production of St. Tammany Parish Coroner's Office Records, 11/11/03.

### C. The misleading testimony of the Medical Examiner, Dr. MacKenzie which the State failed to correct in violation of *Napue*

During cross-examination of the medical examiner at trial, defense counsel attempted to bring forth information about the condition of the body at the time of the discovery in an effort to determine whether it was consistent with the prosecution's theory, or whether it suggested the body had moved. Dr. MacKenzie confirmed that he would expect to see lividity on a body after twelve hours, but indicated that he did not know the condition of the body at that time it was found. He stated that that lividity may move before it is fixed, and may not fix for up to 48 hours. He explained that at the time of the autopsy, two days after the body was found, lividity was on her back. This, he said, reflected the way the body was presented for the autopsy, lying on her back. Thus, he testified, he could not draw any conclusions about the body's condition prior to that.

Q:     Where is lividity?

A:     On the back....

Q:     ... and so what does that indicate to you, doctor?

A:     Indicates to me that, *at the time that I examined the body*, that the lividity was posterior....

116

A:      …Usually lividity will fix in a position within about 48 hours and stay in that position.  If the body is moved, prior to that time frame, then the lividity may move with it….

Q:      … Normally, I thought that lividity became apparent within the first twelve hours?

A:      It can.

Q:      …But then even after the twelve hours it can move?

A:      Correct.

Q:      So from the stand point of body position, can you draw any conclusions from D-1?

A:      No.

Q:      And why not?

A:      Because the lividity is moved posteriorly as the position of the body in presentation for the autopsy… this is the usual pattern that one sees in a body presented for autopsy.

Q:      Okay. Well, let's assume a body lays for twelve hours, at least, in a particular location before it is discovered. Would you expect lividity?

A:      Yes.

Q:      And if that is the lividity – if that lividity shown there is the result of that initial twelve-hour laying, then the lady was laying on her back?

A:      That's correct.

Q:      *…You don't know if that were a fact or not?*

A:      *No.*

Trial Testimony Dr. Fraser MacKenzie, R. 3669–3670 (emphasis added).  The jury and defense were left with the false impression that this critical piece of information was unknown.  Despite this, the prosecution still did not disclose Joy Pfeffer's report.  By virtue of their *Brady* obligations (discussed below), the State should have disclosed Joy Pfeffer's report prior to trial.

After Dr. McKenzie's testimony, they should certainly have provided the report to the defense to correct the misleading impression that testimony gave.

Having allowed this false impression to go uncorrected, the State perpetuated it in argument, and capitalized on the deception. In closing they ridiculed the defense's theory about the body moving on the basis that it was unsupported by the evidence:

> The rigor mortis. Here we go, broke the case wide open. Rigor mortis. That body was left upriver and floated down and backed into that dock with its feet up. Can you believe that? You want to talk about stretching the evidence. There was no evidence of that.

State's Closing Argument, R. 4299. There was no evidence because the State suppressed it.

### D. *NAPUE V. ILLINOIS* VIOLATION

A conviction or sentence procured by the prosecution's knowing use of false or misleading testimony violates due process. In *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), the Court made clear that deliberate deception of a court or jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." Similarly, Due Process is violated when the prosecution solicits information which leaves a "false impression" on the jury. *Alcorta v. Texas*, 335 U.S. 28, 31, (1957). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois,* 360 U.S. 264 (1959); *United States v. Agurs*, 427 U.S. 97, 103, (1976). Petitioner meets the three prong test to prevail on a *Napue* claim. He can clearly demonstrate that: (1) the State presented false testimony; (2) the State knew or should have known it was false; and (3) the evidence was material. *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993).

#### 1. There Was False Testimony

Dr. MacKenzie's misleading testimony meets the false testimony requirement of *Napue*. Technical "perjury" certainly falls within the broad definition of false testimony, but evidence

that yields a "false impression" is forbidden as well. *Alcorta v. Texas*, 335 U.S. 28, 31 (1957). The *Napue* rule applies where testimony, "even though technically not perjurious, would surely be highly misleading to the jury...." *Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir. 1976). This is because a "defendant is entitled to a jury that is not laboring under a Government-sanctioned false impression of material evidence." *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979).

In addition, the State's active participation in misleading the jury on this point during closing argument, and its capitalization on that testimony clearly runs afoul of *Napue*. *Tassin v. Cain*, 517 F.3d 770 (5th Cir. 2008) (upholding district court's reversal of capital murder conviction for *Giglio, Napue* and *Brady* violation based on the prosecution's failure to correct a witness's false testimony coupled with the prosecutor's capitalizing on it in his closing argument); *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977) (same); *and see United States v. O'Keefe*, 128 F.3d 885, 894-895 (5th Cir. 1997) (even when the defense is aware of the falsity of the testimony, a deprivation of due process may result when the information has been provided to the defense but the government reinforces the falsehood by capitalizing on it in its closing argument).

### 2. The Prosecutor Knew The Testimony Was False

The State had knowledge, either actual or constructive, of the important information contained in Joy Pfeffer's report. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the United States Supreme Court held that a prosecutor has constructive knowledge of information in the possession of others acting on his or her behalf. *Kyles*, 514 U.S. at 437-438; *accord Strickler v. Greene*, 572 U.S. 263, n.12 (1999) (an individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case). Knowledge is imputed between state agencies. "The duty to produce requested evidence falls on the state; there is no

suggestion in *Brady* that different 'arms' of the government are severable entities." *United States v. Webster*, 392 F.3d 787 (5th Cir. 2004) (*citing Martinez v. Wainwright*, 621 F.2d 184, 188 (5th Cir. 1980) ("A contrary holding would enable the prosecutor 'to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial.'" (citations omitted). "Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio v. United States*, 405 U.S. 150, 154 (1972). "The prosecution is deemed to have knowledge of information readily available to it." *Williams v. Whitley*, 940 F.2d 132, 133 (5th Cir. 1991).[58]

Joy Pfeffer's report was contained in the file of the St. Tammany Parish Coroner's office, a state agency that was actively involved in the investigation of the homicide. The prosecution could and should have known about her report, and produced it to the defense to correct Dr. MacKenzie's misleading testimony. *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980) (finding *Brady* violation due to non-disclosure of an FBI rap sheet in possession of the medical examiner even though the state prosecutor was unaware it was there).

### 3. The evidence was material

The "materiality" standard in false testimony cases is lower than in *Brady* suppression cases (*see supra*) because the prosecution's actions amount to "a corruption of the truth-seeking function of the trial process." *U.S. v. Agurs*, 427 U.S. 97, 104 (1976). A conviction obtained by the knowing use of false evidence "is fundamentally unfair, and must be set aside if there is any

---

[58] The Louisiana Supreme Court interprets Louisiana's statutory discovery provisions accordingly: "[Louisiana's discovery] code does not limit or deny discovery on the basis of whether an article is contained in the district attorney's file. Therefore, if the district attorney has the power to permit or authorize the discovery of an article within the possession, custody, or control of the state that falls within the criteria of discoverability." *State v. Lee*, 531 So.2d 254 (La. 1988).

reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. at 103 (1976); *Kirkpatrick v. Whitley,* 992 F.2d 491, 497 (5th Cir. 1993); *Nobles v. Johnson,* 127 F.3d 409, 415 (5th Cir. 1997); *Beltran v. Cockrell,* 294 F.3d 730, 735 (5th Cir. 2002). Where the trial defense is something more than contesting the State's proof, the fact that the false testimony detracted from the defense or denigrated the defendant's version of events is relevant to materiality. *See United States v. Alzate,* 47 F.3d 1103 (11th Cir. 1995); *United States v. Kelly,* 35 F.3d 929 (4th Cir. 1994). In assessing materiality, the Court considers how *effective counsel could have used* the suppressed information at trial and through pre-trial investigation and development of other evidence. *Kyles,* 414 U.S. at 441 (finding prejudice where "disclosure of the suppressed evidence *to competent counsel* would have made a different result reasonably probable") (emphasis added); *id. at* 441-49 (reviewing ways in which competent counsel could have used and developed withheld information to impeach prosecution witnesses and undercut police investigation); *U.S. v. Bagley,* 473 U.S. 667, 675 (1985) (materiality analysis considers whether suppressed information, "if disclosed and used effectively" by defense, may have made a difference).

There is no question that with competent counsel to utilize the evidence, there is a reasonable likelihood that the jury would have come to a different conclusion. Dr. MacKenzie's testimony concerned evidence that went to the very heart of the defense case concerning specific intent, the *only* issue in dispute at the guilt phase and critical to the State's case for first-degree murder and death. The State purposefully used the misleading testimony to denigrate the defense case. Had the State complied with its constitutional obligations and disclosed the report, competent defense counsel would have been able to present the compelling evidence that the victim's body had not, as the State maintained, lain where it was found since the shooting. The

condition of the body was far more consistent with Mr. Hoffman's statement that Ms. Elliot was killed at the boat launch, and floated to the dock later. Because there is a reasonable likelihood that the State's misconduct in misleading the jury could have affected the judgment of the jury, Petitioner is entitled to a new trial. *Napue v. Illinois,* 360 U.S. 264 (1959); *United States v. Agurs,* 427 U.S. 97 (1976).

### E. *BRADY V. MARYLAND* VIOLATION

Even if the State had not presented the false testimony of Dr. MacKenzie, the prosecution should have disclosed the coroner's investigator's report. In *Brady v. Maryland,* 373 U.S. 83 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. 83 (1963).

To merit relief on a claim that a *Brady* violation deprived a petitioner of due process, an aggrieved person must show that the prosecution failed to disclose material evidence that was favorable or exculpatory to the defense. There is a two-prong inquiry: did the prosecution withhold evidence in its possession, and was the withheld evidence material? The answer to both is clearly yes. The coroner's investigator's report was in the State's possession. *Strickler v. Greene,* 572 U.S. 263, n.12 (1999) (In order to comply with *Brady,* "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in this case"); *Kyles,* 514 U.S. at 437; *Strickler,* 572 U.S. 263, n.12; *Martinez,* 621 F.2d 184. It was not disclosed to the defense until post-conviction.

The materiality standard, though slightly higher under *Brady* than *Napue,* is also met. Evidence is material under *Brady* if there is a "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United* States *v.*

*Bagley*, 473 U.S. 667, 682 (1985). The test is not outcome-determinative. "An individual need not show that the [error] more likely than not altered the outcome of the case." *Kyles*, 514 U.S. at 434 (*citing Strickland v. Washington*, 466 U.S. 668, 698 (1984)).

Joy Pfeffer's report was material under this standard. The location of the shooting was *key* to the State's case. As the jury foreman confirmed, it was critical to the jury's finding of specific intent, the only issue in dispute at trial. Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury Foreperson), Supplemental Petition, Ex. 109. This evidence would have allowed the defense to present scientific evidence to rebut it.

The State's failure to disclose the evidence, and to correct the misleading impression conveyed by Dr. MacKenzie's testimony, individually and cumulatively, violated Petitioner's rights to due process of law under the Fourteenth Amendment, *Brady*, *Napue* and under the Eighth Amendment to a reliable sentencing hearing. The State's misconduct undermines confidence in the verdict of this capital case. There is a reasonable likelihood this evidence could have effected the jury's decision, and a reasonable probability that but for its suppression, the outcome would have been different.

The *Brady* and *Napue* violations also impacted the penalty phase verdict, impairing a defense case for residual doubt. *See, e.g. Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999), *opinion superseded on rehearing*, 194 F.2d 586 ("this Court has recognized that, in an appropriate capital case, counsel's decision to rely upon the jury's residual doubt about the defendant's guilt may be not only reasonable, but highly beneficial, to a capital defendant"). In

the event that this court does not find that the *Napue* and *Brady* violations materially effected the guilt phase, they undoubtedly effected the penalty phase.[59]

### F.  Applicability of §2254(d); Petitioner is entitled to *de novo* review of these claims

Petitioner exhausted his *Napue* and *Brady* claims in state court.  Amended Supplemental Petition; Supplemental Writ.  However, the state courts did not address them at all; the district court's ruling on his state post-conviction claims contained no reference to those claims whatsoever, and the Louisiana Supreme Court denied his Writ for supervisory review.   State Court Order 5/1/07.  *State v. Hoffman*, 2007-1913 (La. 12/12/08); 2008 La. LEXIS 2791.  These claims have not been "adjudicated on the merits" so the provisions of § 2254(d) are inapplicable. *See* Part One, V(A)(1).

If the court finds that the state court did rule on the merits, AEDPA still does not apply because the state court provided no reasons.  Part One, V(A)(3).  It is impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor*, 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court.  *See Williams*, 529 U.S. at 394, 395, 397-98 (opinion of Stevens, J.); *id.*, at 414-16 (opinion of O'Connor, J.)  *Id.*

If § 2254(d) is to be applied, the court should conduct an independent review of the record to determine the facts the court was silent upon.  *Id.*  The state court's denial of the claim (if there was one at all) was an unreasonable application of federal law and an unreasonable determination of the facts under § 2254(d)(1) and § 2254(d)(2).  In determining whether the State court's treatment of the constitutional claim was unreasonable pursuant to § 2254(d)(1), federal

---

[59] In the event that this Court finds that the evidence was in fact disclosed or available to the defense, Petitioner pleads his *Brady* and *Napue* allegations in the alternative as ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights to counsel and Due Process.  The standard of prejudice required for *Brady* and ineffective assistance of counsel claims under *Strickland* is identical.  *Strickland v. Washington* 466 U.S 668 (1984) (adopting *Brady* materiality standard under *Bagley*, as prejudice standard for ineffective assistance of counsel claims).

courts must take into account the care with which the state court considered the subject. *Williams*, 529 U.S. at 391-98 (examining reasoning of the state court); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) ("A thorough and well-reasoned state court opinion may be more likely to be correct and to withstand judicial review"); *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997) ("The reasonableness of a court's application of federal law must be measured, at least in part, by determining whether a state court provided a responsible, thoughtful answer reached after a full opportunity to litigate"). The state court opinion cannot be considered a reasonable interpretation of federal law requiring deference under § 2254 (d) if the opinion is not a "careful and well-reasoned opinion." *See Burris v. Parke*, 948 F. Supp. 1310, 1321 (N.D. Ind. 1996) *aff'd on other grounds*, 116 F.3d 256 (7th Cir. 1997). *See also, Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (holding state court's denial of *Strickland* claim was "objectively unreasonable"); *DiLosa v. Cain*, 279 F.3d 259, 265 (5th Cir. 2002) ("The state court's legal conclusion.... is not simply a misconstruction of *Brady*, but one serious enough to be unreasonable").

The state court's failure to hold an evidentiary hearing to properly develop the facts also undermines the reasonableness of the court's decision. *See* Part One IV(4)(b)-(c). Moreover, the extensive evidence presented herein clearly and convincingly rebuts any possible implicit findings to the contrary by the court in its unreasoned (an unstated) opinion. §2254(e)(1). In light of the totality of the clear evidence of the State's misconduct and the prejudice it caused to Petitioner, any decision of the state court denying the claim is an unreasonable determination of the facts, and an objectively unreasonable application of *Brady* and *Napue* under clearly established law of the Supreme Court. § 2254 (d)(1); § 2254(d)(2).

## III. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PRESENT CRITICAL EVIDENCE THAT REFUTED THE STATE'S CASE FOR

**FIRST–DEGREE MURDER AND SUPPORTED THEIR OWN THEORY THAT MS. ELLIOT WAS SHOT AT THE BOAT LAUNCH DURING A STRUGGLE**

Petitioner's rights under the Sixth and Fourteenth Amendments were violated when his defense counsel provide him with less than minimally adequate representation at the guilt phase of his trial. *Strickland v. Washington*, 466 U.S. 668 (1984). Defense counsel failed miserably in the presentation of their one-issue case. The defense at trial was not simply weak and unconvincing, it relied on inaccurate, incomplete and unreliable information.

The entire defense case rested on refuting the State's case for specific intent. This required disproving the State's assertion of a cold-blooded march of death down the narrow path and an execution style killing at the dock. The defense theory was that, as Mr. Hoffman described in his confession, he shot Ms. Elliot in a struggle accidentally when they got out of the car at the boat launch and she grabbed for the gun. In addition they faced the task of explaining why Mr. Hoffman carried a gun to work that day, to counter the State's theory it demonstrated his predatory cold-blooded planning of Ms. Elliot's murder. However, defense counsel did not independently investigate the case nor consult forensic experts in order to help them understand the physical evidence and prepare for this defense. They relied on the State's investigation, to the extent that it was produced in discovery, and on their own inexpert and largely incorrect assumptions about the forensic issues. *Not surprisingly they were unable to present any lay or expert witnesses or material evidence that supported their case.* Their efforts were limited to uninformed cross-examination of the State's witnesses and arguments that were unsupported by evidence.[60]

---

[60] They called one witness, a DNA expert who was called to challenge the reliability of the DNA evidence. R. 4152-4205. This had nothing to do with specific intent. By their own admission to the jury, this was pointless

The defense failed to attack numerous inaccuracies in the State's presentation of the evidence, and failed to develop and present critical scientific evidence that supported their case. Because of defense counsel's failings, the jury never heard that:

-   tidal movements and other geographical features of the crime scene location supported the defense's theory that the victim floated to the dock after being shot at the boat launch, and contradicted the contrary impression presented through the state's witnesses;

-   the pathology and condition of the body was consistent with the body having moved around in water and floated to the dock;

-   the injuries to the victim's knees that the state argued were caused when the victim begged for her life on her knees, were consistent with injuries suffered by floating in the river;

-   contrary to the state's arguments, the blood spatter evidence did *not* prove the victim was shot at the dock;

-   the crime-scene reconstruction evidence contradicted the state's theory that the victim walked down the path; there were no markings to the victim's feet, debris, or other trace evidence that you would expect if the victim had been marched down that path;

-   the ballistics evidence contradicted the state's theory that she was shot at the dock;

-   contrary to the state's evidence, the path of the bullet did not suggest an intentional killing;

-   .25 caliber weapons can misfire, and the defendant's account of an accidental shooting was quite credible and *not* far-fetched as the State maintained;

-   there were problems with the handling of the crime scene and evidence that undermined the reliability of the state's case relative to the physical evidence; and

-   Jessie Hoffman lived in violent neighborhoods, had lost eight family members to murder, and had recently started carrying a gun *to protect himself* having been personally a victim to three violent attacks in the months preceding the crime.

---

because they conceded rape. R. 4280-91.  Worse than pointless, as part of a scatter gun approach to attack everything regardless, it damaged the defense's credibility in the areas they genuinely disputed.  *See infra.*

There was ample evidence available to cast reasonable doubt on the State's case for specific intent. Had Petitioner's trial counsel investigated and presented this to the jury, there is a reasonable probability that they would not have found specific intent beyond a reasonable doubt. As demonstrated further below, Petitioner has proven both prongs of *Strickland*: his counsel's performance fell below an objective standard of reasonably effective representation, and there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 683, 686-88 (1984). He is entitled to a new trial.

### A. Defense Counsel's duty to investigate

In analyzing the deficient performance prong of *Strickland*, "[a] convicted defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S., 690. There is no question that Mr. Hoffman's defense counsel should have investigated the facts relevant to the *only* defense that they presented. "At the heart of effective representation is the independent duty to investigate and prepare." *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982). As the court held in *Wade v. Armontrout*, 798 F.2d 304 (8th Cir. 1986):

> Investigation is an essential component of the adversary process. "Because [the adversarial] testing process generally will not function properly unless counsel has done some investigation into the prosecution's case and into various defense strategies . . . 'counsel has a duty to make reasonable investigations. . . .'"

*Id.*, 307 (*quoting Kimmelman v. Morrison*, 477 U.S. 365 (1986) (*quoting Strickland* 466 U.S., 691). This basic and fundamental obligation of defense counsel is also reflected in the American Bar Association's Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) (hereinafter "1989 ABA Guidelines"). Guideline 11.4.1 provides:

> Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin

immediately upon counsel's entry into the case and should be pursued
expeditiously."

Guideline 11.4.1(B) *Id.* The guidelines emphasize the need to interview witnesses, examine the

physical evidence and consult experts where necessary:

> D. Sources of investigative information may include the following:
>
> * * *
>
> 3. Potential Witnesses:
>
> Counsel should consider interviewing potential witnesses, including: A.
> eyewitnesses or other witnesses having purported knowledge of events
> surrounding the offense itself; B. witnesses familiar with aspects of the client's
> life history that might affect the likelihood that the client committed the charged
> offense(s), possible mitigating reasons for the offense(s), and/or other mitigating
> evidence to show why the client should not be sentenced to death;
>
> * * *
>
> 5. Physical Evidence: Where appropriate, counsel should make a prompt request
> to the police or investigative agency for any physical evidence or expert reports
> relevant to the offense or sentencing.
>
> * * *
>
> 7. Expert Assistance: Counsel should secure the assistance of experts where it is
> necessary or appropriate for: A. preparation of the defense; B. adequate
> understanding of the prosecutions case; C. rebuttal of any portion of the
> prosecutions case at the guilt/innocence phase or the sentencing phase of the trial.

*Id.,* Guideline 11.4.1(D). The 1989 ABA Guidelines also make clear that defense counsel's pre-

trial obligations include litigating "access to resources... including independent and confidential

investigative resources... and expert witnesses." *Id.,* Guideline 11.5.1(B)(9) (emphasis added).

The Commentary to the 1989 ABA Guidelines emphasizes the particular importance of

utilizing investigative and expert assistance where necessary:

> Counsel must be experienced in the utilization of expert witnesses and evidence,
> such as psychiatric and forensic evidence, Guidelines 11.4.1(d)(7), 11.8.6(b)(8),
> and must be able to zealously challenge the prosecution's evidence and experts
> through effective cross-examination. **Utilization of experts has become the
> rule, rather than the exception, in proper preparation of capital cases.**

Commentary to Guideline 1.1 (Objective) (emphasis added).  Moreover:

> Since pretrial investigation and preparation are fundamental to attorney competence at trial, assigned counsel requires the services of trial assistants such as investigators to gather evidence and witnesses favorable to the client and to enable counsel to intelligently assess conflicting options.  An adequate defense also requires the services of expert witnesses to testify on behalf of the client and to prepare defense counsel to effectively cross-examine the state's experts.

Commentary to Guideline 8.1 (Supporting Services).

### B. Defense counsel's failure to investigate

A review of the trial record and trial counsel's testimony taken by deposition during the state post-conviction proceedings[61] confirms that defense counsel did virtually *no* investigation into their case against specific intent.

The trial record reflects that defense counsel hired a DNA expert to attack the reliability of the DNA evidence. R. 4152–4205.  However, this had nothing to do with specific intent; by defense counsel's own admission to the jury, this was pointless because they conceded rape. R. 4280-81.  They also apparently conducted their own ballistics experiments looking at gun powder residue deposited when a .25 caliber gun was shot from different distances.  However, this effort added nothing to their case; in an amateur fashion, they reached essentially the same conclusion as the State's qualified expert, that the gun shot that killed Ms. Elliot was fired from over 18" away.  Trial Testimony Otto Stubbs, R. 3842–44.

Trial counsel's testimony taken at post-conviction depositions, confirms the lack of investigation and preparation for their specific intent defense.  They were asked to describe their guilt phase preparation.  Both confirmed that they did not use the services of an investigator at

---

[61] The depositions were held in lieu of evidentiary hearing on the ineffective assistance of counsel at the *penalty* phase. Although most questions focused on the penalty phase, counsel provided some general testimony concerning the guilt phase too.  Petitioner emphasizes that the IAC penalty phase hearing was in no way sufficient to sufficiently develop the facts pertaining to his guilt phase claim.  Indeed the guilt phase claim was not filed until *after* the penalty phase IAC hearing.

all, and did all investigation themselves.  The only investigation mentioned that could
conceivably be related to specific intent was a day trip to the crime scene; thus, lead attorney
William Alford stated:

> I'm sure I took one day to track the scene.  In this case, it started at a corner in
> New Orleans and ended up almost in Mississippi on Highway 90 east, and I recall
> spending a day going – following that route just to try to get a feel for what the
> state was alleging.

Deposition of William R. Alford Jr., 12/12/06, LASC Writ, Ex. 6-9, at 27.  He also requested
discovery from the State.  *Id.*, 24.  Second chair Kevin McNary recounted their work with the
DNA expert and ballistics evidence.  Deposition of Kevin McNary, 12/12/06, LASC Writ, Ex. 6-
10, at 11.

Their efforts apparently did *not* include lay witness interviews, consultation with experts,
or forensic review of physical evidence relevant to specific intent.  This was not due to a lack of
resources.  Trial counsel did not seek funding for investigation or experts from the court.  Lead
counsel William Alford confirmed that they had access to the services of the public defender's
investigator, and sufficient funding for experts.  Thus, when asked about investigative resources
he stated:

> I feel confident that if Kevin and I ask that [the investigator] conduct any
> investigation, Mr. Simmons [Chief Public Defender] would free him up to do that.
> We have not done that.

Deposition of William Alford, 12/12/06, LASC Writ, Ex. 6-9, at 17.  Similarly, he confirmed the
availability of funding for experts:

> We have been given access or the money to hire DNA experts that we thought
> would be favorable to us.  **I can honestly say that we have never requested
> anything that Mr. Simmons has turned down.**

*Id.* at 17 (emphasis added).  Counsel clearly had no financial excuse for their failure.  *See, e.g.,*
*Wiggins v. Smith,* 539 U.S. 510, 524 (finding deficient performance in counsel's failure to

commission social work expert report despite availability of funding from the public defender's

office).

> In conclusion, Mr. Alford summarized their guilt phase efforts as follows:

> Well, you try to develop a theory, and in this case I do not recall that we were successful in developing for the guilt phase in a truly coherent plan... I mean, frankly the concept was you just hope that and you be vigilant and hope that the state makes a mistake or something.

*Id.* at 38-39. This was not a reasonable strategy:

> Strategic choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation in investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland,* 466 U.S. at 690-91. There is no valid reason for defense counsel's decision not to

interview witnesses, consult with appropriate experts or attempt to examine and understand the

evidence as it related to their *only* defense.

This is not a case where defense counsel hired experts who gave unfavorable opinions, or

spoke to witnesses who gave unhelpful answers. They knew the State would argue specific

intent based on the location of the shooting and other forensic evidence and they had made a

strategic decision to present this defense. But they didn't investigate the evidence that supported

it. They (1) did not consult a pathologist, crime scene reconstruction expert or blood spatter

expert to find out if the condition of the body and other physical evidence supported their theory;

(2) did not investigate the realities of .25 caliber weapons to explore and demonstrate the

credibility of Mr. Hoffman's account that the gun discharged accidentally; (3) did not hire an

expert on tides and water movement to find out if their theory was feasible; and (4) did not

investigate the realities of the violence in Mr. Hoffman's community to understand the real

reason Mr. Hoffman carried a gun with him to work. As a result, their evidence consisted, on the

132

one hand, of the self-serving statement provided by Jessie Hoffman, and, on the other, on unsubstantiated assertions about what the physical evidence showed. Their failure to investigate and consult experts was not strategic, nor within the realm of reasonably competent counsel. *Rompilla v. Beard*, 545 U.S. 374 (2005) (counsel's failure to "make all reasonable efforts to learn what they could" about a prior conviction they knew the state were likely to rely on as aggravation at penalty phase).

### C. The evidence the jury never heard

Had defense counsel adequately prepared, the jury would have heard evidence which would have created significant doubt about the State's version of events that fatal night.

#### 1. The expert forensic evidence the jury never heard

##### a. The defense failed to present evidence that the tides and water movements at the location were consistent with the victim's body floating from the boat launch to the dock

At trial, defense counsel *speculated* that the body could have been moved by the tides from the boat launch to the dock, but presented almost nothing to prove it. They elicited testimony from two of the State's witnesses that there were tides in the area. However, relying on inexpert, and unprepared witnesses, their efforts backfired; the testimony did more damage than good. Thus, while Detective Hall testified to the existence of tides he also stated there was no information that the body moved. R. 3824-25. He then gave a speculative opinion about why the body might be wet without having floated in the river. He testified that wakes from boats could cause water to splash on the body.

> Where her body was in relation to that water and where the launch was in relation to her body and where all these individuals that were going and coming from duck hunting... And with the proximity of her body in relation to that water and the wakes that boat provide when they leave from the launch, I can safely assume that quite frequently as boats pass the water changes. You know, when a wake approaches the bank and that water shallows, its going to make a wake and its

133

going to approach the bank, and it probably did lay up in the body of Molly Elliot, yes, sir.

R. 3824-25.   When defense counsel made further efforts to explore the tidal movements, Hall

pled his lack of expertise and knowledge.  He did not know. R. 3825.  Defense counsel had no

reason to think he would.

The defense also failed to attack the State's evidence on this issue.  The State presented

testimony refuting that the body could have been moved from the boat launch to the dock by

tidal movement.  Lt. Frey, the St. Tammany Parish Sheriff's Office crime scene technician,

testified that the water levels and dry areas of the victim's body and hair that he observed at the

scene indicated that the water did not go beyond her head, as she lay headfirst towards the water.

R. 3690.  Had the defense conducted adequate investigation and consulted a qualified expert on

the matter they would have realized that Lt. Frey was wrong.

First, the defense were *in possession* of evidence that contradicted Lt. Frey's testimony.

Defense counsel had been provided, in discovery, with the report of Deputy Tanner, the first

officer to attend the scene.  They therefore should have known that he observed the body with

water partially submerging her shoulder.  He noted in his report:

> At 0753 Dy Tanner was dispatched to a possible signal 29. Reported W/F/ nude **laying half in and half out of the water**…. Upon arrival… Dy Tanner checked subject for a pulse with negative results.  The w/f subject was laying on her left side.  Head toward the east.  **At time of arrival the subjects head and left shoulder were halfway in the water** .

Report of Deputy Tanner, St. Tammany Parish Sheriff's Office, 11/28/1996, Amended

Supplemental Petition Ex. 6 (emphasis added).  At trial Charles Dauzat, a duck hunter who found

the body confirmed that the tide was going out when he found the body and had been going out

while he had been hunting since at least around 5:30 that morning. R. 3678.  Thus when Deputy

Tanner observed the body some time after 8:00 a.m., the tide had already being going out for

some time. The tide clearly came up further than Lt. Frey stated. However, defense counsel

never spoke to Deputy Tanner, never called him to testify, nor did they cross-examine Lt. Frey to

challenge his inaccurate testimony.

Secondly, had defense counsel consulted an appropriate expert they would have realized

that not only were there tides in the area, but the tidal patterns were consistent with their theory.

Not only that, but the river flow together with the shape of the river and location of the dock

caused river currents to flow *directly to the dock.* According to Dr. Rusty Feagin, spatial

scientist and ecologist:

> Considering the tidal movements, currents, likely flow and other hydrological and
> meteorological factors impacting water movement in the relevant area during the
> relevant time period, I conclude that a body lying at the edge of the boat launch
> immediately to the south of the Highway 90 bridge during the evening of
> November 27, 1996 could have been picked up by the river, floated downstream,
> and have become wedged on the floating dock on the west bank of the river,
> approximately 150 feet downstream by 7:30 am November 28, 1996.

> There are several factors which support this conclusion. First, the tidal regime is
> consistent with water movement that could have picked the body up some time
> after the shooting and deposited it further downstream by the time the body was
> located. Secondly the southward downstream current would have contributed to
> movement of a floating object in the downstream direction; the dock is
> downstream, south of the boat launch. Thirdly, the dock sits slightly upstream on
> the outside edge of a bend in the river and is adjacent to an inlet. The
> configuration of the river results in a lateral movement of the water towards the
> dock. Fourthly, the structure and position of the dock in relation to the flow
> patterns of the river is such that an object could become lodged onto it. It is
> partially submerged and slopes gently into the river. It has a short railing on the
> downstream side which could trap a floating object.

Affidavit of Dr. Russell Feagin, 1/4/2006, Amended Supplemental Petition, Ex. 2. This was

powerful evidence that gave scientific credence to the defense's otherwise unsubstantiated theory

which the jury should have heard.

**b. The defense failed to present evidence that the position of the body when it was found was consistent with it having floated onto the dock and become wedged against the railing at the far side.**

Not only was the dock configured and positioned in the flow of the river in such a way that a floating object could have become wedged on it, but the crime scene photographs show that the position of the victim's body is consistent with precisely that happening.  *See, e.g.,* Amended Supplemental Petition, Ex. 7, Photo Exhibit A.

> [T]he victim's body is pushed up against the side of the dock which protrudes upwards.  This is consistent with the body having floated to the current location, where it wedged against the side of the dock.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4.  Again, defense counsel failed to present to the jury this important evidence that would have supported their case.

**c. The defense failed to present other evidence that the condition of body was consistent with the defense case, and that the defense case explained evidence that the state had damningly used against them**

Other aspects of the pathology that supported the defense case could have been discovered by defense counsel if they consulted an expert to find out.  First, the victim had sustained injuries of the type that are commonly observed on bodies that have been in water and knocked around against hard or sharp objects by the water's movement.  The victim had injuries on her toes, knees and elbows, all parts of the body that protrude and could catch on shells, rocks or other objects in a river.  Thus as board certified forensic pathologist, Gerald Liuzza M.D. concluded from the autopsy evidence and photographs:

> Injuries to the victim's toes, knees and elbows are consistent with injuries seen on bodies that have been in rivers and other water systems where water movement can force the body to scrape across hard objects such as shells or rocks on the river bottom and river edge.  Extremities of the body, such as the toes, knees and elbows can be particularly vulnerable to such injuries.

136

Affidavit of Gerald Liuzza M.D., 1/5/07, Amended Supplemental Petition Ex. 3.  The victim's

toe injuries were also consistent with injuries caused by crabs; long scrapes which can be

associated with the crab pincers, clawing at the body.  As Dr. Liuzza stated:

> [t]he longitudinal injuries to her toes are also consistent with injury from the
> pincer actions of crabs and other fish activity as well as animal activity.

*Id.*  Finally, Dr. Liuzza noted that the abrasion to the victim's back recorded by Dr. MacKenzie

at autopsy, could have been caused by the victim's body banging up against the side of the dock

as it floated there.

> The 12-inch abrasion to her back is consistent with her having hit up against the
> hard straight edge of the dock on which she was found.

*Id.*  Had defense counsel adequately investigated the case and consulted an expert they would

have had important evidence to show that the condition of the victim's body was such that she

may have floated to the dock after all.

The pathology evidence would also have explained how the physical evidence that the

State relied on as proof of an execution killing, in fact supported the *defense* case.  At trial the

State presented testimony from the medical examiner that abrasions to the victim's knees were

consistent with their theory that Petitioner made Ms. Elliot kneel down in order to shoot her. R.

3659.  An important aspect of the State's evidence in this regard was the medical examiner's

opinion that these injuries must have occurred before, or very soon after, the shooting occurred.

R. 3659.[62]  In fact, as Dr. Liuzza explained in his post-conviction affidavit, her injuries could

have been caused up to several hours *after* the victim died:

---

[62] "Q: What is depicted in this photograph?  A: There are superficial abrasions on the left knee, some on the right lower leg just below the knee.  Q: Doctor McKenzie, would this abrasion and cut have occurred before or after Mrs. Elliot's death?  A: In the peri-mortem period, or before.  Q: And how do you know that?  A: Because there is bleeding into the wound.  Q: And after someone is dead, they don't bleed?  A: Correct."  Testimony of Frasier McKenzie M.D.  R. 3659

> The injuries could have been caused after her death during the peri-mortem
> interval and post-mortem; cellular death does not occur immediately. Post-
> mortem injuries can occur up to several hours after death and still appear the same
> as injuries that occurred prior to death.

Affidavit of Gerald Liuzza M.D., 1/5/07, Amended Supplemental Petition Ex. 3. Thus, they

might well have been caused after death as the body floated down the river. This was a critical

point that the State's pathologist got wrong. Having failed to consult an expert of their own,

defense counsel did not know this, and were in no position to challenge Dr. McKenzie's

erroneous opinion.

### d. Defense counsel failed to present other evidence that refuted the state's theory of the cold-blooded murderous "march of death" to the dock.

#### i. Lack of injuries to the victim's feet

Defense counsels' failings did not stop there. At trial the defense asserted in closing

argument that the victim did not walk down the path to the dock because she did not have any

injuries to her feet, other than those resulting from animal activity after she died. R.4276.

However, they did not present any evidence in support of this. Consequently, the State was able

to smear the defense for even raising the point, suggesting the defense exploited what was in

reality a small mercy for the victim, that she didn't suffer the additional pain of having her feet

cut on the march to her death. R. 4300. In fact, there was *scientific* support for defense counsel's

contention:

> [a]part from the toe injuries mentioned above, there are no other apparent injuries
> to her feet. If she walked a significant way down the debris strewn path I would
> expect to see some sign of abrasions, nicks in her skin etc, especially if she was
> not used to walking bare foot in rough areas.

Affidavit of Gerald Liuzza M.D., 1/5/07, Amended Supplemental Petition, Ex. 3.

> I understand that the victim's body was located on a dock at the end of a winding
> pathway though reeds and undergrowth. I have viewed the photographs of the
> area and reviewed testimony of people who attended the scene at that time.
> Apparently the path was overgrown with reeds, rough under foot with debris,

including broken glass, rusty nails and shells.  Had the victim walked along the path I would expect to see damage to the victim's feet.  In addition I would expect to see debris, gravel or other items from the path embedded in her feet by the weight of her body as she walked.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4.   Instead of perceiving the defense to be disingenuous, if trial counsel had done their job the jury would have been presented with credible, scientific evidence that supported Mr. Hoffman's statement and the defense theory.

### ii.  Lack of trace evidence

The lack of trace evidence in the victim's car also supported the defense theory:

Had Mr. Hoffman walked along the overgrown path to the wooden dock, I would also expect there to be some transfer of debris, foliage or other matter onto his clothes and shoes as he came in contact with his surroundings.  In turn it is likely that at least some of any matter transferred onto his clothing from the scene would have been transferred into the car when he left the scene.  I note that samples of debris were collected from inside the victim's car, but I have not seen evidence that samples of foliage or other debris underfoot along the pathway were collected and/or preserved for comparison.  Such trace evidence analysis could have been important in providing evidence to assist in determining whether or not Mr. Hoffman walked down the pathway to the dock, and the location in which the offense was committed.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4.  This is evidence the jury should have heard.

### iii.  The cartridge case was not located by the dock

The State alleged that Ms. Elliot was killed at the dock.  However, they never found any cartridge case at that location, despite searches by crime scene investigators.  Although the failure to locate a casing is not conclusive evidence that the shooting did not occur at the dock, it is evidence tending to support that, which the jury should have heard.

The bullet recovered from Ms. Elliot's body at autopsy was identified as a .25 caliber bullet.  Although .22 caliber cartridge cases were found and collected, no .25 caliber cartridge case was found at the scene where the body was found on or around the dock.  When a bullet is fired from a semi-automatic firearm, the fired

139

cartridge case is ejected.  The case can be ejected up to approximately ten feet or more in distance, generally to the right, and in the range of an arc that ranges from front to back, upwards and around to the right of firearm, depending on the type of firearm that is fired.  If the shooting had occurred on or near to the dock, the cartridge case could have landed on the dock or the ground.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4.    There is no indication that law-enforcement ever conducted a thorough search of the boat launch area for bullet casings or other evidence that could have proved that the shooting occurred there.  The crime scene photographs show that the crime scene investigated by law-enforcement, as delineated by yellow crime scene tape, did *not* include the boat launch area but was limited to the overgrown area encompassing and surrounding the dock and the path leading to it.  Even when they learned from Mr. Hoffman that he shot the victim at the *boat launch*, law-enforcement failed to search that area.

> The police reports, testimony, and positioning of the crime scene tape indicate that the crime scene investigation was focused around the vicinity of the body on the dock, and not the area by the water at the boat launch.  I understand that at the time of the crime scene investigation and evidence collection Mr. Hoffman had not confessed or described the location of the shooting.  It is standard practice for crime scene technicians to focus investigation around a body, and not to focus on other areas unless there is evidence that indicates such need.  However, given the layout of the area it is reasonable to assume that if the perpetrator had walked down the pathway to the dock, that he or she also passed through the parking lot at the end of the boat launch.  The crime scene under examination should therefore have included the boat launch area as well as the dock.  Once a question over the location of the shooting had been raised by Jessie Hoffman's statement, adequate investigation should have involved a further and more detailed examination of that alternative site of the shooting for forensic evidence, as soon as possible.  Crime scene investigation teams commonly return to a scene to make further investigations as new evidence comes to light.  There is no evidence that this occurred in this case.

*Id.*

> If the shooting had occurred at the edge of the water at the boat launch area, the cartridge case could have landed somewhere in the gravel on the boat launch.

*Id.*  But law-enforcement never looked.

Had the police looked they might have found the bullet casing from the bullet that killed Ms. Elliot.  Law-enforcement investigation is supposed to be non-partisan and truth-seeking. The inadequacy of the crime scene investigation deprived defendant of potentially critical evidence that could have undermined the State's case and proven his own.  This was something the jury should have known. *See Kyles v. Whitley,* 514 U.S. 419, 446 (1995) (recognizing the materiality of evidence discrediting the caliber of police investigation); *Lindsey v. King,* 769 F.2d 1034, 1042 (5th Cir. 1985) (same).

> iv. **The defense failed to present scientific evidence undermining the state's argument that the victim's blood found on the dock was proof she was killed in that location; contrary to the district attorney's argument, the blood spots were not gun-shot blood-spatter, but were dripped blood; the integrity of the crime scene was demonstrably in doubt, and the blood could have been deposited by law-enforcement personnel as they processed the scene**

To bolster their case for specific intent the State argued that the blood on the dock was produced when Mr. Hoffman shot the victim, and that its existence there proved that she died where she was found.  In closing the state argued:

> As the gun was discharged into her head, a couple of splatters of blood landed on the dock, the dock where she fell into the water.  That's why you know that the murder occurred here."

R. 4231.  However, had defense counsel consulted an expert they would have learned that this was not true.  The blood spot was not discovered in a location consistent with the State's theory of the shooting.

> The body is lying several feet from the blood spots.  If she had been shot kneeling down and was immediately incapacitated by the gunshot she would have fallen to the ground at the location where she was shot.  Assuming she was shot and fell to the ground where her body was found, the blood spots on the dock are too far away to have dripped from her body at that time.   The blood spots are therefore not accounted for by this scenario.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4.   Moreover, it was

not the result of spattering from the impact of a gun-shot to the victim as the state asserted.   The

formation of the blood is inconsistent with that.

> The pattern of the blood is inconsistent with high velocity blood spatter caused by
> the impact of a gunshot to the victim's body.   Rather, the pattern is more
> consistent with being caused by dripping blood.

*Id.*   The totality of the evidence suggests another explanation for the blood; that it was deposited

by law-enforcement personnel or others who attended the scene when the body was found,

several hours after the victim was shot.

> The crime scene photographs show wet blood around the victim's head and
> mouth.   The blood spots on the dock could have been deposited after the body
> was found if someone or something had contact with the blood around the
> victim's mouth, and then dripped it onto the dock.

*Id.*   The crime scene at the dock was sloppily maintained.   There was ample opportunity for the

blood to have been inadvertently dripped or deposited there, by people attending the scene.

> The crime scene photographs indicate problems with the integrity of the crime
> scene.   Until the crime scene is fully processed, movement around the scene
> should be kept to an absolute minimum.   Of particular concern, a gray blanket
> was collected by the crime scene technician and placed into evidence.   The crime
> scene technician's report indicates that it was found "covering the body," yet
> there are no photographs showing the blanket on the body.   Instead, the crime
> scene photographs show a gray blanket in at least two different locations near the
> body, including at one point coming within inches of the victim's head.
> Unnecessary interference or movement around the scene can affect the integrity
> of the evidence at the scene, contaminating it or moving it around.   For instance,
> something could have come into contact with blood from the victim, and dripped
> elsewhere onto the dock.
>
> In addition, the necessary activities of those attending the body to check for vital
> signs could also have impacted the evidence at the scene.   This includes the
> actions of Deputy Tanner who reportedly checked the victim's pulse; as well as
> the coroner's investigator who examined the body, checking the victim's pulse,
> respiration, and eyes, and examining the body for lividity and rigor mortis.

*Id. And see* Lt. Frey, Crime Scene Technician's Report, Evidence Collection Sheet, Amended Supplemental Petition, Ex. 5; Dpy. Tanner Report, 11/28/96, Amended Supplemental Petition, Ex. 6; Amended Supplemental Petition, Ex. 7, Photo Exhibit A and Ex. 8, Photo Exhibit B.

At trial Petitioner's counsel made meager efforts to challenge the State's reliance on the blood spots as evidence the victim died at the dock. They speculated that the blood spots could have got there when the body was removed from the scene. Defense Closing Argument, R. 4275. However, they did not present any evidence to support this. Had they consulted an expert, they would have been able to undermine the State's speculative explanation for them in a scientifically substantiated way.

> **e. Defense counsel failed to investigate and discover that evidence from three scientific disciplines supported their theory that the victim was shot at the boat launch and floated to the dock.**

The physical and scientific evidence supported defense counsel's theory that the victim was shot at the boat launch, and subsequently floated to the dock, and that she was *not* marched down the overgrown path to her death. Evidence from *three* scientific disciplines supported it. Testimony from an expert witness "is very impressive to a jury" because it appears to "emanat[e] from the depth and scope of specialized knowledge." *Ake v. Oklahoma*, 470 U.S. 68, 81 n.7 (1985). Criminalist Ronald Singer, an expert in crime scene reconstruction, ballistics and blood spatter evidence concluded:

> I have not seen any physical evidence that conclusively establishes Ms. Elliot was shot at the location where she was found.
>
> * * *
>
> Overall the evidence I have reviewed is consistent with the victim having been shot at the boat launch by the bridge, and floated down river where she became wedged on the dock at the location where she was found.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4. Pathologist Gerald

Liuzza M.D. similarly found:

> It is my opinion that Ms. Elliot may not have died where she was found, and that
> her body could have floated to the location after she was shot.

Affidavit of Gerald Liuzza M.D., 1/5/07, Amended Supplemental Petition, Ex. 3. Spatial

scientists and geologist Dr. Russell Feagin concurred.

> I conclude that a body lying at the edge of the boat launch immediately to the
> south of the Highway 90 bridge during the evening of November 27, 1996 could
> have been picked up by the river, floated downstream, and have become wedged
> on the floating dock on the west bank of the river, approximately 150 feet
> downstream by 7:30 am November 28, 1996.

Affidavit of Dr. Russell Feagin, 1/4/06, Amended Supplemental Petition, Ex. 2. Had defense

counsel consulted an expert in any one of these fields of expertise, they would have discovered

powerful scientific evidence supporting their theory.

> **f. Defense counsel failed to present evidence supporting their case for an
> accidental shooting, that most .25 caliber weapons are semi-automatic,
> and that it is not unusual to find defective .25 caliber guns**

The State belittled Jessie Hoffman's account of an accidental firing of the gun. They

argued that Mr. Hoffman was attempting to minimize his conduct, and they presented evidence

in an effort to suggest that guns "do not just go off." Thus they presented testimony that in

general firearms require several deliberate actions in order to fire them, including loading the

chamber and removing safety catches.

> When you have the weapon in your hand, if you're really not serious about using
> it, you don't slide the chamber back and load the round into the chamber. And if
> are cautious and you're really not serious in hurting somebody, you keep that
> safety on.

R. 4253-54. The actual gun that was used in the shooting was never recovered so no one will

ever know the condition and type of weapon used. However, the image painted by the State was

not the full picture.

Had defense counsel consulted an expert with ballistics expertise they would have learned important facts that would have supported their defense. First, that being relatively low powered, small and cheap to manufacture, there is a wide variety of .25 caliber weapons available, varying significantly in quality and condition. There are numerous faulty or low quality weapons in circulation, especially among those purchased illegally on the streets where quality control is lacking. Secondly, that according to Jessie Hoffman's description of the gun used, there was no magazine-safety on the gun. Forensic expert Ronald Singer explained in post-conviction:

> The bullet retrieved from the victim's head is a .25 caliber bullet. According to the testimony of Ortho Stubbs, the characteristics of the bullet included six land and groove impressions. These are the most common class characteristics for a .25 semi automatic weapon.

> There are a large variety of firearms that can fire .25 caliber bullets. .25 caliber firearms are relatively cheap and readily available. There are a large number in circulation in the U.S. both legally and illegally. A significant number of .25 caliber firearms do not have magazine safety mechanisms or any other safety features. I note that in Jessie Hoffman's confession he stated there was no magazine. If this were the case the gun could not have had a magazine safety at that time. During my professional experience I have also seen several .25 caliber firearms that are defective and unsafe, or have had deliberate or inadvertent changes made to them. Sometimes the trigger is weakened so that less pressure is required on the trigger to discharge the firearm. The cheaper the firearm, the less likely it is to have safety features and the more likely it is to be defective in some way. A firearm that does not have an actively engaged safety, no safety mechanism at all, or has another a defect that effects the safety of the firearm, for example a "hair trigger" or protruding firing pin, could certainly be discharged accidentally during a fight.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition, Ex. 4. Whether the gun was fired accidentally as Mr. Hoffman confessed, or was fired intentionally, as the State maintained, was *the most critical issue* in dispute in Petitioner's capital murder trial. There is no discernable strategic reason for failing to investigate this evidence and explain it to the jury.

145

**g. Defense counsel failed to challenge the State's erroneous "scientific" evidence that a shots fired during a struggle do not usually impact the head**

As part of their efforts to discredit Mr. Hoffman's confession account of an accidental shooting, the State presented testimony from the coroner that in the scenario Mr. Hoffman described he would expect the victim to be shot in the *torso*, and not the head.

> Q: Assuming for the sake of a hyptothet [sic] that the perpetrator in this matter is five-eleven, an inch taller, and assuming, also, for the sake of the hyptothet [sic], that as the perpetrator raised the gun to shoot the victim in the head, that the victim grabbed his wrist, with both of her hands. Would it be unusual that this would be the course and track, referring to Exhibit 16, that this would be the course and track of the wound?
>
> A: Yes.
>
> Q: Why is that?
>
> A: If an assailant is attacking someone and the defensive mechanisms are to grab whatever the attacking element is, then the torso of the body is usually affected rather than the head.

R. 3657-58.  The State emphasized this point in closing:

> And what did Doctor McKenzie tell you about the tussle, a struggle over the gun? Where would the gunshot go?  Usually in the torso, which is exactly where it would have gone in the demonstration given by the defendant.  She would have been shot in the chest or the belly or the legs or somewhere across here.  There's no way in the world it could have gone through into her head.  No way.  That is the defendants own demonstration of how this happened."

R. 4296.  Defense counsel tried to refute Dr. MacKenzie's testimony by clumsily attempting to demonstrate that other scenarios were possible, through physical interactions with the State's witnesses during cross-examination. Trial Testimony Dr. MacKenzie, R. 3661; Trial Testimony Otto Stubbs, R. 3851; Trial Testimony Det. Harris, R. 4106; Defense Closing Argument, R. 4271.  However, they did not have the benefit of the expert to explain expertly why Dr. McKenzie's testimony was not scientifically supportable.

146

A statement to the effect that the torso not the head is the most common area to be shot during a defensive struggle over a firearm, in my experience is not scientifically substantiated. There are almost infinite possibilities concerning the positions of the victim and Mr. Hoffman at the time of the shooting. The head is a mobile part of the body, and its position can vary enormously depending on how the person is standing, moving, bending, crouching and so forth. A person's hand is even more mobile and could be in a wide variety of positions depending on the person's body and arm movements. I have seen gunshot wounds sustained to the head in cases where there was evidence of a struggle. The likely position of the victim's head with a bullet wound in relation to the firearm *at the moment the firearm was fired* can be scientifically determined. However, what the victim and perpetrator were doing and how they were moving at that time cannot be determined based on the available evidence. Based on the limited information available there is no way to determine which would have been more likely. There are numerous possible positions that could have occurred during a struggle over a gun consistent with the evidence in this case.

Affidavit of Ronald Singer, 4/16/07, Amended Supplemental Petition Ex. 4. Defense counsel was therefore unable to properly cross-examine Dr. MacKenzie, or correct the damaging picture presented to the jury.

### h. Conclusion

In a case where the physical evidence was so important to the *only* issue in dispute, defense counsel's failure to investigate and consult with independent experts is staggering. The State called three forensic experts in support of its case for specific intent; a pathologist, a ballistics expert and a fingerprint expert, as well as numerous law-enforcement investigators who testified about the physical evidence. Defense counsel consulted and called none. Consultation with appropriate experts is critical to trial counsel's ability to provide effective representation:

Even though trial counsel was not a scientist, this should not relieve him of his responsibility to understand the evidence being used to convict and execute his client. Furthermore, aside from the presentation of testimony from his own expert, he would have to be sufficiently informed to cross-examine the State's experts.

*Richey v. Mitchell*, 395 F.3d 660 (6th Cir. 2005) (reversing capital conviction where defense counsel failed to consult with appropriately qualified arson evidence about physical evidence in

the case.)  Having identified the critical part of the State's case against Mr. Hoffman and formulated a defense to it, defense counsel's decision not to hire experts and investigate the physical evidence relating to that defense was unreasonable and inexplicable.  "At a minimum, counsel has the duty to… make an *independent* investigation of the facts and circumstances of the case" *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985.)

Had defense counsel fulfilled this basic defense function in relation to *the only issue in dispute at Mr. Hoffman's capital trial* they would have discovered an array of evidence supporting their case and undermining the State's.

There is a reasonable probability that but for defense counsel's failures in this case, the result would have been different. *Stouffer v. Reynolds,* 214 F.3d 1231 (10th Cir. 2000) (counsel ineffective in capital trial for numerous reasons including failure to seek funds to hire defense experts to assist in attacking the state's theories experts, cross-examining state's expert's based only on reading their reports, and failing to call defense investigator to testify about inconsistencies between the state's case and evidence at the crime scene). *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (reversing for ineffective assistance of counsel where defense counsel failed to investigate state's evidence that blood on the murder weapon matched defendant's, finding that "defense counsel's failures to prepare for the introduction of [state's scientific evidence]" and "to subject the state's theories to the rigors of adversarial testing" involving "an issue of the utmost importance" in the state's case constituted ineffective assistance). *Sims v. Livesay,* 970 F.2d 1575, 1580-81 (6th Cir. 1992) (counsel ineffective in murder case for failing to investigate and present scientific evidence that, consistent with defendant's claim that the shooting was accidental, finding that defense counsel "did not make a reasonable decision that further investigation of the physical evidence was unnecessary," noting

that he did not make an "independent investigation" and failed to ask a defense expert to examine the evidence).

### 2. The documentary evidence and lay witness testimony the jury never heard

#### a. Defense counsel failed to present evidence explaining the real reason that Mr. Hoffman carried a gun to work that day

Defense counsel's failings did not stop with their handling of forensic issues. They also failed to develop lay witness testimony and documentary evidence which would have disproved another aspects of the State's case for specific intent. The State relied on the fact that Mr. Hoffman took a gun to work as part of their case that the killing was planned. R. 4244, R. 4253.

Defense counsel's theory at trial for attacking this was the argument that Petitioner lived in violent neighborhoods and needed the gun for protection. This was true. However, having alluded to this briefly in opening argument, they failed to present *any* evidence to support it. In opening statement defense counsel referred to problems that counsel *speculated* their client *may* have had:

> This young man had a twenty-five, went to work with a twenty-five automatic, very cheap gun, with one bullet, one bullet in it. Now, you and I may have trouble understanding that. That's part of that inner city that those of you who ever lived in New Orleans escape from. Those of you who didn't, maybe have had other experiences concerning this. He felt it necessary. And if you know anything about the Fisher [sic] housing project and where he had to live you might – you might have an understanding of it, separate and apart from what the State might want you to understand about it.

R. 3548. The jury certainly did not have an understanding of it based on anything the defense presented. Had defense counsel investigated Mr. Hoffman's life and experiences, particularly in the time leading up to the crime, they would have been able to present a wealth of testimonial and documentary evidence explaining his decision to carry a gun, in its true and far less insidious context.

The jury never learned that Mr. Hoffman had recently obtained the gun for protection after being victim of three violent assaults in the months leading up to the offense. He had been surrounded by violence his whole life. Violence was endemic both inside his home where he and his siblings were victims, of physical abuse, and domestic violence, and outside in the community. In the housing projects and other low-income neighborhoods where he lived, gun-fire was a daily occurrence.[63] *Murder is the leading cause of death in his family*, eight of his uncles and first cousins were brutally murdered on the streets of New Orleans. At the age of seventeen, Jessie experienced three violent assaults which could have made him the 9th murder victim in his family. In 1994, he and his step-brother Derrick Scott were held up at gun point. Derrick remembered:

> It happened as we were walking down Tulane Avenue in New Orleans. There were five guys walking together. One of them walked up to us and put his hand out in front of him to stop us. Then he pulled out a gun and stuck it straight in front of Jessie's face. It was a black Desert Eagle. I'll never forget seeing that. They can do a whole lot of damage. It was very frightening. He told us to give him all our money. I gave him my whole wallet. Jessie had about $10 in his pocket, which he handed over. Then the guy made Jessie take off his gold chain, his Micky Mouse watch which I think his girlfriend Monique had given him, and his Bally's shoes.

Declaration of Derrick Scott, LASC Writ, Ex. 6-4, Ex. 130. The second occurred three months prior to the offense; a humiliating assault in which Mr. Hoffman was made to strip at gunpoint during an armed robbery of him and his girlfriend while they waited for a bus near his home in the Fischer projects. Mr. Hoffman's girlfriend described what happened:

> Jessie and I were robbed at gun point in early August 1996. I'd been visiting him at his mother's house in the Fischer projects. I stayed over there till late. We expected that Jessie would be able to borrow his mom's car to drive me home.

---

[63] *See* Declaration of Marvin Fields, LASC Writ, Ex. 6-4, Ex. 57; Declaration of Gerald Hoffman, LASC Writ, Ex. 6-4, Ex. 67; Declaration of Naomi Hoffman, LASC Writ, Ex. 6-4, Ex. 72; Declaration of Brigit Nicole Scott, LASC Writ, Ex. 6-4, Ex. 129; Declaration of Raushanah Smith, LASC Writ, Ex. 6-4, Ex. 135; Report of Dr. Sautter, LASC Writ, Ex. 6-6, Ex. 6.

But when Jessie asked to borrow his mom's car, she said "no." I don't know why; she wasn't using it. So we had to get a bus. It was late; around 11.30pm. The bus stop was on a road that ran by the projects. We waited for over three quarters of an hour for the bus but it still didn't come. Three guys around our age had started waiting too. Then suddenly they came over, one pulled out a gun, and they demanded all our money.

Jessie and I were sitting on the curb. They pointed the gun right into his face. He stood up. They kept the gun on him, not me. They took his wallet, his bag. Then they made him strip. They told him to take off his clothes. They took his shirt, his pants and his shoes. He was left in his underwear and socks. After they took our things they made us walk in the direction of the mall, towards some dumpsters. They took off while we were walking. We hid behind the dumpsters.

It was terrifying. I was scared we were going to get shot and killed. I was hysterical, crying. When we were sure they'd gone we walked back to Jessie's mom's place through the project, Jessie practically naked in just his boxer shorts and socks.

Declaration of Raushanah Smith, LASC Writ, Ex. 6-4, Ex. 135. *And see* NOPD Report, Armed Robbery, 8/8/96, LASC Writ, Ex. 6-4, Ex. 8.

Just a few weeks prior to the offense, Jessie was a victim of violence a third time. His girlfriends' violent, drug addicted step-father, Elden Johnson attacked him as he attempted to intervene in a fight between Johnson and Jessie's girlfriend's mother. Johnson pulled out a knife and threatened to kill Jessie.

Elden came in and had obviously been taking drugs, all overdosed and looking terrible. He and my mom had started to fight. Jessie tried to break them up to stop the fight. My mom was shouting and Jessie tried to help. My mom was hitting Elden with the iron, and she ended up hitting Jessie too, in the back, on the arms. Elden pulled a knife on Jessie and told Jessie he'd kill him if he didn't back off. When Elden left off her my mom ran out the house and went to stay at her sisters. Jessie and I went over there soon after, took my mom some clothes and we stayed the night too. This incident happened some time in around September or October of 1996.

Declaration of Raushanah Smith, LASC Writ, Ex. 6-4, Ex. 135.  *And see* Declaration of Ollie

Smith, LASC Writ, Ex. 6-4, Ex. 134.[64]

It was during this escalation of violence personally experienced by Jessie Hoffman, that

he obtained a gun and began to carry it with him for protection.  Thus, his girlfriend, Raushanah

Smith recalled:

> Soon after we got robbed I noticed Jessie started carrying a gun.  I saw him with it
> for the first time one morning when we were waiting for the bus near my
> mom's house.  I remember being very surprised to see him with a gun because I'd
> never seen him with one before and I didn't think he'd have one.  I was shocked
> about it then and didn't say anything.  Sometime later I asked him why he had
> started carrying a gun and he told me he didn't want to get robbed again.

Declaration of Raushanah Smith, LASC Writ, Ex. 6-4, Ex. 135.[65]   As psychologist, Dr. Sautter,

explained:

> Because he already suffered from PTSD and was very paranoid and thought
> disordered, these robberies triggered increases in hyperarousal, hypervigilance,
> and fear, and increased his vulnerability to a future psychotic episode.... It is
> likely that the increased life stress and traumatization as a result of the two
> robberies contributed to the psychosis that Jessie experienced on the day of the
> murder.  He reports experiencing extremely high levels of anxiety in the days
> prior to the murder.

Report of Dr. Sautter, 12/12/03, LASC Writ, Ex. 6-6, Ex. 6.  While his mental illness, and daily

fears for his personal safety does not excuse his illegal carrying of a gun, they certainly explain

it.[66]

---

[64] Records corroborate the Smiths' accounts of Elden Johnson's violent propensities, and the domestic violence he
inflicted on their family.  Ollie Smith/Elden Johnson Municipal Court Domestic Violence Records, July 1996,
LASC Writ, Ex. 6-4, Ex. 84; Elden Johnson Orleans Parish Criminal Records. LASC Writ, Ex. 6-4, Ex. 86
(including charges of second degree murder; illegal use of weapon, illegal carrying of weapons, possession with
intent to distribute cocaine; felon with firearm); Times Picayune articles: *Wanted By Law, 6/11/97; Murder Victim is
Slaying Suspect, 5/1/97; Dead Man is Identified as Suspect, 5/7/97; New Orleans Man Dies from Gunshot Wounds,*
10/28/96 LASC Writ, Ex. 6-4, Ex. 87 (reporting Elden Johnson's suspected involvement in a 10/28/1996 homicide,
and his subsequent murder in retaliation for that killing).

[65] Jessie Hoffman lived, quite literally, in fear of his life.  This fear is understandable for any person with a healthy
desire for safety and self-preservation.  Petitioner experienced it even more acutely because he was mentally ill.
After years of traumatic abuse from his mother and growing up in violent poverty-stricken neighborhoods he
suffered from Post-Traumatic Stress Disorder and a psychotic disorder.  These illnesses resulted in paranoia, and
hyper-vigilance, increasing his awareness and perceptions of real and imagined threats.

Having failed to investigate, defense counsel had no rebuttal to the State's argument that Mr. Hoffman carried a gun planning to kill Ms. Elliot that day. If they had, they would have uncovered a wealth of well-documented and corroborated evidence that would have humanized their client, and provided consistency with the compelling mitigation case at penalty phase. Most importantly, the evidence would have shown the jury the real reason Mr. Hoffman carried a gun to work that day, a reason that had nothing to do with Ms. Elliot, or any violent, let alone murderous, intent.

### 3. Defense counsel was ineffective for presenting an inflammatory and highly prejudicial defense in which they blamed the victim and demonized their client

What defense counsel *did* do was least as damaging as their omissions. Their actions made an inherently inflammatory atmosphere dramatically worse. The defense presentation was seething with defense counsel's own repugnant attitude that the victim was somehow to blame for her own kidnap, robbery rape and murder. They argued she was too "naive" to be working in the "lion's den" of New Orleans and "offered" herself in a misguided attempt to bargain for her life. In opening statement, defense counsel suggested that Ms. Elliot could and should have avoided the whole incident:

> The facts of this case will prove to you beyond any doubt that this is an inner-city crime. **This is not a St. Tammany crime. What led to Molly's death has to do with conditions in Orleans Parish. It doesn't have anything to do with conditions in St. Tammany Parish. It has to do with the world that Jessie Hoffman lives in. It doesn't have anything to do with the house on the hill where Molly lived. You live in St. Tammany. We worry that you might not understand.**

---

[66] Mr. Hoffman's mental illness also explains his detached demeanor after the offense and during trial which the State exploited as demonstrating his cold-bloodedness. *E.g.* R. 4291. The details of Mr. Hoffman's traumatic background and mental illness have been provided much more extensively elsewhere in Petitioner's claim of ineffective assistance of counsel at the penalty phase. *See* Claim I. Petitioner incorporates all facts and law presented in that claim, herein.

> The facts are going to show that **Molly Elliot was not prepared to go into the lion's den every day. I am not saying anything bad about Molly. But she wasn't prepared to go to the 300 block of Camp Street every day of her working life and walk two blocks in the dark to a car on the seventh floor of a dark parking lot and deal with what she had to deal with.**

R. 3544-45.

> For whatever reason, [Mr. Hoffman] walks to the side of the car, shows the gun, and says, "Give me your money." Mary says, "I don't have any. I don't have any money." Well, the window is down. He tries to open the door. **Now, the car is running — this is what I mean by a young lady unprepared. The car is running at a red light. He tries to open the door. The door is locked. "Open the door." She opens the door. He gets in and they end up at this ATM.** He gets two hundred dollars.

R. 3549-50. Continuing to its most offensive conclusion, defense counsel suggested that Ms.

Elliot instigated her own rape and murder, because "she brought it up:"

> In his recount of the circumstances [of the rape], he doesn't indicate that — and when you hear them, maybe you will believe it. There's not vicious, ugly, mean, harassing talking going on. At one point she said, "Please don't kill me," and he answers, "Why would you think I would kill you, you're cooperating." And at one point she says "Look, please don't kill me. You can have anything you want. You can have me."

> I am not, I am not saying that it is not rape. I am not saying that. I can only imagine what's in her mind. What I am saying is, that all the information that you are going to receive in this case, there will not be one iota of information that suggests that Jessie told this lady, "I am going to rape you." **Her clothes are not torn off.** Remember, I am not saying, I am not — **I am still not saying it's not rape. I'm sure she was terrified, but she brought up the subject. The lady was not prepared to go into the lion's den every day. She was not prepared.**

R. 3550-51 (emphasis added). Defense counsel pursued this inflammatory defense throughout

the trial. The defense's cross-examination of witness after witness was infected by this tone,

from law-enforcement witnesses to members of the victim's own family. Thus, when cross-

examining the victim's mother and husband, defense counsel attempted (unsuccessfully) to

establish that Ms. Elliott was not equipped to work in the dangerous city of New Orleans. R.

3557, R. 3579-80. During cross-examination of Ms. Elliot's boss and managers of the parking

lot, defense counsel similarly sought to cast blame on Ms. Elliott's employer and the staff at the

parking garage for not providing her with protection. R. 3601, R. 3632-4.  Later, they questioned

the State's pathologist about the lack of vaginal tears and sexual trauma, and questioned crime

scene technician, Lt. Frey, about the lack of tears to the victim's clothes, presumably to

demonstrate the victim's "failure" to resist being raped at gun-point.  R. 3664, R. 3728.

The defense was so repulsive that it prompted an editorial in The Times Picayune

rebuking the defense team for making such a "completely offensive" argument.

> His lawyers wanted us to believe that that lowered window showed that Mrs.
> Elliott was naive about the dangers of New Orleans. Molly Elliott, who lived in
> Covington, "wasn't prepared to go to the lion's den every day," lawyer Bill
> Alford told jurors this week.

> In other words, she brought this on herself.  That argument is insulting not just to
> the memory of a murder victim but to any woman who lives or works in New
> Orleans.

> The message is: You can lock your doors religiously, avoid risky spots after dark,
> park close to where you're going and in well-lighted spots, but if you let your
> guard down for a second, you're to blame for the consequences.

> * * *

> Calling Mrs. Elliott naive wasn't the worst of the defense's argument this week.
> Mr. Alford also targeted her efforts to bargain with her kidnapper.
> "You can have anything you want. You can have me," he said Jesse Hoffman was
> told.  "I'm not saying it's not rape, but she brought up the subject," Mr. Alford
> told jurors in his opening argument. Her clothes weren't torn off, she wasn't
> beaten,                                                 he                                                 said.

> That is completely offensive. It is essentially the same as the old trick of accusing
> a woman of dressing too provocatively and inviting an assault.

*Don't Blame the Victim*, Times Picayune, 6/27/98, Amended Supplemental Petition Ex. 9, B6.

In a case where the defense conceded guilt to rape and second degree murder, the strategy

served no tangible purpose.  Capital defense legal expert, Michele Fournet, described the

155

devastating effect this argument surely had on Mr. Hoffman's defense, alienating the jury and

undermining the credibility of the entire defense:

> I cannot imagine anything more offensive to a group of 12 people sitting on a case like this that involved undeniably a horribly brutal murder, undeniably clearly a rape, than to hear the lawyer for the person on trial get up and suggest that somehow she brought this on herself and/or that her employers caused this to happen to her. Its not just that its ridiculous, its insulting. I have little doubt that those 12 people were deeply offended, profoundly offended by that.

* * *

> And they don't take that out on the lawyer. They don't take that kind of resentment and anger out on the lawyer. It's the client that pays the price for that kind of very ill-advised conduct during the guilt phase of the trial. So I think it was very damaging.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-9, at 91-92. The prejudice

caused to Mr. Hoffman's defense was particularly profound because of the racial dimensions of

the case:

> [T]his was a young man from the New Orleans inner city and the murder actually occurred in St Tammany Parish, which is very heavily white. Its viewed, correctly or incorrectly, as, quote, a white flight parish, and you have a situation where the district attorney at the time went on television and made statements about St. Tammany parish not wanting, quote, them from New Orleans coming and bringing their problems into St Tammany Parish. So you have a very inflammatory atmosphere.

> And then you have a lawyer whose response to the racial aspect of the case is to blame the victim for being, quote, naïve about New Orleans, but also to describe the inner city where Jessie was from as a lion's den and to remind the jury incredibly, incredibly to remind the jury this is what we came to St. Tammany Parish to get away from.

> So what you're doing when you put all that in one package is you are, in my view, you're throwing gasoline on the flames. You're really identifying yourself with the prosecution. You're given every appearance of subscribing to the very notion that Mr. Reed went on television to propagate. So whatever racism is inherent already in the trial, you have just magnified it a hundred fold instead of addressing it.

156

*Id.*, 95-96.  Identifying with, rather than challenging the prejudicial prosecution approach was not competent "advocacy."  The State had framed their case, albeit much more subtly, in those same prejudicial terms, emphasizing Molly Elliot's "happy story book life" on the top of a hill in St. Tammany Parish, and painting the picture of Jessie Hoffman as an evil predator from New Orleans.  *See* State's Opening Statement, R. 3537-38.  Defense counsel's strategy played right into their hands, and allowed the State to appeal more directly to the jury's passion and prejudices:

> Mr. Alford told you at the beginning of this that Molly Elliot, that Molly Elliot was unprepared to enter the lion's den.  I suggest to you that if, like Daniel, she entered a lion's den, with only lion in it, with the claws and teeth as their weapons, she would have tamed those lions and she would have come out and she would be here today... But Molly as strong as she was, she endured a night with this murderer, was not prepared on Thanksgiving Eve, 1996 to meet the devil.

State's closing argument, R. 4300-01.  The defense's "blame the victim" opened the door to other lines of "inflammatory" argument by the State too.  Appealing to the jury's deep seated racial prejudices, and antipathy to the defendant aroused by defense counsel, the prosecution thus argued in relation to the rape:

> I think it is pretty obvious to everyone here on this jury that Ms. Elliot did not consent to sex with that man over there.  In no way, shape or form did she agree to have sex with him, no matter what he tells you.

*Id.*, R. 4249.

> It's clear at that point that Molly Elliot just wants to leave.  What would you want to do?  Would you want to stick around with this man over here (indicating)?  Of course not.  Do you really think that Molly Elliot offered herself to this man?  Does that make sense to you?  Is that common sense?

*Id.*, R. 4252.

> If he just wanted to have what he described as "sex." He just wanted to have sex with her.  She could have kept her top on.  She could have kept her bra on, her vest, her red sweater.  But he wanted her completely naked.  Vulnerable, weak.  He wanted to see all of her.  He didn't want to just have her.  He wanted to degrade her.  He wanted to humiliate her.  He wanted her entirely vulnerable.  He

took off every stitch of clothing that she had, forced her to lay down in the back of that vehicle, while he entered her. It's one of the most horrible things that could happen to any human being.

*Id.,* R. 4252. On appeal, Mr. Hoffman's appellate counsel argued that these comments were prejudicial error because they were "calculated to arouse racial prejudice in the all-white jury that was seated" and "were calculated to convey to the jury the particular repugnancy with which the rape of a white woman by a black man has historically been view through white eyes." The Louisiana Supreme Court rejected the claim, finding that these apparently "inflammatory" remarks were mostly "responses to defense counsel's opening statement in which he downplayed the violent nature of the rape"; "the prosecutor's diatribe as a whole was designed to combat the defense theory of blaming the victim." *State v. Hoffman* 98-3118 (La. 4/11/00), 768 So.2d 542, 583.

Defense counsel's offensive argument cannot have failed to alienate the jury, and undermined the credibility of the entire defense. It was not the result of reasonable trial strategy. Rather, "this type of argument is calculated to damage appellant's cause. It cannot be considered a reasonable trial strategy." *Miller v. State*, 728 S.W.2d 133, 135 (Tex. Ct. App. 1987) (reversing where, *inter alia*, defense counsel made obscenely racist arguments.) The predictably offensive use of a blame-the-victim defense in this case "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. On this basis alone, the conviction and death sentence must be set aside. When one considers the likely effect of classing their client as part of the "criminal

element" from the "lion's den," and the implication of this for the juror's perceptions of a specific intent based defense, there is no question it was highly prejudicial in this case.[67]

### 4.  Defense counsel's failure to present a credible unified theory

Finally, analysis of defense counsel's efforts in this case would not be complete without consideration of the contradictions and lack of cohesion in the defense case.  Challenging the State's case for specific intent was the crux of their defense against first-degree murder.  They presented virtually no evidence to substantiate their theory.  However, not only was the credibility of their defense undermined by what they did not present to the jury, but it was further undermined by what they *did* present.  They spent considerable effort making points that were unnecessary to, and inconsistent with, their primary theory.

First and foremost was their effort to slander the victim for allegedly encouraging her own rape and murder.  Outrageous and alienating enough in itself, this "strategy" made no sense in a case where the defense conceded guilt to rape and consent was not an issue.

Secondly, they hired a DNA expert to discredit the reliability of the state's DNA evidence, arguing (unconvincingly) that it was contaminated and unreliable. Testimony Allen Friedman, R. 4152-4205.  Defense Closing Argument, R. 4273-80.  Yet, identity was never in dispute.  In closing argument defense counsel admitted that attacking the DNA got them nowhere, but they felt they had to do it, in order to look good for the jury.  R. 4280-81.  That is

---

[67] Other aspects of trial counsel's defense presentation were offensive too.  Defense counsel's engaged in inappropriate aggressive behaviour while cross-examining some of the State's witnesses.  Defense counsel attempted to have the witnesses participate in a physical re-enactment of the shooting, but handled it so disrespectfully that there were times when defense counsel and witnesses almost came to blows.  Thus during the cross-examination of Det. Kenneth Harris, the State was prompted to request an instruction that defense "counsel" "not put his hands on the witness." R. 4116.  At another point the medical examiner pleaded with defense counsel "to be treated as a human being." R. 3662-64.  Ultimately the court admonished defense counsel: "I am not going to have any more tugging or talking between counsel and the witness in that manner.  The proper way to do cross-examination is questions, and allow appropriate time for the answers to be given and then move to the questions... I want you to remain seated Mr. Alford.  Do not approach this witness again, unless you get permission from the court." R. 4123-25.  As with the blame-the-victim defense, there could be no tactical justification for these bullying defense tactics, and they prejudiced Petitioner's defense in violation of *Strickland*.

not a reasonable way to determine trial strategy.  Similarly, they took pains to establish that the State did not test Jessie Hoffman's gloves for gunshot residue.  Trial Testimony Otto Stubbs, R. 3835-36, 3866; Trial Testimony Det. Hall, R. 3819; Defense Closing Argument, R. 4264.  Yet they did not dispute that Jessie Hoffman wore gloves or that Mr. Hoffman shot Ms. Elliot.

Third, they raised questions about the validity of Jessie Hoffman's confession, cross-examining police witnesses to suggest police intimidation and other untoward police interrogation tactics.  R. 3771-3380; R. 3885-87; R. 4116-117.  Yet, at the same time they relied on Mr. Hoffman's confession as the only "piece of direct evidence in this case that came in regarding Jessie Hoffman's intent on that night in question" to prove that there was no specific intent. R. 4269.

During his testimony at a post-conviction deposition, lead counsel, William Alford, confirmed the defense's failure to construct and present a coherent guilt phase theory:

> Well, you try to develop a theory, and in this case I do not recall that we were successful in developing for the guilt phase in a truly coherent plan...  I mean, frankly the concept was you just hope that and you be vigilant and hope that the state makes a mistake or something.

Id. 38-39.  Essentially, defense counsel had no real theory at all.  That is not competent or reasonable advocacy.

### 5. Conclusion

"The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275, 276 (1942).

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law... He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one.  He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

*Gideon v. Wainwright*, 372 U.S. 335, 344-345 (U.S. 1963) (citations omitted).  The legal representation Petitioner received at his capital trial was inadequate to fulfill the Sixth Amendment's requirements of a fair trial.    Had defense counsel provided minimally constitutionally effective assistance to Mr. Hoffman, there is a reasonable probability that the outcome would have been different.   *Strickland*, 466 U.S., 668.  Petitioner's conviction should be reversed.

### D. The guilt phase errors also prejudiced Petitioner at the penalty phase

Defense counsel's performance during guilt the phase had a devastating impact on penalty phase proceedings too.  It was well established at the time of Mr. Hoffman's trial that minimally competent counsel in a capital case should carefully coordinate the guilt and penalty phase strategies, and avoid as far as possible any guilt phase presentation that would undercut the case for life.  The 1989 ABA Guidelines provide:

> As the investigations… produce information, counsel should formulate a defense theory.  In doing so, counsel should consider both the guilt/innocence phase and the penalty phase, and seek a theory that will be effective through both phases.

1989 ABA Guidelines, Guideline 11.7.1(A).  As Petitioner's legal expert explained:

> Capital defense experts everywhere talk about the interrelatedness of these two phases of trial and about the fact that what you do during the guilt phase has implications for the penalty phase.  And when you prepare, whether you're preparing argument or examination of witnesses or your defense theory, you have to keep that in mind: that if that jury comes back guilty, that's not the end of the trial, if you have offended them, insulted them, made ludicrous arguments to them, or taken any action that would cause the defense to alienate the jury or lose credibility with the jury, the jury is not going to suddenly have amnesia about all of that when they get to the penalty phase.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 91; *see also* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases.*, 58 N.Y.U.L. REV. 299, (1983) (explaining critical importance of coordinating guilt and penalty

phase strategies); *Florida v. Nixon*, 543 U.S. 175, 191-192 (U.S. 2004) ("the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus.... defense counsel must strive at the guilt phase to avoid a counterproductive course. . . [and] must consider in conjunction both the guilt and penalty-phases in determining how best to proceed") (citing *Goodpaster* 58 N.Y.U.L. REV. 299, and other articles).[68]

Defense counsel woefully failed in this respect too; their unreasonable guilt phase strategy was *extremely* prejudicial to Petitioner's case

First, the adverse effects of the offensive "blame the victim" defense would have continued throughout the penalty phase:

> If this layer has deeply offended them right out the box in opening statement and done it intermittently throughout the guilt phase trial, you can't put that toothpaste back in the tube when it's time for them to decide if he lives or dies. And they identify the lawyer with the client. Juries always do that. It's as if Jessie Hoffman was making the argument in the minds of the Jury. So very, very damaging.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex. 6-8, at 94. The guilt phase defense was *part* of the penalty phase: all evidence from the guilt phase was admitted as

---

[68] Thus Goodpaster explains: "in order to fulfill the constitutional obligation to ensure a meaningful penalty trial and a reliable sentencing decision in a capital case, defense counsel should integrate the guilt phase defense and the penalty phase case for life... [C]ompetent advocacy in a capital case requires the defense counsel to anticipate a verdict of guilt and, insofar as possible, consistent with the evidence and the clients wishes, frame a guilt phase defense which will not undermine the most favorable mitigating penalty phase case that can be presented. . . . [S]he should not frame a defense case for acquittal which will preclude or handicap effective advocacy for life...[I]nappropriate guilt phase advocacy could so prejudice the sentencer that no persuasive case for a life sentence can be made at the sentencing phase . . . It is essential that counsel try the guilt phase in a manner calculated to preserve credibility at the penalty phase . . . the nature of the defense at the guilt phase may significantly, perhaps determinatively, affect the sentencer's perceptions of the defendant at the penalty trial." *Id.*, 325-34. This seminal article has frequently been cited by the United States Supreme Court. *E.g. Florida v. Nixon*, 543 U.S. 175, 191-192 (2004); *Strickland,* 466 U.S. at 712 ("For a sensible effort to formulate guidelines for the conduct of defense counsel in capital sentencing proceedings, see Goodpaster, *supra*, 343-345, 360-362") (Marshall J., dissenting); *United States v. Cronic*, 466 U.S. 648, 662 (1984).

evidence at the penalty phase, and the jury was instructed to consider it in determining whether Mr. Hoffman should live or die. R. 4539. Not surprisingly, the prosecution exploited the jury's inevitable hostility to the defense's approach during their case for death, just as they had during the guilt phase.   In their closing argument at penalty phase the State emphasized the blame*less*ness of the victim:

> What crime did she commit?  What did she do to cause this?  Nothing.  She was a good decent person.  She had a love of life.  She trusted people.
>
> * * *
>
> She has paid the ultimate price, her life, for doing nothing wrong.  It is was a most cruel death.  It was a death that she did not deserve.  She was victimized, violated, brutalized, robbed, probably asking for leniency just as he is.

R. 4517 – 4518.  They then juxtaposed this, powerfully, to the Defendant:

> What did the defendant do to deserve the possibility of facing the death penalty? We'll talk about, and we already have talked about many times: He committed the crime of armed robbery, taking personal property from her; he committed the crime of aggravated kidnapping, taking away her security; he committed the crime of aggravated rape, taking away her trust of people, her decency, her innocence, and everything that was important and personal and intimate to her.

R. 4518.  Having been alienated by the inflammatory defense, it is hard to imagine a jury less disposed to empathy and compassion.

Secondly, defense counsel's appeal to the negative stereotypes about New Orleans, in blaming the victim, and framing their client as being part of the "lion's den" the victim should have avoided, was similarly problematic for their penalty phase efforts.   The purpose of mitigation is to humanize the defendant, explain the multitude of factors leading to the commission of the offense, and ultimately move the jury through empathy, understanding and compassion, to spare the defendant's life.  Embracing negative stereotypes does the opposite; it *demonizes* the client, distances the jury from the client, and feeds into the same attitudes, the fear of crime, the perceived need and desire for maximum punishment, prejudicial assumptions that

invariably propel capital jurors to vote for death.  In combination with defense counsel's utter

failure to present any truly mitigating evidence, this was devastating:

> The truth of the matter is that it is a lot harder for people to act in a sort of generically racist way in their decision-making.  It's a lot harder for them to do that than it is for them to make a decision based on race when they know all the information about a person.
>
> In other words, as long as Jessie Hoffman fits that racial stereotype that was propagated by Mr. Reed and probably believed by a lot of people in St Tammany Parish at that time that there were predators coming out of the inner City of New Orleans who were violent, and had no redeeming qualities and who were a threat to the people in St Tammany Parish and existed sort of as that type of abstraction, as long as that's what the people on the jury believed, then Jessie Hoffman was going to die.
>
> On the other hand, when you take that stereo-type away from people, even people who may have some racism and you paint a picture of this kid, and he was a kid, he was 18 years old at the time I think, that is a fuller human picture that paints a picture of a kid that, yes, he's African-American, yes, he's from the inner city, but let me tell you a little more about him than that stereo-type, that extraction.  Let me tell you about what kind of life he had.
>
> If you humanize him, which is what mitigation is all about, then people can get past that.  Because everybody has children.  People on the jury, by and large most of the time they're going to have children, they're going to have friends that have children.  Here in St Tammany Parish you want to talk about the jurisdiction, you're probably talking about a jurisdiction where family values are very important. . . . They know how to raise their kids.  They know how important it is for a child to have love, to have a stable environment, to avoid exposure to things that could damage him, and they know what happens when a child doesn't have those things.  Black or white, they know that a child that comes up in the kind of environment that Jessie came up in is not going to function well in society. . . .
>
> But what you've done is you've taken away the stereo-type and you've replaced it with a real live human being with a history with obstacles he's had to overcome, with his few little accomplishments that he's been able to make, with the very damaging environment he's had to fight all his life and you've replaced that abstraction with somebody recognizably human, somebody that maybe is the same age as their kids, you know.  And you've made it a lot harder for a jury in that situation to return a death penalty.  That's what was not done in this case.
>
> Instead, we have defense counsel in argument and by omission in not putting on mitigation feeding the stereotype, the very thing you don't want to do.

Deposition of M. Michele Fournet, 11/30/06, LASC Writ, Ex.6-8, at 99-100.[69]

Trial counsel's contradictory "hit anything that moves" guilt phase defense would likely have had a similarly negative impact on Petitioner's prospects at the penalty phase; undermining the credibility of anything they would later present to spare their client's life, before they even began. When finally provided with defense counsel's non-theory of "a good kid on a bad day, I don't know what happened" it is hard to imagine a defense with less credibility trying to convince a jury to spare their client's life.

Finally, the deficiencies in the guilt phase defense against specific intent undermined what could otherwise have been a potentially powerful mitigation argument based on residual doubt. *See, e.g. Moore v. Johnson*, 194 F.3d 586, 618 (5th Cir. 1999), *opinion superseded on rehearing*, 194 F.2d 586 (recognizing that residual doubt about the defendant's guilt may be "highly beneficial" to a capital defendant in sentencing). In the event that this court does not find that the *Napue* and *Brady* violations materially effected the guilt phase, they undoubtedly effected the penalty phase.[70] Given the effect of the withheld and false evidence in the guilt phase, combined with ineffective assistance of counsel, it is probable that, one or more jurors

---

[69] The experience of juror Mari Lower, bears witness to this. Despite the uncontradicted evidence of numerous witnesses that prior to his arrest Mr. Hoffman was not a trouble-maker, was not violent, did not smoke or drink, or take drugs and had no prior criminal record, and to the contrary had always been well-behaved, jurors thought that "given his background he may have a history of drug use and things like that. We wondered if he was in a gang." Declaration of Mari Lower Supplemental Petition, Ex.106. They speculated, incorrectly, that although he had no adult record, he likely had a juvenile record, turning Mr. Hoffman's youth from statutory mitigator into aggravation. Finally, their negatively race-conscious attitude led them to feel hostility towards defense counsel for supposedly exploiting the "race-card" when race was not part of the mitigation case at all. Declaration of Mari Lower. Supplemental Petition, Ex.106.

[70] In the event that this Court finds that the evidence was in fact disclosed or available to the defense, Petitioner pleads his *Brady* and *Napue* allegations in the alternative as ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment rights to counsel and Due Process. The standard of prejudice required for *Brady* and ineffective assistance of counsel claims under *Strickland* is identical. *Strickland v. Washington* 466 U.S 668 (1984) (adopting *Brady* materiality standard under *Bagley,* as prejudice standard for ineffective assistance of counsel claims).

would have harbored a doubt about intent that would have inured to Petitioner's benefit at sentencing.

For all these reasons, collectively and individually, Petitioner's penalty phase was prejudiced as a result of defense counsel's errors at the guilt phase in violation of his constitutional rights under *Strickland*.  But for those errors, there is a reasonable probability that at least one juror would have voted to spare Mr. Hoffman's life.  *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death").

In addition, the Court must consider the cumulative impact of the above-mentioned constitutional errors at the guilt phase together with all evidence presented in his claim of ineffective assistance of counsel at penalty phase, in determining whether Petitioner received a fair sentencing hearing.  *Strickland*, 466 U.S. at 698 ("defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis added); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) ("when the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable") (reversing death penalty based on cumulative prejudice effect of counsel's deficiencies at guilt phase and penalty phase); *Jones v. Cain*, 227 F.3d 228, 230 (5th Cir. 2000) (to determine prejudice under *Strickland* court "must examine the proceedings as a whole, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting.  We do not assess any alleged error in isolation").  There

is no question that the cumulative prejudice from the guilt phase and penalty phase deficiencies of counsel meets the prejudice prong of *Strickland,* and Petitioner's death sentence should be reversed.[71]

### E. *Strickland* and *Brady/Napue* errors are to be considered collectively or cumulatively and the ultimate question is whether the trial was rendered unfair by the cumulation of error.

Whether ineffective assistance of counsel, prosecutorial misconduct, or both are under review, the fundamental question is whether the trial was fair; and whether errors committed during the course of the trial, considered together, rendered the trial unfair.  The United States Supreme Court noted in *Strickland,* 466 U.S. at 696, that as with *Brady* claims "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged;" and in *Bagley,* 473 U.S. at 674-75 (1985), a progeny of *Brady,* the Court stated: "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." (quoting *United States v. Agurs,* 427 U.S. 97 (1976))."

Given the identical standards of (of *Strickland* prejudice and *Brady* materiality) which implicate the same concern to protect the fundamental fairness of the proceeding, the cumulative impact of the above-mentioned constitutional *Brady* and *Strickland* errors should be considered together in determining whether petitioner received a fair trial.  *Mak v. Blodgett,* 970 F.2d 614, 622 (9th Cir. 1992) ("We do not need to decide whether these deficiencies alone meet the prejudice standard because other significant errors occurred that, considered cumulatively, compel affirmance of the district court's grant of habeas corpus as to the sentence of death");

---

[71] Even if this court does not find that the level of prejudice resulting from the *Strickland* violations are sufficient to reverse his conviction, given the heightened level of reliability required of capital sentencing by the Eighth Amendment, Petitioner's death sentence should be reversed.

*Gonzales v. McKune,* 247 F.3d 1066, 1078 (10th Cir. 2001) (the outcome of the trial "would likely have changed in light of a combination of *Strickland* and *Brady* errors, even though neither test would individually support a petitioner's claim for habeas relief"; *Williams v. Quarterman,* 551 F.3d 352 (5th Cir. 2008) (remanding to district court for *de novo* consideration of *Strickland* claim and of the cumulative prejudice of *Brady* and *Strickland* violations).

### F.    Applicability of §2254(d); Petitioner is entitled to *de novo* review of these claims

Petitioner exhausted his *Strickland* claims in state court, primarily through his Amended Supplemental Petition and LASC Supplemental Writ filed in state post-conviction proceedings (trial counsel's failure to investigate and present evidence supporting defense case against specific intent).    The state post-conviction court overlooked these claims when ruling and denying relief, and failed to adjudicate them on the merits; those claims are clearly exempt from the limitations to relief under § 2254(d) and Petitioner is entitled to review *de novo* of them. *See* Part One, IV(1).

If the court finds that the state court did rule on the merits, AEDPA still does not apply because the state court provided no reasons. *See* Part One, IV(3).  If § 2254(d) is to be applied, the court should conduct an independent review of the record to determine the facts the court was silent upon. *Id.*  The state court's denial of the claim (if there was one) was an unreasonable application of federal law and an unreasonable determination of the facts under §2254(d)(1) and § 2254(d)(2).  The failure of the court to give any reasons, undermines the reasonableness of the claim. Part One, IV(4)(b)-(c).  The state court's failure to hold an evidentiary hearing to properly develop the facts also undermines the reasonableness of the court's decision (if there was one). *Id.* Moreover, the extensive evidence presented herein clearly and convincingly rebuts any possible implicit findings to the contrary by the court in its unreasoned (an unstated) opinion. §2254(e)(1).  In light of the totality of the powerful evidence of defense counsel's ineffectiveness

and the prejudice it caused, any decision of the state court denying the claim is an unreasonable determination of the facts, and an unreasonable application of *Strickland,* under clearly established law of the Supreme Court. §2254 (d)(1); §2254(d)(2).

### 1. Ruling of the Louisiana Supreme Court on Appeal

Two of trial counsel's deficiencies which Petitioner raises in his *Strickland* claim (the offensiveness of "blame the victim" defense, and the aggressive treatment of witnesses) were also raised on direct appeal as part of a claim of ineffective assistance of counsel. The Louisiana Supreme Court denied the claim on the merits. *Hoffman,* 768 So.2d at 576-577. These discreet claims were, therefore, adjudicated on the merits under § 2254(d). However, the court's decision was "contrary to" and "an unreasonable application" of *Strickland.* As an initial point, Petitioner notes that the court correctly found deficient performance in relation to both counts; it found that the blame the victim defense was indeed "offensive," and the aggressive treatment of witnesses was "inappropriate." *Hoffman,* 768 So.2d at 577, 579.[72] However, the court denied the claims for lack of prejudice. *Id.* The denial was unreasonable in several respects and § 2254(d) does not bar relief.

### a. The Louisiana Supreme Court's ruling is "contrary to" *Strickland*

First the court's decision was "contrary to" or an "unreasonable application of clearly established United States Supreme Court law, because the court failed to apply the correct prejudice standard. The court got the standard wrong in two ways.

### i. The Louisiana Supreme Court erroneously applied an outcome determinative test of prejudice

---

[72] In the alternative, if this court does not find that the Louisiana Supreme Court's ruling amounted to a finding of deficient performance, the Court did not adjudicate that prong at all, and this court should apply *de novo* review of that prong in any event.

The United States Supreme Court has made the prejudice standard very clear.   In *Strickland v. Washington,* 466 U.S. 668 (1984), it held that a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Id.* at 694. In so holding, the Court specifically considered and rejected an outcome determinative approach. *Id.* at 693-694.

> [A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . The result of the proceeding can be rendered unreliable, and hence the proceeding unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Strickland,* 466 U.S. at 693-94.   In enunciating this standard in *Strickland,* the court expressly adopted the standard used in prosecutorial non-disclosure cases. *Id.* at 694.   Since then the Supreme Court has frequently emphasized that the *Brady* materiality standard and the *Strickland* prejudice standard are identical. *See, e.g., Bagley,* 473 at 682 n.13 (quoting *Strickland,* 466 U.S. at 695); *Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (quoting *Strickland,* 466 U.S. at 694-95). Supreme Court law on the *Brady* materiality standard is therefore directly relevant to the prejudice prong of *Strickland.*   In *Brady* cases the Supreme Court has also confirmed that the "reasonable probability" standard is *not* out-come determinative, nor a sufficiency of the evidence test. *Kyles,* 514 U.S. at 435-434 (the standard "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal" and it "is not a sufficiency of evidence test") (citing *Strickland,* 466 U.S. at 694.)

Despite this clearly established law, the Louisiana Supreme Court applied an out-come determinative test of prejudice in this case.   Thus, in rejecting petitioner's claim concerning the blame- the-victim defense, the court held concerning prejudice at the guilt phase:

> in light of the overwhelming evidence of the defendant's guilt, this court does not
> believe counsel's opening statement contributed to the jury's guilty verdict.

*Hoffman,* 769 So.2d at 577.  Weighing the harm against the totality of the evidence to assess

whether the deficient conduct *would* have contributed to the verdict is a higher standard than

*Strickland* requires.  The court should have considered whether there was a "reasonable

probability" that the outcome would have been different rather than the outcome determinative

test that *Strickland* specifically rejected.  The court applied a similar erroneous standard of

prejudice in relation to the penalty phase, finding it "unlikely any resentment the jury may have

harbored continued into the penalty phase."  *Id.*  Likewise, in ruling on Petitioner's claim

concerning defense counsel's inappropriately aggressive treatment of witnesses, the court

weighed the harm against all the evidence of guilt but failed to apply the proper "reasonable

probability" standard. The court held that it:

> did not rise to a level which would cause the defendant to suffer substantial
> prejudice, considering the overwhelming evidence of guilt.

*Id.* at 579.  "Substantial prejudice" is *not* the test that Strickland requires. When ruling on

prejudice at the penalty phase it is unclear that the court applied any standard or ruled on the

prejudice prong at all: "counsel sensibly employed a gentler approach during cross-examination

of adversarial witnesses at the penalty phase." *Id.*

Thus, the state court's ruling was "contrary to" the clearly established law of *Strickland,*

and *de novo* review is required. *Kyles,* 514 U.S. at 435-434; *Strickland,* 466 U.S. at 694-95; *See*

*DiLosa v. Cain,* 279 F.3d 259, 264 (5th Cir. 2002)(state court applied rule of law contrary to

*Batson* under 2254(d)(1) by applying a sufficiency analysis rather than the "reasonable

probability" standard).

171

### 2. The court did not assess prejudice cumulatively

The state court's ruling on appeal was also "contrary to" *Strickland* because the ruled on each aspect of ineffectiveness raised separately, and did not assess prejudice cumulatively, as *Strickland* requires. *See Strickland*, 466 U.S. at 698; *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999); *Jones v. Cain*, 227 F.3d 228, 230 (5th Cir. 2000). § 2254(d)(a). For this reason also, Petitioner is entitled to de novo review. § 2254(d)(1).

### 3. The court's rulings were also an unreasonable application of *Strickland* and unreasonably determined the facts.

The rulings on each separate claim were also an "unreasonable application" of *Strickland,* §2254(d)(1) and an unreasonable determination of the facts under § 2254(d)(2).

When ruling on the prejudice resulting from the "blame the victim" defense, the court limited its consideration to the effects of defense's comments during opening argument. Thus it held: "this court does not believe counsel's *opening statement* contributed to the jury's guilty verdict." *Id.,* 577 (emphasis added). The court ignored the evidence that defense counsel's repulsive defense pervaded the entire trial, not just opening argument; it was pursued vigorously by defense counsel during cross-examination of numerous witnesses, and the prejudice was further exacerbated by the prosecution's smart exploitation of its inflammatory effects. Limiting its consideration to just the harm resulting from opening statement, resulted in an unreasonable application of the law and unreasonable determination of facts. *Williams v. Taylor,* 529 U.S. 362, 397-98 (finding state court's decision on prejudice under *Strickland* was an unreasonable application of the law because the court failed to take into account all of the mitigating evidence in reweighing it against the evidence in aggravation"); *Jacobs v. Horn,* 395 F.3d 92, 106 (3rd Cir. 2005) (state court did not consider trial counsel's failure to provide relevant information to experts; decision based on one factor to exclusion of other relevant ones, is unreasonable

172

application of *Strickland*); *Sawyer v. Hofbauer*, 299 F.3d 605, 611-612 (6th Cir. 2002) (state court's failure to identify and consider all the correct evidence suppressed was an unreasonable application of *Brady*).

The courts specific determination of no prejudice at the guilt phase was also unreasonable. The court found there was no prejudice "in light of the overwhelming evidence of the defendant's guilt." *Hoffman,* 768 So.2d at 577. The court reached this conclusion that there was "overwhelming evidence of guilt" without any indication that it considered the *totality* of the evidence presented at trial. Although evidence of second degree murder may have been "overwhelming," evidence of specific intent and first-degree murder was *not*. In its discussion elsewhere of the sufficiency of evidence for specific intent, the court outlined the evidence *in favor* of specific intent, highlighting the coroner's testimony concerning the location of the wound (to the head not the torso), the distance the shot was fired, and the marks on the victim knees. However, there was plenty of evidence in the record before the court to contradict this evidence, including defense evidence that the location of the wound and the distance from which the shot was fired was also consistent with a shooting during a struggle for the gun. The State's theory was just that, a theory. It was not supported by "overwhelming evidence." The court's finding to the contrary was clearly and convincingly rebutted § 2254(e)(1), and resulted in an unreasonable determination of the facts, § 2254(d)(2), and unreasonable application of the law. §2254(d)(1).

The court's finding that the blame the victim defense did not prejudice Petitioner at the *penalty phase* was also unreasonable. It was based on two factors. First, the court found, "[i]t is unlikely any resentment the jury may have harbored continued into the penalty phase because counsel wisely avoided blaming the victim during the second stage of trial." *Hoffman,* 768 So.2d

173

at 577.  Secondly, citing defense counsel's penalty phase closing argument, the court found that "counsel made an effort at damage control." *Id.*[73]  The court's reasoning is erroneous and unreasonable in several ways.

First, it is based on the mistaken and unreasonable premise that defense counsel's conduct in guilt phase would not affect the jury in penalty phase if counsel did not repeat or continue the conduct *in* the penalty phase.  However, it has long been recognized that conduct at the guilt phase will impact the penalty phase, so much so that the minimum professional standards require capital defense counsel to carefully coordinate their guilt phase and penalty phase strategies. 11.7.1 of 1989; 2003 ABA guidelines; *and see* Goodpaster, 58 N.Y.U.L. REV. 299; *Florida v. Nixon*, 543 U.S. 175, 191-192 (U.S. 2004).  Consequently courts consider the effects of counsel's guilt phase deficiencies in assessing prejudice at the penalty phase, under *Strickland.  See, e.g., Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999).

The court's premise is also contradicted by the facts; the offensive defense *was* put to the jury during the penalty phase.  All guilt phase evidence was admitted into evidence at the penalty phase, and the jury instructed to consider it.   The prosecution exploited the effects of the prejudicial argument in their case for death, up to and including their closing penalty phase argument.  Even if there had been no reminder of the offensive guilt phase defense at the penalty phase at all it flies in the face of human nature to think that the inflammatory effects would have dissipated at the penalty phase.

---

[73] "More importantly, counsel made an effort at damage control by stating: 'I, in my opening statement mentioned to you, that she seemed naive.  Believe me, folks, that adds to the tragedy.  It does not in any way lessen the tragedy.  As far as I know, and as far as any of us know, although we don't really need to think about it, but as far as any of us know, this was a young lady that anyone of us who are old enough would have been proud to call our daughter.  A fine young lady who should not have lost her life and to whom the events that happened should not have occurred'."

Moreover, defense counsel's "damage control" during penalty phase closing argument did not undo the prejudice but *reminded* the jury of it and confirmed defense counsel's ongoing commitment to its offensive beliefs. "I, in my opening statement mentioned to you, that she seemed naive. Believe me, folks, that adds to the tragedy. It does not in any way lessen the tragedy." Defense counsel then attempted empathetic remarks, but did so in an offensively qualified way. "*As far as I know, and as far as any of us know, although we don't really need to think about it, but as far as any of us know,* this was a young lady that anyone of us who are old enough would have been proud to call our daughter. A fine young lady who should not have lost her life and to whom the events that happened should not have occurred." R. 4523. This repeated expression of doubt about the worthiness of the victim, was hardly less offensive than suggesting the victim instigated her own demise.

The Louisiana Supreme Court's fact findings are rebutted by clear and convincing evidence, § 2254(e)(1), and its decision was an unreasonable application of established law and involved an unreasonable determination of the facts. § 2254(d)(1); § 2254(d)(2); *Wiggins v. Smith,* 539 U.S. 510, 528 (2003) (finding that the state court's "partial reliance on an erroneous factual finding [that records in possession of trial counsel documented defendant's abuse as a child] further highlights the unreasonableness of the state court's decision").

The court's consideration of defense counsel's inappropriate aggressive treatment of witnesses was similarly unreasonable. The court found that "they did not rise to a level which would cause the defendant to suffer substantial prejudice, considering the overwhelming evidence of guilt." *Hoffman,* 768 So.2d at 579. As with the blame the victim defense, the court reach its conclusions about guilt phase prejudice without properly considering the totality of evidence at the guilt phase, and in particular, the evidence disputing specific intent.

175

Similarly, in finding there was no prejudice at the penalty phase the court again relied on its unreasonable assumption that there would be no prejudice in the penalty phase if defense counsel did not continue the inappropriate conduct into the penalty phase. The court's findings that this error did not prejudice Petitioner at either phase are based on factual findings that are clearly and convincingly contradicted by the record, and/or involves an unreasonable determination of the facts. § 2254(d)(2); § 2254(e)(1). *And see Wiggins,* 539 U.S. 510, 528. There is no limit to the relief which this Court can grant under §2254(d); Petitioner's conviction and death sentence should be reversed.

### G. The need for an evidentiary hearing

Petitioner believes that the evidence in the record amply demonstrates that his claims are meritorious and require relief. However, to the extent that the facts are not sufficiently developed or proven to warrant relief, Petitioner is entitled to an evidentiary hearing in order to do so. If proven as alleged, these claims would clearly warrant relief. No evidentiary hearing has ever been held on these claims, and no court has ever determined or made any findings concerning the bulk of the facts alleged and evidence provided in support of these claims. For both these reasons Petitioner is entitled to an evidentiary hearing under *Townsend. See* Part One (V). The limited findings that were made, were made in the context of applying an erroneous legal standard. For that reason too, a hearing is required. *See, e.g., Kyles v. Whitley,* 514 U.S. 419, 440 (1995). Indeed courts invariably grant hearings on both *Strickland* and *Brady/Napue* claims, both of which typically require in depth inquiry into extensive extra-record facts. Petitioner's claims are no exception and he is entitled to a hearing. *Mason v. Balkcom,* 531 F.2d 717, 722 (5th Cir. 1976) (hearing required because state court made no specific factual findings on ineffective assistance claim).

IV.   **THE PROSECUTORS' REPEATED MISSTATEMENTS OF THE LAW DURING VOIR DIRE AND CLOSING ARGUMENT OF THE PENALTY PHASE, ALL GEARED TOWARD URGING THE JURY TO IGNORE MITIGATING EVIDENCE, SO INFECTED THE SENTENCING TRIAL WITH UNFAIRNESS AS TO BE A DENIAL OF DUE PROCESS AND RESULTED IN AN UNRELIABLE DEATH SENTENCE, IN VIOLATION OF MR. HOFFMAN'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Throughout Mr. Hoffman's trial, the prosecutors misstated the law and engaged in improper argument to the jury. In determining whether a prosecutor's improper remarks require reversal, the Court must determine "whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting [conviction or sentence] a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). "[I]f the prosecutor's remarks evince 'either persistent and pronounced misconduct or … the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred,'" defendant's due process rights have been unconstitutionally compromised. *Kirkpatrick v. Blackburn*, 777 F.2d 272, 281 (5th Cir. 1985), quoting *Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir.1982), *reversed on other grounds*, 462 U.S. 111 (1983). In the capital sentencing context, moreover, improper comments must be reviewed in light of the "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (citation omitted). Because the prosecutor's arguments "[gave] the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's" heightened need for reliability, they violated Mr. Hoffman's rights to both due process and a reasoned sentencing determination.

### A. The Prosecutors Placed the Burden on Defense to Prove Mitigation and Urged Jurors to Disregard Their Constitutional Duty to Consider Mitigation

During voir dire, the state repeatedly misstated the law regarding mitigation, placing the burden on the defense to present proof of mitigation and arguing repeatedly that jurors were free to disregard statutory mitigating factors:

> By Ms. McElwee:   Those are possible choices of mitigating circumstances that the defense, if they choose, and if they have evidence of, may present to you.  You can't just get up and read the list and say you have got to consider these.  They have got to present evidence for you to the consider these.

> \* \* \*

> By Mr. Gracianette:   [W]e are assuming now that we have proved our case of first degree murder beyond a reasonable doubt to you, which means that we have proved one of the three aggravating circumstances....  In order to sit on this jury, you must consider the following mitigating circumstances. *You can consider them.  That doesn't mean you have to accept them.*  You can consider them for purposes of considering —

> \* \* \*

> By Mr. Gracianette:   Now, you must be able to consider all those [mitigating factors] in regard to this matter.  *That doesn't mean that you cannot reject them after hearing the evidence which is presented to you and impose the death penalty,* but you must at least have the ability to consider them.

R. 2290, 2582, 2584.  These remarks, made before the third and fourth panel of prospective jurors from which five jurors were ultimately selected,[74] improperly informed the jury both that (1) the defense was under an affirmative obligation to present mitigating evidence before jurors could consider mitigation; and (2) jurors were free to disregard mitigating evidence.

---

[74] The State continued in this vein before the panel from which the alternate jurors were selected.  *See* R. 3370.

Both mischaracterizations of the critical importance of mitigating evidence were contrary to the law, and it was highly improper for the prosecutor to state otherwise. Under state law, La. C.Cr.P. art. 905.3 *requires* the court to "instruct the jury concerning all of the statutory mitigating circumstances." The statute imposes no burden on the defendant to present mitigation and does not require any particular quantum of proof to establish mitigation. *State v. Jones*, 474 So.2d 919, 932 (La. 1985). Even in the absence of mitigation, the jury remains free to return a life sentence. *State v. David*, 425 So.2d 1241, 1249 (La. 1983).

Moreover, jurors clearly are not free to disregard mitigating evidence. "The sentencer ... may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). Statutory mitigating factors are mitigating as a matter of law and may not be disregarded by the jury. *See, e.g., Ward v. Whitley*, 21 F.3d 1355, 1364 (5th Cir. 1994) (prosecutor may not argue that statutory mitigating factor should not be considered or is not mitigating), *cert. denied*, 513 U.S. 1192 (1995). The State's comments in this regard are particularly egregious, as it was well aware during voir dire that the defense was focusing on the mitigating factors of youth and lack of a criminal record and knew at that time that such evidence would be uncontroverted at trial.[75] Since it knew two factors would be established without any doubt, the State's comments that jurors could reject mitigating factors cannot be construed as suggesting that it would be up to the jury to determine whether mitigating factors had been sufficiently proven.

---

[75] The State was obviously aware that Mr. Hoffman was only eighteen years old at the time of the crime. Prosecutors, moreover, had filed discovery responses indicating that they were unaware of any criminal history, R. 597, and admitted to the court during voir dire that they were unaware of any record. R. 2757.

Here, the prosecutor's statements improperly emphasizing to the jurors that they were free to disregard statutory mitigating circumstances were followed up on during the State's penalty phase closing. The State urged that Mr. Hoffman's lack of *certain kinds of mitigation* meant that there was none at all, despite the existence of two statutorily specified uncontroverted mitigating circumstances: youth and a lack of prior criminal record:

> [T]he evidence presented can be summed up with the testimony of two witnesses essentially: Doctor Elaine Saltzer and Mr. Foster, the criminalist expert.
>
> Ms. Saltzer presented the most confusing picture or portrait of the defendant. He came from a good background, he had no history of problems, he tested well on the exams, *no indication, according to her testing, that the defendant had any serious problems, nothing.* Yet, she couldn't conclude why he committed this horrible crime. It must have been a fluke.
>
> Well, wait a minute, let's back up a second. *If there were a history of problems and he had some disorders and there were other problems associated, she would be coming in here and using that as a justification for you to spare him. How can she now use the lack of problems in his life as a justification for you to spare him again?* That doesn't make any sense. It contradicts itself. *In other words, there is no excuse.*

R. 4519-20 (emphasis added).

The court's charge did nothing to cure the prosecutor's erroneous statements. The instructions did not inform the jury that they did not have to unanimously agree upon the existence of any mitigating circumstances in order to consider them in determining the penalty. *See, e.g., McKoy v. North Carolina*, 494 U.S. 433, 444 (1990); *Mills v. Maryland*, 486 U.S. 367, 384 (1988). The instructions failed to tell the jury that the mitigating circumstances did not have to be proved to them by any particular standard of proof.[76]

_____

[76] Mr. Hoffman here raises as a separate claim the state court's denial of his request for special instructions explaining the scope of the jury's consideration of mitigating factors. *See* R. 1263-65, 4515; *State v. Hoffman*, 768 So.2d at 572-73. Mr. Hoffman's requested instructions were accurate statements of the law and the actual charge given to the jury failed to underscore for the jurors both the fundamental importance of their consideration of mitigation in determining punishment and the broad scope of that consideration. R. 4535-38. Particularly in light of the repeated misstatements of law made by the prosecutor during voir dire and closing argument, suggesting that the

**B. The Prosecutors Urged Jurors to Abandon Consideration of Mitigation Altogether and Sentence Mr. Hoffman to Death Based Solely on a Conviction for First Degree Murder**

In the penalty phase, the prosecutor improperly argued that the jury should disregard the law and sentence Mr. Hoffman to death based purely on its finding that Mr. Hoffman was guilty of first degree murder. The prosecutor argued:

> Mr. Foster [a defense expert] testified that he's been working with lifers, those people who have been convicted of the crimes of aggravated rape, aggravated kidnapping, second degree murder and first degree murder. Those were all sentences for those individuals crimes. I am not here to tell you that life in prison is easy. See, Jessie had a choice.

> After robbing, kidnapping and raping Molly Elliot, he could have stopped right there and he would be spending the rest of his life in jail. But he takes the next step. He commits the most horrible, vicious, cruel crime known to man: He takes the life of a human being, who was special.

> And what's the penalty he wants you to impose for that most horrible, vicious, cruel crime? Life.

> Jessie chose death. Jessie Hoffman on the edge of the Middle Pearl River had a choice and he chose death. After considering all the aggravating and mitigating circumstances in this case, ladies and gentlemen, there is only one verdict. Impose the death penalty. Don't let him get away with murder.

R. 4520-21.[77]

---

jurors were all but free to disregard mitigation, the silence of the trial court on these subjects likely suggested to the jury as a whole that it could indeed ignore the mitigating evidence presented in this case and suggested to those jurors who did find mitigating circumstances that they could not consider mitigation without the unanimous consent of the remaining jury members. This violated Mr. Hoffman's Eighth Amendment right to a reliable sentencing determination. The state court failed to address the Eighth Amendment issue, though clearly raised by Petitioner, so failed to reach the merits of the claim. *Compare* Appeal Brief, at 39-41 *with State v. Hoffman*, 768 So.2d at 572-73. Mr. Hoffman is entitled to a *de novo* review of the Eighth Amendment violation which cannot be construed as harmless error given the critical role full consideration of mitigation plays in a reliable sentencing determination.

[77] Mr. Hoffman raises here as well the unconstitutionality of Louisiana's commutation instruction, which violates due process and invites the arbitrary imposition of death. *See* Appeal Brief, at 80; Supplemental Petition, at 182-83; Reply Brief, at 16. In Mr. Hoffman's case, jurors acknowledged speculating as to his release through commutation in deliberations which introduced an arbitrary factor into sentencing. The Louisiana Supreme Court's and state district court's denial of this claim constitutes an unreasonable application of state law. *See State v. Hoffman*, 768 So.2d at 575; State Court Order, 5/1/07, at 1.

The federal constitution prohibits mandatory death sentences for first degree murder. *See Roberts v. Louisiana*, 431 U.S. 633 (1977). The Louisiana Legislature has seen fit to mandate that those found guilty of committing first degree murder "shall be punished either by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the determination of the jury." La. R.S. 14:30(C). The Legislature has also determined that life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence is the proper punishment for those found guilty of, *inter alia*, second degree murder, La. R.S. 14:30.1(B); aggravated rape, La. R.S. 14:42(D)(1); and aggravated kidnapping, La. R.S. 14:44.

The prosecutor's argument that the death penalty in this matter was necessary because the underlying felonies committed by Mr. Hoffman already required his imprisonment for life and thus a life sentence would "let him get away with murder," was a call for the jury to disregard the law and sentence Mr. Hoffman to death based purely upon its finding that he was guilty of first degree murder.    In effect, the prosecution urged jurors to completely abdicate their role in sentencing and return to the pre-*Furman* days of the automatic imposition of death for first degree murder—a radical misstatement of over 30 years (20 at the time) of capital jurisprudence.

### C. The Misconduct So Infected the Sentencing Trial as To Violate Due Process and Render the Sentencing Proceeding Unreliable

It is one thing to throw in an inappropriate comment here or there, but quite another to encourage a jury to disregard the law regarding a defendant's only defense as well as the law central to evaluating that defense. Either instance would merit reversal of Mr. Hoffman's sentence of death, so profound an effect does each have on a jury's ability to perform its duty.

In urging that Mr. Hoffman would "get away with murder" if the jury sentenced him to life, the prosecutor did not attack the substance of Mr. Hoffman's mitigation, but instead whether

the mitigation should be considered at all. *See e.g. Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000), *cert. denied, Parker v. Gall,* 533 U.S. 941 (2001) (due process violated where "[r]ather than attacking Gall's insanity evidence by pointing to counter-evidence that Gall was sane, the Commonwealth simply assaulted the very use of the defense"). In *Gall*, the prosecution argued that finding the defendant insane would be letting him go free, and allowing him to evade justice "by retreating within the safety of his own skull!" *Id.* The Court noted:

> These comments and misrepresentations comprised part of a broader strategy of improperly attacking Gall's insanity defense by criticizing the very use of the defense itself, rather than addressing its evidentiary merits head on. Courts have long castigated prosecutors when their efforts to rebut an insanity defense constitute no more than an attack on the rationale and purpose of the insanity defense itself.

*Id.* The Court found a violation of due process and reversed the conviction because the prosecutor "clearly misled the jury and prejudiced Gall's defense of insanity." *See also Hanna v. Price*, 2005 U.S. Dist. LEXIS 30376 (W.D. Mi. 2005), *aff'd* 245 Fed. Appx. 538; 2007 U.S. App. LEXIS 21048 (6th Cir. 2007) (unpublished opinion) (prosecutor's arguments unconstitutionally "denigrated the insanity defense by telling the jury to refuse to allow a person's 'fixations of the mind' to excuse the person's crime").

In addition, the prosecution argued that the jury should reject consideration of mitigating circumstances that existed because others didn't, and so the ones that did weren't mitigating. Courts have found prosecutorial misconduct within the context of the sentencing proceeding to merit careful attention, not just to due process violations but also Eighth Amendment violations.

> The Eighth Amendment mitigation requirement also applies to the actions of prosecutors. *See Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985) (a prosecutor's comments that led the jury to believe that later an appellate court could mitigate the death sentence violates the Eighth Amendment because it misleads the jury as to its responsibility). When a prosecutor's actions are so egregious that they effectively "foreclose the jury's consideration of . . . mitigating evidence," the jury is unable to make a fair, individualized determination as required by the Eighth Amendment. As a result, a prosecutor's

comments violate the Eighth Amendment when they are so prejudicial as to
"constrain the manner in which the jury was able to give effect" to mitigating
evidence.

*Depew v. Anderson*, 311 F.3d 742, 748 (6th Cir. 2002), *cert. denied*, 540 U.S. 938 (2003)

(quoting *Buchanan v. Angelone*, 522 U.S. 269, 277 (1998)). Because the prosecutor in *Depew*

urged the jury not consider the defendant's "only potential mitigating circumstance presented,"

thereby undercutting the defendant's sole theory of mitigation, the Court found the comments

warranted automatic reversal. *Id.* at 750. Short of warranting automatic reversal, it is also clear

that the prosecutor's improper argument, particularly in light of the numerous other critical errors

that occurred in the penalty phase, so infected the trial with unfairness as to deny Mr. Hoffman

due process and to undermine the reliability of the death sentence imposed in this matter. The

combination of the due process and Eighth Amendment violations, perpetrated by the

prosecutor's misconduct, likewise warrant reversal of Mr. Hoffman's sentence of death.

### D. Because the State Court Reached Its Decision Based On State Law, Never Addressing the Federal Constitutional Issues Raised, Mr. Hoffman Is Entitled to *De Novo* Review of This Claim.

The Louisiana Supreme Court denied Mr. Hoffman's claims of prosecutorial misconduct

on state law grounds, never referring to or citing federal law. Mr. Hoffman is entitled to *de novo*

review of the federal constitutional rights violations. *See State v. Hoffman,* 768 So.2d at 581-82.

*Hameen v. Delaware*, 212 F.3d 226, 248 (3d Cir. 2000) (applying pre-AEDPA independent

review of constitutional claim where state court decision rested on state law), *cert. denied*, 532

U.S. 924 (2001); *DiBenedetto v. Hall*, 272 F.3d 1, 7 (1st Cir. 2001) (*de novo* review of decision

based on state law).

184

**E. The State Court's Denial of Relief Was Based On An Unreasonable Determination of the Facts In Light of the Evidence Presented and Constituted An Unreasonable Application of *Darden, Caldwell, Eddings,* and *Lockett.***

In the alternative, the state court misunderstood the factual allegations of misconduct and therefore made unreasonable findings of fact in denying the claim. It never reached the constitutional question.

With respect to the prosecutor's argument that Mr. Hoffman didn't present the kind of evidence usually presented in mitigation, i.e. a history of problems, a disorder of some kind, the state court erroneously interpreted Mr. Hoffman's argument to be that the state argued that a *lack of criminal history* should not be considered mitigation:

> Next, the defendant asserts that the State continued making improper comments during its penalty phase closing argument when the prosecutor urged that the defendant's *lack of a criminal record* should not be considered mitigating. However, a review of the transcript indicates the prosecutor was referring to the defendant's lack of "personal" or psychological problems as indicated by Dr. Salzer's testimony, the defense expert in clinical psychology. Thus, contrary to the defendant's claim, the prosecutor did not attempt to downplay the defendant's lack of a prior record, a mitigating circumstance under La.Code Crim. Proc. art. 905.5(a).

*State v. Hoffman,* 768 So.2d at 581-82. That was not, in fact, the argument advanced by Mr. Hoffman on direct appeal. Mr. Hoffman asserted that the prosecutor argued that his "lack of record," i.e., the fact that he was a good guy, without any mental health problems, meant that he had not established any mitigation. Appeal Brief, at 52. A very similar misreading of a defendant's argument occurred in *Hanna v. Price, supra.* 2005 U.S. Dist. LEXIS 30376 at 19. Because the state appellate court considered the prosecutor's remarks to be merely an inappropriate argument, and not one aimed at the heart of disregarding the insanity defense, which was what the defense alleged, the Court found the state's decision to be an unreasonable application of federal law. As in *Hanna,* the state court's fact-finding in Hoffman entirely

misses the point, or never reaches the issue raised, and so is not entitled to a presumption of correctness.

The same failure to appreciate the gist of Petitioner's argument, its gravity and implications, occurred when the state court addressed the prosecutor's wholly impermissible argument that sentencing the defendant to less than death would allow him to get way with murder. First, the state court found that "the defense unwittingly opened the door to this line of argument through the testimony of its expert witness." *Hoffman*, 768 So.2d at 582. This would be akin to saying with respect to an insanity defense, that defense opened the door to argue against the appropriateness of the defense itself by presenting evidence of it. The reasoning doesn't wash: Mr. Hoffman's presentation of evidence of mitigation doesn't open the door to the state to argue that jurors should consider mitigation at all when the conviction of first degree murder is supported by underlying crimes for which the defendant would be sentenced to life.

Nor is it on point to find that the state's argument was not for imposition of an automatic death sentence, but instead the prosecutor's attempt "to distinguish offenders who had committed single felonies such as aggravated rape, which requires a life sentence, from the defendant who committed murder along with three underlying felonies which elevates the instant offense to a capital crime." *Ibid.* The prosecutor wasn't explaining the differences between offenders to the jury. She was arguing that Mr. Hoffman would receive no punishment for murder if jurors didn't sentence him to death.

Because the state court sidestepped *the* issue at the core of the constitutionality of a sentence of death by making curtailed and ludicrous "findings of fact," this Court should find its denial of relief constituted an unreasonable application of the clearly established law of *Darden, Caldwell, Eddings,* and *Lockett.* Mr. Hoffman's sentence of death must be vacated.

**V.    THE STATE VIOLATED ITS DISCOVERY OBLIGATIONS UNDER
*BRADY V. MARYLAND*, 373 U.S. 83 (1963), DEPRIVING PETITIONER OF
HIS RIGHTS TO COUNSEL, DUE PROCESS OF LAW, AND A
RELIABLE SENTENCING PROCEEDING AS SECURED BY THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION**

### A. The State Failed To Reveal Exculpatory/Mitigating Evidence to The Defense Relevant to The Penalty Phase of this Capital Case

Prior to trial, defense counsel filed a motion asking the State to disclose any information it had that was favorable to the defense.  Paragraph 69 of the Petitioner's Request and Motion for Discovery Disclosure and Inspection reads: "[D]isclose all evidence that tends to negate the guilt of the accused or to the alleged crime, or would tend to reduce the punishment therefore, *including information that could lead to the discovery of such evidence*, which evidence or information is in the possession or control of: (A) the District Attorney (B) Any member of his staff (C) Any representative of any prosecuting authority that has participated in the investigation or evaluation of this case . . . (F) Any member of any law enforcement authority. . . . (Emphasis added.) Supprlemental Petition, Ex. 127.

### B. *Brady* Evidence That the State Should Have Disclosed

Pursuant to requests under the Public Records Act, post-conviction counsel obtained a copy of the District Attorney's file in this matter.  These documents were not available to trial or appellate counsel.  A review of the file reveals that the District Attorney had in its possession copies of rapsheets and NCIC reports for Mr. Hoffman's family, including: his two older brothers, Charles Fields and Marvin Fields; his mother, Elvera Ruffin; and, his father, Jessie Hoffman, Sr.[78]

---

[78] The District Attorney also ran RAP sheets and NCIC reports for Petitioner's high school football coach, Leroy Walker, and for his girlfriend, Raushanah Smith.

Even a cursory review of these reports paint a drastically different picture of Petitioner's family life than had been seen before. These records show that Mr. Hoffman's immediate family members had numerous run-ins with law enforcement in the past, for charges ranging from armed robbery and aggravated assault (Charles Fields), to simple kidnapping (Jessie Hoffman Sr.). Had trial counsel had access to these law enforcement documents, counsel would have been put on notice that the superficial portrait of their client's supposedly happy, violence-free family life was the wrong picture. Counsel would have had direct evidence that Petitioner's family was rife with violence and instability, and notice of the need to investigate further.

### C. Review of the Law on *Brady*

In the landmark case of *Brady v. Maryland*, 373 U.S. 83 (1963), the Court noted the prosecution's obligation to disclose any evidence in its possession that is favorable to the defense or that may "tend to exculpate [the defendant] or reduce the penalty." *Id.* at 88. *Brady* held:

> that the suppression by the prosecution of evidence *favorable* to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87 (emphasis added). The *Brady* rule is quintessentially truth seeking. An individual's right to a fair trial requires that the false or suppressed evidence be disclosed so that a defendant is assured "of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984). Importantly, the prosecution's obligation to deliver to the defense the favorable evidence it possesses is not limited to the question of innocence. *Brady* itself was a penalty case: the prosecution's *Brady* obligation emphatically pertains to favorable evidence that is material to sentence. *Brady; Giglio v. United States*, 92 S.Ct. 763 (1972); *United States v. Bagley*, 473 U.S. 667 (1985).