The State violated its discovery obligations, as mandated by *Brady*, by withholding evidence material to the penalty phase from the defense. Mr. Hoffman's representation for purposes of presenting mitigation at sentencing was abysmal. Had the state furnished the rapsheets to defense, defense counsel would have been given notice of Mr. Hoffman's turbulent and violent family life. This evidence would have called into question previous, undocumented reports that Mr. Hoffman's family life was normal and serene. Because these documents were not turned over to the defense, Mr. Hoffman's rights to counsel, due process of law, and a reliable sentencing proceeding have been violated and he is entitled to a new trial.[79]

### D. Mr. Hoffman Is Entitled to Habeas Relief on This Claim

Mr. Hoffman raised this claim in state post-conviction proceedings. Supplemental Petition, Claim X, at 171-73. The state court summarily denied an evidentiary hearing and denied the claim on its merits. State Order, at 1. The state court never made findings of fact, nor did it rest its denial on clearly identified federal law. This Court should review the decision denying relief *de novo* and grant Mr. Hoffman a new sentencing proceeding. *See Nobles v. Johnson*, 127 F. 3d 409, 416 (5th Cir. 1997) (expressing "reservation about applying the more stringent AEDPA standards to this claim because we are not convinced that the state habeas court sufficiently addressed Nobles' ... claim). In the alternative, Petitioner requests that this Court simply not accord the state court ruling the same weight it would had the state court articulated a rationale behind its denial. *See Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir. 2000) (en banc); *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied.*, 121 S Ct. 1415 (2001);

---

[79] The state's failure to turn over the documents which would have penetrated the false façade of a happy life is particularly egregious since it argued to jurors, at sentencing, that Mr. Hoffman's life did not present the typical problems addressed by mitigation, and that therefore, in essence, he did not present mitigation. See *supra* (prosecutor's improper argument to jury at sentencing). All the while, the state knew that Mr. Hoffman had been raised by parents who both had a criminal history. The error is akin to eliciting false evidence. *See e.g. Napue v. Illinois*, 360 U.S. 264 (1959); *United States v. Agurs*, 427 U.S. 97, 103 (1976).

*Walter v. Gibson,* 228 F.3d 1217, 1240 (10th Cir. 2000), *cert. denied,* 121 S Ct 2560 (2001). Short of both those alternatives, even under § 2254(d)(1), the state court's decision in this instance constitutes an unreasonable application of state law, and Mr. Hoffman's sentence of death should be vacated.

## VI.   PETITIONER'S RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN THE TRIAL COURT UPHELD THE STATE'S RACED-BASED PEREMPTORY STRIKES AGAINST THE ONLY TWO QUALIFIED PROSPECTIVE AFRICAN-AMERICAN JURORS IN THE VENIRE

The trial court violated Petitioner's Fourteenth Amendment rights to Equal Protection in denying his *Batson* challenges to the State's use of peremptory challenges to remove the two of the three black prospective jurors from the venire, Elaine B. Malter and Michael Galatas. The only other black prospective juror questioned, Cedrik Cooper, was removed by a State cause challenge under *Witherspoon.* R. 2893.[80]  Petitioner raised *Batson* challenges to the strikes against Ms. Malter and Mr. Galatas. The trial court found that Petitioner had established a *prima facie* case of discrimination. R. 2207-08, R. 2907. However, the court accepted the "racially-neutral" reasons offered by the State to explain the strikes, and allowed the removal of the only two qualified African-American jurors from the case. R. 2219-20, R. 2909-10. The State's reasons were pretextual and are flatly contradicted by the record. When the issue was raised on appeal, the State, without notice to the court or defense, had the court reporter file a "corrected" version of the relevant parts of the transcript into the record, inserting pauses and changing words to make the record consistent with their asserted race-neutral reasons. Although the appellate court did not credit the "corrected version" the court denied Petitioner's appeal.

---

[80] During the six days of voir-dire, 108 jurors were questioned. 47 survived challenge for cause. The State used its peremptory strikes to exclude 100% of the qualified black jurors, but only 26% of the qualified white jurors.

A contextual examination of the record reveals the invidious influence of race in the State's conduct of trial. The State's peremptory strikes formed part of the St. Tammany Parish District Attorney's office's long history of excluding African-Americans from jury service, striking them over *three times* more frequently than whites. More importantly it reflected the State's special efforts in this case to seat an all-white jury in St. Tammany, a 90% white, white-flight parish, to obtain a conviction and death sentence against an African-American man from New Orleans, for the rape-murder of a white woman from St. Tammany. From the outset the state conceived of their case in racial terms and issued press statements announcing its intention to "send a message" to the "people over the lake" that St. Tammany would not tolerate the intrusion of its criminal elements. The State intentionally chose a St. Tammany venue over majority African-American New Orleans so as to limit the number of African-Americans on the venire (its protestations to the contrary belied by pretextual reasons that did not bare scrutiny), and completed the job during voir dire. It was thus able to secure a jury most favorable to its thinly veiled appeals to racial stereotypes during the presentation of its case, who would surely convict Petitioner and sentence him to death. Because of the State's clear discriminatory intent in removing African-Americans from his jury, Petitioner's conviction and death sentenced should be reversed.

### A. The many factors relevant to a showing of purposeful discrimination

It is "clearly established" that when determining whether a defendant has met his ultimate burden of proving purposeful discrimination at the third stage of *Batson,* the Court must consider :all the relevant circumstances." *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) (hereinafter, "*Miller-El II*") (citing *Batson v. Kentucky,* 476 U.S. 79, 96-96); *and see, id.* at 251-252 ("The rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a

bearing on it"); *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008) ("in considering a *Batson*

objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear

upon the issue of racial animosity must be consulted"); *Batson v. Kentucky*, 476 U.S. 79, 93

(1986) (trial court must undertake "a sensitive inquiry into such circumstantial and direct

evidence of intent as may be available") (*citing Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S. 252, 266 (1977)).

Relevant information relied upon by the United States Supreme Court includes:

- Statistical disparities between the numbers of white and black jurors struck peremptorily by the State in the case at hand, and/or historically by members of the same prosecutor's office. *Miller El II*, 545 U.S. at 240-241; *Batson*, 429 U.S. at 93 (circumstantial evidence of "disproportionate impact") (*citing Washington v. Davis*, 426 U.S. 229, 242 (1976)); *Miller-El v. Cockrell*, 123 S.Ct. 1029, 1036 (2003) (hereinafter *"Miller-El I"*) 1036, 1045 (explaining that such evidence "casts doubt on the legitimacy of the motives underlying the State's actions");

- Comparative analysis of similarly situated white jurors. *Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step") (*citing Reeves v. Sanderson Plumbing Products, Inc.*, 5230 U.S. 122, 147 (2000); *Miller-El I*, 123 S.Ct. at 1029 (same) *Snyder*, 128 S.Ct. at 1211-1212 (finding *Batson* violation in part because State did not peremptorily strike similarly situated jurors);

- Disparate questioning of white and non-white jurors, in a manner designed to elicit plausibly neutral grounds for a peremptory strike. *Miller-El II*, 545 U.S. at 255; *and see: Miller-El I*, 123 S.Ct. at 1037 (same);

- Whether or not prosecutors reasons are supported by the record or are otherwise plausible. *Miller-El II*, 545 U.S. at 243-244 (finding reasons based on mischaracterization of juror testimony to indicate prosecutor's "ulterior reason"); *Snyder*, 128 S.Ct. at 1207-1208 (finding *Batson* error where the prosecutor's alleged reasons for concern were not borne out by the record and finding that the reason was therefore "implausible," "unconvincing," and "suspicious"); *Batson v. Kentucky*, 476 U.S. at 98 (the neutral explanation must be actually "related to the particular case to be tried");

- Evidence of pretextual timing. *Miller-El II*, 545 U.S. at 246 (finding that the second reason given by prosecutor after first one was questioned by the defense, "reeks of afterthought" and demonstrates "pre-textual timing");

- Whether the State meaningfully questioned the jurors about the subject of the State's alleged concern. *Miller-El II*, 545 U.S. at 246 ("the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination") (citation omitted); *Snyder*, 128 S.Ct. at 1210 (noting that the prosecution "did not choose to question [excluded juror] more deeply about [the] matter" of their alleged concern);

- Whether the juror "should have been an ideal juror in the eyes of a prosecutor seeking a death sentence." *Miller-El II*, 545, U.S. at 247;

- Whether the race neutral reasons asserted in response to the *Batson* challenge were mentioned when the State initially made the strike. *Miller-El II*, 545, U.S. at 247-48;

- Broader patterns of practice related to jury selection. *See e.g., Miller-El II*, 545 U.S. at 253 (state's exercise of jury shuffle in a way calculated to limit number of African-Americans on the panel, indicated racist intent);

- Circumstances surrounding the prosecution's strikes of other minority jurors. *Snyder*, 128 S.Ct. at 1208-09 ("In *Miller-El v. Dretke*, the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted. Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks") (citations omitted);

- Evidence of systematic exclusion. *Batson*, 476 U.S. at 95-95 ("Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the "result bespeaks discrimination") (citing *Hernandez v. Texas*, 347 U.S. 475, 482 (1954); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977)); and

- The pattern of the State's strikes as a whole. *Batson* 476 U.S. at 97 ("a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *See also McGahee v. Ala. Dept. of Corr.*, No. 08-15602, at 25 (11th Cir. March 4, 2009) ("There can be no clearer "pattern" than the total removal of all African-American jurors from the venire by the State.") (*citing Batson*, 476 U.S. at 97).

All relevant evidence before the court must be considered "cumulatively." *Miller-El II*, 545 U.S. at 256 (finding *Batson* violation where although some of the evidence could go either way, the "evidence... viewed cumulatively... is too powerful to conclude anything but discrimination").

### B. The State's Purported Race Neutral Reasons for Striking Mr. Galatas and Ms. Malter are implausible, belied by the record, and were a pretext for race discrimination

A review of the trial record reveals that the race neutral reasons given by the State for striking both Mr. Galatas and Ms. Malter are contradicted by the record, implausible and were a pretext for race discrimination.

#### 1. Michael Galatas

Michael Galatas, the first African-American peremptorily struck by the State, appears to have been an ideal juror for the State. Mr. Galatas was a 38 year-old black male who worked for Folgers, his wife worked for the St. Tammany Parish School Board, and he was born and raised in Slidell. R. 1906, R. 2169. He previously served on a criminal jury that convicted, R. 1920, and had friends and relatives in law enforcement; his cousin was a sheriff, his brother-in-law used to work for the Sheriff's Department, and his friend was a State trooper. R. 1927. Neither he nor any members of his family had ever been arrested. R. 2070. In response to the State's questioning he testified that he could consider both the death penalty and life imprisonment, could consider both aggravating and mitigating factors, and could put pretrial publicity out of his mind. R. 2071-73. In subsequent questioning by the District Attorney, Walter Reed, Mr. Galatas confirmed, without hesitation, that he could consider the death penalty, and that he could look at the defendant and envision himself actually voting for the death penalty. R. 2117-18, R. 2120-21. He testified he was a six on Mr. Reed's "decisiveness scale," an ideal answer for the District Attorney who stated, "I want people in the middle." R. 2139- 2140. Finally, in response to

defense counsel's questioning based on the Texas case of Henry Lee Lucas, Mr. Galatas testified, unlike the vast majority of prospective jurors, that his sense of justice would *not be offended* if a person were executed for a murder he did not commit if he had committed several other murders.  R. 2149.  He appeared to be an ideal juror for the State.

The State nonetheless exercised a peremptory strike against Mr. Galatas.  R. 2206-2220. The defense raised a *Batson* challenge, and the trial court requested "a satisfactory racially neutral reason for the exercise of the challenge" from the State.  Assistant District Attorney McElwee gave the following response:

> All right. Your Honor.  When we were here, what I call "chambers out of the courtroom," Mr. Reed asked Mr. Galatas if he could consider the death penalty. And as we watched him, he sat there and he hesitated and his exact words were, "I think I could." Then Mr. Reed asked him if he could consider life, no reservation, he said "I could."
>
> We go back out in the courtroom, Mr. Reed again asked the individuals of the panel if they could consider the death penalty.  He again hesitated and gave a very weak "I think I could." Mr. Reed couldn't hear him.  He had to ask him, what did you say? And at that point, he said "I could." That is the racially neutral reason.  I don't care what color he is.  We are looking for people who have strong feelings, or strong opinions about the death penalty.  I don't think he will do it, even though he said he could.  I don't think he is capable of it.

R. 2207-8.  Petitioner's attorneys immediately disputed the State's "assessment that he was soft, hesitant in any fashion" and the trial court took a recess to consider the challenge.  R. 2209-2210.

When it returned, the court and the attorneys again discussed the law concerning the *Batson* challenge.  R. 2210-2214.  Defense counsel again urged the court to review the transcript because it would show that Galatas answered "every Whitherspoon [sic] question the way that the State would expect a juror to answer...," and again noted that the State's characterization of Mr. Galatas' responses as being "soft" and hesitant, was "all wrong."  R. 2213.  At this point, Ms. McElwee supplemented her race-neutral reasons as follows:

> If you would allow, I would like to add a couple of things on the record. The reason I gave, in good faith to this Court as an officer of this court, is that he hesitated, and I think it would be clear in the record, hesitated out of Court and in here, it was clear to all three of the prosecutors sitting here that he was hesitant on whether he could consider the death penalty. Yes, he did say he could consider the death penalty.

R. 2214. Ms. McElwee then referred to several other prospective jurors who had testified that they could consider the death penalty, but that the State struck peremptorily because, the State now said, they felt they were "weak" or "hesitant" on the death penalty. R. 2215-17 (discussing prospective jurors John Scazzafavo, Elizabeth Corrin, Ralph Tortorich, Barry Boudreux, and Mr. Pope).[81] The State then discussed Mr. Galatas in a far more detailed and specific way than it had those other jurors:

> Now we come to Mr. Galatas who sat here and more clearly to us hesitated in his answer: Could you consider the death penalty? He paused and then said, "I think I could," not "I could."

> As the majority of the jurors said in open court, and sitting here, he said "I think I could," after hesitating. And when asked about life, he said "I could" with no hesitation.

> Your Honor, in addition to that, in court, as I already stated, Mr. Reed had to ask him a second time for his response because he was so weak in his answer. It was difficult to hear him. I think he nodded his head.

R. 2217. Ms. McElwee continued:

> Out in court when Mr. Reed went through the panel again, asked him, could you consider the death penalty. When it came to Mr. Galatas, he either was so weak with his response or just nodded. Mr. Reed stopped and said "I'm sorry" to him. Meaning, could you repeat it? Pardon me, I didn't hear what you said.

R. 2217. After stating that "this is a difficult decision [this Court] has to come to," the trial court stated it wanted to review the transcript and make a decision concerning the challenge in the

---

[81] Defense counsel objected to the court's consideration of the after-the-fact efforts by the State to supplement and bolster their reasons, noting that they had over an hour to come up with them. R. 2215. The court over-ruled this objection.

morning.  However, the court subsequently concluded that a decision should be made that day.

R. 2218-19.  After another recess, the Court rendered its decision:

> The State has given a racially neutral reason for exercising this preemptory challenge.  The State related the reasons for the record, recounted, however, similarly preemptory challenges were exercised by the State.  After considering the objection of counsel, in the voir dire proceeding, both in chambers or at side bar, on a one-on-one situation, where each of the prospective jurors, and in open court, the case law as presented in *State versus Williams*, the Court cannot find the State is exercising its preemptory challenge on this prospective juror as a subterfuge to exclude blacks or African-Americans and, therefore, will allow this preemptory challenge.

R. 2220.

### a. The record contradicts the State's proffered "racially-neutral" reasons for peremptorily striking prospective juror Mr. Galatas.

The "racially-neutral" reasons that the State proffered were a pretext to exclude one of

the only two qualified blacks from the jury.  The record flatly contradicts each facet of the

State's purportedly racial-neutral reasons.  When first asked for a "racially-neutral reason" for

exercising a preemptory strike on Mr. Galatas, Ms. McElwee stated that although Mr. Galatas

indicated he could impose the death penalty he was "weak" in his answer because he stated, "I

think I could."  R. 2209.  Mr. Galatas did say "I think I could;" however Ms. McElwee failed to

provide the entire context of Mr. Galatas' response to trial court:

> Mr. Reed: The law of Louisiana says that you have to be able to consider the death penalty. Do you think you can do that?
>
> Mr. Galatas: I think I could, yes.
>
> Mr. Reed: You say you think you could. Can you do it or not?
>
> Mr. Galatas: The reason I say I think I could, I couldn't until I heard the facts.  I couldn't tell you whether I could or couldn't.  I have to hear all the facts first.
>
> Mr. Reed: So as it should be.  But we have to know if you would consider.
>
> Mr. Galatas: If the facts lead that way, I could.

> Mr. Reed: The law says also that you have to not only be able to consider the death penalty, you also have to be able to consider life, life imprisonment. Those would be the only two sentences: Death or life. Do you think—
>
> Mr. Galatas: Depending on what the circumstances are, which we haven't heard them yet.
>
> Mr. Reed: Do you think you could also consider life imprisonment as a possible sentence.
>
> Mr. Galatas: I could.

R. 2071-72.   The record is clear that Mr. Galatas' response to the question "Do you *think* you can [consider the death penalty]" was linguistically reflexive, "I *think* I could." R. 2071. (emphasis added).   This response in light of the entire context does not indicate that Mr. Galatas was in fact "weak" on the death penalty.  Mr. Galatas' response about the death penalty was qualified by the phrase, "I have to hear all the facts."  This is exactly the same response he gave the first time he was asked about his ability to impose a life sentence, "[d]epending on what the circumstances are, which we haven't heard them yet," even though Ms. McElwee stated that his response was with "no reservation, [when] he said 'I could.'"  R. 2071-2; R. 2207.

The record is equally clear that Mr. Reed's subsequent voir dire of the entire panel did not occur as Ms. McElwee said it did.  Ms. McElwee stated in her first response:

> We go back out in the courtroom, Mr. Reed again asked the individuals of the panel if they could consider the death penalty.  He again hesitated and gave a very weak "I think I could."  Mr. Reed couldn't hear him.  He had to ask him, what did you say? And at that point, he said "I could."

In her second proffered explanation for the strike, she repeated and expanded upon her mischaracterization:

> Your Honor, in addition to that, in court, as I already stated, Mr. Reed had to ask him a second time for his response because he was so weak in his answer.  It was difficult to hear him.  I think he nodded his head...
>
> Out in court when Mr. Reed went through the panel again, asked him, could you consider the death penalty.  When it came to Mr. Galatas, he either was so weak

with his response or just nodded.  Mr. Reed stopped and said "I'm sorry" to him. Meaning, could you repeat it? Pardon me, I didn't hear what you said.

R. 2217.  This account is not in the record.  Mr. Reed asked the entire venire panel whether they could consider the death penalty twice.  None of Mr. Galatas' answers at this time were qualified by the word "think."  Neither was he asked to repeat his answer or say it louder.  The first exchange is as follows:

> Mr. Reed:     Mr. Galatas, can you consider the death penalty, in this case?
>
> Mr. Galatas:  Yes.

R. 2118.  Mr. Reed then probed deeper into each juror's ability to actually impose death in this case:

> Mr. Reed:     …let's suppose there has been a first degree murder, a conviction has been returned, you have considered the aggravating circumstances, and you've reviewed the mitigating facts. Can each of you look at the defendant at this time and imagine that you're in the jury room deliberation? In your mind can you envision yourself actually voting, being able to consider the death penalty? … Mr. Galatas, could you?
>
> Mr. Galatas:  Yes, sir.

R. 2120-21.  His response was exactly the same as eventual white jurors Mr. Burns, Mr. Bacharach, Ms. Lower, and Mr. Pufal, who were questioned in the same panel. R. 2121-22. The record reflects no hesitation, no nodding of his head, no stuttering, no inaudible response and no request for the answer to be repeated on either of these separate incidents.[82]   Mr. Galatas'

---

[82] Petitioner is relying upon the original certified record of the trial court, lodged on appeal at the Louisiana Supreme Court.  During the oral arguments of the direct appeal the State informed Petitioner's attorney that they had, without giving notice to either the defense or the trial court, got the court reporter to filed a "corrected" version of the record with the Court.  The relevant corrections related to the voir dire of Ms. Malter who is the second African-American juror who was the subject of a *Batson* challenge, discussed below.  The "corrected" version amended the record so that the juror's answers were consistent with the State's asserted race neutral reasons for striking her; in the original they were not, and appeal counsel had argued that this demonstrated the pretextual nature of the State's reasons.  The court reporter filed a second purported "correction" of the record on March 29, 2000, which likewise inserted the various alleged pauses and other aspects of the exchanges with Mr. Galatas which the State relied on in giving its "race neutral reasons," but which the initially filed record did *not* reflect.  Despite the State's efforts, the Louisiana Supreme Court relied on the original version of the record in ruling on appeal.  This

answers reflect strength, not weakness, on the death penalty. In fact, his support of the death penalty extended beyond that of almost all other jurors, to people *innocent* of the crime, if they had committed other murders. R. 2149. His connections to law enforcement, as well his prior service on a jury that convicted, similarly indicated that he would have been an ideal juror for the State. R. 1920, 1927.

The State's reliance on mischaracterizations of the record to bolster its race neutral reasons is itself further evidence that the reasons are pretextual, particularly given that his questioning as a whole indicated that he was state-friendly. *Miller-El II*, 545 U.S. at 257 (finding that, on reading entirety of testimony, "[juror] should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutors' explanations for the strike cannot reasonably be accepted"); *Reed v. Quarterman*, 2009 U.S. App. LEXIS 579 (5th Cir. 2009) (fact that prospective juror appeared to be an ideal juror for the state, confirmed implausibility of State's race-neutral reasons for strike).

The State's after-the-fact effort to bolster the credibility of its asserted reasons, by pointing to allegedly "similar" white jurors they struck, is also unconvincing, and smacks of pretext too. The State simply listed *all* the other jurors they had previously struck. Three of those five *were* weak on the death penalty, but were clearly far weaker than Mr. Galatas. Juror Corrin testified that life was "very precious" to her and that she would require proof beyond a "shadow of a doubt" to impose the death penalty and that she felt "more sure" of a life sentence.

---

represents an implicit finding by the state court that the original version is the correct one. That finding is subject to deference under § 2254(e)1). Moreover, any reliance on the "corrected" version would raise questions about the reliability of the rest of the certified transcribed voir dire testimony. Petitioner would be particularly concerned that some of the other 80 plus similarly situated prospective jurors "decisiveness" scale ratings may have been mistranscribed, or that additional jurors may have equally hesitated when asked about their views on the death penalty. Thus, the basis for any court concluding whether *Batson* has been violated would be entirely undermined and require a total re-examination of this issue, which must include, at minimum, a complete re-transcription of the voir dire testimony containing any and all pauses, hesitations, or quavering responses by prospective jurors.

R. 1780-81; Tortorich stated that he personally did not agree with the death penalty but could put

aside his feelings, R. 1772-74; and Boudreaux testified that he didn't feel he had "the power to

take someone else's life." R. 1771.  They were not "similar" to Mr. Galatas, and the State's

assertion that they were, in order to justify his strike, makes the State's reasons seem more, not

less, suspicious.  The other two jurors mentioned by the State were not actually "weak" on the

death penalty at all.  Scazzaforo stated unequivocally when questioned by Mr. Reed that he could

vote for the death penalty, and would go either way depending on the evidence.  R. 1784, R.

1858. Mr. Reed did not follow up his responses with further questions. *Id.*  Pope was barely

questioned on the death penalty at all.  The State's attempt to bolster its justification for striking

Galatas, by making a further implausible argument that is contradicted by the record, simply

confirms the pretextual nature of their asserted reasons for striking Mr. Galatas. *Miller-El II,* 545

U.S. at 246 ("the State's failure to engage in any meaningful voir-dire examination on a subject

the State alleges it is concerned about is evidence suggesting that the explanation is a sham.");

*Reed v. Quarterman*, 2009 U.S. App. LEXIS 579 (5th Cir. 2009) (same).

Lastly, the State continued its disingenuous tactics when defending its case during direct

appeal.  Without notice to either defense counsel *or* the trial court, the State attempted to amend

the official trial record to insert the non-existence evidence it purported to rely on to support the

racial neutrality of their strikes.   Thus, they contacted the court reporter, and had her re-

transcribe or "correct" the relevant sections of the record, which she had certified previously

were "true, accurate and complete." R. 2229, R.2916.  In so doing the State paid scant regard to

basic principles of fairness.[83]  Having obtained a version they wanted by these arguably improper

---

[83] L.C.Cr.P. art. 916(2) provides "The jurisdiction of the trial court is divested and that of the appellate
court attaches upon the entering of the order of appeal.  Thereafter, the trial court has no jurisdiction to take
any action except as otherwise provided by law and to . .   (2) Correct any error or deficiency in the

means, the State filed two "corrected" segments of the record.  The first related to the record of Ms. Malter's voir-dire responses (which defense counsel did not learn of until the day of oral argument), and will be discussed further below.  In the second, which the State filed after the direct appeal oral argument, but before the appeal had been decided, the State attempted to insert the non-existent pauses, head nodding and repeating of questions, which it had alleged occurred during the group voir dire of Mr. Galatas (and which defense counsel at the time had strenuously argued was "all wrong", and appeal counsel relied on in the appeal to prove pretext).[84]  The State's resort to this underhand tactic reeks of defensiveness, and increases the suspicion with which their reasons must be viewed.

The State's reliance on mischaracterizations of the record, and the state-*favorable* nature of Mr. Galatas' answers, demonstrate the implausibility of the State's race-neutral reasons.  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Reed v. Quarterman*, 2009 U.S. App. LEXIS 579 (5th Cir. 2009) (*citing Purkett v. Elem*, 514 U.S. 765, 768, (1995)); *Miller-El II*, 545 U.S. at 243-244 (finding that reasons based on mischaracterization of juror testimony indicate prosecutor's "ulterior reason"); *Snyder*, 128 S.Ct. at 1207-1208 (finding *Batson* error where because the prosecutor's alleged reasons for concern, not  borne out by the record, finding that the reason was therefore "implausible", "unconvincing" and "suspicious").  "The prosecution's proffer of this pretextual

---

record."  Although the code does not establish the procedure, a Louisiana appellate court has explained that for a transcript to be changed "a comparison would have to be made between the tape of the testimony and the transcript" and should be dealt with "in an application for post-conviction relief" with the trial court. *State v. Dairies*, 560 So.2d 968, 971 (La.Ct.App. 4 Cir. 1990).  Such a procedure would allow for all parties to be involved in the process, so that unilateral action would not produce such controversy over a critical part of a court's record.  At the very least, this statute requires the judge to make such a correction, which did not occur in this instance.

[84] As will be discussed further below, the Louisiana Supreme Court apparently did not credit this last minute effort by the State to "correct" the official record of Mr. Galatas questioning; the court instead relied on the official version of the record, without the State's edits.

"implausible", "unconvincing" and "suspicious"). "The prosecution's proffer of this pretextual explanation naturally gives rise to an inference of discriminatory intent." *Snyder*, 128 S.Ct. at 1212.

> **b. Similarly situated white jurors and alternates whom the State did *not* strike gave "weaker" responses concerning the death penalty than Mr. Galatas, demonstrating that the reasons for striking Mr. Galatas were based on race.**

The State's discriminatory purpose is further demonstrated by the State's different treatment of similarly situated *white* jurors; in fact several white jurors who expressed *more* ambivalence about the death penalty than Mr. Galatas were accepted by the State and served on Petitioner's jury.

When Juror Dr. McDonald, the eventual foreman of Mr. Hoffman's jury, was asked if he could consider imposing either a life sentence or the death penalty, Juror Dr. McDonald gave the almost exact response as Mr. Galatas - without having been posed a leading question:

Mr. Gracianette: Dr. McDonald?

Dr. McDonald: I *think I could* consider both.

Mr. Gracianete: What are your feelings on the death penalty?

Mr. McDonald: I *think* if the circumstances were appropriate.

Mr. Gracianete: Dr. Thank you.

R. 2599 (emphasis added).   Unlike Mr. Galatas, Juror Dr. McDonald was not prompted to respond by using the phrase "I think," nor was he asked repeatedly about his answers.  Yet, Dr. McDonald was not peremptorily struck by the State for his "weak" position on the death penalty. Dr. McDonald was white.  He sat on the jury and was eventually selected the foreperson of the jury that convicted Mr. Hoffman and sentenced him to death.

Juror Ms. Miller testified that imposing the death penalty would be "a hard decision… "

R. 2808. This sentiment was echoed by Juror Chisham, who, when asked about his feelings

about the death penalty, gave this response:

> The death penalty, I do agree with it, if all the evidence points to that…I have
> thought about this over and over a period of time…it's not an easy decision. It
> would have to be a very careful train of thought, looking at all the evidence that
> was presented and then make a decision.

R. 2297. Unlike Juror Miller and Juror Chisham, Mr. Galatas never expressed to the trial court

that it would be hard for him to impose the death penalty. Nor did Mr. Galatas say that the death

penalty would be a last resort, as Juror Suddeth did:

> Well I feel that it's an area that it would—I could vote for the death penalty, but I
> would have to be truly convinced that the person—that there was mitigating
> circumstances and other reasons that caused a person to be that way. *It would be
> a last resort thing that I could do.* But I could, I could vote for that.

R. 3078 (emphasis added). These were the sworn statements of people who were actually

"weaker" on the death penalty than Mr. Galatas, but who the State successfully sought to sit on

Petitioner's jury.

Two of the alternate jurors also expressed hesitation in the use of the death penalty, yet

they were not struck by the State. When Alternate Juror Blackwell was asked if he could

consider imposing the death penalty, he stated, "I'm not really sure." R. 3332. Alternate Juror

Petty said that in order for him to impose the death penalty the situation would have to be

"unusual." R. 3478. Lastly, Petitioner notes that the State was also willing to accept white

panelist, Cecil Bennett, as a juror with no question, even though his response to the State's

question whether he could consider the death penalty was a mere nod of the head. R. 1785.[85]

---

[85] Cecil Bennett was peremptorily struck by the defense. R. 1883.

The fact that all these jurors expressed more concern about the use of the death penalty in their answers than Mr. Galatas is further proof that the St. Tammany District Attorney's Office struck him based on his race. *Miller-El II,* 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step"); *Snyder,* 128 S.Ct. at 1211-1212 (finding *Batson* violation in part because State did not peremptorily strike similarly situated jurors); *Reed v. Quarterman,* 2009 U.S. App. LEXIS 579, *38 (5th Cir. 2009) (finding state's asserted race-based reasons were "spurious" because "the State accepted several nonblack jurors who expressed a similar sentiment.").

### c.  Disparate questioning

It is also significant to the court's determination of discriminatory intent that the District Attorney's questioning during individual voir dire was inconsistent as between Mr. Galatas and virtually all the other (white) jurors on his panel.[86]

Questioning was initially conducted during group voir dire.  At this point Mr. Reed did not question any jurors regarding their views on the death penalty.  Individualized voir-dire was then performed in chambers, primarily to explore the juror's exposure to publicity.  It was conducted in the same order for each juror; by the court, then District Attorney Reed, and finally defense counsel Alford.  Mr. Reed did not ask any questions at all to several jurors who testified on the court's questioning that they had no media exposure.  *See* questioning of: Pufal (accepted

---

[86] Comparison with questioning on other panels is less illuminative because the structure of questioning was different.  In the first panel, the State did not ask any questions about the death penalty at all until after individual voir dire.  When group voir-dire recommenced the State asked *all* jurors in turn about their views on the death penalty.  From the third panel onward the *court* initiated the questioning on the death penalty during individual voir dire, and the State questioned each juror individually, about their views on the death penalty.  Unlike in Mr. Galatas' panel, all jurors were therefore questioned individually about their views on the death penalty, regardless of their earlier responses.

as juror), R. 163-68; Richardson, R. 2043-48; Pope, R. 2065-68; Ryals, R. 2086-89; Keller (accepted as juror) R. 2098-99. Reed questioned other jurors about publicity, the juror's ability to be fair to the State, claims of hardship, and prior arrests of the juror or family members. *See* questioning of: Ruple, who was accepted as juror but later excused on hardship grounds, R. 2000-01 (whether he could give State a fair trial); Bacharach, who was accepted as juror, R. 2015 (same); Bawser, R. 2089 (questioned about brother-in-law's convictions). Locklear was questioned solely about her medical condition, R. 2084-85; and Schenck was questioned, initially about his financial problems, R. 1978-79, and later, when called back to chambers, about a remark he made about the defendant's guilt to other jurors. R. 2102-04.

Mr. Reed typically only asked a juror questions about the death penalty if that juror had already indicated strong feelings about the case or punishment or raised some other issue of concern to the State, during prior questioning by the court or defense counsel. *See* questioning of Lien, R. 1956-60 (questioning to rehabilitate juror after she indicated strong feelings about death penalty); Fulkerson, R. 1974 (same); Lower, who was accepted as juror, R. 1988-91 (brief question on death penalty, after questioning about husband's arrests and brother's murder); Carruthers, R. 2021, 2034-36 (questioning to rehabilitate juror after he indicated strong feelings about death penalty); Burns, who was accepted as juror, R. 2052-54 (question on death penalty after questioning on DWI conviction and publicity); Laizer, R. 2077-79 (questioning to rehabilitate juror after he indicated strong feelings about case).

There were two exceptions in the panel of eighteen: Mr. Galatas and Mr. Lopez. For both these jurors the State broke its clearly established questioning pattern and asked them about the death penalty despite nothing in their prior questioning that could give rise to any concern. Both Mr. Galatas and Mr. Lopez had testified (like white jurors Pufal, Lower, Ruple,

Bacaharach, Caruthers, Richardson, Lockheart and Bawser who were not questioned about the death penalty), that they had seen some publicity, but had formed no opinion about the case. Unlike the white jurors who *were* questioned about the death penalty (Lien, Fulkerson, Lower, Carruthers and Laizer), neither testified to anything else that could conceivably raise a concern for the State. (Galatas had testified he previously sat on a convicting jury and would not suffer hardship by sitting on this one, while Lopez testified he had no convictions).   Yet the State singled out these two jurors from all of the rest to question them about their views on the death penalty.[87]   By doing so, the State increased the likelihood of creating a race-neutral reason justifying a strike.   As the United State Supreme Court has made clear, "to the extent a divergence in responses can be attributed to the racially disparate mode of examination" they are evidence of purposeful discrimination. *Miller-El v. Cockrell*, 537 U.S. 322 (U.S. 2003) (citing *Batson*, 476 U.S. at 97 ("Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose")).

> **d.  Evidence that the state struck another African-American juror, because of her race, and the general pattern of the state's strikes against African Americans in the venire**

The United States Supreme Court has made clear that, when considering whether discriminatory intent was shown in the strike of one juror, the court should consider evidence of discriminatory intent relating to other jurors, even if evidence relating to others is not sufficient in itself to warrant relief:

> In *Miller-El v. Dretke,* the Court made it clear that in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted.

---

[87] Mr. Galatas was African-American, and Mr. Lopez, on information and belief, was Hispanic.  Mr. Lopez was peremptorily struck by the defense.

Here, as just one example, if there were persisting doubts as to the outcome, a court would be required to consider the strike of Ms. Scott for the bearing it might have upon the strike of Mr. Brooks.

*Snyder,* 128 S.Ct. at1208-09 (citation omitted). Thus, all the evidence that the State struck another African-American juror, Ms. Malter, because of her race (see further below), confirms that the State struck Mr. Galatas because of his race.

In addition, the pattern of the State's strikes as a whole is relevant evidence of the State's intent. *Batson* 476 U.S. at 97 ("a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"). Discriminatory intent may be inferred where, as here, the State was responsible for striking *all* African-Americans from the venire through a combination of cause challenges and peremptory strikes. *McGahee v. Ala. Dept. of Corr.,* No. 08-15602, at 25 (11th Cir. March 4, 2009) ("There can be no clearer "pattern" than the total removal of all African-American jurors from the venire by the State").

Clearly, race was the **only** reason for the State's use of a peremptory challenge against Galatas, and the trial court erred in overruling Petitioner's *Batson* challenge.

### 2. Elaine Malter

Ms. Malter was the only other black qualified juror on Mr. Hoffman's 108-person venire. Ms. Malter also appeared to be an ideal juror for the State. She testified that she had a cousin who is an attorney in the St. Tammany District Attorney's office, R. 2528, that she had been exposed to pretrial publicity but could still be fair to Petitioner and the State, R. 2772, that she could consider both aggravating and mitigation factors, R. 2586, and that she could consider both life imprisonment and the death penalty. R. 2601. She specifically stated that she could consider the death penalty "if [as here] a number of crimes have been committed along with the murder." R. 2601. Just as Ms. Malter was called for individual in-chambers questioning, the State requested a five minute recess. R. 2771. Suspiciously, this was the only recess requested mid

way through individual voir dire of a panel. In chambers, Ms. Malter testified that pretrial

publicity would not affected her and repeated that she would consider aggravating and mitigating

factors and that her relationship to her district attorney cousin would not affect her deliberations.

R. 2777-80.

Even though Ms. Malter's responses indicated she could vote for the death penalty and

would be fair and impartial juror, the State exercised a preemptory challenge to strike Ms.

Malter. R. 2907. Petitioner raised a second *Batson* challenge requesting a "racially neutral

reason." R. 2907. Mr. Gracianette responded by stating:

> No objection, Judge. The Court is well aware that the State in every voir dire ever
> handled has requested the jury to judge himself on a scale of one to ten on the
> decisiveness (sic). The State has consistently used this, at least myself, has used
> this scale for purposes of determining whether or not people would be willing to
> be an appropriate juror to the case. I have noted that Ms. Malter was 1 on the
> decisive scale.

> The State has indicated in previous discussions with the Court that it wants people
> to be in the eight to nine range, seven is appropriate. Five is right in the middle. I
> also note, for the record, Your Honor, that when Ms. Malter was back here during
> the course of discussion and the Court was interviewing her, she had a concerned
> look on her face with one hand placed here and the other arm underneath her. Her
> body language was inappropriate for someone who is a (sic) indecisive individual.
> The last question the defense counsel asked the juror was whether or not she
> could give the defendant a fair trial. Of all the jurors that the State has looked at,
> Ms. Malter looked the defendant in the eye and smiled and said, "Yes, I can."
> And for those reasons the State will submit that she would be inappropriate for
> serving on this jury.

R. 2907-8. After this explanation, Petitioner questioned the race neutral reason "that she smiled

and said she could give the defendant a fair trial." R. 2908. The State responded by stating:

"She looked the defendant in the eye and smiled, and I note for the record that no other juror

throughout the entire proceeding has done that." R. 2908. Defense counsel again disputed the

body language the State relied on, referring to it as "total hogwash." R. 2908-9. After a brief

recess to consider the matter, the trial Court overruled the *Batson* challenge:

The Court finds that the defendant has brought a prima facie case, that the State is exercising preemptory challenge by asserting a race of a juror, an African-American, a person of African-American descent.

The State has responded with a racially neutral reason. The Court notes that out of the 72 prospective jurors that have been voir dired in these proceedings, only three have been of African-American descent...

Although the Court finds this juror's responses were appropriate, the Court also finds that the State has presented a sufficient racially neutral reason for use of its preemptory challenge and will accordingly allow the use of the preemptory challenge.

R. 2909-2910.

### a. The record contradicts the State's proffered racial-neutral reasons.

The State's record-based response for striking this qualified black juror is once again belied by the record. Ms. Malter did not rate herself a "one" on the decisiveness scale, as the District Attorney said, R. 2907-08, but "about a five." R. 2865. The difference between Ms. Malter being portrayed as "very indecisive, wishy washy, having a hard time making decisions" prospective juror versus someone who actually was in the middle of this 1-10 range is enormous. R. 2863. The prosecution was wrong; they did *not* strike Ms. Malter because she was a "one," because she wasn't a one. The State had another reason: her race. *Miller-El II*, 545 U.S. at 243-244 (finding that reasons based on mischaracterization of juror testimony indicate prosecutor's "ulterior reason").

As with the record of voir dire of Mr. Galatas, the State also attempted to amend the official trial transcript of the voir-dire of Ms. Malter in advance of the Louisiana Supreme Court's decision on appeal. Without notice to either defense counsel or the trial court, the State attempted to amend the official trial record so that it read that Ms. Malter rated herself as the "one" rather than the "five," consistent with the reason they asserted to support the racial neutrality of their strikes. The State informed the defense of this for the first time *at* oral

argument.  See Appellant's Motion For Remand to District Court For Purpose of Conducting

Hearing On Alleged Inaccuracies in Record.  The State's resort to this underhand tactic increases

the suspicion with which their reasons must be viewed.

Moreover, Petitioner's trial counsel has since stated:

"This was the first time I encountered the numerical rating system used by the
state during jury selection.  I remember they used it to defend striking an African-
American lady.  Since then, I have objected to their use of this numerical
"system".  I think it is nothing more than a pretext for race-based peremptories."

Declaration of William Alford, LASC Writ Ex. 6-9, Ex 1.

The St. Tammany District Attorney's office offered a second race neutral explanation for

striking Ms. Malter, based on her indecisive body language and a knowing glance at the

Defendant.  However, the record reflects that the court overruled the *Batson* challenge based on

the decisiveness scale reason alone.  The trial court expressly found only "*a*" racial neutral

reason for the use of its preemptory challenge, not two.  R. 2910.  The court specifically noted

that Ms. Malter's responses were "appropriate," which indicates that the court was *not* relying on

the State's argument about Ms. Malter's "inappropriate" body language, and presumably relied

only on the decisiveness scale argument.

In any event, the State's body language reason is not believable either, for several

reasons.  First, it was expressly based on their assertion that she was as indecisive as an

individual can be (a "one" on the State's scale) and that her body language was "inappropriate

for" such an indecisive individual.  Because the first assertion is discredited and clearly

contradicted by the record, the body language reason which derives from it is correspondingly

suspect.

Secondly, the purportedly "inappropriate" display of body language was alleged to have

taken place during in-chambers questioning, *before* Ms. Malter was questioned about her

decisiveness. It seems unlikely that her body language was so striking that the prosecutor could, in retrospect, recall its "inappropriateness." Defense counsel certainly thought the whole proposition was "hogwash." R. 2908.

Finally, although Ms. Malter subsequently gave herself a rating on the decisiveness scale which the State felt was incongruous with such apparently striking body language, *they did not question her about it at all.* R. 2865-66. This makes the reason particularly suspect. *Miller-El II*, 545 U.S. at 246 ("the State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination") (citation omitted); *Snyder*, 128 S.Ct. at 1210 (the fact that the State "did not choose to question [excluded juror] more deeply about [the] matter" of their alleged concern, taken into account in determining validity of State's reason). *Reed v. Quarterman*, 2009 U.S. App. LEXIS 579 (5th Cir. 2009) (*citing Miller-El II*, 545 U.S. at 246: "if the State asserts that it was concerned about a particular characteristic but did not engage in meaningful voir dire examination on that subject, then the State's failure to question the juror on that topic is some evidence that the asserted reason was a pretext for discrimination") (holding failure to question juror about her health care job, demonstrated that the State's reason for striking juror (that she was a health care professional who the state disfavored in medical cases) demonstrated pretext and reversing conviction for *Batson* violation).

Two nearby appellate courts have warned against reliance on such intangible and unreviewable race-neutral explanations. *Avery v. State*, 545 So.2d 123, 127 (Ala. Ct. Crim. App. 1988) ("This type of non-specific explanation based on body language or looks could become the standard untestable *post-hoc* justification for what is in reality an unconstitutional exclusion based on group discrimination.") (citation omitted); *C.E.J. v. State*, 788 S.W.2d 849, 857

(Tex.App. 1990) (Courts should "scrutinize elusive, intangible and easily contrived explanations with a healthy skepticism."). When the State's reason is subjected to the proper scrutiny, it beggars belief; pretext is the fair conclusion. *Purkett v. Elem,* 514 U.S. 765, 768, (1995) (per curiam) ("At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"); *Hernandez v. New York,* 500 U.S. 352, 365 (1991) (plurality opinion) ("in the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed").

### b. Evidence that the state struck another African-American juror, because of his race and the pattern of the State's strikes.

All the evidence that the State struck another African-American juror, Mr. Galatas, because of his race, and that the State was responsible for removing all African-Americans from the venire through cause challenges and peremptory strikes also confirms that the State struck Ms. Malter because of her race. *Snyder,* 128 S.Ct. at 1208-09; *Batson* 476 U.S. at 97; *McGahee v. Ala. Dept. of Corr.,* No. 08-15602, at 25 (11th Cir. March 4, 2009).

### C. The race-based peremptory strikes of the only two qualified African-American jurors on Petitioners' voir dire forms part of a long established practice by the St. Tammany District Attorney's Office of striking qualified prospective black jurors in murder cases of black defendants.

The St. Tammany Parish District Attorney's office under Mr. Reed's administration *systematically* strikes qualified African-American jurors to prevent them sitting on murder trials of black defendants. This provides further evidence that the peremptory strikes exercised against the only two qualified African American jurors in this case were motivated by race. *Miller-El,* 123 S.Ct. at 1045 (historical evidence of systematic exclusion "casts doubt on the legitimacy of the motives underlying the State's actions").

In the 15 years surrounding Petitioner's capital trial the St. Tammany Parish District Attorney's Office has struck 67.7% of qualified black jurors in first and second degree murder trials of black defendants.[88]   This is more than *three* times the rate at which the District Attorney's Office struck qualified white jurors in the same cases, 19.3% of the qualified white jurors. Report of Joel Devine, 12/01/03, Supplemental Petition, Ex. 103.



Petitioner has examined all the cases in which black defendants were tried for murders in St. Tammany Parish from 1987 through 2003, some 15 cases.  *Id.*  Of 31 qualified African-

---

[88] The method for compiling this data is as follows: 1) Petitioner received from the Clerk's Office of St. Tammany a list of all the first and second degree murder cases in St. Tammany since 1997. Most of the cases stated the outcome of the case and the race of the defendant. For the cases that did not include race or jury information, Petitioner went through the public records to determine this information. At this point the list of first and second degree murder trials of black defendants was compiled. Petitioner then copied the Clerk's minutes and voir dire pages listing the voir dired prospective jurors. Petitioner then compiled a spreadsheet of this data- listing all jurors, alternates, and preemptory strikes from both the state and the defense. Petitioner sent a redacted version of this list to the St. Tammany Registrar of Voters to have them list the race and gender of the prospective jurors. It is from this data that these numbers are compiled.

Americans, the St. Tammany District Attorney's Office struck 21 of them; 67.7%. Supplemental Petition, Exs. 102 and 103. Of 420 non-blacks,[89] the State struck 83; 19.3%. *Id.*

The District Attorney's office struck around 23% of all the qualified prospective jurors: black, white, and other included.[90] If the State's 104 total preemptory strikes were exercised on a random basis, the State would only have struck 7 black prospective jurors. Instead the State struck three times that amount, 21. Supplemental Petition, Ex. 103.

**CHART A: ACTUAL DISTRIBUTION:**

|  | Black | White & Other |
|---|---|---|
| State Peremptory | 21 (68%) | 83 (20%) |
| Accepted by State | 10 (32%) | 337 (80%) |

**CHART B: DISTRIBUTION WITH A 23% STRIKE RATE:**

|  | Black | White & Other |
|---|---|---|
| State Peremptory | 7 (23%) | 97 (23%) |
| Accepted by State | 24 (77%) | 323 (77%) |

"In a situation where there are a number of discrete results that may be measured and the question is whether there is a significant difference between the observed results and what would be expected, the most widely used measure of significance is the chi-square test $(\chi^2)$." Supplemental Petition, Ex. 102. Petitioner has employed the chi-square test "to determine whether there is a statistically significant discrepancy between the calculated null hypothesis (of no inter-group differences vis-à-vis the condition of interest) and the observed results, and the

---

[89] The 420 non-blacks are composed of 409 whites and 11 others.
[90] This rate is calculated by dividing the total number of peremptory strikes by the total number of qualified jurors: 104/451= .23.

probability that the discrepancy is the result of chance." *Id.*  By using the actual numbers of Chart A, the *chi-square* statistical test resulted in a figure of 37.4581009244002 and a *p* <.001. The actual number is 9.83117E-10.  **This means that the chance that the use of peremptory strikes by the prosecutors is not contingent on race is 1 in 1 billion**. *Id.*

The raw numbers combined with the statistical analysis demonstrate that the St. Tammany District Attorney's Office has engaged in a systematic exclusion of qualified black jurors in the murder cases of black defendants since at least 1987 through 2003.[91]  The ratios tell us that Mr. Galatas and Ms. Malter were three times more likely to be struck than the prospective white jurors.  Both in fact *were* struck by the State in highly suspicious circumstances, for reasons contradicted by the record.  This demonstrated pattern of exclusion of African American people from jury's in cases similar to Petitioner's is further proof that the State intentionally removed Mr. Galatas and Ms. Malter because they were black.  *Miller-El I*, 123 S.Ct. at 1044 (according weight to historical evidence indicating that African-Americans almost categorically were excluded from jury service by the District Attorney's Office) (*citing Batson*, 476 U.S. at 94 ("Proof of systematic exclusion from the venire raises an inference of purposeful discrimination because the 'result bespeaks discrimination.'")).  *See also Alexander v. Louisiana*, 405 U.S. 625, 630 (1972) (finding racial discrimination in selection of grand jurors, based on statistical improbability that exclusion of blacks occurred chance, combined with procedures which provided a clear and easy opportunity for racial discrimination that jury commissioners knew race of prospective jurors).

---

[91] During this time period of 1987 to the present, the St. Tammany District Attorney's Office has been under the control of the Walter Reed administration.

### D. Other evidence that the State's peremptory strikes of Mr. Galatas and Ms. Malter were motivated by race

#### 1. The State's whole case was designed to appeal specifically to white people from St. Tammany parish

This case was racially charged from the outset. Petitioner, an African-American man from inner-city New Orleans, was charged with raping and killing a white woman from St. Tammany parish. St. Tammany has a long history of racism. Partly as a result of this history, the parish has a lower than average percentage of African American and minority inhabitants. According to the 2000 Census, the state of Louisiana had 32.5% black population, whereas St. Tammany blacks comprised only 9.9% of the parish's population. The discrepancy is often linked to "white flight."[92] It has been a fertile ground for those with white supremacist or other extreme racist views. In 1991, David Duke, former grand wizard of the Ku Klux Klan, won 44% of the white vote for Louisiana governor in St. Tammany Parish. R. 1514. *And see,* Bill McMahon, "Johnston Says Duke's Showing Won't Change His Views," *The Advocate*, pg. 4 (Oct. 8, 1990) (David Duke, "carried three metropolitan areas [in his race for Senator] – Ouachita (Monroe), Jefferson (Duke's home parish), and suburban St. Tammany, an area of

---

[92] *See,* Derrick Nunnally, "BR Now Majority Black Change May Affect Power in Local Politics," *The Advocate*, NEWS, pg. 1 (March 18, 2001) ("State demographer Karen Paterson said white flight to suburbs is indicative a statewide trend that has been going on near metropolitan area for decades. White New Orleanians' movement to St. Tammany and other previously rural parishes is one example"); Chris Adams, "Our Separate Ways: Integration in Name Only," *Times-Picayune*, NEWS, pg. 1 (Nov. 14, 1993) (discussing school desegregation in New Orleans and the white flight that resulted). During a pre-trial hearing on Petitioner's claim that the choice of venue violated his rights to Equal Protection and a jury of his peers, Petitioner presented expert evidence from a demographer about the demographic changes in the fifteen years between 1980 and 1995. The expert testified that there was nearly a 54% increase in the population of St. Tammany Parish, and a 13% decrease in the Orleans Parish population. At the same time the racial composition of the parishes changed; in St. Tammany the percentage of African-American residents decreased from 12.2 % to 11%, while the percentage in New Orleans increased from 60% to 62%. R. 1513.

white flight from urban New Orleans").[93]   One of the prospective jurors on the venire in this case

worked for a company whose owners had Klan associations. R. 1979.

The local pre-trial publicity portrayed the crime in a racially prejudiced way, highlighting

and perpetuating racist animosity in the community concerning the crime.   One St. Tammany

citizen told reporters that:

> [n]othing that happens in New Orleans surprises me over in that zoo.  That's why
> we live over here in God's country to get away from all that nonsense over across
> the lake.

WVUE Fox 8 Tape, at 3.52-4.00; 5.49-6.17 (Ex. 142).  Such commentary reflects thinly veiled

racism.  *See:* Sheri Lynn Johnson, *Racial Imagery in Criminal Cases*, 67 TUL. L.REV. 1739,

1753-54 (1993) (discussing use of animal imagery to express racial prejudice).

District Attorney, Mr. Reed, and his office understood the racial implications of the case

from the moment of Mr. Hoffman's arrest, and seized on them immediately.   The State thus

defined the prosecution from the outset by the image of St. Tammany seeking retribution against

an outsider from New Orleans.  In his initial public statements about the prosecution, the D.A.

demonstrated a thinly veiled racist zeal, appealing to St. Tammany fears about the "other" world

of predominantly African-American New Orleans:

> Because of the particular heinousness of the crime I will seek and ask for the
> death penalty in this matter and I will also issue a strong statement to the criminal
> element of New Orleans that we will not tolerate this type of victimization of our
> citizens in St. Tammany Parish.

(WVUE Fox 8 Tape, at 13.06-13.20; *see also* WWL-TV, Tape 1, at 6.17-6.24, 6.53-8.00).

What I'm saying is to the criminal element of New Orleans, don't think that you

can come across those bridges and we're easy picking and we're just going to take

---

[93] In 1996, Duke ran unopposed for a seat on St. Tammany's Republican Executive Committee and later became its
chairman.  The Klan is still active in the area.  Just last year a woman was murdered when trying to leave part-way
through a Klan initiation ceremony in St. Tammany.  David Mitchell and Greg Garland, "Woman slain at Klan rite
*** 8 suspects arrested; victim reported tried to leave" *The Advocate,* pg. 1A (Nov. 12, 2008).

it and not do anything about it....  We will not tolerate this kind of victimization of
our citizens in St. Tammany Parish.

WWL-TV, Tape 1, at 7.12-7.24, 7.52-7.59.  Reed, moreover, stated, "crimes like this should

warn St. Tammany commuters to be careful when they come to the city":

> And when they leave here and they go to work, it's a whole different situation.
> So people have to be able to make that switch from the feeling of safety, it's not a
> complete feeling of safety, but a relative feeling of safety that we have here, and
> then when they go to work, you have to really really be careful.

WWL-TV, Tape 1, at 12.12-12.58.  In what the press recognized as "a rare move," the District

Attorney himself then *personally* conducted the opening two days of voir dire.  WWL-TV, Tape

1, at 8.14-8.40.  The racial undertones of Mr. Reed's public messages for "our citizens in St.

Tammany Parish" were perpetuated throughout the State's case at trial.  Thus opening their case,

they presented a story-book image of Ms. Elliot, living a pure and idyllic life on the top of a hill:

> Once upon a time in St. Tammany Parish their lived a young and beautiful woman
> named Mary Margaret Murphy Elliot, and her friends called her Molly.
>
> The lived on top of a hill, on Pat O'Brien Road, and her name for the hill, because
> it was pretty, was Lock Linda, which was a made up name to her which meant
> "pretty hill."  And she lived there with her husband Andy, who adored her.
>
> And she lived with her two dogs, Bugger and Gracie, a cat Lucy, and some goats
> and chickens.

R. 3537.  They were then able to contrast this with Jessie Hoffman from New Orleans, a man

with "ice water in his  veins" who is "mean," "cruel," and "lazy," R 4288; "the devil".  R. 4361.

Most significantly, the State's arguments about the rape appealed to classic racist stereotypes

calculated to convey to the jury the particular repugnancy with which the rape of a white woman

by a black man has historically been viewed through white eyes.  In urging the **non-issue** of

whether the victim had consented to sex, the prosecutor remarked, "I think it is pretty obvious to

everyone here on this jury that Ms. Elliot did not consent to sex with that man over there.  In no

way, shape or form did she agree to have sex with him, no matter what he tells you."  R. 4249.

"It's clear at that point that Molly Elliot just wants to leave.  What would you want to do?
Would you want to stick around with this man over here (indicating)?  Of course not.  Do you
really think that Molly Elliot offered herself to this man?  Does that make sense to you?  Is that
common sense?"  R. 4252.  In describing the rape itself, the prosecutor attempted to tap into
deeply rooted stereotypes about the insatiable, cruel hunger of the black man for white women:

> If he just wanted to have what he described as "sex."  He just wanted to have sex
> with her.  She could have kept her top on.  She could have kept her bra on, her
> vest, her red sweater.  But he wanted her completely naked.  Vulnerable, weak.
> He wanted to see all of her.  He didn't want to just have her.  He wanted to
> degrade her.  He wanted to humiliate her.  He wanted her entirely vulnerable.  He
> took off every stitch of clothing that she had, forced her to lay down in the back of
> that vehicle, while he entered her.  It's one of the most horrible things that could
> happen to any human being.

R. 4252.  In rebuttal argument, the prosecutor described the victim as "humiliated and defiled
and contaminated by him...."  R. 4288.[56]

The State's case was thus conceived of, and delivered, in a way designed to appeal in
particular to people who harbor such racial stereotypes.  The prosecution had clear motive to

---

[56]  In discussing the historical treatment by the judiciary of the rape of a white woman by a black man, Jennifer
Wriggens observes:

> [C]ourts applied special doctrinal rules to Black defendants accused of the rape or attempted rape of white
> women. One such rule allowed juries to consider the race of the defendant and victim in drawing factual
> conclusions as to the defendant's intent in attempted rape cases. If the accused was Black and the victim
> white, the jury was entitled to draw the inference, based on race alone, that he intended to rape her. ... The
> "social conditions and customs founded upon racial differences" which the jury was to consider included
> the assumption that Black men always and only want to rape white women, and that a white woman would
> never consent to sex with a Black man.
> ... Judicial attitudes toward the rape of white women by Black men are also manifested in the factual
> descriptions of the crime in opinions.  Courts sometimes created pornographic images of the events of the
> rape. One court, for example, wrote, "[The victim,] while clad only in her pajamas was forced to a remote
> spot some two blocks from her home, where battered, bruised, bleeding and exhausted she was
> overpowered...."  The sense of disgusted fascination that such opinions convey is not paralleled in cases
> where offender and victim are both white.

Jennifer Wriggens, *Rape, Racism, and the Law*, in CONFRONTING RAPE AND SEXUAL ASSAULT, 199, 202 (ed.s M.
Odem and J. Clay-Warner 1998).  The authors point out: "[t]he patterns that began in slavery and continued long
afterwards have left a powerful legacy that manifests itself today in several ways."  *Id.* 203.  *See also* Sheri Lynn
Johnson, *Racial Imagery in Criminal Cases*, 67 TUL.L.REV. 1739, 1754 (1993) ("In other cases, prosecutors play on
the supposed sexual appetite of, or the supposed sexual threat posed by, black men.  In the rape case variation, the
prosecutor argues, sometimes in hysterical terms, that the victim, a white woman, would never have consented to
have sex with the defendant because he is a black man").

ensure that as many jurors who heard the case were white. This is strong circumstantial evidence that the State's actions, which resulted in the seating of an all white jury, were motivated by race.

### 2. The State's exercise of discretion in choosing the venue of St. Tammany Parish had a racially discriminatory impact on the composition of the jury, just as its use of peremptory strikes did

Further evidence confirming that the State's approach to jury selection was race-based emerges from the State's choice of venue. Elements of the crime happened both in New Orleans and St. Tammany Parishes. Under Louisiana law both parishes had jurisdiction to try the case.[94] It seems no coincidence that the State exercised its discretion by choosing St. Tammany. St. Tammany's citizens would be the most receptive to Mr. Reed's "us (St. Tammany)" and "them (New Orleans)" rhetoric discouraging "them" from "com[ing] across those bridges;" would relate most closely to Molly's storybook life on the "Lock Linda" hill; and would be most likely to respond favorably to the prosecution's appeal to racial stereotypes at trial.

There is no question that the State's selection of St. Tammany parish as a venue had a significant impact on the racial make-up of the jury, and limited the number of African-Americans who could sit on the jury. Elsewhere, Petitioner argues that the choice of venue based on racial considerations in itself violated his rights to Equal Protection and an impartial jury.[95] Whether or not that claims succeeds, the circumstances surrounding the State's exercise of discretion in its choice of venue, is relevant in determining whether the State had a discriminatory purpose when it chose to strike the only two qualified African American jurors from the case. And it confirms that they did. *Miller-El II,* 545 U.S. at 253-54 (State's exercise

---

[94] La.C.Cr.P. art. 611(A) provides: "All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred."

[95] *See* Claim X where Petitioner demonstrates that the State's purported race-neutral reasons for choosing St. Tammany were also belied by the record, contradicted by its practices in other cases, and were pretextual.

of discretion at other points in the jury-selection process which also limited the number of African-American jurors, relevant to determination that the State's subsequent peremptory strikes of African-Americans were racially motivated.)[96] *Alexander v. Louisiana,* 405 U.S. 625, 630 (1972) (finding racial discrimination in selection of grand jurors where Petitioner alleged a "consistent process of progressive and disproportionate reduction of the number of Negroes eligible to serve on the grand jury at each stage of the selection process until ultimately an all-white grand jury was selected to indict him").

### E. Conclusion

The evidence is overwhelming: the State's alleged race-neutral reasons are belied by the record. The State constructed a case based on racial concern and then systematically exercised their discretion to ensure that no African American sat on his jury. Petitioner's conviction must be reversed under *Batson* and its progeny. "Viewed cumulatively, the direction of the evidence was too powerful to conclude anything but discrimination." *Miller-El II,* 545 U.S. at 265.

### F. Relief for these constitutional violations is not barred by § 2254

Petitioner's *Batson* claims were denied on the merits by both the Louisiana Supreme Court on direct appeal, and by the state district court during post-conviction. *State v. Hoffman,* 98-3118 (La. 4/11/00), 768 So.2d 542, 556-60. State Court Order, 1/5/07. However, those decisions were unreasonable; they were contrary to law, involved an unreasonable determination of the facts, and were based on factual findings that are contradicted by clear and convincing evidence. § 2254(d)(1); § 2254(d)(2); § 2254 (e)(1). Petitioner's conviction and death sentence should be reversed.

---

[96] In that case the Court considered the State' use of "jury shuffles," a unique Texas procedure by which parties could randomly re-arrange the order in which potential jurors were called for questioning.

### 1. The state district court's decision

The state district court did not give reasons for denying the merits of Petitioner's *Batson* claims in post-conviction. State Court Order, 1/5/07. It is impossible to apply the requirements of § 2254(d) pursuant to *Williams v. Taylor,* 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court. *Williams*, 529 U.S. at 394, 395, 397-98 (opinion of Stevens, J.); *id.*, 414-16 (opinion of O'Connor, J.) *See further* Part One IV(A)(3).

If § 2254(d) is to be applied, the court should conduct an independent review of the record to determine the facts the court was silent upon. *See* Part One IV(A)(3). The complete lack of any reasoning provided by the court itself raises significant concern as to the reasonableness of the decision under § 2254(d). *See* Part One IV(A)(4)(b)-(c).

In addition, the court's failure to hold an evidentiary hearing, to properly develop the facts, particularly in relation to the statistical evidence of systematic use of peremptory challenges against African-American's, also undermines the reasonableness of the court's decision. *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir.), *cert. denied*, 537 U.S. 1179 (2003) (state courts could not have made proper determination of facts when courts refused Petitioner evidentiary hearing on matter). *And see Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (declining to apply presumption where state court failed to hold an evidentiary hearing); *Wilson v. Sirmons*, 536 F.3d 1064, 1082 (10th Cir. 2008) (same). *See further* Part One IV(A)(4)(b)-(c).

The factual evidence of discriminatory intent in the prosecutor's use of peremeptory challenges against both Mr. Galatas and Ms. Malter clearly and convincingly rebuts any possible implicit findings to the contrary by the state court in its unreasoned opinion. § 2254(e)(1). In light of the totality of the powerful evidence of discrimination the court's decision is an unreasonable determination of the facts, and an unreasonable application of *Batson,* under clearly

established law of the Supreme Court. § 2254 (d)(1); § 2254(d)(2). *Miller-El II*, 545 U.S. 231 (finding unreasonable determination of the facts under § 2254(d)(2) when "viewed cumulatively, the direction of the evidence was too powerful to conclude anything but discrimination").

### 2. The Louisiana Supreme Court's decision was an unreasonable application of clearly established U.S. Supreme Court law and an unreasonable application of the facts

#### a. Mr. Galatas

The Louisiana Supreme Court's decision to uphold the trial court's rejection of the *Batson* claim concerning Mr. Galatas was unreasonable for several reasons.

##### i. The court partially relied on erroneous factual findings that are rebutted by clear and convincing evidence

First, the court's decision was objectively unreasonable, and an unreasonable determination of the facts because it was based on several factual findings that are contradicted by the record. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (state court's decision which partially relied on an erroneous factual assumption was objectively unreasonable application of *Strickland*).

As an initial point, Petitioner notes that the court *correctly* found that Mr. Galatas' initial answer to whether he could consider the death penalty "*I think* I could", was not itself suggestive of hesitation on the death penalty. Similarly, the court rejected the State's assertion that Mr. Galatas expressed hesitation about the death penalty when subsequently asked about it during group voir.[97] Thus, the court found that "these exchanges tend to support the defendant's contention." These findings should be accorded deference under § 2254(e)(1).

---

[97] Although the court does not say so expressly, presumably the court accepted Petitioner's evidence that Mr. Galatas' expression "I think," was merely linguistically reflective of the State's question "do you think..." Likewise, it can be presumed that the court's rejection of the State's argument that Mr. Galatas was also hesitant about the death penalty during subsequent questioning during group voir dire, was based on the fact that the State's argument relied on a gross mischaracterization of the record; (contrary to the State's assertion, the record does *not*

However, the state supreme court went on to erroneously find, based on its assessment of the remainder of Mr. Galatas' responses to the State's questioning on the death penalty, that Mr. Galatas *had* been hesitant. The court thus found that he "clearly waivered" on the death penalty, that he "appeared reluctant in his death penalty responses," and that when questioned about life he answered "affirmatively without equivocation." *Hoffman,* 768 So.2d at 558. These findings are clearly and convincingly wrong. § 2254(e)(1). Mr. Galatas' answers during individual voir dire, which the court relied on to reach those findings, do not reveal "reluctan[ce]" or "waiver[ing]" but rather an expression of his intention to review all the evidence before reaching a conclusion *either* way. Also contrary to the court's finding, Mr. Galatas used almost identical language in response to the State's questions about his ability to consider a life sentence: "Depending on what the circumstances are, which we haven't heard them yet." R. 2071-72. It is clearly unreasonable for the court to find that this language is unequivocal as it relates to his answer about a life sentence, but the opposite when essentially the same answer is given in relation to the death penalty.

Secondly, the court unreasonably rejected evidence of disparate questioning. The court found: "contrary to Hoffman's claim, no particular questions were asked, or not asked, merely because Mr. Galatas was African- American." *Hoffman,* 768 So.2d at 558-559. It is true, as the court noted, that the State did question some white jurors on the death penalty, as well as Mr. Galatas. However, the court missed the point that such questioning of white jurors occurred *only* if their prior answers prompted some obvious concern for the State; that just was not true of Mr. Galatas.

---

reflect that Mr. paused, answered quietly, required prompting by repeat of the question; he answered, unequivocally, "yes," he could consider death). This also suggests that the court did not credit the State's "corrected" version of the record it improperly obtained without notice to the defense or trial court, and then filed in support of its case on appeal.

### ii. **The court partially took irrelevant factors into account in reaching its decision**

The court's decision was also unreasonable because it rested in part on consideration of irrelevant factors.   It's finding that there was no disparate questioning and therefore no discrimination, was unreasonable because it relied primarily on *defense* counsel's questioning of jurors, not the State's.   The court's analysis proceeded as follows:

> The transcript shows that when prospective jurors indicated that they had no exposure to pretrial publicity, questioning by the trial court *and the attorneys for the defense* and State was very brief.   However, if prospective jurors, like Mr. Galatas, expressed knowledge about the case, *both sides* engaged in a thorough examination often including questions about the death penalty.   Furthermore, although the defendant claims that Mr. Galatas was the only prospective juror subjected to intense death penalty questioning by the prosecution, in the same way, *defense counsel* rigorously examined Mr. Carruthers after he indicated the death penalty was an appropriate sentence for first degree murder.   Thus, a fair reading of the record reveals that Mr. Galatas was not singled out by the prosecution; instead, *both sides* subjected all prospective jurors to in-depth questioning based on pretrial publicity exposure.

*Hoffman*, 768 So.2d at 558 (emphasis added).   The questions *defense* counsel asked bare *no* relevance to why the *State* decided to question a juror on the death penalty or not.   To hold otherwise assumes that counsel for the State and Defense were pursuing a *joint* strategy, which is clearly not the case of two parties with such opposing interests.   Moreover, the aspects of the State's questioning that were racially disparate always occurred *before* defense counsel's questioning began.   *See Miller-El*, 545 U.S. at 245 (finding defense counsel's strikes irrelevant to court's determination of the State's intent because "the underlying question is not what the defense thought about these jurors", and noting that the defense did not make its decisions until after the State had done so); *Bui v. Haley*, 321 F.3d 1304, 1318 (11th Cir. 2003) (holding state court's finding of no purposeful discrimination was unreasonable determination of the facts under § 2254(d)(2) and clearly erroneous under §2254(e)(1) where four of the seven factors the state court relied on were irrelevant) (reversing conviction under *Batson*).

226

If defense counsel's questioning is ignored, the glaring discrepancy in the State's questioning of Mr. Galatas, compared to questioning of white jurors, is clear. The court's contrary finding is wrong, to a clear and convincing degree, § 2254(e)(1), and it resulted in an unreasonable determination of the facts. *Wiggins,* 539 U.S. at 534 (state court decision unreasonable because court partially relied on erroneous factual finding).

### iii. **The court failed to take into account important evidence of discriminatory intent**

Finally, the court's decision that there was no discriminatory intent was unreasonable because, contrary to law, the state court failed to take into account and cumulatively consider the other strong evidence within the record before it that the State's reason's were a pretext for race discrimination. It is "clearly established" that when determining whether a defendant has met his ultimate burden of proving purposeful discrimination the court must consider "all the relevant circumstances." *Snyder,* 128 S. Ct., 1208 ("in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted"); *Miller-El II,* 545 U.S. at 240 (the trial court must consider "all the relevant circumstances") (citing *Batson,* 476 U.S. at 96-96); *and see id.,* at 251-252 ("The rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."); *Batson,* 476 U.S. at 93 (1986) (trial court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available") (*citing Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977)). The court failed to do so.

Thus, the court failed to consider: (1) evidence that Mr. Galatas' appeared to be an ideal juror for the State, *Miller-El II,* 545, U.S. at 247; (2) the State's acceptance of not just similarly

situated jurors, but jurors who expressed far more ambivalence or hesitation about the death penalty than Mr. Galatas, *Miller-El II,* 545 U.S. at 241; (3) evidence that the State mischaracterized the record of the group voir-dire questioning of Mr. Galatas, to bolster its race-neutral reasons *Snyder,* 128 S.Ct. at 1207-1208; (4) evidence that the State improperly attempted to amend the official trial record to insert the non-existent pauses, head nodding and repeating of questions, without notice to defense counsel or the trial court, *see Miller-El II,* 545 U.S. at 243-244; (5) evidence that the State's peremptory strike of the only other qualified black juror, Ms. Malter, was also motivated by race, *Snyder,* 128 S.Ct. at 1208-09; (6) evidence that the State was responsible for removing all African Americans from the venire, *Batson* 476 U.S. at 97; *McGahee v. Ala. Dept. of Corr.,* No. 08-15602, at 25 (11th Cir. March 4, 2009); (7) evidence that the State's case was constructed in a way designed to appeal specifically to jurors who might harbor racial prejudices against African-Amercians; and (8) evidence that the State had exercised its discretion in choosing venue in a way which dramatically decreased the number of African-American's likely to serve on the jury.

Limiting its consideration in this way, and by failing to cumulatively consider a wealth of relevant evidence in deciding whether there was purposeful discrimination, the court unreasonably applied the law and unreasonably determined the facts in light of the evidence before it.  § 2254(d)(2), §2254(e)(1); *Miller-El I,* 537 U.S. at 346 ("Our concerns are amplified by the fact that the state court also had before it, and apparently ignored, testimony demonstrating that the Dallas County District Attorney's Office had, by its own admission, used this process to manipulate the racial composition of the jury in the past."); *McGahee v. Ala. Dept. of Corr.,* No. 08-15602, at 25 (11th Cir. March 4, 2009) (The state court's "failure to consider "all relevant circumstances" as required by *Batson,* was an unreasonable application of

law) (reversing conviction for *Batson* violation when state court failed to consider one of the state's three asserted reasons, the fact the State removed all African Americans from the venire by cause challenges and peremtory strikes, and fact that one of state's asserted reasons was not supported by the record); *Williams v. Taylor,* 529 U.S. 362, 397-98 (finding state court's decision on prejudice under *Strickland* was an unreasonable application of the law because the court failed to take into account all of the mitigating evidence in reweighing it against the evidence in aggravation"); *Jacobs v. Horn,* 395 F.3d 92. 106 (3rd Cir. 2005) (state court did not consider trial counsel's failure to provide relevant information to experts; decision based on one factor to exclusion of other relevant ones, is unreasonable application of *Strickland*); *Guidry v. Dretke,* 397 F.3d 306, 327 (5th Cir. 2005) ("the state trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim, where the witnesses are apparently credible, brought into question whether, under subpart (d)(2), its 'decision… was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'").

The unreasonableness of the court's decision is further demonstrated by the evidence subsequently presented by Petitioner in post-conviction, that the District Attorney's office under Walter Reed's administration systematically discriminates against African-American's when picking juries.

In light of the court's failure to consider numerous relevant factors, its consideration of irrelevant factors, and its reliance on erroneous findings, its decision that the State's peremptory strike of Mr. Galatas was not motivated by race, is rebutted by clear and convincing evidence, § 2254(e)(1), is an "unreasonable determination of the facts," § 2254(d)(2), and an unreasonable

application of law. § 2254(d)(1).  The limitations under § 2254 to this court's power to grant

relief do not apply.  Petitioner's conviction and death sentence should be reversed.

### 3. Problems specific to the court's ruling on Ms. Malter

The Louisiana Supreme Court's consideration of the State's strike of Ms. Malter is

similarly problematic.

### a. The court improperly relied on a potentially race-neutral reason that the State never gave

The court first addressed the State's asserted race-neutral reason that Ms. Malter rated

herself a "one" on the decisiveness scale.  The court correctly found that Ms. Malter had in fact

rated herself a five.  However, instead of recognizing the State's mischaracterization of the

record as evidence of pretext, the court went on to assess the State's reason as if the State had

relied on her "five" decisiveness rating, rather than on the "one" they actually alleged.

Substituting a potentially plausible reason in this way for the actual reasons provided by the State

is contrary to the clearly established law of the United States Supreme Court:

> T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason
> for striking the juror, and it requires the judge to assess the plausibility of that
> reason in light of all evidence with a bearing on it. 476 U.S. at at 96-97... [A]
> prosecutor simply has got to state his reasons as best he can and stand or fall on
> the plausibility of the reasons he gives... If the stated reason does not hold up, its
> pre-textual significance does not fade because a trial judge, or an appeals court,
> can imagine a reason that might not have been shown up as false.

*Miller-El II,* 545 U.S. at 251-52 (finding that the Fifth Circuit Court of Appeal's "substitution of

a reason for eliminating [a juror] does nothing to satisfy the prosecutors' burden of stating a

racially neutral explanation for their own actions."); *and see Johnson v. California,* 545 U.S.

162, (2005) ("[I]t does not matter that the prosecutor might have had good reasons . . . [w]hat

matters is the real reason they were stricken" (*citing Paulino v. Castro,* 371 F.3d 1083, 1090 (9th

Cir. 2004); *Reed v. Quarterman*, 2009 U.S. App. LEXIS 579 (5th Cir. 2009) (*citing Miller-El II,*

545 U.S. at 252) ("we must consider only the State's asserted reasons for striking the black jurors").

The appeal court also improperly considered the State's asserted race-neutral reason based on Ms. Malter's body language. The court correctly noted that "peremptory challenges by the prosecutor based on body language have survived *Batson* challenges when accepted by a trial judge who possesses broad discretion in making the ultimate factual determination regarding purposeful discrimination." *Hoffman,* 768 So.2d at 559. However, the trial court did *not* rely on the State's body language based reason in overruling the *Batson* challenge. *See* above. The appeal court's reliance on this was improper.

Third, contrary to clearly established law of the United States Supreme Court, the state court also unreasonably failed to take into account, and cumulatively consider, the other strong evidence within the record before it, that the State's reason's were a pretext for race; (1) evidence that Ms. Malter appeared to be an ideal juror for the State, *Miller-El II,* 545, U.S. at 247; (2) evidence that the State's race neutral reason was based on a mischaracterization of the record; *Snyder,* 128 S.Ct. at 1207-1208 (3) evidence that the State improperly attempted to amend the official trial record to change Ms. Malter's *actual* answer ("five"), to the answer the State *asserted* she gave ("one"), without notice to defense counsel or the trial court; *see Miller-El II,* 545 U.S. at 243-244 (5) evidence that the State's peremptory strike of the only other qualified black juror, Mr. Galatas, was also motivated by race, *Snyder,* 128 S.Ct. at 1208-09; (6) evidence that the State was responsible for the removal of all African Americans from the venire The pattern of the State's strikes as a whole; *Batson* 476 U.S. at 97; *McGahee v. Ala. Dept. of Corr.,* No. 08-15602, at 25 (11th Cir. March 4, 2009); (7) evidence that the State's case was constructed in a way designed to appeal specifically to *white* jurors; and (8) evidence that the State had

exercised its discretion in choosing venue in a way which dramatically decreased the number of African-American's likely to serve on the jury. *Miller-El II,* 545 U.S. at 240 (the trial court must consider "all the relevant circumstances").

The court improperly considered irrelevant factors, and failed to consider a wealth of relevant evidence, in reaching its decision to uphold the trial court's conclusion that the State's peremptory strike of Ms. Malter was not motivated by race. The court's decision is clearly and convincingly rebutted by the evidence of the State's purposeful discrimination in the record on appeal, and the further evidence presented in post-conviction that Mr. Reed's office has systematically excluded African American's from juries presiding over the trials of black murder defendants in St. Tammany. § 2254(e)(1). The appeal court's decision involved an unreasonable determination of the facts. § 2254(d)(2). As such, this court's power to grant relief is not limited by the provisions of § 2254. Petitioner's conviction and death sentence should be reversed.

### G. An evidentiary hearing is required

In the alternative, if the court finds that the facts are not sufficiently developed to warrant relief, or that there are unresolved factual disputes, Petitioner is entitled to an evidentiary hearing. *See Miller-El II,* 545 U.S. 231 (2005) (relying on record as developed as fully developed at an evidentiary hearing to determine *Batson* claim); *Williams v. Runnels,* 432 F.3d 1102, 1103 (9th Cir. 2006) (reversing district court's denial of relief on *Batson* claim, and remanding for evidentiary hearing to develop facts concerning statistical evidence of racial disparities in use of prosecutor's peremptory challenges, which "district court, not having the guidance of the Supreme Court's opinions in *Johnson v. California,* 125 S. Ct. 2410 (2005), and *Miller-El v. Dretke,* 125 S. Ct. 2317 (2005), failed to appreciate the import of"); *Blackmon v. Scott,* 22 F.3d 560, 566-67 & n.27 (5th Cir. 1994) (because "[n]o state court findings were made

with respect to [one] aspect of petitioner's claim… [r]emand is necessary for an evidentiary hearing."). *See further* Part One, V.

## VII. INTENTIONAL RACIAL DISCRIMINATION IN THE SELECTION OF GRAND JURY FOREPERSONS VIOLATES THE EQUAL PROTECTION CLAUSE, REQUIRING REVERSAL OF PETITIONER'S CONVICTION AND DEATH SENTENCE.

The State of Louisiana intentionally discriminated against African-Americans in the selection of grand jury forepersons in St. Tammany Parish. Mr. Hoffman's indictment by a grand jury was infected with racial bias, in violation of his right to equal protection under the Sixth Amendment to the United States Constitution. Petitioner raised this issue pretrial in a motion to quash the indictment. The trial court denied the motion to quash without an evidentiary hearing. Because Mr. Hoffman established a prima facie case of discrimination in the selection of grand jury forepersons, he is entitled to a hearing at which time he will demonstrate, through documentary and testimonial evidence, that his grand jury proceedings were predicated on racially discriminatory practices. His conviction and death sentence must be reversed and a new trial ordered.

### A. Procedural Posture

On January 8, 1997 a St. Tammany Parish grand jury returned a true bill for first-degree murder in the case of Petitioner, an African-American, for the homicide of Ms. Elliot, a white woman. R. 98. On June 3, 1997, Petitioner filed a "Motion to Quash the Indictment on Account of Discrimination in the Selection of Grand Jury Forepersons," citing *Rose v. Mitchell*, 443 U.S. 545 (1979); *Guice v. Fortenberry*, 722 F.2d 276 (5th Cir. 1984) (en banc); and *Vasquez v. Hillery*, 474 U.S. 254 (1986). R. 356. Petitioner specifically complained that the Louisiana's grand jury foreperson selection process was a "system open to abuse," citing *Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991). R. 356. The trial court slated this claim for an evidentiary

233

hearing on June 20, 1997. R. 1467; R. 1475. The hearing never occurred. On January 15, 1998, the trial court "disposed of" the motions filed by Attorney Donald Pinkston, including the Motion to Quash the Indictment, "as being moot or dismissed." R. 1566. The Court provided no oral or written reasons for this judgment.

In state post-conviction proceedings, Petitioner again alleged that his indictment was the product of a grand jury infected by a racially discriminatory process for the selection of forepersons, and requested an evidentiary hearing. Supplemental Petition at 3-11. The state court refused to grant Petitioner an evidentiary hearing and denied the claim on its merits. State Court Order, 5/1/07, at 1.

### B. Equal Protection and the Racially Discriminatory Process of Selecting Grand Jury Forepersons in St. Tammany Parish.

Since the Supreme Court's decision in *Rose v. Mitchell* in 1979, courts have held that racial discrimination in the selection of grand jury forepersons violates the Equal Protection Clause, mandating the reversal of a criminal conviction and sentence. *Rose v. Mitchell*, 443 U.S. 545 (1979); *Guice v. Fortenberry*, 722 F.2d 276 (5th Cir. 1984); *Johnson v. Puckett*, 929 F.2d 1067 (5th Cir. 1991); *Rideau v. Whitley*, 237 F.3d 472 (5th Cir. 2000).

A line of cases, some more than a century old, holds that the Equal Protection Clause of the United States Constitution is violated when the process of selecting a grand jury panel or foreperson is infected with race discrimination. *See Castaneda v. Partida,* 430 U.S. 482 (1977); *Alexander v. Louisiana,* 405 U.S. 625 (1972); *Arnold v. North Carolina,* 376 U.S. 773 (1964); *Eubanks v. Louisiana,* 356 U.S. 584 (1958); *Reece v. Georgia,* 350 U.S. 85 (1955); *Cassell v. Texas,* 339 U.S. 282 629 (1950); *Hill v. Texas,* 316 U.S. 400 (1942); *Smith v. Texas,* 311 U.S. 128 (1940); *Pierre v. Louisiana,* 306 U.S. 354 (1939); *Rogers v. Alabama,* 192 U.S. 226 (1904); *Carter v. Texas,* 177 U.S. 442 (1900); *Bush v. Kentucky,* 107 U.S. 110 (1883); *Neal v. Delaware,*

103 U.S. 370 (1881); and *Strauder v. West Virginia,* 100 U.S. 303 (1880). The Supreme Court stated in *Rose*: "where sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, this Court uniformly has required that the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed." 443 U.S. at 551; *see Guice v. Fortenberry,* 661 F.2d 496, 499 (5th Cir. 1981).

The Supreme Court did more than just reaffirm the Constitutional prohibition of discriminatory grand jury selection procedures in *Rose v. Mitchell*. The mandates of *Rose* expanded the scope of Equal Protection to include claims of race discrimination in the selection of grand jury forepersons. *Id.* Since *Rose,* the case law is clear that constitutional injury occurs whether the discriminatory exclusion affects the selection of the individual grand jurors to the panel, or the selection of the foreperson from among the grand jurors on the panel. *Ramseur v Beyer,* 983 F.2d 1215, 1238 (3d Cir. 1993) (citing *Johnson v. Puckett,* 929 F.2d at 1071). This position was recently re-affirmed by the Supreme Court in *Campbell v. Louisiana,* 523 U.S. 392 (1998):

> In Louisiana, . . . the judge selects the foreperson from the grand jury venire before the remaining members of the grand jury have been chosen by lot . . . (Ohio, Oklahoma, Tennessee, and Virginia use procedures similar to Louisiana's). In addition to his other duties, the foreperson of the Louisiana grand jury has the same full voting powers as other grand jury members. As a result, when the Louisiana judge selected the foreperson, he also selected one member of the grand jury outside of the drawing system used to compose the balance of that body. These considerations require us to treat the case as one alleging discriminatory selection of grand jurors.

*Id.* at 396-97.

To establish a *prima facie* case of discrimination for equal protection purposes, Petitioner must demonstrate: (1) that the group against whom discrimination is asserted is a distinct class, singled out for disparate treatment; (2) a significant degree of under-representation by comparing

the proportion of the group in the total population to the proportion called to serve as a foremen over a significant period of time; and (3) that the selection procedure is susceptible to abuse or is not racially neutral. *Rose*, 443 U.S. at 565.

### 1. Discrimination against a Distinct Class.

Louisiana and federal courts have long recognized that African-Americans are a distinct class capable of being singled out for disparate treatment under the law. *Rose*, 443 U.S. at 565; *Johnson*, 929 F.2d at 1072.

### 2. A Pattern of Under-representation.

Petitioner has also met the actual under-representation requirement.[98] Petitioner currently has racial data of the 51 former St. Tammany forepersons spanning the period between 1971 up to and including the foreperson of Jessie Hoffman's grand jury in 1997. Supplemental Petition, Ex. 101. Judge Stephen Druczer appointed Ceola D. Angeletti the first African-American Grand Jury foreperson in St. Tammany Parish's modern history in 1988. John Fahey, "Black Woman Jury Foreman First for Parish," *Times-Picayune*, METRO, pg1, (Dec. 8, 1988). Supplemental Petition, Ex. 104. Public records confirm that only 1 of the 51 forepersons was African-American, while the other 50 forepersons were white during this 26 year period in a population that consisted of over 11% African-Americans, according to the 1990 Census. Supplemental Petition, Ex. 101. In order to establish a *prima facie* case, courts have turned to the statistical formulas of absolute and comparative disparity as a means of guidance.

The most often used measure to determine "significant under-representation" is the absolute disparity method. To calculate absolute disparity, one subtracts the percentage of black grand jury forepersons from the percentage of the population/registered voters/qualified grand

---

[98] The discussion of grand jury foreperson under-representation is measured in the same fashion as other under-representation claims, such as under-representation in grand jurors. *Rose v. Mitchell*, 443 U.S. 545 (1979).

jurors.[99]   Although there are no precise methods for determining what constitutes significant under-representation, *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), courts have held that absolute disparities between the composition of the jury or grand jury representatives and the parish population of over ten percent are sufficiently significant to show a prima facie case of unconstitutional under-representation.   Here, the absolute disparity of 6.75% barely fails to surpass the 10 percent threshold set in *Alexander v. Louisiana*.[100]   Supplemental Petition, Ex. 101.

However, when a "less-than-10% minority" is at issue, the Fifth Circuit has indicated that they do not believe "that the absolute disparity method is the sole means of establishing" significant under-representation.   *U.S. v. Butler*, 615 F.2d 685, 686 (5th Cir. 1980); *accord Mosely v. Dretke,* 370 F.3d 467 (5th Cir. 2004), *cert. denied* 543 U.S. 1154 (2005) ("if the distinctive group at issue makes up less than 10% of the population, comparative disparity may be used"). When small percentages of minorities are involved, the absolute disparity numbers can be misleading and the outcome distorted.   For example, even if nary an African-American was appointed grand jury foreperson in 100 grand juries in St. Tammany, the result would nonetheless fail to meet the absolute disparity threshold.   This, despite the fact a truly random

---

[99] There is frequent debate in Louisiana when determining the proper percentage of "qualified" grand jurors to be used to measure absolute disparity. *See State v. Langley*, 813 So.2d 356 (La. 2002). The options for this calculation include: 1) The Percentage of blacks in the population (Census data); 2) The percentage of blacks in the grand jury pool (in this case as measured by voter registration); 3) The percentage of those qualified to serve as grand jurors (those in the grand jury pool minus those who would not be qualified if called to serve).  This third measure can be demonstrated by examining the demographics of grand jurors over a number of years, since a "group of grand jurors who actually served is, by virtue of La. Code Crim. Proc. Art 413(B), a randomly-selected sample or subset of the total grand jury venire." *Id.* at 369-370.  The Louisiana Supreme Court in *State v. Langley* discussed but did not decide which measure is most appropriate, however it did say that when the percentages are "all statistically nearly identical," that the State cannot complain. *Id.* at 370.  In this case the numbers are as follows: Population percentage of 1990 Census 11.01%; Register of Voters Percentage from 1990 8.76%; Grand Jurors Percentage 8.71%. Supplemental Petition, Ex. 101.  Petitioner will employ the narrowest and most accepted percentage: the percentage of those qualified to serve as grand jurors 8.71%.

[100] The absolute disparity numbers are the difference between the 8.71% (percentage of African-Americans in a sample group of over 500 grand jurors who served from 1971-1996) - and the 1.96% (percent of African-Americans selected as grand jury forepersons.)

selection process would predict nearly 9 (8.7) black grand jury forepersons out of a 100 grand juries.   If courts strictly adhered to the absolute disparity approach to measure under-representation claims, then they would be authorizing the total exclusion of African-Americans from grand jury foreperson duty in communities where African-Americans represent less than 10% of the qualified grand jurors.

This would have the constitutionally unacceptable result of sanctioning race discrimination in geographic areas where a history of racism has resulted in a lower than average percentage of minorities.   St. Tammany Parish is such a place.[101]   Such an approach, and the outcome that would follow, would be hard to defend considering the amount of attention this issue has received from the Supreme Court in the past quarter century.   *See generally, Rose v. Mitchell*, 443 U.S. 545 (1979); *Campbell v. Louisiana*, 523 U.S. 392 (1998).   Fortunately, the 5th Circuit in Judge Gewin's lengthy Appendix to *Foster v. Sparks*, 506 F.2d 805 (1975) entitled "An Analysis of Jury Selection Decisions," predicted such a situation and provided a guideline for this Court:

> [A]n intractable use of the absolute measure may, in certain circumstances also produce distorted results.   For example, if a district with 10% non-white population has .5% non-whites in the wheel, the 9.5% disparity may not evoke disapproval under an absolute measure but may require it under a comparative measure.   Hence, flexible use of the two measures is advisable, with the selection of either to be guided by both a desire to avoid distorted results and a need to adequately protect the interests of those challenging the selection system.

---

[101] According to the 2000 Census, the state of Louisiana had 32.5% black population, whereas St. Tammany blacks comprised only 9.9% of the county's population.   The vast difference in percentages is often said to occur because of "white flight."   *See*, Derrick Nunnally, "BR Now Majority Black Change May Affect Power in Local Politics," *The Advocate*, NEWS, pg. 1 (March 18, 2001) ("State demographer Karen Paterson said white flight to suburbs is indicative of a statewide trend that has been going on near metropolitan areas for decades.   White New Orleanians' movement to St. Tammany and other previously rural parishes is one example."); Chris Adams, "Our Separate Ways: Integration in Name Only," *Times-Picayune*, NEWS, pg. 1 (Nov. 14, 1993)(discussing school desegregation in New Orleans and the white flight that resulted); Bill McMahon, "Johnston Says Duke's Showing Won't Change His Views," *The Advocate*, NEWS, pg. 4 (Oct. 8, 1990)(David Duke, a former Klansman, "three metropolitan areas [in his race for Senator] – Ouachita (Monroe), Jefferson (Duke's home parish), and suburban St. Tammany, an area of white flight from urban New Orleans.")

*Id.*; *see also Smith v. Berghuis*, 543 F.3d 326, 338 (6th Cir. 2008) ("[w]here the distinctive group alleged to have been under-represented is small, as is the case here, the comparative disparity test is the more appropriate measure of under-representation").

The comparative disparity figure "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called" for grand jury foreperson duty, in contrast to what their presence in the community should be. *Ramseur*, 983 F.2d at 1231-32. Some courts relying upon Judge Gewin's Appendix have suggested that a comparative disparity of 20% or larger should be the "demarcation of substantial underrepresentation." *Waller v. Butkovich*, 593 F.Supp. 942, 957 (M.D. N.C. 1984); *U.S. v. Facchiano*, 500 F.Supp. 896, 903 (S.D. Fl. 1980) (referring to the 20% comparative disparity measure a helpful guideline). While other courts, including one Louisiana Court of Appeals, consider a comparative disparity of 40% as 'borderline' to determine a prima facie case of significant underrepresentation. *State v. Kennedy*, 823 So.2d 411 (La.App. 5 Cir. 2002) citing *Ramseur v. Beyer*, 983 F.2d 1215 (3rd Cir. 1992). In this case, the comparative disparity is measured at 77.5%, even larger than the almost 70% in *State v. Langley*, 813 So.2d 356 (La. 2002) where the indictment was quashed by the Louisiana Supreme Court and the conviction reversed.[102] In other words, blacks were 77.5% less likely to be called as a grand jury foreperson than if the process were truly random in St. Tammany during the period of 1971-1997.

Recently, one Louisiana appellate court stated it should "examine and consider the results of both [absolute and comparative disparity methods] in order to obtain the most accurate picture possible," "[b]ecause we think that figures from both methods inform the degree of under

---

[102] This number 77.5% posits how many African-Americans would be grand jury forepersons if there were full representation (4.44 or 8.7%), and then calculates the percentage decrease from this figure [(4.44-1)/4.44]x100% or [(8.71%-1.96%)/8.71]x100% due to the under-representation (percentage decrease 77.5% difference).

representation." *Kennedy*, 823 So.2d at 418. Although each measure separately can help determine whether significant under-representation exists, both methods also "suffer from...acknowledged flaws" that can distort an analysis. *U.S. v. Royal*, 174 F.3d 1, 7 fn.3, (1st Cir. 1998) citing *Foster v. Sparks*, 506 F.2d 805 (5th Cir. 1975); *also see generally* Detre, Peter A., "A Proposal for Measuring Under-representation in the Composition of the Jury Wheel," 103 Yale L.J. 1913 (1994). The absolute disparity measure "ignore[s] the size of the underrepresented group in the greater population... [which] can lead to apparently unfair results." *Id.* at 1921. In this case, it is clear that if this Court employs the absolute disparity test to decide whether "significant under-representation" in the selection of grand jury forepersons occurred, then there can be no case in which such a claim will succeed when the percentage of blacks who served on the grand juries is a small, but significant 8.7 percent. The flaws of absolute disparity are highlighted in Petitioner's case and should not be solely relied upon.

The comparative disparity method can also lead to distorted results because "it can seem to overstate the degree of under-representation in the case of a very small minority." *Id.* at 1921-22. The concern cited by courts and commentators when discussing the value of comparative disparity to measure "under-representation" claims is the situation where there is only one member or a very small number of a minority group in a community:

> For example, in an area that had 500,000 whites and only one black eligible to serve as jurors, a random selection system that failed to place the single black on the master wheel would produce a 100 percent comparative disparity, even though an all-white jury would clearly form a 'fair-cross section' of the community.

*U.S. v. Hafen*, 726 F.2d 21, 23 (1st Cir. 1984); *U.S. v. Shinault*, 147 F.3d 1266, 1273 (10th Cir. 1998); Detre, at 1921. However, Petitioner's case is different from this hypothetical. Unlike other courts that have relied on this logic to deny using comparative disparity measures for under-representation claims, this case has a considerable percentage of qualified black grand

jurors 8.7% and that the absolute disparity measure is large at 6.75%. Compare with *Hafen*, 726 F.2d at 23 (eligible underrepresented jurors 3.73%, absolute disparity 2.02%, and comparative disparity of 54.2%); *Shinault*, 147 F.3d at 1273 (eligible black jurors 5.11%, absolute disparity 2.56%, and comparative disparity 50%; eligible Asian jurors 1.27%, absolute disparity .76%, and comparative disparity 60%; eligible Hispanic jurors 2.92%, absolute disparity 1.42%, and comparative disparity 48.63%). After examining and considering the results of both tests and obtaining "the most accurate picture possible," the concern expressed by other courts with the comparative disparity test is unfounded here. *Kennedy*, 823 So.2d at 418.

Simply put, one would have expected over four (4.44) African-Americans to be selected grand jury foreperson out of a universe of fifty-one forepersons. Instead, St. Tammany judges chose only one from 1971 up through Mr. Hoffman's indictment in 1997, and this choice was considered worthy of a place on the front page of the St. Tammany Metro section of the *Times-Picayune*. Supplemental Petition, Ex. 104. The data leads to the conclusion that African-Americans were systematically and intentionally excluded from service as grand jury forepersons in St. Tammany Parish.

Early in the new century, according to a *Times-Picayune* article, the St. Tammany District Attorney's Office, "[i]n a pre-emptive move to fend off legal attacks…resubmitted two old murder cases to a St. Tammany Parish grand jury…for reindictment." Stephanie A. Stanley, "Grand Jurors Reindict Murder Cases: Prosecutors Respond to State Court Ruling," *Times-Picayune*, METRO pg 1, (April 20, 2002). Supplemental Petition, Ex. 105. This act of reindictment included a murder indictment that took place after Petitioner's indictment. *Id.* This act clearly bespeaks a concern for these indictments' constitutionality by an agent other than Petitioner, and should at the very least necessitate an evidentiary hearing regarding this matter.

Even Judge Duczer's selection of Ceola D. Angelotti, the first black St. Tammany Grand Jury foreperson, was predicated on her race: "In this case, you might say, I took affirmative action…I was looking for a black woman." Supplemental Petition, Ex. 104.

### 3.  Opportunity to Discriminate.

Finally, Petitioner must demonstrate that Louisiana's system of grand jury selection was susceptible to abuse and was not racially neutral.  Under Louisiana law in effect at the time of Petitioner's trial, the district court judge selected the grand jury foreperson from the grand jury venire.  La. C.Cr.P. art. 413 (B).  Basing its decision on federal constitutional law, the Louisiana Supreme Court has stated: "Louisiana's procedure for selecting grand jury forepersons was unquestionably subject to abuse according to subjective criteria that may include race and gender."  *See State v. Langley*, 95-1489 (La. 04/03/02); 813 So.2d 356, 371 (citing *State v. Cosey*, 97-2020 (La. 11/28/00); 779 So.2d 675, 682-83, *cert denied*, 533 U.S. 907 (2001)); *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Johnson v. Puckett*, 929 F.2d 1071 (5th Cir. 1991). Louisiana law set forth no criteria for the judge's selection of grand jury forepersons.  As a result, the district court judge was left with his or her own subjective criteria from which to determine the qualifications of grand jury forepersons.  Without the guidance of objective criteria set forth in the law, the process for selection of a grand jury foreperson in Louisiana was inherently susceptible to abuse and discrimination.  *See Guice v. Fortenberry, supra* (noting that the absence of legal standards applicable to the selection process of a grand jury foreperson in Louisiana and the idiosyncratic methods of the district court judges demonstrate susceptibility to abuse).  Recognizing this, the Louisiana Legislature implemented a new law in which grand jury forepersons were selected from the grand jury panel at random, ridding the process of the highly subjective and often discriminatory practice of judge's choice.  La.C.Cr.P. art. 413(B) (2003) (amended by *La. Acts 1999*, No. 984, §1).

**C. Discrimination in the Selection of Grand Jury Forepersons Is a Structural Defect that Requires the Reversal of Hoffman's Conviction and Death Sentence.**

The United States Supreme Court has recognized that "intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the state to prevent." *Vasquez v. Hillary*, 474 U.S. 254, 262 (1986). Because "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, [it] is not amenable to harmless error review." *Vasquez*, 474 U.S. at 264.

**D. Petitioner Requests an Evidentiary Hearing to Prove This Claim**

The state court refused to hold a hearing on Mr. Hoffman's claim of discrimination. The claim, as pled, entitles him to relief. Mr. Hoffman is entitled to a hearing to establish discrimination in the selection of grand jury forepersons in St. Tammany Parish. *Guidry v. Dretke*, 397 F.3d 306, 323 (5th Cir. 2005) ("if a petitioner develops a factual basis for a claim in state court (or sufficiently attempts to do so), subpart (e)(2) does not bar an evidentiary hearing in district court"); *Daley v. Cain*, (5th Cir. 2007) (remanded to district court for hearing on grand jury foreperson claim).

**E. AEDPA Does Not Prevent Granting Habeas Relief**

The state court's denial of this claim was presumably based on an unreasonable application of the clearly established law of *Rose* and *Campbell*. Following an evidentiary hearing at which Mr. Hoffman will prove discrimination, this Court should reverse his conviction and remand his case to state court for a new trial.

VIII. **PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS, TO DUE PROCESS TO A FAIR TRIAL BY AN IMPARTIAL JURY, TO EFFECTIVE COUNSEL AND TO A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WERE VIOLATED WHEN THE TRIAL COURT PREVENTED PETITIONER FROM QUESTIONING PROSPECTIVE JURORS ABOUT THE ISSUE OF RACIAL BIAS, AND BY HIS DEFENSE COUNSEL'S FAILURES ON VOIR DIRE.**

Petitioner's rights to Due Process, to a fair trial by an impartial jury, to the effective assistance of counsel and to a reliable sentencing hearing free from arbitrary factors were violated when the trial court prevented Petitioner from questioning prospective jurors about the issue of racial bias, and by his defense counsel's failure to pursue race based questioning when permitted, as they had strategically plan.

A. **Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to Due Process to a fair trial by an impartial jury and to a reliable sentencing hearing were violated when the trial court prevented Petitioner from questioning prospective jurors about the issues of racial bias**

"A capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on issue of racial bias." *Turner v. Murray*, 476 U.S. 28, 36-37 (1986). Where a defendant is deprived of this right, the only remedy is reversal of the death sentence. *Id.*

Petitioner, an African-American man, was accused of the rape-murder of a white woman. The trial court violated Petitioner's rights under *Turner* when it sustained the State's objection to defense counsel's attempts to question prospective jurors on issues of race. Addressing the fourth panel of prospective jurors, defense counsel began:

> "We are all frightened to death of crime, I would suppose. All of us are prejudiced against crime, are we not? We are in a courtroom where we have got a young black man on trial for his life, for killing a young, attractive, white female. So, if there are any prejudices that we might have — it's a very good chance that this will be an all white jury.

R. 2886.  At this point the State objected to the questioning and the court sustained the objection. R. 2886.  By so doing, the trial court impermissibly interfered with Petitioner's constitutional rights under the Sixth, Eighth and Fourteenth Amendments to question jurors concerning their racial prejudices.  Petitioner's death sentence must be reversed.  *Turner,* 476 U.S. 28.

**B. Petitioner's rights under the Sixth and Fourteenth Amendments to the effective assistance of trial counsel were violated when his counsel failed to voir-dire prospective jurors about racial prejudices in circumstances where the risk of racism was obvious and significant, and despite their considered view that it was necessary in this case**

Petitioner was deprived his Sixth and Fourteenth Amendment rights to the effective assistance of counsel during voir dire, when trial counsel failed to conduct adequate questioning of all prospective jurors about their racial prejudices.  The circumstances of Petitioner's case raised particularly strong concerns that race would be a factor in jury deliberations.  Not only did he face a capital charge involving inter-racial violence, (which alone created a risk of racial animus in a jury that constitutionally entitled him to voir dire on the issue of race under *Turner*), but several other factors enhanced this risk.  First the crime was one of *sexual* violence (historically raising racist passion more than any other type of crime).  Secondly, St. Tammany had a long history of racism.  It was a parish home to "white-flight" from New Orleans, many of whom had voted in recent years for a former Ku Klux Klan leader to be Louisiana governor, and had a far lower than average percentage of African American and minority inhabitants.  *See* claim X.  Fourth, pre-trial publicity portrayed the crime in a racially prejudiced way, highlighting and perpetuating racist animosity in the community concerning the crime. *See* claim XIII.  Fifth, the State defined its prosecution of the case from its initial pre-trial press releases, through to the trial itself, appealing to racially charged concept of St. Tammany citizens seeking retribution against an outsider from New Orleans.   *See* claim X.

Petitioner's trial counsel was unquestionably aware of the potential for racial animus on the part of jurors against their client. They filed a motion for change of venue based specifically about their concerns that the inter-racial nature of the offense and the racial make-up of the parish created an impermissible risk that there would be an all white jury and that racism would infect deliberations. R. 653.   During voir-dire they objected numerous times to the lack of African-Americans on the venire, raised *Batson* challenges and again objected that all white jury could not be fair in this case. R. 1582-84, R. 2207-9, R. 2217-21, R. 2907-10.[103]

However, they neglected one of the most crucial steps they could have taken to ensure that people with racial prejudices would not be on the jury: questioning potential jurors about their views of race.  While trial counsel did make some efforts to voir-dire on race, those efforts were inconsistent and inadequate.  Six panels of prospective jurors were questioned during voir-dire both as a group and individually.  Of those six panels defense counsel attempted group questioning on race on only one panel, and even then indirectly.  Defense counsel asked the first panel if the jurors would want a jury of half their own race. R. 1805.  Defense counsel also addressed the same question individually to fifteen out of the eighteen jurors on that panel.

Trial counsel attempted to question the fourth panel of jurors about their racial biases, but as noted above, the trial court stopped them, in violation of *Turner*.  R. 2886.

Defense counsel also asked questions about race to four jurors during individual voir-dire.  Three were questioned on race after their answers to non-race based questions raised concerns about racial prejudice.[104]  Ms. Rivers was the only prospective juror outside the first

---

[103] Petitioner's earlier trial counsel had also filed a pre-trial motion, requesting individual voir dire be permitted on race, because of the racial sensitivities of the case. R. 449, though that same prior counsel waived the motion three weeks later. R. 36.

[104] First, when asked about any relatives who were crime victims Bobbie Margiotta mentioned her mother had been the victim of a rape by a *black* man.  Defense counsel then asked whether the fact in this case that the defendant was

panel that defense counsel questioned spontaneously about race during individual voir-dire; defense counsel asked if it would matter to her that the defendant was black and the victim white; she answered "no." R. 3135.

In total, defense counsel asked only nineteen of the 108 jurors examined during voir-dire about their racial attitudes. Most devastatingly for Petitioner, they failed to ask Mari Lower, about her racial biases, which resulted in a person with race-based animus being seated as an actual juror. See claim IX.

Petitioner's trial counsel have confirmed in post-conviction that they believed it was important to question prospective jurors on race in this case and that they had made a strategic decision to do so. Their failure to put that planned strategy into practice, was not strategic or tactical:

> We asked some questions about race during jury selection, as we thought it was important to attempt to discern racial attitudes on the part of potential jurors. If there were jurors we failed to ask about race, it was not as a result of a strategic or tactical decision.

Declaration of William Alford, LASC Writ, Ex. 6-9, Ex. 1.

> We knew that race would be a big factor in this case: it was a white victim, the defendant was African-American, and the venue the State chose was St. Tammany Parish.

> We did ask some questions about race during jury selection, as we thought it was important to attempt to discern racial attitudes on the part of potential jurors. If

---

black and the victim was white would make any difference to her consideration of the death penalty. She, with candor, answered that she was not sure. R. 3182-3. She was later challenged her for cause because of her "unfair mind." R. 3274-5. Likewise, Mr. Manning volunteered the race of the two *black* men that robbed his mother several years ago. Defense counsel followed up by asking whether that meant he harbored ill-will to black people in general, to which he answered, "no." R. 3166-67. Finally, when questioning Mr. Schenk about his employment, Defense counsel recognized the name of the company and recollected that the company had connections to the Ku Klux Klan (the previous owner, brother to the current owner, had been a member). Defense counsel therefore asked if Mr. Schenk would hold it against the defendant because he was black; Mr. Schenk said "no." R. 1985.

there were jurors we failed to ask about race, it was not as a result of a strategic or
tactical decision.

Declaration of Kevin McNary, LASC Writ, Ex. 6-9, Ex. 1. Their failure to do so in this racially

charged case fell below the standard of minimal competence and was not the result of a strategic

decision. *Strickland,* 466 U.S. at 688, ("the performance inquiry must be whether counsel's

assistance was reasonable considering all the circumstances"). It prejudiced Petitioner. There is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different. *Strickland v. Washington,* 466 U.S. 668, 694 (1984). In *Turner* itself

the U.S. Supreme Court recognized that:

> It remains an unfortunate fact in our society that violent crimes perpetrated
> against members of other racial or ethnic groups often raise [a reasonable
> probability that racial prejudice would influence the jury]…

*Turner,* 476 U.S. at at 36 n.7. In Petitioner's case there were so many additional factors

increasing the risk that racism would taint the jury that is clearly one of the "often" occurring

instances where there was "a reasonable probability that racial prejudice would influence the

jury." *Id.* On this basis alone *Strickland* prejudice is shown. Moreover, of the nineteen jurors

who were directly questioned about race, one revealed actual racial bias, which founded a strike

for cause. Bobbie Martiotta, R. 3176, 3183. This suggests both that Mr. Hoffman's jury pool

did harbor racists, and that questioning about their prejudices would have ensured their

removal.[105] If 1/19 of the rest of the venire were racist, defense counsel missed the racism of

four venire members, any of which could have sat on Petitioner's jury.

---

[105] La.C.Cr.P. art. 797 provides: "The state or the defendant may challenge a juror for cause on the ground
that: …(2) The juror is not impartial, whatever the cause of his partiality." There is no reason to believe
Ms. Lower would be less candid when under oath in Court, than during post-conviction interviews with
defense counsel. Moreover, in assessing prejudice under, the court should presume "that the judge or jury
acted according to law." *Strickland v. Washington,* 466 U.S. 668, 694 (1984) and should therefore assume
Mari Lower would not have perjured herself during voir dire.

Finally, defense counsel's failure to question Mari Lower, who sat on the jury, resulted in obvious prejudice to Petitioner.  As her Declaration reveals, she harbored racial animus against Petitioner to such a degree that she mistrusted his defense (thought defense counsel "played the race card" so he could "use it to get off later" "like O.J. Simpson"), made race-based stereo-typed assumptions about him (that he was in a gang, took drugs, and involved in criminal activities), and worst of all presumed him guilty/death worthy, from the start of the trial, simply from looking at the color of his skin. *See* claim IX. Had defense counsel questioned Mari Lower and exposed her prejudices, she Ms. Lower could have been struck for cause and would have not sat on the jury.  Because defense counsel failed to ask *any* questions to Ms. Lower about her racist prejudices against Petitioner, she was seated on his jury and injected them into deliberations by engaging in racist discussions with other jurors, and relied on them in evaluating the evidence presented at trial and deciding Petitioner's fate.

This is a prejudice of the most egregious kind.  Just one racially biased juror is structural error resulting from violations of rights to an impartial jury, equal protection, and a reliable sentencing hearing free from arbitrary and capricious influences of prejudice, requiring *automatic reversal. Vasquez v. Hillery,* 474 U.S. 254, 263 (1986); *Tumey v. Ohio,* 273 U.S. 510, 535 (1927); *McCleskey v. Kemp,* 481 U.S. 279 (1987); *Turner* 476 U.S. at 36 (1986).  A unanimous verdict is required for a death sentence in Louisiana. La.C.Cr.P. art. 782.  But for counsel's failure to weed out Ms. Lower's racism, (and any that of any other juror), there is a reasonable probability that the verdict would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  *State v. Carter* 641 N.W.2d 517, 521 (Wis. Ct. App. 2002) (counsel ineffective in sexual assault case for failing to adequately voir dire on personal bias; prejudice

found because "[a] guilty verdict without twelve impartial jurors renders the outcome unreliable and fundamentally unfair").[106]

### C.   Applicability of § 2254(d)

The state district court gave no reasons for denying the merits of these claims.  State Court Order, 1/5/07.  It is therefore impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor,* 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court.  *See* Part One IV(A)(3).  If § 2254(d) is to be applied, the court should conduct an independent review of the facts to determine the facts the court was silent upon.  *Id.*

The complete lack of any reasoning provided by the court in itself raises significant concern as to the reasonableness of the decision under § 2254(d). *See* Part One IV(A)(4)(b)-(c). In addition, the court's failure to hold an evidentiary hearing, to properly develop the facts, also undermines the reasonableness of the court's decision.  *Id.*

In any event the evidence and law supporting the claims is so overwhelmingly strong that that whatever the basis for the court's findings, its decision constitutes an unreasonable application of the law under § 2254(d)(1) an unreasonable determination of the facts under § 2254 (d)(2), and was based on factual findings that are contradicted by clear and convincing evidence under § 2254(e)(1).

### D.  The direct appeal decision on the claim of ineffective assistance of trial counsel is also unreasonable

On direct appeal to the Louisiana Supreme Court appeal counsel raised the claim that trial counsel had provided ineffective assistance by failing to adequately voir-dire potential jurors on

---

[106] Had defense counsel failed to strike Mari Lower for cause in this situation, that would also have constituted ineffective assistance of counsel. *Johnson v. Armontrout,* 961 F.2d 748 (8th Cir. 1992) (failure to strike *actually* biased juror when actual bias is apparent from voir dire meets *Strickland* standard of prejudice); *Hughes v. United States,* 258 F.3d 453 (6th Cir. 2001) (same, because presence of a biased juror is structural error).

race.  The court denied relief on the basis that Petitioner had not met the performance prong of

*Strickland*:

> counsel's decision to forego interjecting the issue of race explicitly into trial
> represents a reasonable tactical choice protected by Strickland's presumption of
> defense counsel's competence.

*Hoffman,* 768 So.2d, 578.  This decision was unreasonable too.  The court relied solely on the

legal presumption of competence in making its finding.  It therefore assumed that the decision

was reasonable and strategic without taking into account the wider circumstances evident from

the record, and defense counsel's contemporaneous vantage point, as the law requires.

*Strickland,* 466 U.S. at 688 ("the performance inquiry must be whether counsel's assistance was

reasonable *considering all the circumstances*") (emphasis added).  *Wiggins v. Smith,* 539 U.S.

510, 523 (2003) ("In assessing counsel's investigation, we must conduct an objective review of

their performance... which includes a context-dependent consideration of the challenged conduct

as seen "from counsel's perspective at the time) (citing *Strickland,* 466 U.S. at at 688- 689).

Thus, the court apparently did not consider the racially inflammatory context of the case, nor

defense counsel's repeatedly expressed concern about racism on the jury, nor the inexplicably

inconsistent way in which counsel attempted to question some, but not all prospective jurors

about race.  As such the decision was both "contrary to" and "an unreasonable application of"

clearly established United States Supreme Court law and an unreasonable determination of the

facts. § 2254(d)(1)-(2).  *And see Marcrum v. Luebbers,* 509 F.3d 489, (8th Cir. Mo. 2007):

> The Supreme Court has held in several cases that the habeas court's commission is
> not to invent strategic reasons or accept any strategy counsel could have followed,
> without regard to what actually happened; when a petitioner shows that counsel's
> actions actually resulted from inattention or neglect, rather than reasoned
> judgment, the petitioner has rebutted the presumption of strategy.

*Id.,* 502-503 (*citing Rompilla v. Beard,* 545 U.S. 374, 395-96 (2005) (O'Connor, J., concurring);

*Wiggins v. Smith,* 539 U.S. 510, 526-27, (2003)); *Wiggins,* 539 U.S. at 526-27 (state court's

decision unreasonable because "the "strategic decision" the state court… invoke[d] to justify counsel's limited pursuit of mitigating evidence resembles more a *post-hoc* rationalization of counsel's conduct than an accurate description of their deliberations.")

The post-conviction statements of defense counsel show that their failure to question all jurors on race was *not* strategic. This further demonstrates the unreasonableness of the appeal court's decision under § 2254(d)(1)-(2), and rebuts the court's finding of "strategy" by clear and convincing evidence. §2254(e).

This highlights Petitioner's next point: the court's decision was also unreasonable because the court failed to hold a hearing to ascertain the relevant facts.  Had it done so, the court's false assumption about defense counsel's "strategy," would have been abundantly clear. Petitioner is entitled to *de novo* review of this question.  *Wiggins,* 539 U.S. at 526-34 (state court's decision that counsel performed competently was unreasonable under §2254(d) because the court "partially relied on an erroneous factual assumption" that defense had made a "strategic" decision to focus exclusively on residual doubt at penalty phase rather than client's troubled childhood, when record demonstrated defense counsel did intend to present evidence of the client's background; therefore counsels failings were "the result of inattention, not reasoned strategic judgment").

Petitioner is also entitled to *de novo* review of the prejudice prong, because the appellate court did not reach that question at all. *Rompilla v. Beard,* 545 U.S. 374, 390 (2003) (noting that "because the state courts found the representation adequate, they never reached the issue of prejudice . . . we examine this element of the *Strickland* claim *de novo.*"); *Wiggins v. Smith,* 539 U.S. 510 (2003) (reviewing prejudice prong of *Strickland* claim *de novo,* where state court had denied claim based on performance prong alone).

### E. Requirement for an Evidentiary Hearing

If this court finds that the facts are insufficiently developed to warrant relief, or that there are unresolved factual disputes, Petitioner is entitled to an evidentiary hearing on these claims. *See* Part One, V.

**IX.   PETITIONER WAS DEPRIVED OF HIS FUNDAMENTAL RIGHTS TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT, TO DUE PROCESS AND A FAIR HEARING BY AN IMPARTIAL JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS, AND TO A RELIABLE SENTENCING UNDER THE EIGHTH AMENDMENT WHEN THE JURY'S DECISION TO CONVICT AND SENTENCE HIM TO DEATH WAS TAINTED BY RACIAL BIAS, AND AT LEAST ONE MEMBER OF THE JURY, THE ULTIMATE DECISION-MAKER OF HIS CAPITAL CHARGE, HELD RACE-BASED ANIMUS AGAINST HIM.**

Mr. Hoffman is a young African-American man. He was convicted and sentenced to death by an all-white jury for the killing of a white woman. The United States Supreme Court has recognized that there is a "risk of racial prejudice influencing a jury whenever there is a crime involving interracial violence." *Turner v. Murray*, 476 U.S. 28, 36, n.8 (1986). That risk is inherently higher when all jury members are white; in mixed-race juries, the presence of minority-race jury members discourages racist jurors from injecting their biases into the proceedings.[107] These dangers were realized in Petitioner's case.

---

[107] Studies have shown that exclusively white juries are more likely to convict and impose death sentences on black defendants, than mixed-race juries. E.g. DC Baldus, G Woodworth, D Zuckerman, NA Weiner & B Broffitt, *The use of peremptory challenges in capital murder trials: a legal and empirical analysis*, Uni.Penn. J.Const.Law, 3, 2001, 3 (Philadelphia study: the "findings indicate that predominantly black juries (ones with five or more blacks) were less likely to impose death sentences than were juries with four or fewer black jurors.") Elsewhere Petitioner argues that African-American citizens were unconstitutionally excluded from his jury as a result of race-based decision-making by the State, at two stages in the proceedings, further violations of his rights to Equal Protection. First, although venue would have been proper in two jurisdictions: Orleans Parish where the percentage of African-Americans was around 67.3%, and St.Tammany where the percentage is 9.82 %. (U.S. Census Bureaus; http:quickfacts.census.gov/); the State decided to prosecute him in St. Tammany in part because of the racial make-up of the respective parishes and the likelihood that a jury selected in St. Tammany would have significantly fewer African-Americans. Secondly, the State intentionally struck African-American jurors from the venire, because of their race.

Mari Lower sat on Mr. Hoffman's all-white jury and decided that he was guilty of first-degree murder, and should be sentenced to death. She has expressed the following recollections of the trial:

> There were no black people on the jury. The defense made sure that there weren't any. From the start of the trial I thought that was deliberate by the defense so they could play the race card and get him off later. I've heard about people getting off on technicalities like that before. The jurors speculated about this during the trial.
>
> We also thought it was defense strategy to use his race and background in other ways. They obviously tried to use it as an excuse to try to make us feel sorry for him being a poor black man from the projects so he did not get the death penalty. Like O.J. Simpson using it to get off. This tactic did not surprise me. I've seen that attitude before with people using their background to justify whatever they can. I believe that people like that should take responsibility for what they do.
>
> During the penalty phase deliberations we wanted to know whether the defendant had a juvenile record. We thought that given his background he may have a history of drug use and things like that. We wondered if he was in a gang.

Declaration of Mari Lower, Supplemental Petition, Ex. 106. Mari Lower's words reveal that she harbored an overt race-based animus against Mr. Hoffman throughout her service as a juror at his capital trial. As will be discussed further below, they also show that: race was irreparably injected into the juror's consciousness when jurors discussed their perception that the defense was playing "the race card" "to get him off" during the trial and again in the penalty phase; and racial prejudice lead jurors to distrust Petitioner's defense, to presume his guilt and/or death-worthiness, to apply negative racist stereotypes, and to consider Petitioner's race during penalty phase deliberations and weigh his race against him when considering mitigating circumstances and deciding that he should die. As a consequence, Petitioner was convicted and sentenced to death in violation of his fundamental constitutional rights to an impartial jury, to equal protection of the law which guarantees a trial free from purposeful race discrimination, and to a reliable capital sentencing hearing free from the influence of arbitrary and prejudicial factors. The presence of a racially-biased juror is a fundamental structural defect and requires automatic

reversal of conviction. *Neder v. United States*, 527 U.S. 1, 8 (1999) (holding that the presence of a biased decision-maker is structural error "subject to automatic reversal"); *Vasquez v. Hillery,* 474 U.S. 254, 263 (1986) ("When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm"); *Virgil v. Dretke*, 446 F.3d 598, 607 (5th Cir. 2006) (seating of biased juror is structural error); *Johnson v. Armontrout* 961 F.2d 748, (8th Cir. 1992) (presence of juror who was actually biased was not subject to harmless error review) *citing: United States v. Crockett,* 514 F.2d 64, 69 (5th Cir.1975) and *Ford v. United States,* 201 F.2d 300, 301 (5th Cir.1953)); *Solis v. Cockrell*, 342 F.3d 392, 400, n. 44 (5th Cir. (2003)). Petitioner's conviction and death sentence should be reversed.

### 1.  The evidence of racial bias against Petitioner

Because the bias of a juror will rarely be admitted by the juror himself, "partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it" the courts recognize that "bias necessarily must be inferred from surrounding facts and circumstances." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 558 (1984) (emphasis added), citing *Smith v. Phillips,* 455 U.S. 209, 221-222, (O'Connor, J., concurring).  Petitioner need not demonstrate an express admission of discriminatory intent; it can be, and is in this case, inferred from the juror's words.

#### a.  Members of Petitioner's jury engaged in racist discussions during the trial

Juror, Mari Lower, has made clear in express terms that she and other members of the jury were race-conscious, and engaged in racist discussions from the early stages of Petitioner's capital trial.  She stated that:

> There were no black people on the jury.  The defense made sure that there weren't any.  From the start of the trial I thought that was deliberate by the defense so they

> could play the race card and get him off later. I've heard about people getting off
> on technicalities like that before. The jurors speculated about this during the trial.

Declaration of Mari Lower, Supplemental Petition, Ex. 106. Jury foreperson Gary McDonald

remembers similar discussions by jurors:

> There were no African-American jurors on the jury. We discussed this and
> thought that the defense would use this on appeal to try to overturn the sentence.
> I've seen cases in the paper where that happened.

Declaration of Gary McDonald (unsigned), Exhibit A to Affidavit of Caroline Wallace,

Supplemental Petition Ex. 109.[108] Ms. Lower's words demonstrate a race-based interpretation of

the trial, and show actual racial bias against the African-American Petitioner. First, her stated

belief that the defense acted deliberately to ensure the jury was all white so as to "play the race

card and get him off later," expresses a race-based distrust of Petitioner's defense. The African-

American venire members were not removed by the defense but rather the State. Yet, Ms.

Lower and other jurors misperceived this as a disingenuous move by *defense* counsel so they

could "get him off later." Distrust for Petitioner's defense because he is black bespeaks a racism

inherently prejudicial to Petitioner at his capital trial. It calls into question each and every

credibility judgment made by the jury at both guilt and penalty phase.[109]

---

[108] Caroline Wallace (now undersigned counsel, Caroline Tillman) was, at the time of the state post-conviction proceedings, a paralegal for Petitioner's state post-conviction counsel. She conducted several jury interviews, including of Mr. McDonald. At the end of the interview he agreed with her that she would return to his house with a typed declaration reflecting the matters discussed during the interview, for him to review and sign. When she returned at the arranged time, he indicated he did not have time to review it, but took it and stated he would return it by mail. He did not mail back the Declaration. Affidavit of Caroline Wallace. Ex. 109.
[109] The jury's decision in the guilt phase that Petitioner was guilty of first-degree murder hinged significantly on the jury's credibility determination of Petitioner and his confession. Petitioner's confession contained admissions to every element of the offense of first-degree murder, *except* conduct consistent with specific intent. Thus the jury's finding of specific intent and first-degree murder necessarily required the jury to find that part of Petitioner's confession incredible. Such a crucial credibility judgment by a jury that distrusted Petitioner's defense from the start of trial and assumed or prejudged him as guilty *because* he was black cannot be relied upon. Likewise, in penalty phase, the jury's perceptions of the defendant were distorted; as Ms. Lower herself described, the jury resorted to racist stereotyping (assuming, wrongly, that Petitioner was involved in drugs and gangs) and doubted the unimpeached testimony of *eight* African-American witnesses as to Petitioner's good conduct prior to his arrest. See further below.

Equally disturbing, Ms. Lower's words suggest a race-based presumption of guilt or death worthiness, or even worse, that she had prematurely determined that he was guilty and/or deserving of the death penalty: a defendant would not need to play "the race card" "to get off" on appeal if in fact he was innocent. In her own words, this belief was held "from the start of trial." This is racism at its most invidious in the criminal justice system; it should be confined to the annals of history. In 1883 Frederick Douglass observed that:

> it is not so much the business of his enemies to prove [a Black man] guilty, as it is the business of himself to prove his innocence. The reasonable doubt which is usually interposed to save the life and liberty of a white man charged with crime, seldom has any force or effect when a colored man is accused of crime.

*Symposium on the Black Lawyer in America Today,* Harv. L. Sch. Bull. 6, 57 (Feb.1971) (quoting Frederick Douglass), cited by Joan W. Howarth, *Representing Black Male Innocence,* 1 J. Gender Race & Just. (1997).[110] Premature deliberations and failure to adhere to the presumption of innocence are themselves serious species of juror misconduct, warranting reversal of a conviction. *See* claim XII. As a product of racism, they are anathema to impartiality. As Ms. Lower and Mr. McDonald indicated, these were not privately held thoughts by individual jurors, but a subject of discussions among jurors during the trial; through this the racial prejudice tainted the entire jury before they even began deliberations.

---

[110] As discussed further below, Mari Lower also states that the jury speculated that the defendant took drugs and was in a gang. This was despite the lack of any evidence presented and in the face of unimpeached evidence to the contrary. This occurred during penalty phase deliberations and further demonstrates an assumption of criminality, which supports a tendency to presume guilt and death-worthiness.

257

### b. The jury continued to engage in racist discussions and considered Petitioner's race in penalty phase deliberations when deciding to sentence Petitioner to death

Juror Lower's subsequent comments show that jurors continued to engage in racist discussions through the penalty phase, and considered Petitioner's race when deciding whether Petitioner should live or die:

> We also thought it was defense strategy to use his race and background in other ways. They obviously tried to use it as an excuse to try to make us feel sorry for him being a poor black man from the projects so he did not get the death penalty. Like O.J. Simpson using it to get off. This tactic did not surprise me. I've seen that attitude before with people using their background to justify whatever they can. I believe that people like that should take responsibility for what they do.

> During the penalty phase deliberations we wanted to know whether the defendant had a juvenile record. We thought that given his background he may have a history of drug use and things like that. We wondered if he was in a gang.

Declaration of Mari Lower, Supplemental Petition, Ex. 106. First, her words again reflect a powerful race-based distrust of Petitioner and his defense. At *no point* did defense counsel argue race in mitigation at the penalty phase. Juror Lower (and the other jurors encompassed by "we") once more reinterpreted the conduct of the defense through race conscious eyes, in a way prejudiced against Petitioner.

Secondly, her O.J. Simpson comment is a classic expression of race-based prejudice. It reflects a common response among white Americans in the aftermath of the 1995 O.J. Simpson trial, to a perceived fear of black defendants exploiting their race to avoid their just deserts, and in Mr. Simpson's case, "get away with murder." By definition, this is an exploit which only non-whites could be accused of; the racial dimensions are obvious. The racially-inflammatory and prejudicial nature of such remarks has been recognized by numerous courts[111] and

---

[111] *State v. Snyder,* 1998-1078 (La. 9/06/06 942 So. 2d 484, *rev'd, Snyder v. Louisiana,* 128 S. Ct. 1203, (2008) ("the State injected race into the proceedings directly" when it mentioned the O.J. Simpson case during the penalty phase

commentators.[112] This juror's reference to Petitioner using his race to "like O.J. Simpson to get off," is further demonstration, if indeed any were required, that Petitioner's death sentence and conviction were impermissibly tainted by Juror Lower's negative race-based judgments of him.[113]

Thirdly, Ms. Lower stated that the jury speculated in the penalty phase about the possibility that Petitioner took drugs and was a member of a gang, based not on evidence presented at trial, but solely upon their speculative assumptions about his "background." This speculation was despite lack of *any* evidence that Mr. Hoffman was ever in a gang or took drugs, and in face of overwhelming evidence to the contrary presented at trial, that prior to his arrest Mr. Hoffman was not a trouble-maker, was not violent, did not smoke or drink, or take drugs and had no prior criminal record. R. 4364, 4432, 4487, 4481, 4471. R. 3595-96, 3610-11. It is well

---

and that prosecutions reference to O.J. Simpson getting away with murder was motivated by "a racially discriminatory purpose of inflaming the jury") (J. Kimball, dissenting); *Id,* at 504-505 ("there is much evidence that the majority of white Americans believed O. J. Simpson was guilty of murdering his wife and that he "got away with it," and finding that the prosecution's improper and clearly inflammatory comments about O.J. Simpson created a substantial risk that the death penalty would be imposed, such that the death sentence should be reversed) (Justice Johnson, dissenting); *United States v. Lentz,* 58 Fed. Appx. 961 (4th Cir. 2003) (finding that district court did not abuse its discretion in excluding statements made by defendant to the victim alluding to the O.J. Simpson trial, implying that he would murder her and evade punishment (O.J. statements), finding that the statements were prejudicial, noting evidence that such O.J. statements had become slang to describe getting away with murder and that the O.J. Simpson case excited public emotion and could have excited the emotions of the jury); *United States v. Jones,* 1998 U.S. App. LEXIS 224 (10th Cir. 1998) (finding that a prosecutor's reference to the O.J. Simpson case in closing argument was a "gratuitous and inappropriate attempt to impugn the credibility of Mr. Jones' counsel and challenge the legitimacy of his defense," though finding comments harmless because the jury was instructed that counsel's arguments were not evidence);

[112] *See, e.g.,* Leonard M. Baynes *A Time To Kill, The O.J. Simpson Trials, And Storytelling To Juries* 17 Loy. L.A. Ent. L.J. 549, 560 (1997); Paul Gewirtz *Victims And Voyeurs At The Criminal Trial* 90 Nw. U. L. Rev. 863, 890; Cathleen Decker, *The Times Poll: Most in County Disagree with Simpson Verdicts,* L.A. Times, Oct. 8, 1995 reporting poll showing that when asked about defense lawyer Johnnie L. Cochran, Jr.'s appeal to the jury in his closing argument to send a message about racism with their verdict, 69% of whites thought that race was used inappropriately while 64% of blacks and 47% of Latinos thought race appropriate; cited by Deborah Hellman, in *The Expressive Dimension Of Equal Protection* 85 Minn. L. Rev. 1 (2000).

[113] Ms. Lower also uses more subtle, but no less pernicious elements of the language of racism. She distinguishes "people like that," who try to use their race and background to "get off," as those more deserving of punishment, presumably than people who are *not*: "like that." "People like that" means "black people."

known that racism breeds assumptions about criminality in general,[114] drug activity,[115] and in more extreme cases, gang affiliation.[116] As the Sixth Circuit has noted:

> The obvious difficulty with prejudice in a judicial context is that it prevents the impartial decision-making that both the Sixth Amendment and fundamental fair play require. A racially or religiously biased individual harbors certain negative stereotypes which, despite his protestation to the contrary, may well prevent him or her from making decisions based solely on the facts and law that our jury system requires.

*United States v. Heller*, 785 F. 2d 1524, 1528 (11th Cir. 1986). The juror's unwarranted speculation about Petitioner's criminality is further proof that racism prejudiced the jury's assessment of Petitioner's worthiness to live. *Jimenez v. Heyliger*, 792 F.Supp. 910 (D. Puerto Rico 1992) (considering alternate juror's comments that the defendant was Dominican, and seemed to be "a buscona" (translated as "plain money searcher, money seeker, street walker, hustler, or prostitute"), court held that "since there was no evidence introduced or anything in the trial record that could lead an objective juror to draw such conclusions regarding the plaintiff, her remarks clearly demonstrate Rotver's bias against the plaintiff and her inability to objectively

---

[114] L Quillian & D Pager, *Black Neighborhoods, higher crime? The role of racial stereotypes in evaluations of neighborhood crime*, Amer. J. Sociology, 107(3), 717 (2001) (discussing the stereotyping regarding crime rates being perceived as higher in African American neighborhoods); J. Hurwitz & M. Peffley, *Public perceptions of race and crime: the role of racial stereotypes*, Amer.J. Political Science, 41(2), 375 (1997) ("A large and eclectic literature has shown convincingly that whites respond more punitively to blacks than to those of their own race"; the authors find an overlap between negative African American stereotypes and more punitive views of crime policy among white respondents).

[115] *See e.g.* J.Convington, *The Social Construction of the Minority Drug Problem*, Social Justice (Winter 1997), Vol 27, Issue 4, 117 (describing popular negative assumptions about minority drug use); FDA Harris, *"Driving While Black" and all other traffic offences: the Supreme Court and pretextual traffic stops*, J.Criminal Law and Criminology, 87(2), 544 (1997) (describing greater focus on African-American in drug policing).

[116] *See, e.g.*, Gary Stewart, *Black Codes And Broken Windows: The Legacy Of Racial Hegemony In Anti- Gang Civil Injunctions*, 107 Yale L.J. 2249 (1998) (describing the stigmatization of minority communities by identification of black males with gangs, resulting from anti-gang injunctions and noting how "gang members are popularly envisioned as lower-class members of racial and ethnic minorities") at 2251; Dorothy E. Roberts, *Foreword: Race, Vagueness, And The Social Meaning Of Order-Maintenance Policing*, 89 J. Crim. L. & Criminology 775 (Spring 1999) ("identification of someone as a gang member is highly associated with his race"). Joan W. Howarth *Representing Black Male Innocence*, 1 J. Gender Race & Just. 97, Penalties, Prohibitions & Punishment Symposium Article (describing use of social construct of black gang members in trials to prejudice of African Americans; "more and more, the distinction between ordinary Black man and Black gang member is disappearing").

evaluate the evidence presented")(reversing medical malpractice conviction); *Fisher v. State*, 690 A.2d 917 (Del. 1996)(new trial ordered where defendant was convicted by "less than 12 impartial jurors"; one juror told other jurors that any African-American male in the area where defendant was arrested was guilty of drug dealing).[117]

Finally, the juror's reliance on stereotypes over evidence again highlights the jury's race-based distrust of Petitioner's entire defense and its impact on the jury's credibility determinations.  A jury whose judgment of the credibility of African-American witnesses was impaired by racism could not have been more prejudicial than in a black-on-white crime like this where eight out of ten of the defenses witnesses during the penalty phase were African-American, and both the State's witnesses were white.

Moreover, in capital sentencing the defense and prosecution battle to win the jury's empathy for the defendant and victim/victim's family, respectively.  The State seeks to engage the jury's sympathy through presentation of victim impact, and the defense by presentation of mitigating evidence.  A juror that shares the victim's race, and that harbors racial animus towards the defendant, his family, and his mitigation witnesses, is inherently less likely to identify with the humanity of the defendant, and spare his life.  Several of Petitioner's African-American penalty phase witnesses recounted their feelings of racial isolation during the trial:

> It felt it was very prejudiced over in St.Tammany.  You could feel it.  It's hard to describe, but people were staring at us as we walked by.  We were pretty much the only black people over there around the court house.

Declaration of Rebecca Hoffman Shallowhorne, LASC Writ, Ex. 6-4, Ex. 132.

---

[117] Discussion by jurors about criminal acts of a defendant extraneous to the trial record has in itself been held by many courts to constitute jury misconduct that requires reversal of a conviction; Petitioner pleads it as such, further below.  It is that much more egregious when the extraneous factors discussed are untrue, and created in the minds of the jurors by their racism.

> The whole experience at court was really difficult. It was in St.Tammany which
> is a very white parish. It felt uncomfortable in the court room and around the
> court house. Apart from my family I didn't see any other black people there.

Declaration of Bridget "Nicky" Scott, LASC Writ, Ex. 6-4, Ex. 129. Petitioner's father

remembers being asked to leave the courtroom during voir dire partly because of a concern that

his presence might intimidate the jury:

> There were no black people in the courtroom except my son and our family and
> friends. And most of us weren't allowed in there for most of the trial. I was told I
> had to leave because I was going to be a witness. I also remember someone told
> me it would be a good idea for me to leave the court room during voir dire
> because my being there might be intimidating to the jurors.

Declaration of J.D. Hoffman, Sr., LASC Writ, Ex. 6-4, Ex. 68. Petitioner's jury was actually

biased against him. His conviction and death sentence should be reversed.

### B. The Multiple Constitutional Guarantees That Should Have Protected Petitioner From Racist Jurors: Rights To An Impartial Jury, To Freedom From Discrimination In Exercise Of Fundamental Rights, And To A Reliable Capital Sentencing Hearing

The racism in Petitioner's jury violated several of his constitutional rights. First, it

violated his rights to an impartial jury guaranteed by the Due Process clause. "Due process

means a jury capable and willing to decide the case solely on the evidence before it." *Smith v.*

*Phillips*, 455 U.S. 209, 217 (U.S. 1982). Due Process thus requires a jury free from external

influences, including racism; racial prejudice "negates the defendant's right to be tried on the

evidence in the case and not on extraneous issues.....". *United States ex rel. Haynes v.*

*McKendrick*, 481 F.2d 152, 157 (2nd Cir.1973) (citation omitted). In this case, as well as

considering race, the jury considered extraneous aggravating evidence of other crimes, drug use,

and gang involvement, created in their imaginations by racism. Petitioner has demonstrated

actual racial bias, or at the very least circumstances serious enough to demonstrate a showing of

implied bias, which warrants automatic reversal. *Smith v. Phillips*, 455 U.S. 209, 222 (U.S.

1982) (conclusive presumption of prejudice to be applied in implied bias cases) (O'Connor, concurring); *Leonard v. United States*, 378 U.S. 544 (1964); *Willie v. Maggio*, 737 F.2d 1372, 1379 (5th Cir.1984) (same).

Secondly, it violated Petitioner's rights to Equal Protection under the Fourteenth Amendment which protects an African–American accused from racial discrimination throughout the proceedings bringing him to justice. *Hill v. Texas,* 316 U.S. 400, 406, (1942) ("no state is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution… forbids"). When race is factored into a jury's decision-making process, this constitutes purposeful discrimination, prohibited by the Fourteenth Amendment. *McCleskey v. Kemp*, 481 U.S. 279, 293 (U.S. 1987) (holding Equal Protection violated where "racial considerations played a part" in a juror's decision to impose the death penalty, but denying relief on the facts because the statistical evidence presented in that case was insufficient to support such an inference); *see also United States v. Webster*, 162 F.3d 308, 356 (5th Cir. 1998) (Equal Protection clause prohibits the use of race in capital sentencing).

Thirdly, the injection of race into deliberations violated his rights under the Eighth Amendment which guarantees rights to a reliable capital sentencing proceeding free from arbitrary and capricious factors:

> A capital sentencing system in which race more likely than not plays a role does not meet this standard….

*McCleskey v. Kemp,* 481 U.S. 279, 335 (1987) (Brennan, J., dissenting); *Furman v. Georgia,* 408 U.S. 238, 250 (1972) ("A penalty… should be considered 'unusually' imposed if it is administered arbitrarily or discriminatorily"); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976); *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980). Racial prejudice is "the paradigmatic capricious and irrational sentencing factor." *Tuilaepa v. California*, 512 U.S. 967, 992 (1994),

citing *Graham v. Collins,* 506 U.S. 461, 484, (1993) (Thomas, J., concurring).  As the Fifth

Circuit explained:

> Considering the race of a defendant or victim in deciding if the death penalty
> should be imposed is completely at odds with th[e] concern that an individual be
> evaluated as a unique human being.  Decisions influenced by race rest in part on a
> categorical assessment of the worth of human beings according to color,
> insensitive to whatever qualities the individuals in question may possess.

*U.S. v. Webster,* 162 F.3d 308, (5th Cir. 1998)( (citations omitted).  Both the United States

Supreme Court and the Fifth Circuit have "explicitly acknowledged the illegitimacy of race as a

consideration in capital sentencing." *McCleskey v. Kemp,* 481 U.S. 279, 335 (Brennan, J.,

dissenting) (citing *Zant v. Stephens,* 462 U.S. 862, 885 (1983)); *United States v. Webster,* 162

F.3d 308, 356 (5th Cir. 1998).  As the Supreme Court has held, "the risk of racial prejudice

infecting a capital sentencing proceeding is especially serious in light of the complete finality of

the death sentence." *Turner v. Murray,* 476 U.S. 28, 35 (1986) (citing *California v. Ramos,* 463

U.S. 992, 998-999 (1983)).  Heightened vigilance against *racism* is particularly important in

death penalty cases because the nature of capital sentencing procedures provides an unequalled

opportunity for racial prejudice to operate:

> [b]ecause of the range of discretion entrusted to a jury in a capital sentencing
> hearing, there is a unique opportunity for racial prejudice to operate but remain
> undetected.  On the facts of this case, a juror who believes that blacks are violence
> prone or morally inferior might well be influenced by that belief in deciding
> whether petitioner's crime involved the aggravating factors specified under
> Virginia law.  Such a juror might also be less favorably inclined toward
> petitioner's evidence of mental disturbance as a mitigating circumstance. More
> subtle, less consciously held racial attitudes could also influence a juror's decision
> in this case.  Fear of blacks, which could easily be stirred up by the violent facts of
> petitioner's crime, might incline a juror to favor the death penalty.

*Turner v. Murray,* 476 U.S. 28, 35 (1986) (holding that capital defendants charged with inter-

racial crimes are entitled to voir dire prospective jurors as to racial bias because of the unique

susceptibility to racism in capital sentencing).

264

**C. The presence of a biased juror is a structural defect and requires automatic reversal of Petitioner's conviction and death sentence**

Actual or implied juror bias is structural error under the Sixth Amendment, which requires automatic reversal. *Vasquez v. Hillery,* 474 U.S. 254, 263 (1986) ("When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm.")(finding automatic reversal required where grand jury infected with racism) (citing *Tumey v. Ohio,* 273 U.S. 510, 535 (1927) (trial by a biased judge is structural error not subject to harmless error analysis)); *Neder v. United States,* 527 U.S. 1, 8 (1999) (holding that the presence of a biased decision-maker is structural error "subject to automatic reversal"); *Virgil v. Dretke,* 446 F.3d 598, 607 (5th Cir. 2006) (seating of biased juror is structural error); *Johnson v. Armontrout,* 961 F.2d 748 (8th Cir. 1992) ("The presence of a biased jury is no less a fundamental structural defect than the presence of a biased judge"); *Solis v. Cockrell,* 342 F.3d 392, 400 (5th Cir. (2003) (remedy for implied bias claim is a new trial); *United States v. Heller* 785 F. 2d 1524 (11th Cir. 1986) (racism once introduced to the jury could not be expunged from deliberations despite assurances by all jurors they could consider the evidence free of prejudice); *Wright v. CTL Dist., Inc.,* 650 So.2d 641 (Fla. Dist. Ct. App. (1995)) (no attempt by jurors to recharacterize their racially charged comments could erase prejudice); *Connecticut v. Santiago,* 245 Conn. 301, 715 A.2d 1 (Conn. 1998) ("allegations of racial bias are fundamentally different from other types of juror misconduct because such conduct is ipso facto prejudicial").

Petitioner's showing of purposeful discrimination by the decision maker in his capital case also warrants automatic reversal under the Equal Protection clause.  The use of race in decision-making is prohibited by the Fourteenth Amendment unless it can meet the "most exacting scrutiny... justified by a compelling government interest." *U.S. v. Webster,* 162 F.3d

308, (5th Cir.1998); *McLaughlin v. Florida*, 379 U.S. 184 (1964).   In the realm of capital sentencing, this standard never can be met because race is a totally irrelevant factor.   *United States v. Webster*, 162 F.3d 308, (5th Cir.1998) (holding race cannot be considered in capital sentencing determinations).   The Supreme Court has thus "maintained a *per se* reversal rule rejecting application of harmless-error analysis in cases involving racial discrimination because it "strikes at the fundamental values of our judicial system and our society as a whole.""   *McCleskey v. Kemp*, 481 U.S. 279, 349 (1987) (Blackmun, J. dissenting) (citing *Rose v. Mitchell*, 443 U.S. 545, 556 (1979); *Whitus v. Georgia*, 385 U.S. 545, 549-550 (1967); *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880)).

Similarly, violations of Petitioner's Eighth Amendment rights require automatic reversal of his death sentence.   *Turner v. Murray*, 476 U.S. 28, 36 (1986) (reversing death sentence where court's interference with defense attempts to voir dire prospective jurors on race created constitutionally unacceptable risk that racial prejudice may have infected petitioner's capital sentencing); *Caldwell v. Mississippi*, 472 U.S. 320, 343 (U.S. 1985)(reversing death sentence where prosecutorial argument created "an unacceptable risk" that "the death penalty may have been meted out arbitrarily or capriciously").

### D. Petitioner was prejudiced by Juror Lower's racism

Even if this court does not find Petitioner has demonstrated actual or implied bias, intentional discrimination, or an unacceptable risk that racism contributed to his death sentence to warrant automatic reversal, Petitioner's conviction and death sentence should be reversed in any event because he can demonstrate under the general standards for jury misconduct claims that Mari Lower's racial prejudices resulted in the "actual bias" of one or more jurors.   *Smith v. Phillips*, 455 U.S. 209, 217 (1982).   The "ultimate inquiry" for the court is whether "the intrusion

affect[ed] the jury's deliberations and thereby its verdict." *United States v. Olano*, 507 U.S. 725, 739 (1993).

The statements made by Mari Lower in her declaration demonstrate that the racial prejudices held by her and other jurors prevented them from viewing the evidence and conduct of the trial impartially and objectively. First, the racial bias created mistrust of Petitioner's *entire defense*; despite evidence to the contrary the jury believed defense counsel attempted to exploit Petitioner's race in order to get him off. Secondly, racism caused Ms. Lower and other jurors to abandon the court's instructions to follow the law, to adhere to the presumption of innocence or refrain from deliberating until conclusion of the evidence and to limit deliberations to facts duly in evidence: Petitioner's jurors either presumed or prematurely determined that defendant was guilty/deserving of death, because he was black. Thirdly, racial stereo-typing distorted their view of Petitioner during penalty phase determinations, as they speculated that he was a member of a gang, took drugs "and things like that," despite unimpeached evidence of the opposite.

Mari Lower's statements suggest racism pervaded and influenced other jurors as well as herself. However, the racial bias of one juror alone is sufficient to warrant reversal of Petitioner's conviction. *Parker v. Gladden*, 385 U.S. 363 (1966) (holding that petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors); *see also Morgan v. Illinois*, 504 U.S. 719 (1992) (Due Process requirement of impartiality dictates that if even one juror who would automatically impose the death penalty presides in a capital sentencing and the death sentence is imposed, the State is disentitled to execute the sentence.) This is particularly imperative in Petitioner's case: the Louisiana Constitution requires *unanimous* verdicts of *twelve*

impartial jurors in capital cases at both guilt and penalty phases.  La. Const. Art. 1 § 17(A); La.C.Cr.P. Art. 782(A) and Art. 905.6); *State v. Lott*, 325 So.2d 576, 578 (La. 1976).[118]

On these several grounds Petitioner's conviction and death sentence must be reversed by this Court, and his case remanded for a trial free from the taint of racism.

### E.  The applicability of § 2254(d)

The state district gave no reasons for denying the merits of Petitioner's jury misconduct claims.  State Court Order, 1/5/07.  It is therefore impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor,* 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court.  *See* Part One, IV(A)(3).  If § 2254(d) is to be applied, the court should conduct an independent review of the facts to determine the facts the court was silent upon.  *Id.*

The complete lack of any reasoning provided by the court, in itself raises significant concern as to the reasonableness of the decision under § 2254(d).  *See* Part One, IV(A)(IV)(b)-(c).  In addition, the court's failure to hold an evidentiary hearing, to properly develop the facts, also undermines the reasonableness of the court's decision.  *Id.*

In any event the evidence in support of Petitioner's claims is so overwhelmingly strong that whatever the basis for the court's findings, its decision constitutes an unreasonable application of the law under § 2254(d)(1), an unreasonable determination of the facts under §

---

[118] Petitioner acknowledges that the Fifth Circuit has held that in habeas cases, Petitioner must demonstrate the higher standard that juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *E.g. Oliver*, 541 F.3d, 341.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  Petitioner submits that the Fifth Circuit is incorrect and that *Brecht* doesn't apply; other circuits agree.  *See McNair v. Campbell*, 416 F.3d 1291, 1309 (11th Cir. 2005) (on habeas review assessing prejudice resulting from juror misconduct without applying *Brecht*); *Grotemeyer v. Hickman*, 393 F.3d 871, 880 (9th Cir. 2004) (same); *States v. Johnson*, 2009 U.S. App. LEXIS 1872 (6th Cir. 2009) (same).  However, even if *Brecht* does apply, the racial considerations injected into Petitioner's trial and sentencing deliberations meets that standard.  Petitioner is entitled to a new trial and sentencing hearing under the Sixth, Eighth and Fourteenth Amendments.

2254 (d)(2), and was based on factual findings that are contradicted by clear and convincing evidence under § 2254(e)(1). His conviction and death sentence should be reversed.

### F. An evidentiary hearing is required.

If this court finds that the facts are insufficiently developed to warrant relief, or that there are unresolved factual disputes, this Court should hold an evidentiary hearing on these claims. *Smith v. Phillips,* 455 U.S. 209 (1982) (where allegations of juror partiality are made, due process requires a hearing in which the defendant has the opportunity to prove bias).

Petitioner has alleged facts, which if proven, would entitle him to relief. Because the state court failed to hold an evidentiary hearing (despite Petitioner's several requests), and failed to provide any reasons for denying the merits of these claims, Petitioner is entitled to an evidentiary hearing, under the *mandatory* requirements of *Townsend. See* Part One V. *See also Conway v. Polk,* 453 F.3d 567, 589-590 (4th Cir. 2006) (remanding for evidentiary hearing on claim of juror misconduct where state court denied his request for a hearing "depriving him of the opportunity to build a factual record."); *Weaver v. Thompson,* 197 F.3d 359, 362 (9th Cir. 1999) (remanding for evidentiary hearing where the state court at no time held an evidentiary hearing to determine the substance of the extraneous evidence or the effect it had on jury deliberations); *Stockton v. Virginia,* 852 F.2d 740, 743-45 (4th Cir. 1988) *cert. denied,* 489 U.S. 1071 (1989) (given absence of state court fact-finding on critical question whether and how third party contacted juror during deliberations federal hearing required).

### X. PETITIONER'S RIGHTS TO A FAIR TRIAL AND TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT WERE VIOLATED WHEN THE STATE'S DECISION AS TO VENUE FOR THE TRIAL WAS TAINTED BY RACISM

Petitioner's fundamental constitutional rights to Equal Protection were violated when the State's decision to prosecute him in St. Tammany Parish, rather than Orleans Parish, was

motivated by racial considerations, and contributed, ultimately, to the exclusion of all African-Americans from his jury.

The State alleged that Petitioner kidnapped and robbed Ms, Elliot in Orleans Parish, but raped and killed her in St. Tammany Parish.  Because elements of the first-degree murder offense charged took place within in both Orleans Parish and St. Tammany Parish both parishes had jurisdiction and venue over the offense.[119]  The State chose to prosecute Petitioner in St. Tammany parish.

Prior to trial, defense counsel challenged the State's choice of venue based on race through a motion for change of venue.  R. 653.  The court held a hearing.  Defense counsel called a demographer to establish that St. Tammany's voter registration figures reflected a far smaller African-American population (9%) than Orleans (63%), and that the demographic trend reflected "white flight" from Orleans to St. Tammany with the ratio of white to black increasing in St. Tammany, but decreasing in Orleans between 1990 and 1995.  R. 1513.  The demographer also testified about the 1991 governor election in which 44% of St. Tammany voters voted for David Duke, previous grand wizard of the Ku Klux Klan. R. 1514.  Lastly, defense counsel questioned Houston Gascon, the first assistant District Attorney for the 22nd judicial district, about other murder cases in their jurisdiction, to demonstrate that in cases where elements of a homicide occurred in more than one parish, the District Attorney's office for the 22nd Judicial District did *not* always prosecute homicides in the parish where the killing occurred.  Thus, defense counsel established that a first-degree murder case against Rodney Vernon was

---

[119] La.Const. art. 1 § 16 provides: "every person charged with a crime… is entitled to a… trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law." La.C.Cr.P. art. 611 provides: "All trials shall take place in the parish where the offense has been committed, unless the venue is changed.  If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred."

prosecuted in Washington parish, even though the victim was murdered in Texas, and merely kidnapped from Washington Parish. R. 1557. Defense counsel also tried to question Mr. Gascon about the case of Wilbur Russell, whose case was prosecuted in St. Tammany, even though the body was found in Washington parish, but Mr. Gascon did not recall the case. R. 1558. As well as the Equal Protection argument, defense counsel also argued to the court that in light of the racial demographics of St. Tammany, Petitioner would be deprived of his right to a fair trial by an impartial jury.

### A. The State's purported race-neutral reasons

The State called no witnesses at the pretrial hearing. In argument the State provided the following race-neutral reason for the choice of St. Tammany: that the homicide itself, as well as the alleged rape, occurred in St. Tammany parish. R. 1563. In addition, the State noted that: "the investigation was conducted in St. Tammany parish and went to New Orleans as a means of locating the proper suspect"; the victim resided in St. Tammany; and that "most of the witnesses will dare say, that we will call, will be from St. Tammany Parish." R. 1564.

The trial court denied the motion. The court noted that the homicide and aggravated rape occurred in St. Tammany parish, and found that "there has been no showing that the defendant would not receive a fair and impartial trial here in St. Tammany Parish." R. 1565. [120]

The trial court was wrong and unreasonable to deny the motion. Race was the primary motivation for the State's decision to try the case in St. Tammany Parish. Several factors lead to that conclusion.

---

[120] During jury selection, trial counsel re-urged the motion because the prejudice he feared as a result of the race-based decision to prosecute him in St. Tammany, was readily apparent because of the lack of African-American jurors in the jury pool, R. 1582-24, R. 2221, and R. 2209. The court deferred its judgment at that time, but ultimately denied the motion. R. 3643.

**B. The State's asserted race-neutral reasons were pre-textual**

The State's proffered race-neutral reasons do not withstand scrutiny. First, the State's assertion that St. Tammany was chosen as a venue because the murder occurred there is belied by evidence that such considerations were not determinative in other cases in the same Judicial District. At trial defense counsel highlighted two such cases. In addition, Petitioner points to the differential treatment given in a subsequent case with remarkably similar facts, but with the location of abduction and recovery of the body reversed. Ralph Stogner was charged in 1998 with the kidnap, sexual assault and murder of a young girl. The victim was kidnapped from St. Tammany Parish, and sexually assaulted, murdered and her body found in Orleans Parish. Although her body was found in Orleans, the St. Tammany District Attorney's Office and, *not* Orleans Parish District Attorney's Office, prosecuted Mr. Stogner. Supplemental Petition Ex. 123. In Mr. Hoffman's case, where the location of the abduction and finding of the body were reversed, the case was *still* prosecuted in St. Tammany.

Secondly, the State's suggestion that all of the investigation occurred in St. Tammany, except when they "went to New Orleans as a means of locating the proper suspect," is simply untrue. In fact, apart from the investigation at the scene where the body was found, virtually all of the rest of the investigation and evidence gathering occurred in New Orleans, including: collection of ATM records (in New Orleans East), R. 230; analysis of ATM camera footage, R. 230-31; investigations at the Sheraton parking garage where Mr. Hoffman worked in downtown New Orleans, including interviews with co-workers, review of the garage surveillance footage, employee time cards, and uniforms, R. 224, R.229, R. 231, R. 233; interviews of the victim's work colleagues about her disappearance, R. 223-24, R. 229; interviews of Petitioner's family members, girlfriend and girlfriend's family in New Orleans East and Algiers, R. 215-17, R. 217-18, R. 222; obtaining and executing an Orleans Parish search warrant of Petitioner's mother's

apartment in Algiers, in Orleans parish, R. 145-48, R. 220; obtaining an Orleans Parish search

warrant to perform a rape kit on Petitioner, executed at Charity Hospital in New Orleans, R. 219;

searches at the apartments of Petitioner's grandmother and girlfriend in New Orleans East, R.

141-43, R. 144, R. 218; locating the victim's clothes and other items at a road side in New

Orleans R. 228; locating the victim's car in a down town New Orleans housing project, R.138-

39, R.232, and interviews of various witnesses about the car, R. 213-15; arresting Petitioner at

work in New Orleans business district, R. 233; interrogating Petitioner at the New Orleans police

department (by New Orleans police officers), where they ultimately obtained his confession. R.

233-41.

   Thirdly, most of the State's trial witnesses were *not* from St. Tammany: in fact only a

little over a third were.  Of the twenty-four witnesses the State called at trial, only nine were

from St. Tammany,[121] eleven were based in New Orleans,[122] three were from New Orleans'

neighboring parish of Jefferson for whom New Orleans was clearly more convenient,[123] and one

---

[121] Andrew Elliot, the victim's husband R. 3558; Charles Dauzat Jr., who found the body, R. 3672; Lt. Frey, supervisor of the St. Tammany Parish Crime Laboratory, R. 3680; Det. Hall, St. Tammany Parish Sheriff's Office, R. 3807; Deputy Stubbs, analyst at St. Tammany Parish Crime Laboratory, R. 3826; Det. Oswald, St. Tammany Parish Sheriff's Office, R. 3852; Gregory Smith, manager of St. Tammany Parish Jail medical unit, R. 3889; Mario Benitez, evidence officer at St. Tammany Parish Sheriff's Office, R. 3895; Randy Perkins, videographer based in Covington, St. Tammany Parish.

[122] Alvaro Medina, Regional manager USA parking at the Sheraton, down town New Orleans, R. 3580; Giovanni Molina, Assistant manager USA parking at the Sheraton, R. 3602; David Crane, Account Supervisor, Peter Mayer Advertising, downtown New Orleans, R. 3615; Frank Holland, Security Director for Regions Bank, New Orleans East, R. 3730; Joseph Guiterrez who found the victim's clothes, R. 3745; Det. Marco Demma of NOPD homicide division, R. 3753; Det. Joseph Waguespack of NOPD homicide division, R. 3787l; Michael Verges, RN at New Orleans Charity Hospital, R. 3892; Zachary Franklin M.D., physician at New Orleans Charity Hospital, R. 3952; Anne Montgomery, molecular biologist, from ReliaGene Technologies, Inc, New Orleans, R. 3972.

[123] Fraser MacKenzie M.D., medical examiner with Jefferson Parish Coroner's Office; Sgt. Keith Lataxes, of Jefferson Parish Sheriff's Office, R. 3737; Bonnie DuBourg, analyst at Jefferson Parish Sheriff's Office Crime Laboratory, R. 3901.

was from out of State.[124]  Of course, almost *all* defense witnesses were from New Orleans, and *none* were from St. Tammany.[125]

The State's asserted race-neutral reasons for selecting St. Tammany parish as the venue in this case are contradicted by the record.  This is strong evidence that the reasons were pre-textual.  "In the typical… inquiry, the decisive question will be whether counsel's race-neutral explanation… should be believed." *Hernandez v. New York,* 500 U.S. 352, 365 (1991) (plurality opinion).  In this case they cannot be.  The implausibility of the State's reasons gives rise to a strong inference of pretext and discriminatory intent. *Purkett v. Elem,* 514 U.S. 765, 768, (1995) (per curiam) ("At [the third] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination") (citation omitted); *Snyder v. Louisiana,* 128 S. Ct. 1203, 1212 (2008) ("the prosecution's proffer of this pre-textual explanation naturally gives rise to an inference of discriminatory intent").

### C. The other evidence of discriminatory intent

As discussed in more detail elsewhere, the crime was racially charged from the outset: an African-American man from inner-city New Orleans charged with the rape-murder of a white woman from a predominantly white parish with a long history of racism.  As defense counsel's demographic evidence shows, the racial make up of the St. Tammany parish population was such that it was extremely likely that far more members of the jury would be white, than if the case were prosecuted in New Orleans.  Juror studies suggest that a white St. Tammany jury would be more likely to convict and sentence the African-American Petitioner to death, than a jury from

---

[124] Roxie Stouffer, Ms. Elliot's mother, was from Arizona, R. 3555.

[125] All but two of the defense's eleven witnesses were based in New Orleans; Elaine Salzer, Damon Mercandel, Leroy Walker, Rosa Lee Hoffman, Kruzshander Scott, Rebecca Scott, Raushanah Smith, Bridget (Nikki) Scott, Victor Sims and Jessie Hoffman Sr..  Defense counsel's DNA and criminology experts Dr. Friedman and Dr. Foster, were from Milwaukee, Wisconsin and Lafayette respectively.

New Orleans, which would likely contain many more African-Americans.[126]  Moreover, the

State constructed the prosecution of their case in way which was specifically designed to appeal

to *white jurors from St Tammany,* exploiting St. Tammany fears about the "other" world of

predominantly African-American New Orleans through thinly disguised racist rhetoric.  This is

reflected throughout the proceedings, from the District Attorney's initial statements to the press

shortly after Petitioner's arrest, through to the state's arguments at trial itself.  *See* claims VI, X

XIII.

Secondly, the State made good in its intent to exclude African American jurors, by

striking *all* African American potential jurors from the venire during jury selection (the first two

were struck peremptorily by the State, the third was struck for cause at the request of the State).

*See* claim VI.  This subsequent race-based action by the State in pursuance of its aim is further

evidence from which to infer discriminatory intent during its earlier exercise of discretion as to

venue.

Thirdly, the State got what it intended; after exercising prosecutorial discretion in a

purposefully racist way by selecting St. Tammany as a venue, and then striking the remaining

African-Americans from the venire in violation of his rights under *Batson,* an all white jury was

seated that discriminated against Petitioner on the basis of his race.  *See* claims VI, IX.  *Batson v.*

*Kentucky,* 476 U.S. 79, 93 (1986) ("Circumstantial evidence of invidious intent may include

proof of disproportionate impact.  We have observed that under some circumstances proof of

discriminatory impact "may for all practical purposes demonstrate unconstitutionality because in

---

[126] *See, e.g.,* DC Baldus, G Woodworth, D Zuckerman, NA Weiner & B Broffitt, *The use of peremptory challenges in capital murder trials: a legal and empirical analysis,* Uni.Penn. J.Const.Law, 3, 2001, 3 (Philadelphia study: the "findings indicate that predominantly black juries (ones with five or more blacks) were less likely to impose death sentences than were juries with four or fewer black jurors").

various circumstances the discrimination is very difficult to explain on nonracial grounds.""). (*citing Washington v. Davis*, 426 U.S. 229 (1976)).

Viewed cumulatively, the evidence is too powerful to conclude anything but discrimination. *Miller-El II*, 545 U.S. at 256.

The Fourteenth Amendment safeguards defendants from intentional discrimination by state actors interfering with the enjoyment of fundamental rights to a fair trial. *See Hill v. Texas, 316 U.S. 400, 406, (1942).* The United States Supreme Court has "repeatedly stated that prosecutorial discretion cannot be exercised on the basis of race." *McCleskey v. Kemp* 481 U.S. 279, 310 (1987); *United States v. Batchelder*, 442 U.S. 114 (1979); *Oyler v. Boles*, 368 U.S. 448 (1962). The Court has especially condemned state efforts to exclude blacks from grand and petit juries. *Vasquez v. Hillery*, 474 U.S. 254, (1986) (exclusion of African American's from grand jury service violates equal protection; *Alexander v. Louisiana*, 405 U.S. 625, 628-629, (1972) (same); *Norris v. Alabama*, 294 U.S. 587, 589, (1935) (systematic exclusion of African-Americans from petit jury service though exercise of state discretion, violates Equal Protection); *Batson v. Kentucky*, 476 U.S. 79 (1987) (prosecutor's exercise of peremptory challenges on the basis of race, violates Equal Protection); *Swain v. Alabama*, 380 U.S. 202, (1965) (same)). It is not necessary to show that the decision rested solely on a racially discriminatory purpose, or even that it was primary purpose. Petitioner need only show that race played some part. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-266 (1977). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977).

The concern of the Fourteenth Amendment is not limited to those areas where discriminatory action by State officials has been traditionally recognized; it extends to *any* type of discretionary action by the State in which the State has the opportunity for race-based action, and whose actions suggest race is the cause. Thus, in *Miller-El II*, 545 U.S. 231 (2005), a *Batson case,* the Court considered discretionary actions of the State aimed at reducing the number of African-Americans selected for jury service through its the use of the Texas "jury shuffle" procedure, to limit number of African American's selected for jury questioning, as being relevant to determining State's discriminatory intent. In *this* case, the State's exercise of its discretion in selecting the venue for its capital prosecution of Mr. Hoffman was driven by race-based considerations, and contributed to the seating of an all white- jury which convicted Petitioner, and sentenced him to death. Such a violation requires automatic reversal of Petitioner's conviction and death sentence. *McCleskey v. Kemp*, 481 U.S. 279, 349 (1987); (Blackmun, J. dissenting; *Rose v. Mitchell*, 443 U.S. at 545, 556 (1979). *Batson,* 476 U.S. 79.

### D.  Applicability of § 2254(d)

The state district court ruled on this claim when it was raised prior to trial. However, in doing so the court failed to address the Equal Protection basis for the claim, and denied it only on consideration of Sixth Amendment grounds, finding that there had been no showing that a St. Tammany jury would not be fair and impartial. R. 1565. When the claim was presented to the State district court in post-conviction proceedings, the court did denied the claim on the merits, but did not give reasons. State Court Order, 1/5/07.  It is impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor*, 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court. *See* Part One IV(A)(3).

If § 2254(d) is to be applied, the court should conduct an independent review of the record to determine the facts the court was silent upon. *Id.* The complete lack of any reasoning

provided by the court itself raises significant concern as to the reasonableness of the decision under § 2254(d).  *See* Part One IV(A)(4)(b)-(c).  In addition, the court's failure to hold an evidentiary hearing, to explore all the relevant facts, also undermines the reasonableness of the court's decision.  *Id.*.

The factual evidence of discriminatory intent in the State's choice of venue clearly and convincingly rebuts any possible implicit findings to the contrary by the state district court in its unreasoned opinion. §2254(e)(1).  In light of the totality of the evidence of discrimination the state court's decision is an unreasonable determination of the facts, and an unreasonable application of United States Supreme Court Fourteenth Amendment jurisprudence.  §2254 (d)(1); §2254(d)(2).  *Miller-El II,* 545 U.S. 231 (considering *Batson* claim, finding unreasonable determination of the facts under § 2254(d)(2) when, "viewed cumulatively, the direction of the evidence was too powerful to conclude anything but discrimination").

### E.  An evidentiary hearing is required

In the alternative, if the court finds that the facts are not sufficiently developed to warrant relief, or that there are unresolved factual disputes, Petitioner is entitled to an evidentiary hearing so that he may fully explore the events that unfolded at the jury's crime scene view, and demonstrate the prejudice that resulted.  Petitioner has alleged facts, which if proven, would entitle him to relief.  Because the state post-conviction court failed to hold an evidentiary hearing (despite Petitioner's several requests), and failed to provide any reasons for denying the merits of these claims, Petitioner is entitled to an evidentiary hearing, under the *mandatory* requirements of *Townsend. See* Part One V.

## XI. PETITIONER'S RIGHTS TO DUE PROCESS, TO A FAIR TRIAL BY AN IMPARTIAL JURY, TO CONFRONTATION, TO BE PRESENT AT ALL STAGES OF HIS CAPITAL TRIAL, TO APPELLATE REVIEW, AND TO A FULL TRANSCRIPT OF TRIAL PROCEEDINGS WERE VIOLATED IN NUMEROUS WAYS DURING THE JURY CRIME SCENE VISIT

It is axiomatic that a verdict of guilt and a sentence of death must be based *solely* on constitutionally acceptable evidence that has been admitted by the court and subjected to cross-examination in the presence of the accused and his counsel. *See Turner v. Louisiana,* 379 U.S. 466, 473 (1965). Such evidence must also be preserved and reviewable on appeal. These trial rights, guaranteed to Petitioner by the Sixth and Fourteenth Amendments, were violated during the jury's crime scene visit in this case.

On motion by the State, and after objection by defense counsel, the Court authorized and conducted a jury crime scene visit during the guilt phase of the trial. R. 78, R. 3937-38. This visit formed a key part of the State's case for first-degree murder and the death penalty. The location of the body, and the layout of the crime scene was crucial to the State's case for specific intent, the *only* element of first-degree murder which was in dispute at trial. *See* claims II, III. Thus, the State requested the crime scene visit "as the nature and location of the crime scene is relevant evidence in this case which bears directly on the issue of specific intent." R. 1242. The State's strategy was effective. The consequent crime scene visit *was* important to the finding of specific intent, at least for the foreman of the jury:

> During the guilt phase the jury was taken to the crime scene. This was important for me because it let me see the layout of the path which Jessie Hoffman made the victim walk down to reach the floating dock where she was killed. *This was critical to my conclusion that Mr. Hoffman intended to kill the victim* and had planned it all along. The path was hidden and out of the way. You had to walk a way round the wooded area from where he would have parked the car to get to that path. I don't think that anybody could have found that path in the dark unless they knew about it already. If, as the defense argued, he didn't intend to kill her but just intended to drop her off somewhere, he would have left her in the area where the car was or let her out somewhere else. The only logical reason for

279

driving out all the way to the Pearl River and for walking the victim down that path would be that he intended from the start to kill her and hide the body.

For this reason I thought that Jessie Hoffman planned to rob and kill the woman ahead of time.

Declaration of Gary McDonald (unsigned), Exhibit A to Affidavit of Caroline Wallace, Supplemental Petition Ex.109 (emphasis added). Under Louisiana law, the scene visit was a court session, and the viewing of the crime scene constituted the taking of evidence.[127] The crime scene visit should have been conducted with the same due process procedural safeguards as if evidence was being taken in the courtroom. But it was not.

The proceeding was meant to be no more than a silent viewing of the scene. The Court instructs the jurors to refrain from any comments or discussions:

> This is in the parish and the purpose of this is to show the scene. We did bring the court reporter. The viewing of this area is for bearings and things of that nature. I would ask that someone lead the way. Okay. And then I think we'll just follow along. We will not – we don't have any comments, one way or the other. Observe what you observe. And then, at the conclusion, we will come back and confer and we'll wait. So we will reconvene at nine a.m. in the morning. And, again, I would ask you not to discuss anything of this nature even in a general nature."

R. 3937. The remainder of the crime scene visit was not recorded. R. 3938-3939. Until recently, Petitioner was in the dark about events at the scene. However, evidence obtained during post-conviction shows that numerous constitutional errors and procedural violations occurred.

Jurors and alternate jurors recalled their visit to the crime scene as follows:

> We were taken to the crime scene during the trial. It was a very isolated place... There were a lot of police and lawyers there. **I do not remember the defendant coming with us. We were allowed to ask questions.**

---

[127] La.C.Cr.P. art. 762 provides: "Sessions of court shall be held at the parish courthouse and, if there is more than one courthouse in a parish, sessions may be held at any such courthouse, or sessions may be held at places within the parish other than the courthouse or courthouses in the discretion of the court:...(2) To allow the jury or judge to view the place where the crime or any material part thereof is alleged to have occurred, or to view an object which is admissible in evidence but which is difficult to produce in court. At this view, the court shall not permit the taking of evidence except in connection with the place or object..."

Declaration of Mari Lower, Supplemental Petition, Ex. 106 (emphasis added).

> We were taken to the scene where the body was found. There were a lot of court people and the lawyers were there. **I remember the prosecutors pointing things out to us.** I didn't remember the defense lawyers talking to us there. **I don't remember seeing the defendant at the scene** or how he behaved.

Declaration of David Petty, Supplemental Petition, Ex. 107 (emphasis added).

> The judge and lawyers came with us to the scene. Jessie Hoffman came too. I did not see how he reacted to being at the scene; **he stayed at the top of the path with the sheriffs and his lawyers and did not walk down the path with us to the floating dock.**

Declaration of Gary McDonald (unsigned), Exhibit A to Affidavit of Caroline Wallace,

Supplemental Petition, Ex. 109 (emphasis added).

> At one point they took me and the jurors to the scene where the body was found… The bailiffs were there and the lawyers were there. **I do not remember seeing the defendant there.** The police who were involved in the case were also there. **The jury were allowed to ask questions and the police answered them about the scene and where the body was.**

Declaration of Austin Beasley (unsigned), Exhibit A to 2nd Affidavit of Caroline Wallace

Supplemental Petition, Ex.108. (emphasis added).

> Trial counsel also recalled the visit to the scene:

> At the crime scene visit, I walked behind the jurors down the path to the pier. They had to go single file. The prosecuting attorneys and I did not get right next to the jurors, but hung back about 40 feet or so. **If the jurors had asked questions, or talked to each other or one of the bailiffs or police officers, I would not have heard them. I remember seeing a police officer pointing out a spot on the dock to the jury.**

Declaration of William Alford, Supplemental Petition, Ex. 4 (emphasis added).

> **At the crime scene visit, I stayed with Jessie near the top of the path to the dock, and never went all the way to the dock.** I think that the bailiffs ordered him not to go all the way down the path and out to the dock, and so I stayed with him.

Declaration of Kevin McNary, Supplemental Petition, Ex. 5 (emphasis added). This evidence

demonstrates numerous constitutional errors and procedural violations which individually, and

cumulatively violated Petitioner's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to due process, to confrontation of witness and evidence against him, to be present at all stages of his capital proceedings, to a fair trial by an impartial jury, free from outside influences, and due process rights to an appeal based on a complete record of proceedings.

### A. Petitioner's rights to Confrontation of all evidence presented against him, to be present, to Due process and to a fair trial were violated.

Petitioner was not physically present during the crucial times in which the jury viewed the relevant locations at the crime scene, and could neither see nor hear any interactions that took place between the jury and the prosecution or police officers. As the jury foreperson and trial counsel remember, Petitioner remained at the top of the path and did not walk with the jurors to the two locations which were the subject of the scene view: first, the location where the body was found (on a floating dock at the end of an overgrown path), and second, down a boat launch to the river. Several other jurors questioned did not remember the defendant being there at all—presumably because he was so far away.

The right of a defendant to be present at every stage of the proceedings is "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause." *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (citing *Lewis v. United States*, 146 U.S. 370 (1892)). It applies at "all... stages of the proceedings." *Diaz v. United States*, 223 U.S. 442, 454 (1912). The defendant's right to be present logically includes the viewing of a crime scene. *See, e.g., State v. Pepper*, 180 So. 640 (La. 1938), citing *Hopt v. Utah*, 110 U.S. 574 (1884).

Due Process also safeguards a defendant's right to be present during a jury crime scene view. *Snyder v. Massachusetts*, 291 U.S. 97 (1934) (overruled on other grounds) (a defendant

282

has a due process right to be present at jury crime scene visit "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge").

Although in some cases the right to be present can be limited, in capital cases the right is unwaivable, absent clear express waiver by the defendant on the record. *United States*, 223 U.S. 442, 455 (1912); *Profitt v. Wainwright* 685 F.2d 1227, 1258 (11th Cir. 1982) *modified on rehearing*, 706 F.2d 3111 (11th Cir. 1983).

The requirement cannot always be met constructively by the presence of defense counsel. Over a century ago, the Supreme Court acknowledged that "[t]he necessities of the defense may not be met by the presence of his counsel only." *Hopt v. People*, 110 U.S. 574, 578 (1884); *see also Snyder*, 291 U.S. at 105-106 ("in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present *in his own person*," because only then "will [it] be in his power... to give advice or suggestions") (emphasis added).[128] The Michigan Supreme Court described the importance of the defendant's right to be personally present at during a jury scene visit as follows:

> A jury view may provide a defendant with an opportunity to render assistance to defense counsel at, during or after its occurrence. For example, by being present, a defendant might ensure that the jurors do not engage in improper conduct by reporting to defense counsel improprieties which the latter did not observe. Further, any familiarity a defendant has with the area of the jury view might lead to recognition of significant changes in the area which should be pointed out to the jurors by later testimony or argument. Although a defendant can impart knowledge of the area to defense counsel prior to the view, the defendant's presence will make it more likely that any significant observations of aid to the defense are made. Finally, and most importantly, even a defendant unfamiliar with the area of the view may make observations of that area during the view which can be passed on to defense counsel and which might directly aid the defense.

---

[128] Petitioner filed a pre-trial motion asserting this right. Assertion of Right To Be Present, R. 558. The State did not oppose it. State's Answer To Assertion of Right To Be Present. R. 605. The Court ruled that the motion would not be needed because the Defendant would be present. R. 32.

*People v. Mallory*, 365 N.W.2d 673, 681-82 (Mich. 1984) (reversing first degree murder conviction after court conducted jury crime scene view with defense counsel present, but without the defendant present, after denying his request to be there).

Moreover, even if the presence of defense attorneys could theoretically meet the requirements of the Confrontation Clause and Due Process in these circumstances, Petitioner's defense attorneys were also not actually present to implement Petitioner's rights to confrontation of the evidence adduced against him at the scene either. One remained with Petitioner, and thus was unable to see or hear the events, and the other also remained out of earshot. Supplemental Petition, Ex. 5 and Ex 6.

The deprivation of Petitioner's fundamental right to be present and to confront the evidence against him at the crime scene, where critical prosecution evidence was presented to the jury in support of their capital charge against him, mandates reversal of his conviction. *See Pointer v. Texas*, 380 U.S. 400, 404 (1965) ("There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal").

**B. Petitioner's rights to a fair trial by an impartial jury, and to confrontation were violated when the jury was compromised by extraneous influences during the crime scene visit**

During the crime scene visit the jury were allowed to ask questions of the prosecutors and police present at the crime scene, and the prosecution pointed things out to the jury. Supplemental Petition, Ex. 106, Ex. 108. The court's initial instructions ordering all those present to refrain from comments or discussions confirm that these interactions were *not* expressly authorized by the Court. The Sixth Amendment guarantee of an impartial jury requires that a jury verdict be made free from extraneous influences or information. The verdict must be

284

based on evidence presented during trial proceedings which accord with all the basic requirements of due process. *Turner v. Louisiana*, 379 U.S. 466, 473 (1965). The reported interactions between the jurors and third persons during the crime scene visit were clearly not authorized, they violated the direct instructions of the judge and constituted extraneous influences upon the jury. *Snyder*, 291 U.S. at 97, 118 (judge's comment to jurors about evidence during crime scene visit essentially constituted juror misconduct and reversal of conviction would be required if it prejudiced the jury).

Most reported cases concern extraneous influence being brought to bare outside of the courtroom. However, in many ways the interactions in this situation are inherently *more* prejudicial. On the one hand, the interactions were not accompanied by the panoply of evidentiary and procedural requirements designed to ensure the integrity and reliability of evidence given, such as the rules regarding hearsay or opinion testimony, relevancy and procedure. On the other hand, because the scene visit was the "court," these interactions would have been cloaked with the appearance of legitimate evidence sanctioned by the court, and the jury would likely accord them greater reverence than influences in other situations. By all accounts some of the unauthorized comments were made by the prosecutors or police officers, both state representatives, who were likely to be accorded particular weight.

Comments by the State may also have violated rules prohibiting testimonial assertions to facts not in evidence, within the prosecutor's personal knowledge, during argument. This could have prejudiced Petitioner particularly given the lack of adequate procedures to safeguard against it or mitigate harm. *United States v. Causey*, 185 F.3d 407, 417 (5th Cir. 1999) ("Improper comments by the prosecutor may constitute reversible error when the defendant's right to a fair trial is substantially affected").

When a jury considers extraneous evidence, prejudice is presumed and the burden is on the State to demonstrate that the misconduct was not prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954) (stating that ""private communication, contact, or tampering" with the jury is presumptively prejudicial"); *Oliver v. Quarterman*, 541 F.3d 329, 340-41 (5th Cir. 2008) ("under *Remmer*, if prejudice is likely from the jury's consultation of an external influence, the court may place the burden of rebutting that presumption on the state") (citations omitted). The State has not met its burden; crime scene evidence was critical to the State's theory concerning the *only* element of the offense in dispute in Petitioner's trial. Petitioner's death sentence and conviction for first-degree murder should be reversed.[129]

## C. Petitioner's rights to a fair trial by an impartial jury were violated when the jury engaged in premature deliberations

The jury is required to refrain from prematurely discussing a case in order to protect a defendant's Sixth Amendment right to a fair trial as well as his due process right to place the burden on the government to prove its case beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *See also United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993) (reversing conviction and remanding for new trial after district court failed to conduct adequate investigation into evidence that jurors engaged in premature discussions about the evidence).

The jury were invited to ask questions at the scene and engaged in interactions with prosecutors and third parties. This raises serious concerns regarding premature deliberations.

---

[129] Petitioner acknowledges that the Fifth Circuit has held that in habeas cases, Petitioner must demonstrate the higher standard that juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). *E.g. Oliver*, 541 F.3d, 341. Petitioner submits that the Fifth Circuit is incorrect and that *Brecht* does not apply; other circuits agree. *See McNair v. Campbell*, 416 F.3d 1291, 1309 (11th Cir. 2005) (on habeas review assessing prejudice resulting from juror misconduct without applying *Brecht*); *Grotemeyer v. Hickman*, 393 F.3d 871, 880 (9th Cir. 2004) (same); *States v. Johnson*, 2009 U.S. App. LEXIS 1872 (6th Cir. 2009) (same). Even if *Brecht* does apply, the jury misconduct in this case, the prejudice of the extraneous influences on the jury meets this standard. Petitioner is entitled to a trial and sentencing hearing under the Sixth, Eighth and Fourteenth Amendments.

Jurors are required to refrain from engaging in discussions prior to the conclusion of evidence and the Court's instructions.   The prohibition on premature discussion by a jury protects Petitioner's rights to a fair trial by an impartial jury, and to due process of law in requiring the prosecution to prove their case beyond reasonable doubt.

> **D. Petitioner's constitutional rights to due process, to appeal, to the effective assistance of counsel and to judicial review based on a complete record of the proceedings were violated when the critical parts of the court proceedings at the crime scene were not recorded.**

There is no federal constitutional right to an appeal.  However, where a State has created a right of appeal, "the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985).  This includes the proper provision of transcripts, where it is required by state law. *Entsminger v. Iowa*, 386 U.S. 748, 751 (1967) (due process violated where Petitioner had not received full transcript of trial for appeal, in violation of state law requiring it).  Provision of complete trial transcripts on appeal is also a corollary of the Sixth Amendment right to the effective assistance of counsel on appeal.  *See Hardy v. United States*, 375 U.S. 277 (1964):

> As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law.  Anything short of a complete transcript is incompatible with effective appellate advocacy.

*Id.* at 288; *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (finding that state must provide such a transcript to indigent criminal appellants who could not afford to buy one if that was the only way to assure an "adequate and effective" appeal, holding due process and equal protection violated by state's failure to do so).

Louisiana guarantees Petitioner the constitutional rights to appeal, La. Const. art. V § 5(D)(2), *and* to judicial review based on a complete record of the proceedings; La. Const. art. I, §

19.   Various procedural provisions supplement these rights.[130]  The burden is on the court, not

the defendant to ensure that the proceedings are properly recorded and transcribed.[131]  Louisiana

recognizes that provision of a complete transcript is necessary for a meaningful appeal, and that

material omissions from a transcript of proceedings at trial bearing on the merits of an appeal

will require reversal.  *State v. Ford*, 338 So.2d 107, 110 (La.1976) ("Without a complete record

from which a transcript for appeal may be prepared, a defendant's right of appellate review is

rendered meaningless"; finding reversal required when record missing the testimony of four state

witnesses and the voir dire of prospective jurors); *State v. Robinson* 387 So.2d 1143 (La. 1980)

(reversal required when record failed to contain the testimony of a State and defense expert

witness).  Louisiana also recognizes that full recording is particularly important where appeal

counsel is different from trial counsel.  *State v. Landry*, 751 So.2d 214, 215 (La. 1999) (noting

particular importance of full recording of trial proceedings in cases where trial counsel does not

do the appeal); *United States v. Upshaw*, 448 F.2d 1218 (5th Cir. 1971) (same), *cert. denied*, 405

U.S. 934, (1972); *United States v. Garcia-Bonifascio*, 443 F.2d 914 (5th Cir. 1971) (same).

Although the court reporter attended the crime scene with the jury, the crucial periods

where the jury walked to view the scene were off the record.  R. 3938-39.  The failure of the trial

court to ensure adequate recording of proceedings during the jury crime scene visit violated

Petitioner's federal constitutional rights to due process in the implementation of his state

---

[130] La.C.Cr.P. art. 843 provides: "In felony cases, and on motion of the court, the state, or the defendant in misdemeanor cases tried in a district, parish, or city court, the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections."
[131] *See State v. Johnson*, 237 So.2d 38 (La.1970); La.C.Cr.P. art. 17 "criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done"; *State v. Bizette*, 334 So.2d 392 (La.1976).  La.R.S. 13:961(C) provides that in criminal cases tried in the judicial districts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. *State v. Landry*, 751 So.2d 214, 215 (1999) (reversing capital murder conviction based on inadequate record); *State v. Boatner*, WL 22853865, at 2 (La. 2003).

constitutional rights of appeal and judicial review based on a complete record of proceedings. The jury crime scene viewing involved the taking of the evidence which was critical to the State's case for specific intent.   This omission is material and undoubtedly effected the defendant's ability to appeal; had the proceedings been recorded, the record would have revealed the unauthorized interactions between the jury and third parties at the scene (prosecution and the police), which constitutes juror misconduct that violates Petitioner's rights to a fair and impartial jury, to confrontation and to cross examination of witnesses.   The prejudice is further compounded in this case because, not only was Petitioner's appellate counsel different from trial counsel, and therefore not present at the scene to observe these errors, and any other that occurred, but *Petitioner was not there either.*   Thus Petitioner's conviction should be reversed due to violations of his constitutional rights to an effective appeal, to a full record with which to appeal, and to due process.

### E.   Petitioner's Due Process rights to a fair trial were violated when the trial court woefully failed to conduct a critical part of the trial proceedings according to minimum standards of due process or fairness.

The numerous constitutional violations asserted above individually and cumulatively require reversal of Petitioner's conviction.  However, regardless of whether they are deemed to warrant reversal in themselves, they represent symptoms underlying a more chronic deprivation of rights; the trial court fundamentally failed to ensure the integrity of the entire proceedings at the scene. "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Because the proceedings were not recorded, and Petitioner could neither see nor hear events at the scene, he will probably never know the extent of the misconduct and other errors which took place.  Part of the injury suffered in this situation is that the scope of the harm

to Petitioner is *unknown.* Petitioner fears he has uncovered only the tip of the iceberg. Petitioner cannot be deprived of his right to a new and fair trial, because the court was so derelict in its duties that the harm was hidden from him. The numerous errors already identified raise an inference that the integrity of the proceedings is entirely unreliable. The crime scene proceedings were critical to the State's case for specific intent, the *only* issue in dispute at his trial. In such a situation, the chronic deprivation of due process on multiple levels, both known and unknown, requires that Petitioner's conviction for first-degree murder be reversed.

In the alternative, Petitioner asserts that his rights to the effective assistance of counsel under *Strickland* were violated when trial counsel failed to object to any or all of the violations detailed above. Had trial counsel performed his duty, the errors would have been raised and dealt with. Because they did not, Petitioner suffered prejudice for all the reasons discussed above; but for trial counsel's failure, there is a reasonable probability that the outcome would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).

### F. Applicability of § 2254(d)

The state district gave no reasons for denying the merits of Petitioner's jury misconduct claims. State Court Order, 1/5/07. It is therefore impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor,* 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court. *See* Part One (A)(IV)(3). If § 2254(d) is to be applied, the court should conduct an independent review of the facts to determine the facts the court was silent upon. *Id.*

The complete lack of any reasoning provided by the court, in itself raises significant concern as to the reasonableness of the decision under § 2254(d). *See* Part One (A)(IV)(4)(b)-(c). In addition, the court's failure to hold an evidentiary hearing, to properly develop the facts, also undermines the reasonableness of the court's decision. *Id. See also, e.g., Smith v. Phillips,*

455 U.S. 209, 215 (U.S. 1982) ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"). When Petitioner urged his request for a hearing on this claim orally before the district court, the court indicated that part of its reason for denying a hearing was because the court was present at the crime scene visit. There was no record of the proceedings at the scene. The judge's reliance on his own memory of what happened several years earlier raises further questions about the reliability of his factual findings and decision to deny relief. *See McKenzie v. Risley*, 915 F.2d 1396, 1397-98 (9th Cir. 1990) (rejecting state trial judge's determination, and ordering hearing to assess whether state judge's ex parte meeting with prosecutor prior to sentencing prejudiced petitioner.) *Tyler v. Swenson*, 427 F.2d 412, 415 (8th Cir. 1970) (state judge relied on memory of prior proceedings and did not allow himself to be cross-examined).

In any event the evidence and legal arguments supporting the claim is so overwhelmingly strong that that whatever the basis for the court's findings, its decision constitutes an unreasonable application of the law under § 2254(d)(1), an unreasonable determination of the facts under § 2254 (d)(2), and was based on factual findings that are contradicted by clear and convincing evidence under § 2254(e)(1). His conviction should be reversed.

### G. An evidentiary hearing is required

In the alternative, if the court finds that reversal is not warranted based on the facts as established in the existing record, or that there are unresolved factual disputes, Petitioner is entitled to an evidentiary hearing so that he may fully explore the events that unfolded at the jury's crime scene viewing, and demonstrate the prejudice that resulted. *See, e.g., Smith v. Phillips*, 455 U.S. 209, 215 (U.S. 1982) ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *Williams v. Taylor*,

529 U.S. 420, 442 (2000) (ordering evidentiary hearing on claim of juror misconduct, to allow petitioner opportunity to establish that juror "was not impartial").

Petitioner has alleged facts, which if proven, would entitle him to relief. Because the state court failed to hold an evidentiary hearing (despite Petitioner's several requests), and failed to provide any reasons for denying the merits of these claims, Petitioner is entitled to an evidentiary hearing, under the *mandatory* requirements of *Townsend*. *See* Part One, V.

## XII.   PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL JURY AND A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WHEN THE JURY ENGAGED IN NUMEROUS ACTS OF MISCONDUCT AND THE JURY'S DELIBERATIONS WERE PREJUDICED BY EXTRANEOUS AND IRRELEVANT FACTORS.

The "Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 85 (1988) (*citing Wainright v. Witt,* 469 U.S. 412 (1985).

> [I]n the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.

*Turner v. Louisiana,* 379 U.S. 466, 472-73 (1965). The need for truly impartial jurors is particularly acute at capital sentencing, where "the range of discretion entrusted to a jury in a capital sentencing hearing" creates "a unique opportunity for . . . prejudice to operate." *Turner v. Murray,* 476 U.S. 28, 35 (1986). Additionally, in a capital case, the Eighth Amendment mandates that the death penalty may be constitutionally imposed only when the State's sentencing scheme focuses the jury on the specific factors it is to consider in reaching a verdict and when the jury is free from the influence of arbitrary and prejudicial factors. *See Godfrey v. Georgia,* 446 U.S. 420, 428 (1980). Similarly, due process requires that the verdict and sentence must be based on the evidence developed at trial. *See Turner,* 379 U.S. at 473.

All of these rights were denied to Petitioner when the jury engaged in numerous acts of misconduct, including: premature deliberations; improper discussions of parole during sentencing deliberations; and improper speculation as to non-existent extra-record facts outside the record of Petitioner's juvenile record, drug abuse and gang membership.

### A. Petitioner Was Denied His Right To A Fair And Impartial Jury During The Guilt/Innocence And Penalty Phases Of His Trial When The Jury Engaged In Premature Deliberations During Both Phases.

Petitioner's Sixth and Fourteenth Amendment rights to due process, to a fair trial, and to the presumption of innocence were violated when jurors engaged in premature deliberations at both phases of his trial. *See In re Winship*, 397 U.S. 358, 364 (1970). *See also United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993) ("It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body.") Premature deliberations create a great risk of prejudice. *Id.* at 689-90.[132]

---

[132] "There are a number of reasons for this prohibition on premature deliberations in a criminal case... First, since the prosecution presents its evidence first, any premature discussions are likely to occur before the defendant has a chance to present all of his or her evidence, and it is likely that any initial opinions formed by the jurors, which will likely influence other jurors, will be unfavorable to the defendant for this reason. *See Commonwealth v. Kerpan*, 508 Pa. 418, 498 A.2d 829 (1985). Second, once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint. *See Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir.1945); *State v. Joyner*, 346 S.E.2d 711, 712 (1986). Third, the jury system is meant to involve decision-making as a collective, deliberative process and premature discussions among individual jurors may thwart that goal. *See Winebrenner*, 147 F.2d at 329; *Kerpan*, 498 A.2d, 831. Fourth, because the court provides the jury with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the reasonable doubt standard. See *Winebrenner*, 147 F.2d, at 327. Fifth, if premature deliberations occur before the defendant has had an opportunity to present all of his or her evidence (as occurred here) and jurors form premature conclusions about the case, the burden of proof will have been, in effect, shifted from the government to the defendant, who has "the burden of changing by evidence the opinion thus formed." Id. at 328. Finally, requiring the jury to refrain from prematurely discussing the case with fellow jurors in a criminal case helps protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364, (1970)." *U.S. v. Resko*, 3 F.3d 684, 689-90 (3rd Cir. 1993).

The foreman of Petitioner's capital jury recalled that despite the judge's instructions not to discuss the evidence during the trial, some of the jurors did talk about the evidence before deliberations began:

> The judge clearly instructed the jury that they were not to talk about the case. Some of the other jurors talked about the trial at lunch some days, discussing the evidence they had just heard.

Declaration of Gary McDonald (unsigned) to Supplemental Petition, Ex. 109, Exh. A.[133]  He also remembered a detailed discussion between a juror and an alternate juror concerning technical matters about guns, including issues of velocity:

> At one meal time I remember a juror and an alternate juror having an in depth discussion about guns; they both seemed to know a lot about them.  One of them said he had a cupboard full of thousands of bullets at home.  I think he did shooting as a sport, not for hunting.  They were talking about the mechanics of guns; shooting and re-loading guns, distances, technical things, something about bullet velocity.  It was a technical discussion and I tuned out.

*Id.*  While juror McDonald does not confirm whether the lunchtime discussion concerned evidence presented at trial, the discussions certainly correspond to such evidence.  The ballistics and gun related evidence was hotly contested at trial.  The *only* issue in dispute at the guilt phase was specific intent.  The State's theory adopted virtually everything in Petitioner's confession, except the circumstances surrounding the shooting homicide.  According to Petitioner, the shooting of the victim was an accident that occurred during a struggle; as such he did not have specific intent to kill.  A key aspect of the State's case for specific intent was ballistics evidence suggesting that there was no struggle between the victim and the defendant; this was contested by the defense who argued conversely that the ballistics evidence demonstrated the likelihood of

---

[133] Alternate Juror, David Petty, also recalls that jurors discussed the evidence in the case outside of deliberations: Sometimes in the corridor when we were being moved from one place to the other someone might comment on what we'd seen, that some evidence was convincing.  Declaration of David Petty, Supplemental Petition, Ex. 107.

a struggle.  Thus a key issue before the jury was what the gun evidence indicated—including what physical evidence and scientific calculations of bullet velocity suggested with regard to the likely angle of the gun and the distance of the gun from the body.  In this context, and in conjunction with statements indicating that jurors did talk about the case during lunch, the lunchtime discussions about "shooting and re-loading guns, distances, technical things, something about bullet velocity" suggests that the jurors prematurely discussed this key evidence.  In addition, given the obviously "technical" nature of the subject matter, there is a risk that the discussions by jurors with knowledge of guns and ballistics and any conclusions that they reached would have functioned as unauthorized expert opinion on the matter, extraneous evidence that Petitioner had no opportunity to confront.

Petitioner has presented further evidence of premature deliberations elsewhere.  First, several jurors asked questions of the prosecutors or police officers during the jury's visit to the crime scene part way through the guilt phase.  2nd Affidavit of Caroline Wallace (Alternate Juror Austin Beasley), Supplemental Petition, Ex. 108; Declaration of Mari Lower, Supplemental Petition, Ex. 106.  The location of the offense was a second key factor in the State's case for specific intent.  Indeed, jury foreman, Gary McDonald, indicated that the location of the shooting (down a long wooded path), was critical to his finding of specific intent.  Supplemental Petition, Ex. 109.

Secondly, during the trial, jurors discussed their perception that Mr. Hoffman was using the "race card" in order to try and "get off."  Juror Lower stated that she had this concern from the start of trial.  Supplemental Petition, Ex. 106.  As argued elsewhere, Petitioner asserts that these discussions indicate that Ms. Lower and other jurors had prematurely judged the

defendant's guilt.  The jurors would not have thought Petitioner needed to play the race card "to get off later" if they presumed he was innocent—a presumption required by law.

Prejudgment of the guilt (or death worthiness) of a capital defendant, such that jurors are already contemplating the defendant's tactics on appeal to "get off," is inherently prejudicial. This reaches such a level that bias is implied and reversal is automatic. *Leonard v. United States,* 378 U.S. 544 (1964) (per curiam) (holding that prospective jurors who had heard the trial court announce the defendant's guilty verdict in one trial should have been automatically disqualified from sitting on a second trial on similar charges). For this reason, Petitioner's conviction must be reversed.

In the alternative there is sufficient showing to create a presumption of prejudice under *Remmer v. United States,* 347 U.S. 227, 229 (1954) ("private communication, contact, or tampering" with the jury is presumptively prejudicial"); *Oliver v. Quarterman,* 541 F.3d 329, 340-41 (5th Cir. 2008) ("under *Remmer,* if prejudice is likely from the jury's consultation of an external influence, the court may place the burden of rebutting that presumption on the state") (citations omitted).   Under *Remmer,* Petitioner is entitled to relief unless the State can show beyond reasonable doubt that there was no harm.  When "the court determines that prejudice is likely the government must prove its absence." *United States v. Sylvester,* 143 F.3d 923, 934 (5th Cir. 1998).  In the alternative Petitioner demonstrates actual prejudice, warranting relief under *Smith v. Phillips,* 455 U.S. 209, 217 (1982).  The "ultimate inquiry" for the court is whether "the intrusion affect[ed] the jury's deliberations and thereby its verdict." *United States v. Olano,* 507 U.S. 725, 739 (1993).

Similarly, the premature deliberations of jurors, and consideration of quasi expert evidence from members of the jury concerning key evidence of the only element in dispute at

Petitioner's first degree murder trial was prejudicial to him.  It results in a presumption of bias under *Remmer,* which cannot be rebutted, or in the alternative evidences actual prejudice under *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Petitioner's conviction and death sentence should be reversed.  *United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993) (conviction reversed and case remanded for new trial because all jurors admitted to premature deliberations). *See also Oswald v. Bertrand*, 374 F.3d 475 (7th Cir. 2004) (affirming grant of habeas relief where the trial court, among other errors, failed to conduct an adequate inquiry into pretrial conversations among potential jurors that defendant was likely guilty).  Petitioner's death sentence and conviction for first-degree murder should be reversed.  *See also Doan v. Brigano*, 237 F.3d 722, 733 (6th Cir. 2001) (finding Sixth Amendment violation where juror conducted out of court experiment and reported her findings to the jury in the manner of an expert witness; "[i]n short, Juror A's experiment and her subsequent report of its results, results which indicated that Doan may not have been truthful in his testimony on the witness stand, injected extraneous and potentially prejudicial evidence into the jury's deliberations, evidence which Doan and his attorneys had no chance to refute.")

Petitioner acknowledges that the Fifth Circuit has held that a Petitioner in habeas cases must demonstrate the higher standard of harm under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), that the juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  *E.g. Oliver,* 541 F.3d at 341.  Petitioner submits that the Fifth Circuit is incorrect and that *Brecht* doesn't apply; other circuits agree.  *See McNair v. Campbell,* 416 F.3d 1291, 1309 (11th Cir. 2005) (on habeas review assessing prejudice resulting from juror misconduct without applying *Brecht*); *Grotemeyer v. Hickman*, 393 F.3d 871, 880 (9th Cir. 2004) (same); *States v. Johnson*, 2009 U.S.

App. LEXIS 1872 (6th Cir. 2009) (same).   However, even if *Brecht* does apply, the jury

misconduct in this case, meets that standard.   Petitioner is entitled to a new trial and sentencing

hearing under the Sixth, Eighth and Fourteenth Amendments.

### B. Petitioner Was Denied His Right To A Fair Trial And Reliable Sentencing By An Impartial Jury Free From Arbitrary Extraneous Factors When The Jury Discussed During Deliberations the Possibility that, if They Voted For Life, Petitioner Could Be Paroled

In Louisiana, a defendant convicted of first-degree murder shall be sentenced to death or

to life imprisonment without benefit of parole, probation or suspension of sentence. La.R.S.14:30

(C).   Petitioner's jurors were instructed accordingly at the conclusion of Mr. Hoffman's penalty

phase. R. 4534.   Pursuant to La.C.Cr.P. art. 905.4 the court further instructed the jury in relation

to the governor's powers regarding reprieves, commutation, and pardons:

> Under the Constitution of Louisiana, the governor is empowered to grant a reprieve, a pardon, or a commutation of sentence following conviction of a crime. The governor may, in exercising such authority commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence with the possibility of parole.   The governor may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. Under this authority, the governor may allow the release of an offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon.

R. 4534-35.   However, the jury was also instructed to ignore these powers of the governor in

making their decision: "the fact that the governor is granted the authority I've just described

should not influence your deliberations or vote in this case." R. 4535.

Petitioner's jury disregarded this instruction.   Juror Mari Lower remembered that several

jurors, including herself, expressed concern that Petitioner might get out of prison and reoffend,

and said that this consideration was "*very important*" to the jury's decision to return a death

verdict:

> Several of the jurors were worried that he might be released one day or escape and if he did he'd do it again.   This was discussed in deliberations and considered

> by us in deciding that he should get the death penalty. I felt it was my duty to make sure that the young girls out there were protected from him. This was very important to our decision.

Declaration of Mari Lower, Supplemental Petition, Ex. 106. The jury foreman, Gary McDonald, confirmed that the jury discussed their concern that if Mr. Hoffman was sentenced to life in prison, he could be released. He also recalled that it was a factor he considered when deciding to vote for the death penalty:

> A professor testified for the defense as an expert on the prison system. He testified that people who are convicted of crimes like the one we were dealing with do not get pardoned or paroled and are never released. We discussed this testimony in deliberations. Some jurors were concerned that in fact Mr. Hoffman might one day be released if he got a life sentence. I am skeptical of politicians and I did not trust that in 20 years Mr. Hoffman would not be released even if he was sentenced to life. This was something I thought about when deciding the penalty.

Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury Foreperson, Supplemental Petition, Ex.109.

It is clear that several jurors speculated extensively about the possibility of Petitioner being granted parole and their fear of Petitioner being released. At best, the jury misunderstood the possibility of parole and the judge's instructions. At worst, they consciously chose to disregard the relevant law. There is no question that the jury's misapprehension about the possibility of parole was a significant factor in their decision to sentence Petitioner to death. The United States Supreme Court has discussed the seriousness of a juror's mistaken belief that a defendant could be released on parole if not executed:

> To the extent that this misunderstanding pervaded its deliberations, it had the effect of creating a false choice between sentencing him to death and sentencing him to a limited period of incarceration.

*Simmons v. South Carolina*, 512 U.S. 154, 161 (1994) (reversing and remanding for capital resentencing where jury was allowed to deliberate in such circumstances). While the *Simmons*

Court was addressing a trial court's refusal to give instructions regarding the defendant's ineligibility for parole, its analysis regarding a jury's misunderstanding of the relevant law, and the resulting false choice between a death sentence and limited incarceration, applies directly to Petitioner's case.   Petitioner was unfairly sentenced to death because a number of jurors deliberated within the confines of such a false choice.

Moreover, a potential determination by the Pardon Board, Governor, and Parole Board that Petitioner has sufficient redeeming virtues to merit commutation from death sentence to a prison term with parole eligibility is an impermissible reason for him to be executed.  *Zant v. Stephens,* 462 U.S. 862, 885 (1983) (unconstitutional to predicate a sentence of death on matters which should rather be considered mitigating); *Turner v. State* 573 So. 2d 657, 673-75 (Miss. 1990) (finding ineligibility for parole to be mitigating evidence that should be before a jury in capital sentencing).  For this reason too, the jury's consideration of the possibility of his release in deciding that he should die violated his rights to Due Process and a fair and reliable sentencing hearing.

The jury's consideration of a possibility they had been expressly instructed not to consider also shows that they impermissibly considered extrinsic evidence in reaching a decision, in violation of Due Process.  *Turner v. Louisiana,* 379 U.S. 466, 473 (1965) (The jury's verdict and sentence must be based on the evidence developed at trial).  Finally, it violated the separation of powers for the jury to speculate what the executive branch may elect to do in years to come.

As the Fifth Circuit has held, to warrant relief from juror misconduct concerning improper parole discussions, the petitioner must show prejudice.  *Drew v. Collins*, 964 F.2d 411, 415-16 (5th Cir. 1992) (parole discussions by capital jurors in sentencing constitutes misconduct

which requires relief where it prejudiced the defendant).  In *Drew*, the court found no prejudice from the improper discussions because a juror gave a statement that it did not influence their answers.  In contrast in this case, Mari Lower clearly stated that jurors' fears that Petitioner would one day be released was "very important to our decision."  Prejudice is proven, under *Brecht,* under *Smith,* under *Remmer,* or any other possibly applicable standard.  Petitioner is entitled to a new sentencing hearing under the Sixth, Eighth and Fourteenth Amendments.

### C. Petitioner Was Denied His Right To A Fair And Impartial Jury During The Penalty Phase Of His Trial When The Jury Improperly Speculated That Petitioner Was Involved With Drugs And Was A Member Of A Gang.

According to Juror Mari Lower:

> During the penalty phase deliberations we wanted to know whether the defendant had a juvenile record.  We thought that given his background he may have a history of drug use and things like that.  We wondered if he was in a gang.

Declaration of Mari Lower, Supplemental Petition, Ex. 106.  Elsewhere Petitioner asserts that the jury's speculation of Petitioner's involvement with drugs and gangs was the result of racial stereotyping, and that their speculation about a possible juvenile record resulted from exposure to pre-trial publicity and/or the trial court's insufficient response to the jury's question about it.  Claims IX, XIII, XVI.  He incorporates those allegations herein. Regardless of the cause of the speculation, the discussion of such matters alone constitutes misconduct, requiring reversal of Petitioner's death sentence.  No evidence at trial showed that Petitioner ever took drugs or was in any way related to any gang activities.  Several defense witnesses testified that they never knew him to take drugs, to get into trouble, or to be violent.  R. 4364, 4432, 4487, 4481, 4471. Similarly, the evidence at trial was uncontroverted in showing that Mr. Hoffman had no prior criminal history.  R. 3595-96, R. 3610-11.

When a jury considers matters extraneous to evidence duly presented in court, his Sixth and Fourteenth Amendment rights to confrontation, effective assistance of counsel, and due

process are violated. *Turner v. Louisiana,* 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."). The Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida,* 430 U.S. 349 (1977).[134]

Juror Lower's declaration establishes that the jury acted improperly by considering extraneous evidence in determining Petitioner's punishment. Other crimes evidence is aggravating and inherently prejudicial. Evidence of other crimes, "no matter how minor the crime, may tend to inject an arbitrary factor into the hearing." *State v. Jackson,* 608 So. 2d 949, 954 (La. 1992). Courts typically employ strict procedures to ensure the reliability and relevance of such evidence before it is admitted for consideration at a penalty phase. Louisiana is no exception, and evidence of juvenile record is particularly restricted. *Id.* (limiting admissibility generally to crimes of violence, and further limiting admissibility of juvenile adjudications to felonies, and limiting admissions of unadjudicated juvenile conduct yet further). The Louisiana Supreme Court noted that these limitations were necessary "in order to insure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing." *Id.*

---

[134] In addition, the United States Supreme Court has held that gang affiliation, without evidence that such affiliation entails criminal activity, is protected under First Amendment rights to freedom of association and *cannot* be considered in aggravation in a capital case where evidence is not relevant to any issue being decided at penalty phase. *Dawson v. Delaware,* 503 U.S. 159 (1992) (applying principle enunciated in *Zant v. Stephens* that an aggravating circumstance is invalid if "it authorizes a jury to draw adverse inferences from conduct that is constitutionally protected" 462 U.S. 862, 885 (1983)). In *Dawson,* the Court found that a stipulation as to the defendant's membership in an Aryan gang was irrelevant to the penalty phase because the evidence was not tied in any way to the murder of the victim, and there was no showing that the organization committed any unlawful or violent acts or even endorsed those acts. As presented, the stipulation provided no evidence of aggravating circumstances nor did it constitute a permissible rebuttal of mitigating circumstances.

Consideration of gang affiliation is even more aggravating, and has great potential for prejudice where improperly considered. Courts have found that it indicates violent propensities, future dangerousness, and can even counter-act statutory mitigation of youth. *See, e.g., United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) (finding gang membership to be evidence of future dangerousness and holding that the jury "necessarily" rejected the defendant's age as a mitigating factor because crime was climax of gang activities which made him older, criminally, than his chronological age). There is no question that consideration of juvenile criminality and gang membership was prejudicially considered in this case. This improper consideration is all the more prejudicial because Petitioner's youth and his lack of prior violence or criminality were the thrust of the defense's case for life.

The jury's consideration of highly prejudicial, inadmissible, and extraneous evidence at his penalty phase prejudiced petitioner under *Brecht,* under *Smith,* under *Remmer* and under any other possibly applicable standard; he is entitled to a new sentencing hearing under the Sixth, Eighth and Fourteenth Amendments. *See United States v. Keating*, 147 F.3d 895 (9th Cir. 1998) (conviction reversed because jurors knew of or became aware of a state court conviction on related charges); *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972) (conviction reversed because jurors knew about inadmissible evidence and some jurors used this information to convince other jurors of the defendant's guilt).

### D.  Applicability of § 2254(d)

The state district court gave no reasons for denying the merits of Petitioner's jury misconduct claims.  State Court Order, 1/5/07.  It is therefore impossible to apply the requirements of §2254(d) pursuant to *Williams v. Taylor,* 529 U.S. 362 (2000), so the claims should be considered *de novo* by this court. *See* Part One, IV(A)(3).  If § 2254(d) is to be

applied, the court should conduct an independent review of the facts to determine the facts the court was silent upon. *Id.*

The complete lack of any reasoning provided by the court, in itself raises significant concern as to the reasonableness of the decision under § 2254(d). *See* Part One IV(A)(4)(b)-(c). In addition, the court's failure to hold an evidentiary hearing, to properly develop the facts, also undermines the reasonableness of the court's decision. *Id.* S*ee also, e.g., Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias").

In any event the evidence and legal arguments supporting the claims are so overwhelmingly strong that whatever the basis for the state court's findings, its decision constitutes an unreasonable application of the law under § 2254(d)(1), an unreasonable determination of the facts under § 2254 (d)(2) and was based on factual findings that are contradicted by clear and convincing evidence under § 2254(e)(1). §2254 (d) does not bar relief, and Petitioner is entitled to the reversal of his conviction and/or death sentence.

**E.      An Evidentiary Hearing is Required**

If this court finds that the facts are insufficiently developed to warrant relief, or that there are unresolved factual disputes, Petitioner is entitled to an evidentiary hearing on these claims. *Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *Dennis v. United States*, 339 U.S. 162, 171-72 (1950) ("Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury"); *Williams v. Taylor*, 529 U.S. 420, 442 (2000) (ordering evidentiary hearing on claim of juror misconduct, to allow petitioner opportunity to establish that juror "was not impartial").

Petitioner has alleged facts, which if proven, would entitle him to relief. Because the state court failed to hold an evidentiary hearing (despite Petitioner's several requests), and failed to provide any reasons for denying the merits of these claims, Petitioner is entitled to an evidentiary hearing, under the *mandatory* requirements of *Townsend. See* Part One V. *And see Conway v. Polk,* 453 F.3d 567, 589-90 (4th Cir. 2006) (remanding for evidentiary hearing on claim of juror misconduct where state court denied his request for a hearing "depriving him of the opportunity to build a factual record."); *Weaver v. Thompson,* 197 F.3d 359, 362 (9th Cir. 1999) (remanding for evidentiary hearing where the state court at no time held an evidentiary hearing to determine the substance of the extraneous evidence or the affect it had on jury deliberations); *Stockton v. Virginia,* 852 F.2d 740, 743-45 (4th Cir. 1988) *cert. denied,* 489 U.S. 1071 (1989) (federal hearing required given absence of state court fact-finding on critical question of whether and how third party contacted juror during deliberations).

## XIII. PETITIONER'S CONVICTION AND DEATH SENTENCE SHOULD BE VACATED BECAUSE HE WAS DENIED HIS RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO DUE PROCESS, TO A FAIR TRIAL BY A FAIR AND IMPARTIAL JURY, AND TO A RELIABLE SENTENCING HEARING FREE FROM ARBITRARY FACTORS WHEN THE TRIAL COURT DENIED HIS MOTION FOR CHANGE OF VENUE

Petitioner's rights to due process, to a fair trial by a fair and impartial jury, and to a reliable sentencing hearing free from prejudicial and arbitrary influences were violated when the trial court denied his pre-trial motion for change of venue. R. 3643-47.

When pre-trial publicity is pervasive, a change of venue is required in order to preserve the accused's right to an impartial jury. *See Irvin v. Dowd,* 366 U.S. 717 (1961); *Rideau v. Louisiana,* 373 U.S. 723 (1963); *Sheppard v. Maxwell,* 384 U.S. 333, 351-55 (1966); *Estes v. Texas,* 381 U.S. 532 (1965). Denial of a motion for change of venue is presumptively prejudicial when the pre-trial publicity was inflammatory and saturated the community. *Sheppard,* 384 U.S.

305

at 362-63; *Rideau*, 373 U.S. at 726-27; *Pamplin v. Mason*, 364 F.2d 1, 4-6 (5th Cir. 1966); *United States ex rel. Bloeth v. Denno*, 313 F.2d 364, 372-73 (2nd Cir. 1962).

Prior to trial, Mr. Hoffman sought a change of venue on the ground that prejudicial and inflammatory media coverage and general prejudice in the community precluded him from receiving a fair trial in St. Tammany Parish. Motion for Change of Venue, R. 291-96; *see also* R. 2041, 2222, 3518-28. His arrest and trial riveted the public and engendered extensive media coverage in the newspapers, television and radio. *See* Appeal Brief, 6-12, and attached exhibits. Reports repeatedly asserted that Mr. Hoffman had made a full confession to robbery, rape, and murder and incorrectly stated that he had been identified from the videotape of the ATM transaction. The televised reports often showed footage of Mr. Hoffman being escorted to jail and to court clothed in prison garb and in shackles. St. Tammany officials frequently appeared in televised news broadcasts discussing details of the murder investigation, with District Attorney Walter Reed conducting a news conference after the return of the grand jury indictment and telling the community that he was "convinced that 19 [sic] year old Jessie Hoffman kidnapped Mary Elliot in New Orleans and killed her last month near Slidell."

From the outset of the case, Mr. Reed attempted to use Mr. Hoffman's position as an outsider—both because of Mr. Hoffman's race[135] and because of his hometown—in an effort to engender fear. Mr. Reed announced he would "seek and ask for the death penalty" so as to "issue a strong statement to the criminal element of New Orleans that we will not tolerate this type of victimization of our citizens in St. Tammany Parish." His "message" continued: "What I'm saying is to the criminal element of New Orleans, don't think that you can come across those

---

[135] Mr. Hoffman was a young black male accused of kidnapping, raping and murdering a young white woman in a parish in which approximately 90 percent of the registered voters were white and African Americans constituted approximately 12.2 percent of the population.

bridges and we're easy picking and we're just going to take it and not do anything about it." Mr. Reed was not alone in his sentiments. One St. Tammany citizen told reporters that "[n]othing that happens in New Orleans surprises me over in that zoo. That's why we live over here in God's country to get away from all that nonsense over across the lake."

Elsewhere, Petitioner argues that the State exercised its discretion as to choice of venue (St. Tammany over New Orleans), and peremptory strikes (striking the only two qualified potential African Americans from the jury), based on racial considerations. See xxx. The evidence of race-based intent presented in those claims is further evidence of prejudice in the St. Tammany community, from which the jury was drawn. The likelihood that few or no minority members would be seated on the jury (and the fact that none were seated) clearly magnified the possibility of a conviction and death sentence returned on the impermissible basis of racial bias.

Moreover, as discussed more fully elsewhere, the State constructed and presented its case against Jessie Hoffman to appeal to such prejudices of St. Tammany jurors. This confirms that the State, at the very least, recognized that the prejudice was there to exploit. See xx.

The thinly-veiled racism present in the comments by Mr. Reed and the unnamed citizen were also reflected in the attitude of the jury later seated at Mr. Hoffman's trial, as evidenced by the statement of Juror Mari Lower. Declaration of Mari Lower, Supplemental Petition Ex. 106. See xxx.

The extensiveness of the media coverage of Petitioner's case was confirmed during voir dire.[136] The community's engrossment continued as the case went to trial. The December 27,

---

[136] Seventy-two (80%) of the ninety prospective jurors from whom the jury was selected, and nine of the twelve jurors selected (75%) indicated that they were familiar with the facts of this case. R. 1677, 1941, 2274, 2605, 3040, 3124. The district court excused seven prospective jurors specifically on the basis of pretrial publicity, R. 2201, 2200, 2419, 2425, 2421, 2423, 2896, although seven other jurors (for a total of fourteen), who were excused on other grounds, were removable due to publicity, as they testified that pretrial publicity had led them to form opinions

1998 Slidell edition of *The Times Picayune* listed the two-week trial of this case among its "top ten" news stories of 1998.   The same article also indicates that emotions and outrage were running particularly high at the time—another of the "top ten" stories concerned the recent kidnap, rape, and murder of 11-year-old Lorin Easterling in St. Tammany parish on April 15, 1998.  Voir dire in Petitioner's case commenced just a few weeks later, on June 5th.

The Louisiana Supreme Court recognized the media frenzy and climate of fear surrounding the case:

> The widespread publicity and community outrage generated by the crime is not disputed.
>
> . . . This event must be viewed against the backdrop of fear and desperation caused by a crime wave that engulfed both St. Tammany and Orleans in November of 1996. First, as the videotaped and printed news reports submitted by the defense reveal, the murder of Molly Elliot shared the spotlight with an armed robbery and triple murder at the Louisiana Pizza Kitchen in the French Quarter. According to a *Times-Picayune* article covering the Pizza Kitchen slayings, "the triple murder capped a week of violence" which included the Elliot murder, along with the much publicized murders of two security guards outside a popular eastern New Orleans nightclub. Fifteen homicides occurred during the Thanksgiving holidays of 1996. Tara Young, *Pizza Kitchen Killings Rock French Quarter*, TIMES-PICAYUNE, Dec. 2, 1996, at A1. Thus, news coverage at the time of the Elliot murder focused not only on the horrific details of each incident, but also emphasized the amount of crime affecting the city as a whole.
>
> . . . [A]fter the rash of Thanksgiving murders discussed above, including the murder of Ms. Elliot, enraged New Orleans citizens marched on City Hall demanding safe streets.

Hoffman, 553, 554.  Given the strong evidence of prejudicial pretrial publicity, and the general prejudice in the collective minds of the community, the trial court's denial of the motion for change of venue violated Petitioner's rights to due process to a fair trial by a fair and impartial

---

regarding guilt and/or punishment.  *See* R. 1680-81 (Robbins); 1715-18 (Lovelady); 1731-36 (Boudreaux); 2094 (Bawser); 2376 (Hughes); 3058-59 (Allday); 3154-55 (Manning). Petitioner peremptorily struck yet another juror whose voir dire responses indicated that she could not put aside her opinions based on pretrial publicity that the death penalty should be imposed for this crime, after the trial court denied defendants' challenge for cause. (Miller) R. 2492.

jury, and to a reliable sentencing hearing free from prejudicial and arbitrary influences. The extent of the media coverage both at the time of the crime and the time of trial, together with the "backdrop of fear and desperation caused by a crime wave that engulfed both St. Tammany and Orleans," is evidence that the State strategically exploited the communities' fears and prejudices pre-trial and during trial, as well as evidence of prejudice in the jury that sat; together, they constitute prejudice of such "nature and strength" that it raises the presumption of partiality. *Irvin v. Dowd*, 366 U.S. 717, 723 (U.S. 1961); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Sheppard v. Maxwell*, 384 U.S. 333, 351-55 (1966); *Estes v. Texas*, 381 U.S. 532 (1965). In the alternative, this evidence demonstrates the existence of actual prejudicial attitudes in Mr. Hoffman's venire and jury. His conviction should be reversed.

### A. The Louisiana Supreme Court's ruling on direct appeal

Petitioner challenged the trial court's ruling on direct appeal. The Supreme Court denied the merits of his claim. *State v. Hoffman*, 768 So.2d 542 (2000). The claim was therefore "adjudicated on the merits" in state court and §2254(d) applies. However, § 2254(d) does not bar review because the courts decision was "contrary to" and an "unreasonable application" of clearly established federal law, and involved an unreasonable determination of the facts. §2254(d)(1) and §2254(d)(2).

### 1. The state court's decision was "contrary to" clearly established federal law

The state court's decision was "contrary to" and an "unreasonable application of" clearly established federal law because it relied solely on an analysis of actual prejudice in denying Petitioner relief. *Hoffman*, 768 So.2d at 552-56. However, the United States Supreme Court has clearly held that a "showing of actual prejudice is not a prerequisite to reversal…," as the circumstances surrounding a prosecution may "involve[] such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542-43

(1965). In *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) the Supreme Court specifically stated that courts should not limit their enquiry to showings of actual prejudice, but should consider also "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality." *See also Sheppard*, 384 U.S. at 351 (jurors' expression of impartiality despite exposure to publicity is not dispositive); *Rideau*, 373 U.S. at 727, 732 (Clark, J., dissenting) (court vacated conviction where only three jurors saw the publicity, and all said they could set it aside); *Pamplin v. Mason*, 364 F.2d 1, 4-5 (5th Cir. 1966) ("Supreme Court cases hold that evidence of pervasive community prejudice is enough for reversal, *even without a showing of a clear nexus between community feeling and jury feeling*.") (emphasis supplied).[137] The present case shares important facts with a number of these precedents. The Supreme Court vacated the conviction in *Rideau* due to the publication of the defendant's confession. *Rideau*, 373 U.S. at 727. And in *Pamplin*, the court, in granting the petitioner a new trial, recognized the importance of a community's racial prejudice: "Where racial feeling may be strong, the voir dire...can hardly be expected to reveal the shades of prejudice that may influence a verdict. Due process of law requires a trial before a jury drawn from a community of people free from inherently suspect circumstances of racial prejudice against a particular defendant." 364 F.2d at 7. The court's failure to apply the correct standard resulted in a decision that was "contrary to" and an "unreasonable application" of clearly established federal law. *Williams v. Taylor*, 529 U.S 362, 406 (2000).

---

[137] The *Pamplin* court went on to state, "As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires procedural safeguards, such as a change of venue, to assure a fair an impartial trial." 364 F.2d at 5.

## 2. The state court's decision was an "unreasonable application of" clearly established federal law and involved an unreasonable determination of the facts

The state court's decision was also an unreasonable application of the law and an unreasonable determination of the facts, under §2254(d)(1); §2254(d)(2). Several of the state court's key fact findings on which it relied in denying relief are not credible, and are rebutted by clear and convincing evidence. § 2254(e)(1).

First, the court relied on the fact that the "trial occurred in June of 1998, one and one-half years after the murder and initial flurry of publicity." *Hoffman*, 768 So.2d at 553. However, the court failed to properly consider the volume of publicity around the time of the trial or the length of time between the start of voir dire and the commencement of trial when the jury was ultimately sequestered. In an earlier footnote the court recognized that Petitioner's trial was one of the "top ten" stories for St. Tammany's primary local paper, yet failed to weigh this in its determination. *Id.* at 553 n.2. The Louisiana Supreme Court also relied on the trial court's "admonition" to prospective jurors to avoid media coverage during voir dire, and the trial court's own finding when denying the motion that "many of the jurors interrogated reflected that they had followed the admonition of the court." *Id.* However, the court failed to consider that voir dire took over *two* weeks, during which time jurors not yet questioned would clearly have been able to view media coverage, or at the very least might be subject to community discussions concerning one of the "top ten" stories of the year. Moreover, although "many" jurors were questioned about their compliance with the admonition, "many" were not.

Secondly, the Supreme Court seemed to rely on the general "backdrop of fear and desperation" engendered by other crimes as well as Petitioner's, as if that somehow lessened the prejudice against Jessie Hoffman. The opposite is true; a community filled with "fear and desperation" cannot have been anything *but* prejudicial to Jessie Hoffman. Similarly, the court

311

also seems to suggest that because a significant part of the focus of the "fear and desperation" was on New Orleans, and that that also mitigated the prejudicial effects. However, in doing so, the court failed to recognized that New Orleans was where the crime was initiated; the victim worked in New Orleans and was kidnapped as she left work. Moreover, many St. Tammany citizens commute for work into New Orleans.[138]  The crime wave in New Orleans was thus central to the "fear and desperation" felt by St. Tammany residents.

Third, the court found that Walter Reed's early comments to the press were not prejudicial because "none of the prospective jurors individually questioned during voir dire even recalled the statements made by Mr. Reed. The fact that none of the prospective jurors remembered this specific statement proves the statement certainly did not cause prejudice against Jessie Hoffman in the public mind." *Hoffman*, 768 So.2d at 554.  However, although it may be true that jurors didn't mention it when asked generally about what news coverage they had seen, *the jurors were not specifically questioned about it*.  The questions were primarily geared to what "facts" about the crime or the defendant the jurors had heard or seen.  Moreover, even if jurors didn't specifically remember Mr. Reed's statements, that does *not* mean they did not hear them and were not prejudiced by them, nor does it mean they did not share the prejudicial attitudes expressed by Mr. Reed, even if they didn't hear them; (presumably Mr. Reed made the statements because they appealed to his audience).

Finally the court found that "[m]oving the trial to New Orleans to escape pre-trial publicity is a ludicrous proposition" because part of the crime also occurred there and there was extensive publicity in Orleans. *Id.* at 554.  The court assumed that Petitioner had filed his change

---

[138] Although jurors were not asked specifically, several prospective jurors questioned acknowledge commuting to New Orleans, or knowing that people did, including one who sat on the jury.  Juror Suddeth testified he commuted from Slidell to work at the Greater New Orleans Auto Auction. R. 2986. *See also* R. 1731, R. 2348.

of venue motion in order to be moved to Orleans, but that was not the case. Petitioner filed a change of venue so that he could be tried in a venue that was fair. Simply because there were other unfair venues in no way defeats his claim concerning St. Tammany.

Many of the court's key fact findings it relied upon in reach its decision are rebutted by clear and convincing evidence. Its decision involved an unreasonable determination of the facts, and an unreasonable application of the law.

## XIV. PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT AND THE LOUISIANA CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT BECAUSE THE EVOLVING STANDARDS OF DECENCY PROHIBIT THE EXECUTION OF SEVERELY MENTALLY ILL OFFENDERS.

Petitioner's death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because he is mentally ill. Reversing its 1989 holding in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Supreme Court in *Atkins v. Virginia* held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibited the execution of individuals with mental retardation. 536 U.S. 304, 321 (2002). Since then, already two state court justices have opined that the rationale of *Atkins* likewise precludes the execution of severely mentally ill offenders. *See Corcoran v. State*, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting); *Overstreet v. State*, 877 N.E.2d 144 (Ind. 2007) (Rucker, J., dissenting; *State v. Nelson*, 803 A. 2d 1, 47 (N.J. 2002) (Zappala, J., concurring) (applying the reasoning of *Atkins* to a severely mentally ill defendant as a matter of state constitutional law) (death sentence vacated on other grounds); *see also Ryan v. Mullin*, 335 F.3d 1207, 1225 (10th Cir. 2003) (Henry, J., concurring in part and dissenting in part) ("The Supreme Court has held that the deficiencies borne by the mentally retarded "do not warrant an exemption from criminal sanctions, but diminish their personal culpability." *Atkins*, 536 U.S. at 320. The Court's logic applies no less to those in Mr. Bryan's shoes who suffer from severe mental deficiencies"). Moreover, two Supreme Court

justices have voted to grant a stay of execution in the case of a schizophrenic defendant. *Colburn v. Cockrell*, 537 U.S. 1015 (2002). In light of these facts, Petitioner argues that the rationale that underlies *Atkins* compels the conclusion that executing a mentally ill defendant for conduct he was unable to control is a violation of the Eighth Amendment of the United States Constitution.

### A. Insanity, Criminal Responsibility, and the Volitional Incapacity.

The traditional legal definition of insanity was formulated in *M'Naghten's* Case. 8 Eng. Rep. 718 (H.K.1843): A defendant is insane (and therefore absolved of criminal responsibility) if, due to a defect of reason caused by mental illness, at the time of the act, he did not know either the nature and quality of the act or that the act was wrong. The Model Penal Code, which has been widely adopted by states (although not Louisiana), defines insanity as such:

> (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirement of law.
>
> (2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

The Model Penal Code's test expands the *M'Naghten* rule in three important ways. First, it relaxes the term "know" to "appreciate;" second, instead of requiring a "total lack of capacity" to appreciate wrongfulness, it requires only lack of "substantial capacity;" and third it adds a second, "volitional" prong, exonerating defendants who lack substantial capacity to control their conduct. MPC §4.01 (1985). It is this last strand of the Model Penal Code's expansion that this claim focuses on, which is sometimes referred to as the volitional incapacitation prong.

The Model Code's broadening of the insanity defense, in particular the second volitional prong, led to a backlash causing states to adopt Guilty But Mentally Ill (GBMI) statutes. GBMI verdicts attempt to create a middle ground between guilty verdicts and insanity acquittals by recognizing the role mental illness has played in the offense, yet insisting that the defendant is

nonetheless criminally responsible for it, and therefore subject to some form of punishment. It is this tension between society's compassion for the severely mentally ills defendants' diminished capacities and society's desire to punish criminal acts that colors this claim.

### B. Jessie Hoffman: A Severely Mentally Ill, "Non-Willing" Offender.

As outlined earlier in this petition, Mr. Hoffman suffers from severe and debilitating mental illnesses and mental impairments, including PTSD, a psychotic disorder, and brain dysfunction resulting in severe neuro-cognitive deficits. His mental problems severely affected his capacity to control his actions during the offense. According to one expert:

> On the day of the murder he experienced himself as observing his own behavior as an external observer. He reports that he commanded himself to "stop" at various times during the crime, but that he did not obey his own commands to stop. He reports intense confusion about his behavior during the crime.

Report of Dr. Sautter, LASC Writ, Ex. 6-6, Ex. 6. At the evidentiary hearing held on ineffective assistance of penalty phase, Dr. Sautter explained in detail his findings and conclusions about the effects of Petitioner's mental illness on the day of the crime and confirmed his opinion:

> within a reasonable degree of professional certainty that Jessie Hoffman was unable to conform his conduct to the requirements of law as a result of the PTSD and psychosis at the time of the crime.

Deposition of Frederic J. Sautter, Jr., 11/17/06, LASC Writ Ex. 6-6, at 108.   Another expert made similar findings: "[A]t the time of the offense, because of his brain which was not fully matured, and the neuro-cognitive deficits associated with psychosis, Mr. Hoffman had moderate to severe impairments. He therefore had impaired capacity to make mature judgments, control impulses, consider consequences, and efficiently perform abstract reasoning, particularly under stress or decompensation." Report of Ruben Gur, LASC Writ, Ex. 6-3, Ex. 2. *See also* Deposition of Dr. Ruben Gur 11/7/06, LASC Writ Ex. 6-3.

While not legally insane under Louisiana's insanity statute, these findings demonstrate that Petitioner's severe mental illness caused him to be volitionally incapacitated during the crime. La. Rev. Stat. §14:14 (West 2004). As will be shown later in this claim, this fact would have led Petitioner to be ineligible for the ultimate punishment in most states through either insanity or other various statutes concerned with the moral culpability of the severely mentally ill with diminished capacities. This claim presumes competent counsel; that is counsel who investigated Petitioner's family history and background, and was prepared to present expert testimony proving the extent of Petitioner's volitional incapacity.

### C. General Principles In Determining Whether a Punishment Is Cruel and Unusual

The Supreme Court has stated that the core concept underlying the Eighth Amendment is the "'dignity of man.'" *Atkins*, 536 U.S. at 311-12 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)); *Enmund v. Florida*, 458 U.S. 782, 788-793 (1982); *Coker v. Georgia*, 433 U.S. 584, 593-596 (1977); *Gregg v. Georgia*, 428 U.S. 153, 179-181 (1976). Guided by this principle, the Supreme Court outlined the basic tenet of Eighth Amendment jurisprudence: "The Cruel and Unusual Punishments Clause of the Eighth Amendment is directed at all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." *Enmund v. Florida*, 458 U.S. 782, 788 (1982) (internal quotations omitted). To determine whether a given punishment is disproportional, i.e unconstitutional, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins*, 536 U.S. at 312 (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958)).

Although the Eighth Amendment tests all punishments for their congruence with evolving standards of decency, capital sentences, because of their extremity, require more. A capital sentence violates the Eighth Amendment when it is "grossly out of proportion to the severity of the crime" or "so totally without penological justification that it results in the

gratuitous infliction of suffering." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *Id.* at 183. In *Gregg v. Georgia*, the Supreme Court identified retribution and deterrence as the two principal social functions that the death penalty purports to serve, and held in *Enmund v. Florida* that, "Unless the death penalty when applied to those in [the defendant's] position measurably contributes to one or both of these goals, it 'is nothing more than the purposeless and needless imposition of pain and suffering,' and hence an unconstitutional punishment." 458 U.S. 782, 798 (1982).

Relying on this foundation, the Supreme Court in *Atkins* provided a practical guideline for Eighth Amendment claims. According to the Supreme Court, the evolving standards determination should rely on "objective factors to the maximum extent possible"; hence, the most reliable evidence of this standard is found in state legislative enactments and jury verdicts. *Atkins*, 536 U.S. at 312 (citations omitted). The Supreme Court also endorsed looking to the opinions of social and professional organizations, international practice, and polling data to determine if there is a consensus. *Id.* at 316 n.21.

Once it found such a consensus, the *Atkins* Court examined the underlying merits of the consensus, beginning with the observation that it reflected a judgment about the "relative culpability of mentally retarded offenders and the relationship between mental retardation and the penological purposes served by the death penalty." *Id.* at 317. While not justifying an exemption from criminal liability, the Supreme Court stated that because of the diminished capacities of the mentally retarded "to understand and process information, to communicate, to abstract from mistakes and learn from experience, to control impulses and to understand the reactions of others," their personal culpability is diminished to the extent that neither of the justifications advanced by states in support of the death penalty– retribution and deterrence–

317

would be served by permitting their execution. *Id.* at 318-9. The Court also announced concern for both an increased risk of wrongful convictions and that the offender's demeanor "may create an unwarranted impression of lack of remorse for their crimes" which could enhance the likelihood of a jury imposing the death penalty. *Id.* at 321. All of these factors helped solidify the merit of the national consensus against executing the mentally retarded.

### D. The Application of *Atkins* to Severely Mentally Ill Non-Willing Offenders.

By implementing the framework provided by the Supreme Court in *Atkins*, Petitioner examines whether the Eighth Amendment Cruel and Unusual Punishment bars the execution of the severely mentally ill, non-willing offender. In support of his claim Petitioner first produces objective evidence of the rejection of the practice expressed in the form of state legislative enactments, jury verdicts and opinions of organizations that have closely examined this issue. Petitioner then analyzes the moral culpability of those who cannot conform their conduct due to mental illness. Finally Petitioner determines that there is a heightened risk of wrongful execution due to severe mental illness.

#### 1. Objective Evidence of the Non-Acceptance of Executing the Volitionally Incapacitated Offender.

In seventeen states, there are laws that would have shielded Petitioner from *all* criminal responsibility and *all* punishment because of his volitional incapacity.[139] In thirteen other states, the death penalty would have been precluded by the fact that Petitioner was so severely mentally ill as to be unable to control his conduct: through statutes closely related to the volitional prong

---

[139] These states all have a volitional prong as part of their insanity defense. ARK. STAT. ANN.§5-2-312 (1995); CONN. GEN. STAT..§ 53A-13 (1994);GA. CODE ANN.§16-3-2 (1996); HAW. REV. STAT.§704-400(1996);KY. REV. STAT. ANN.§504.020 (MICHIE 1995); MD. HEALTH-GEN. CODE §12-108(1995); MICH. STAT. ANN.§28.1044(1); OR. REV. STAT.§ 161.295(1995); 13 VT. STAT. ANN.§ 4801 (1995); WIS. STAT. 971.15 (1994); WYO. STAT. 7-11-304(1996); *Commonwealth v. McHoul*, 226 N.E. 2d 556 (Mass. 1967); *State v. Cegelis*, 638 A. 2d 783 (N.H. 1994);*State v. White*, 270 P. 2d 727 (N.M. 1954); *State v. Johnson*, 399 A.2d 469 (R.I. 1979); *Thompson v. Commonwealth* 70 S.E. 2d 284 (Va. 1952); *State v. Myers* 222 S.E. 2d 300 (W.V. 1976).

of the insanity defense (1);[140] through statutes providing an affirmative defense to murder charge which reduces the charge to manslaughter (1);[141] by having an effect on proportionality through the review of judges (6);[142] and by not having the death penalty at all (5 others not included in the previous numbers).[143]   This makes *thirty states* whose laws preclude the execution of volitionally incapacitated, mentally ill persons.   Furthermore, only one state affirmatively permits the execution of the volitionally incapacitated.[144]   That leaves nineteen states that are silent on the issue of executing the volitionally incapacitated, including Louisiana.  None of these states has held, or said in dicta, or even suggested, that the death penalty may be applied to

---

[140] Montana allows mental illness to excuse criminal conduct only when the defendant can prove the existence of a mental disease or defect at the time of the offense that rendered the defendant unable "to conform the defendant's behavior to the requirements of law." In such situations, "the court shall sentence him to be committed to the custody of the director of the department of corrections to be placed in an appropriate institution for custody, care, and treatment for a definite period of time…" MONT. CODE ANN.§ 46-14-311(1995); § 46-14-312 (1995).

[141] In New York it is an affirmative defense to murder, which would reduce the charge to manslaughter, that the defendant "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." N.Y. Penal Law. §125.27 (Consol. 1996).

[142] *See e.g., State v. Jimenez*, 799 P.2d 785, 797-801 (Ariz. 1990) (reducing death sentence to life imprisonment based on defendant's mental incapacity); *State v. Fierro*, 804 P.2d 90 (Ariz. 1990) (death penalty held disproportionate due in part to defendant's "history of psychological illness"); *State v. Doss*, 568 P.2d 1054, 1061 (Ariz. 1977) (same); *Jones v. State*, 332 So.2d 615, 619 (Fla. 1976) (reducing death sentence to life based on evidence of defendant's mental illness); *Burch v. State*, 343 So.2d 831 (Fla. 1977) (same); *Huckaby v. State*, 343 So.2d 29 (Fla. 1977) (evidence of mental illness outweighed evidence in aggravation and required reduction of sentence from death to life imprisonment; while defendant "may have comprehended the difference between right and wrong his capacity to appreciate the criminality of his conduct and to conform it to the law was substantially impaired"); *Knowles v. State*, 632 So. 2d 62 (Fla. 1993) (mitigating factors of defendant's mental illness, including his impaired capacity to control his conduct outweighed aggravating factors); *Besaraba v. State*, 656 So 2d 441 (Fla. 1995) (death sentence overturned where defendant was under the influence of great emotional disturbance); *Evans v. State*, 598 N.E. 2d 516, 519 (Ind. 1992) (where defendant produced uncontradicted evidence of psychiatric disorder, and parental neglect, death penalty inappropriate despite aggravate4d nature of crime and defendant's prior violent history); *State v. Claytor*, 61 Ohio St. 3d 234 (1991) (where defendant produced unrebutted evidence that he lacked substantial capacity to conform, impact of that mitigating factor should have been given more weight and a life sentence imposed); *Edwards v. State*, 441 So.2d 84, 92-94 (Miss. 1983) (plurality opinion) (vacating death sentence based on offender's mental illness);   *Haynes v. State*, 103 Nev. 309, 739 P.2d 497 (1987) (vacating as disproportionate death sentence imposed on mentally ill offender).

[143] These States either do not have an insanity defense with a volitional prong, do not look to whether offender had an extreme emotional disturbance with mitigates murder to manslaughter, do not have a statutory provision limiting punishment to imprisonment, or have proportionality review which removes severely mentally ill offenders.  Alaska, Iowa, Maine, Minnesota, and North Dakota.

[144] *State v. Wilson*, 413 S.E. 2d 19 (S.C. 1992). However, U.S. District Judge Matthew J. Perry, Jr. granted Wilson's writ of habeas corpus on other grounds. *See* St. Claire Donaghy, "Oakland Shooter Ordered Off Death Row," *The Index-Journal*, (Jan. 23, 2003) found at http://www.angelfire.com/journal/indexjournal/03Jan23.html (as of Dec. 9, 2003).

offenders who lack sufficient capacity to conform their conduct to the requirements of the law. Thus, speculation about silent states can run in either direction. But the incontrovertible fact is that no state has by express legislative enactment rendered offenders who lacked capacity to conform their conduct to the requirements of law eligible for capital punishment, and only one court has authorized this practice. Thirty states specifically forbid it. Moreover, bills have been introduced in two states already this year to exempt the severely mentally ill from death penalty altogether; in Indiana and North Carolina. *See* http://www.deathpenaltyinfo.org/recent-legislative-activity#2009.

In 2006 the American Bar Association adopted the following recommendation that volitionally incapacitated be exempt from the death penalty:

> Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequence or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to confirm their conduct to the requirements of the law.

American Bar Association Recommendation, adopted by the House of Delegates August, 7-8. 2006. This resolution has also been adopted by the American Psychiatric Association,[145] and the American Psychological Association.[146] *See also* ABA Recommendation and Report on the Death Penalty and Persons with Mental Disabilities, 30:5 MPDLR 668, 670 (2006) (discussing the recommendation, and emphasizing its basis in "long established principles of Angol-American law that the Supreme Court recognized and embraced in Atkins and recently affirmed in *Roper v. Simmons*"). In fact, nearly every major mental health association in the United States

---

[145] *See* Am. Psychiatric Ass'n, Diminished Responsibility in Capital Sentencing; Death Sentences for Persons with Dementia or Traumatic Brain Injury; Mentally Ill Prisons on Death Row: *available at* http://www.psych.org/edu/other_res/lib_archives/archives/200406pdf., 200508.pdf, 200505.pdf.

[146] *See* American Psychological Association, Excerpt from the Counsel of Representatives 2005 Meeting Minutes (Feb. 18-20, 2—5); Excerpt from the Counsil of Representatives 2006 Meeting Minutes (Feb. 17-19, 2006).

has published a policy statement addressing the issue of the execution of severely mentally ill offenders, and all of these organizations advocate either an outright ban on executing *all* severely mentally ill offenders, or a moratorium until a more comprehensive evaluation system can be implemented.[147]

Public opinion, as reflected by polling data and by informed public commentary, sheds additional light on contemporary societal norms regarding criminal punishments. *Atkins*, 536 U.S. at 316 n.21. Opinion poll data, although limited, also supports a ban on the execution of the mentally ill. A 2002 Gallup poll showed that 73% of the populace oppose the execution of the mentally ill, while only 19% were in favor. Gallup News Service, May 20, 2002.

The execution of the volitionally incapacitated also runs afoul of international law and opinion. When conducting Eighth Amendment analysis, the United States Supreme Court has frequently looked to the law, norms and practices of the international community in determining contemporary standards of decency.[148]   The Human Rights Committee of the United Nations

---

[147] Am. Psychiatric Ass'n, Moratorium on Capital Punishment in the United States (approved October 2000), APA Document Ref. No. 200006, available at http://www.psych.org/archives/200006.pdf (last visited Sept. 3, 2003); Am. Psychological Ass'n., Resolution on the Death Penalty in the United States (Aug. 2001), available at http://www.apa.org/pi/deathpenalty.html (last visited Sept. 3, 2003); Nat'l Alliance for the Mentally Ill, The Criminalization of People with Mental Illness, available at http:// web.nami.org/update/unitedcriminal.html (last visited Sept. 3, 2003); Nat'l Mental Health Ass., Death Penalty and People with Mental Illness (approved March 10, 2001), available at http:// www.nmha.org/position/deathpenalty/deathpenalty.cfm (last visited Aug. 27, 2003). Specifically, the National Mental Health Association (NMHA) found that the fact-finding portion of capital trials "fails to identify who among those convicted and sentenced to death actually has a mental illness." *Id.* Similarly, the American Psychological Association (APA) argued that too many "[p]rocedural problems, such as assessing competency," render capital punishment unfair to the mentally ill. Am. Psychological Ass'n, *supra.* Such procedural inadequacies fall far short of the "basic requirements of due process," according to the American Psychiatric Association (AMPA). Am. Psychiatric Ass'n, *supra.* Thus, the NMHA, APA, and AMPA believe that the criminal justice system routinely executes many mentally ill individuals without adequately considering that illness as a mitigating factor. All of these organizations favor a moratorium. The National Alliance for the Mentally Ill (NAMI) has voiced a stronger opinion, advocating an outright ban on death sentences for individuals with any type of brain disorder. Nat'l Alliance for the Mentally Ill, *supra.*

[148] *See Atkins* at 316 n.21 (execution of mentally retarded offenders "overwhelmingly disapproved" within the international community); *Thompson v. Oklahoma*, 487 U.S. 815, 830-31 (1988) ("The conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European

has interpreted the International Covenant on Civil and Political Rights (ICCPR) to forbid the execution of persons with severe mental illness.   In the case of *Francis v. Jamaica*, Communication No. 606/1994 U.N.H.R.C., U.N. Human Rights Committee held that the execution of an individual who was mentally disturbed, but examined and found not to be "insane," amounted in that case to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR.[149]   In addition, year after year, the United Nations Commission on Human Rights has adopted resolutions calling on all states that maintain the death penalty "[n]ot to impose the death penalty on a person suffering from any form of mental disorder or to execute any such person."[150]   In concurrence, the European Union has consistently asserted that the execution of persons "suffering from any form of mental disorder . . . [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." *EU*

---

nations that share our Anglo-American heritage, and by the leading members of the Western European community"); *Enmund v. Florida*, 458 U.S. 782, 796 n.22 (1982) (death penalty for "felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe"); *Coker v. Georgia*, 433 U.S. 584, 596 n.10 (1977) (noting that the Court previously examined "the climate of international opinion concerning the acceptability of a particular punishment. It is thus not irrelevant here that out of 60 major nations in the world surveyed in 1965, only 3 retained the death penalty for rape where death did not ensue") (citing United Nations, Department of Economic and Social Affairs, Capital Punishment 40, 86 (1968)); *Trop v. Dulles*, 356 U.S. at 100 (no support among the world's nations for loss of statehood as punishment).   Referring to the history of the Eighth Amendment, Justice Blackmun remarked that "[t]he drafters of the Amendment were concerned, at root, with 'the dignity of man,' and understood that 'evolving standards of decency' should be measured, in part, against international norms." Harry Blackmun, *The Supreme Court and the Law of Nations*, 104 Yale L.J. 39, 45-46 (1994) (internal citations omitted).   Moreover, the Supreme Court has recently considered international human rights law as a reflection of the "values that we share with a wider civilization." *Lawrence v. Texas*, 123 S.Ct. 2472, 2483 (2003) (citing decisions of the European Court of Human Rights in analysis of Due Process Clause requirements); *see also Grutter v. Bollinger*, 123 S.Ct. 2325, 2347 (2003) (Ginsburg, J., concurring) (citing the Convention on the Elimination of All Forms of Racial Discrimination in affirmative action ruling); *Thompson v. Oklahoma*, 487 U.S. at 831 n.34 (citing the International Covenant on Civil and Political Rights and the American Convention on Human Rights in decision on the execution of juveniles).
[149] International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), art. 6; See William Schabas, International Norms on Execution of the Insane and the Mentally Retarded, 4 Criminal Law Forum 95, 100 (1993).
[150] The term "mental disorder" has been interpreted by the Commission to encompass both mental retardation and mental illness. See U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2004/67 (2004) U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2003/67 (2003); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2002/77 (2002); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/RES/2001/68 (2001); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/RES/2000/65 (2000); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/RES/1999/68 (1999); *see also* UN Commission on Human Rights Resolution 2005/59; UN Commission on Human Rights Resolution 2004/67.

322

*Memorandum on the Death Penalty* (Feb.25, 2000), *available at* http://www.eurunion.org/
legislat/DeathPenalty/eumemorandum.htm. In 2000, the U.N. Special Rapporteur on
Extrajudicial, Summary, or Arbitrary Executions called on the United States "to take immediate
steps to bring [its] domestic legislation and legal practice into line with the international
standards prohibiting the imposition of death sentences in regard to minors and mentally ill or
handicapped persons."[151]

### 2. Imposition of the Death Penalty for Conduct the Defendant was Unable to Control is Grossly Disproportionate to His Personal Moral Culpability and Lacks Penological Justification.

When the Supreme Court accepted the contention that mentally retarded murderers are
*categorically* so lacking in moral blameworthiness as to be ineligible for the death penalty, its
rationale for doing so compels the conclusion that the volitionally incapacitated are likewise
ineligible. The Supreme Court in *Atkins* noted the obvious cognitive limitations of the retarded,
but also stressed their "diminished capacity . . . to control impulses, and the "abundant evidence
that they often act on impulse rather than pursuant to a premeditated plan," characterizations that
have even greater applicability to those who because of mental illness are completely unable to
conform their conduct to the requirements of the law. *Atkins*, 536 U.S. at 318. Moreover, this
inference as to the moral centrality of volitional control is corroborated by the Court's reasoning
in determining that execution of persons under the age of sixteen violates the Cruel and Unusual
Punishments Clause. *Thompson v. Oklahoma*, 487 U.S. 815, 834 (1988). Certainly if crimes
committed by the retarded and by young adolescents deserve less punishment due to those
groups' *lesser* capacity to control their own conduct, the same should be true for Petitioner.

---

[151] *Extrajudicial, Summary, or Arbitrary Executions: Report of the Special Rapporteur*, U.N. GAOR, Hum. Rts, Comm., 56th Sess., para. 97, U.N. Doc. E/CN.4/2000/3 (2000).

Similar to the reasons set forth in *Atkins*, the death penalty's penological goals are not served by executing the severely mentally ill. Unless the death penalty "measurably contributes" to either the goal of deterrence or the goal of retribution, it is "nothing more than the purposeless and needless infliction of pain and suffering," and therefore an unconstitutional punishment. *Enmund v. Florida*, 458 U.S. 782, 798 (1982). Neither retribution nor deterrence is served by the execution of defendants whose mental illness rendered them powerless to avoid the criminal conduct.

### 3. The Capital Prosecution of the Volitionally Incapacitated Carries the Same Risks of Unjustified Executions.

Finally, the Supreme Court considered the enhanced risk faced by retarded defendants "that the death penalty will be imposed in spite of factors which may call for a less severe penalty," as a second justification for the national consensus that they should be categorically excluded from eligibility for the death penalty. *Atkins*, 536 U.S. at 320-1 (quoting *Lockett v. Ohio*, 438 U.S. 586, 605 (1978)). The increased risk of false confessions, the likelihood of difficulties in communicating with counsel, a lesser ability (due to limited communication skill) to effectively testify on their own behalf cited as concerns by the *Atkins* Court are just as relevant in the case of the volitionally incapacitated because of severe mental illness as the mentally retarded. *Id.*

### E. Conclusion.

Mr. Hoffman is severely mentally ill. In addition, Mr. Hoffman's severe mental illness appears to have caused him to be volitionally incapacitated during the crime. Since his conviction, the *Atkins* Court has given a directive to lower courts to be concerned about the tension between the desire to punish and the compassion for those whose diminished capacities make them less culpable. A survey of the today's societal landscape reveals that there already is

national consensus against the execution of the severely mentally ill and volitionally incapacitated. International opinion is also strongly against this practice, further signifying such a consensus. Similar to the practice of executing the mentally retarded, the penological interests of the death penalty--retribution and deterrence--are not served by executing the severely mentally ill. Finally, the underlying rationale for prohibiting the execution of the mentally retarded and juveniles (they possess a lesser degree of moral culpability) certainly pertains to those inflicted with a severe mental illness that incapacitates volition. Therefore, the Eighth Amendment's prohibition of executing the mentally retarded extends to those who are severely mentally ill and/or suffered from volitional incapacitation during the criminal act. The social climate is ripe for banning the practice of executing the severely mentally ill, thus under the guiding light of *Atkins*, Mr. Hoffman's death sentence is in violation of the Eighth Amendment's Cruel and Unusual Punishment Clause and requires a reversal of his sentence.

### F. Petitioner is entitled to *de novo* review of this claim

Petitioner raised his federal claim to the state court in post-conviction proceedings. The court dismissed the claim without prejudice. The state court therefore did not adjudicate the claim on the merits for the purposes of §2254(d) and he is entitled to *de novo* review. If the Court finds that AEDPA does apply, the state courts' decision is contrary to, or an unreasonable application of clearly established federal law and an unreasonable determination of the facts. Any fact findings deemed to be made are clearly and convincingly rebutted by the evidence. Petitioner is entitled to relief.

### XV. THE TRIAL COURT'S IMPROPER RESPONSE TO THE JURY'S QUESTION REGARDING WHETHER MR. HOFFMAN HAD A JUVENILE RECORD OF PRIOR CRIMES THAT HAD NOT BEEN DISCLOSED, AS WELL AS DEFENSE COUNSEL'S FAILURE TO REQUEST A CURATIVE INSTRUCTION, VIOLATED PETITIONER'S RIGHT TO A RELIABLE SENTENCING PROCEEDING, TO CONFRONT THE EVIDENCE AGAINST HIM, TO EFFECTIVE

**ASSISTANCE OF COUNSEL, AND TO DUE PROCESS UNDER THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During penalty phase deliberations the jury sent the court a question:

If Jesse Hoffman had any kind of record, would the State have had access to it and would we have been made aware of it?

R. 1272, 4543-44.  Over objection from the defense the Court sent a written response stating only that "this question can not be answered." R. 1272, 4543-44.

On direct appeal, Petitioner argued that the jury's question clearly demonstrated that jurors, during deliberations, (1) were skeptical about the reliability of uncontroverted evidence of the statutory mitigating circumstance that Mr. Hoffman had no prior criminal history; (2) were turning the mitigating factor of youth on its head and perceiving it to be aggravating; and (3) were rampantly speculating that the only reason they had not been informed of Mr. Hoffman's prior criminal history was that he must have been under age at the time of his priors (as he had only recently turned eighteen when Ms. Elliott was killed) and thus the State was unable to inform them of his juvenile record because of special rules governing juvenile adjudications.[152]

In fact, Mr. Hoffman had no juvenile record of adjudications.  The only time he even came in contact with the law was an arrest at age eleven for unauthorized entry of a business.  R. 2757.  The charge was never pursued.  *See* Sentence Investigation Report, at 5.  Under state law, the arrest was clearly inadmissible at the penalty phase of the trial, and the jury properly heard no

---

[152] Indeed, post-conviction investigation revealed that jurors had engaged in precisely the speculation asserted by counsel on direct appeal.  According to the foreperson: "The jury sent the judge one question during the penalty phase deliberations.  The jury asked if the defendant had a juvenile record.  Given that he was so young the jury thought that any criminal record held by the Defendant would have been as a juvenile.  They asked the question because they wanted to get a handle on what the kid was really like.  The defense were arguing that he had been a good kid and they wanted to know if that was true, or if he had a string of juvenile offenses." Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury Foreperson), Supplemental Petition, Ex. 109.  *See also*, Declaration of Mari Lower, Supplemental Petition, Ex. 106.

evidence of it.  *See State v. Jackson*, 608 So.2d 949, 957 (1992).  Mr. Hoffman had no juvenile record at all.

The trial court's response to the question, that it could not be answered, did nothing to curtail the jury's rank speculation about the existence of a juvenile record — indeed, the court's response implicitly confirmed that Mr. Hoffman did have a juvenile record, which the court, like the prosecutors, was not permitted to disclose.  Instead of informing the jury that its question "can not be answered" and thereby reinforcing the jury's speculations that Mr. Hoffman indeed had a record that could not be disclosed, the trial court, at the very least, should have instructed the jurors that they were to confine their deliberations to matters in evidence.  Appropriate instructions, however, would have gone further.  The judge certainly could and should have given the jury accurate information that the prosecution could have discovered Mr. Hoffman's juvenile records, if they existed, and would have been permitted to present evidence of juvenile adjudications on felony charges and unadjudicated charges of those serious crimes for which a juvenile (of appropriate age) may be prosecuted as an adult.  *Jackson, supra*, 608 So.2d at 956-57.

### A. The Court's Failure to Respond Honestly and Directly to the Jury's Question Deprived Mr. Hoffman of Due Process and His Right to Confrontation.

The trial court's response to the jury's question deprived Mr. Hoffman of the opportunity to confront evidence that was being used against him, *in this case by the jury*, to support a sentence of death.  A prior criminal history supports the prosecution's argument for a sentence of death , and in fact, under Louisiana law, prior convictions for certain crimes constitute a statutory aggravating circumstance under Louisiana law. La. C.Cr.P, art. 905.4(A)(3).  Petitioner has a Sixth Amendment right to Confrontation and a Fourteenth Amendment Due Process right to deny or rebut factual allegations that support of the imposition of death. *Gardner v. Florida*, 430

U.S. 349, 362 (1977) (holding that "petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain"); *Crawford v. Washington*, 541 U.S. 36, 42 (2004) ("The [Confrontation] Clause's ultimate goal is to ensure reliability of evidence. . . . The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.") (citations omitted).

It was obvious from its question, even without post-trial interviews, that the jury was speculating as to the existence of a confidential juvenile record the state could not tell them about. Petitioner was entitled at that point to an unequivocal response from the court that he did not have a criminal record, or short of that, to an opportunity to rebut the jury's erroneous speculation with evidence to the contrary. Instead, the court answered the jury's question in a way that confirmed their false suspicions of a juvenile record. Petitioner's inability to rebut the jury's belief that a juvenile record existed, when the jury was clearly discounting one of two mitigating circumstances, effectively robbed him of his rights to due process and to confront evidence against him in this capital sentencing proceeding.

**B. The Court's Instruction in Response to the Jury's Question Was Misleading and Erroneous and Caused the Jury to Disregard Substantial Uncontroverted Mitigation.**

The trial court's supplemental "instruction" in response to the jury's penalty phase question about Mr. Hoffman's juvenile record was erroneous and misleading, and created a grave risk that the jury improperly rejected uncontroverted mitigating evidence and sentenced Mr. Hoffman to death on the basis of rank speculation regarding the existence of a phantom juvenile record.

The testimony at the penalty trial, by both state and defense witnesses, established that Mr. Hoffman had no prior criminal record. Alvaro Medina and Giovanni Molina, both State's

witnesses employed at the parking garage, testified that Mr. Hoffman had undergone a background check and drug testing prior to employment at the garage and that both checked out fine. R. 3595-96, 3610-11. Mr. Hoffman's lack of a criminal history was likewise the subject of testimony by Elaine Saltzer, the defense psychologist, R. 4364, 4368, as well as members of Mr. Hoffman's family and his highschool football coach. R. 4408-49, 4497, 4503.[153] There was no basis in the record for the jury's skeptical treatment of this uncontroverted evidence.[154]

Mr. Hoffman's penalty phase defense was, essentially, that he was a good kid with no problems prior to this offense and that this crime was an aberration that simply could not be explained. The jury, with no basis in the record, doubted the reliability of this defense. Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury Foreperson), Supplemental Petition, Ex. 109; Declaration of Mari Lower, Supplemental Petition, Ex. 106. The result was that jurors failed to consider critical mitigation—actually *the only* mitigation—advanced by the defense.

It is abundantly clear that the jury *must consider* the mitigating circumstances offered by the defense. *Lockett v. Ohio*, 438 U.S. 586 (1978) (jury must consider "any aspect of the defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death"). It is a "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring). Moreover, "it is not enough simply to allow the defendant to

---

[153] Mr. Hoffman's lack of a record was moreover the subject of a discussion between the court and counsel during voir dire at which the prosecution indicated he was unaware of any record, but would run an NCIC report to make sure and would provide it to defense counsel. R. 2757. The record does not reflect any subsequent discussion of the subject.

[154] The jury's speculation about a juvenile record does suggest that members of the jury were familiar with pretrial publicity suggesting that Mr. Hoffman might have a juvenile record. *See* Direct Appeal Brief, Ex. A, at 5 (print media coverage suggesting Mr. Hoffman may have criminal record); WWL-TV, Tape 1, Supreme Court Exhibits, at 9.20-9.38 (suggesting Mr. Hoffman may have juvenile record); WWL-TV, Tape 1, at 27.51-27.55 (Mr. Hoffman "no stranger to police"); WWL-TV, Tape 2, at 1.47- 1.51 (same).

329

present mitigating evidence to the sentencer.  The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. 302, 318.  The trial court was under an obligation to enforce this most fundamental Eighth Amendment precept.

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme Court addressed the issue of juror speculation regarding parole eligibility.  There, the Court reversed a death sentence because the trial court refused to permit evidence of or to instruct the jury that the defendant would not be eligible for parole.  When the jury requested information regarding the defendant's parole eligibility, the trial court merely instructed them that parole was not a valid subject for consideration.  Although reversing on due process grounds because the trial court's rulings precluded the defense from countering the state's evidence of future dangerousness,[155] the Court focused on the unreliability of the sentence engendered by jury speculation as to the defendant's release:

> In this case, the jury reasonably may have believed that petitioner could be released on parole if he were not executed.  To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.  *This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information* regarding petitioner's parole ineligibility....

*Id.* at 161-62 (emphasis added).  Elsewhere, the Court observed that the trial court's response to the jury's question about parole actually confirmed the jury's speculation: "[I]t is true ... that the trial court admonished the jury [in response to its question about parole] that 'you are instructed not to consider parole' and that parole 'is not a proper issue for your consideration.' ... Far from

---

[155] The Court did not reach the Eighth Amendment question in that case.  *Id.* at 162 n.4.  However, Justice Souter, in his concurring opinion, observed that the Eighth Amendment's requirement of heightened reliability in death penalty proceedings mandates that "whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been 'arbitrarily or discriminatorily' and 'wantonly and ... freakishly imposed.'" Id. at 172-73 (Souter, J., concurring)(quoting *Furman v. Georgia*, 408 U.S. 238 (1972)).

ensuring that the jury was not misled, however, this instruction actually suggested that parole *was* available but that the jury, for some unstated reason, should be blind to this fact." *Id.* at 170. *See also McDowell v. Calderon*, 130 F.3d 833 (9th Cir. 1997) (en banc) (reversing death sentence where court's supplemental charge in response to jury question indicating confusion about meaning of mitigation failed to correct jury's misconceptions), *cert. denied sub nom Calderon v. McDowell*, 523 U.S. 1103 (1998).

Indeed, the trial court might properly have given a peremptory instruction to the jury that Mr. Hoffman's lack of a criminal history had been established by the uncontroverted evidence. *See, e.g., Magwood v. Smith*, 791 F.2d 1438, 1449-50 (11th Cir. 1986) (habeas relief granted on grounds that the trial judge's rejection of mitigating circumstances was not fairly supported by the record); *Gray v. Lucas*, 710 F.2d 1048, 1055 n. 5 (5th Cir.) (observing that had evidence of defendant's mental illness been presented at the penalty phase, he "would most probably now be entitled to a peremptory instruction to consider a mitigating circumstance that his capacity to conform his conduct to the requirements of law was substantially impaired...."), *cert. denied*, 463 U.S. 1237 (1983).

Short of such an instruction, the jurors should have been clearly instructed that they had heard all of the evidence, and they must base their decision solely on the evidence before them, without baseless speculation as to other matters.

> "Discharge of the jury's responsibility for drawing appropriate conclusions from the testimony depend[s] on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties, the trial judge should clear them away with concrete accuracy."

*Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). Here, the trial court failed to discharge this fundamental duty.

The trial court's response to the jury's question implicitly corroborated the speculation about a non-existent juvenile record underlying the jury's question. *See Simmons, supra*, 512 U.S. at 170. As a result, the jury improperly failed to consider a statutory mitigating circumstance it was required by law to consider. La.C.Crim.P. Art. 905.5; *Eddings v. Oklahoma*, 455 U.S. 104 (1982). A death sentence resting on such profound misinformation harkens back to the pre-*Furman* days of unbridled sentencing discretion and arbitrary sentences of death and cannot stand.

### C. The Court's Response to the Jury's Question Was Misleading and Erroneous and Transformed a Statutory Mitigating Circumstance, Youth, Into an Aggravating Circumstance, a Prior Criminal Record.

As a result of the court's erroneous and misleading response to the jury's question, not only did the jury fail to consider a statutory mitigating circumstance, no prior record, it also turned a second statutory mitigating circumstance, youth, into an aggravating circumstance, a prior criminal record. The jury's consideration of a mitigating circumstance as an aggravating one further undermined the reliability of the sentencing proceeding and mandates reversal of Petitioner's sentence of death. *Zant v. Stephens*, 462 U.S. 862 (1983).

The United States Supreme Court has repeatedly recognized the unconstitutionality of jurors confusing evidence presented in mitigation of a capital crime and erroneously considering it as aggravating evidence. *Penry v. Lynaugh*, 492 U.S. 302 (1989); *Atkins v. Virginia*, 536 U.S. 304 (2002). In Mr. Hoffman's case, the court abdicated its duty to clarify the jury's speculation and confusion about the effect of Mr. Hoffman's youth on the existence of a prior record. Thus, although the jury was statutorily and constitutionally required to consider youth as a mitigating factor, in reality youth led the jury to speculate about Mr. Hoffman's juvenile record. The juror's question to the court should have put the court on notice of this. By failing to instruct the jurors that (a) they must not consider such information, (b) that they should consider only the

evidence presented to them during the trial, the Court's response encouraged speculation about Petitioner's juvenile criminality, and the jury's use of statutory mitigation in aggravation, requiring reversal of Petitioner's death sentence.

### D. The Louisiana Supreme Court's Decision Denying Relief Was Contrary To *Penry*, and Mr. Hoffman Is Entitled to Habeas Relief.

*Penry, supra,* sets out in no uncertain terms the legal definition of what constitutes consideration of a mitigating circumstance for Eighth and Fourteenth Amendment purposes. The Louisiana Supreme Court applied a legal definition of "consideration" that is contrary to the clear definition in *Penry.*

The Louisiana Supreme Court found that because the jury heard uncontradicted evidence of the mitigating factor of Mr. Hoffman's lack of prior criminal history and even asked a question about it, it "considered" the mitigating factor:

> Moreover, as the defendant emphasizes, lack of criminal history was the subject of uncontroverted testimony by both State and defense witnesses. During the guilt phase, the State presented testimony of the defendant's managers from the parking garage. They both verified a background check of the defendant during the hiring process did not reveal a prior criminal record. The defense psychologist also testified the defendant had no prior experience with "criminal behavior." Furthermore, members of the defendant's family, along with his football coach, testified that the defendant did not have a history of run-ins with the law. Additionally, in its jury instructions during the penalty phase, the trial court included the specific mitigating circumstance set out in La.Code Crim. Proc. art. 905.5(a): "the offender has no significant prior history of criminal activity." Finally, the trial court gave jurors a copy of the statutory mitigating factors before they retired to deliberate. In Louisiana, a sentence of death shall only be imposed if the jury *considers* all of the mitigating circumstances and determines that death is an appropriate sentence. La.Code Crim. Proc. art. 905.3 (emphasis added). We believe that there is proof in the record, including the jury's inquiry into whether there was any juvenile record, to establish that the jury considered mitigating factors in compliance with La.Code Crim. Proc. art. 905.3.

*Hoffman,* 768 So.2d at 570. It then cited *Penry* for the erroneous proposition that a jury must *merely* consider mitigation in order for a sentence of death to pass constitutional muster. *Ibid.*

The clear holding of *Penry*, however, was not so shallow: in order to be found to have "considered" mitigating juries must give mitigating effect to evidence presented in mitigation:

> Indeed, it is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a "'reasoned *moral* response to the defendant's background, character, and crime.'" *Franklin, 487 U.S., at 184* (O'Connor, J., con concurring in judgment) (quoting *California v. Brown, 479 U.S., at 545* (O'Connor, J., concurring)). In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson, 428 U.S., at 305*, the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime.

*Id.* at 327-28.

The Louisiana Supreme Court applied a definition of "consider" that is contrary to both the meaning and purpose of "consider" as set out in *Penry*. This Court must conduct *de novo* review of Mr. Hoffman's claim that he was deprived of a reliable sentencing determination by the court's erroneous instruction. *See Williams v. Taylor*, 529 U.S. 362, 393 (O'Connor, J., concurring) (application of wrong legal standard defining ineffective assistance of counsel resulted in *de novo* review); *Goodman v. Bertrand*, 467 F.3d 1022 (7th Cir. 2006) (same). Because of the court's erroneous and misleading instruction, Mr. Hoffman is entitled to a new, reliable sentencing determination by jurors who give mitigating effect to Mr. Hoffman's lack of prior criminal history.

### E. The Louisiana Supreme Court's Decision Constitutes an Unreasonable Application of *Penry* and *Gardner*

The Louisiana Supreme Court's denial of Mr. Hoffman's claim of error in the trial court's response to the jury's question constitutes an unreasonable application of *Penry* and *Gardner*. It is founded on the erroneous conclusion that jurors considered mitigation, as

reflected in the Court's instructions prior to the commencement of penalty deliberations.  Mr. Hoffman is entitled to a new sentencing hearing.

### F.  Ineffective Assistance of Counsel.

Mr. Hoffman's right to the effective assistance of counsel at sentencing was violated when trial counsel failed to move for a mistrial, despite being on notice, through the jury's question to the judge, that the jurors were violating the court's instructions and Petitioner's constitutional rights by considering youth in an aggravating way and impermissibly speculating about matters extraneous to evidence presented at trial.

Defense counsel was also ineffective for failing to request an evidentiary hearing in order to determine if jury misconduct had taken place.  Well-pleaded allegations of prejudicial juror misconduct violating a defendant's constitutional rights will require an evidentiary hearing at which jurors shall testify.  Had such motion been granted. jurors would have revealed their unfounded, impermissible speculations as to Petitioner's prior criminality, and involvement in drug and gang activities, and that such speculations arose in part, *because* of defendant's youth, which should have been considered only in a mitigating way.  Declaration of Mari Lower (Ex. 106); Affidavit of Caroline Wallace (Interview with Gary McDonald, Jury foreperson) (Ex. 109).

The state court denied relief on this claim in post-conviction, summarily, without conducting an evidentiary hearing.  This Court should conduct an evidentiary hearing on the claim of ineffective assistance of counsel and review it *de novo*.  Mr. Hoffman is entitled to a new sentencing hearing.

XVI.  **PETITIONER'S DEATH SENTENCE SHOULD BE VACATED BECAUSE A JUROR THAT WAS SUBSTANTIALLY IMPAIRED IN HER ABILITY TO CONSIDER A LIFE SENTENCE, AND WHO EXPRESSLY STATED SHE WOULD NOT CONSIDER THE MITIGATING CIRCUMSTANCES THAT PETITIONER PRESENTED, SHOULD HAVE BEEN EXCLUDED FOR CAUSE AND COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE A CAUSE CHALLENGE TO EXCLUDE HER**

A.  **Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments were violated when the court allowed a juror to sit on his capital jury despite being unable to consider statutory mitigating factors**

"Any juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude the imposition of the death penalty." *Morgan v. Illinois*, 504 U.S. 719, 738 (1992). One of the primary duties of a capital sentencing juror is "to give *full* consideration and *full* effect to mitigating circumstances in choosing the defendant's appropriate sentence." *Smith v. Texas*, 543 U.S. 37, 38 (2004) (per curiam) (emphasis in original) (citations omitted). "The sentencer ... may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).[156] A juror who refuses to consider mitigating evidence should be excluded for cause because "the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Greene v. Georgia*, 519 U.S. 145 (1996). A failure to excuse such a juror for cause violates a defendant's constitutional rights to Due Process, to a fair trial by an impartial jury, and to a

---

[156] *See also Penry* v. *Lynaugh*, 492 U.S. 302, 319 (1989) ("*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and *give effect to* that evidence in imposing sentence"); *Hitchcock* v. *Dugger*, 481 U.S. 393 (1987) (also relied upon in *Penry*); *Parker* v. *Dugger*, 498 U.S. 308, 321 (1991) (death sentence violates Eighth Amendment when established mitigating evidence is ignored); *Magwood* v. *Smith*, 791 F.2d 1438, 1447-50 (11th Cir. 1986) (same) ("To find that mitigating circumstances do not exist where such mitigating circumstances clearly exist returns us to the state of affairs which were found by the Supreme Court in *Furman v. Georgia* to be prohibited by the Constitution.").

reliable capital sentencing hearing in violation of the Sixth, Eighth, and Fourteenth Amendments. "If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

The trial court violated all these rights of Petitioner's when it allowed Ms. Lower[157] to serve on the jury even though she had unequivocally stated that she would not consider the statutory mitigating circumstances of youth or lack of criminal record.[158] Ms. Lower made very clear, during individual, in-chambers questioning, that she would not consider the mitigating factors of youth and lack of a criminal record. She continually emphasized that her decision would be based solely on what she called "the facts of this case" and not matters she deemed extraneous, i.e. she would consider the circumstances of the crime, but not the character and circumstances of the defendant:

> Mr. Alford: Would you — there are mitigating and aggravating circumstances. I am just talking about the penalty portion of the trial. And some mitigating circumstances that are important to us in this case are that the youth — the age of Jessie Hoffman, would you take that into consideration in trying to reach a determination?
>
> Ms. Lower: **I think I would make my decision based on the facts of the case rather than the defendant's age.**
>
> Mr. Alford: Okay. What about the fact that the defendant had no prior history of criminal conduct?

---

[157] Ms. Lower's racial prejudice is also at issue in this case, as discussed in Claim IX. Also pertinent to this claim, Ms. Lower had a more personal stake in the proceedings than most jurors — her brother had been murdered by a hitchhiker who was never brought to justice. R. 1921-22. Although in response to the State's questions, she indicated that her brother's murder would not impact her deliberations in this matter, R. 1989-91, the fact that her brother was murdered must be considered when evaluating her responses elsewhere. Defense counsel did not question this juror about the possible effect of her brother's murder or her ability to deliberate impartially regarding either guilt or sentence. This is particularly inexplicable given defense counsels' argument that another prospective juror, Nancy Ritzmann, should be excused for cause on the grounds that her sister had been murdered in a domestic situation. R. 3277.

[158] Youth and lack of prior record are both *statutory* mitigating circumstances under Louisiana's capital sentencing scheme. La. C.Cr.P. 905.5 provides: "The following shall be considered mitigating circumstances: (a) the offender has no significant prior history of criminal activity; . . . (f) The youth of the offender at the time of the offense."

> Ms. Lower:   **Again, I believe I could make my decision on the facts of this case, not prior cases.**
>
> Mr. Alford:   Okay.

R. 1993-94 (emphasis added).   Ms. Lower's subsequent responses did nothing to dispel her expressed inability to consider youth and lack of prior record as mitigating factors, but rather confirm that the factors she would "consider" were inappropriately limited:

> Mr. Alford:   Okay, Now, it sounds to me like, that because when you get into the sentencing portion it is different, you're not thinking about — I mean, you are not working with guilt anymore. You are just thinking of other mitigating factors and aggravating circumstances of the offense. Are you — do you believe that, if you sat on the jury and you determined from the facts, proven that the defendant was guilty of first degree murder, do you feel that then, having determined that, you would automatically find the — sentence the defendant to death, after seeing the facts and finding him guilty of first degree murder?  Do you feel that you would automatically have to sentence him to death?
>
> Ms. Lower:   No, not automatically sentenced to death, no, sir.  I am sure, like you said, there may be mitigating circumstances and you would take those into consideration before you decide.
>
> Mr. Alford:   So you feel that you could decide, this is a horrible crime, but then you could still have and keep in mind the mitigating and aggravating circumstances, and you could consider both life imprisonment and the death penalty?
>
> Ms. Lower:   I believe so, ***based on the circumstances of the case***, I believe.
>
> Mr. Alford:   And let me try to make it easier.  I understand, as you sit here now, as you sit here now, after having heard something about the case on television, if it turns out that it was a horrible crime, my question is, would you automatically go for the death penalty?
>
> Ms. Lower:   I think we already know it was a horrible crime.  We don't know who committed it or the circumstances involved.  And again, I think I can just repeat what I said earlier, that ***the circumstances surrounding the case, I mean — did the person know that he was going to kill this person?  Did he plan to kill this person?  I think you have — I think you could take that all into consideration.***

R. 1994-96 (emphasis added).   It thus appears that Ms. Lower's conception of "mitigating circumstances" was limited to facts which should actually bar *conviction* for first degree murder.

She showed absolutely no indication that she could consider facts about Mr. Hoffman's life, his upbringing, and other relevant circumstances in reaching a decision. All of Ms. Lower's answers indicate that, given the facts that are necessary in order for a first degree murder conviction to result, she was unable to return a sentence other than death.

Ms. Lower was substantially impaired in her ability to consider a life sentence. The sole circumstance that she cited as relevant to support a life sentence was whether the killing was intentional — an element necessary to support a conviction for first degree murder and to render the defendant death eligible. Moreover, Ms. Lower clearly and emphatically stated that she could not consider the only statutory mitigating factors on which the defense relied.

Defense counsel did not ask Ms. Lower any further questions in chambers and in subsequent questioning did not address her attitudes towards the death penalty or her ability to consider mitigating factors of youth and lack of prior record. Neither did the State or the court. Ms. Lower's explicitly expressed and *unchallenged* statement that she would not consider a defendant's youth or lack of prior criminal activity as mitigation show that her ability to follow the trial court's instructions was substantially impaired, such that she should have been struck for cause. *Greene v. Georgia*, 519 U.S. 145 (1996) (citing *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)). The failure of the trial court to exclude Ms. Lower from his capital jury violated his constitutional rights under the Sixth, Eighth and Fourteenth Amendments; this constitutional error mandates automatic reversal of his capital sentencing. *Greene,* 519 U.S. at 145; *Morgan,* 504 U.S. at 729; *Witt* 469 U.S. at 412; *and see Eddings,* 455 U.S. at 115; *Smith,* 543 U.S. at 38.

**B. Petitioner's rights under the Sixth and Fourteenth Amendments to the effective assistance of counsel were violated when his lawyer failed to move the trial court to strike a juror who expressly stated she would not consider the statutory mitigating evidence he presented in determining whether he should live or die**

Defense counsel did not challenge Ms. Lower for cause, nor exercise a peremptory strike against her, and she sat on Petitioner's jury. R. 2204. Defense counsel's failure to do so fell outside the "range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). No reasonable "trial strategy" exists for allowing a juror who will not consider mitigating evidence to sit on a capital jury. *See Virgil v. Dretke*, 446 F.3d 598, 610 (5th Cir. 2006) (jurors "unchallenged statements during voir dire that they could not be "fair and impartial" obligated Virgil's counsel to use a peremptory or for-cause challenge on these jurors; not doing so was deficient performance under *Strickland*"); *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) (counsel deficient for relying on general statements of jurors that they could be impartial, and failing to ask jurors who had sat on co-defendant's trial about how that would affect their fairness) (reversing conviction).

Counsel's failure to strike Ms. Lower, and/or properly explore her willingness to consider youth or lack of prior record as mitigating was especially deplorable given that those were the key mitigating factors counsel planned to present, and ultimately did present, at the penalty phase. *Strickland*, 466 U.S. at 689 (when determining whether counsel's performance is deficient, courts much "evaluate the conduct from counsel's perspective at the time").

Petitioner was prejudiced by defense counsel's failure; he was judged by a juror who explicitly stated she would not consider the mitigating circumstances that he actually presented. *Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (finding defendant was prejudiced under *Strickland* where juror expressly indicated she could not be a fair juror); *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) (failure to strike actually biased juror when actual bias is apparent

340

from voir dire meets *Strickland* standard of prejudice); *Hughes v. United States*, 258 F.3d 453 (6th Cir. 2001) (same); *Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000) (recognizing that prejudice results when defense counsel fails to attempt to remove from the jury a person who has been established on voir dire to be biased).

Even if the court had denied a challenge for cause made by counsel, the error would have been preserved and pursued on appeal. Petitioner had exhausted all his peremptory challenges and would have been entitled to relief.[159]  *Virgil v. Dretke*, 446 F.3d 598, 613 (5th Cir. 2006) (had Virgil's counsel challenged [the biased jurors] for cause, the trial judge would have been forced to rule, a ruling that counsel could have objected to and pursued as error on direct appeal. There is little doubt that such an error would have been sustained by the Texas courts on direct review).

### C. The State Court's decision is contrary to clearly established law.

Petitioner raised this constitutional violation on direct appeal to the Louisiana Supreme Court, which denied the claim. *State v. Hoffman*, 768 So.2d 542, 563. Petitioner's claims were "adjudicated on the merits" in state court for the purposes of § 2254(d). However, the factual findings underlying the court's decision are clearly and convincingly rebutted by the record evidence. *See* § 2254(e)(1). The court's decision involved an unreasonable application of clearly established federal law, § 2254(d)(1), and "an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2).

Ms. Lower made it very clear that she would give "no weight" to the mitigating evidence regarding Mr. Hoffman's age and lack of prior criminal history. The Louisiana Supreme Court's

---

[159] **Error! Main Document Only.**The record reflects that the defense exhausted all twelve of its peremptory challenges by the end of the fourth day of voir dire. R. 56, 60, 62, 65. The court allotted the parties an additional peremptory challenge, which the defense exercised on the fifth day. R. 69.

decision was therefore in error.  The facts garnered by the Louisiana Supreme Court in reaching

their decision are quite simply inaccurate.  Having acknowledged Mari Lower's initial express

statement that she would not consider youth or lack of prior criminal history as mitigating

evidence, the court then held:

> However, the defendant's claim is undercut by Ms. Lower's later response
> declaring, "I am sure, like you said, there may be mitigating circumstances and
> you would take those into consideration before you decide."  Ms. Lower's
> answers indicated she would not solely consider aggravating circumstances;
> instead, she would consider all of the circumstances.

*Hoffman*, 768 So.2d at 563.  In fact, Ms. Lower made very clear that she would *not* consider "all

of the circumstances."  When asked whether she would consider Mr. Hoffman's age in reaching

a determination of life or death, she answered that she would "make my decision based on the

facts of the case rather than the defendant's age."  Similarly, she said that she would not consider

Mr. Hoffman's lack of a prior criminal history in reaching a decision, saying she would make her

decision based "on the facts of this case, not prior cases."  *These were the only mitigating*

*circumstances on which Ms. Lower was questioned, and she was unambiguous in stating that she*

*would not consider them were the case to reach the penalty phase*.  When she said she would

consider "mitigating circumstances," she clearly did not include Petitioner's youth or lack of

prior criminality because she did not believe they *were* "mitigating circumstances."

The second finding relied on by the Louisiana Supreme Court in denying Petitioner's

claim was also clearly and convincingly rebutted by the record.  The court stated:

> More importantly, whatever confusion existed in Ms. Lower's mind as to what
> constituted a mitigating circumstance, she made clear, on more than one occasion,
> that she would not automatically impose the death penalty if the defendant was
> found guilty of first degree murder.

*Hoffman*, 768 So.2d at 563.  Ms. Lower did state as a general proposition that she would not

automatically impose death if Mr. Hoffman was found guilty of first degree murder, and that she

would consider mitigating circumstances in reaching a decision. However, the fact that she would consider *certain* circumstances before imposing the death penalty (and therefore would not impose it automatically), in no way lessens the constitutional problem that she would not consider other factors that the Eighth Amendment requires that she consider. The court's finding otherwise is clearly erroneous.

The court's denial of Petitioner's ineffective assistance claim was based on its conclusion that Ms. Lower should not have been struck for cause, and is therefore also unreasonable for the reasons stated above.

The Louisiana Supreme Court's factual findings are clearly and convincingly rebutted by the evidence and are entitled to no deference under § 2254(e)(1). The court's decision, based on these erroneous fact findings, resulted in an unreasonable determination of the facts under § 2254(d)(2), and an unreasonable application of clearly established law under § 2254(d)(1). *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (state court decision unreasonable because court partially relied on erroneous factual finding). Relief is not foreclosed under § 2254(d), and Petitioner's capital sentence must be reversed.

## XVII. THE USE OF A "SHORT FORM" GRAND JURY INDICTMENT VIOLATED MR. HOFFMAN'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 2, 3, 14, 15, 16, 17, 20 AND 22 OF THE LOUISIANA CONSTITUTION.

### A. Introduction

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639 (1990), "to the extent. . . [*Walton*] allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 576-577. Quite simply, *Ring* subjected capital sentencing to the Sixth and Fourteenth Amendment rule of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), "that the Sixth Amendment

Case 2:09-cv-03041-JCL-SS   Document 1-2   Filed 03/10/09   Page 156 of 174

does not permit a defendant to be expose[d] …to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* 536 U.S. at 564, *quoting Apprendi*, 530 U.S. at 483. "Capital defendants, no less than non-capital defendants," the Court in *Ring* declared, "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.*

While *Ring* specifically invalidated State statutes that prescribe judge rather than jury sentencing, it also has constitutional implications for jury sentencing in states such as Louisiana. Specifically, it renders "short form" grand jury indictments unconstitutional.

### B. Statutory Aggravators Constitute Elements of a Capital Offense and Therefore Must Be Indicted by the Grand Jury.

Petitioner's grand jury indictment did not include any of the aggravating circumstances necessary in Louisiana to elevate a crime to first-degree murder, nor did it include the aggravators argued by the State at the penalty phase of the trial. The indictment reads in pertinent part as follows:

> The Grand Jurors of the State of Louisiana, duly impaneled and sworn in and for the body of the Parish of St. Tammany, in the name and by the authority of the said State, upon their oath find and presents:
>
> That one, JESSIE D. HOFFMAN late of the Parish of St. Tammany, on the 27TH of NOVEMBER in the year of our Lord, one thousand nine hundred and 96, in the Parish of St. Tammany, aforesaid, and within the jurisdiction of the Twenty-second Judicial District Court of Louisiana, for the Parish of St. Tammany:
>
> COUNT ONE: R.S. 14:30 FIRST DEGREE MURDER, by killing MARY ELLIOTT in the first degree.

R. 98. Thus, the indictment failed to charge both the aggravating circumstances under La. R.S. 14:30 (circumstances necessary for a conviction for first degree murder) or the statutory aggravators under La.C.Cr.P. art. 905.4 (circumstances necessary for a sentence of death).

344

*Jones v. United States*, 526 U.S. 277 (1999*), Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring, supra,* mandate that statutory aggravating factors, which must necessarily be found before the death penalty may be imposed, are the functional equivalent of elements of an offense that must be proven beyond a reasonable doubt to the jury.   The implications of this constitutional rule, reiterated in *Ring,* is that all of the constitutional rights that are guaranteed regarding elements of an offense in the guilt-innocence phase of trial must also be provided with respect to statutory aggravators in the sentencing phase of trial.   Since a defendant is entitled to a grand jury indictment on every element of an offense, likewise, a defendant is entitled to a grand jury indictment on statutory aggravators.

Of course, the right to a grand jury indictment under federal law is not an incorporated right accruing to state defendants.   However, in Louisiana, under the Louisiana Constitution, defendants have the right to a grand jury indictment when indicted for a capital offense.   La. Const. art. I, § 15  (2002):

> Section 15. [N]o person shall be held to answer for a capital crime or a crime punishable by life imprisonment except on indictment by a grand jury.

Because Louisiana specifically requires a grand jury indictment for capital cases, it follows that the grand jury must find the statutory aggravators to be valid.   In *Jones, supra,* the Supreme Court stated the constitutional rule: "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime *must be charged in an indictment,* submitted to a jury, and proven beyond a reasonable doubt."  526 U.S. at 243 n.6 (emphasis added).

The following year, the Supreme Court addressed the same issue and concluded that its holding in *Jones'* footnote 6 controlled.  *Apprendi*, 530 U.S. at 490 (*quoting Jones*, 526 U.S. at

243 n.6). The Court in *Apprendi* held that if a "sentencing factor" serves to increase a sentence beyond a maximum sentence otherwise statutorily authorized, "it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. *Indeed it fits squarely within the usual definition of an 'element' of the offense.*" *Id.* at 494 n.19 (emphasis added).

Although the *Ring* decision did not explicitly discuss whether a defendant was entitled to a grand jury indictment on the facts that, if proven, would justify a sentence of death, the cases upon which it squarely rested, *Jones* and *Apprendi,* did articulate such a constitutional rule. Moreover, shortly before *Ring* was decided, the Supreme Court held that failure to allege in an indictment a fact that increased the statutory maximum sentence rendered respondent's enhanced sentences erroneous under the reasoning of *Apprendi* and *Jones.* *United States .v Cotton*, 535 U.S. 625 (2002) (declining to consider whether the indictment error affected respondent's substantial rights because he failed to object to such error during trial).

The Court in *Jones* explained that the constitutional rule at issue concerns "*the required procedures for finding the facts that determine the maximum permissible punishment [including] the safeguards going to the formality of notice.*" 526 U.S. at 243 n.6 (emphasis added). Since *Ring*'s rationale and decision rested entirely on *Jones* and *Apprendi*, and both of these decisions held that "any fact . . . that increases the maximum penalty for a crime *must be charged in the indictment . . .*" it appears to be a foregone conclusion that aggravating factors that are essential to the imposition of the death penalty must appear in the indictment. 526 U.S. at 243 n.6; 530 U.S. at 494 n.19 (emphasis added); *see also State v. Promise*, 255 F.3d 150, 152 (4th Cir. 2002) (concluding that under *Apprendi*, in order to authorize the imposition of a sentence exceeding the maximum allowable without a jury finding of a specific factor, such factors must be treated as

elements of aggravated offenses, i.e., *"charged in the indictment and proved to the jury beyond a reasonable doubt."*) (emphasis added).

What *Apprendi* and *Ring* teach is that what has been called a "sentencing factor" must be now recognized as a matter of substantive criminal law as an essential element. As with all essential elements, they must be proven to a jury beyond a reasonable doubt. Similarly, as with all essential elements of capital crimes, they must be indicted by a grand jury.

The importance of function over form is stressed repeatedly in the *Ring* and *Apprendi* decisions. While the U.S. Supreme Court acknowledges that states have wide latitude with respect to criminal law, the Court reminds that, "constitutional limits exist to States' authority to define away facts necessary to constitute a criminal offense." *Apprendi*, 530 U.S. at 467 (citing, *McMillan v. Pennsylvania*, 477 U.S. 79, 85-88 (1986)). These same principles were affirmed with respect to the Louisiana constitution in *State v. Straughan*, 87 So.2d 523 (La.1956):

> [T]here can be no question but that the constitutional provisions of the state are supreme, transcending any legislative enactment -- or judicial pronouncement or executive act for that matter -- and that in prescribing the form of charge and the procedure in criminal cases a legislature can never, either directly or indirectly, endanger any of the safeguards and protections with which the rights of the individual have been surrounded in that instrument, or, by circumvention, in any manner trench upon its guarantees. To this end, it is the duty of the court to interpret legislative enactments and to decide cases in the light of these guarantees, and it may not, in the name of expediency or in the wake of changing modern trends, permit the legislative body to unlawfully override the mandates of the constitution where these are plain and unambiguous.

*Straughan*, 87 So.2d at 528.

The decisions in *Apprendi* and *Ring* contain clear rules of substantive criminal law, which remove ambiguity from current charging practice in Louisiana capital cases—this practice is unconstitutional. These decisions clearly establish penalty phase statutory aggravators as essential elements, and the case law in Louisiana is consistent with regard to the need for

charging all such elements.   Therefore, failure to charge penalty phase statutory aggravators represents an unconstitutional abdication of the grand jury's duty to charge capital defendants.

Thus Petitioner is entitled to a reversal of his conviction and sentence of death.

### C.  Mr. Hoffman Is Entitled to Habeas Relief.

Mr. Hoffman raised this claim in his post-conviction proceedings.  *See* Supplemental Petition, Claim XVI, at 198-201.  The state court summarily denied it on its merits.  *See* State Court Opinion, 5/1/07, at 1.  Because the state court provided no reasons for the denial, this Court should review the claim *de novo* and grant relief.  In the alternative, the state court;s decision constitutes an unreasonable application of *Ring* and *Apprendi,* and this Court should reverse Mr. Hoffman's conviction and sentence of death and remand his case for a new trial.

## XVIII. WHEN   VIEWED   AS   A   WHOLE,   THE   PROCEDURAL   AND SUBSTANTIVE ERRORS HEREIN ARGUED CANNOT BE HARMLESS SINCE THE COMBINATION OF ERROR DEPRIVED HIM OF THE FUNDAMENTALLY FAIR TRIAL GUARANTEED UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

As set forth above, Mr. Hoffman's capital murder trial was riddled with multiple constitutional errors.   Although courts often face isolated claims of constitutional violations in petitions for writs of habeas corpus, this case, by contrast, presents an extraordinary array of well-documented, constitutional deprivations resulting from misconduct, incompetence, and error that combined to infect the trial and sentencing process with fundamental unfairness in violation of the Sixth, Eighth, and Fourteenth Amendments.   These errors of constitutional magnitude prevented the jury from properly assessing the State's evidence of Mr. Hoffman's guilt, death eligibility and moral culpability.

While there are arguments above for addressing each individual error, addressing these errors solely on an individual basis may not afford the adequate safeguards required by the Constitution against an improperly imposed death sentence.   The touchstone of constitutional

due process is "fundamental fairness." "The Fourteenth Amendment is a protection against criminal trials . . . conducted in such a manner as amounts to a disregard of that fundamental fairness essential to the very concept of justice, and in a way that necessarily prevents a fair trial." *Lyons v. Oklahoma*, 322 U.S. 596, 605 (1944) (citations omitted); *see also California v. Trombetta*, 467 U.S. 479, 485 (1984) (under the Due Process Clause, "criminal prosecutions must comport with prevailing notions of fundamental fairness").

Ensuring due process in the context of capital trials is of particular significance. As the Fifth Circuit explained in *Gholson v. Estelle*, "it is precisely the inflexible and terminal nature of the death penalty that makes it a matter of exceeding consequence to assure that before such a condemnation is made, the individual receives the full force of the protections and safeguards guaranteed by the Constitution." 675 F.2d 734, 737 (citation omitted); *see also Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (recognizing that the gravity and finality of the death penalty dictates the need for careful, individualized sentencing).

Federal courts in this and other circuits have recognized that where pervasive constitutional error has infected a state criminal trial, a defendant has been denied due process of law and is entitled to relief. *See Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992), *cert. denied*, 508 U.S. 960 (1993) (en banc) (when trial court errors "so infect[] the entire trial that the resulting conviction violates due process" reversal is warranted) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *Guerra v. Collins*, 916 F. Supp. 620, 637 (S.D. Tex. 1995), *aff'd*, 90 F.3d 1075 (5th Cir. 1996) (applying *Derden*, the Court held that the "number of instances of [prosecutorial] misconduct [including intimidation of witnesses, suggestive identification procedures, a Brady violation, and the use of false evidence at trial,] as well as the type and degree [of that misconduct,] compel the conclusion that the cumulative effect . . . rendered the

349

trial fundamentally unfair");[160] see also *Moore v. Johnson*, 194 F.3d 586, 619-22 (5th Cir. 1999) (considering the "cumulative errors" of counsel and finding them to be prejudicial); *United States v. Johnston*, 127 F.3d 380, 398 (5th Cir. 1997), *cert. denied*, 522 U.S. 1152 (1998) (considering, in narcotics case, the cumulative effect of prosecutorial misconduct and finding prejudice sufficient to cast doubt upon the correctness of the jury's verdict).[161]

Petitioner's trial is riddled with so many violations of his Sixth and Fourteenth Amendment rights to Due Process, that it cannot be considered the "fundamentally fair trial" to which he is entitled under the federal constitution. He received ineffective assistance of counsel at both the sentencing stage and guilt stage of his trial. The prosecution failed to disclose exculpatory evidence and then capitalized on its failure. The deliberations were tainted with numerous counts of jury misconduct including the consideration of improper evidence, premature deliberations, and parole discussions, as well as pretrial publicity and community prejudice, prosecutorial misconduct, and inadequate instructions. Under the Eighth Amendment, Petitioner's sentence is unconstitutionally unreliable, unconstitutional under *Atkins*, and disproportionate.

Finally, racism tainted virtually every aspect of Petitioner's trial. From the circumstances of the crime (the racially charged scenario of the rape and murder of a suburban white woman by an inner-city black man), to the pretrial publicity ("over in that zoo"), to the choice of venue (a

---

[160] The majority of other circuits also have adopted a cumulative effect rule with respect to due process violations in this context. *See Lundy v. Campbell*, 888 F.2d 467, 481 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990) (considering the prejudicial effect of procedural errors cumulatively); *Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988), *cert. denied*, 489 U.S. 1088 (1989) (noting in *dicta* that errors "cumulatively" causing sufficient harm can make a conviction fundamentally unfair); *Walker v. Davis*, 840 F.2d 834, 839 (11th Cir. 1988) (considering circumstances of prosecutorial misconduct "in their entirety").

[161] The Supreme Court has continued to hold that the prejudicial focus, particularly in post-conviction and/or habeas corpus proceedings, must be adjudicated through the prism of the trial as a whole. *Strickland v. Washington*, 466 U.S. 668, 690 (1984) (counsel's performance must be reviewed with an eye to all of the circumstances); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (custodial status must be assessed in the light of the "totality of the circumstances"); *Kyles v. Whitley*, 514 U.S. 419 (1995) (errors not to be adjudicated "item by item").

community whose meteoric growth was a result of "white flight"), to the indictment by an unconstitutionally constructed grand jury (only one black grand jury foreperson out of fifty one), to the atmosphere in the courtroom ("there were no black people in the courtroom"), to prosecution's use of preemptory strikes to strike all qualified African-Americans (a one in one billion chance), and finally to the unconstitutional jury deliberations ("like O.J. Simpson using it to get off"); every stage of Mr. Hoffman's case was plagued with racial prejudice.  Recently a Judge from New York's highest state court remarked: "It is a sad and ugly badge of shame that the imposition of death in this country has been tainted with racial prejudice." *New York v. Cahill*, 2003 N.Y. Lexis 3978, 117-8 (N.Y. 2003) (Judge George Bundy Smith concurring opinion).  Petitioner's case cannot be considered to have escaped the indelible stain of racism that is so deeply interwoven into the fabric of death penalty jurisprudence.  In fact, if ever a case deserved Judge Smith's "sad and ugly badge of shame," it would be Petitioner's trial that would merit such a dishonor.

Given the number and significance of the constitutional violations that occurred in the course of Mr. Hoffman's trial, discussed *supra*, it is impossible to conclude that these errors did not dramatically affect if not determine an unjust conviction and sentence.  His conviction and death sentence are fundamentally unfair; they were obtained in violation of Due Process and should be reversed.

This claim was fairly presented to, and adjudicated on the merits by, the state court.  However because the court gave no reasons, § 2254(d) does not apply.  If it does the Court should independently review the record.  The lack of reasons given for the state court denial of relief renders it unreasonable.  The strength of evidence supporting the claim is overwhelming, and the decision was an unreasonable application of clearly established federal law, and an

unreasonable determination of the facts. *See* § 2254(d)(1); § 2254(d)(2). Petitioner is entitled to relief.

## XIX.  PETITIONER ASSERTS HIS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO A FAIR CLEMENCY PROCESS WHICH COMPLIES WITH A MINIMUM LEVEL OF DUE PROCESS, AND HIS RIGHT NOT TO BE EXECUTED UNTIL SUCH CLEMENCY PROCESS IS AVAILABLE TO HIM

In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 118 S. Ct. 1244 (1998), a majority of justices of the United States Supreme Court held that death row inmates have a life interest that is implicated by any clemency process that is provided by the individual states. Petitioner's life interest is protected by the due process provisions and the prohibition against cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments.

These rights entitle him to a minimum level of due process in the administration of the Louisiana clemency procedure, including, but not limited to, a genuine opportunity to invoke it in fair procedures untainted by bias. *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 118 S.Ct. 1244, 1250, 1254 (1988); *Faulder v. Texas Board of Pardons and Paroles*, 178 F.3d 343 (5th Cir.) *cert. denied*, 527 U.S. 1017 (1999) (same); *and see Burnsworth v. Gunderson*, 179 F.3d 771, 775 (9th Cir. 1999); *Lankford v. Idaho*, 550 U.S. 110 (1991). These principles flow from the intersection of due process precedent and a recognition of the critical role that the availability of clemency plays in a system of capital punishment. "It is an unalterable fact that our judicial system, like the human beings who administer it, is fallible. Executive clemency has provided the 'fail-safe' in our criminal justice system." *Herrera v. Collins*, 506 U.S. 390, 415 (1994). It follows that the clemency process itself must include a "fail-safe" of some minimal requirements of fairness, in order to serve its "fail-safe" function. *See also, e.g., Young v. Hayes*, 218 F.3d 850 (8th Cir. 2000) (clemency proceeding cannot be fundamentally unfair).

Louisiana's clemency system arbitrarily denies Petitioner these fundamental rights.  To execute Petitioner without according him such protections would further violate these rights. The unique importance of the clemency power lies precisely in its ability to operate late in the day and after the judicial process has finished.  Only then may it serve its crucial function as the final "fail safe" of our criminal justice system. *See Herrera,* 506 U.S. at 415; *Cherrix v. Braxton,* 131 F.Supp. 2d 756 (E.D. Va. 2001) ("Clemency is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted").

The clemency system fails to meet the minimal requirements of due process either on the face of the relevant statutory provisions, or as they will be applied in Petitioner's case for the following reasons: (1) it requires death row inmates to file an application within one year of direct appeal; (2) it requires statements of all witnesses in favor of a condemned inmate receiving a life sentence to be made public, but requires all statements of witnesses *opposed* to Plaintiff receiving a sentence of life in prison to be kept private; (3) it does not guarantee a clemency hearing and provides no opportunity to be heard to argue for a hearing; (4) it drastically restricts evidence that may be presented in an application; and (5) it restricts the number of witnesses that may testify at a hearing. *See* La. Admin. Code tit. 22, pt V, § 101 et seq.

These procedures violate Petitioner's constitutional rights under *Woodard* to meaningful access to a fair clemency procedures comporting with minimum due process, and his right, under the Eighth Amendment, not to be executed without vindication of these rights.  Accordingly, Petitioner respectfully requests that this Court find Louisiana's clemency procedures to be unconstitutional and vacate his death sentence.

In the alternative, Petitioner requests that this Court order full discovery and a full and fair evidentiary hearing in order to present facts in support of his claims, and orders the State not

to proceed with Petitioner's execution until it adopts and implements safeguards to avoid the risks set forth in herein.  Petitioner also reserves his rights under the Eight Amendment to challenge any subsequent clemency procedures should they change in the future, and hereby asserts such claim.

Petitioner raised his federal claim to the state court in post-conviction proceedings. The court dismissed the claim without prejudice.  The state court therefore did not adjudicate the claim on the merits for the purposes of §2254(d) and he is entitled to *de novo* review.  If the court finds that AEDPA does apply, the state court's decision is contrary to, or an unreasonable application of clearly established federal law and an unreasonable determination of the facts. Any fact findings deemed to be made are clearly and convincingly rebutted by the evidence. Petitioner is entitled to relief.

## XX. LOUISIANA'S LETHAL INJECTION PROTOCOL VIOLATES PETITIONER'S EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS

Petitioner faces execution by lethal injection.[162]  Petitioner raised this claim in state post-conviction proceedings.  The state court dismissed the claim without prejudice for lack of ripeness.  This execution method as currently administered in Louisiana violates Petitioner's federal constitutional rights under the Eighth and Fourteenth Amendments as it creates a substantial risk of serious, unnecessary pain.  Accordingly, Petitioner's death sentence must be set aside.

---

[162] By statute, condemned prisoners in Louisiana are executed "by the intravenous injection of a substance or substances in a lethal quantity into the body of a person convicted until such person is dead." La. R.S. 15:569 (B).

### A.  A Method Of Execution That Creates A Substantial Risk of Severe Pain Violates The Federal And State Constitutions.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishment."  This forbids the infliction of unnecessary pain in the execution of a sentence of death. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (opinion of Reed, J.)  For this reason, "[t]he traditional humanity of modern Anglo-American law forbids the infliction of unnecessary pain in the execution of the death sentence." *Resweber*, 329 U.S. at 463.

In a recent decision, the United States Supreme Court explained how this test should be applied to methods of execution by lethal injection.  In *Baze v. Rees*, 128 S.Ct. 1520 (2008), the Court considered the constitutionality of a written protocol adopted by the Kentucky Department of Corrections to implement execution by lethal injection. *Id.* at 1527.  Kentucky's protocol called for the injection of 3 grams of sodium thiopental, 50 milligrams of pancuronium bromide, and 240 milliequivalents of potassium chloride. *Id.*  The protocol specified that the intravenous lines used to administer these drugs must be flushed with 25 milligrams of saline between injections in order to prevent clogging. *Id.* at 1528.  The protocol required that the IV catheters administering these drugs be inserted by qualified personnel with at least one year of professional experience. *Id.*  The protocol also contained detailed procedures to be followed in the event the first dose of sodium thiopental does not render the prisoner unconscious. *Id.*  Finally, the protocol mandated that a physician be present to revive the prisoner in the event of a last-minute stay of execution. *Id.*

In a fractured plurality opinion, the Court upheld Kentucky's written protocol, citing the multiple, detailed safeguards Kentucky had adopted to minimize the possibility of a "botched" execution.  The plurality also set forth a new standard to assess the constitutionality of a particular method of execution: the Eighth Amendment is violated only if the execution method

creates a "substantial risk of serious harm." *Id.* at 1531 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 & n.9 (1994)).

### B. Louisiana's Lethal Injection Procedure Creates A Substantial Risk Of Serious Harm.

Unlike Kentucky's protocol, Louisiana's lethal injection procedure lacks nearly every safeguard cited and approved by the Unites States Supreme Court in *Baze*. As a result, Louisiana's method of execution is substantially likely to result in severe harm to the condemned inmate. For that reason, Louisiana's method of execution violates the Eighth Amendment under *Baze*.

#### 1. Louisiana's Lethal Injection Protocol Lacks the Procedural Safeguards Relied Upon by the United States Supreme Court in finding Kentucky's Protocol Constitutional

Louisiana's written protocol for administering lethal injections appears at Title 22, Part I, Section 103 of the Louisiana Administrative Code. The portion of that Section setting forth "procedures" to be followed is eight paragraphs long. Two of those eight paragraphs describe the procedures to be followed in administering lethal injections:

> 2. The inmate will then be taken to the lethal injection room by the escorting officers. Once in the room, the inmate will be afforded the opportunity to make a last verbal statement if he so desires. He will then be assisted onto the lethal injection table and properly secured to the table by the officers. Once the officers exit the room, the warden will close the curtain to the witness room and signal the I.V. technician(s) to enter. The I.V. technician(s) will appropriately prepare the inmate for execution and exit the room. The warden will reopen the witness room curtain.

> 3. The person designated by the warden and at the warden's direction, will then administer, by intravenous injection, the appropriate substances in a lethal quantity into the body of the inmate until he is deceased.

La. Admin. Code tit. 22, pt. I, § 103.J.2 to 3 (2007). A comparison of the Louisiana protocol

with the Kentucky protocol upheld in *Baze* shows that Louisiana's written procedures are

woefully inadequate:

- Unlike the Kentucky protocol, the Louisiana protocol does not specify the particular chemicals to be used, or the dosages to be administered. While "Kentucky's protocol called for the injection of 2 grams of sodium thiopental, 50 milligrams of pancuronium bromide, and 240 milliequivalents of potassium chloride ... In 2004, as a result of this litigation, the department chose to increase the amount of sodium thiopental from 2 grams to 3 grams." *Baze*, 128 S.Ct. at 1528. Louisiana's protocol states only that the executioner shall administer "the appropriate substances in a lethal quantity." La. Admin. Code tit. 22, pt. I, § 103.J.3.

- Unlike the Kentucky protocol, the Louisiana protocol does not specify who is to prepare and administer the injections, the nature and extent of their training, if any, and their experience, if any, with the instruments used to start an IV line. Whereas Kentucky "reserves responsibility for inserting the IV catheters to qualified personnel having at least one year of professional experience," and includes "a certified phlebotomist and an emergency medical technician" on the team that administers the injection. *Baze*, 128 S.Ct. at 1528. Louisiana states only that "I.V. technician(s) will appropriately prepare the inmate," and "[t]he person designated by the warden" will administer the injection. La. Admin. Code tit. 22, pt. I, § 103.J.2 to 3.

- Unlike the Kentucky protocol, the Louisiana protocol does not address how to avoid occlusion of the IV lines. Kentucky requires that members of the execution team flush the IV lines between injections "to prevent clogging of the lines by precipitates that may form when residual sodium thiopental comes into contact with pancuronium bromide." *Baze*, 128 S.Ct. at 1528. Louisiana says nothing about this.

- Unlike the Kentucky protocol, the Louisiana protocol does not include any procedures to be followed in the event of an emergency. Kentucky provides that if the warden and deputy warden determine that the prisoner is not unconscious within 60 seconds following injection of sodium thiopental, a new dose is administered. *Id.* Kentucky further provides that a physician shall be present to revive the inmate in the event of a last-minute stay of execution. *Id.* Louisiana provides neither.

- Unlike the Kentucky Protocol, the Louisiana protocol does not require the members of the execution team, including the IV technicians, to participate in any practice sessions before a scheduled execution. Kentucky requires the execution team to participate in at least 10 practice sessions per year. "These sessions, required by the written protocol, encompass a complete walk-through of the

357

execution procedures, including the siting of IV catheters into volunteers." *Id.* at 1534. Louisiana's protocol is silent on this issue.

Louisiana's failure to adopt safeguards like Kentucky's puts inmates at a substantial risk of suffering severe harm during executions. Such safeguards are necessary because lethal injection can cause serious, unnecessary pain if administered improperly. As the *Baze* plurality recognized, "It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride." *Baze*, 128 S.Ct. at 1533.

### a. Lethal injections fail frequently.

Lethal injections fail frequently—each time causing unnecessary suffering. There have been twenty-one botched lethal injection executions since 1985. Michael Radelet, *On Botched Executions,* forthcoming in Peter Hodgkinson and William Schabas (eds.), *Capital Punishment: Strategies for Abolition* (Cambridge University Press, 2001) (hereinafter "Radelet"). "Lethal injection, meant to be the neat and modern execution method, [has been] plagued with problems, or 'execution glitches,' as they are also referred to in the business." Stephen Trombley, *The Execution Protocol*, 14 (Random House 1992) (hereinafter "Trombley").

Several states have documented failed lethal injection executions. In Texas, several inmates have been subjected to excruciating failed executions. *See* Trombley at 14 (Billy Wayne White suffered forty-seven minutes of failed IV insertions; Stephen Morin suffered forty-five minutes of failed IV insertions; Randy Wools suffered through failed IV insertions on two separate occasions; and Stephen McCoy received an excessive dose of poison). In Louisiana, John Ashley Brown convulsed violently after receiving an excessive dose of the lethal solution; the same happened to Scott Dawn Carpenter in Oklahoma. Trombley at 14-15. Raymond

358

Landry lay only half-dead when the IV popped from his vein—his death took twenty-four minutes. *Id.* In Illinois, Charles Walker's IV was inserted incorrectly which caused the poison to flow away from his heart and prolonged the suffering. *Id.*, at 156-157, 252.

As these examples demonstrate, the three-drug lethal injection procedure followed by States such as Louisiana can cause serious harm if it is improperly administered. If the chemicals are improperly delivered, or if the dosage of sodium thiopental is insufficient to ensure that the prisoner is unconscious, or if the first dose of sodium thiopental does not take effect quickly enough, or if the IV lines become clogged, for example, the prisoner will suffer an unnecessarily excruciating death. Louisiana's failure to adopt and implement the safeguards recognized in *Baze* renders its lethal injection process unconstitutional.

### b. The absence of medical experts in Louisiana's procedure is constitutionally intolerable.

Louisiana's lethal injection protocol does not require the use of medical experts or automated processes which would reduce execution malfunctions. *See* La. Admin. Code tit. 22 § 103 (2007).[163] A lethal injection execution is essentially a medical procedure. Effective and humane administration of the lethal solution requires a trained medical professional. Unlike other states that involve medical professionals, *see* Trombley at 76, Louisiana does not require those administering lethal injections to have the experience necessary to minimize the possibility of needless pain. And, unlike other states, Louisiana does not employ sophisticated machines that, if calibrated by medical professionals, would reduce the chance of execution malfunctions. Mr. Hoffman may suffer unnecessary torture and suffering because those administering the lethal injections are not medically trained.

---

[163] The regulations only require that a "competent person" administer the lethal injection.

### C. Conclusion

For the foregoing reasons, Louisiana's method of execution by lethal injection creates a substantial risk of serious harm.  As the Supreme Court's recent decision in *Baze* makes clear, the Eighth Amendment prohibits Louisiana from executing Mr. Hoffman by lethal injection so long as unnecessary, substantial risks of severe pain are present.  Accordingly, Petitioner respectfully requests that this Court find Louisiana's lethal injection protocol unconstitutional and vacate his death sentence. In the alternative, Petitioner requests that this Court order an evidentiary hearing on this claim; order the Department of Corrections to produce, in discovery, any and all materials relevant to lethal injection; and to enjoin the State from proceeding with Petitioner's execution until it adopts and implements safeguards to avoid the risks set forth in herein.  Petitioner also reserves his rights under the Eighth Amendment to challenge any subsequent lethal injection or other execution procedures in Louisiana should they change in the future, and hereby asserts such claim.

### D. Petitioner is entitled to *de novo* review of his claim

Petitioner raised his federal claim to the state court in post-conviction proceedings. The court dismissed the claim without prejudice.  The state court therefore did not adjudicate the claim on the merits for the purposes of § 2254(d) and he is entitled to *de novo* review.  If the Court finds that AEDPA does apply, the state courts' decision is contrary to, or an unreasonable application of clearly established federal law and an unreasonable determination of the facts.  Any fact findings deemed to be made are clearly and convincingly rebutted by the evidence. Petitioner is entitled to relief.

## PRAYER FOR RELIEF

Petitioner requests the following relief:

A.        That Petitioner be granted such discovery as necessary for full and fair resolution of the claims contained in this Petition;

B.        That leave to amend this Petition, if necessary, be granted;

C.        That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

D.        That Petitioner be allowed to respond to any affirmative defenses or other arguments and new matters that Respondents might assert; and

E.        That Petitioner's conviction and death sentence be vacated.

Respectfully submitted,

Sarah Ottinger, La bar # 24589
Capital Appeals Project
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955

Caroline W. Tillman, La. Bar # 31411
Capital Post-Conviction Project of Louisiana
1340 Poydras St., Suite 1700
New Orleans, LA 70112
(504) 212-2110

Dated:  3\10\09

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Petition for Writ of Habeas Corpus has been served via

Federal Express, upon Respondent through Assistant District Attorney, Dale Branch, 1743

Goodyear Drive, Bogalousa, LA 70427 and the Office of the Attorney General, 1885 North 3rd

Street, Baton Rouge, LA 70802 on this 10th day of March, 2009.


_____
Sarah Ottinger