# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**JESSIE HOFFMAN, #400473**        **CIVIL ACTION NO.  09-3041**

**VERSUS**        **SECTION "B"**

**BURL CAIN, WARDEN**        **MAGISTRATE (1)**

## MEMORANDUM IN OPPOSITION TO APPLICATION FOR HABEAS CORPUS

**MAY IT PLEASE THE COURT:**

Walter Reed, District Attorney for the Parish of St. Tammany, 22nd Judicial District Court files this Memorandum in response and opposition to the habeas corpus application filed by Jessie Hoffman (hereinafter referred to as "Hoffman") herein.

## STATEMENT OF THE CASE

The State admits that petitioner, Jessie Hoffman, is a state court prisoner incarcerated following a jury verdict of guilty to first degree murder and sentenced to death.  Petitioner's conviction and sentence were affirmed by the Louisiana Supreme Court on April 11, 2000, the opinion was supplemented on June 14, 2000, and the court denied petitioner's

application for rehearing on May 12, 2000.  The United States Supreme Court denied petitioner's writ application on October 16, 2000.  Petitioner filed an application for post conviction relief with the district court on July 20, 2001, which was denied by the court on May 1, 2007.  However, petitioner filed an Amendment to his state post-conviction application on April 17, 2007, which was never ruled upon by the state district court. Petitioner filed a writ application with the Louisiana Supreme Court from the May 1, 2007 Order, and that writ application was denied on December 12, 2008, and this habeas application was filed on March 10, 2009.

For the reasons further detailed hereinbelow, the State of Louisiana asserts that the Petition filed by Hoffman herein seeking habeas corpus relief should be denied.

## LAW AND ARGUMENT

### Timeliness and Exhaustion

The federal habeas corpus application filed herein by Hoffman must be filed in accordance with the requirements of 28 U.S.C. 2244, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The AEDPA applies to this case since it was filed after the enactment of the AEDPA, which became effective on April 24, 1996. Leonard v. Hubert, 2001 WL 333123 (E.D. La. 2001).  The AEDPA established a one (1) year statute of limitations for the filing of federal habeas applications. 28 U.S.C. 2244(d)(1). Pursuant to this sub-section, this one year statute of limitations runs from the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.  Petitioner did appeal his conviction and sentence herein.  The

Louisiana Supreme Court affirmed his conviction and sentence on April 11, 2000, the opinion was supplemented on June 14, 2000, and the Court then denied his application for rehearing on May 12, 2000.  The United States Supreme Court denied his application on October 16, 2000.  Accordingly, for AEDPA purposes, the State of Louisiana submits that Hoffman's conviction and sentence became final on October 16, 2000.

The AEDPA provides for interruption of the one year limitations period, stating that "the time during which a properly filed application for state post conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection".  28 U.S.C. §2244(d)(2).  By its plain language, the statute at issue, 28 U.S.C. §2244(d)(2), does not create a new full one year term within which a federal habeas petition may be filed at the conclusion of state court post conviction proceedings.  Flanagan v. Johnson, 154 F.3d 196 (5th Cir. 1998).  Because this statute is a tolling provision, the time during which state court post conviction proceedings are pending must merely be subtracted from the one year limitations period.  *See* Flanagan, *supra*.  A matter is pending for §2244(d)(2) purposes as long as the ordinary state collateral review process is in continuance.  Carey v. Saffold, 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002).

Hoffman filed his initial Application for Post Conviction Relief with the state district court on July 20, 2001, which served to interrupt the limitations period set forth by the AEDPA.  As of that date, 276 days of the limitations period had elapsed, i.e. from October 16, 2000 to July 20, 2001.  That application was amended and supplemented several times,

and the district court denied certain post conviction claims by Order dated May 1, 2007. Subsequently, petitioner's writ application with the Louisiana Supreme Court was denied on December 12, 2008.  Hoffman filed this application on March 10, 2009, and therefore, another 87 days elapsed, bringing the total elapsed time to 363 days, just within the one year period.

28 U.S.C. 2254(b)(1)(A) provides that an application for writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a state court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.  The exhaustion requirement is satisfied if a petitioner has fairly presented the substance of his claims to the state courts.

The State submits that Hoffman has not presented the substance of habeas claims II and III asserted herein to the state courts.  On page 10 of the Petition filed herein, Hoffman asserts that claims II and III were properly raised in the state post-conviction proceedings, but were not mentioned at all by the state court when it denied the application.  The State disagrees with petitioner's assertion that these claims were properly presented, and certainly submits that these claims have never been addressed by the state court.  On October 20, 2006, Hoffman filed a motion striking his previously filed post conviction application and substituting it with an amended and supplemental petition for post conviction relief.  Claim II herein alleges that Hoffman's rights were violated under Napue v. Illinois, 360 U.S. 264 (1959) and Brady v. Maryland, 373 U.S. 83 (1963) when the State allegedly failed to disclose a forensic report that supported the defense case against specific intent and allegedly

failed to correct misleading testimony of a State witness regarding that evidence.  Claim III herein alleges that Hoffman's trial counsel were ineffective for failing to present certain evidence at trial to rebut the State's case.  However, a review of the October 20, 2006 post conviction application does not show that the substance of these issues were presented to the state court at that time.  That state application does present a Brady claim, but it related to rapsheets for Hoffman's family.  (See October 20, 2006 application, Volume 4 of post conviction pleadings, at p. 171).  Claims II and III herein were apparently set forth in Amendment to Supplemental Petition for Post Conviction Relief filed on April 17, 2007.  However, the evidentiary hearing in this action had already occurred on January 8, 2007, some three months prior to the filing of this Supplemental Petition raising these new claims.  The trial court issued the Order regarding the ruling on the various claims set forth previously on May 1, 2007, less than two weeks after the Supplemental Petition was filed.  It is clear that these two claims have never been addressed by the state courts.  The state court should be allowed an opportunity to address these claims prior to their presentment to this Court.  Accordingly, Hoffman's petition is subject to dismissal without prejudice as a mixed petition.  See Alexander v. Johnson, 163 F.3d 908 (5th Cir. 1998), which held that a habeas petition containing both exhausted and non-exhausted claims is a mixed petition which should be dismissed without prejudice.  In the alternative, petitioner could voluntarily dismiss these two unexhausted claims.

**The Crime**

The facts of this gruesome crime were succinctly stated by the Louisiana Supreme

Court as follows:

Evidence introduced at trial showed that Jessie Hoffman kidnaped Ms. Elliot at gunpoint, in her own car, as she was leaving the Sheraton parking garage after a long day at work.  Hoffman then forced Ms. Elliot, at gunpoint, to drive to an ATM machine to withdraw money from her account so that he could rob her.  The ATM video tape shows the terror on Ms. Elliot's face as she withdrew money from her account, and Hoffman can be seen standing next to his victim.  Two hundred dollars were withdrawn from the ATM, and a statement from Hoffman's girlfriend indicated that she and Hoffman went shopping soon thereafter, and that Hoffman paid cash for several items.

Hoffman did not leave Ms. Elliot at the ATM machine after he had already caused the most horrific night of her life, by both kidnaping and robbing her at gunpoint.  Instead, he forced her, still at gunpoint, to drive with him to a remote area of St. Tammany Parish.  Ms. Elliot often begged Hoffman not to hurt her, and he answered that he would not because she was cooperating.   Hoffman even said that Ms. Elliot 'offered herself' while begging him not to hurt her.  Hoffman, still armed with a handgun, then had sexual intercourse with his victim at a secluded, desolate area of St. Tammany Parish where he had forced her to drive.  The jury did not believe Hoffman's contention, that the sex he had with Ms. Elliot, while Hoffman was armed with a handgun, in the back of Mr. Elliot's own car, was consensual, and found aggravated rape as an aggravating circumstance.

Even after kidnaping, robbing, and raping Ms. Elliot, all of which were done at gunpoint, Hoffman did not allow her to leave.  Instead, he forced her, while she was still completely nude subsequent to her rape, to get out of her car and march down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump.  Her death march ultimately ended at a small, makeshift dock at the end of this path, where she was forced to kneel and shot in the head, execution style.  Ms. Elliot likely survived for a few minutes after being shot, but she was left on the dock, completely nude on a cold November evening, to die.

After kidnaping, robbing, raping, and shooting Ms. Elliot, Hoffman disposed of her belongings and his gun, then returned to work.  Hoffman's

'lunch hour' as he told his managers he would be taking, lasted approximately two and one-half hours.  State v. Hoffman, 768 So.2d 542 (La. 2000).

As the Louisiana Supreme Court noted, and as admitted by Hoffman herein, there is no dispute that Hoffman robbed, kidnaped, raped and killed Molly Elliot.  However, Hoffman disputes that he had specific intent to kill her, arguing that the gun accidentally discharged during a struggle with Ms. Elliot, an argument which was obviously rejected by the jury.

During the penalty phase of this trial, the prosecution focused on the fact that the murder occurred in connection with the other crimes of aggravated rape, aggravated kidnaping and armed robbery, and the heinousness of the crime, reintroducing all evidence from the guilt phase and calling the victim's husband and mother to testify regarding victim impact evidence.  The defense called eleven witnesses during the penalty phase, including family and friends, a clinical psychologist and an expert in clemency and corrections.

In returning the death penalty sentence herein, the jury found the following aggravating circumstances:

1.      Hoffman was engaged in the perpetration of aggravated rape;
2.      Hoffman was engaged in the perpetration of aggravated kidnaping;
3.      Hoffman was engaged in the perpetration of armed robbery; and
4.      The offense was committed in an especially heinous, atrocious or cruel manner in that the victim was subjected to torture, serious physical abuse or pitiless infliction of unnecessary pain and suffering.

(State Court Record, Volume VI, p. 1276).

**Standard of Review**

Hoffman's Petition for Writ of Habeas Corpus was filed pursuant to 28 U.S.C. 2254, which provides that an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall only be entertained on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.  A federal court may grant a writ of habeas corpus only if a state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently than the United States Supreme Court has on a set of materially indistinguishable facts.  Absent such a direct conflict with the United States Supreme Court, the writ of habeas corpus is available only if the state court unreasonably applies clearly established federal law, as determined by the United States Supreme Court, to the facts of the prisoner's case, or makes an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   The standard is one of objective reasonableness.  Montoya v. Johnson, 226 F.3d 399 (5th Cir. 2000).  Furthermore, state court factual determinations shall be presumed correct unless rebutted by "clear and convincing evidence".  In challenged applications of law to fact, federal court relief may only be granted when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect.  If reasonable jurists could disagree, the state court decision on a mixed question of law and fact is not an unreasonable application of federal law, and thus the decision is immune from federal habeas attack.  Williams v. Cain, 125 F.3d 269 (5th Cir. 1997).

A federal district court need not conduct an evidentiary hearing if the state record is sufficient to dispose of the issues.  Joseph v. Butler, 838 F.2d 786 (5th Cir. 1988).

**Claim No. 1 - Ineffective Assistance of Counsel at the Sentencing Proceeding**

In his first claim, Hoffman asserts he received ineffective assistance of counsel at the sentencing proceeding, because his counsel failed to properly investigate mitigation evidence.

The state district court conducted an evidentiary hearing, and following testimony presented both live at the hearing and in the form of depositions, the court found that the trial attorneys for Hoffman had no reason to suspect any mental deficiencies or psychotic condition of Hoffman, and that the expert reports and the attorneys' interaction with Hoffman himself led to their reasonable belief that no such conditions were present.  The district court found that the attorneys followed the American Bar Association guidelines which were in effect at the time of the trial of this case, and their representation of Hoffman was competent and reasonable.  Hoffman must show that these factual findings by the state court constituted an objectively unreasonable determination of the facts in light of the evidence presented.  The State submits that Hoffman has failed to meet that burden.

Both of the trial attorneys for Hoffman, William Alford (hereinafter referred to as "Alford") and Kevin McNary (hereinafter referred to as "McNary") testified by deposition, which was introduced into evidence.  Both counsel were certified to handle capital cases at the time of the Hoffman trial.  Alford had prosecuted approximately 30 capital cases during his time as a prosecutor prior to this trial and had defended 2 capital cases prior to this trial.

(*See* deposition of Kevin McNary, at p. 7 and deposition of William Alford, at p. 8-11). Both counsel handled this case as public defenders, and at the time of this case, the public defender's office had one fact investigator, but McNary and Alford handled most, if not all, of the investigation themselves. (*See* deposition of William Alford, at p. 12, 17). In 1998, when this case was tried, mitigation experts were just emerging and were not utilized in these cases. (*See* deposition of Kevin McNary, at p. 16, 20 and deposition of William Alford, at p. 18). The attorneys did obtain a mental health expert to evaluate Hoffman, who advised counsel of no mental health problems. (*See* deposition of Kevin McNary, at p. 17 and deposition of William Alford, at p. 31).

The trial attorneys for Hoffman began working on the penalty phase as soon as they realized the State had a very good case, which was long before the trial. There was no real dispute that Hoffman had robbed, kidnaped, raped and killed the victim, but it was always his position that the killing was accidental, and that was the focus of the defense at trial, both at the guilt and penalty phases. During the penalty phase, the plan was to emphasize residual doubt and to show the jury that Hoffman was a "nice young man that made a grossly terrible mistake", a "good kid", a "good student", who had been in no serious trouble before, and that Hoffman was "not the kind of kid that we ought to reserve the death penalty for". (*See* deposition of Kevin McNary, at p. 13 and deposition of William Alford, at p. 20, 43).

The trial attorneys investigated and prepared for this trial, but nothing was disclosed to the attorneys by either Hoffman or his family members that gave the attorneys any reason to believe they should dig further into family history or mental illness issues. They spent

untold hours working on the penalty phase of the case.  They spoke to family members and friends of Hoffman and called many of these witnesses to testify at the penalty phase of the trial.  (*See* deposition of Kevin McNary, at p. 12,, 16-18 and deposition of William Alford, at p. 32-33, 41-43, 44, 46-49).  The attorneys collected information regarding Hoffman's education, sports activities and employment.  They were aware he had been arrested once as a juvenile, but there was nothing significant about it.  (*See* deposition of William Alford, at p. 55).  In his experience, Alford had found residual doubt to be effective in penalty phase proceedings.  Although if he had known of the information that has since been uncovered by post-conviction counsel, he probably would have introduced it, he questions the effectiveness of such evidence.  (*See* deposition of William Alford, at p. 62-64). This was not a case in which defense counsel put forth little or no effort in the penalty phase of the proceeding.  To the contrary, defense counsel vigorously fought, on behalf of Hoffman, to have the jury see Hoffman in the way they saw him, i.e. a nice young man who made a grave mistake, not one to be subjected to death.

The focus of the prosecution case in the penalty phase was the fact that the murder was committed in connection with the perpetration of armed robbery, aggravated kidnaping and aggravated rape.  These were the aggravating circumstances found by the jury, along with the heinousness of the crime, to justify the death penalty.

In order to establish an ineffective assistance of counsel claim, Hoffman must meet the two prong test set forth in <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 688, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984).  In order to prevail on a claim of ineffective assistance of counsel, a

defendant must show both that counsel's performance was deficient, meaning that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and that counsel's errors prejudiced the defense.  In evaluating the performance of counsel, the inquiry must be whether counsel's assistance was reasonable considering all of the circumstances.  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

The burden of proof lies with the petitioner, and the petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable professional assistance.  An attorney's performance generally carries with it a strong presumption of adequacy and is only deficient if it is objectively unreasonable.  An analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  Lambert v. Cain, 2001 U.S.Dist. Lexis 3487 (E.D. La. 2001).

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, *supra* 466 U.S. at 689, 104 S.Ct. 2052.

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate

decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.  Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause."  <u>Strickland</u>, *supra* 466 U.S. at 688-689, 104 S.Ct. 2052.  The ABA Standards for Criminal Justice "are only guides" and do not establish the constitutional baseline for effective assistance of counsel.  <u>Rompilla</u> v. <u>Beard</u>, 545 U.S. 374, 125 S.Ct. 2456 (2005) (Kennedy, dissenting), citing <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. 2052.  The generally accepted standard is one of "reasonable investigation" into an accused's background and character, but a counsel's failure to research and present mitigating evidence during the penalty phase of a trial is not per se ineffective assistance.  <u>Villegas</u> v. <u>Quarterman</u>, 274 Fed. Appx. 378 (5th Cir. 2008).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and a reviewing court may not find ineffective assistance of counsel merely because it disagrees with counsel's strategy.  <u>Villegas</u>, *supra* at 382.

While Hoffman relies on <u>Rompilla</u>, *supra*, in support of his position, that case is clearly distinguishable.  The fault that the Court found with the counsel therein was their failure to examine the court file on Rompilla's prior conviction, knowing that this "prior conviction would be at the very heart of the prosecution's case", "the prior conviction went not to a collateral matter, but rather to one of the aggravating circumstances making Rompilla eligible for the death penalty".  <u>Rompilla</u>, (O'Connor, concurring), 545 U.S. at

Page 13

394, 125 S.Ct. at 2470.  Counsel in Rompilla "fell short" because they failed to make reasonable efforts to review the prior conviction file, "despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case", and the unreasonableness of attempting no more than they did "was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt".  Rompilla, 545 U.S. at 389-390, 125 S.Ct. at 2467.

Moreover, the Court, in Rompilla, distinguished "possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case", noting that "searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there".  Rompilla, 545 U.S. at 389, 125 S.Ct. at 2467.

"When a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. Strickland, 466 U.S. at 691, 104 S.Ct. 2052.  In this case, the trial counsel clearly attempted to obtain information regarding Hoffman, but neither Hoffman nor any family member ever disclosed to counsel any of the information that is at issue herein.  With respect to mental illness issues, counsel relied upon the expert they retained to evaluate Hoffman and the two experts appointed by the court to

determine competency for trial, all of whom found no evidence of mental illness.  Since counsel did not believe there was any information in Hoffman's personal history nor any mental illness issues available as evidence, they concentrated their efforts on the issue they believed was most likely to influence the jury and counter the aggravating circumstances at issue in this case, i.e. residual doubt and lack of intent to murder.  However, as stated above, the other theory in the penalty phase was the fact that Hoffman did not appear to be the type of person to commit such a crime, i.e. that he was really a nice young man who made a terrible error in judgment, but not a person who should be subjected to death for that mistake.  This was a viable argument, one the that the jury could have used to impose a life sentence.  From the evidence heard by the jury in the penalty phase, there was nothing to suggest Hoffman was capable of the terrible crime he committed.  However, had the jury heard the evidence at issue herein regarding the alleged violent nature of his family, it could have reduced any probability of the jury imposing a life sentence.  Counsel were obviously arguing to the jury to see the "good" in Hoffman, and thereby, spare his life.  The evidence at issue herein which Hoffman now argues should have been introduced seeks to portray Hoffman as a victim.  Considering the brutality of this crime and the fact that Hoffman showed no mercy toward the true victim in this crime, Molly Elliot, it was more likely that the evidence actually presented at this trial could have resulted in a life sentence, rather than attempting to have this jury consider Hoffman a victim.  Moreover, it was the gruesome and violent nature of this crime that led the jury to the death penalty, and while hindsight may

be something that defendants want to grasp, it should not be and is not the standard by which trial counsel should be judged.

Another case relied upon by Hoffman is Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527 (2003), but that case is also distinguishable.  First, counsel for Wiggins told the jury in the opening statement of the penalty phase of the trial that they would hear about Wiggins' difficult life, but evidence of that difficult life was never introduced.  Moreover, most of the evidence at issue was known to Wiggins' counsel and consisted of "severe privation and abuse", "physical torment, sexual molestation, and repeated rape while in foster care".  Wiggins, 539 U.S. at 512.  Although the Court, in Wiggins, found that the attorneys' investigation did not meet Strickland's performance standards, it noted that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. The Court further held that choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation.  Wiggins, 539 U.S. at 533.

Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000) is also factually distinguishable, in that the Court found that counsel did not begin preparing for the penalty phase of the trial until a week before the trial, and counsel failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' childhood, only because they thought incorrectly that state law barred access to such records. In this case, trial counsel began preparing for the penalty phase long before trial, and based upon

that preparation, discussions with both defendant, family and friends, counsel had no reason to believe that any issues existed with respect to Hoffman's childhood that bore upon the case.

An examination of an attorney's performance must be "highly deferential" and "must consider the facts and resources available" to the attorney "at the time of trial". <u>Williams</u> v. <u>Cain</u>, 125 F.3d 269 (5th Cir. 1997). Although Hoffman has now produced, in post-conviction proceedings, experts who are testifying that Hoffman suffers from post traumatic stress disorder, psychosis and significant neurocognitive deficits, this Court must examine the information available to trial counsel *at the time of trial*. Clearly, trial counsel for Hoffman retained the services of an expert to evaluate Hoffman and provide the counsel with her opinion regarding any mental illness or defects. Counsel relied upon her expertise in informing them that there were none. Dr. Elaine Salzer, an expert in clinical psychology, evaluated Hoffman on behalf of the defense. Hoffman's IQ was in the low average range. According to Dr. Salzer, Hoffman had an atypical profile, dissimilar to the profile normally found in this type of crime. In this kind of crime, the assailant is not usually a kid who made B's and C's in high school, was a quarterback and captain of the football team, started working at age 15 while in school and was a camp counselor for a church summer camp. Dr. Salzer noted that typically there is a history of early childhood conduct which includes defiance, truancy, theft or fire setting, but none of that existed in this case. (*See* Testimony of Dr. Salzer, Record at p. 4361, 4363-4364). While Hoffman now argues that Dr. Salzer had insufficient evidence, there is still no evidence of these types of issues in Hoffman's

childhood.  The facts remain true that he made good to average grades in school, was a leader in sports and was a responsible young man.  Moreover, the testing Dr. Salzer performed on Hoffman was consistent with her other findings.  The testing did not reveal sociopathy, aggression or violence.  However, she did believe that Hoffman seemed to be impulsive, and since he had no history with criminal acts, once involved, he had no way to manage the situation.  (*See* Testimony of Dr. Salzer, Record at p. 4368).  Dr. Salzer's opinion was consistent with the defense theory of the case that Hoffman was not acting in a premeditated manner when these crimes were committed, thus attempting to bolster his claims during the penalty phase of residual doubt as to his intent.  (*See* Testimony of Dr. Salzer, Record at p. 4367).  Moreover, Hoffman disclosed "nothing" to Dr. Salzer that suggested to her he was abused or brutalized as a youngster, and he was positive toward his mother and father in their discussions.  (*See* Testimony of Dr. Salzer, Record at p. 4370).

Although Hoffman asserts as untrue the factual finding by the state district court that the two experts appointed by the court to determine Hoffman's mental status both concluded he had no mental defects or psychosis, arguing that those experts only found Hoffman competent to stand trial, the evidence supports the finding of the court.  Dr. Rafael Salcedo, one of the experts at issue, was deposed in connection with the post-conviction proceedings, and testified his task "consisted of determining whether Mr. Hoffman at the time of the examination was suffering from a psychiatric disorder", and if he was suffering from any disorder, whether that impaired his competency to stand trial.  (*See* deposition of Dr. Salcedo, at p. 17).  While the ultimate purpose was to determine his competency to stand

trial, he had to first determine whether Hoffman suffered from any psychiatric disorder before reaching the issue of competency. Dr. Salcedo conducted a clinical interview with Hoffman on May 31, 1997. Dr. Salcedo noted that Hoffman was able to give crisp and accurate responses to questions, and the result of the examination was that Hoffman was not suffering from any diagnosable mental disorder or any major psychopathology. (*See* deposition of Dr. Slacedo, at p. 19).

With respect to the opinions of the post-conviction experts retained by Hoffman, Dr. Salcedo completed disagreed with the opinion of Dr. Gur. According to Dr. Salcedo, who examined Hoffman prior to the trial, there was clearly no evidence of schizophrenia. (*See* deposition of Dr. Slacedo, at p. 25). Dr. Salcedo did acknowledge that Hoffman could have later developed it, but again, the court here must deal with what was available to counsel *at the time of trial*, not information developed many years thereafter. Moreover, Dr. Salcedo further stated that if he had no symptoms of schizophrenia in 1997, he would not have had any at the time of the crime in 1996, because it is a chronic condition that does not go away, but gets progressively worse. The conclusions of Dr. Gur in 2003 are not applicable to Hoffman's mental condition in 1997. (*See* deposition of Dr. Slacedo, at p. 25-26, 29). Although Dr. Gur attempted to rely on brain imaging performed on Hoffman during post-conviction proceedings to allege deficits, Dr. Salcedo opined that such imaging techniques have been found to contain issues and may neither confirm or deny a suspected condition. According to Dr. Salcedo, in Louisiana, such brain imaging techniques are not used as a deciding factor in diagnosis. There must be clinical findings. Moreover, such brain imaging

techniques, if available before 2000, were in their infancy and not readily available.  (*See* deposition of Dr. Slacedo, at p. 49-51).

Another post-conviction expert for Hoffman, Dr. Sautter, opined as to Hoffman's family history of schizophrenia.  Dr. Salcedo acknowledged that such a history creates an increased risk, just as a family history of diabetes creates an increased risk of diabetes, but Hoffman was not suffering from schizophrenia in 1997, prior to trial.  (*See* deposition of Dr. Slacedo, at p. 31-32).  The same was true with respect to post traumatic stress disorder. While Hoffman may have been exposed to risk factors associated with the disorder, in 1997, he did not show any symptoms of that disorder, and Dr. Salcedo's examination would have revealed such if he had it at that time.  (*See* deposition of Dr. Slacedo, at p. 33).

Moreover, even had Dr. Salcedo been aware at the time of his examination of the facts which Hoffman relies on now regarding his allegedly abusive childhood, it would not have changed his opinion.  Hoffman denied such abuse to Dr. Salcedo, when he was specifically asked about abuse.  However, Dr. Salcedo noted no anxiety on the part of Hoffman when he examined him.  Hoffman "certainly" was not suffering from either psychosis or post traumatic stress disorder at the time of his examination.  (*See* deposition of Dr. Slacedo, at p. 34-37, 39, 45).

Dr. John Pratt, the other expert appointed by the court who examined Hoffman in 1997, also testified in post-conviction proceedings that Hoffman had no psychiatric symptoms in 1997.  Dr. Pratt further disagreed with the post-conviction experts retained by Hoffman and confirmed that brain imaging technology was not routine in 1997 and was only

utilized as a research tool.  (*See* Testimony of Dr. Pratt, Transcript of 1/8/07 hearing, at p. 20-27).

The trial court noted the importance of the fact that the post-conviction experts hired on behalf of Hoffman interviewed or examined Hoffman six to seven years after the trial and the examinations of Drs. Salzer, Salcedo and and Pratt.  In addition, the trial court found that much of the opinions of the post-conviction experts were based upon hearsay information of family members and much of it dealt with alleged mental instability of other family members, irrelevant to Hoffman and this case.

The state court findings of fact are  presumed correct unless rebutted by clear and convincing evidence.  The standard requires the court to review the information available to trial counsel at the time of trial.  Hoffman has failed to rebut the factual findings of the court by clear and convincing evidence.  Trial counsel for Hoffman worked diligently on his behalf, began working on the penalty phase long before trial, and interviewed Hoffman, family and friends to obtain information on Hoffman.  Counsel are not required to look for a "needle in a haystack, when a lawyer truly has reason to doubt there is any needle there". Rompilla, 545 U.S. at 389, 125 S.Ct. at 2467.  Counsel reasonably investigated the issues pertinent to this case, and the State submits that Hoffman has failed to show his trial counsel's performance with respect to the penalty phase fell below the objectively unreasonable standard.

In addition, even if Hoffman's trial counsel were adjudged deficient, Hoffman has further failed to prove that he was prejudiced by such actions.  Hoffman must show that there

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. The State submits that this mitigation evidence in the form of an abusive childhood was insufficient to overcome the aggravation evidence consisting of the heinousness of this crime and the commission of the murder in connection with the robbery, kidnaping and rape of Molly Elliot endured before her murder, left naked in the elements, while Hoffman returned to his job and went shopping with his girlfriend with money stolen from his victim.

For the foregoing reasons, the State submits this claim is without merit.

## Claims II and III - Alleged Non-Disclosure of Coroner Investigative Report, Alleged Failure to Correct Misleading Testimony and Ineffective Assistance of Counsel

Claim II herein alleges that Hoffman's rights were violated under Napue v. Illinois, 360 U.S. 264 (1959) and Brady v. Maryland, 373 U.S. 83 (1963) when the State allegedly failed to disclose a forensic report that supported the defense case against specific intent and failed to correct misleading testimony of a State witness regarding that evidence.  Claim III alleges ineffective assistance of counsel in failing to introduce evidence that Hoffman claims could have refuted the State's case.  These claims were apparently set forth in Amendment to Supplemental Petition for Post Conviction Relief filed on April 17, 2007.  However, the evidentiary hearing in this action had already occurred on January 8, 2007, some three months prior to the filing of this Amendment raising these new claims. The trial court issued the Order regarding the ruling on the various claims set forth previously on May 1, 2007,

less than two weeks after the Supplemental Petition was filed.  It is clear that these claims have never been addressed by the state courts. As stated above, the State alleges these claims have not been exhausted in state court, but out of an abundance of caution, will address the merits of these claims.

Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) held that it is a violation of the Fifth and Fourteenth Amendments to the United States Constitution for the prosecution to knowingly use perjured testimony. To demonstrate such a violation, the petitioner must demonstrate that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false. May v. Collins, 955 F.2d 299, 315 (5th Cir.1992). False evidence is deemed material for this analysis ""if there is any reasonable likelihood that [it] could have affected the jury's verdict."" Westley v. Johnson, 83 F.3d 714, 726 (5th Cir.1996).

Actual falsity of the testimony is required to prove a Napue violation.  *See* United States v. Wall, 389 F.3d 457, 473 (5th Cir.2004), *cert. denied,* 544 U.S. 978, 125 S.Ct. 1874, 161 L.Ed.2d 730 (2005) (""Wall has not established that McDowell's testimony was actually false. He has merely shown that Ristau's testimony would establish a conflict in the testimony, a far cry from showing that it was ''actually false.'')  In Kimmel v. Quarterman, 199 Fed.Appx. 338 (5th Cir. 2006), Kimmel argued that the prosecutor knowingly used false testimony in violation of Napue by ""duping"" Dr. Gripon into agreeing that the tattoos signified anarchy, and failing to alert the trial judge that this testimony was false.  He argued

that, outside the presence of the jury, Dr. Gripon indicated that he did not know the significance of the tattoos; however, in front of the jury, the witness was duped into agreeing with the prosecutor that the tattoos signified anarchy because the prosecution previously suggested this meaning.  The court held this was insufficient to meet the standard in Napue that ''the testimony was actually false''.   Hoffman cites Dupart v. United States, 541 F.2d 1148 (5th Cir. 1976) in support of his argument that a Napue violation exists if the testimony is misleading, but not technically perjurious.   However, the State submits that case is distinguishable, as the witness testified there was no pending "case" against him, when, in fact, there were pending "charges" against him.  Here, Dr. MacKenzie testified that he believed the lividity noted in Ms. Elliot's back was the "usual pattern" on a body presented for autopsy, and he did not know whether this lividity was from the initial 12 hour period following her murder.  There is no falsity in this testimony.

Clearly, Hoffman has not met his burden on this issue.  There has been no showing that Dr. MacKenzie gave false testimony.  The alleged false testimony is that there was nothing to indicate the condition of the body, with respect to lividity, when it was found.  However, that was not the testimony of Dr. MacKenzie, who was never asked whether there was any information as to the condition of the body when it was found.  The testimony cited by Hoffman alleged to be false was a response to defense counsel's question that Dr. MacKenzie did not know whether the lividity was the result of the victim being on her back during the initial 12 hour period.  Dr. MacKenzie simply testified that he did not know that to be a fact.  In fact, Dr. MacKenzie had, in the preceding minutes, testified that the lividity

Page 24

he noted at the autopsy was the "usual pattern" that he sees in a body presented for autopsy, i.e. the body has been placed on her back for some time. (*See* Testimony of Dr. MacKenzie, Record at p. 3669). Contrary to Hoffman's assertion, the testimony at issue implied no lividity at the time the body was discovered, precisely the impression Hoffman wants.

Moreover, he further testified that lividity will fix in approximately 48 hours and stay in that position. However, within that time frame, lividity can come and go. Molly Elliot's body was found well within 48 hours of her death. (*See* Testimony of Dr. MacKenzie, Record at p. 3668). While the defense argues that the lack of lividity when the body was found is crucial to its case, Dr. MacKenzie never testified that lividity was present when the body was found. In fact, in reviewing his testimony, in its entirety, it seems to indicate there was no lividity present, other than the lividity that occurred as a result of placing the body on her back prior to the autopsy. While Hoffman attempts to use an affidavit of an expert to support his theory, Dr. MacKenzie also testified that, although lividity can become apparent within 12 hours after death, the lividity can still move. The expert affidavit attached to Hoffman's Amendment filed in state court provides the same principle, i.e. movement of a body before lividity is fixed can prevent lividity from forming. The State fails to see the manner in which Dr. MacKenzie's testimony is deemed by the defense to be "actually false". Hoffman further fails to show that the prosecution had knowledge of this information and how this issue could have affected the verdict. As stated above, his argument is premised on the fact that it was crucial to his case to show that no lividity was present on the body when it was found. However, there was no testimony that lividity was

Page 25

present on the body when it was found.  Hoffman has failed to meet his burden to prove a Napue violation.

Hoffman further alleges a Brady violation, arguing the State should have disclosed the coroner's investigator's report.  While recognizing that some jurisprudence imputes knowledge among government agencies, it is not alleged that the District Attorney had possession of this report, and the District Attorney desires to point out that this report was not in the possession of the prosecutors.  In fact, the prosecutors disclosed all evidence in their possession, providing open file discovery.  In its response to discovery, in addition to producing the documentation in its possession, the State  provided that "all evidence is available for defense inspection, testing and reproduction".  (Record at p. 283).

To be entitled to federal habeas relief on a Brady claim, Hoffman must prove that: (1) the prosecutor suppressed or withheld evidence; (2) which was favorable; and (3) material to the defense.  Castillo v. Johnson, 141 F.3d 218 (5th Cir. 1998). As argued above, the State submits this report was neither favorable nor material to the defense.  Hoffman argues it would have established that no lividity existed at the time the body was found, but the State did not present evidence that lividity existed at that time.  Moreover, the presence or absence of lividity is not indicative of Hoffman's intent.

In his third claim, Hoffman asserts that his trial counsel were ineffective in failing to present critical evidence to refute the State's case.  On p. 127 of the Petition filed herein, Hoffman makes several assertions regarding evidence that could have been presented by his counsel.  In support of these multiple claimed omissions, Hoffman presents affidavits of

alleged experts, not subject to cross-examination or qualification by the court.  The standard for adjudicating ineffective assistance of counsel claims is set forth above.  Hoffman has the burden of showing both that counsel's performance was deficient, meaning that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and that counsel's errors prejudiced the defense.   "The presentation of testimonial evidence is a matter of trial strategy".  Day v. Quarterman, 2009 WL 1110589 (5th Cir. 2009); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978) "A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance." Green v. Cockrell, 2003 WL 21145722 (5th Cir. 2003).   Hoffman has failed to meet his burden of proving ineffective assistance of counsel by failing to produce the alleged evidence.

## Claim IV - Alleged Misstatement of Law and Improper Argument

In his fourth clam, Hoffman asserts that prosecutors misstated the law and argued improperly to the jury to ignore mitigation evidence.

"[A] prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." Ortega v. McCotter, 808 F.2d 406, 408 (5th Cir.1987) A federal habeas petitioner who claims that the prosecutor engaged in improper jury argument has the burden of establishing that the prosecution's argument was improper and that such argument was so prejudicial that it rendered the trial fundamentally unfair. Rushing v. Butler, 868 F.2d 800, 807 (5th Cir.1989). A trial is rendered fundamentally unfair by improper jury argument if, in the context of the entire trial, the improper argument was

related to crucial, critical and highly significant factors in the case. Ortega, *supra*. A petitioner must show that the prosecutors' improper arguments "so infected the penalty phase of the trial with unfairness as to make the resulting sentence a denial of due process." Barrientes v. Johnson, 221 F.3d 741, 753 (5th Cir.2000).  "[T]he burden is on the habeas petitioner to also show a reasonable probability 'that but for these remarks' the result would have been different." Nichols v. Scott, 69 F.3d 1255, 1278 (5th Cir.1995).

On p. 178 of the Petition filed herein, Hoffman cites the three statements which he alleges were improper statements of the law regarding proof of mitigation.  The State submits that Hoffman places improper emphasis on a few words, which were simply meant as argument by the State that it believed the evidence would prove the aggravating circumstances, thereby allowing imposition of the death penalty.  In the first alleged statement, the prosecutor was not informing the jury that the defense was under an obligation to present mitigating evidence, only that if the defense chose to do so, evidence must be presented, i.e. mitigation could not be based on argument, with no evidence.  Nevertheless, as the Louisiana Supreme Court found when this issue was raised on direct appeal, after the defense objected, the prosecutor further informed the jury that the court would instruct it on mitigating circumstances, and the jury must consider the mitigating circumstances.  The Louisiana Supreme Court found that the court had properly instructed the jury on the law governing mitigating circumstances.  In the second and third statements cited by Hoffman, the State was simply arguing that although the jury must consider the mitigating circumstances, the jury could still impose the death penalty if the State proved an

Page 28

aggravating circumstance.  Regardless, when the defense objected to those statements, the trial court admonished the jury to disregard the State's comments and instructed the State to rephrase its question regarding mitigating circumstances.  There is no argument by Hoffman that the trial court failed to properly instruct the jurors as to their duty in considering mitigation evidence.

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts as to this claim.

## Claim V- Alleged Brady Violation

In his fifth claim, Hoffman alleges a <u>Brady</u> violation for the failure of the State to produce rapsheets and NCIC reports for Hoffman's family, including two brothers, his mother and father.

It is critical to this inquiry to note that this claim is alleging the State failed to produce evidence of the criminal history of defendant's family members, not State witnesses.  Since this is a habeas action, Hoffman is only entitled to relief if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently than the United States Supreme Court has on a set of materially indistinguishable facts.  Absent such a direct conflict with the United States Supreme Court, the writ of habeas corpus is available only if the state court unreasonably applies clearly established federal law, as determined by the United States Supreme Court, to the facts of the prisoner's case, or makes an unreasonable determination

of the facts in light of the evidence presented in the state court proceedings.  Hoffman has cited no federal cases that would have required the State to disclose criminal history records of defense witnesses.

To establish that the State breached its duty under <u>Brady</u>, Hoffman must show that (1) the State withheld evidence; (2) the evidence was favorable to the accused; and (3) the evidence is material to guilt or punishment.  <u>DiLosa</u> v. <u>Cain</u>, 279 F.3d 259 (5th Cir. 2002). The federal courts are required to defer to the state court's decision rejecting a <u>Brady</u> claim unless the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States.  <u>Trevino</u> v. <u>Johnson</u>, 168 F.3d 173 (5th Cir. 1999).  Petitioner has not cited any federal cases in which a burden was placed on the State to provide the defense with the criminal history of defense witnesses or family members or that has held such information to be "favorable to the accused" as required by <u>Brady</u>, *supra*.

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts as to this claim.

## Claim VI - Alleged Race-Based Peremptory Strikes

In his sixth claim herein, Hoffman alleges the trial court erred in denying his <u>Batson</u> challenges to the State's use of two peremptory challenges, which removed two of three black prospective jurors from the venire, Elaine Malter and Michael Galatas.

There is no dispute herein that the state court followed the procedure for evaluating Hoffman's claims of racial discrimination in the jury selection herein pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).  For purposes of habeas review, a state trial court's finding of the absence of discriminatory intent is a pure issue of fact that is accorded great deference and will not be overturned unless clearly erroneous.  In a habeas proceeding, the role is to determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary.  Murphy v. Dretke, 416 F.3d 427 (5th Cir. 2005).  Since its ruling in Batson, *supra*, the United States Supreme Court has reiterated a defendant's burden of proof, which is to show that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race and that this fact, the potential for abuse inherent in a peremptory strike, and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.  The Court has further noted that during jury selection, the entire *res gestae* takes place in front of the trial judge. Because the judge has before him the entire venire, he is well situated to detect whether a challenge to the seating of a juror is part of a pattern of singling out members of a single race for peremptory challenges.  He is in a position to discern whether a challenge to a black juror has evidentiary significance; the significance may differ if the venire consists mostly of blacks or of whites.  U.S. v. Armstrong, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).

A federal court may only grant habeas relief for a <u>Batson</u> claim ""if it was unreasonable to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge."" ""In <u>Batson</u>, [the Supreme Court] explained that the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."" A state court's fact findings are presumed to be correct unless rebutted with ""clear and convincing evidence."" <u>Ellis</u> v. <u>Quarterman</u>, 2009 WL 1941885 (S.D. Tex. 2009), *citing* <u>Hernandez</u> v. <u>New York</u>, 500 U.S. 352, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991).

The state court's finding that the State did not commit racial discrimination in its use of peremptory challenges is a question of fact. A reviewing court examines only the reasonableness of the result of the state court's adjudication, not ""every jot"" of its reasoning. In short, ""[o]ur role on appeal is to determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary."" <u>Hogues</u> v. <u>Quarterman</u>, 312 Fed.Appx. 684 (5th Cir. 2009).

In regard to Mr. Galatas, the Louisiana Supreme Court noted that while the portions of the voir dire cited by Hoffman tended to support his contention, those portions did not convey the totality of the circumstances. The Court found that upon continued questioning regarding the death penalty, Mr. Galatas clearly waivered. As a result the Court found that the entire discussion between the prosecutor and Mr. Galatas supported the State's argument that he appeared reluctant in his death penalty responses, but "when questioned regarding

consideration of life imprisonment, Mr. Galatas answered affirmatively without equivocation". While Hoffman argues that the State's reliance on the answer by Mr. Galatas that "I think I could" consider the death penalty is unreasonable, because it was only phrased in that manner because the question was "do you think you can", that argument ignores the fact that the same question was posed regarding life imprisonment. Mr. Galatas was asked "do you think you could also consider life imprisonment", but this time, instead of answering "I think I could" in response to a question worded in that same manner, he instead responded "I could". (Record at p. 2071-2072).

Hoffman seeks to take each question and answer and compare it, but the entirety of the voir dire with this prospective juror should be examined, and while some of his answers may not be equivocal, others were. Hoffman also alleges disparate questioning as to Mr. Galatas, but that assertion was also rejected by the Louisiana Supreme Court, which found, as a factual matter, that Mr. Galatas was not singled out by the prosecution. It found instead, that both sides subjected all of the prospective jurors to in-depth questioning, and that no particular questions were asked, or not asked, of Mr. Galatas merely because he was African-American. The Court also noted that defense counsel had the opportunity to rehabilitate him following the prosecutor's inquiry about the death penalty, but refrained from doing so. The Court found that the State struck white jurors who similarly hesitated, when questioned about their ability to consider the death penalty.

In regard to Ms. Malter, Hoffman refers to the scale that the prosecutors used to have jurors rate themselves. As the Louisiana Supreme Court noted, in its ruling, part of the

reason for the confusion when this issue was discussed in giving reasons for striking this prospective juror was that a different prosecutor questioned the panel with Ms. Malter and used a different scale.  Whereas the scale previously used by District Attorney Reed was wanting people in the middle of the scale, i.e. a 5, the scale used by Assistant District Attorney Gracianette, who questioned Ms. Malter, wanted people on the high end of the scale, because of the manner in which he defined it.  The Court also found that the State had exercised a peremptory challenge on Ms. Wampler, who indicated, just as Ms. Malter, that she was a 5 on the scale.  The other jurors on the panel who were ultimately selected had rated themselves 8 or 9, distinguishing them from the ones struck by the State.  The State also cited Ms. Malter's body language and the fact she smiled at the defendant when responding that she could give him a fair trial.

The Fifth Circuit has held that the reasoning may be stronger if counsel is able to articulate an objective fact, such as the juror being slow in answering questions or had to have questions repeated, obviously signaling that such gestures, hesitations and intonations that may not be apparent from a cold record but are observable by the trial judge may form the reasoning behind peremptory strikes.  United States v. Bentley-Smith, 2 F.3d 1368 (5th Cir. 1993).  A judge is free, based on all of the information presented and the judge's eyewitness observation of counsel to conclude that the reason is offered in good faith and not as a subterfuge for race. Bentley-Smith, *supra*.

While Hoffman appears to allege or at least imply that he is entitled to be tried by a jury comprised of at least some African-American members, such is not the case. The equal

protection clause of the Fourteenth Amendment prohibits only the exclusion of racial groups from the venire from which a jury is selected. See <u>Holland</u> v. <u>Illinois</u>, 493 U.S. 474, 478-79, 110 S.Ct. 803, 806, 107 S.Ct. 905 (1990). There is no corresponding constitutional right to a trial by members of a particular racial group. <u>Fields</u> v. <u>Quarterman</u>, 2007 WL 1435606 (N.D. Tex. 2007).  A State violates a defendant's rights if it uses its peremptory challenges to strike prospective jurors solely on the basis of race. <u>Batson</u>, *supra* at 89 (1986). Although a potential juror may not be excluded on the basis of his or her race, it is well-settled that "a defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.' " *Id.* at 85. The absence of juror diversity alone is insufficient to satisfy the *prima facia* requirement of <u>Batson</u>. <u>Stubblefield</u> v. <u>Dretke</u>, 2006 WL 2045800 (S.D. Tex. 2006).

Although Hoffman does not specifically allege that the selection of the prospective jurors was not a fair cross section, it is implicit in his argument.  However, to establish a prima facie violation of the fair cross-section requirement, Hoffman must show ""(1) that the group alleged to be excluded is a ''distinctive'' group in the community; (2) the representation of this group in the venire panel is not reasonable in relation to the number of such persons in the community; (3) that this under-representation is due to systematic exclusion in the jury selection process."" When a district court determines that the selection process was random and computer-generated, there can be no ""systematic exclusion"" of African-Americans.  <u>U.S.</u> v. <u>Wheeler</u>, 79 Fed.Appx. 656 (5th Cir. 2003).  In this case, there is no allegation that the selection process was not random and computer generated.  In fact, trial counsel for Hoffman admitted that the jury selection process was done by random

allotment.  (Record at p. 1583).  However, defense counsel argued that the venue should

have been changed to a venue where Hoffman could have seated more blacks on the jury.

Clearly, there is no constitutional right to a change of venue to one allegedly more favorable

to a defendant because of its racial makeup.  As the trial court found in denying Hoffman's

motion for change of venue, there was no showing that a jury in St. Tammany Parish would

not be fair and impartial simply because the population is predominantly white.  (Record at

p. 1565).

Hoffman has failed to meet his burden of proving the state court made an

unreasonable application of clearly established federal law or an unreasonable determination

of the facts as to this claim.

**Claim VII - Selection of Grand Jury Forepersons**

In his seventh claim, Hoffman alleges racial discrimination in the selection of grand

jury forepersons.

While Hoffman claims in his Petition that this claim was denied on the merits by the

state trial court, citing the court's written Order of May 1, 2007, the State disagrees.  That

Order specifically referenced, as to some of the claims, the prior hearing held on December

1, 2004 in which the court made findings on some of the claims.[1]  The transcript of that

---

[1]Although the state court issued one written Order on May 1, 2007 disposing of all claims
asserted in the post conviction application (with the exception of the Amendment filed on April
17, 2007, as discussed above in more detail), there was a hearing held on December 1, 2004 in
which the court made certain findings as to some of the claims.  However, counsel for Hoffman
had requested that the court defer "ruling" on the claims in order that separate writ applications
would not have to be taken.  The State had no objection to this procedure, but submits that this
Court should look not only to the May 1, 2007 Order, but also to the factual findings made as to

hearing shows that the trial court found that the motion to quash filed by Hoffman regarding this grand jury issue was abandoned by Hoffman.  The court found it was marked satisfied, which meant the defendant was not going to pursue that motion.  As a result, the trial court held that the claim would not be considered in the post-conviction proceedings.  (*See* Transcript of hearing of December 1, 2004, at pp. 24-26).

Since this claim was disposed of by the state court as a result of a procedural bar, the State submits that Hoffman is procedurally barred from raising the issue herein.  A federal habeas court will not consider the merits of a federal claim when the state courts denied the claim on the basis of a state procedural rule that is adequate to support the decision and independent of the merits of the claim. *See, e.g.,* Dretke v. Haley, 541 U.S. 386, 392 (2004). To determine whether the state courts denied relief based on an adequate and independent state procedural rule, courts look to the last reasoned state court decision to see whether it applied a procedural bar or addressed the merits of the claim. *See* Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (noting that ""where, as here, the last reasoned opinion of the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits"").

It is clear from a review of the transcript that the state court imposed the procedural bar, as it found that the defendant abandoned this motion, and therefore, was procedurally barred from raising it in post-conviction proceedings.  The Louisiana Supreme Court denied

---

some of claims during that December 1, 2004 hearing.

the writ application without reasons, and therefore, it can be presumed it did not consider the merits of the claim.  As a result, the State submits that Hoffman is procedurally barred from pursuing this issue herein.

## Claim VIII - Prevention of Questioning of Prospective Jurors About Racial Bias

In his eighth claim, Hoffman alleges the trial court prevented him from questioning prospective jurors about racial bias and that he was denied effective assistance of counsel when his counsel failed to question the prospective jurors about racial bias

While Hoffman alleges at p. 253 of his Petition that he is entitled to an evidentiary hearing if this Court finds the facts are insufficiently developed or there are unresolved factual disputes, during the state court post conviction hearing, Hoffman chose to submit this claim without argument and without evidence.  (*See* Transcript of hearing on December 1, 2004, at pp. 7 and 43-44).

With regard to this claim, Hoffman cites one statement made by defense counsel in voir dire to which the State objected, which objection was sustained by the court.  (Petition at p. 244-245).  Hoffman cites no questions posed to prospective jurors by defense counsel regarding racial prejudice which were not allowed by the court.  The State submits that a review of the voir dire proceedings reflects that prospective jurors were, in fact, questioned about racial prejudice.  In fact, in his first questioning of the first panel of prospective jurors, defense counsel told the prospective jurors he wanted a jury with six black jurors and proceeded to question them, without objection, about whether they would want at least half of the jurors to be of their own race if they were on trial.  (Record at beginning p. 1806).

Page 38

In this claim, Hoffman further asserts that he received ineffective assistance of counsel because his counsel failed to voir dire prospective jurors about racial prejudice in circumstances where the risk of racism was obvious and significant.  As stated above, the State submits that the record reflects questioning of jurors regarding racial prejudice.  As previously stated herein, under Strickland, *supra*, in order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient, meaning that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and that counsel's errors prejudiced the defense.  In evaluating the performance of counsel, the inquiry must be whether counsel's assistance was reasonable considering all of the circumstances.  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  The burden of proof lies with the petitioner, and the petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable professional assistance.  An attorney's performance generally carries with it a strong presumption of adequacy and is only deficient if it is objectively unreasonable.  An analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.

Trial counsel's decisions during voir dire are considered issues of trial strategy and do not give rise to a claim of ineffective assistance of counsel unless the decisions render the entire trial unfair. Teague *v.* Scott, 60 F.3d 1167, 1172 (5th Cir.1995).  Hoffman has failed

to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts as to this claim.

## Claim IX - Jury Verdict Allegedly Tainted by Racial Bias

In his ninth claim, Hoffman asserts that the jury verdict was tainted by racial bias.

The State submits that the affidavits and purported statements made to counsel for Hoffman by members of the jury are inadmissible.  Both Louisiana Code of Evidence art. 606 and Federal Rule of Evidence 606 provide as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes

Federal Rule of Evidence 606 has been applied to capital habeas proceedings. *See* Villegas v. Quarterman, 274 Fed.Appx. 378 (5th Cir. 2008), in which the court rejected affidavits of two jury members, holding that Rule 606(b) of the Federal Rules of Evidence prohibits the use of such evidence to determine the effect any particular thing might have had on the outcome of a verdict. *See also* Bacon v. Lee, 225 F.3d 470 (4th Cir. 2000).  In order to protect the finality and integrity of verdicts and to guard against the harassment of jurors, a party seeking to invalidate a verdict may not rely upon evidence of "a juror's mental process in connection with the verdict."  United States v. Cheek, 94 F.3d 136, 143 (4th

Cir.1996).  "Long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry. Petitioners' Sixth Amendment interests in an unimpaired jury, on the other hand, are protected by several aspects of the trial process. The suitability of an individual for the responsibility of jury service, of course, is examined during *voir dire*. Moreover, during the trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict." Tanner v. United States, 483 U.S. 107, 121, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) (Citations omitted).

The evidence at issue is merely alleged thoughts and discussions of the jurors, not extraneous prejudicial information alleged to be improperly brought to the jury's attention, such as in the case of a bribe or information provided to the jury by a third party. Even if evidence of juror deliberations were admissible, the State submits that the discussions at issue allegedly made would not indicate a ""substantial and injurious effect or influence in determining the jury's verdict."" Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

Hoffman admits that the words at issue do "not demonstrate an express admission of discriminatory intent", but allege that "in this case [should] be inferred from the juror's words".  (Petition at p. 255).  While Hoffman uses comments made by Juror Lower (in an affidavit she did not prepare, but allegedly signed) to allege the jury had a "race-based distrust of Petitioner's defense", the defense lawyers representing Hoffman at trial were both

white.  Hoffman also further interprets Juror Lower's comments, stating that she must have "prematurely determined" he was guilty, because a defendant would not need to play the race card to get off on appeal if he was "innocent".  (Petition at p. 257).  However, Hoffman had already admitted his role in the robbery, kidnaping, rape and killing of Ms. Elliot.  The only question before the jury was whether the murder constituted first or second degree murder.  The question clearly was never whether defendant was "innocent".  Moreover, the words seized upon by Hoffman do not reveal race based animus toward Hoffman, but constitute the musings of a juror as to the defense put forth by Hoffman.  The same is true of the statements allegedly made by Juror McDonald.

The fact that the jury may have wondered about his background is also not evidence of racial animus toward Hoffman.  Jurors often speculate about innumerable matters, but were clearly instructed to reach a verdict based upon the evidence presented.  In addition, the comments of Hoffman's father are clearly irrelevant to this determination.  He alleges that "someone" told him it would be a good idea for him to leave the courtroom during voir dire because his being there might intimidate the jury.  He acknowledges that he could not be present in the courtroom, because he was going to be a witness, but the fact that "someone" allegedly told him to leave for another reason has nothing to do with any alleged racial animus of the jury.  Moreover, the fact that defense witnesses claim now that they were "uncomfortable" in the courtroom is also irrelevant to this issue.  Hoffman committed a gruesome crime - no one in court enjoyed or was comfortable with these proceedings - they were made necessary by the actions of Hoffman.

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

## Claims X and XIII - Change of Venue

In his tenth and thirteenth claims, Hoffman alleges that the venue should have been changed and St. Tammany Parish was tainted by racism and pretrial publicity of this crime.

Hoffman complains that portions of the crimes at issue herein occurred in both St. Tammany and Orleans Parishes, and the only reason the State chose St. Tammany Parish for prosecution was based on some sort of racial advantage alleged by Hoffman. Such a conclusion is unsound. Hoffman cites the testimony of Houston Gascon, First Assistant District Attorney for the 22nd Judicial District, alleging his testimony supports Hoffman's position that this District Attorney did not always prosecute homicides in the parish where the killing occurred. To the contrary, Mr. Gascon's testimony established that the District Attorney for the 22nd Judicial District prosecutes crimes that occur in his district, even when they may have been subject to prosecution in other jurisdictions. Hoffman cites the case of Rodney Vernon, where he alleges the victim was "merely kidnaped" from Washington Parish, but murdered in Texas. District Attorney Walter Reed prosecuted him in Washington Parish for the murder. The same is true of the case of Ralph Stogner, also cited by Hoffman, allegedly in support of his argument. A young girl was kidnaped from St. Tammany Parish, sexually assaulted, murdered and her body was found in Orleans Parish. District Attorney Walter Reed prosecuted him in St. Tammany Parish. In other words, this district attorney's

office is not interested in passing along to other jurisdictions criminal prosecutions which may be pursued in this district.  He is interested in bringing criminals to justice that commit crimes in his district.  No less is true herein - While the initial robbery and kidnaping occurred in Orleans Parish, the rape and murder occurred in St. Tammany Parish.  Clearly, St. Tammany Parish was a place of proper venue, and to suggest that the prosecution occurred there for some nefarious reason is without basis in fact.

Hoffman also cites portions of the investigation that occurred in Orleans, arguing that records were obtained from Orleans Parish and witnesses were interviewed in Orleans Parish, glossing over the fact that the murder scene was in St. Tammany Parish and much of the investigation occurred there.  Hoffman further argues that only a little over a third of the witnesses were from St. Tammany Parish, but cites that 9 of the 24 witnesses were from St. Tammany and 11 were from Orleans.  Accordingly, the number of witnesses from each of these parishes was nearly identical.  While Hoffman alleges that it would have been more convenient for the other 3 witnesses, who were from Jefferson Parish, to travel to Orleans, that assumption is incorrect.  It is just as convenient for those witnesses to travel to St. Tammany.

In the thirteenth claim herein, Hoffman asserts the trial court erred in failing to change the venue due to pretrial publicity of this case.  This issue was addressed in detail by the Louisiana Supreme Court in the direct appeal by Hoffman, and its factual findings are subject to great deference herein.  Hoffman bears the burden of proving those factual findings incorrect by clear and convincing evidence.  As the Court found, much of the media

coverage shortly after the murder also focused on other crimes which happened during this same time frame, i.e. Thanksgiving week of 1996, including the triple murder at Louisiana Pizza Kitchen in New Orleans.  In other words, the Court found that the media coverage was emphasizing the amount of crime affecting the city as a whole.  In fact, the Court noted that media coverage of the offense in Orleans Parish was "just as extensive", and following this week of violence, concerned citizens marched on City Hall demanding safe streets, thereby not appearing "that a jury pool made up of Orleans Parish residents would have constituted a sympathetic audience".  The Court held that moving the trial to New Orleans to escape pre-trial publicity was a "ludicrous proposition", because many of the articles and news broadcasts at issue were New Orleans televisions stations or newspapers circulated in New Orleans.

Agreeing with the trial court's reasons for denial of the change of venue, the Court found that most of the prospective jurors knew only the basic facts surrounding this case, rather than specific details, noting that "very few prospective jurors remembered anything about the confession or videotape".  In regard to Hoffman's argument regarding St. Tammany officials, including the district attorney, making statements to the press, the Court noted that these statements occurred immediately following the crime and further found that none of the prospective jurors even recalled the statements made by Mr. Reed.  The Court specifically found that "the fact that none of the prospective jurors remembered this specific statement proves the statement certainly did not cause prejudice against Jessie Hoffman in the public mind".

Page 45

""[A]s a general rule, a state defendant who seeks habeas relief as a result of pretrial publicity must demonstrate an actual, identifiable prejudice on the part of members of the jury that is *attributable to that publicity*."" <u>Moore</u> v. <u>Johnson</u>, 225 F.3d 495 (5th Cir. 2000), citing <u>Willie</u> v. <u>Maggio</u>, 737 F.2d 1372, 1386 (5th Cir.1984). (Emphasis added.)  ""The trial court is necessarily the first and best judge of community sentiment and the indifference of the prospective juror. Appellate courts, *especially on collateral attack,* will interfere only upon a showing of manifest probability of prejudice."" <u>Bishop</u> v. <u>Wainwright</u>, 511 F.2d 664, 666 (5th Cir.1975).

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

### Claim XI - Crime Scene Visit

In his eleventh claim, Hoffman alleges his rights were violated by the crime scene visit during trial, alleging he was not physically present during crucial times and could neither see nor hear any interactions that took place between the jury and the prosecution or police officers.

For the reasons stated above, the State objects to the use of the alleged juror statements regarding the crime scene visit and their thoughts about it.  Moreover, some of the statements are clearly factually wrong, as some of the jurors stated they did not recall Hoffman being there for the crime scene visit, but the trial court found he was present (Transcript of hearing of December 1, 2004 at p. 55), and Hoffman admits in the Petition he

was there, but complains of his location during the visit.  The trial court noted that it had specifically admonished the jury that there would be no talking and no questions. (Transcript of December 1, 2004 hearing, at p. 55).

Hoffman cites <u>Snyder</u> v. <u>Com. Of Mass.</u>, 291 U.S. 97, 54 S.Ct. 330 (1934) in support of his position, but that case is factually distinguishable.  In <u>Snyder</u>, the trial court did not permit the accused, Snyder, to accompany his counsel to the crime scene for the visit by the jury, court and counsel.  Clearly, in this case, Hoffman was present at the scene, along with both of his counsel.

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

## Claim XII - Jury Misconduct

In his twelfth claim, Hoffman asserts the jury engaged in misconduct, because their discussions constituted premature deliberations.

Again, Hoffman seeks to use alleged statements from the jurors, to which the State objects for the reasons stated hereinabove.

Nevertheless, Hoffman alleges the jurors discussed the evidence, parole issues and speculated about his criminal record or drug use.  He further alleges that two of the jurors had a technical discussion about guns.  In regard to the parole issues, this was a matter for which there was testimony presented by the defense during the penalty phase of the trial, and the jury was instructed as to the law regarding commutation by the governor of both life and

death sentences.  In regard to the criminal record and drug use discussion, the juror merely stated that they "wondered" about this, not that it bore upon their decision.  As to the gun discussion, there is nothing to suggest this was a discussion about the gun evidence in this case, but merely a discussion about guns in general.  The reference to discussion of the "evidence" is non-specific and provides no details of any such discussion.  None of these discussions constitute premature deliberations.

Hoffman has the burden of establishing that as a result of alleged premature deliberations, the jurors formed an opinion as to his guilt before they heard all the evidence and were incapable of impartiality.  U.S. v. Arriola, 49 F.3d 727 (5th Cir. 1995).  "When there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." United States v. Resko, 3 F.3d 684, 690 (3rd Cir. 1993).

There is no evidence before the court that any alleged discussions among jurors, in violation of the court instructions not to have any such discussions, resulted in the jury forming an opinion before hearing all evidence or that they were incapable of impartiality. Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

## Claim XIV - Execution of Mentally Ill Offenders

In his fourteenth claim, Hoffman asserts he is mentally ill, and therefore, should not be executed. However, he admits, at p. 316 of his Petition, that he is not legally insane under Louisiana's insanity statute.

While Hoffman submits that this claim should be reviewed *de novo*, because the state court did not adjudicate the claim on the merits, Hoffman elected to submit this claim without submitting further evidence at the hearing on December 1, 2004. (Transcript at p. 8 - this was claim XIX in the state post conviction application).

La. R.S. 15:567.1 provides that a person is not competent to proceed to execution when he *presently* lacks the competence to understand he is to be executed and the reason he is to suffer that penalty. The statute further provides a procedure whereby a defendant may allege and prove such incompetency. Hoffman does not allege that he presently meets the standard as set forth in R.S. 15:567.1. Rather, he alleges his mental illness caused him to be volitionally incapacitated during the crime. Moreover, this claim is premature, as Hoffman has not yet exhausted the state law remedies set forth in the applicable statute.

Hoffman relies on Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242 (2002), which prohibited execution of the mentally retarded. However, to the extent he seeks an extension of Atkins to the mentally ill, the Fifth Circuit has previously rejected such an argument, unless the petitioner contends he is insane and therefore incompetent to be executed. ShisInday v. Quarterman, 511 F.3d 514 (5th Cir. 2007).

Incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition. <u>Panetti</u> v. <u>Quarterman</u>, 551 U.S. 930, 127 S.Ct. 2842 (2007). *See also* <u>Stewart</u> v. <u>Martinez-Villareal</u>, 523 U.S. 637, 644-45 (1998) ("[R]espondent's *Ford* claim was dismissed as premature, not because he had not exhausted state remedies, but because his execution was not imminent and therefore his competency to be executed could not be determined at that time.").

The State submits this claim is premature at this time and should be dismissed without prejudice.

## Claim XV - Improper Response to Jury Question

In his fifteenth claim, Hoffman alleges the trial court responded improperly, during penalty phase deliberations, when the jury asked if Hoffman had any kind of record, whether the State would have had access to it and whether the information would have been provided to the jury. The court responded that the question could not be answered.

Again, to the extent Hoffman seeks to rely on statements from jurors, the State objects to the admissibility of such statements as improper, as further detailed above.

Defendant alleges the question should have been answered that Hoffman did not have a criminal record, because the way the court answered it confirmed the jury's "suspicions" of a juvenile record. However, as the Louisiana Supreme Court found on this issue, both the State and the defense emphasized Hoffman's clean criminal history, and the prosecutor in this case did not interject issues broader than Hoffman's background and the circumstances of the crime at the sentencing stage.

Hoffman further objects to the "supplemental instruction" provided to the jury by the court in response to this question, alleging it was erroneous and misleading, relying on Simmons v. South Carolina, 512 U.S. 154 (1994).   The Louisiana Supreme Court specifically distinguished the facts in this case from Simmons, because there the court's actions "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration".   Simmons, 512 U.S. at 163, 114 S.Ct. at 2193.  As the Louisiana Supreme Court found, in this case, the judge's response did not create such a "false choice" for the jury in light of its previous instruction on mitigating circumstances, which included lack of a criminal history, and the fact that both sides had emphasized Hoffman's "clean criminal history".

Hoffman's argument that this issue also turned his youth, which was a mitigating circumstance, into an aggravating circumstance by asking about his juvenile record does not logically follow.  The question does not mention "juvenile" or age or youth.  It merely asks if he had "any kind of record".  The same question could have been asked in relation to a forty year old defendant.

The mere fact that the jury asked this question does not provide evidence that the mitigating circumstances of youth and lack of a criminal record were not considered. Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

**<u>Claim XVI - Juror Should Have Been Excluded for Cause</u>**

In his sixteenth claim, Hoffman alleges Juror Lower should have been excluded for cause because she stated she would not consider the mitigating factors of youth and lack of a criminal record.

First, the State submits that Hoffman mischaracterizes and does not include the entirety of Ms. Lower's statements during voir dire.  In reviewing the voir dire of Ms. Lower, and specifically the portion cited by Hoffman, she appeared to be referring to the guilt phase, stating she make her decision based on the facts of the case.  Hoffman's trial counsel apparently realized they were speaking about different phases of the trial and then explained to her that it was "somewhat complicated", but he was referring to the sentencing phase, assuming the jury found Hoffman guilty of first degree murder, explaining that at that point, they jury would no longer be dealing with guilt.  Once Mr. Alford explained this to Ms. Lower, she specifically stated that she would not automatically sentence Hoffman to death, that there may be mitigating circumstances, as Mr. Alford had explained, and those would be taken into consideration before deciding the penalty.  (Record at p. 1993-1995). Secondly, these questions were asked prior to Ms. Lower and the jury being instructed by the court regarding their duty to consider mitigating circumstances and the identity of such mitigating circumstances.

As the Louisiana Supreme Court found, although Ms. Lower "initially stated that she would make her decision based on the 'facts of the case', rather than the defendant's age or lack of a criminal history", Hoffman's claim was later "undercut" by Ms. Lower's response

declaring "I am sure, like you said, there may be mitigating circumstances and you would take those into consideration before you decide".  The Court held that her responses indicated she would not solely consider aggravating circumstances, but instead, she would consider all of the circumstances, and that more importantly, "whatever confusion existed in Ms. Lower's mind as to what constituted a mitigating circumstance, she made clear, on more than one occasion, that she would not automatically impose the death penalty if the defendant was found guilty of first degree murder".

In this same claim, Hoffman also claims his counsel was ineffective for failing to challenge Ms. Lower for cause.  The burden to be borne by Hoffman on such a claim has previously been discussed herein.  Moreover, trial counsel's decisions during voir dire are considered issues of trial strategy and do not give rise to a claim of ineffective assistance of counsel unless the decisions render the entire trial unfair. Teague *v.* Scott, 60 F.3d 1167, 1172 (5th Cir.1995).  In addition, part of Hoffman's argument on the ineffectiveness claim is that "even if the court had denied a challenge for cause made by counsel, the error would have been preserved and pursued on appeal".  However, that argument ignores the fact that this issue was raised on appeal, and as noted, the Louisiana Supreme Court addressed the merits of this claim, rejecting it for the reasons stated.

Hoffman has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

**<u>Claim XVII - Short Form Indictment</u>**

In his seventeenth claim, Hoffman alleges his rights were violated by the use of a short form indictment, because it failed to list the aggravating circumstances.

While Hoffman submits that this claim should be reviewed *de novo*, because the state court did not adjudicate the claim on the merits, Hoffman elected to submit this claim without submitting further evidence at the hearing on December 1, 2004. (Transcript at p. 8 - this was claim XIX in the state post conviction application).

"[T]he sufficiency of a state indictment is not a matter for federal habeas corpus review unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction.". <u>Alexander</u> v. <u>McCotter</u>, 775 F.2d 595, 598 (5th Cir.1985).

Hoffman cites <u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584 (2002) and <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000). However, the denial of this claim by the state courts is not contrary to or an unreasonable application of clearly established federal law because the Supreme Court has yet to hold that aggravating factors must be charged in the indictment. <u>United States</u> v. <u>Bourgeois</u>, 423 F.3d 501, 507 (5th Cir.2005). *See also* <u>Simpson</u> v. <u>Quarterman</u>, 2007 WL 1008193 at *21 (E.D. Tex. 2007) (""Neither *Apprendi* nor *Ring* held that aggravating factors in a state capital case must be pleaded in the indictment.""); <u>Stevens</u> v. <u>Epps</u>, 2008 WL 4283528 (S.D. Miss. 2008). For these reasons, this claim is without merit.

## Claim XVIII - Combination of Errors

In his eighteenth claim, Hoffman alleges that the combination of errors deprived him of a fundamentally fair trial, while addressing each individual error may not afford adequate safeguards.

""Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process."" Derden v. McNeel, 978 F.2d 1453, 1454 (5th Cir.1992) (en banc).

For the reasons stated hereinabove, the State submits that the claims of Hoffman are without merit, and accordingly, there is no cumulation of errors.  Moreover, there is no evidence that, if any errors occurred, that they "so infected the entire trial" that the resulting conviction violated due process.  Hoffman has failed to meet his burden of proving the state courts made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

## Claim XIX - Right to Fair Clemency Process

In his nineteenth claim, Hoffman alleges he is entitled to a fair clemency process, arguing that Louisiana's clemency system fails to meet minimum due process requirements.

While Hoffman submits that this claim should be reviewed *de novo*, because the state court did not adjudicate the claim on the merits, Hoffman elected to submit this claim

without submitting further evidence at the hearing on December 1, 2004.  (Transcript at p. 8 - this was claim XIX in the state post conviction application).

The State submits that the Fifth Circuit has previously rejected a similar argument attacking Louisiana's clemency process, alleging lack of due process.  In Sepulvado v. Louisiana Bd. of Pardons and Parole, 171 Fed.Appx. 470 (5th Cir. 2006), petitioner sought to distinguish Louisiana's clemency procedure from those in other States, claiming, because Louisiana law does *not guarantee* a clemency hearing, its procedure falls below the minimum due-process threshold. The Court noted that other cases, including Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 118 S.Ct. 1244 (1988), cited by Hoffman, do *not* establish specific requirements States must follow.  Louisiana state law allows every inmate to apply for clemency, and the court held petitioner had no claim in asserting Louisiana's clemency procedure falls below the minimum constitutional threshold.

Hoffman has failed to meet his burden of proving the state courts made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

**Claim XX - Lethal Injection Cruel and Unusual Punishment**

In his final habeas claim, Hoffman asserts that lethal injection, as administered in Louisiana, violates his constitutional rights, because it creates a risk of serious, unnecessary pain.

While Hoffman submits that this claim should be reviewed *de novo*, because the state court did not adjudicate the claim on the merits, Hoffman elected to submit this claim

Page 56

without submitting further evidence at the hearing on December 1, 2004.  (Transcript at p. 8 - this was claim XIX in the state post conviction application).

Hoffman fails to cite a case clearly establishing the unconstitutionality of Louisiana's procedure, and accordingly, has failed to meet his burden of proving the state courts made an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

## **CONCLUSION**

For the foregoing reasons, the State of Louisiana respectfully submits that petitioner's Application for Habeas Corpus Relief be denied.

Respectfully submitted:

By:     s/Kathryn Landry
KATHRYN LANDRY, Bar No.  19229
P. O. Box 82659
Baton Rouge, LA 70884
Telephone:  (225) 766-0023
Facsimile: (225) 766-7341

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing MEMORANDUM IN OPPOSITION TO APPLICATION FOR HABEAS CORPUS has been mailed to counsel of record and the opposing party herein:

Sarah Ottinger
Capital Appeals Project
636 Baronne St.
New Orleans, LA 70113

Caroline Tillman
Capital Post Conviction Project of Louisiana
1340 Poydras St., Suite 1700
New Orleans, LA 70112

Baton Rouge, Louisiana this 23rd day of July, 2009.

  s/Kathryn Landry
KATHRYN LANDRY