UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JESSIE HOFFMAN                          CIVIL ACTION

VERSUS                                  No. 09-3041

BURL CAIN, WARDEN,                      SECTION "B"(1)
LOUISIANA STATE PENITENTIARY


**<u>OPINION</u>**


Petitioner, Jessie Hoffman, filed this Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his conviction and death sentence.  He is in custody pursuant to the judgment of a state court.  Respondent, Walter P. Reed, District Attorney for St. Tammany Parish, State of Louisiana filed an Answer (Rec. Doc. No. 18) and a Memorandum in Opposition to Application for Habeas Corpus.  (Rec. Doc. No. 19).  Petitioner then filed a Reply to the State's Answer and Memorandum.  (Rec. Doc. No. 27). An extensive post-conviction record, composed of state and federal proceedings, has been made by all parties.[1]

Jessie Hoffman was tried and convicted following a jury verdict of guilty to first degree murder on June 25, 1998, and a jury death verdict two days later on June 27, 1998. In accordance with the jury verdicts, the state trial court pronounced a sentence of death on September 11, 1998.  The conviction and sentence were affirmed by the Louisiana Supreme Court on April 11, 2000, the opinion was supplemented on June 14, 2000, and the court denied the petitioner's application for rehearing on May 12, 2000.  The United

---

[1]

As to all claims, we find that the state court record and the federal habeas record negate the need for further evidentiary hearings. The state trial court held exhaustive post-conviction proceedings, including consideration of depositions and documentary materials. This court has also received and considered extensive documentation and oral arguments from all parties' counsel. All motions for evidentiary hearings, including to limit same, are dismissed in view of our findings. *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011);  (Rec. Docs. 1, pp.22-29; 19; 46; 47; 57; 65; 69)

States Supreme Court denied petitioner's writ application on October 16, 2000. Petitioner filed an application for post conviction relief with the state district court on July 20, 2001, which was denied by the court on May 1, 2007. Petitioner filed another writ application with the Louisiana Supreme Court from the May 1, 2007 Order, which was denied on December 12, 2008.

The facts of the crime were summarized by the Louisiana Supreme Court as follows:

> Evidence introduced at trial showed that Jessie Hoffman kidnapped Ms. Elliot at gunpoint, in her own car, as she was leaving the Sheraton parking garage after a long day at work. Hoffman then forced Ms. Elliot, at gunpoint, to drive to an ATM machine to withdraw money from her account so that he could rob her. The ATM video tape shows the terror on Ms. Elliot's face as she withdrew money from her account, and Hoffman can be seen standing next to his victim. Two hundred dollars were withdrawn from the ATM, and a statement from Hoffman's girlfriend indicated that she and Hoffman went shopping soon thereafter, and that Hoffman paid cash for several items.
>
> Hoffman did not leave Ms. Elliot at the ATM machine after he had already caused the most horrific night of her life, by both kidnaping and robbing her at gunpoint. Instead, he forced her, still at gunpoint, to drive with him to a remote area of St. Tammany Parish. Ms. Elliot often begged Hoffman not to hurt her, and he answered that he would not because she was cooperating. Hoffman even said that Ms. Elliot 'offered herself' while begging him not to hurt her. Hoffman, still armed with a handgun, then had sexual intercourse with his victim at a secluded, desolate area of St. Tammany Parish where he had forced her to drive. The jury did not believe Hoffman's contention, that the sex he had with Ms. Elliot, while Hoffman was armed with a handgun, in the back of Mr. Elliot's own car, was consensual, and found aggravated rape as an aggravating circumstance. Even after kidnapping, robbing, and raping Ms. Elliot, all of which were done at gunpoint, Hoffman did not allow her to leave. Instead, he forced her, while she was still completely nude subsequent to her rape, to get out of her car and march down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump. Her death march ultimately ended at a small, makeshift dock at the end of this path, where she was forced to kneel and shot in the head, execution style. Ms. Elliot likely survived for a few minutes after being shot, but she was left on the dock, completely nude on a cold

-2-

November evening, to die.

After kidnapping, robbing, raping, and shooting Ms. Elliot, Hoffman disposed of her belongings and his gun, then returned to work. Hoffman's 'lunch hour' as he told his managers he would be taking, lasted approximately two and one-half hours. *State v. Hoffman*, 768 So.2d 542 (La. 2000).

There is no dispute that Hoffman robbed, kidnapped, raped and killed Molly Elliot. In choosing the death penalty, the jury found the following aggravating circumstances: Hoffman was engaged in the perpetration of aggravated rape, kidnapping, and armed robbery, and that the offense was committed in an especially heinous atrocious or cruel manner in that the victim was subjected to torture, serious physical abuse, or pitiless infliction of unnecessary pain and suffering. (State Court Record, Volume VI p. 1276).

**Timeliness**

Neither side contests the timeliness of this petition which needed to be filed in accordance with the requirements of 28 U.S.C. § 2244, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA established a one year statute of limitations for the filing of federal habeas applications. This one year statute of limitations runs from the date on which the judgment became final by the conclusion of direct review. Accordingly, for AEDPA purposes, Hoffman's conviction and sentence became final on October 16, 2000.

However, the AEDPA provides for interruption of the one year limitations period, stating that "the time during which a properly filed application for state post conviction or other collateral review . . . shall not be counted toward any period of limitation under this subsection." 28 U.S.C. §2244(d)(2). By its plain language, 28 U.S.C. §2244(d)(2), does not create a new one year term for filling a federal habeas petition at the conclusion of state court post conviction proceedings. *Flanagan v. Johnson*, 154 F.3d 196 (5th Cir. 1998). Since this statute is a tolling provision, the time during which state court post conviction

proceedings are pending must merely not be counted towards the one year period. *Id.*

Hoffman filed his initial Application for Post Conviction Relief with the state district court on July 20, 2001, which halted the limitations period set forth by the AEDPA. As of that date, 276 days of the limitations period had elapsed, from October 16, 2000 to July 20, 2001. The writ application with the Louisiana Supreme Court was denied on December 12, 2008 resuming the one year period. Hoffman filed this application on March 10, 2009, after another 87 days elapsed, bringing the total elapsed time to 363 days, just within the one year period.

**Exhaustion**

The State contends that claims II and III of this petition have not been exhausted and therefore the petition must be dismissed without prejudice as a mixed petition containing both exhausted and non-exhausted claims. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998). The statute, 28 U.S.C. § 2254(b)(1)(A), provides that an application for writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a state court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.

Claim II alleges that Hoffman's rights were violated under *Napue v. Illinois*, 360 U.S. 264 (1959) and *Brady v. Maryland*, 373 U.S. 83 (1963), because the State allegedly failed to disclose a coroner investigator's report that supported the defense case against specific intent and allegedly failed to correct misleading testimony of a State witness regarding that evidence. Claim III alleges that Hoffman's trial counsel were ineffective for failing to present certain evidence at trial to rebut the State's case.

On October 20, 2006 Hoffman  filed a motion  striking his previous post conviction application and substituting it with an amended and supplemental petition for post conviction relief. An evidentiary hearing was conducted on January 8, 2007. However, claims II and III were not added until another amendment on April

-4-

17, 2007. Only a few weeks later, the state court issued its ruling on May 1, 2007, without addressing claims II and III.

The exhaustion rule does not require the state court to directly address or even acknowledge the claim at all. Exhaustion requires only that the Petitioner "fairly present" the claim to the courts in the manner required by state law, affording the state courts "meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986); *See Also O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (exhaustion rule "requires only that state prisoners give state courts a fair opportunity to act on their claims").

Petitioner fulfilled this duty by presenting these claims in his Amendment to Supplemental Petition for Post Conviction Relief, April 18, 2007 which was properly and timely filed. The State has never claimed that the Amended Petition was untimely or otherwise procedurally barred. Petitioner subsequently raised these claims to the Louisiana Supreme Court, after the state district court denied relief. By doing so, he properly exhausted the claims. *See Soffar v. Dretke*, 368 F.3d 441, 467 (5th Cir. 2004) ("The fact that the Texas Court of Criminal Appeals did not make an explicit ruling on Soffar's ineffective assistance of counsel claim bears no weight on whether the claim has been exhausted. Once a federal claim has been submitted to the state's highest court, the exhaustion requirement is satisfied, even if the state court fails to address the federal claim."); *Carter v. Estelle*, 677 F.2d 427 (5th Cir. 1982) ("[I]f the substance of the petitioner's claims is brought to the state court's attention, the fact that the court does not explicitly pass on the claims is irrelevant to the question of exhaustion, because the opportunity to consider them has been presented."). The absence of a proposed order in the amended petition has not been shown violative of any state procedural bar. However, Petitioner's post-hearing addition of claims here, without a standard proposed order for the state trial judge, presents

highly questionable tactics that bear upon standards for professional conduct. Nevertheless, we find that petitioner's amended claims have been exhausted, albeit barely within sufficient time for fair consideration by the state trial courts. *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986).

## Claim I – Ineffective Assistance of Counsel at Sentencing

Petitioner contends that as a result of counsel's ineffective representation, the jury that sentenced Hoffman never heard any of the compelling mitigation evidence readily revealed by basic investigation. (Rec. Doc. No. 1, p. 31). Petitioner claims that this evidence included trauma and abuse in his childhood, a multi-generational history of mental illness in his family, and that Hoffman himself suffered from psychosis, post traumatic stress disorder, and brain damage. (Rec. Doc. No. 1, p. 32).

7

Petitioner contends that the trial counsel's performance at sentencing fell below an objective standard of reasonably effective representation because counsel failed to conduct a reasonable investigation into Hoffman's life history, failed to obtain a competent and reliable mental health evaluation, and failed to present readily available mitigation evidence. (Rec. Doc. No. 1, p. 36). Petitioner argues that counsel failed to follow *American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, and that the United States Supreme Court has repeatedly stressed the importance of a thorough social history investigation, citing the ABA standards as "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); (Rec. Doc. No. 1, p. 37).

Petitioner claims that trial counsel merely obtained Hoffman's school records and conducted one group interview of some family members as well as a separate interview of his grandmother. (Rec. Doc. No. 1, p. 38). Petitioner contends that trial counsel failed to collect readily available records including those supporting

Hoffman's mental illness, childhood abuse and neglect, substance abuse, and chaotic upbringing. (Rec. Doc. No. 1, p. 40). Petitioner also contends that trial counsel failed to interview readily available witnesses by only holding a single group interview (Rec. Doc. No. 1, p.42) and that this resulted in an inaccurate and incomplete life history (Rec. Doc. No. 1, p. 43).

8

Petitioner contends that trial counsel's failure to investigate left the medical expert with no accurate information to base a diagnosis and that this, itself, was ineffective counsel.  (Rec. Doc. No. 1, p. 44). Petitioner argues that all of trial counsel's failures actually lead the defense counsel to offer evidence in support of the death penalty.  Rather than offer mitigation evidence in support of a life sentence, the defense offered evidence that Hoffman was a "nice young man that made a terrible mistake," a "good kid," and a "good student."  Petitioner then provides detailed findings of the post conviction investigation that produced evidence of alleged mental illness and a family environment of substance abuse, criminality, violence, and instability. (Rec. Doc. No. 1, p. 47-71).

Respondent argues that the state district court conducted an evidentiary hearing during post conviction proceedings, and following live testimony and depositions, the court found that the trial attorneys for Hoffman had no reason to suspect any mental deficiencies or psychotic condition.  Also, the court found that the expert report and the attorneys' personal interaction with Hoffman led to their reasonable belief that no such conditions were present and that the attorneys followed the ABA guidelines. (Rec. Doc. No. 19, p. 9).

Respondent contends that the trial attorneys investigated and prepared for this trial but nothing was disclosed suggesting

9

further investigation into family history or mental illness. (Rec. Doc. No. 19, p. 10).  The attorneys spoke to family members and friends and called many of these witnesses to testify.  They also obtained a mental health expert to evaluate Hoffman who advised counsel of no mental health problems.  (Rec. Doc. No. 19, p. 10). Respondent contends that the defense attorney's vigorously fought to have the jury see Hoffman as they saw him, a nice young man who made a grave mistake but should not be subjected to death.  (Rec. Doc. No. 19, p. 11)

In a federal habeas challenge to a state criminal conviction, the question of whether a lawyer was ineffective in rendering assistance is a mixed question of law and fact.  *Strickland v. Washington*, 466 U.S. 668, 698 (1984).  As such, a federal court must defer to the state court's decision unless, in accordance with 28 U.S.C. § 2254(d)(1), it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  The two prongs of § 2254 (d)(1) are distinct and relief may be granted under either.  *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000). Also, according to 28 U.S.C. § 2254 (d)(2), the petition may be granted if the state court decision  involved an "unreasonable determination of the facts."

For a claim of ineffective assistance of counsel, "the defendant must show that the counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  A defendant must also show that he was prejudiced by the attorney's unreasonable behavior. *Id.*

Petitioner provides three theories as to why the Petition for Writ of Habeas Corpus should be granted in regards to the claim of ineffective council.  First, Petitioner contends that under 28 U.S.C. § 2254(d)(1) the state court  decision was contrary to clearly established federal law in *Wiggins*, 539 U.S. 510 (2003), despite materially indistinguishable facts.  A state court decision is contrary to federal law if "the state court confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives a result different from [Supreme Court] precedent." *Coble v. Quarterman*, 496 F.3d 430, 435 (5th Cir. 2007).

In *Wiggins,* defense counsel received information in a Presentence Investigation Report and records from social services detailing Mr. Wiggins' mother's alcoholism, his placement in foster care, and numerous instances of sexual and physical abuse*. Wiggins*, 539 U.S. at 518.  Also, a psychologist report detailed that Mr. Wiggins had difficulty coping with stress and exhibited features of a personality disorder. *Id.* at 523.  The Court held that the decision to stop investigating after receiving this information was unreasonable because it fell short of ABA guidelines at the time, and "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.* at 525.

Petitioner contends that indistinguishable failures to investigate occurred in this case.  (Rec. Doc. No. 1, p. 85). Petitioner points to the report of defense witness Dr. Salzer that suggested "paranoid ideation that may reach the level of psychotic delusions."  However, Dr. Salzer also opined that the paranoid ideation might be attributable to Hoffman's incarceration.  (Rec. Doc. No. 1, p. 86).  Petitioner also mentions the same report which found testing indicating that Hoffman engaged in drug or alcohol abuse contrary to his denial of such a problem, with Dr. Salzer recommending that interviews be conducted with family members to clarify this issue. (Rec. Doc. No. 1, p. 86).  Petitioner also mentions that both defense attorneys had limited knowledge of Hoffman's mother, but that limited knowledge should have raised red flags. (Rec. Doc. No. 1, p. 87).

However, *Wiggins* is distinguishable from the current case. The *Wiggins* Court held that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at

sentencing.  *Wiggins*, 539 U.S. at 533.  Choices by an attorney after less than complete investigation are reasonable to the extent that professional judgments support the limitations on investigation.  *Id.*

In *Wiggins,* the information in the Presentence Investigation Report, records from social services, and the psychologist report led to the Court finding that the decision to stop investigating was unreasonable.  *Id.* at 523.  However, in this case, the state district court found that the defense attorneys had no reason to suspect any mental deficiencies that would lead them to believe further investigation was necessary.  Petitioner has failed to show that these factual findings by the state court constituted an objectively unreasonable determination of the facts in light of evidence presented.  *See Williams v. Taylor*, 529 U.S. 362, 409 (2000).  Also 28 U.S.C. § 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

For this claim Petitioner has failed to meet this burden.

Second, under 28 U.S.C. § 2254, Petitioner contends that the state court's decision rests on an unreasonable application of clearly established federal law in that it is premised on wholly inaccurate fact findings leading to an objectively unreasonable application of *Strickland*.  This statute is satisfied when the state decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams*, 529 U.S. at 407-08.  Petitioner claims that in the state district court correctly identified *Strickland* as the precedent governing ineffective assistance of counsel claims, but the application of *Strickland* was unreasonable because the state court's decision rested on many facts not borne out by the record before the state court. (Rec. Doc. No. 1, p. 92).

Specifically, Petitioner contests various findings of the state court in its order May 1, 2007, denying post conviction relief.  Petitioner contests the finding of the state court that the trial defense attorneys interviewed family members Marvin Fields, and Jo Ann Normand. (Rec. Doc. No. 1, p. 93).

Petitioner also objects to the language used by the state district court that a forensic  psychiatrist  and psychologist appointed by the court, and defense psychologist Salzer all found that Hoffman had no psychosis or mental deficiencies.  (Rec. Doc. No. 1, p. 94-96).  Petitioner claims that the court appointed psychiatrist and psychologist only found that Hoffman was competent to stand trial and this finding did not necessarily mean that he had no psychosis or mental deficiencies. Also, Petitioner contends that Dr. Salazar's diagnosis was based upon incomplete information. (Rec. Doc. No. 1, p. 94-96).

Petitioner also objects to the state district court's finding that the trial attorneys had no reason to suspect mental deficiencies or psychosis and that the defense attorneys followed ABA guidelines which were in effect at the time of trial of this case.  Petitioner then concludes that these erroneous fact findings, critical to the assessment of counsel's competence, render the state court's application of  *Strickland* objectively unreasonable.

However, the standard in *Strickland* provides that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*.

Petitioner has not met his burden of clear and convincing evidence to overturn the findings of the state court for most of Petitioner's claims of factual error.  Except for his claim that trial counsel did not interview family members Marvin Fields and Jo

-11-

Ann Normand, all of the other state court findings were reasonable and accurate based on the factual record.

If trial counsel did not interview Fields and Normand, this mistaken finding by the state court was immaterial. Under the deferential standard of *Strickland,* the state court still could have found that counsel representation was reasonable with only the group interview of many relatives and friends and the individual interview of the grandmother. Petitioner has not proven that the state court wrongly applied *Strickland* based upon this one fact in dispute. The trial attorneys spent countless hours working on the penalty phase of the case, spoke to family members and friends, and called many of these witnesses to testify. (Rec. Doc. No. 19, p.11). Defense counsel vigorously fought on behalf of Hoffman to have the jury see him in a favorable light and refuse the death penalty. (Rec. Doc. No. 19, p.11). Therefore, under the deferential standard of *Strickland*, the state court's finding of adequate representation was reasonable.

Third, Petitioner claims that for all of the reasons previously mentioned the state court's decision is also based in "an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d)(2). Once, again the clear and convincing standard has not been met for most of Petitioner's claims of factual error in the findings of the state court. The state court's findings about the conclusions of the expert witnesses, the information provided to trial counsel, the reasoning and suspicions of trial counsel during investigation, and the following of ABA guidelines are all reasonable and have not been overturned by clear and convincing evidence. The mistake about trial counsel interviewing two family members was immaterial to the decision of the state court. Given the group interview of many family and friends, the finding that two family members were not interviewed would not under the clear and convincing standard alter the finding of adequate representation. Countless hours of preparation by trial counsel and the deferential standard of

*Strickland* further support the state court's ultimate findings here as reasonable in all aspects. A reasonable probability of a different outcome has not been established.

## Claim II - Non-Disclosure of Coroner Investigator's Report and Alleged Failure to Correct Misleading Testimony

The only issue in dispute at the guilt phase of the trial was specific intent. Hoffman has maintained since his confession that he shot the victim accidentally during a struggle with his gun. (Rec Doc. No. 1, p. 103). Without specific intent to kill, Petitioner could not be guilty of first degree murder and would not be eligible for the death penalty.

During trial, the state argued that the physical evidence was more consistent with an execution style shooting, citing the location of the bullet, the angle and path of the bullet, the cuts and bruises on the victim's knees, and evidence that the gun was fired at least 18'' from the victim, too far away to suggest a struggle. (Rec. Doc. No. 1, p. 107). The State also tried to establish the location of the shooting as the place where the body was found, an old wooden boat dock 150 feet down river from a boat launch adjacent to the Highway 90 Bridge. Petitioner claims that establishing the location of the shooting at the dock and describing the "death march" down the overgrown path to the dock was essential to the State's case because these facts helped to prove specific intent. (Rec. Doc. No. 1, p. 108).

During trial, defense counsel argued that the physical evidence presented by the State, in fact, supported a struggle. (Rec. Doc. No. 1, p. 107). The defense also disputed the State's evidence of premeditation and contested the location of the shooting. The defense claimed that the shooting occurred at the boat launch rather than the floating dock where the body was found. Defense pointed out that in his confession Hoffman never mentioned finding the dock or walking down the overgrown path to reach the dock. (Rec. Doc. No. 1, p. 109). Defense also argued that the lack of injuries on the victim's feet was inconsistent with a walk

down an overgrown path.  Defense theorized that the body could have floated down river and washed up on the dock.  (Rec. Doc. No. 1, p. 112).

Defense also argued that the physical condition of the body was inconsistent with the body remaining on the dock for the entire period between the shooting and when the body was found, but this was hampered by the lack of evidence concerning the condition of the body at the time it was found.  (Rec. Doc. No. 1, p. 113). During trial the medical examiner only testified concerning the condition of the body at the time of the autopsy two days later.

In Claim II, Petitioner contends that the State failed to disclose key information about the condition of the victim's body at the time it was found, information which allegedly supported Petitioner's account of the shooting.  Petitioner also contends that the State knowingly presented misleading testimony from their forensic pathologist suggesting that the exculpatory information about the victim's body did not exist.

At issue is a report by a coroner's investigator made on the morning the body was found.  That report said that lividity was not noted and rigor mortis was noted in the mandible but was not fixed. Petitioner contends that this report could have supported defense arguments.  (Rec. Doc. No. 1, p. 114). Petitioner provides the testimony of an expert witness hired post conviction stating: "Given the lack of lividity and the limited amount of rigor mortis observed by the coroner's investigator after the body was discovered, it is unlikely that Ms. Elliot was found in the position she fell after being shot over 12 hours previously." (Affidavit of Gerald Liuzza M.D., 1/5/07, Rec. Doc. No. 1, p. 115).

Petitioner contends that the report was not disclosed despite a request for discovery of all information about any tests and examinations of the victim's body filed January, 16 1997.  (Rec. Doc. No. 1, p. 115).  In response to the initial discovery request, the state filed 147 pages of discovery which included the autopsy report but not the investigator's report.  The prosecution asserted

in their Answer to Request and Motion for Discovery that "all tests are identified in police  reports. Results of testing will be provided." (Rec. Doc. No. 1, p. 116).  However, the prosecution never provided defense counsel with the report and Petitioner obtained the report for the  first time in  post conviction proceedings.  (Rec. Doc. No. 1, p. 116).

Petitioner also contends that at trial the medical examiner, Dr. MacKenzie, testified as to the lividity in the body at the time of autopsy but could not testify as to the condition of the body at the time it was found because lividity can move posteriorly when the body is presented for autopsy. (Rec. Doc. No. 1, p. 117). Petitioner contends that  this testimony left  the misleading impression that no evidence existed about the condition of the body at the time it was found, and that this testimony should have been corrected.

Respondent contends that there was no false testimony.  Dr. MacKenzie testified that he believed the lividity noted in Ms. Elliot's back was the "usual pattern" on a body presented for autopsy, and he did not know whether this lividity was from the initial 12 hour period following her murder.  (Rec. Doc. No. 19, p. 24).  The alleged false testimony is that there was nothing to indicate the condition of the body when it was found.  However, that was not the testimony of Dr. MacKenzie, who was never asked whether there was any information as to the condition of the body when it was found.  (Rec. Doc. No. 19, p. 24).  Dr. MacKenzie was merely asked if he could draw any conclusions about the body position and he said that he could not.

Respondent contends that, contrary to Hoffman's assertion, the testimony at issue actually implied no lividity at the time the body was discovered, precisely the impression Hoffman wanted. (Rec. Doc. No. 19, p. 25).  Dr. MacKenzie never testified that lividity was present when the body was found and in reviewing his testimony, in its entirety, it seems to indicate there was no lividity present, other than the lividity that occurred as a result of

placing the body on her back prior to the autopsy.  Respondent also
contends that Hoffman further fails to show that the prosecution
had knowledge of this information and how this issue could have
affected the verdict.

In regards to the *Brady* violation, Respondent contends that
the prosecutors were not in possession of the report in question
and the state produced all evidence in its possession.    Also
respondent argues that the report was not favorable or material to
the defense.  (Rec. Doc. No. 19, p. 26).

As noted earlier, claims II and III were added on April 17,
2007; a little over four months after the January 8, 2007
evidentiary hearing, but prior to the state trial court's ruling on
May 1, 2007. Also previously noted, claims II and III were not
mentioned in the ruling. Petitioner subsequently raised these
claims to the Louisiana Supreme Court, after the state trial court
denied relief. The Louisiana Supreme Court subsequently denied the
writ of discretionary review in two words, "writ denied." *State v.
Hoffman*, 2007-1913 (LA. 12/12/08); 2008 La. LEXIS 2791.

Review by the Louisiana Supreme Court of the denial of post
conviction relief is entirely discretionary and is very rarely
granted. The court's writ denial is therefore not a decision of the
issues raised before it, but "merely a decision not to exercise the
extraordinary powers of supervisory jurisdiction."    *State v.
Fontenot*, 550 So.2d 179, 179 (La. 1989).

The issue is how this treatment by the state courts of claims
II and III applies to the requirements of 28 U.S.C. §2254(d).
According to the statute §2254(d)(1)-(2) apply only to claims
"adjudicated on the merits" in the state court. The Fifth Circuit
has consistently held that claims not exhausted in state court or
procedurally dismissed have not been "adjudicated on the merits."
*Valdez v. Cockrell*, 274 F.3d 941, 946-47. "The deference offered in
28 U.S.C. §2254(d) operates when the state court has adjudicated
the petitioner's claim on the merits. An adjudication on the merits
occurs when the state resolves the case on substantive grounds,

rather than procedural grounds." *Id*. *See also, Jones v. Jones*, 163 F.3d 285, 299-300 (5th Cir. 1998)(applying pre-AEPDA de novo standard of review to claims of ineffective counsel not exhausted in state court but addressed in federal court at the court's discretion).

The Third Circuit has addressed this issue in *Holloway v. Horn*, and ruled that when a claim was never mentioned in the state court's ruling, it had not been adjudicated on the merits. *Holloway v. Horn*, 355 F.3d 707, 718 (3d Cir. 2004). After the denial of a post-verdict motion for a new trial, Holloway was appointed new counsel for his direct appeal, and that counsel did not brief a *Batson* issue to the Pennsylvania Supreme Court. *Id*. at 714. Trial counsel preserved that issue by moving for a mistrial based on the prosecutor's pattern of striking potential African-American jurors, and Holloway himself raised a *Batson* claim in a pro se appellate brief. *Id*.

The Pennsylvania Supreme Court made no mention of the pro se brief of the *Batson* claim, and issued no order or decision on whether it had accepted or rejected the pro se brief for consideration. *Id*. at 715. The Third Circuit held, "[w]e have interpreted §2254(d)'s 'adjudication on the merits' language to mean that 'when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply.'" *Id*. At 718 (*quoting Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001)).

Here, in following the reasoning of the Third Circuit, under pre-AEDPA standards the legal conclusions of the state court are reviewed de novo. *Holloway*, 355 F.3f at 719. For mixed questions of law and fact, "[t]he court must presume that the state court's factual findings are correct unless, inter alia, they are not fairly supported by the record." *Id*.

In *Napue* the Supreme Court held that knowingly using perjured testimony is a violation of the Fifth and Fourteenth Amendments to

the United States Constitution.   *Napue,* 360 U.S. at 269.   To demonstrate such a violation, the Petitioner must demonstrate that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false.   *May v. Collins*, 955 F.2d 299, 315 (5th Cir. 1992).   False evidence is deemed material for this analysis "if there is any reasonable likelihood that [it] could have affected the jury's verdict." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996)(citations omitted).   It is important to emphasize that due process is not violated "unless the prosecution actually knows or believes the testimony to be false or perjured…." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981).

In regards to the first element, Petitioner has not shown that Dr. MacKenzie gave false testimony.   Dr. MacKenzie was never asked whether there was any information as to the condition of the body when it was found. (Rec. Doc. No. 1, p. 117).   Dr. MacKenzie was merely asked if he could draw any conclusions about the body position from the lividity and he said that he could not.   Actual falsity of the testimony is required to prove a *Napue* violation. See *Thompson v. Cain*, 161 F.3d 802, 808–09 (5th Cir. 1998) (holding witness testimony was not false when witness said that he was not promised a reward despite the fact that witness was aware of the existence of a reward).   Therefore, Petitioner's *Napue* claim fails without need to discuss the other elements.

In *Brady* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.   To be entitled to federal habeas relief on a *Brady* claim, Hoffman must prove that: (1) the prosecutor suppressed or withheld evidence; (2) which was favorable; and (3) material to the defense. *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).

In regards to the first element, the state prosecutors were unaware of and hence did not disclose the coroner investigator's report, despite the request for discovery of all information about any tests and examinations of the victim's body. Petitioner obtained the report for the first time in post conviction proceedings. (Rec Doc. No. 1, p. 116). It does not matter if the failure to disclose was accidental or intentional as the good faith or bad faith of the prosecution is irrelevant. *Brady*, 373 U.S. at 87. Also, it does not matter that Respondent argues that the prosecution did not have possession of the report when the request for discovery was made. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley*, 514 U.S. 419, 437. Accordingly, the first element of the *Brady* claim is satisfied.

In regards to the second element, the coroner's report has highly questionable value to the defense. Given overwhelming evidence of Hoffman's specific intent to kidnap, rob, rape, murder his defenseless victim, to ultimately cover his crimes, during hours of torment that he caused his defenseless victim, while armed, negate the speculative value of this report.

In regards to the third element, "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The materiality element depends on the type of evidence, the alleged crime, and the other evidence available. See *Miller v. Dretke*, 404 F.3d 908(5th Cir. 2005) (denying Brady claim because given the overwhelming evidence of inmate's involvement in robbery, the suppressed evidence possibly used to impeach three witness was immaterial to inmate being found guilty for capital murder); *Duncan v. Cain*, 278 F.3d 537 (5th Cir. 2002)(holding that the district

court correctly upheld the state court's conclusion that the Brady documents were immaterial because a witness's transcribed statement was the best evidence of what he had said, rather than the omitted police reports).

The missing coroner investigator's report was not material in light of the overwhelming trial evidence of specific intent and applicable legal standards. Petitioner further fails to show a reasonable probability that the penalty phase verdict would have been different had the complete report been available and offered at trial.

Petitioner admittedly shot the victim in the head at about an 18-inch range after intentionally committing other horrific crimes against her person over a span of about two hours. Petitioner's self-serving contention of an accidental shooting was rejected. The great weight of the evidence established that at all times, the victim was compliant with Hoffman's orders because of his overwhelming show of life-threatening force while armed with a firearm. The introduction of evidence that the victim's body was moved after the fatal head shot is immaterial to the outcome at either stage of the trial. The so-called march of death began hours before when Hoffman decided to forcibly, while armed, kidnap and rob Ms. Elliot, and ultimately take her to a remote area to then rape and murder her. Accordingly, Hoffman fails to show any ensuing prejudice to his defense from the failure by the state to produce the coroner investigator's report. *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). There is no reasonable probability for a different result because the report has not been shown to undermine confidence in the trial's outcome. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

## **Claim III - Ineffective Counsel for Failing to Present Critical Evidence to Refute State's Case**

According to Petitioner, the defense only relied on the state's investigation instead of independently conducting their own investigation. He argues the defense did not present any witness

or material evidence that supported their case; did not present evidence about tidal movements, the condition of the body, ballistics evidence, problems with the handling of the crime scene, and Hoffman's reasoning for carrying a gun. (Rec. Doc. No. 1, p. 127).

Petitioner contends that defense counsel had a duty to investigate and should have investigated the only issue in the case, specific intent, but did not. (Rec. Doc. No. 1, p. 130). Petitioner admits that defense counsel did perform experiments with gun powder residue, hired a DNA expert, and did all investigation themselves. Petitioner details the availability of investigators and funding for expert witnesses to argue that there was no excuse for not investigating further. (Rec. Doc. No. 1, p. 132).

Petitioner then provides the testimony of a post conviction expert witness that tidal movements and currents could have caused a body to float from the boat launch to the dock and become lodged. (Rec. Doc. No. 1, p. 135). Petitioner also provides a post conviction medical expert, Dr. Liuzza who opined that the injuries on the victim's body were consistent with the body being in the river, and that cuts on the knees that the prosecution attributed to the victim kneeling before execution could also have been caused in the river after her death. (Rec. Doc. No. 1, p. 137).

Petitioner claims that defense counsel failed to present evidence about the lack of injuries to the victim's feet, despite defense counsel using this reasoning in closing arguments to refute prosecution's "march to death" theory. (Rec. Doc. No. 1, p. 138). Petitioner contends that defense counsel also did not mention that a cartridge case was never found at the dock which tends to support Petitioner's story. (Rec. Doc. No. 1, p. 139). Petitioner contends that the defense did not present evidence or expert testimony refuting the prosecution's attempt to use the blood found at the dock as proof that the shooting occurred there. Petitioner provides a post conviction witness that argues that the pattern of blood spots on the dock is not consistent with the shooting

-21-

occurring at the dock.   (Rec. Doc. No. 1, p. 141).

Petitioner contends that defense failed to present testimony from a ballistics expert supporting the existence and possibility of a .25 caliber gun that had been altered or defective and could easily discharge during a fight which would have supported the "struggle" theory.  (Rec. Doc. No. 1, p. 145).  Also, Petitioner contends that the defense did not present expert testimony to challenge the prosecution statement that most accidental shootings do not occur in the head. (Rec. Doc. No. 1, p. 146). Also, Petitioner contends that defense failed to present evidence explaining Petitioner's need to carry a gun for protection because Petitioner was the victim of three violent assaults in the months leading up to the offense.  (Rec. Doc. No. 1, p. 149-53).

Petitioner argues that the only thing defense counsel did was present an inflammatory and highly prejudicial defense by calling the victim unprepared to work in the dangerous city of New Orleans, and suggesting that the victim offered herself sexually to be set free.   (Rec. Doc. No. 1, p. 154).

Finally, Petitioner contends that the defense did not present a unified and credible theory because they did not present evidence against specific intent but instead focused on blaming the victim and discrediting DNA evidence despite the identity of the criminal never being in dispute.

Respondent contends that the Petitioner has not met his burden of showing both that counsel's performance was deficient, meaning that counsel made errors so serious that he was not functioning as the counsel guaranteed the defendant by the Sixth Amendment, and that counsel's errors prejudiced the defense. Respondent also argues that the expert witnesses relied on by the Petitioner have not been subject to cross examination or qualification by the court.

As discussed above, the question of whether a lawyer was ineffective in rendering assistance is a mixed question of law and fact.  *Strickland*, 466 U.S. at 698.  Since the state court did not

-22-

decide this claim "on the merits," the legal conclusions of state courts are reviewed de novo. *Holloway*, 355 F.3d at 719. For mixed questions of law and fact, "[t]he court must presume that the state court's factual findings are correct unless, inter alia, they are not fairly supported by the record." *Id.*

For a claim of ineffective assistance of counsel, "the defendant must show that the counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A defendant must also show that he was prejudiced by the attorney's unreasonable behavior. *Id.* "An attorney's performance generally carries with it a strong presumption of adequacy and is only deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1996).

In this case Hoffman has failed to meet his burden. "The presentation of testimonial evidence is a matter of trial strategy." *Day v. Quarterman*, 2009 WL 1110589 (5th Cir. 2009); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) "A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance." *Green v. Cockrell*, 2003 WL 21145722 (5th Cir. 2003). Hoffman's speculative and conclusory post-trial "evidence" is immaterial and fails to show a reasonable probability for a different outcome in light of noted overwhelming evidence of guilt for the crimes at issue.

**Claim IV Prosecutors Misstated the Law and Argued Improperly**

Petitioner contends that during voire dire the state made three statements misstating the law regarding mitigation and improperly informed the jury that both (1) the defense was under an affirmative obligation to present mitigating evidence before jurors could consider mitigation and (2) jurors were free to disregard mitigating evidence. (Rec. Doc. No. 1, p. 178). Petitioner also contends that these improper statements were followed up by prosecutors during penalty phase closing arguments. (Rec. Doc. No. 1, p. 180–81).

Respondent contends that the Petitioner places improper

emphasis on a few words, which were simply meant as argument by the State that it believed the evidence would prove the aggravating circumstances, thereby allowing the imposition of the death penalty. (Rec. Doc. No. 19, p. 28). In the first alleged statement the prosecutor was not informing the jury that the defense was under an obligation to present mitigating evidence, only that if the defense chose to argue mitigation, evidence must be presented. Also, after the defense objected the prosecutor further informed the jury that it must consider mitigating circumstances. (Rec. Doc. No. 19, p. 28). In the second and third statements the state was merely arguing that although the jury must consider mitigating circumstances the jury could still impose the death penalty if the  state proved the aggravating circumstances. Again when the defense objected, the trial court instructed the jury to disregard the comments.

Petitioner first contends that under 28 U.S.C. § 2254(d)(2) the state courts decision involved an "unreasonable determination of the facts." (Rec. Doc. No. 1, p. 185). Petitioner contends that during trial the prosecution improperly argued that Mr. Hoffman didn't present the kind of evidence usually presented in mitigation. However, Petitioner contends that this improper argument was interpreted by the state court erroneously during post conviction proceedings as the prosecution only arguing that a lack of criminal record should not be mitigating. While the state court found that the prosecutors did not make the "lack of criminal record" argument, Petitioner contends that the prosecution did improperly refer to the lack of any usual mitigation evidence to argue that mitigation did not exist.

First, petitioner has failed to establish by "clear and convincing evidence" that the state court's interpretation of the facts was unreasonable. *See* 28 U.S.C. § 2254(e)(1). Moreover, even if Petitioner proved an improper argument, "a prosecutor's improper argument will, in itself, exceed constitutional limitations in only the most egregious cases." *Ortega v.*

*McCotter*, 808 F.2d 406, 408 (5th Cir.1987).  A federal habeas petitioner who claims that the prosecutor engaged in improper jury argument has the burden of establishing that the prosecution's argument was improper and that such argument was so prejudicial that it rendered the trial fundamentally unfair. *Rushing v. Butler*, 868 F.2d 800, 807 (5th Cir.1989).

In the trial of this case, defense counsel objected to every alleged improper statement and the trial court instructed the jury to ignore those statements.  Therefore, Petitioner has not proven such prejudice to make the trial "fundamentally unfair." Petitioner also claims under  28 U.S.C. § 2254(d)(1) that the improper findings of fact by the stat court led to an unreasonable application of the clearly established federal law of  *Darden, Caldwell,* and *Eddings.* (Rec Doc. No. 1, p. 186).  *See Darden v. Wainwright,* 477 U.S. 168, 181 (1986)(holding that the Court must determine whether the prosecutor's comments so infected the trial with unfairness to make the resulting conviction a denial of due process); *Caldwell v. Mississippi,* 472 U.S. 320 (1985) (describing the need or heightened scrutiny in capital proceedings); *Eddings v. Oklahoma,* 455 U.S. 104 (1982)(holding that jurors are not free to disregard mitigating evidence).

Since Petitioner has failed to prove with clear and convincing evidence that the state court's interpretation of the facts was incorrect, Petitioner cannot prove that the state court unreasonably applied federal law.  It is important to remember that Petitioner makes no argument that the trial court failed to properly instruct the jurors as to their duty to consider mitigating evidence. Petitioner only claims that the prosecution made improper arguments, and has not met his burden to overrule the state court findings that the trial was fair.

**Claim V Alleged Brady Violation-Criminal Rapsheets and NCIC Reports of Hoffman's Family**

Petitioner contends that defense counsel filed a motion asking

the state to disclose any information that it had favorable to the defense. Petitioner contends that the state should have disclosed a copy of the District Attorney's file in the matter but these documents were not disclosed until post conviction proceedings. (Rec. Doc. No. 1, p. 187).   Petitioner contends that this file contained rapsheets for many members of Hoffman's family and even a cursory review of this file would have painted a different picture of Hoffman's family life leading to more investigation by defense counsel. (Rec. Doc. No. 1, p. 188).

Respondent contends that Petitioner has not cited any federal cases in which a burden was placed on the state to provide him the criminal history on his own family members. (Rec. Doc. No. 19, p. 30).   Respondent also contends that Petitioner has failed to meet his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts as to this claim.

Under the *Brady* standards, as discussed in section D, Petitioner's arguments fail. First, Petitioner provides no federal cases that would have required the State to disclose criminal history records of his family members. Petitioner also does not provide authority establishing that such information would be "favorable to the accused" or should have any effect upon the outcome. *Castillo*, 141 F.3d at 222. Therefore, Petitioner has failed to prove an unreasonable application of federal law.

**Claim VI Alleged Race-Based Peremptory Strikes**

Petitioner contends that the trial court violated his Fourteenth Amendment rights to Equal Protection in denying his *Batson* challenges to the prosecution's use of peremptory challenges to remove two of the three black prospective jurors from the venire. The only other prospective black juror was removed by a state cause challenge under *Witherspoon*. Petitioner raised *Batson* challenges to the strikes and the trial court found a prima facie case of discrimination but accepted the racially neutral reasons to

explain the strikes.  (Rec. Doc. No. 1, p. 190).

Petitioner accuses the state of making special efforts to seat an all-white jury.  Addressing the first excluded juror, Mr. Galatas, Petitioner disputes the state's claim that the juror was dismissed because he was soft spoken and hesitant when asked if he could consider the death penalty.  Petitioner argues that the record reflects no hesitation, nodding of head, stuttering, inaudible response, or request for the answer to be repeated in any of the questioning. (Rec. Doc. No. 1, p. 199).  Petitioner also accuses the state of after-the-fact efforts to bolster the credibility of its asserted reasons by trying to amend the record. Petitioner contends this is further evidence that the reasons are pre-textual. (Rec. Doc. No. 1, p. 200).  Petitioner compares the answers of other jurors struck for being weak on the death penalty and argues that those jurors were either far weaker than Mr. Galatas, or not weak at all and struck for other reasons making the state's mentioning of them irrelevant.  (Rec. Doc. No. 1, p. 201).

Petitioner uses the state's attempt to amend the official record as proof of disingenuous tactics.  (Rec. Doc. No. 1, p. 202). Petitioner then contends that similarly situated white jurors and alternates who the state did not strike gave weaker responses concerning the death penalty. (Rec. Doc. No. 1, p. 203).  Some jurors not struck said the death penalty would be "a hard decision." (Rec. Doc. No. 1, p. 204).  Another responded with a mere nod of his head.  (Rec. Doc. No. 1, p. 204).

Petitioner also accuses the state of disparate questioning. Petitioner contends that during individualized voir dire the District Attorney typically only asked a juror questions about the death penalty if that juror had already indicated strong feelings about the case or raised some other issue of concern to the state during the group questioning.  Petitioner claims that the state broke from this pattern only twice, with Mr. Galatas and Mr. Lopez, questioning them on their views about the death penalty hoping to

-27-

create a race neutral reason to strike. (Rec. Doc. No. 1, p. 207).

Petitioner then discusses the second excluded juror, Ms. Malter. Petitioner claims that the state suspiciously asked for its only recess before Ms. Malter was called into chambers for individual questioning. (Rec. Doc. No. 1, p. 208). Petitioner disputes the race neutral reasons provided by the state that the juror was indecisive, smiled at the defendant, and had concerned body language. (Rec. Doc. No. 1, p. 209). Petitioner specifically contends that although the state in defending the challenge said that Ms. Malter was a "one" on an indecisiveness scale from one to ten that Ms. Malter actually said she was "about a five." Petitioner again accuses the state of trying to amend the transcript of voir dire in advance of the Louisiana Supreme Court's decision on appeal. (Rec. Doc. No. 1, p. 210).

Petitioner also contends that the record reflects that the trial court overruled the *Batson* challenge on the indecisiveness scale alone, but in any event, the other alleged race neutral reasons of smiling and body language are not believable. Finally Petitioner argues that if the state wanted to use those reasons it should have questioned the prospective juror more on those issues. (Rec. Doc. No. 1, p. 211).

Petitioner then alleges that the St. Tammany District Attorney's office has a history of systematically striking qualified African American jurors when black defendants are on trial for murder. (Rec. Doc. No. 1, p. 213). Petitioner provides statistical data showing that proportionally more blacks were struck than whites in those trials and claims that this result was statistically significant. (Rec. Doc. No. 1, p. 214–16). Petitioner then contends that this case was racially charged from the outset, that prosecutions trial strategy was to appeal to white people, and that the selection of St. Tammany parish as the venue was racially motivated. (Rec. Doc. No. 1, p. 217–221).

Respondent emphasizes that this claim was addressed and rejected by the Louisiana Supreme Court. Respondent also discusses

-28-

that in regards to Mr. Galatas the Louisiana Supreme Court looked at the entire voir dire transcript conveying the totality of the circumstances while Hoffman only cited portions of the voir dire that supported his contention. (Rec. Doc. No. 19, p. 32). Respondent also mentions that the Louisiana Supreme court did not find disparate questioning.

In regards to Ms. Malter the Louisiana Supreme Court found that different prosecutors questioned different panels of jurors, used different scales, and explained the scale differently before having the jurors rate themselves.  This particular prosecutor was looking for people that were eights or nines on her scale, and while Ms. Malter was a five, another person who was a five was also dismissed by a peremptory challenge.  (Rec. Doc. No. 19, p. 34).

A State violates a defendant's rights if it uses peremptory challenges to strike prospective jurors solely on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). However, the Equal Protection clause of the Fourteenth Amendment prohibits only the exclusion of racial groups, guaranteeing only a fair cross-section of the community rather than trial by particular members of a racial group.  *Holland v. Illinois* , 493 U.S. 474, 478-80 (1990).

Petitioner's *Batson* claims were denied on the merits by both the Louisiana Supreme Court on direct appeal and by the state district court during post conviction proceedings.  The state court followed the proper procedure for evaluating the *Batson* claims, and in following that procedure the state court found no discriminatory intent.  Petitioner again argues under 28 U.S.C. § 2254, that the state court decisions were unreasonable, contrary to law, and involved an unreasonable determination of the facts.

For purposes of habeas review, "[a] state trial court's finding of the absence of discriminatory intent is 'a pure issue of fact' that is accorded great deference and will not be overturned unless clearly erroneous."  *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005)(quoting *Hernandez v. New York*, 500 U.S. 352, 364-65

(1991)). In a habeas proceeding the role of the federal court on appeal is to "determine whether the trial court's determination of the prosecutor's neutrality with respect to race was objectively unreasonable and has been rebutted by clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

The Supreme Court has also noted that during jury selection the entire res gestae takes place in front of the trial judge, leaving the judge well situated to detect the true purpose of the peremptory challenge. *United States v. Armstrong*, 517 U.S. 456, 468 (1996). The Fifth Circuit has held that the reasoning may be "stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated." *United States v. Bentley-Smith*, 2 F.3d 1368, 1375 (5th Cir. 1993). A "judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race." *Id.*

In this case, Petitioner has not provided clear and convincing evidence to find the trial court's determination unreasonable. The trial judge observed the entirety of the voir dire proceedings and concluded the prosecutor's race neutral reasons were legitimate. The Supreme Court of Louisiana reviewed the entire voir dire proceedings and did not overturn the trial judge. That court also dismissed Petitioner's allegations of disparate questioning and a racially motivated venue selection, and Petitioner has not refuted these findings by clear and convincing evidence. The claim here of improper racial motive in the selection of venue is further reviewed later.

## Claim VII - Discrimination in Selection of Grand Jury Foreperson

On January 8, 1997 a St. Tammany Parish grand jury returned a true bill for first-degree murder in the case of Petitioner. On June 3, 1997 Petitioner filed a Motion to Quash the Indictment on Account of Discrimination in the Selection of Grand Jury Forepersons. Petitioner specifically contends that the Louisiana

grand jury foreperson  selection process was a "system open to abuse," citing *Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991).  Petitioner contends that he established a prima facie case of discrimination and was entitled to a hearing but no hearing was given. (Rec. Doc. No. 1, p. 233).  This motion was disposed on January 15, 1998 with no oral or written reasons for this judgment. (Rec. Doc. No. 1, p. 234).

Petitioner contends that in state post-conviction proceedings Petitioner again alleged that his indictment was the product of a grand jury infected by a racially discriminatory process for the selection of forepersons and requested an evidentiary hearing. Petitioner contends that the state court refused to grant Petitioner an evidentiary hearing and denied the claim on its merits in its May 1, 2007 order.  (Rec. Doc. No. 1, p. 234).

Respondent disagrees with the Petitioner that this claim was denied on the merits.  Respondent contends that the May 1, 2007 order specifically referenced, for some of the claims, the prior post-conviction hearing held on December 1, 2004.  Respondent contends that findings were made as to this claim at that hearing, but counsel for Hoffman requested that the court defer ruling on any claims to keep all of the claims in one writ application. (Rec. Doc. No. 19, p. 36 note 1).  Respondent contends that the transcript of that hearing shows that the trial court found that the motion to quash filed by Hoffman regarding this grand jury issue was later abandoned by Hoffman.  Respondent contends that the court found that it was marked satisfied meaning the defendant was not going to pursue that motion and therefore the claim would not be considered in the post-conviction proceedings. (Rec. Doc. No. 19, p. 37).

A federal habeas court will not consider the merits of a federal claim when the state courts denied the claim on the basis of a state procedural rule that is adequate to support the decision and independent of the merits of the claim. *See, e.g., Dretke v.*

*Haley*, 541 U.S. 386, 392 (2004). The state court record shows the trial court found the motion to quash was later abandoned and marked it satisfied. (State Record, Transcript of Dec. 1, 2004 hearing, pp. 24-26).

If the claim was not procedurally barred and only denied on the merits during state post conviction proceedings, then this claim would be analyzed under 28 U.S.C. § 2254(d), as petitioner contends that the state court decision was based on an unreasonable application of clearly established federal law of *Rose v. Mitchell,* 443 U.S. 545 (1979) and *Campbell v. Louisiana*, 523 U.S. 392 (1998).

Racial discrimination in the selection of grand jury forepersons violates the Equal Protection Clause, mandating the reversal of a criminal conviction and sentence. *Rose*, 443 U.S. at 551. Since *Rose,* the case law is clear that constitutional injury occurs whether the discriminatory exclusion affects the selection of the individual grand jurors or the selection of the foreperson from among the grand jurors. *Campbell*, 523 U.S. at 396-97.

To establish a prima facie case of discrimination for equal protection purposes, Petitioner must demonstrate: (1) that the group against whom discrimination is asserted is a distinct class, singled out for disparate treatment; (2) a significant degree of under-representation by comparing the proportion of the group in the total population to the proportion who serve as a foreman over a significant period of time; and (3) that the selection procedure is susceptible to abuse or us not racially neutral. *Rose*, 443 U.S. at 565. In regards to the first element Louisiana and federal courts have long recognized that African- Americans are a distinct class capable of being singled out for disparate treatment under the law. *Id.*; *Johnson v. Puckett*, 929 F.2d 1067 (5th Cir. 1991).

In regards to the second element petitioner provided statistics that only 1 of 51 (1.96%) grand jury forepersons spanning the period from 1971 to 1997 was African American in a population that consisted of over 11% African Americans with 8.71%

of qualified grand jurors being African American. (Rec. Doc. No. 1, p. 236). This difference of 6.75% (8.71% - 1.96%) does not surpass the 10% threshold set in *Alexander v. Louisiana*, 405 U.S. 625, 630, as sufficient to show a prima facie case of unconstitutional under-representation. See also, *United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980)(finding that the disparity offered by the defendant was less than 10% and therefore did "not make out a constitutional violation"); and *Mosley v. Dretke*, 370 F.3d 467 (5th Cir. 2004) (Disparity of 9.4% found insufficient to make out a prima facie equal protection violation under *Rose*).

However, when a "less than-10% minority" is at issue the Fifth Circuit has indicated that it does not believe "that the absolute disparity method is the sole means of establishing significant under-representation." *U.S. v. Butler*, 615 F.2d 685, 686. "If the distinctive group at issue makes up less than 10% of the population, comparative disparity <u>may</u> be used." *Mosely v. Dretke*, 370 F.3d 467 (5th Cir. 2004)(Emphasis Added).   The comparative disparity figure measures the diminished likelihood that members of an under represented group will be called for grand jury foreperson duty.  In this case the comparative disparity is measured at 77.5%, meaning blacks were 77.5% less likely to be called as a grand jury foreperson than if the process were truly random.  One Louisiana court of Appeals considers a comparative disparity of 40% as borderline to determine a prima facie case of significant under representation.  *State v. Kennedy* 823 So.2d 411 (La.App. 5 Cir. 2002) citing *Ramseur v. Beyer*, 983 F.2d 1215 (3rd Cir. 1992). However, in *State v. Langley*, 813 So.2d 356 (La. 2002) the Louisiana Supreme Court utilized the absolute disparity method in striking an indictment where the disparity ranged from 15.5% to 15.9%. Here, as noted earlier, the disparity is less than that in *Langley* and below the minimum standard as set forth in *Alexander v. Louisiana*, *supra*.  Under either rubric, Hoffman fails to show by clear and convincing evidence that the state court findings here are unreasonable or in conflict with clear federal constitutional

principles.

## Claim VIII- Prevention of Questioning of Prospective Jurors About Racial Bias

Petitioner contends that the state court violated the Petitioner's rights when it sustained the State's objection to defense counsel's attempts to question prospective jurors on the issue of race. (Rec. Doc. No. 1, p. 244).  Addressing the fourth panel of prospective jurors the defense counsel began:

> We are all frightened to death of crime, I would suppose. All of us are prejudiced against  crime are we not?  We are in a courtroom where we have got a young black man on trial for his life, for killing a young, attractive, white, female.  So if there are any prejudices that we might have – it's a very good chance that this will be an all white jury.

At this point the state objected and the objection was granted. Petitioner contends that granting this objection was a violation of his constitutional rights by the court.

Petitioner also contends that he was deprived the right to effective assistance of counsel when trial counsel failed to conduct adequate questioning of all perspective jurors about their racial prejudices. (Rec. Doc. No. 1, p. 245).  Petitioner contends that defense counsel was aware of the potential for racial animus because they filed a change of venue motion specifically for this reason. (Rec. Doc. No. 1, p. 246).  Petitioner admits to some race based questioning during voir dire by defense counsel but calls those efforts inconsistent and inadequate.  Petitioner claims that in total defense counsel asked only 19 of the 108 jurors examined during voir dire about their racial attitudes and this failure was not strategic of tactical. (Rec. Doc. No. 1, p. 247).  Petitioner claims that this led to a person with race-based animus, Mari Lower, seated as a juror.

Respondent contends that Petitioner is not entitled to an evidentiary hearing on this claim because there already was a post-conviction hearing and Hoffman made the choice to submit this claim without argument or evidence. (See Transcript of Hearing on Dec. 1 2004, p.7 & 43–44; Rec. Doc. No. 19, p. 246).  Respondent

also contends that Hoffman only cites a statement made by defense counsel to which the State objected and the court sustained. Respondent argues that Hoffman cites no questions posed to prospective jurors regarding racial prejudice which were not allowed by the court. (Rec. Doc. No. 19, p. 38). Respondent also contends that a review of voir dire proceedings reflects that prospective jurors were questioned about racial prejudice and these questions were allowed by the court.

First, Petitioner alleges that the trial court prevented his defense counsel from questioning prospective jurors about racial bias. "[A] capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. *Turner v. Murray,* 476 U.S. 28, 36–37 (1986). Where a defendant is deprived of this right, the only remedy is reversal of the death sentence. *Id.*

However, Petitioner only cites one statement made by defense counsel and no actual questions proposed to jurors which were not allowed by the trial court. The State and Petitioner both admit that some questioning of jurors about the issue of racial bias did occur and the Petitioner cannot provide an instance when a question about racial bias was not  allowed by the court. Therefore, Petitioner has failed to meet his burden under 28 U.S.C. § 2254 of proving an unreasonable application of the law or an unreasonable determination of the facts.

Second, Petitioner asserts that he received ineffective assistance of counsel because his counsel failed to ask racial questions during voir dire to all prospective jurors.   As previously stated in order to prevail on a claim of ineffective counsel, "the defendant must show that the counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. A defendant must also show that he was prejudiced by the attorney's unreasonable behavior.  *Id.*

" A fair assessment of attorney performance requires that

every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. "An attorney's performance generally carries with it a strong presumption of adequacy and is only deficient if it is objectively unreasonable." *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1996).

In this case defense counsel questioned some prospective jurors about racial bias in groups and then asked questions about race to individual jurors when answers to non-race based questions raised concerns about prejudice. "The attorney's actions during voir dire are considered to be a matter of trial strategy. A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995)(citations omitted).

Due to the extreme deference and strong presumption of adequacy given to the performance of an attorney, Petitioner has failed to carry his burden of proving the state court made an unreasonable application of clearly established federal law or an unreasonable determination of the facts as to this claim.

## Claim IX - Jury Verdict Allegedly Tainted by Racial Bias

Petitioner contends that at least one member of the jury, Mari Lower, harbored an overt race-based animus against Hoffman. Petitioner uses a declaration of Mari Lower to contend that race was irreparably injected into the consciousness of the jury when jurors discussed the possibility that the defense was playing the "race card" to "get him off" during the trial and the penalty phase and when jurors speculated about petitioner's drug use and gang membership based solely on his background. (Rec. Doc. No. 1, p. 254).

Petitioner contends that this was a violation of his

constitutional rights to an impartial jury, to equal protection of the law, and to a reliable capital sentencing hearing. Petitioner mentions that because the bias of a juror will rarely be admitted by the juror himself, the courts recognize that bias "necessarily must be inferred from surrounding facts and circumstances." *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 558 (1984). Therefore, Petitioner contends that he need not demonstrate an express admission of discriminatory intent it can be inferred from the juror's words.

Alternatively, Petitioner contends that even if this court does not find actual or implied bias, intentional discrimination, or an unacceptable risk that racism contributed to his death sentence to warrant automatic reversal, Petitioner's conviction should be reversed in any event because he can demonstrate under the general standards for jury misconduct claims that Mari Lower's racial prejudices resulted in the "actual bias" of one or more jurors.

*Phillips*, 455 U.S. at 217 (1982). Petitioners claim that the statements of Mari Lower prevented the jurors from viewing the evidence and conduct of the trial impartially and objectively because it created mistrust of petitioners entire defense and caused the jury to abandon the court's instructions to follow the law.

Respondent contends that the affidavits and purported statements by members of the jury are inadmissible according to Louisiana Code of Evidence art. 606 and Federal Rule of Evidence 606 which provide:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether

extraneous prejudicial information was improperly brought
to the jury's attention. Nor may his affidavit or
evidence of any statement by him concerning a matter
about which he would be precluded from testifying be
received for these purposes. FED. R. EVID. 606.

Federal Rule of Evidence 606 has been applied to capital
habeas proceedings. *See Villegas v. Quarterman*, 274 Fed.Appx. 378
(5th Cir. 2008), (rejecting the affidavits of two jury members and
holding that Rule 606 of the Federal Rules of Evidence prohibits
the use of such evidence to determine the effect any particular
thing might have had on the outcome of a verdict).

In this case the declaration of Mari Lower should be
inadmissable under Federal Rule of Evidence 606. The evidence at
issue is merely one juror's statement about the alleged thoughts
and discussions of the jury. This declaration does not fall into
the exception provided in Federal Rule of Evidence 606 that "a
juror may testify on the question whether any outside influence was
improperly brought to bear upon any juror, and, in criminal cases
only, whether extraneous prejudicial information was improperly
brought to the jury's attention." Petitioner claims racial bias
but does not claim any outside influence of extraneous information
improperly brought to the jury's attention.

## Claim X- State's Decision as to Venue was Tainted By Racism

Petitioner contends that his constitutional rights to Equal
Protection were violated when the State decided to prosecute him in
St. Tammany Parish, rather than Orleans Parish despite both
parishes having jurisdiction and venue over the offense. (Rec. Doc.
No. 1, p. 270). Petitioner contends that the trial court was wrong
to deny the motion to change the venue. At the hearing on this
motion Petitioner called an expert to establish the demographics of
both parishes showing that substantially fewer African Americans
live in St. Tammany. The expert also established the fact that
David Duke, the previous grand wizard of the Ku Klux Klan, won 44%
of St. Tammany voters in the 1991 governor election.

Petitioner also contends that the state's asserted race neutral reasons were pre-textual and do not withstand scrutiny. (Rec. Doc. No. 1, p. 272). The State said that St. Tammany was chosen because the murder occurred in that parish, but Petitioner contends that this reason is undermined by other cases in the same judicial district being tried in a different venue than where the murder took place. Petitioner contends that the State's suggestion that all of the investigation occurred in St. Tammany is untrue because the collection of ATM records and camera footage, investigations at the Sheraton parking garage, interviews of work colleagues, searches of Hoffman's family members' residences, execution of a rape kit on Petitioner, interrogation of Petitioner, and the finding of the victim's car all occurred in Orleans Parish.

Petitioner also contends that most of the State's trial witnesses were not from St. Tammany because of the twenty-four witnesses the State called at trial only nine were from St. Tammany. (Rec. Doc. No. 1, p. 273). Petitioner again alleges that other evidence of discriminatory intent exists such as the racially charged crime from the outset, the history of racism in St. Tammany parish, the construction of the case by prosecutors appealing to an all white jury, and the exclusion of African American jurors. (Rec. Doc. No. 1, p. 275).

Respondent contends that the conclusion of racial motivation is unsound. Respondent contends that other cases cited by Petitioner which were prosecuted in a parish other than where the murder occurred were all cases in which District Attorney Walter Reed was not interested in passing along to other jurisdictions criminal prosecutions which could be pursued in his district. Respondent contends that those cases needed to be tried in the districts chosen in order for District Attorney Reed to have jurisdiction. Respondent contends that the District Attorney is interested in bringing all criminals to justice that commit crimes in his district. (Rec. Doc. No. 19, p. 44).

Respondent also contends that Petitioner overlooks the fact

that the murder scene was in St. Tammany Parish and despite investigation in Orleans most of the investigation occurred at the murder scene.  (Rec. Doc. No. 19, p. 44).

The United States Supreme Court has repeatedly stated that prosecutorial discretion cannot be exercised on the basis of race. *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Batchelder*, 442 U.S. 114 (1979); *Oyler v. Boles*, 368 U.S. 448 (1962).  The state district court ruled on this claim when it was raised prior to trial, and again denied the claim on the merits during post conviction proceedings.  Petitioner argues under 28 U.S.C. §2254(d) that the state court's decision is an unreasonable determination of the facts and an unreasonable application of clearly established law.

However, St. Tammany Parish clearly was a place of proper venue as the most heinous crimes of rape and murder were committed in that parish. Hoffman's claim here fails.

## Claim XI- Crime Scene Visit  by Jurors as  Violation of Petitioner's Constitutional Rights

Despite objections of the defense the court granted the State's motion for a jury crime scene visit during the guilt phase of the trial.  The proceeding was meant to be no more than a silent viewing of the scene and the court instructed the jurors to refrain from any comments or discussions.  (Rec. Doc. No. 1, p. 280). After instructions the remainder of the crime scene visit was not recorded and Petitioner contends that until recently he did not know what happened at the scene.  Petitioner contends that evidence obtained during post conviction proceedings shows numerous constitutional errors and procedural violations.

Petitioner relies on the testimony of the jury foreperson and trial counsel to prove that Petitioner was not physically present at the crime scene when the jury viewed it but remained at the top of the path.  (Rec. Doc. No. 1, p. 282).  Petitioner contends that the right to be present cannot always be met constructively by the presence of defense counsel and even so

defense counsel were not actually present at all times either. (Rec. Doc. No. 1, p. 283-84).

Petitioner also contends that extraneous influences compromised Petitioner's rights to a fair trial. Petitioner contends that during the trial jurors were allowed to ask questions of the prosecutors and police present at the crime scene and the prosecution pointed things out to the jury against the initial instructions of the court. (Rec. Doc. No. 1, p. 284). Petitioner contends that these extraneous influences were worse than extraneous influences from other cases since these occurred during a crime scene visit which was still considered "in court" giving these extraneous influences the appearance of legitimate evidence sanctioned by the court. (Rec. Doc. No. 1, p. 285).

Petitioner also contends that the jury engaged in premature deliberations at the crime scene violating Petitioner's right to a fair trial. (Rec. Doc. No. 1, p. 286). Finally, Petitioner contends that the failure to provide a proper transcript of the crime scene visit violates Due Process. (Rec. Doc. No. 1, p. 287). Petitioner contends that the court reporter attended the crime scene with the jury but the crucial periods where the jury walked to view the scene were off the record. (Rec. Doc. No. 1, p. 288). Petitioner also alleges that numerous unknown violations could have occurred since part of the proceedings were not recorded. (Rec. Doc. No. 1, p. 289). Alternatively Petitioner alleges an ineffective assistance of counsel claim because defense counsel failed to object to any of the above violations.

Again Respondent cites Louisiana Code of Evidence art. 606 and Federal Rule of Evidence 606 to object to the use of alleged juror statements regarding the crime scene visit and their thoughts about it. (Rec. Doc. No. 19, p. 46). Respondent contends that the state court found that Hoffman attended the crime scene visit with both of his counsel and that his only complaint was his location during the visit. (Rec. Doc. No. 19, p. 47). Respondent also mentions that the trial court instructed the jury that there would be no

-41-

talking and no questions during the visit.

The state district court denied this claim on the merits, so 28 U.S.C. § 2254(d) applies.  As discussed above, the alleged juror statements should not be allowed under Federal Rule of Evidence 606 at least when asking the significance of the crime scene visit to the jury's verdict.  However, declarations making allegations of outside extraneous influences would be allowed under the exception provided in Federal Rule of Evidence 606 that "a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention."

Petitioner argues under 28 U.S.C. § 2254 that the state court decision constitutes an unreasonable application of the law, and an unreasonable determination of the facts.  Petitioner cites *Snyder v. Massachusetts,* 291 U.S. 97 (1934) to argue that the state court decision was an unreasonable application of the law.  However, *Snyder* is distinguishable because in that case the defendant was not allowed at the crime scene but in this case Hoffman was present. Petitioner also argues an unreasonable determination of the facts under § 2254 but has not disproven the state court findings by clear and convincing evidence.  The state district court denied this claim on the merits  because the court was present at the crime scene visit, the court instructed the jurors not to talk or ask questions, and Petitioner and defense counsel were allowed to be present.

### Claim XII- Jury Misconduct

Petitioner contends that his constitutional rights to a fair and impartial jury and to a reliable sentencing hearing free from arbitrary factors were violated when the jury engaged in numerous acts of misconduct. (Rec. Doc. No. 1, p. 292).  Specifically, Petitioner contends that the jury engaged in premature deliberations at both the guilt and sentencing  phases of the trial.  Petitioner uses a declaration of the jury foreman to argue

that some of the jurors discussed the trial at lunch and also
mentions that the foreman heard a technical discussion about guns
between a juror and an alternate juror, and argues that this
discussion corresponded to evidence at trial. (Rec. Doc. No. 1, p.
294).  Next petitioner mentions the alleged discussions between
jurors during the crime scene visit and alleged discussion about
how Hoffman was using the "race card" as discussed in previous
claims. (Rec. Doc. No. 1, p. 295).

Petitioner acknowledges that the Fifth Circuit has held that
a Petitioner in habeas cases must demonstrate the higher standard
of harm under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), that
the juror misconduct had a "substantial and injurious effect or
influence in determining the jury's verdict."  Petitioner contends
that the jury misconduct in this case does meet that standard.
(Rec. Doc. No. 1, p. 298).

Petitioner also contends that the jury did not ignore the
courts discussion of the power of the governor to grant a reprieve
or pardon despite the court instructing the jury to ignore these
powers in making their sentencing decision. (Rec. Doc. No. 1, p.
298).  Petitioner cites declarations of several jury members saying
that the possibility that the prisoner might be released was a
concern and Petitioner contends that it was impermissible to
consider this extrinsic evidence during sentencing and that this
misconduct was prejudicial.

Petitioner then contends that the jury improperly speculated
during the penalty phase of the trial that Petitioner used drugs or
was a member of a gang despite no evidence of either being
presented at trial. (Rec. Doc. No. 1, p. 301).  Petitioner contends
that evidence of past criminal activity or gang affiliation is
usually subject to strict procedures to determine its reliability
and relevance before it is admitted for consideration at a penalty
phase.  (Rec. Doc. No. 1, p. 302-03).

Again Respondent cites Louisiana Code of Evidence art. 606 and
Federal Rule of Evidence 606 to object to the use of the alleged

juror statements if used to determine what factors influenced the jury decision.  In regard to the parole issues, Respondent contends that the jury was properly instructed as to the law regarding the powers of the governor to commute prisoner sentences. In regard to the criminal record and drug use issues Respondent contends that the juror statement used by the Petitioner merely says that they "wondered" about this, not that it bore upon their decision or that they actually received any extraneous information about these topics. (Rec. Doc. No. 19, p. 48).   In regards to the gun discussion, Respondent contends that there is nothing to suggest that it was a discussion about the gun evidence in this case, or anything more than a general gun discussion. (Rec. Doc. No. 19, p. 48).

The state district court denied this claim on the merits, so 28 U.S.C. § 2254(d) applies.  As discussed above the alleged juror statements should not be allowed under Federal Rule of Evidence 606 at least when asking the significance of the crime scene visit to the jury's verdict.  Petitioner argues under 28 U.S.C. § 2254 that the state court decision constitutes an unreasonable application of the law, and an unreasonable determination of the facts.

Petitioner has not disproven the state court findings of no jury misconduct by clear and convincing evidence.  The court's instructions were proper regarding the parole and commutation issues and there is not clear and convincing evidence that these instructions were not followed.  As to the drug use and gang affiliation claims, the jury only wondered about this issue, but without any evidence about drug use or gang affiliation presented at trial, it is mere speculation that this information actually bore on the jury decision.  As to the gun discussion claim, Petitioner has not shown anything more than a general discussion about guns during lunch.  Therefore, as to all allegations of jury misconduct, Petitioner has not proven with clear and convincing evidence that the alleged juror misconduct had a "substantial and injurious effect or influence in determining the jury's verdict."

-44-

*Brecht*, 507 U.S. at 637.

## Claim XIII- Change of Venue Motion

Petitioner contends that prior to trial he sought a change of venue on the ground that prejudicial and inflammatory media coverage and general prejudice in the community precluded him from receiving a fair trial in St. Tammany Parish. Petitioner contends that his arrest and trial riveted the public and engendered extensive media coverage. Petitioner contends District Attorney Walter Reed attempted to use Mr. Hoffman's position as an outsider because of his race and hometown in an effort to engender fear. (Rec. Doc. No. 1, p. 306). Petitioner uses the District Attorney's statement that he would "seek and ask for the death penalty" so as to "issue a strong statement to the criminal element of New Orleans that we will not tolerate this type of victimizations of our citizens in St. Tammany Parish," as proof of this strategy. (Rec. Doc. No. 1, p. 306).

Petitioner contends that the extensiveness of the media coverage of the case was confirmed during voir dire because 80% of the prospective jurors indicated they were familiar with the facts of the case. (Rec. Doc. No. 1, p. 307). Petitioner then mentions that even the Louisiana Supreme Court recognized the extensiveness of the media coverage, "[t]he widespread publicity and community outrage generated by the crime is not disputed." *Hoffman*, 768 So.2d at 553. (Rec. Doc. No. 1, p. 308). Petitioner contends that Given this evidence of prejudicial pretrial publicity the court's denial of the motion for change of venue violated Petitioner's constitutional rights.

Respondent contends that this issue was addressed in detail by the Louisiana Supreme Court in the direct appeal by Hoffman, and its factual findings are subject to great deference. Therefore, Hoffman bears the burden of proving the factual findings incorrect. (Rec. Doc. No. 19, p. 44). Respondent mentions that the court found that much of the media coverage also focused on other crimes which happened in the area during this time frame and was

emphasizing the amount of crime affecting this city as a whole. *Hoffman*, 768 So.2d at 554. (Rec. Doc. No. 19, p. 45). The court also noted that media coverage of the offense in Orleans Parish was just as extensive and enraged New Orleans citizens marched on City Hall demanding safe streets. *Id.* The court held that moving the trial to New Orleans to escape pre trial publicity was a "ludicrous proposition" because many of the articles and news broadcasts at issue were New Orleans television stations or newspapers circulated in New Orleans. *Id.* at 555; (Rec. Doc. No. 19, p. 45).

Respondent also mentions that the Louisiana Supreme Court agreed with the trial court's reasons for denying the motion because most of the jurors knew only the basic facts surrounding the case rather than specific details, and none of the prospective jurors recalled any statements by St. Tammany officials. *Id.* at 553; (Rec. Doc. No. 19, p. 45).

Petitioner claims that the state court's decision was contrary to and an unreasonable application of clearly established law because it relied *solely* on an analysis of actual prejudice which is not a "prerequisite to reversal." *Estes v. Texas,* 381 U.S. 532, 542 (1965). However, Petitioner has not proven that actual prejudice was the only factor considered by the trial court in denying the change of venue request. While the Louisiana Supreme Court felt the need to discuss actual prejudice in detail on appeal, it did mention the general standard of La. Code Crim. Proc. art 622 which reads, "A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending." There is nothing to suggest this standard was not followed.

Moreover, "[t]he trial court is necessarily the first and best judge of community sentiment and the indifference of the prospective juror. Appellate courts, especially on collateral attack, will interfere only upon a showing of manifest probability

of prejudice." *Bishop v. Wainwright*, 511 F.2d 664, 666 (5th Cir.1975).

Petitioner also claims an unreasonable application of the law and an unreasonable determination of the facts. However, Petitioner has not proven by clear and convincing evidence that the state court's findings were incorrect or violative of federal constitutional laws.

## Claim XIV- Execution of Mentally Ill Offenders

Petitioner contends that his death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment because he is mentally ill. Petitioner uses *Atkins v. Virginia*, 536 U.S. 304, 321, in which the Court prohibited the execution of individuals with mental retardation to argue that the execution of mentally ill offenders would be unconstitutional as well. Petitioner also mentions that two state court justices have opined that the rationale of *Atkins* likewise precludes the execution of severely mentally ill offenders. See *Corcoran v. State*, 774 N.E.2d 495 (Ind.
2007) (Rucker, J., dissenting); *State v. Nelson*, 803 A.2d 1, 47 (N.J. 2002) (Zappala, J., concurring). (Rec. Doc. No. 1, p. 313).

Petitioner then contends that while not legally insane under Louisiana's insanity statute, his post traumatic stress disorder and psychosis caused him to be volitionally incapacitated during the crime. (Rec. Doc. No. 1, p. 316). Petitioner then attempts to apply the framework from *Atkins* to mentally ill offenders by producing evidence of the community rejecting the execution mentally ill offenders in the form of legislative enactments, jury verdicts, and opinions of organizations that have closely examined the issue. (Rec. Doc. No. 1, p. 318-23). Petitioner then analyzes the moral culpability of those who cannot conform their conduct due to mental illness (Rec. Doc. No. 1, p. 323-24), and demonstrates that there is a heightened risk of wrongful execution due to severe mental illness (Rec. Doc. No. 1, p. 324).

Respondent emphasizes that Petitioner admits that he is not legally insane under Louisiana's insanity statute. Respondent also argues against de no review of the claim because Petitioner chose to submit this claim without submitting further evidence at the hearing on December 1, 2004. (Rec. Doc. No. 19, p. 49). Respondent discusses La. R.S. 15:567.1 which states that a person is not competent to proceed to  execution when  he presently lacks the competence to understand he is to be executed and the reason he is to suffer the penalty.  The statute also provides a procedure to allege and prove such incompetency.  Respondent argues that this claim is premature because Hoffman has not yet exhausted the state law remedies provided in the statute.

The Fifth Circuit has already rejected an extension of *Atkins* to the mentally ill unless the Petitioner contends he is insane and therefore incompetent to be executed. *See ShisInday v. Quarterman*, 511 f.3d 514, 521 (5th Cir. 2007)(distinguishing a person who is mentally ill from a person who is insane).  Also, the claim is premature at this time because incompetency claims as a general matter are not ripe until after the time has run to file a first habeas petition. *Panetti v. Quarterman*, 511 U.S. 930, 947 (2007). *See also Stewart v. Martinez-Villareal*, 523 U.S. 637, 644–45 (1998) ("[R]espondent's *Ford* claim was dismissed as premature, not because he had not exhausted state remedies, but because his execution was not imminent and therefore his competency to be executed could not be determined at that time."). Therefore this claim is dismissed without prejudice.

**Claim XV Trial Court's Improper Response to Jury Question**

Petitioner contends that during penalty phase deliberations the jury sent the court a question: "If Jessie Hoffman had any kind of record, would the State have had access to it and would we have been made aware of it?"  Over objection from defense counsel the Court sent a written response stating only that the question could not be answered.  On direct appeal Petitioner argued that the jury's question clearly demonstrated that jurors during

deliberations, (1) were skeptical about the uncontroverted mitigating evidence that Mr. Hoffman had no prior history, (2) were turning the mitigating factor of youth on its head and perceiving it to be aggravating, (3) were speculating that special rules governed the ability to disclose a juvenile record. (Rec. Doc. No. 1, p. 326).

Petitioner contends that the trial court's response that it could not answer the  question did nothing  to curtail the jury's speculation about the existence of a juvenile record and implied the existence of a juvenile record. (Rec. Doc. No. 1, p. 326). Petitioner contends the trial court should have responded that prosecution could have discovered Mr. Hoffman's records if they existed. (Rec. Doc. No. 1, p. 326).

Petitioner cites *Simmons v. South Carolina*, 512 U.S. 154 to support his argument. In *Simmons,* the jury sent a note asking whether the imposition of a life sentence carried with it the possibility of parole and the trial court responded that the jury was not to consider parole or parole eligibility in reaching a verdict. *Id. at 160.* The Court held prosecution secured a death sentence on the ground, at least in part, of Petitioner's future dangerousness, while at the same time concealing from the sentencing jury that the Petitioner was not eligible for parole. *Id.* at 171. The Court concluded that this "false dilemma" between execution or possibly allowing the Petitioner to someday be released denied petitioner due process. *Id.*

Petitioner contends that jury instructions should have included that Mr. Hoffman's lack of criminal history had been established by the uncontroverted evidence, or at least that the jurors have heard all of the evidence and must base their decision solely on the evidence before them. (Rec. Doc. No. 1, p. 331).

Second Petitioner contends that a mitigating circumstance, youth was turned into an aggravating circumstance, a prior criminal record by the trial court's refusal to answer the jury question. Third, Petitioner claims ineffective assistance of counsel because

defense counsel failed to move for a mistrial despite being on notice through the jury's question to the judge that the jurors were violating the court's instructions by considering youth in an aggravating way and impermissibly speculating about matters extraneous to evidence presented at trial.  Petitioner also claims that counsel should have requested an evidentiary hearing in order to determine if jury misconduct had taken place. (Rec. Doc. No. 1, p. 335).

To the extent Hoffman seeks to rely on statements from jurors Respondent again cites Louisiana Code of Evidence art. 606 and Federal Rule of Evidence 606 to object to the use of the alleged juror statements.  Respondent then argues that the Louisiana Supreme Court found on this issue that both the State and the defense emphasized Hoffman's clean criminal history. (Rec Doc. No. 19, p. 51).

Respondent disagrees with Hoffman's characterization that this question turned youth into an aggravating circumstance, and respondent points out that the question asks if he had "any kind of record" but does not mention youth or juvenile.  Respondent contends that the mere fact that the jury asked this question does not prove that the mitigating circumstances of youth and lack of a criminal record were not considered. (Rec. Doc. No. 19, p. 51).

This claim was denied on the merits, so 28 U.S.C. §2254 applies. Petitioner contends that the state court decision was contrary to clearly established federal law in *Simmons.*  However, the Louisiana Supreme Court correctly differentiated this case from *Simmons* because there the court's actions had the effect of creating a false choice between sentencing the petitioner to death and sentencing him to a limited period of incarceration, but in this case there was no  false choice in light of the previous mitigating circumstances, jury instructions, and both sides emphasizing Hoffman's clean criminal history. *Hoffman*, 768 So. 2d at 571.

Petitioner also contends that the state court decision is

contrary to established federal law in *Penry v. Lynaugh*, 492 U.S. 302 (1989). In *Penry* the Supreme Court set out the definition of what constitutes consideration of a mitigating circumstance, and Petitioner contends that the Louisiana Supreme Court used a contrary definition of "consideration." Petitioner contends that the Court in *Penry* required the jury "to consider and give effect to any mitigating evidence." *Id.* at 327-28. Petitioner argues that the Louisiana Supreme Court merely required the jury to consider mitigating factors. However, this claim is baseless because there is no clear and convincing evidence that the jurors did not "consider and give effect" to mitigating factors.

Petitioner claims ineffective assistance of counsel when the defense did not move for a mistrial, but Petitioner has failed to prove that defense counsel failed to meet the objective standard of reasonableness under *Strickland*, 466 U.S. at 688.

## Claim XVI- Juror Should Have Been Excluded For Cause

Petitioner contends that the trial court violated his constitutional rights when it allowed Ms. Lower to serve on the jury even though she had unequivocally stated that she would not consider the statutory mandated mitigating circumstances of youth or lack of a criminal record. Petitioner use Ms. Lower's answers in individual questioning when asked about considering mitigating circumstances that she would make her decision based on the facts of the case as proof she would not consider mitigating circumstances. (Rec. Doc. No. 1, p. 337-38). Petitioner then uses further questioning on mitigating circumstances to argue that Ms. Lower had an erroneous conception of mitigating circumstances as facts that would actually bar conviction for first degree murder altogether. (Rec. Doc. No. 1, p. 338).

Petitioner also claims ineffective assistance of counsel because defense counsel did not challenge Ms. Lower for cause, or exercise a peremptory strike against her. (Rec. Doc. No. 1, p. 340). Petitioner contends that even if the court had denied a challenge for cause made by counsel, the error would have been

preserved and pursued on appeal.

Respondent contends that the Petitioner mischaracterizes and does not include the entirety of Ms. Lower's statements during voir dire. Respondent contends that when Ms. Lower said she would make her decision based on the facts of the case she was referring to the guilt phase, and once it was explained by the defense that they were asking about the sentencing phase Ms. Lower said she would consider mitigating circumstances. Respondent emphasizes that this explanation was consistent with the finding of the Louisiana Supreme Court on this issue. (Rec. Doc. No. 19, p. 52).

Respondent also disagrees with Petitioner's ineffective counsel argument that "even if the court had denied a challenge for cause made by counsel, the error would have been preserved and pursued on appeal." Respondent argues that this statement ignores the fact that this issue was addressed on appeal by the Louisiana Supreme Court anyway. (Rec. Doc. No. 19, p. 53).

The state district court denied this claim on the merits, so 28 U.S.C. § 2254 applies. Petitioner argues under 28 U.S.C. § 2254 that the state court decision constitutes an unreasonable application of the law, and an unreasonable determination of the facts. However, Petitioner has not shown that the Louisiana Supreme Court's factual findings that Mr. Lower would consider mitigating circumstances, and would not automatically impose the death penalty are incorrect. Also, Petitioner has not provided clear and convincing evidence that the Louisiana Supreme Court's findings of adequate representation by counsel were incorrect or unreasonable interpretations of clear federal law.

**Claim XVII Short Form Indictment**

Petitioner contends that the indictment failed to charge both aggravating circumstances under La. R.S. 14:30 (circumstances necessary for a conviction for first degree murder) or the statutory aggravators under La.C.Cr.P. art 950.4 (circumstances necessary for a sentence of death). (Rec. Doc. No. 1, p. 344).

Respondent contends that de novo review is not appropriate for

this claim because Hoffman elected to submit this claim without submitting further evidence at the hearing on December 1, 2004. (Rec.Doc. No. 19, p. 54).

"[T]he sufficiency of a state indictment is not a matter for federal habeas corpus review unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction." *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). Hoffman cites *Ring v. Arizona*, 536 U.S. 584 (2002) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) for the proposition that a sentencing judge sitting without a jury does not have the authority to find an aggravating circumstance necessary for the death penalty.  However, the denial of this claim by the state courts is not contrary to or an unreasonable application of clearly established federal law because the Supreme Court has yet to hold that aggravating factors must be charged in the indictment. *United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir.2005).

## Claim XVIII Combination of Errors

Petitioner contends that when viewed as a whole the procedural and substantive errors combine to infect the trial and sentencing process with fundamental unfairness in violation of the Sixth Eighth and Fourteenth Amendments. (Rec.  Doc. No. 1, p. 348). Petitioner then lists his alleged errors of ineffective assistance of counsel at the guilt and sentencing stage, failure by the prosecution to disclose exculpatory evidence, numerous counts of jury misconduct, pretrial publicity and community prejudice, prosecutorial misconduct, inadequate instructions, and racism.

Respondent contends that as discussed above the claims of Hoffman are all without merit, and accordingly there is no accumulation of errors.

Since each individual claim has been denied, the instant claim based upon a combination of errors is dismissed.

## Claim XIX Right to Fair Clemency Process

Petitioner contends that his right to a fair clemency process

have been arbitrarily denied by Louisiana's clemency system. Petitioner emphasizes the importance of the clemency process because it operates late in the day after the judicial process has finished as a final "fail safe". Petitioner contends that the Louisiana clemency system fails to meet the minimal requirements of due process because: (1) it requires death row inmates to file an application within one  year of direct appeal, (2) it requires statements of all witness in favor of a condemned inmate to be made public but statements opposed to be keep private, (3) it does not guarantee a clemency hearing and provides no opportunity to be heard and argue for one, (4) it restricts evidence allowed in the application, and (5) it restricts the number of witnesses that may testify at a hearing.

Respondent once again disputes the availability of de novo review because Respondent contends that Petitioner elected to submit this claim without submitting further evidence at the hearing on December 1, 2004.

The Fifth Circuit rejected a similar argument attacking Louisiana's clemency process, alleging lack of due process. In *Sepulvado v. Louisiana Bd. of Pardons and Parole*, 171 Fed.Appx. 470 (5th Cir. 2006), petitioner sought to distinguish Louisiana's clemency procedure from those in other States, claiming, because Louisiana law does not guarantee a clemency hearing, its procedure falls below the minimum due-process threshold. *Id.* The Court noted that other cases do not establish specific requirements States must follow. *Id.*

## Claim XX Lethal Injection as Cruel and Unusual Punishment

Petitioner contends that the lethal injection execution method as currently administered in Louisiana creates a substantial risk or serious, unnecessary pain. Petitioner compares the Louisiana execution protocol to the execution protocol from Kentucky upheld as constitutional in *Baze v. Rees*, 535 U.S. 35 (2008). Petitioner uses many differences from that protocol to argue that the Louisiana execution method should be unconstitutional. (Rec. Doc.

No. 1, p. 357). Specifically the Louisiana protocol does not specify the particular chemicals and dosages to be used, who will be administering the injections, how to avoid occlusion of the IV lines, procedures to be followed in the event of an emergency, or training sessions before the actual execution.

Respondent once again disputes the availability of de novo review because Respondent contends that Petitioner elected to submit this claim without submitting further evidence at the hearing on December 1, 2004. Respondent also contends that Petitioner has failed to cite a case clearly establishing the unconstitutionality of Louisiana's procedure.

The Supreme Court has upheld the method of lethal injections as constitutional and has not otherwise provided specific guidelines that must be followed. *Baze,* 535 U.S. 35. Therefore, the Louisiana procedure which provides ample safeguards such as IV technicians and warden supervision is constitutional under prevailing federal law, as established by the U.S. Supreme Court.

New Orleans, Louisiana, this 29th day of March, 2012.

UNITED STATES DISTRICT JUDGE