IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

JESSIE HOFFMAN, #400473,

       Petitioner

                                      NO. 09-3041

v.

                                      SECTION "B"

DARRYL VANNOY,

       Louisiana State Penitentiary,

       Angola, Louisiana,              **EXECUTION SCHEDULED

       Respondent                  MARCH 18, 2025**

## PETITIONER'S MEMORANDUM IN SUPPORT OF MOTION TO REOPEN THE JUDGMENT PURSUANT TO FED. R. CIV. P. 60(b)(6)

COMES NOW Petitioner Jessie Hoffman, by and through undersigned counsel, who respectfully requests that this Court reopen his habeas proceedings pursuant to Federal Rule of Civil Procedure 60(b)(6), due to extraordinary circumstances triggered by the intervening Supreme Court decisions in *Smith v. Arizona*, 602 U.S. 779 (2024), and *Andrew v. White*, 145 S.Ct. 75 (2025), which together support Mr. Hoffman's request for relief at this time pursuant to *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), and *Buck v. Davis*, 580 U.S. 100 (2017), decisions unreasonably applied by the Louisiana Supreme Court's decision in *State v. Hoffman*, 326 So. 3d 232, 238 (La 2021). Together, these decisions demonstrate a "defect in the integrity of the federal habeas proceeding"—this Court's previous order denying Mr. Hoffman an evidentiary hearing on his claim that one or more jurors voted to impose his death sentence on the basis of racial bias— and provide compelling grounds for this Court to reopen Mr. Hoffman's habeas proceedings to allow him to prove this claim. *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005).

1

## INTRODUCTION

Despite undisputed evidence presented at trial that 18-year-old Jessie Hoffman did not have a criminal record or history of violence or gang affiliation, the all-white jury that sentenced him to death asked the judge during penalty-phase deliberations, "If Jesse Hoffman had any kind of juvenile record, would the State have had access to it and would we have been made aware of it?" TR. 4543 (state court record on appeal). Over defense objection, the trial court responded, "This question can not be answered," TR. 4543, a response that likely validated the jurors' concerns. The trial record does not indicate what prompted the jury's question, given that "both the State and the defense emphasized the defendant's clean criminal history." *State v. Hoffman*, 98-3118 (La. 04/11/00), 768 So. 2d 542, 571 (La. 2000). The reason—the invidious racist views of one or more jurors—would not come to light until years later when Mr. Hoffman's legal team interviewed jurors in connection with Mr. Hoffman's state postconviction case.

When interviewed, Juror Mari Lower revealed that jurors "wanted to know whether the defendant had a juvenile record" because "[w]e thought that given his background he may have a history of drugs and things like that" and "wondered if he was in a gang." *See* Exh. A Affidavit of Mari Lower, dated July 16, 2011, endorsing the accuracy of her attached declaration, dated September 23, 2003. Ms. Lower further disclosed that jurors also speculated about defense counsel's role in keeping black people off the jury "so they could play the race card and get [Mr. Hoffman] off later," and that jurors "thought it was a defense strategy to use [Mr. Hoffman's] race and background . . . as an excuse to try to make us feel sorry for him being a poor black man from the projects so he did not get the death penalty. Like O.J. Simpson using it to get off." *Id.* "This tactic did not surprise" Ms. Lower, as she had "seen that attitude before, with people using their background to justify whatever they can." *Id.*

Ms. Lower's signed declaration indicates that she and other members of the deliberating jury were preoccupied with race, which should have been an irrelevant concern in this case, and that "racial stereotypes or animus" influenced Ms. Lower, and possibly other jurors, in reaching their decision to impose the death penalty. Ms. Lower's declaration reflects that, instead of following the court's instructions to consider the aggravating and mitigating evidence, based solely on the evidence presented in court, she and other jurors engaged in rank speculation about Mr. Hoffman's non-existent history of criminality and violence, and discounted undisputed mitigating evidence of Mr. Hoffman's lack of a criminal history and impoverished background. If proven, these statements about the jury's sentencing process would establish serious constitutional flaws that fatally undermine the reliability and fairness of Mr. Hoffman's death sentence.

Contrary to these unfounded speculations based on racial stereotypes, Jessie Hoffman did not have a criminal record and, at age 18, was the first member of his family to graduate from high school and was the quarterback for his high school football team. As a result, those who knew him, including family members, coaches, friends and his girlfriend, struggled to understand what happened; it seemed unfathomable that Jessie Hoffman—a young, well-behaved, quiet, kind, withdrawn teenager who avoided conflict—went out one day and committed this horrible crime.

Mental health experts who have examined Mr. Hoffman since have concluded that he suffered from chronic trauma, as a result of extreme childhood abuse, which trauma resulted in extreme dissociative states and caused a particularly debilitating form of Post-Traumatic Stress Disorder (PTSD). It has become clear through the work of these mental health experts, and the reconstruction of the traumatic events that Mr. Hoffman experienced himself, that he killed Molly Elliott while in a dissociative state and engaged in compulsive, behavioral reenactment of his own traumatic experiences. While nothing can excuse Mr. Hoffman's acts that day, they can be, and

should have been, understood by the jury in this context and not in the context of improper racial stereotypes.

Given his non-existent history of criminality, violence or gang affiliation, Jessie Hoffman has, since his conviction and incarceration, worked hard to and succeeded in transforming himself for the better and is no longer the same person -- that traumatized teenager -- who took the life of Molly Elliott over 28 years ago. The Jessie Hoffman of today is a much loved and valued prisoner at Angola, whose kindness and humble integrity has touched many people both inside and outside of the prison. He is a loving father of a beloved son. He is rock for his siblings, who suffer ongoing consequences of their shared history of childhood abuse. And he is a much-respected leader among his fellow Death Row prisoners and a fellow spiritual seeker with others both within and outside the prison walls.

Mr. Hoffman's evolution and reformation have occurred over his years on Death Row during which he has thoughtfully and methodically addressed the history of trauma and psychiatric distress that overwhelmed him as an eighteen-year-old, and faced head on both those traumas and the damaging impact they had on him and his fateful decision to take the precious life of another human being in 1996. Moreover, Jessie Hoffman consistently has taken full responsibility and expressed deep remorse for his horrible crime as that young man. His is a story of redemption and reformation and human value – one that the all-white jury, which sentenced him to death on the apparent belief that a young, impoverished black man of the New Orleans projects must be a violent, gang-affiliated criminal who is not worthy of life, simply could not have contemplated.

Despite the *prima facie* evidence that Mr. Hoffman was sentenced to death on the impermissible basis of his race, the state courts refused to allow Mr. Hoffman the opportunity to prove his claim on the ground that any evidence would be inadmissible under Louisiana's rule no-

4

impeachment rule, La. C. Evid. 606(B). This Court followed suit, refusing to allow an evidentiary hearing because any evidence would not be admissible under Fed. R. Evid. 606(b).  Although, on appeal, Mr. Hoffman argued that this Court erred in denying an evidentiary hearing, the Fifth Circuit never addressed this claim.

Intervening decisions from the Supreme Court of the United States demonstrate the error of this Court's refusal to hold a hearing on whether race impermissibly influenced Mr. Hoffman's sentence, a defect in the proceedings properly corrected under Rule 60(b)(6). In *Pena-Rodriguez v. Colorado*, 580 U.S. 206 (2017), the Supreme Court held that evidence rules precluding the admission of juror testimony to impeach their verdict could not bar admission of testimony "showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id.* at 869. In *Buck v. Davis*, 580 U.S. 100 (2017), the Court held that the Fifth Circuit had erred in denying a certificate of appealability to review the district court's denial of the petitioner's Federal Rule of Civil Procedure Rule 60(b)(6) motion, that relief from judgment should have been granted, and that petitioner had proven that his trial attorney provided ineffective representation at sentencing by presenting expert testimony that petitioner's race made him more likely to be a future danger.

Together these cases demonstrate that this Court's denial of Mr. Hoffman's motion for an evidentiary hearing, predicated on the erroneous conclusion that such evidence was inadmissible, was in error and that, under Rule 60(b)(6), this Court has the authority and discretion to cure this defect in Mr. Hoffman's initial federal habeas proceedings.

In addition, the state courts misapplied these decisions when Mr. Hoffman returned to state court on the basis of these new decisions, again seeking an opportunity to prove that his death sentence resulted from the pernicious racist views of one or more jurors and, again, the courts

denied him this opportunity. The trial court dismissed the claim as previously adjudicated, but the Louisiana Supreme Court disagreed, instead denying relief on the ground that the racist views expressed in Ms. Lower's declaration were not so "egregious" as to warrant relief. That ruling was unreasonably wrong on the law and the facts.

Based on these extraordinary circumstances, Mr. Hoffman respectfully asks this Court to reopen his case to review this meritorious claim.

## I.  RELEVANT FACTS AND PROCEDURAL HISTORY
### A.  The Trial

On November 29, 1996, Mr. Hoffman was arrested for the murder of Mary Elliott the day before. Mr. Hoffman, a black youth, had turned eighteen just two months before the crime. A St. Tammany Parish grand jury indicted him for first degree murder, and the prosecution announced it would seek the death penalty. Jury selection in Mr. Hoffman's capital trial began on June 5, 1998. An all-white jury was seated six days later—after the prosecutor used peremptory challenges to remove the only two black jurors in the qualified pool. The guilt phase commenced on June 21, 1998, and concluded, on June 25, 1998, with the jury's verdict of guilty of first-degree murder. The sentencing hearing was conducted June 26-27, 1998.  After an hour and half of deliberations, the jury returned a sentence of death.

During trial, Mr. Hoffman's lack of a criminal history was the subject of uncontroverted testimony by both State and defense witnesses.  Alvaro Medina and Giovanni Molina, both State's witnesses, testified in the guilt phase that Petitioner had undergone a background check and drug testing prior to employment at the garage and that both checked out fine. Petitioner's lack of a criminal history was likewise the subject of testimony in the penalty phase by Elaine Saltzer, the defense psychologist, as well as members of Mr. Hoffman's family and his high school football

coach. Despite this uncontroverted evidence, during sentencing-phase deliberations, the jury sent the trial court the following question:

> If Jesse Hoffman had any kind of juvenile record, would the State have had access to it and would we have been made aware of it?

TR. 4543. Following an unrecorded bench conference conducted in Mr. Hoffman's absence, the trial court observed that defense counsel waived their client's presence, explained the jury's question, and decided, over objection, to send the jury a written response stating only, "This question can not be answered." The jury returned a sentence of death. TR. 4543.

On appeal, Mr. Hoffman challenged *inter alia* the trial court's response to the jury's question, arguing that it encouraged the jury to base its decision on rank speculation about matters outside the record and resulted in an unreliable death sentence in violation of the Eighth and Fourteenth Amendments. On April 11, 2000, the Louisiana Supreme Court affirmed the conviction and sentence. *State v. Hoffman*, 98-3118 (La. 04/11/00), 768 So. 2d 592, *cert. denied*, 531 U.S. 946 (2000).

### B. State Post-Conviction Proceedings

Mr. Hoffman sought post-conviction relief in state court pursuant to La.C.Crim.P. art. 924, *et seq.* During his investigation, he obtained a signed declaration, subsequently endorsed under oath, from one of the jurors who had voted to sentence him to death. Juror Lower's declaration stated in pertinent part:

- I watched him during the trial. . . .  Looking at him you could tell that he did this cold-blooded crime."

- "There were no black people on the jury. The defense made sure that there weren't any. From the start of trial I thought that was deliberate by the defense so they could play the face card and get him off later. I've heard about people getting off on technicalities like that before The jurors speculated about this during the trial.

- "We also thought it was a defense strategy to use his race and background in other ways. They obviously tried to use it as an excuse to try to make us feel sorry for him being a poor black man from the projects so he did not get the death penalty. Like O.J. Simpson using it to get of. This tactic did not surprise me. I've seen that attitude before with people using their background to justify whatever they can.

- "During the penalty phase deliberations we wanted to know whether the defendant had a juvenile record. We thought that given his background he may have a history of drugs and things like that. We wondered if he was in a gang. The judge told us we were not allowed to have that information."

Exh. A.

Mr. Hoffman presented Ms. Lower's declaration as *prima facie* evidence that his conviction and death sentence were tainted by the racial biases of one or more jurors. He alleged in his state habeas petition that he was denied his rights to a fair trial and reliable sentence under the Sixth, Eighth, and Fourteenth Amendments because one or more of his jurors based their decisions on the impermissible basis of race. He requested a hearing to present evidence proving his claim. The State, in turn, argued that Louisiana's jury-shield law, La.C.E. 606(B), barred the court from considering the evidence. *See Hoffman*, 326 So. 3d at 237 n.2. The state district court denied a hearing on the issue and summarily denied the claim without issuing reasons. *Id.* The Louisiana Supreme Court summarily denied Mr. Hoffman's application for a writ of review and the Supreme Court denied certiorari.

### C. Federal Habeas Proceedings

This Court granted Mr. Hoffman a certificate of appealability on, *inter alia*, the racist-juror claim and this Court's denial of an evidentiary hearing to prove it. Although Mr. Hoffman briefed both claims, the Fifth Circuit failed to consider the propriety of this Court's denial of an evidentiary hearing. The Fifth Circuit held that the state habeas court's summary denial of relief was not unreasonable and affirmed this Court's denial of the claim. *Hoffman v. Cain*, 752 F.3d 430, 450-51 (5th Cir. 2014).

8

### D. Successive State Post-Conviction Proceedings

In February 2019, Mr. Hoffman returned to state court, filing a second post-conviction petition in the state district court, raising several claims and requesting an evidentiary hearing to prove them. His first claim alleged that the Supreme Court's *Pena-Rodriguez* decision "makes plain that Mr. Hoffman's Sixth, Eighth, and Fourteenth Amendment rights were violated with the jury relied upon racially invidious stereotypes in arriving at its guilt and death verdicts."

The state district court denied the petition without first conducting a hearing. With respect to the claim that the racial bias of one or more jurors invalidated the conviction and/or death sentence, the court ruled that the issue had been thoroughly reviewed and denied in initial post-conviction proceedings. The Louisiana Supreme Court disagreed. The court noted that, when Mr. Hoffman first raised the claim, the state and federal "courts dismissed [it] by relying on no-impeachment rules." *Id.* at 237. It further observed that the Supreme Court's decisions in *Pena-Rodriguez* and *Buck* "render Hoffman's juror bias claim 'new or different' from the one he raised in the previous application." *Hoffman*, 326 So. 3d at 237. As the court observed, "[t]he no-impeachment rule rendered the previous claim virtually impossible to prove" but, under *Pena-Rodriguez*, "the issue now is whether the evidence supports removing the no-impeachment bar," rendering the claim "'new or different' for purposes of La.C.Cr.P. art. 930.4." *Id.* at 238. The district court, accordingly, "erred when it found the claim was previously litigated." *Id.*

The Louisiana Supreme Court nonetheless determined that the *Pena-Rodriguez* claim lacked merit and "warrant[ed] no further attention." *Id.* at 238.[1] It found that "the juror statements

---

[1] The Louisiana Supreme Court chose not to address whether *Pena-Rodriguez* applied retroactively, noting that, while three federal circuit courts had found that the decision did not apply to cases on collateral review, "[n]one of these decisions bind this Court." *Id.* at 238 and 238 n.4.

suggest they held beliefs that may have rested on racial stereotypes," but concluded the juror statements "were not nearly as 'egregious and unmistakable' as those presented in *Pena-Rodriguez*" and did "not amount to 'a clear statement that indicates [a juror] relied on racial stereotypes or animus to convict'" or "prove that 'racial animus was a significant motivating factor in the juror's vote' for the death sentence." *Id.* at 298 (quoting *Pena-Rodriguez*, 580 U.S. at 225-26).

The Louisiana Supreme Court's determinations that the *degree* of juror racism was not sufficiently "egregious" or that Ms. Lower's declaration did not amount to a "clear statement" of racial animus were unreasonable as a matter of fact and law. Indeed, as the *Buck* decision makes unmistakably clear, "[s]ome toxins can be deadly in small doses." *Buck*, 580 U.S. at 233 (addressing the harm of a defense expert's brief testimony that the defendant's race would likely contribute to his future dangerousness).

## ARGUMENT

This Court should exercise its discretion to reopen federal habeas proceedings to give Mr. Hoffman the opportunity to prove his case at an evidentiary hearing. Mr. Hoffman has raised a colorable claim that his death sentence was fatally tainted by the racist views of juror Mari Lower, and possible other jurors, in both state and federal habeas proceedings, but has never been allowed to prove the claim. This Court's previous denial of a hearing constitutes a defect in Mr. Hoffman's habeas proceedings which this Court has the discretion to correct. Rule 60(b) of the Federal Rules of Civil Procedure authorizes this Court to grant relief from judgment "for any . . . reason that justifies relief," Fed. R. Civ. P. 60(b)(6), although such relief "is available only in 'extraordinary circumstances,'" *Buck*, 580 U.S. at 123 (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005)). That high threshold is met in this case.

I.    **Juror Lower's Declaration Indicates that She and Possibly Other Jurors "Relied on Racial Stereotypes or Animus" in Voting to Impose the Death Penalty, a Perversion of the Justice System that, If Proven, Would Invalidate Mr. Hoffman's Death Sentence.**

Juror Lower's declaration reflects that she and other jurors speculated that the defense had orchestrated the all-white jury in order to "play the race card and get [Mr. Hoffman] off early," that the defense strategically used Mr. Hoffman's race "to try and make us feel sorry for him being a poor black man from the projects so he did not get the death penalty. Like O.J. Simpson using it to get off," and that "given [Mr. Hoffman's] background he may have a history of drugs and things" and they "wondered if he was in a gang." Jurors worried that, if Mr. Hoffman were not sentenced to death, he would one day get released and kill again.

These statements smack of racial bias and strongly suggest that "racial animus and stereotypes" influenced the sentencing decision of Ms. Lower and other jurors.[2] The comparison of Mr. Hoffman to O.J. Simpson and suggestion that, like Mr. Simpson, he was "play[ing] the race card" to escape responsibility was a particular pernicious stereotype at the time of Mr. Hoffman's arrest and trial in the late 90's, which was amplified by O.J. Simpson's acquittal.

The declaration further shows that jurors, without any evidence apart from the color of Mr. Hoffman's skin and his childhood in New Orleans' projects, discredited uncontroverted testimony from both parties about his lack of a criminal history and speculated that he in fact had a juvenile record. This too was the result of a pernicious stereotypes about the dangerous and criminal

---

[2] The declaration explicitly mentions race multiple times, an indication that race was on the minds of Ms. Lower and other jurors during the deliberations she described. *See, e.g., Foster v. Chatman*, 578 U.S. 488, 514 (2016) (finding prosecution voir notes that repeatedly referenced race of jurors "plainly demonstrate[d]" race discrimination in exercise of peremptory strikes); *Miller-El v. Dretke*, 545 U.S. 231, 264-66 (2005) (finding prosecutor's marking of juror's race on juror cards supported the proposition that race was a factor). Ms. Lower's declaration makes clear that for her and other jurors, Mr. Hoffman's race was front and center in the jury's sentencing deliberations.

character of inner-city black youth, a particularly toxic manifestation of racial bias. Racial stereotypes that black men are "dangerous" and "criminals" pose a particular risk in capital sentencing. "A juror who believes that blacks are violence prone . . . might well be influenced by that belief" in deciding whether to impose death. *Turner*, 476. U.S. at 35. The impact of this insidious racial stereotyping on the jury's deliberations in Mr. Hoffman's case is clear from the Lower declaration and necessarily impacted the jury's decision to impose the death penalty.

While Lower's declaration does not include the words "I sentenced Mr. Hoffman to death because he is black," it is nonetheless clear—from the jury's explicit discussions of race, race-based hostility, and reliance on racial stereotypes—that race was a significant motivating factor in the verdict, casting "serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict" in this capital case. *Peña-Rodriguez*, 580 U.S. at 208.

## II.    A Death Sentence Tainted by Racial Discrimination Cannot Stand.

"Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 555 (1979). "Permitting racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Pena-Rodriguez*, 580 U.S. at 223 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). *See generally id.* at 222-23 (discussing Supreme Court's efforts "to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system"). And its presence within the jury itself – "a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice'" – is particularly pernicious. *McCleskey v. Kemp*, 481 U.S. 279, 310 (1987) (quoting *Strauder v. West Virginia*, 100 U. S. 303, 309 (1880)). "Because of the risk that the factor of race may enter the criminal justice process, [the Supreme Court] accordingly [has] engaged in 'unceasing efforts' to eradicate racial

prejudice from our criminal justice system." *McCleskey*, 481 U.S. at 309 (quoting *Batson v. Kentucky*, 476 U.S. 79, 85 (1986)).

The Supreme Court has specifically recognized the heightened risk that racial prejudice may infect the capital sentencing decision in light of the wide discretion accorded capital juries:

> Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. On the facts of this case, a juror who believes that blacks are violence prone or morally inferior might well be influenced by that belief in deciding whether petitioner's crime involved the aggravating factors specified under [state] law. Such a juror might also be less favorably inclined toward petitioner's evidence [of] mitigating circumstance[s]. More subtle, less consciously held racial attitudes could also influence a juror's decision in this case. Fear of blacks, which could easily be stirred up by the violent facts of petitioner's crime, might incline a juror to favor the death penalty.
>
> The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence.

*Turner v. Murray*, 476 U.S. 28, 35 (1986).

Clearly the risk that racial prejudice will taint the capital sentencing decision is realized when, as here, a juror who, at the time of trial, appeared to be impartial later reveals her racist bias. Juror Lower's declaration, which she endorsed under oath, indicates that she and other jurors voted to impose the death penalty on the basis of racial stereotypes and extra-record speculation that Mr. Hoffman was a dangerous, seasoned criminal because he is black. Mr. Hoffman's death sentence is accordingly the unreliable and unfair product of racial discrimination, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Mr. Hoffman learned that one or more of the jurors who sentenced him to death secretly harbored racists views when members of his legal team interviewed Ms. Lower during state post-conviction proceedings. Mr. Hoffman raised his racially biased juror claim in state habeas proceedings but the state habeas judge denied him a hearing on the basis of Louisiana's no-impeachment rule, La.C.Evid. 606(B). *See Hoffman*, 326 So.3d at 237. In federal court, Mr.

Hoffman again raised this claim and requested an evidentiary hearing. This Court denied a hearing on the ground that the evidence would be inadmissible under Fed.R.Evid. 606(B) and denied relief. *See Hoffman*, 2012 U.S. Dist. LEXIS 44610, at *64-65. Subsequently, in a successive habeas action, the state courts again denied a hearing, this time on the ground that Ms. Lower's declaration did not indicate a sufficiently egregious degree of racist views. *See Hoffman*, 326 So. 3d at 238. This determination was unreasonable as a matter of fact and law. The state court failed to consider the *Buck* decision in its analysis, although it was highly pertinent to the evaluation of the harm caused by the racist views of Ms. Lower and possibly other jurors reflected in Ms. Lower's declaration. Moreover, the court's determination that the views expressed in the declaration were not sufficiently egregious ignores that Ms. Lower expressed "a particularly noxious strain of racial prejudice," the "powerful racial stereotype [] that [] black men a[re] 'violence prone.'" *Buck*, 580 U.S. at 121 (quoting *Turner*, 476 U. S. at 35 (plurality opinion)).

The state and federal courts' repeated refusal to allow Mr. Hoffman to present evidence to prove that the jury's decision to sentence him to death was tainted by invidious racism was based on legal analysis that *Pena-Rodriguez* and *Buck* have shown to be erroneous. Mr. Hoffman respectfully submits that his initial federal habeas case should be reopened to correct the defective process he received and to allow him the opportunity to prove that his death sentence cannot stand under the Sixth, Eighth, and Fourteenth Amendments.

## III.    The Supreme Court's *Pena-Rodriguez* Decision Establishes The Error Of This Court's Refusal to Allow Factual Development of this Claim.

*Pena-Rodriguez* makes clear that this Court's denial of an evidentiary hearing on the claim that racism tainted the jury's vote to impose the death penalty in this case was wrong. This Court denied a hearing on the ground that evidence that racism influenced the verdicts was inadmissible

under Fed.R.Evid. 606(b). *Hoffman v. Cain*, No. 09-3041, 2012 U.S. Dist. LEXIS 44610, at \*62-65 (E.D. La. Mar. 30, 2012).

In *Pena-Rodriguez*, however, the Supreme Court held that Rule 606(b)'s no-impeachment rule must yield where racial discrimination infiltrates the jury's decision-making in order to secure the defendant's critical constitutional rights to equal protection and a fair trial. As the Court observed, "[r]acial bias of the kind alleged in this case differs in critical ways" from the juror misconduct alleged in the Court's prior cases upholding the no-impeachment rule. *Pena-Rodriguez*, 580 U.S. at 223-24 (citing *McDonald v. Pless*, 238 U.S. 264 (1915), where the petitioner challenged the jurors' method for calculating damages; *Tanner v. United States*, 483 U.S. 107 (1987), where jurors allegedly used drugs and alcohol during deliberations; and *Warger v. Shauers*, 483 U.S. 107 (2014), where it was alleged the foreperson had failed to disclose bias favoring a party during voir dire). Unlike these random anomalies in the jury system, "racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Pena-Rodriguez*, 580 U.S. at 224. Because the typical safeguards for ensuring an impartial jury "may be less effective in rooting out racial bias than other kinds of bias," the Court reasoned, "there is a sound basis to treat racial bias with added precaution," *id.* at 124-25, as the Supreme Court has done "[t]ime and again . . . to enforce the Constitution's guarantee against state sponsored racial discrimination in the jury system," *id.* at 223 (citing cases).

Accordingly, "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 225.

Mr. Hoffman made this very argument to this Court, contending that the evidence of racism in Ms. Lower's declaration "reveals that Petitioner was deprived of the most basic federal constitutional rights to Due Process and Equal Protection under the Fourteenth Amendment, to a fair hearing by an impartial jury under the Sixth Amendment, and to a reliable sentencing under the Eighth Amendment," and that "[e]videntiary rules should not be applied blindly in such a way as to undermine the enforcement of fundamental constitutional rights." Doc. 27 (citing *inter alia Chambers v. Mississippi,* 410 U.S. 284, 302 (1973); *Drew v. Collins,* 964 F. 2d 411, 415-416 (5th Cir. 1992)). *See also Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987); and 27 Wright and Gold, *Federal Practice and Procedure* § 6074 (1990)). But the Court rejected the argument, denying a hearing and denying relief.

On appeal, Mr. Hoffman again raised these issue and again argued that Rule 606(b) cannot bar consideration of the evidence given that the allegations of racism violate "fundamental constitutional rights" and "the particularly invidious nature of racial discrimination," citing *United States v. Villar,* 586 F.3d 76, 87 (1st Cir. 2009) (citing cases) (finding District Court erred in finding Rule 606(b) was absolute bar to hearing juror testimony about racially biased statements made during deliberations because evidence implicated defendant's constitutional rights); Reply, ROA.555-57. *See also United States v. Marrero*, 904 F.2d 251 (5th Cir 1990) (considering juror testimony evidencing juror bias, while applying Rule 606(b) to bar consideration of other juror testimony). Though this Court's denial of an evidentiary hearing was properly before the Fifth Circuit, that Court never addressed the claim.

This Court's denial of an evidentiary hearing to permit Mr. Hoffman to prove that racial bias tainted his death sentence thus constitutes a defect in the integrity of Mr. Hoffman's federal habeas proceedings that this Court, through Fed. R. Civ. P. 60(b)(6), is empowered to correct.

**IV.    Fed. R. Civ. P. 60(b) Provides The Appropriate Mechanism For Allowing Mr. Hoffman the Opportunity to Prove His Claim at an Evidentiary Hearing.**

Rule 60(b) of the Federal Rules of Civil Procedure "allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances, including fraud, mistake, and newly discovered evidence." *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005). Rule 60(b)(6) "permits reopening when the movant shows 'any . . . reason justifying relief from the operation of the judgment' other than the more specific circumstances set out in Rules 60(b)(1)-(5)."[3] *Id.* "Rule 60(b)(6) 'is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses,' [whose] 'broad language . . . gives the courts ample power to vacate judgments whenever such action is appropriate to accomplish justice.'" *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 642 (5th Cir. 2005) (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458 (5th Cir. 1992)).

While the Antiterrorism and Effective Death Penalty Act of 1996 has placed limits on Rule 60(b)'s application in federal habeas proceedings, it appropriately applies to cases like Mr. Hoffman's, which "attack[], not the substance of the federal court's resolution of a claim on the merits, but some defect in the integrity of the federal habeas proceedings," *id.* at 532, in this case the denial of an evidentiary hearing at which Mr. Hoffman could prove his claim that racism in his jury fatally taints his death sentence.

---

[3]  Grounds 1-5 permit judgment to be opened due to

(1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . , misrepresentation, or misconduct by an opposing party; (4) the judgment is void; [and] (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable . . . .

Fed.R.Civ.Proc. 60(b).

"Rule 60(b) vests wide discretion in the courts, but . . . relief under 60(b)(6) is available only in 'extraordinary circumstances.'" *Buck*, 580 U.S. at 123 (quoting *Gonzalez*, 545 U.S. at 535). Such circumstances must be determined on the basis of "a wide range of factors [that] may include, in an appropriate case, 'the risk of injustice to the parties' and 'the risk of undermining the public's confidence in the judicial process.'" *Id.* (quoting *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 863-64 (1988)).

In *Buck*, the Supreme Court held that the district court had abused its discretion in denying relief under Rule 60(b)(6), given proof that the habeas petitioner "may have been sentenced to death in part because of his race." *Id.* This type of error represented a "disturbing departure from a basic premise of our criminal justice system," which "punishes people for what they do, not who they are," a departure "exacerbated because it concerned race." *Id.* In *Buck*, trial counsel had presented expert testimony at sentencing that Buck was more likely to be a future danger because he was black. *Id.* at 107-08. Trial counsel's ineffectiveness in this regard, however, was not raised on direct appeal or in his initial state postconviction proceedings, though it was raised and ruled procedurally defaulted in a second state habeas application. *Id.* at 110. In federal habeas proceedings, the claim was deemed procedurally defaulted, and the merits of the claim were not reached. *Id.* at 110-11.

Following the conclusion of Buck's initial habeas proceedings and a subsequent unsuccessful effort to reopen federal habeas proceedings, *see id*. at 111, intervening Supreme Court decisions established that state habeas counsel's ineffective representation could establish cause to excuse the procedural default of a substantial claim of trial counsel's ineffectiveness. *See Martinez v. Ryan*, 566 U.S. 1 (2012); *Trevino v. Thaler*, 569 U.S. 413 (2013). Based on these new decisions, Buck filed a motion under Rule 60(b)(6) to reopen his claim that his death sentence was

tainted by his trial counsel's ineffectiveness in presenting racially discriminatory expert testimony. The district court denied relief, concluding that Buck had not shown "extraordinary circumstances" and had failed to demonstrate the merits of the underlying claim as the expert only linked race and future dangerousness twice and the effect was accordingly "*de minimis*." *Buck*, 580 U.S. at 114. The Fifth Circuit denied a certificate of appealability to address the claim. *Id.* at 114.

The Supreme Court disagreed with the rulings from both lower federal courts. With respect to the district court's refusal to reopen the case under Rule 60(b)(6), the Court initially concluded that Buck succeeded on the merits of his claim that trial counsel were ineffective in presenting expert testimony linking Buck's race to his future dangerousness, given the centrality of the future dangerousness finding, the stark impropriety of presenting such testimony, and the likelihood that the expert's racist testimony influenced the sentencing jury. *Id.* at 118-22. More pertinent to this Court's inquiry, however, the Supreme Court repudiated the district court's conclusion that the criteria for granting the Rule 60(b)(6) motion was not met because the case did not present "extraordinary circumstances." Rather, the Court observed:

> Buck may have been sentenced to death in part because of his race. As an initial matter, this is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle. As petitioner correctly puts it, "[i]t stretches credulity to characterize Mr. Buck's [ineffective assistance of counsel] claim as run-of-the-mill." Brief for Petitioner 57.

> This departure from basic principle was exacerbated because it concerned race. "Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell*, 443 U. S. 545, 555 . . . (1979). Relying on race to impose a criminal sanction "poisons public confidence" in the judicial process. *Davis v. Ayala*, 576 U. S. ___, ___, 135 S. Ct. 2187 . . . (2015). It thus injures not just the defendant, but "the law as an institution, . . . the community at large, and . . . the democratic ideal reflected in the processes of our courts." *Rose*, 443 U. S., at 556 . . . (internal quotation marks omitted). Such concerns are precisely among those we have identified as supporting relief under Rule 60(b)(6). *See Liljeberg*, 486 U. S., at 864 . . . .

*Id.* at 123-24. That such circumstances were "extraordinary" was "confirmed by what the State itself did in response to [the expert's testimony] in other cases," namely confessing error in five of the six cases the State had identified in which the expert had given such testimony. *Id.* at 124-25. Only Buck's capital sentence had been left untouched. *Id.* Given these circumstances, the Court found, its recent decisions in *Martinez* and *Trevino* provided the mechanism for having Buck's ineffective-assistance claim finally determined on the merits.

The Supreme Court's conclusion that the circumstances in *Buck* were sufficiently "extraordinary" to merit relief under Rule 60(b)(6) fully apply to the facts of Mr. Hoffman's case. Although "intervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6), *Agostini v. Felton*, 521 U.S. 203, 239 (1997), *Buck* clearly shows that that "something more" is presented here. First, the confluence of *Buck* and *Pena-Rodriguez* provides a path for this Court to correct its error in denying an evidentiary hearing to prove his claim, a hearing he first requested 22 years back and has since diligently pursued. More significantly, *Buck* shows that the subject matter of the claim – the likelihood that Mr. Hoffman was "sentenced to death in part because of his race" – is of exceptional importance, representing a "disturbing departure from a basic premise of our criminal justice system" heightened by the "odious" and "pernicious" taint of racial discrimination. *Buck*, 580 U.S. at 123-24; *see also Pena-Rodriguez*, 580 U.S. at 224 (observing that "racial bias [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice" and that it "implicates unique historical, constitutional, and institutional concerns[;]" hence "[a]n effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy"); *id.* at 225

(noting that addressing racial bias in the criminal justice system "is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right."); *cf. Liljeberg*, 486 U.S. at 864 (in granting relief under Rule 60(b) to correct district court's failure to recuse itself based on circumstances creating the appearance of impropriety, the Court noted that "it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process").

Together, *Buck* and *Pena-Rodriguez* establish that this Court should exercise its broad equitable powers under Rule 60(b)(6) to reopen federal habeas proceedings to permit Mr. Hoffman to prove that his death sentence was the unfair and unreliable product of racial bias.

Moreover, two recent Supreme Court cases demonstrate that Mr. Hoffman is reasonably seeking relief under Rule 60(b)(6) motion at this time. The decisions in *Smith v Arizona*, 602 U.S. 779 (2024), and *Andrew v. White*, 145 S. Ct. 75 (2025), together provide a pathway for Mr. Hoffman to seek relief in this Court under Rule 60(b)(6), as they show that *Pena-Rodriguez* was a straightforward application of clearly established federal law, as determined by the United States Supreme Court, is thus fully retroactive, and, accordingly, that Mr. Hoffman now has solid grounds upon which to seek relief under Rule 60(b)(6).

In *Smith*, the Supreme Court addressed whether the Confrontation Clause prohibits testimony by an expert witness who "conveys an absent analyst's statements in support of his opinion." *Smith*, 602 U.S. at 783. In holding that it does, the Court observed that "federal constitutional rights are not typically defined—expanded or contracted—by reference to non-constitutional bodies of law like evidence rules" and that, accordingly, evidence rules could not answer whether the testimony was offered for its truth. *Id.* at 794. *Andrew*, in turn, repudiated

the 10th Circuit's determination that no clearly established Supreme Court precedent addressed whether the admission of prejudicial evidence violated due process. To the contrary, the Court held, "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court," and a long line of Supreme Court decisions established the proper analysis, as "'certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.'" *Andrew*, 220 L. Ed. 2d at 347 (citations omitted).

Here, a long line of Supreme Court decisions establish the fundamental principle that "discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice,' . . . damaging 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State . . . .'" *Pena-Rodriguez*, 580 U.S. at 208 (citations omitted). Clearly established Supreme Court law, existing at the time Mr. Hoffman's conviction and sentence became final, secured the Sixth Amendment right to an impartial jury and the Fourteenth Amendment right to equal protection under the law as a means to safeguard a criminal defendant's right not to be convicted and condemned on the basis of race. *See, e.g.*, *Turner v. Murray*, 476 U.S. 28, 35 (1986) ("The risk of racial prejudice infecting a capital sentencing proceeding is especially serious in light of the complete finality of the death sentence. . . . By refusing to question prospective jurors on racial prejudice, the trial judge failed to adequately protect petitioner's constitutional right to an impartial jury."); *Rose v. Mitchell*, 443 U.S. 545, 555 (1979) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice."). *See also Williams v. Illinois*, 567 U.S. 50, 53 (2012) ("[S]tate evidence rules do not trump a defendant's constitutional right to confrontation."). *See generally Pena-Rodriguez*, 580 U.S. at 222-23 (discussing equal protection and Sixth Amendment

case law).[4] Indeed, Justice Kennedy, who authored *Pena-Rodriguez*, observed years before that a ruling addressing the "important questions of federal law" posed by the exclusion of juror testimony evidencing a juror's racism would not be *Teague*-barred. *See Spencer v. Georgia*, 500 U.S. 960, 960 (1991) (Kennedy, J., concurring in the denial of certiorari) (observing that "if I thought our decision in *Teague* . . . would prevent us from reaching those issues on federal habeas review, I would have voted to grant certiorari.  I have confidence that petitioner's equal protection claim will not be barred in federal habeas corpus proceedings by *Teague* and its progeny . . . .").

*Pena-Rodriguez* simply applied this clearly established law in holding that Mr. Pena-Rodriguez's right not to be convicted on the basis of a juror's racist views trumped no-impeachment evidentiary rules. *Smith* and *Andrews* make clear that the decisions holding to the contrary are no bar to Mr. Hoffman's motion to reopen the judgment to cure this Court's prior error in denying him an evidentiary hearing on his racist-juror claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Hoffman respectfully requests that the Court grant his motion to relieve him from the final judgment in this matter and permit him the opportunity to prove that his death sentence was fatally tainted by racial discrimination, in violation of Mr. Hoffman's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

[4] In *Pena-Rodriguez*, moreover, the Supreme Court noted that previous decisions had recognized that the no-impeachment rule may give way in the "'gravest and most important cases' where exclusion of juror affidavits might well violate 'the plainest principles of justice.'" *Pena-Rodriguez*, 580 U.S. at 216 (quoting *United States v. Reid*, 53 U.S. 361, 366 (1852), and *McDonald v. Pless*, 238 U.S. 264, 269 (1915)).  There was nothing new in the Court's recognition that evidence that racial bias motivated a verdict satisfies those narrow exceptions.

**Respectfully Submitted,**

s/  Rebecca L. Hudsmith, La. Bar No. 07052
Rebecca L. Hudsmith
FEDERAL PUBLIC DEFENDER FOR THE
MIDDLE AND WESTERN DISTRICTS OF
LOUISIANA
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Phone:  337-262-6336
Facsimile:  337-262-6605
Email: Rebecca_Hudsmith@fd.org

## CERTIFICATE OF SERVICE

This certifies that I electronically filed the foregoing motion, along with the proposed order,

with the Clerk of Court by using the CM/ECF system that will send a notice of electronic filing to

all counsel of record on this 17th day of March, 2025.

/s Rebecca L. Hudsmith